DANIEL J. WEINBERG (SBN 227159)
dweinberg@fawlaw.com
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California  94065
Telephone:      (650) 593-6300
Facsimile:      (650) 593-6301

VALERIA CALAFIORE HEALY (*pro hac vice* pending)
valeria.healy@healylex.com
HEALY LLC
154 Grand Street
New York, New York  10013
Telephone:      (212) 810-0377
Facsimile:      (212) 810-7036

Attorneys for Plaintiff
LOOP AI LABS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS INC., a Delaware corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962 *ET SEQ.*;** |
| ANNA GATTI, an individual, ALMAVIVA S.p.A., an Italian corporation, ALMAWAVE S.r.l. an Italian corporation, ALMAWAVE USA, Inc., a California corporation, IQSYSTEM LLC, a California limited liability company, IQSYSTEM, Inc., a Delaware corporation, | **(2) COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §§ 1030 *ET SEQ.* AND UNAUTHORIZED ACCESS TO COMPUTERS, CAL. PENAL CODE §§ 502 *ET SEQ.*;** |
| Defendants. | **(3) FRAUD IN THE INDUCEMENT;** |
| | **(4) RESCISSION AND RESTITUTION;** |
| | **(5) FRAUD;** |
| | **(6) BREACH OF CONTRACT;** |
| | **(7) BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING;** |
| | **(8) THEFT OF CORPORATE OPPORTUNITY;** |

COMPLAINT

**(9) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

**(10) TORTIOUS INTERFERENCE WITH CONTRACT;**

**(11) MISAPPROPRIATION OF TRADE SECRETS, CAL. CIVIL CODE §§ 3426 *ET SEQ.*;**

**(12) CONVERSION;**

**(13) UNFAIR COMPETITION, CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*;**

**(14) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

1        Plaintiff Loop AI Labs Inc., formerly known as Soshoma, (the "Company"), with

2   knowledge as to its own conduct and upon information and belief as to all others, complains

3   against Anna Gatti ("Gatti"), Almaviva S.p.A, Almawave S.r.l., Almawave USA Inc. (together,

4   the "Almaviva Defendants"), IQSystem LLC and IQSystem, Inc. (together "IQS"), as well as

5   against their as yet unnamed co-conspirators, as follows:

6                    **SUMMARY AND NATURE OF THE ACTION**

7        1.       This is a case involving multiple acts of fraud and willful misappropriation of

8   proprietary information and trade secrets committed by Gatti, IQS and the Almaviva Defendants,

9   in furtherance of a scheme of racketeering activities directed at the Company.  The Defendants'

10   unlawful activities also were committed in violation of various contractual and other obligations.

11        2.       The Company, a startup founded in 2012, seeks to deploy its proprietary artificial

12   intelligence ("AI") technology, that automatically learns about people and things by

13   understanding the internet-based data related to them, by automatically converting unstructured

14   big data and social data to structured data, which can then be used by companies in a wide variety

15   of industries to understand their customers, products, and more without the need to hire data

16   scientists.  The Company also has developed, among other things, a Digital Genome Platform that

17   works automatically without human intervention to perform speech and text analytics, semantic

18   understanding, data/text mining, information/feature discovery and sentiment analysis on any data

19   set of big data or social data.

20        3.       In this action, the Company seeks legal and equitable relief in respect of the

21   injuries caused by the unlawful conduct of the Company's recently terminated employee,

22   Defendant Gatti, the other Defendants and their co-conspirators, including Gatti's boyfriend Tony

23   DiNapoli.  The Company discovered this wrongdoing only recently, after terminating Gatti as an

24   officer and employee of the Company on February 3, 2015.

25        4.       Gatti was the Chief Executive Officer of the Company from mid-2012 until late

26   2014, when Gatti's position was changed to that of President.  When Gatti first joined the

27   Company in 2012, she entered into various written agreements defining the terms of her

28   employment with the Company.  Pursuant to her employment compensation package, Gatti

                                    -1-                          COMPLAINT

received a large restricted stock grant, covering shares that today represent approximately 30% of the Company's outstanding shares. The employment agreements that Gatti entered into with the Company provided, among other things, that she was required to devote her full-time business efforts to the Company, that she could not engage in any other business activities without the Company's prior written consent, and that she was required to protect the confidentiality of the Company's proprietary information, technology and trade secrets.

5. Gatti's principle assigned role with the Company was to assist it in its venture capital fund raising activities and closing business partnerships. Gatti's performance in this role was a failure. As a result, the Company recently terminated her employment. Gatti was also removed as a director of the Company shortly thereafter.

6. At the time of Gatti's termination, the Company believed that her failure to perform her assigned duties was the result of her incompetence. Following Gatti's termination, however, the Company discovered that while Gatti had indeed performed in an incompetent manner, she and the other Defendants also had engaged in a pattern of intentional wrongdoing designed to defraud the Company and enrich Gatti and the other Defendants at the expense of the Company. That wrongdoing is more fully described below.

7. After Gatti was fired, the Company discovered that she had provided materially false information in applying for employment with the Company in 2012, including, but not limited to, submitting false information in her written application, which she certified to the Company be true and correct.

8. Gatti *did not* engage in mere puffery while seeking employment with the Company. The lies Gatti told when she applied for her job at the Company went far beyond improper-but-frequently-expected fibbing. The Company has now learned that a substantial, if not the entire, picture that Gatti painted of herself during the application process is false. Her true credentials and capabilities were utterly different from those she presented. There can be no doubt that, had Gatti told the truth, her request for employment with the Company would have been summarily rejected.

COMPLAINT

1   9.  For instance, the Company has learned that during her employment application

2 process, Gatti falsified her academic credentials, which she represented to have included both a

3 PhD and a Post-Doctorate degree from Stanford University, as well as other academic credentials.

4 In fact, Gatti never received these degrees from Stanford University.  Gatti also represented to

5 have been a Visiting Professor at Stanford University, as well as at the University of California,

6 Berkeley.  Gatti never has held such positions at either university.

7   10.  Gatti misrepresented her employment history by substantially exaggerating her

8 prior compensation, by failing to disclose that she had been terminated by her previous employer

9 and by misrepresenting the periods of time for which she had been employed, among other

10 material falsehoods.  And Gatti falsely claimed to have skills and relationships that would enable

11 the Company to raise the venture capital funding and develop the business partnerships that it

12 required (and continues to require) when in fact (as demonstrated by her abject failure to obtain

13 any such funding or business partnerships for the Company) she does not have those skills or

14 relationships.  Gatti carefully manufactured this and other information to deceive the Company

15 and induce it to hire her and provide her a compensation package that includes stock representing

16 30% of the Company.

17   11.  The Company was shocked to learn, in February 2015, of Gatti's false statements

18 and other dishonest conduct.  Before Gatti was hired, the Company checked the references she

19 provided, which were uniformly positive.  Gatti had carefully cultivated, through deceit and other

20 tactics, a network of supporters in the Northern California technology industry as well as in Italy.

21 Through her deceitful behavior, often deployed through the use of her social networks and

22 activities, Gatti has been able to insinuate herself at the highest level and obtain the support of

23 highly established and reputable professionals, presumably unaware of Gatti's true history.

24   12.  Throughout the course of her employment with the Company, Gatti wholly failed

25 to perform her principal assigned task of obtaining venture capital funding for the Company and

26 closing business partnerships.  Gatti ***did not*** simply do her very best for the Company only to fail

27 for reasons largely outside her control.  Gatti instead proved to be an utterly disloyal employee,

28 who was spending her time defrauding the Company.

       COMPLAINT

13.     As the Company has now learned, almost immediately after being hired by the Company into a full-time senior executive position, Gatti began violating the express terms of her employment agreement by seeking and taking on additional positions with other businesses.

14.     While still pretending to work in a full-time senior executive role for the Company, Gatti was providing "advisory" services for multiple competing startups, including The Needs Inc. ("The Needs").  As of January 2014, Gatti, incredibly, took *a concurrent CEO position with another company, defendant Almawave USA Inc.*, that she held at the same time that she continued *to be employed as the <u>full-time</u> CEO, and later as the <u>full-time</u> President, of the Company*.

15.     While Gatti was unlawfully working for Almawave and The Needs, both of those companies were actually or potentially competing with the Company.  The Needs is a startup, formed one year after the Company, that is seeking to develop commercial applications based on the same artificial intelligence, language understanding of big data and user profiling technologies as the Company.  Indeed, the Chief Executive Officer of The Needs, before retaining Gatti as a consultant, questioned Gatti as to whether the consulting arrangement, into which she pushed The Needs to enter with her, would not be improper because The Needs was a competitor of the Company.  Gatti responded with a lie – she assured The Needs' Chief Executive Officer by email that there was no competitive problem.

16.     Similarly, defendant Almawave sought to establish a business in San Francisco that focused on the use of artificial intelligence in a manner similar to the Company's technology. Gatti's improper relationship with Almawave began not later than January 2014, as a result of Gatti's negotiations with a large European company, defendant Almaviva S.p.A ("Almaviva IT"). Gatti undertook to assist Almaviva IT to implement its strategy of building a U.S. business focused on artificial intelligence and related technologies.  Pursuant to this arrangement, Gatti established Almawave USA in San Francisco on behalf of Almaviva IT, and domiciled the company at her home residence at 24 Clarendon Avenue in San Francisco.

17.     The Almaviva Defendants knew that Gatti was the full-time CEO of the Company. In order to quickly establish a presence in the U.S. AI technology market, the Almaviva

1     Defendants intended, with Gatti's assistance from the inside, to purchase the Company for a

2     bargain price or to hire away the Company's key employees, and thereby obtain access to the

3     Company's proprietary technology.  A principal objective of the Almaviva Defendants in hiring

4     Gatti was to exploit her knowledge of the Company and to gain access to the Company's

5     proprietary technology and trade secret information.

6         18.        Despite the fact that Almawave and The Needs both were actual or potential

7     competitors of the Company, Gatti shared with both Almawave and The Needs (as well as with

8     the other Defendants), and used in the course of providing services to those companies,

9     proprietary information and other property belonging to the Company.  In addition, Gatti

10    repeatedly used the Company's time, property, IT system, work-space and other resources to

11    conduct business on behalf of the Almaviva Defendants and TheNeeds.  Gatti also diverted to the

12    Almaviva Defendants and The Needs information belonging to the Company regarding current

13    and prospective investors, business opportunities, software engineers, advisors and a variety of

14    other confidential and trade secret information.  In doing so, Gatti and the other Defendants, in

15    addition to committing multiple violations under federal and state law, also violated the express

16    provisions of Gatti's employment agreement.

17        19.        The Company has recently discovered that Gatti has held positions with other

18    companies while employed by the Company since the inception of her employment in 2012 and

19    has continued to hold other positions through her termination.  As of January 2015, while still

20    employed by the Company, and notwithstanding the already numerous positions that Gatti

21    already held, Gatti actively was negotiating for yet more business relationships, including most

22    recently with a company called IControl Networks.

23        20.        Gatti's employment agreement required her to devote her full-time and best

24    business efforts to the Company and expressly prohibited her from engaging in any other business

25    activities to the detriment of the Company and without the express prior written consent of the

26    Company.  Aware that the Company would never consent to her working multiple jobs at the

27    same time, including jobs involving actual and potential competitors, Gatti did not seek consent

28    from the Company to her second and third jobs with Almaviva and The Needs, as she was

1    required to do. Nor did she ever seek consent for any of the other positions she held. Instead,

2    Gatti deliberately concealed from the Company her unlawful activities.

3        21.    Gatti and the other Defendants profited handsomely from the unlawful scheme

4    perpetrated against the Company. Gatti received a substantial stock grant in The Needs. She

5    received various lucrative benefits from the Almaviva Defendants, including large cash payments

6    of no less than $70,000 a month. Gatti also received substantial compensation from other third

7    parties for whom she performed various business services or provided stolen information and

8    trade secrets, in violation of her contractual and other obligations.

9        22.    Gatti also concealed from the Company that she had established the two IQS

10   Defendants, as well as the Almawave USA Defendant. Gatti created the IQS Defendants, also

11   domiciled at her home residence, to funnel the money that she was receiving as compensation for

12   her illegal activities. That compensation amounted to hundreds of thousands of dollars, if not

13   millions. The Company is informed and believes that the Almaviva Defendants alone were

14   paying Gatti more than $70,000 a month to participate in this unlawful scheme. Similarly, the

15   Company is informed and believes that Gatti, through the IQS Defendants, was receiving

16   hundreds of thousands of dollars in other compensation obtained in furtherance the scheme.

17       23.    To conceal the large compensation that Gatti was receiving through the IQS

18   Defendants, and potentially other entities, Gatti, aided by her longtime boyfriend and participant

19   in this scheme, Tony DiNapoli, opened multiple bank accounts on both the East and West Coasts,

20   as well as in Italy, to make detection of the various unlawful payments as difficult as possible,

21   and, presumably, to conceal the funds if she was caught. Gatti's correspondence reflects that she

22   was even pondering the use of yet other entities to transfer money to her, through the IQS

23   Defendants, in a way that made it look as if the money came from and belonged to her

24   boyfriend's son, Gennaro DiNapoli. Gatti's and the other defendants' conduct uncovered to date

25   demonstrates the high level architecture and execution of this fraudulent, if not criminal, scheme

26   they perpetrated against the Company.

27       24.    Presumably aware that her fraudulent and duplicitous behavior in working for

28   competitors, even as she was required to work full-time for the Company, could not long evade

1    detection, by February 2014, Gatti, with the assistance and participation of the Almaviva

2    Defendants and the other conspirators, was actively pursuing the take-the-money-and-run part of

3    her scheme, designed to force a premature sale of the Company by sabotaging the Company's

4    access to venture capital funding.

5         25.      This scheme would allow Gatti to cash out and move on before being caught.  If

6    the Company could be sold before the Defendants' wrongdoing was discovered, the vesting of

7    Gatti's restricted stock would accelerate and she would be able to walk away with a potentially

8    significant sum without compromising the massive cash flow she was receiving from the

9    Almaviva Defendants and other companies.  If instead the Company discovered her duplicitous

10   conduct before it was sold (as has turned out to be the case), Gatti would face the prospect of

11   forfeiting everything and losing her carefully-cultivated reputation in the Northern California

12   technology industry and in the Italian business community.  The Almaviva Defendants would

13   profit by being able to access the Company's assets and key employees for a substantially lesser

14   value than they would have otherwise have had to pay.

15        26.      A principal component of Gatti's scheme to force a premature sale of the

16   Company involved sabotaging the Company's access to funding, including venture capital.  Thus,

17   although Gatti had been singularly unsuccessful in obtaining venture capital funding for the

18   Company, other Company employees proved much more adept, leading to several occasions

19   where the Company was on the verge of securing funds.  But in every one of those situations,

20   Gatti managed to insinuate herself into the potential funding transaction and then prevent it from

21   closing.  Gatti then covered up her sabotage by claiming she had made a mistake, or that she had

22   miscommunicated with the investment funds, or that the prospective funding source had disliked

23   one of the other Company employees.

24        27.      In one such instance, for example, after a venture capital fund agreed to provide

25   the Company a substantial amount of funding, including an immediate bridge amount to be paid

26   in October 2014.  In connection with this investment, the venture capital fund commented that

27   "the Loop AI Labs team has built a new generation of AI that puts them a leap ahead."  Indeed,

28   the Company had been selected to participate in Beta Track at the Web Summit, and, the bridge

1    funding was going to provide additional support the Company's efforts during that period.

2        28.        Gatti worked hard to destroy this opportunity and ensure that the funds would not

3    be provided.  Some of the wrongdoing in which Gatti engaged to destroy this transaction

4    included, but was not limited, to repeatedly lying to the Company about the need for the

5    Company to refrain from accepting any other investor money pending this investment.  Gatti told

6    her colleagues at the Company that the venture capital fund would not proceed if other parties

7    invested at the same time.  In reliance on Gatti's misrepresentation of the fund's position, the

8    Company turned down other investors that had asked to invest during that period of time.

9    Thereafter, the Company learned that the fund, without any reason, had decided not to go through

10   with the funding.  When the Company had a call with the fund to clarify the situation, the

11   Company was shocked to learn of Gatti's lies, which Gatti dismissed during the call as having

12   been a misunderstanding between her and the fund.  As a result of Gatti's fraudulent conduct, she

13   achieved her goal of mining company funding, because the Company lost both investments.

14       29.        This was just one of several investment transactions that Gatti intentionally

15   destroyed to bring the Company into an immediate financial crisis and be left with no choice but

16   to sell.

17       30.        The harm suffered by the Company as a result of the funding failures caused by

18   Gatti is substantial. Gatti, acting in furtherance of her scheme with the other defendants, caused

19   the Company to lose millions of dollars that investors had already committed to providing.  The

20   lack of funding caused by Gatti's scheme has forced the Company to defer additional investments

21   in its product development, thereby slowing its introduction and marketing of new products to

22   market and making the Company more vulnerable to competitors.

23       31.        Gatti's misconduct did not stop after her termination.  After Gatti was terminated

24   from the Company and removed from the Company's Board of Directors, Gatti continued to

25   communicate with the Company's employees and its existing investors with the intent to cause

26   further damage to the Company.  For example, in an email she sent to the Company's current

27   shareholders dated February 13, 2015, Gatti falsely claimed that she had voluntarily stepped

28   down from her executive position at the Company, and that she was appointed Chairman of the

1  Company, which is defined as the most powerful member on the board of directors who provides

2  leadership to the firm's officers and executives. Gatti claimed, writing in that impostor capacity,

3  that she was advising the Company and its investors to remain focused on fundraising. These

4  false and misleading communications have confused the Company's employees and investors,

5  who had been informed that Gatti was terminated. Gatti's continuing wrongdoing has caused

6  further harm to the Company by demoralizing employees and making investors reluctant to

7  provide additional funding to the Company.

8        32.     When the Company informed Gatti, following her termination, that it had

9  uncovered serious wrongdoing by her and the other defendants, Gatti proceeded to destroy

10  materials belonging to the Company and to take other steps to impede the Company's

11  investigation. This activity on Gatti's part has included retaining a computer expert to delete data

12  on a laptop computer that is owned by the Company (and that she failed to return as she was

13  contractually required) and deleting her calendar and other information from the Company's IT

14  system.

15        33.     Based on the foregoing, it is clear that Gatti's and the other defendants' unlawful

16  activities, including their use of the wires to engage in multiple acts of fraud against the

17  Company, and their continued use and destruction of stolen Company property are expected to

18  continue unless enjoined by a Court. If those unlawful activities are allowed to continue, they

19  will cause substantial and irreparable harm to the Company.

20        34.     To remedy the defendants' egregious and unlawful conduct described herein, the

21  Company seeks equitable relief in the form of (i) temporary, preliminary and permanent

22  injunctive relief restraining the defendants' unlawful acts, (ii) rescission of the restricted stock

23  grant made by the Company to Gatti and (iii) disgorgement of all proceeds and other benefits

24  obtained by the defendants from their unlawful activity. The Company also seeks damages

25  against the defendants, jointly and severally, such damages to be trebled pursuant to the

26  provisions of the Racketeer Influenced and Corrupt Organizations Act, as well as recovery of all

27  costs and expenses incurred in this action.

28

          COMPLAINT

**THE PARTIES**

35.      Plaintiff Loop AI Labs Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

36.      Upon information and belief, Defendant Anna Gatti ("Gatti") is an individual residing at 24 Clarendon Avenue in San Francisco, California.

37.      Upon information and belief, Defendant IQSystem LLC is a limited liability company established under the laws of the State of California on January 21, 2014, domiciled at one of Gatti's personal residences in San Francisco.  Upon information and belief, Defendant Gatti is the sole member of IQSystem LLC.  Gatti created IQSystem LLC to receive payments resulting from her wrongdoing committed against the Company.  The Company is informed and believes that during the time period relevant herein, through IQS, Gatti received hundreds of thousands of dollars from the Defendants and other parties, in exchange for Gatti's provision of illegal property and services.  As a result of the large profits that Gatti was unlawfully making at the expense of the Company, Gatti was able to afford a very luxurious lifestyle, which, in the last few months alone, included such expenses as making an offer via IQS to buy a luxury condo at the Ritz Carlton costing more than $1.5 million, buying a Maserati for herself and a Porsche for her boyfriend,  going on luxury vacations, and booking expensive business class tickets to Europe for her and her boyfriend.

38.      Upon information and belief, Defendant IQSystem Inc. is a Delaware Corporation that Gatti caused to be created for the same purposes described above in respect of IQSystem LLC.  The two IQSystem entities were created in Delaware and California to make detection and discovery of Gatti and the other Defendants' wrongdoing more difficult.  For similar purposes, Gatti caused multiple bank accounts to be opened in the name of various Defendants as well as other individuals and entities, in order to safeguard her loot in the event she would be caught. (IQSystem LLC and IQSystem Inc. together referred to as "IQS").

39.      Defendant Almaviva S.p.A. ("Almaviva IT") is an Italian company with its principal place of business in Rome, Italy.  Almaviva IT holds itself out as a top Italian information and technology company, with international operations throughout the world.

1    Almaviva's executives and board members were directly involved in every aspect of the scheme

2    and conspiracy orchestrated by Gatti against the Company in San Francisco.  Almaviva IT sent

3    their highest-level executives repeatedly to San Francisco to oversee Gatti's unlawful activities

4    against the Company, and continuously used the wires (both telephone and email) to carry out the

5    conspiracy with Ms. Gatti and her boyfriend, Tony DiNapoli, in San Francisco.

6        40.      Defendant Almawave S.r.l. ("Almawave IT") is an Italian company with its

7    principal place of business in Rome, Italy.  Almawave IT holds itself out as doing business all

8    over the world, including in the United States, through the company created by Gatti.  The

9    highest-level executives of Almaviva IT, including Marco Tripi ("Tripi") and his wife Valeria

10   Sandei ("Sandei"), who were the main participants and the ones who authorized and financed the

11   wrongful scheme against the Company, are key executives in both Almawave IT, and its parent

12   company Almaviva IT.

13       41.      Defendant Almawave USA Inc. is a California corporation that Gatti caused to be

14   incorporated in May 2014, with its principal place of business listed at Gatti's residence at 24

15   Clarendon Avenue in San Francisco, California.

16                              **OTHER CO-CONSPIRATORS**

17       42.      Antonio or Tony DiNapoli ("DiNapoli"), an individual residing in San Francisco

18   at 24 Clarendon Avenue with Gatti, actively participated in the conspiracy by aiding and abetting

19   Gatti, IQS and the Almaviva Defendants in misappropriating the Company's tangible and

20   intangible assets and properties, and in concealing from the Company the Defendants'

21   wrongdoing.

22       43.      Manuela Micoli ("Micoli"), an individual residing in San Francisco, also actively

23   participated in the conspiracy and assisted Gatti, DiNapoli and the other Defendants in

24   perpetrating the wrongdoing against the Company, and keeping said wrongdoing concealed from

25   the Company.  Among other things, Micoli and DiNapoli, took steps in furtherance of the

26   racketeering scheme being perpetrated against the Company by intentionally obtaining access to

27   the Company's office through the use of false pretenses and deception.

28

44.     On information and belief, and based upon the company's current investigation other individuals, Peter Huang ("Huang") actively assisted Gatti and the other Defendants in the same manner as described in respect of DiNapoli and Micoli.  These individuals were hired by Gatti to help her and the other Defendants steal from the Company.  Among other things, Gatti gave Huang access to the Company's electronic accounting system, and falsely represented to the Company's bank in San Francisco that Huang was permitted to obtain access to the Company's bank.

45.     Upon information and belief, Dario Vignudelli ("DV") is an individual residing in Seattle, Washington.  DV is a former consultant of the Company and while employed by the Company, DV aided and abetted Gatti and the other Defendants in her wrongdoing, including by taking the Company's confidential information and trade secrets and using it for the Almaviva Defendants.

46.     On information and belief, The Needs and its Chief Executive officer, Gabriele Pansa, both domiciled in San Francisco, conspired with Gatti and the other Defendants to engage and facilitate the wrongdoing described herein.

47.     The Company's investigation is ongoing and these, as well as additional individuals and entities will be joined in the action as will be appropriate.

**JURISDICTION**

48.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, based on Plaintiff's claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1964 *et seq*. and the Computer Fraud and Abuse Act, 18 U.S.C.§§ 1030 *et seq*..

49.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), because all remaining claims are so related to the claims in the action within this Court's original jurisdiction that they form part of the same controversy.

50.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to Plaintiff's claims alleged in this Complaint occurred in this district.

COMPLAINT

51.     This Court has personal jurisdiction over Gatti, IQSystem LLC and Almawave USA because they are domiciled in San Francisco at Gatti's home residences and because they engaged in and directed a substantial part of their wrongdoing against the Company in San Francisco.

52.     This Court also has personal jurisdiction over the foreign Defendants Almaviva IT, Almawave IT, and IQSystem Inc. (together, the "Foreign Defendants") because at all times relevant to this action, these Defendants have maintained systematic and continuous contacts with California while engaging in the acts described in this Complaint.  In addition, this Court has personal jurisdiction over the Foreign Defendants as a result of their pattern of wrongful and tortious activities directed against the Company in San Francisco.

                    **INTRADISTRICT ASSIGNMENT**

53.     Pursuant to Local Rule 3-2(d), this action arises in San Francisco County and shall be assigned to the San Francisco Division or the Oakland Division.

        **GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A.      The Company Entered Into The Stock Purchase Agreement In Reliance Upon Gatti's Materially False And Misleading Representations.**

54.     Gatti induced the Company to hire her and execute the Stock Purchase Agreement dated August 3, 2012 ("SPA") by intentionally providing the Company's founder materially false information.

55.     In January 2012, the Company's founder traveled to the United States to hold meetings relating to the launch of the Company.  At that time, the founder, accompanied by one of his Italian friends, agreed to meet with Gatti because he was seeking someone who could work for the Company in obtaining venture capital funding, find business partnerships and manage the operations.

56.     Gatti expressed strong and insistent interest in becoming part of the soon to be formed company.  In order to persuade the Company's founder to consider her, Gatti claimed that she had extensive academic credentials and significant experience in the field, as well as an extensive network of funding and other business sources in San Francisco and Silicon Valley, and

that she would be able to bring funding and business partnerships to the Company.  Gatti claimed that she would be able to bring the funding that the Company would need from her sources.  During these meetings and communications, which continued from January 2012 for several months, Gatti repeatedly maintained her story about her background, abilities, and connections in order to persuade the Company's founder to agree that the Company should hire her and join his team in the Company.

57.     Having convinced the Company's founder that she has the right credentials and was the right fit for the Company, Gatti proceeded to provide false statements about her then current work.  Gatti claimed that she was a high-level executive at Skype Inc., from which she was receiving cash compensation of $450,000 a year plus stock options.  Gatti claimed that she could not leave such a lucrative position to join the startup Company, unless the Company agreed to give her a compensation package that included a substantial share of the company, in exchange for which she would agree to a lower salary than what she was allegedly receiving from Skype Inc.

58.     Gatti also directed the founder to verify her background and credentials directly by reference to materials available in the public domain, including interviews by highly reputable Italian newspapers and a resume that she submitted under penalty of perjury for filing with the Italian Bourse, as well other materials and interviews that she had given to Italian newspapers.

59.     Gatti claimed that she was an independent director in an Italian public company but that her role was terminating.  Gatti also claimed that in exchange for the large share of the Company that she demanded (which, when fully vested would have amounted to approximately 30% of the Company) to purportedly leave her job at Skype, and wind down her director position with Italian company Buongiorno, she would focus one hundred percent of her time and effort on the Company, as she subsequently contractually agreed to do.

60.     Gatti also claimed that in order for her to carry out her role of bringing funding and business opportunities to the Company, she required the title of Chief Executive Officer.

61.     The Company is now informed and believes that Gatti's representations made to induce the Company to hire her, give her a large percentage of shares in the Company, as well as

a key executive position, were false.  Gatti made these fraudulent representations to induce the Company to give her that which Gatti could never have received had the Company known the truth.

62.     The Company is now informed and believes that Gatti, in fact, had been fired by Skype and that as of April 2012, Gatti was unemployed and was desperately looking for any other employment she could find.  Contrary to Gatti's material misrepresentations to the Company, Gatti was not leaving her employment at Skype to join the Company and was not earning the high compensation that she represented to the Company she would have to forego.

63.     In reliance on Gatti's representations, the Company agreed to give her a very expensive compensation package, including by agreeing to give her almost 30% of the Company, to make up for the alleged reduction in her cash compensation that Gatti falsely represented she would have had to take.

64.     Gatti used these and other materially false representations to defraud the Company and induce it to hire her and enter into the Stock Purchase Agreement.

65.     By this conduct, Gatti was able to fraudulently obtain shares in the Company that she would not otherwise have obtained, thereby damaging the Company.

**B.     Gatti's Contractual Obligations To The Company.**

66.     The Company's award to Gatti of restricted shares in the Company was made pursuant the SPA.  The award of shares to Gatti was inextricably intertwined and conditioned upon Gatti's employment obligations to the Company.  Specifically, the vesting of any shares awarded Gatti under the SPA was conditioned on her "Continued Service Status" with the Company and provided a 1-year cliff before any vesting would begin.  After the first year, any additional vesting of shares in the Company continued to be conditioned on Gatti's Continued Service Status.  The SPA provides that in the event of a voluntary or involuntary termination of Gatti's Continuous Service Status, the Company was entitled to repurchase 100% of the shares that had not yet vested in accordance with SPA's vesting provisions.

67.     Gatti's employment obligations with the Company were memorialized in an Offer Letter (the "Executed OL") and in a Confidential Information and Invention Assignment

1   Agreement (the "CIIAA"), both of which were executed by Gatti on October 3, 2012 (the

2   Executed OL and the CIIAA together referred to as the "Employment Agreement").

3       68.      Under the terms of Gatti's Employment Agreement, Gatti agreed among other

4   things, to the following contractual provisions:

5       • "**Position.** You will start in a full-time position as Chief Executive Officer…. By
         signing this letter, you confirm with the Company that you are under no
6         contractual or other legal obligation that would prohibit you from performing your
7         duties with the Company." Executed OL at § 1.

8       • "**Outside Activities.** While you render services to the Company, ***you agree that
         you will not engage in any other employment, consulting or other business
9         activity without the written consent of the Company.*** In addition, while you
10        render services to the Company, ***you will not assist any person or entity in
         competing with the Company, in preparing to compete with the Company or in
11        hiring any employees or consultants of the Company***." *Id.* at § 7 (emphasis
         added)

12

13      69.      In the CIIAA, Gatti further agreed that as "a condition of [her] becoming

14  employed (or [her] employment being continued) by" the Company, she would be bound by the

15  following obligations relevant to this action:

16      • "**Relationship.** [] Any such employment or consulting relationship between the
         parties hereto, whether commenced prior to, upon or after the date of this
17        Agreement, is referred to herein as the "Relationship." CIIAA at § 1.

18      • "**Duties**. [] During the Relationship, ***I will devote my entire best business efforts
         to the interests of the Company and will not engage in other employment or in
19        any activities detrimental to the best interests of the Company without the prior
20        written consent of the Company.***" *Id.* at § 2.

21      70.      Gatti also agreed under the CIIA to extensive confidentiality provisions which

22  covered, but were not limited to, the Company's:

23          technical data, trade secrets, know-how, research, product or service ideas or plans,
            software codes and designs, algorithms, developments, inventions, patent applications,
24          laboratory notebooks, process, formulas, techniques … engineering designs and
            drawings, hardware configuration information, agreements with third parties, lists of,
25          or information relating to, employees and consultants of the Company (including, but
            not limited to, the names, contact information, jobs, compensation, and expertise of
26          such employees and consultants), lists of, or information relating to, suppliers and
            customers (including, but not limited to, customers of the Company on whom I called
27          or with whom I became acquainted during the Relationship), price lists, pricing
28

COMPLAINT

methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally or by observation. *Id.* at § 3(b).

71.     Gatti's confidentiality obligations continued following termination of her employment.

72.     Gatti further agreed to act in the best interest of the Company at all times during the Relationship, including, but not limiting, by agreeing to comply with the following obligations:

- **"8.  Solicitation of Employees, Consultants and Other Parties.**  As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company.  I further agree as follows:

    a.     **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

    b.     **Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.  In addition, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship.  I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant. *Id.* at § 8(a)-(b).

73.     Gatti also agreed to be bound by an extensive "No Conflicts" provision, which provided, in relevant part:

COMPLAINT

- **"No Conflicts.** []  I acknowledge and agree that I have listed on Exhibit A all agreements … if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.  *Id.* at § 10(b).

## C.    Unlawful Activities By Gatti And The Other Defendants Since October 2012.

74.    Vesting of Gatti's shares under the SPA was conditioned on her continued employment in compliance with the terms of her agreements.  Under the SPA, had Gatti left or been terminated during the first year of employment, Gatti would not have vested a single share in the Company due to the SPA's 1-year cliff before vesting began.  Thereafter, Gatti's shares were to continue to vest based on her continued employment with the Company for a period of 4 years.

75.     In furtherance of her scheme, from as early as October 2012, Gatti proceeded to engage in, and conceal, the numerous activities she was undertaking in violation of her contractual and other obligations to the Company.  Since at least January 2014, the other Defendants participated and furthered Gatti's scheme against the Company.

76.    Gatti was able to avoid detection for as long as she did because of her role in the Company as CEO and later President.  Gatti's title and her assigned role to obtain venture capital funding for the Company inevitably gave her a great deal of flexibility and made it difficult for the other members of the Company's management and Board to effectively oversee her activity on behalf of the Company.  Gatti was expected to network within the venture capital community and the Northern California technology world, with a view to building awareness of the Company and the value of its proprietary technology, to gather market intelligence that would be useful to the Company, and to find and close financing from investors.  As a result, her extended absences from the Company's offices, and her regular appointments with people not directly associated with the Company, raised no suspicions because the appearances were consistent with the Company's expectations with respect to her assigned role.  In addition, Gatti is a convincing liar, and was able to perpetrate this fraud through her masterful use of cover-ups and

1    misrepresentations.  Thus, the Company had no basis to question her activities or motives, and

2    she repeatedly cultivated the Companies' employees and their families to perpetrate her deception

3    and ensure they would have no reason to question her.  In fact, when Gatti used the Company's

4    premises and other resources to conduct business on behalf of the Company's competitors, she

5    accomplished a double deception -- she improperly concealed the true nature of her disloyal and

6    improper conduct, while at the same time knowingly creating the false impression that she was

7    hard at work on the Company's behalf.

8         77.    It was Gatti's conduct just before and during the meeting in which she was

9    terminated that caused the Company to begin an investigation.  The Company was utterly

10   shocked to discover evidence of such extensive and egregious, if not criminal, wrongdoing by

11   Gatti and the other Defendants.

12        78.    For instance, as of October 2012, Gatti had already undertaken consulting

13   positions with at least three separate companies, and was constantly in the process of seeking

14   additional consulting positions for herself while she was contractually required to work full time

15   for the Company or else face termination.

16        79.    With the passage of time, Gatti continued unlawfully to use the Company's

17   confidential information and contacts, including contacts with investors that the Company was

18   approaching to obtain venture capital funding, and potential business partners to seek

19   opportunities for herself.

20        80.    Although the extent of the Defendants' wrongdoing discovered to date is too

21   extensive to detail in full in this Complaint, below are descriptions of some of the wrongful

22   activities that are part and parcel of the Defendants' scheme to defraud the Company.

23        **1.    TheNeeds**

24        81.    At the end of August 2013, the Company pitched to Investment Fund 1.  Within

25   less than 10 days, Gatti improperly used the Company's contact at Investment Fund 1 to advance

26   her own agenda, and seek to profit from the Company's confidential and trade secret information.

27   Specifically, Gatti used Investment Fund 1 to gain an introduction to Gabriele Pansa ("Pansa"),

28   the CEO of TheNeeds, to discuss becoming involved with TheNeeds.

82. At that time, TheNeeds was a brand new startup seeking to begin operating in a virtually identical technology space as the Company, by seeking to use some level of artificial intelligence to transform unstructured social data to structured data in order to provide personalized services in a particular internet arena.

83. TheNeeds presented a perfect opportunity for Gatti to begin cashing in on the back of the Company's work. Gatti had access to critical confidential business and technical information that would have been invaluable to a company like TheNeeds that sought to enter the same space and that also sought to access the same investors.

84. On October 21, 2013, at Gatti's invitation, Pansa came to the Company's offices in San Francisco to meet with Gatti. During the course of this meeting, Pansa, on information and belief, discussed with Gatti the issue of her collaboration with TheNeeds while he perceived TheNeeds and the Company to be competitors.

85. In response to this "competitive" concern, in an email dated October 28, 2013, Gatti wrote to Pansa as follows:

> "Here [is] where I think we are:
> - *we are not competitors but we are complementary*
> - I can see how I can help you: from pitch deck content and format, to pitch rehearsal, to introductions to potential investors, to brainstorming on strategy *= this is equal to a hands-on advisor commitment*
> - *I don't think it is beneficial for you to list yet another Italian advisor in your deck*. I do think it is beneficial for you to have someone who can help you in getting ready to pitch
> - if you think that having an hands-on advisor *not listed in your deck* would be useful to you, we can discuss terms and conditions of the engagement. (emphasis added).

86. In the following days, Gatti continued to negotiate with Pansa for a role and a stake in TheNeeds in exchange for her unlawful delivery of highly confidential information, trade secrets, opportunities and services belonging to the Company. Pansa and TheNeeds knew that their conduct with Gatti was unlawful, and that Gatti was not permitted to divert to TheNeeds the valuable confidential information, opportunities and services that belonged to the Company.

87. Within a short period after this meeting, Gatti obtained a consulting agreement from TheNeeds with a compensation offer that provided the award to Gatti of shares equivalent to 10% of TheNeeds.

88.     Since Gatti began her secret and unlawful engagement with TheNeeds, TheNeeds suddenly began to adopt technology, marketing materials, strategies and terminology that, at least as advertised to the public, appear to be virtually identical to those that were being confidentially discussed and used by the Company.  For instance, TheNeeds recent evolution towards the concept of digital DNA of a person happened after Gatti began her engagement with TheNeeds and the Company's patent application was not yet public.  By way of another example, another business strategy involving third parties that the Company was discussing internally before its launch was thereafter adopted by TheNeeds, as announced by its CEO in an interview.  TheNeeds evolution, at least on the surface, in a direction that is so similar to that of the Company, while the Company's CEO is secretly working with them, cannot be coincidence.

### 2.     The Almaviva Defendants.

89.     Another opportunity for Gatti to profit from the Company's valuable confidential information, trade secrets and other assets, came in the form of the Almaviva Defendants.

90.     The Almaviva Defendants operate a technology company in Italy and in other parts of the world.  The Almaviva Defendants sought to enter into San Francisco and Silicon Valley with a company that focused on the use of artificial intelligence for speech analytics, semantic understanding, data/text, information discovery and sentiment analysis on big data and social data.  The Almaviva Defendants new proposed venture in Silicon Valley was in the same technology field as the Company.  As CEO of the Company, Gatti could never have been legitimately involved with the Almaviva Defendants, while also being the CEO of the Company and while having ongoing access to the Company's trade secrets and confidential information.

91.     While knowing that their conduct was impermissible, as of January 2014 the Almaviva Defendants appointed Gatti to serve as their lead executive and CEO of their San Francisco "start up."  Knowing that Gatti could not legitimately operate two offices, the Almaviva Defendants agreed with Gatti that she would domicile the new company, later named Almawave USA, at Gatti's own home residence.

92.     But for Gatti's role as CEO of the Company, the Almaviva Defendants would never have hired Gatti, let alone made her the CEO of their start-up concurrently with her existing

1    CEO position at the Company.  Other than her ability to freely access the Company's confidential

2    and proprietary information and property, Gatti had no experience or knowledge in the artificial

3    intelligence space, and had nothing to contribute to the Almaviva Defendants independently of

4    what she was stealing from the Company.

5         93.       The Almaviva Defendants agreed to participate in this scheme because through

6    Gatti they could immediately gain access to highly proprietary information, technology and

7    strategies, investors, and potential business partners by simply paying a tiny fraction of what they

8    would have had to pay to even be taken into consideration as a legitimate investor.  The Almaviva

9    Defendants are believed to have paid Gatti at least $70,000 a month, which payments Gatti sought

10   to conceal through the use of the newly formed IQS Defendants.

11        94.       As of January 2014, Gatti and the Almaviva Defendants were actively executing

12   their fraudulent scheme against the Company.  Gatti would continue working for the Company,

13   while at the same time using most of her working day preparing to launch Almaviva USA.

14   Concurrently, Gatti would work from the inside of the Company to cause the Company to have to

15   sell itself, instead of seeking investment for its growth.  This strategy would have permitted Gatti

16   to deliver the Company's assets and its key employees to the Almaviva Defendants on the cheap.

17   At the same time, Gatti would have been able to cash out on all of her shares in the Company

18   (which vesting would have accelerated upon a sale), while she had profited from the Company's

19   property and obtained a new role with the Almaviva Defendants.  A win-win scheme for Gatti

20   and the Almaviva Defendants.

21        95.       On January 2014, the President of the Company emailed Gatti to request that she

22   make herself available to participate in a critical investor meeting with Investment Fund 2.  Gatti

23   falsely claimed that she could not attend because she was traveling to Italy "to see if Almaviva

24   wanted to invest" in the Company.  Upon her return, Gatti told the President of the Company that

25   in fact she had determined that Almaviva was not interested in investing in the Company.  Gatti's

26   statements were all false.  In fact, as Gatti failed to inform the Company, she was already working

27   with the Almaviva Defendants to steal from the Company.

28

COMPLAINT

1    96.    Upon returning from the meeting with the Almaviva Defendants, and hearing of an

2  approaching investment, Gatti undertook to intentionally sabotage it before its closing date.  A

3  successful investment into the growth of the Company seriously threatened Gatti's scheme,

4  because it would have undermined her ability to persuade the Company that it needed to sell,

5  instead of continuing to grow and remain independent.

6    97.    To interject herself into this and another investment opportunity, Gatti claimed that

7  as CEO of the Company, she was the one who had to lead communications with investors.  At the

8  time, this made sense because she had been hired for that role and the rest of the Company was

9  very busy working around the clock to continue advancing the Company's business and products.

10  In March 2014, in anticipation of a meeting with Investment Fund 2, Gatti unlawfully and in

11  violation of her obligations to the Company revealed confidential Company information to

12  Investment Fund 2, and specifically that the Company was working with Investment Fund 3 to

13  close an investment from them.  Gatti knew that revealing this confidential information could

14  have caused interference and halted the investment by Investment Fund 3, for reasons that were

15  well known to her.  Indeed, shortly after her disclosure, Investment Fund 3 decided to wait in

16  closing the investment.  Gatti justified her behavior to the Company by claiming that her

17  disclosure was accidental.  Thereafter, not long after this incident, and after the Company met

18  multiple times with Investment Fund 2, Gatti proceeded to invite Investment Fund 3 to an event

19  with the Almaviva Defendants, which presumably made it known to Investment Fund 3 that Gatti

20  was working for the Almaviva Defendants as well.  As has now been revealed, Gatti intentionally

21  began to try to sabotage as many investment opportunities of the Company as she could get

22  involved with.

23    98.    With the aid and assistance of the Almaviva Defendants, Gatti continued

24  perpetrating her unlawful scheme, by sending fraudulent communications through the wires to the

25  Company's other executives and key employees.  In one such communication, Gatti falsely told

26  the Company's President, that in her capacity as CEO and in charge of finding investments for the

27  Company she was directing that the Company stop seeking investments from various sources, as

28  she had knowledge that that would jeopardize investments from institutional sources.

99.     Gatti's need to force the company into a cash crisis in order to limit growth, demoralize employee, and sell became especially urgent when the Company was entering the market, after being selected for the Beta track at the Dublin Web Summit, held in November 2014.  The Web Summit features only a few companies in this category.  The companies invited are selected based on their display of true innovation and business acumen.

100.     Upon hearing the Web Summit news, Gatti failed to perform initial marketing activities for the launch, and then claimed that she did not have sufficient time to perform the marketing activities and the work that was needed by the Company to duly prepare to present at the Web Summit.  When the Company sought immediately to hire a senior marketing director to ensure the Company would be able to complete the work required, Gatti intentionally tried to sabotage the hiring of this person by telling this high-level candidate during the interview that she was "not needed" and that as the CEO of the Company she did not want to hire her.  As a result of this incident, Gatti was asked to step down from her position as CEO of the Company, so that the Company could nonetheless proceed with the hiring and properly prepare for its launch at the Web Summit.  Gatti agreed to step down if appointed President of the Company with no operational role.  Gatti also demanded to continue remaining the point of contact with other investors, including Investment Fund 4, with whom the Company was in the process of negotiating a term sheet.  Gatti fraudulently claimed that if she were removed from her participation in the communications with Investment Fund 4, the Company was likely to lose the investment.  In fact, Gatti made these fraudulent representations so that she could continue to further the Defendants' unlawful scheme against the Company.

101.     Gatti then proceeded to inform the other founders of the Company that she had spoken to Investment Fund 4 and that they told her that they would provide the Company with a large investment, so long as the Company would refrain from seeking or bringing other money from other smaller investors.  Gatti claimed that Investment Fund 4 told her that they would themselves be bringing other investors to the Company to participate in the funding round, that they would have proactively involved other venture capital ("VC") investors that they alone wanted to choose.  Gatti also told the other founders that the Company needed to sit tight and wait

1      to meet with other VC brought by Investment Fund 4 to join the round.

2      102.      In reliance on Gatti's representations, the Company, during a meeting with other

3      investors held in November 2014, turned down their investments, which the new Company's

4      CEO wanted to obtain to ensure the Company had sufficient liquidity in the event of any issue

5      with Investment Fund 4, whose funding was due to be received and closed in December 2014.

6      Gatti assured Company management that while additional investments from smaller investors

7      were not acceptable to Investment Fund 4, these investments were not in any event needed

8      because Investment Fund 4 would have wired the funds before the end of November, and the

9      Company could rely on that for its financial planning.  The Company was shocked when the

10     closing date of the investment with Investment Fund 4 arrived, and the Company did not receive

11     the funding that Investment Fund 4 had agreed to make.

12     103.      Gatti claimed that she did not know why Investment Fund 4 had failed to make the

13     agreed upon transfer.  During a subsequent call with Investment Fund 4, that Gatti tried to

14     postpone and avoid for as long as she could, but in which the new CEO of the Company required

15     her to participate, Investment Fund 4 explained that they had told Gatti that their investment was

16     contingent on the Company communicating to them that it had found at least another investor on

17     its own to participate in that round.  Investment Fund 4 explained that it would have made some

18     introductions on a best effort basis, but the scouting of additional investors to the round was

19     entirely on the Company.  During the call, Gatti claimed that she had misunderstood and that she

20     thought the Company did not need to do anything other than to wait.  When the CEO of the

21     Company confronted Gatti about the contrary information she had given the Company —

22     including that Investment Fund 4 had purportedly demanded that the Company stop accepting

23     investments from smaller investors — Gatti again claimed that she had misunderstood what

24     Investment Fund 4 told her.  Following this incident in mid-December 2014, Gatti disappeared.

25     Upon her return to the office on February 3, 2014, Gatti was terminated from her executive and

26     employee positions with the Company.  Gatti was removed from her position as director in the

27     Company shortly thereafter.

28

104.     As the Company discovered following her termination, Gatti's conduct was not the product of incompetence.  It was intentional wrongdoing, part and parcel of the Defendants' unlawful scheme against the Company.

105.     Indeed, as has now been revealed, in late 2014, Gatti was also working to get her other company, TheNeeds, acquired by the Almaviva Defendants.

106.     The Company also discovered numerous additional acts of wrongdoing that Defendants and their co-conspirators perpetrated against the Company to execute this scheme. For instance, beginning in April 2014, Gatti claimed that DiNapoli, her boyfriend, was launching a new microchip business and that, as he was awaiting office space, he should be able to use some empty desks in the Company's offices.  Based on these materially false representations, the Company consented to the use of two desks by DiNapoli and his purported assistant, Micoli.

107.     In fact, as the Company has now learned, DiNapoli and Micoli worked for Gatti and the Almaviva Defendant, through IQS, and assisted those Defendants in misappropriating the Company's property, among other things.  DiNapoli and Micoli began using the empty desks in the Company offices pretending that they were working on a microchip business, while in fact, they were working all along for Gatti and the Almaviva Defendants and had fraudulently gained access to the Company's offices.

108.     Thus, Gatti, the Almaviva Defendants and their co-conspirators, in addition to openly stealing from the Company, were now unlawfully using the Company's premises in its San Francisco office to carry out their unlawful enterprise.  Concurrently, Gatti formally incorporated Almawave USA, which she domiciled at her home residence, while she in fact was unlawfully operating said fraudulent and competing enterprise, as well as the IQS Defendants, from the Company's offices, without the Company's knowledge or permission.

109.     As a result of this pattern of illegal activities, the Almaviva Defendants launched their new US startup in no time.  In connection with the official launch of Almawave USA, Gatti in her capacity as CEO of said new startup, used the Company's trade secrets and contacts to invite numerous people to meet the Almaviva Defendants in San Francisco.

COMPLAINT

1    110.    Key executives of the Almaviva Defendants were involved in every aspect of this

2    scheme and repeatedly traveled to and were in constant communications with Gatti and her co-

3    conspirators in San Francisco to further the execution of this scheme.

4    111.    As a result of this extensive wrongdoing, it is not surprising that in just a few

5    months, Almawave USA, whose only employee was Gatti and had no engineers, claimed that it

6    would be focusing on services with the same core technology as the Company.  For instance,

7    Almawave heavily emphasizes its capability for semantics and "natural language-based semantic-

8    ontological interpretation" that is similar to the Company's technology: generating semantics

9    from unstructured text data.  Almawave claims to provide "understanding and interpretation of

10   Customer requirements, by tracking and extracting concepts of interest."  Tracking and extracting

11   concepts of interest from text exactly describes the core technology of the Company.  Aside from

12   analyzing client text data, Almawave also emphasizes using web sources like social media to

13   capture and track semantics and concepts related to the customer interest, claiming that "content

14   retrieved from the Web thus becomes shared information to understand the Customer journey and

15   the setup of consistent and effective models for cross-channel analytics."  This strategy of using

16   large amounts of available web data and social media data has been the Company's strategy from

17   the start.  Finally, there is a great deal of overlap in Almawave claims of sentiment analysis of

18   these data.  Almawave claims it will be able to do "sentiment analysis to understand Customer

19   needs, brand reputation and strategies for information dissemination."  They claim to answer the

20   questions of, "What are people talking about? (products, services, brands, current events,

21   politics)," "With what sentiment? (positive, negative, neutral)," and "On which channels? (blogs,

22   social network, Websites, forums)."  These are exactly the questions and means by which the

23   Company's AI sought to create value from its technology.  The phrase, "enable the semantic

24   analysis of contents retrieved from public sources, by interpreting 'non-structured' contents

25   published by social network users" sounds particularly reminiscent of the main pitch of the

26   Company.

27   112.    These similarities are not coincidental.  They are the product of Gatti and the

28   Almaviva Defendants' carefully orchestrated theft from the Company, through a carefully

1    orchestrated inside job and cover-up.

2       113.     The Defendants' wrongdoing has greatly damaged the Company and will continue

3    to damage the Company if not restrained.

4    **D.      Gatti and the Almaviva Defendants' Wrongdoing Is Ongoing.**

5       114.     Despite terminating Gatti from any and all roles at the Company, the Defendants

6    wrongful and fraudulent conduct continues.

7       115.     For instance, despite her termination, Gatti continued to unlawfully access the

8    Company's electronic system to continue stealing information and attempting to conceal evidence

9    of the Defendants' wrongdoing.

10      116.     Recently, Gatti and the Almaviva Defendants even sent one of their employees,

11   Francesca Valentini, to the Company's offices under the false pretense that she needed to speak to

12   a company in offices adjacent to the Company.

13      117.     Even after Gatti was informed by the Company that an investigation had revealed

14   serious wrongdoing on her part, and even after Gatti was asked immediately to cease her

15   wrongful activities towards the Company, on February 13, 2014, Gatti responded by sending an

16   email to investors in the Company seeking to cause further damage to the Company.  In this

17   email, Gatti falsely and fraudulently claimed that she had amicably stepped down from the

18   Company and that she now was the Chairman of the Company.

19      118.     Most recently, on February 17, 2015, Gatti caused a computer attack to be

20   launched on her former Company account, being preserved under a litigation hold, and caused her

21   calendar records detailing substantial evidence of her wrongdoing to be deleted.  Although the

22   Company had imaged those records and had separately preserved the evidence, Gatti's conduct

23   demonstrates that unless judicially restrained, Gatti will not cease her unlawful activities.

24                              **FIRST CAUSE OF ACTION**

25   **(Racketeer Influenced and Corrupt Organizations, 18 U.S.C. §§ 1962 *et seq.*,**

26                              **against All Defendants)**

27      119.     The Company repeats and realleges each and every allegation contained in the

28   foregoing paragraphs and incorporates them herein by reference.

1    120.    By the acts alleged above as well as those set forth below, the Defendants and their

2    unnamed co-conspirators associated in a joint enterprise engaged in interstate commerce to

3    conduct the enterprise's affairs through a pattern of racketeering activity, in violation of 18

4    U.S.C. § 1962 *et seq.*

5    121.    All Defendants named in this action were persons within the meaning of 18 U.S.C.

6    § 1961.

7                                    **The Enterprise**

8    122.    The enterprise with which the Defendants associated was organized at least as

9    early as January 2014, if not sooner, for the purpose of infiltrating the operations of the Company

10    in order to steal the Company's confidential information and trade secrets, divert the Company's

11    existing and prospective employees, advisors, consultants, and partners, as well as existing and

12    prospective investors, among other things, and force the Company to have to sell itself for a

13    fraction of what the Company is worth for the benefit of the Defendants associated in the

14    enterprise.

15    123.    This enterprise was and is directed chiefly by Defendant Gatti and the Almaviva

16    Defendants, through Ms. Sandei as well as other executives of the Almaviva Defendants, who

17    held primary decision making and operational authority over the enterprise, and who directed the

18    activities and operations of Defendant Almawave USA and the IQS Defendants, in which Gatti is

19    an officer, member and shareholder, and in which the other Almaviva Defendants are also

20    owners.  As chief decision makers in the enterprise, Gatti and the Almaviva Defendants directed

21    the activities of fellow enterprise associates DiNapoli, Micoli, Vignudelli, Huang, and others,

22    who assisted the enterprise in conducting their racketeering activity against the Company.

23    124.    The Defendants are associates of the enterprise and cause the enterprise to function

24    as a continuing unit by performing their individual roles as described in the foregoing allegations,

25    as a repeated in part below.

26    125.    Defendant Gatti infiltrated the Company's operations by providing to members of

27    the enterprise, the Almaviva Defendants, the IQS Defendants, DiNapoli, Micoli, Huang,

28    TheNeeds, and Pansa, the confidential and trade secret Company information described above,

and by giving them unlawful access to the Company's offices and property using false pretenses. As an officer of the Company, Gatti was integral to the enterprise's operations.  In her role, Gatti coordinated the efforts of the other Defendants and co-conspirators named above in actively concealing the fraudulent activities of the enterprise, which have included, but were not limited to:

- Using the Company's email, computer and other IT systems and accounts for the purpose of running the financial and communications operations of the IQS and Almawave USA, including the use of phones as the primary method of voice communication for IQS and Almawave USA's operations, creating contracts, managing accounting, conducting meetings of these two entities, and directing the services of the Company's employees and advisors for the benefit of IQS and Almawave USA, and managing these two entities' relationships with third-party suppliers and technicians obtained from the Company's confidential service provider list.

- Misappropriating the confidential and proprietary information and trade secrets of the Company, which include the Company's proprietary technology and strategies developed over the course of several years.  The associate of the enterprise used the Company's confidential information and trade secrets to also track and monitor the Company's progress and strategies in order to identify opportunities for diverting investments, employees and advisors away from the Company.

- Causing the Company to pay for charges incurred in furtherance of the interests of the Defendants, and not the Company.

- Defendant Gatti infiltrated the Company by purporting to act as its CEO while simultaneously enlisting the assistance of the Defendants and the other participants in the enterprise to divert the Company's resources toward the end of defrauding the Company of its property, including its confidential information and trade secrets, its sales revenue, and the unfettered use and direction of the Company's assets.

COMPLAINT

- At the same time as Gatti infiltrated the Company in this manner, she oversaw the operation of the enterprise's separate legal entities Almawave USA and the IQS Defendants.

126.    Gatti actively performed activities on behalf of the enterprise while working as an employee and officer of the Company and took measures to ensure that the Company did not detect the activities of the enterprise.

127.    The enterprise existed as an entity separate and apart from the pattern of racketeering in which it engaged, in that Gatti and the other Defendants and their associates coordinated the commission of several predicate acts of mail and wire fraud against the Company, while Defendant Almawave USA and the IQS Defendants simultaneously purported to engage in a legitimate business operation.

**The Pattern of Racketeering Activity**

128.    Defendants engaged in a pattern of Racketeering Activity by committing countless acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, against the Company, with the common and continuous purpose of conducting the operations of the enterprise, as set forth in this Complaint, and defrauding the Company. Defendants' actions were committed on a continuous and regular basis beginning as early as January 2014, if not earlier, and continue without cessation to the present day.

129.    The continuous nature of Defendants' racketeering activities is clearly demonstrated by Gatti's repeated use of electronic communications in interstate commerce to transfer to her personal email account, as well as to one or more of her co-conspirators, confidential and trade secret information stolen from the company. Gatti perpetrated this activity by automatically forwarding to her personal email account *all emails* received by her work email account. This activity was ongoing for at least one year, and continued through her termination on February 3, 2015.

130.    Defendants' acts were designed with the ultimate goal of forcing the Company out of business and making off with all of its valuable intellectual property – goals that the Defendants still seek to effectuate today by, among other activities, using the wires to destroy

1   evidence of their fraudulent behavior.  For example, on February 17, 2015, Gatti caused an attack

2   on her work account in an attempt to delete calendar data.  These unlawful acts committed by the

3   Defendants will continue into the future, unless enjoined, and are designed to continue to damage

4   the Company's business operations.

5                                    **Mail and Wire Fraud**

6       131.        Defendants engaged in a scheme to defraud the Company through use of mail and

7   the wires, including, but not limited to, by:

8       •        Gatti's active misrepresentations of her own activities, as well as those of her co-

9                conspirators which she brought to the Company's offices, as well as

10               misrepresenting Gatti's whereabouts while a full-time employee of the Company,

11               and actually working in direct competition with and to damage the Company.

12      •        Crafting false pretenses that Gatti, as employee of the Company, was using and

13               accessing the Company's property and resources only for the benefit of the

14               company, when, in reality, Defendants were misappropriating the Company's

15               assets and resources for their own benefit and that of the enterprise;

16      •        Misappropriating for their own benefit, and that of Almawave USA and the other

17               Defendants, the confidential information and trade secrets of the Company;

18      •        Causing the Company to pay for charges that Gatti incurred in furtherance of the

19               interest of Almawave USA and the other Defendants, and not the Company.

20      132.        As part of their pattern of racketeering activity, Gatti and the other defendants

21   engaged in innumerable fraudulent acts during the relevant time period.  A small sampling of the

22   Defendants' activities include the following:

23      •        Throughout 2013 and 2014, Gatti repeatedly and continuously used the wires in to

24               transfer to herself and the enterprise confidential information and trade secrets of

25               the Company in furtherance of the Defendants' racketeering activities and scheme

26               against the Company;

27      •        On or about February 11, 2014, Gatti sent false and fraudulent statements to the

28               Company by email, in interstate commerce, asserting that she would be meeting

                                            -32-                          COMPLAINT

1      with Almaviva IT to solicit their investment for the Company.  At the time of that

2      email, Gatti was already engaged in her pattern of racketeering activity with the

3      Almaviva Defendants for more than one month, and her false statements were

4      designed to further the Defendants' scheme to misappropriate the Company's

5      confidential, proprietary information and trade secrets;

6          •    On or about February 14, 2014, Gatti sent false and fraudulent statements to the

7      San Francisco branch of Bank of the West by email, in interstate commerce, to

8      fraudulently authorize Bank of the West to give access to the Company's bank

9      account to one of her co-conspirators, Peter Huang, who was a participant in the

10     enterprise with Gatti and the other Defendants.  In the email, Gatti falsely and

11     fraudulently stated to Bank of the West that Huang worked for the Company,

12     when in fact this was another step in furtherance of the Defendants' fraudulent

13     against the Company;

14         •    On or about March 13, 2014, Gatti used the wires, in interstate commerce, to

15     access the Company's electronic calendar and disseminate to the Company false

16     and fraudulent information regarding her activities for the Company, falsely

17     stating that she would be spending all day in Palo Alto to perform work for the

18     Company, when in fact Gatti was in Palo Alto meeting with the Almaviva

19     Defendants to conduct activities in furtherance of the enterprise's racketeering

20     activities and scheme against the Company.

21         •    On or about October 22, 2014, Gatti made false and fraudulent statements to the

22     Company by email, in interstate commerce, demanding to serve as the primary

23     contact with investors for the benefit of the Company, when in fact she was using

24     that communication to further the racketeering activities and scheme of the

25     enterprise against the Company by limiting the Company's access to funding and

26     diverting funding and other business opportunities to the enterprise;

27         •    On or about November 3, 2014, Gatti used the wires, in interstate commerce, to

28     access the Company's electronic calendar and disseminate to the Company false

1    and fraudulent information regarding her activities for the Company, falsely

2    stating that she was holding a meeting for the Company, when in fact she was

3    having a meeting with the Almaviva Defendants in furtherance of Defendants'

4    racketeering activities against the Company.

5    •    On or about November 13, 2014, Gatti made false and fraudulent statements to the

6    Company by email, in interstate commerce, to an interested investor with whom

7    the Company was due to meet, by falsely and fraudulently telling the investor that

8    the meeting needed to be cancelled because the Company's co-founder and chief

9    scientist was ill, when in fact this was not true.

10    133.    The foregoing are but a few of the numerous fraudulent activities that the

11    Defendants carried continuously and repeatedly for an extensive period of time.  In furtherance of

12    this scheme, the Defendants repeatedly perpetrated this fraud through regular wired

13    communications, including, but not limited to, emails and other electronic communications sent

14    to the Company and the Company's agents from various locations both within and outside

15    California, and through interstate commerce.

16    134.    The Defendants also caused to be placed in the mail, both within and outside of

17    California, and through interstate commerce, instruments of their fraud in furtherance of the

18    scheme described herein.

19    135.    In furtherance of the same scheme and racketeering activities, the Defendants

20    repeatedly used interstate wire and mail transmissions, in the form of interstate e-mails, telephone

21    calls, faxes, access to electronic repositories, wire transfers, and mail, among other things, to

22    communicate and conduct transactions on behalf and in furtherance of their racketeering

23    enterprise.

24    136.    As a direct and proximate result of the Defendants' racketeering activities in

25    violation of 18 U.S.C. § 1962 et seq., the Company has been injured and suffered losses to its

26    business and property, including, but not limited to, loss of confidential information, investor

27    goodwill, past and future existing and prospective business relations, lost assets, and lost

28    profitability.

COMPLAINT

137.     WHEREFORE, the Company demands judgment against all Defendants, jointly and severally as more fully set forth in the Prayer for Relief below, including, but not limited to preliminary and permanent injunctive relief, damages in an amount to be determined at trial, trebled with interest, attorneys' fees and costs, and any other and further relief as the Court may deem appropriate.

## SECOND CAUSE OF ACTION

(**Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030** *et seq.*, **against all Defendants and Unauthorized Access to Computers, Cal. Penal Code §§ 502** *et seq.* **against all Defendants**)

138.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

139.     Gatti, in conspiracy with the other Defendants, continued to access the Company's computers, IT and other electronic repositories after beginning employment with, becoming advisor for, or joining the board of the Company's competitors and other companies, including the other Defendants, in violation of her fiduciary, contractual and other obligations to the Company.  This access was improper and unauthorized in light of Gatti's unlawful activities in violation of her obligations to the Company, including, but not limited to, her breach of numerous contractual provisions that precluded her from undertaking any other employment, let alone employment for actual or potential competitors of the company, as well as her pattern of fraudulent conduct against the Company, as more fully described above.

140.     Following her termination, Gatti continued to retain possession of and continued to access a laptop computer provided to her by the Company for use solely in connection with her employment.  This access was and continues to be improper and unauthorized.

141.     Gatti used this unauthorized access to obtain confidential and proprietary trade secret information from the Company for the purpose of unfairly competing with the Company, unjustly enriching herself and the other Defendants, and in violation of state and federal law as well as numerous duties owed to the Company.

142.     Gatti also used this unauthorized access to destroy or alter evidence of her and the other Defendants' activities, including but not limited to deleting information from her calendar

-35-                                    COMPLAINT

1    maintained on the Company's IT system following termination of her employment, and erasing

2    information from her work laptop, in violation of state and federal law as well as numerous duties

3    owed to the Company.

4         143.    As a result of this unauthorized access, the Company has suffered a loss during

5    any one-year period of in excess of $7,000 in value in real economic damages.

6         144.    As a further result of Gatti's unlawful and unauthorized access to the Company's

7    computers, the Company has suffered and will continue to suffer significant harm, including but

8    not limited to the loss of confidential information, investor goodwill, past and future existing and

9    prospective business relations, and lost profitability.

10        145.    WHEREFORE, the Company demands judgment against all Defendants, jointly

11   and severally as more fully set forth in the Prayer for Relief below, including, but not limited to

12   preliminary and permanent injunctive relief, damages in an amount to be determined at trial,

13   trebled with interest, attorneys' fees and costs, and any other and further relief as the Court may

14   deem appropriate.

15        146.    Pursuant to Section 502(e)(2) of California's Penal Code, the Company also seeks

16   its attorney's fees associated with the investigation and prosecution of this action.

17        147.    Pursuant to Section 502(e)(4) of California's Penal Code, to the extent Gatti is

18   guilty of oppression, fraud, and malice, Gatti is also liable for punitive damages in an amount to

19   be determined at trial.

20                            **THIRD CAUSE OF ACTION**

21                       **(Fraud in the Inducement against Anna Gatti)**

22        148.    The Company repeats and realleges each and every allegation contained in the

23   foregoing paragraphs and incorporates them herein by reference.

24        149.    Gatti made numerous misrepresentations of fact to the Company in connection

25   with her application for employment with the Company, including, but not limited to the

26   following:

27        •    That she worked as a Visiting Professor and was awarded a PhD and Post-Doc by

28             Stanford University;

- • That she worked as a Visiting Professor at the University of California, Berkeley;
- • That she earned a salary of $450,000 per year at her prior job at Skype, justifying an award of a large number of shares of stock in the Company to compensate for a lower salary;
- • That a bigger stake in the Company was necessary to require her to leave Skype, when in fact Gatti had already been terminated by Skype;
- • That she had the ability, skill, connections and intention to procure funding for the Company through her allegedly extensive network.

150.    Gatti at all times knew that the Company would rely on her representations.

151.    Gatti knowingly made these representations in order to extract both employment and unwarranted compensation in the form of stock and salary from the Company.

152.    The Company justifiably relied upon Gatti's representations when it elected to hire Gatti, appoint her as CEO, appoint her to the Company's board, provided her with a significant fraction of potential ownership of the Company, specifically 30% of the Company if all the shares vested, and relied upon her supposed expertise and connections in attempting to grow its business.

153.    As a result of Gatti's fraudulent inducement, the Company has been  harmed.

154.    WHEREFORE, the Company demands judgment against Gatti, including rescission of the SPA (as more fully set forth below) and legal damages in respect of the other contracts in which Gatti fraudulently induced the Company to enter into.

155.    To the extent Gatti was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

## **FOURTH CAUSE OF ACTION**

### **(Rescission and Restitution for Failure of Consideration, against Anna Gatti)**

156.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

COMPLAINT

157.     In reliance on Gatti's fraudulent representations described above, the Company was induced into entering in the SPA with Gatti, and was induced to convey under the SPA a large amount of stock in the Company, amounting to approximately 30% of the Company had the stock fully vested.

158.     As a result of Gatti's fraudulent inducement, the Company is entitled to rescind the SPA and obtain a return of all the shares that Gatti has fraudulently vested.

159.     In the alternative, the Company is entitled to a declaration that the shares under the SPA stopped vesting at the time Gatti began breaching her employment agreement and, therefore, would have no longer been in Continues Service Status under the SPA for vesting purposes, because, had the Company known the true facts it would have immediately terminated Gatti, and Gatti could not have lawfully vested a single share in the Company.

160.     The Company is further entitled to rescission of the SPA with Gatti as a result of a complete failure of consideration resulting from Gatti's failure to deliver actual valuable technology or business assets as the SPA required her to convey.

161.     The promised consideration for the stock Gatti received under the SPA therefore never materialized, because it never existed in the first place.  Gatti had no intention to , and did not cure this material defect in the SPA.

162.     As a result of either or both of Gatti's fraudulent inducement and/or failure to provide consideration for the SPA, the SPA between the Company and Gatti is null and void, of no effect, and should be declared rescinded.

163.     As a result of this conduct, the Company also suffered substantial damages and prays for an offset of a token payment made by Gatti to the Company in the amount of $293.33, which payment should serve to offset the rescissionary damages caused by Gatti to the Company.

### FIFTH CAUSE OF ACTION

**(Fraud against all Defendants)**

164.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

165.     The Defendants, through Gatti, made numerous fraudulent representations and omissions to the Company, including, but not limited to the following:

- Gatti misstated key aspects of her qualifications, employment history, and salary history, both in written and verbal communications to the Company, in order to obtain employment from the company;

- Gatti fabricated positive employment references and documentation, which she directed the Company to check, to reinforce her own fraudulent misstatements;

- Gatti, acting for her own benefit and as an agent of the other Defendants, continuously misled the company through ongoing representations that she was acting in the Company's best interests and on the Company's behalf, when she knew this was not the case;

- Gatti, acting for her own benefit and as an agent of the other Defendants, continuously misled the Company by concealing key information as to her relationships with numerous other business, including, but not limited to, her consultancy with The Needs Inc., her creation of the IQS Defendants, her role as CEO of Almawave USA, and her ongoing relationship with the Almaviva Defendants;

- Gatti opened numerous bank accounts in order to conceal the payments she received from the Company's competitors in return for her misdeeds;

- Gatti, acting for her own benefit and as an agent of the Almaviva Defendants, misrepresented her purpose in going to Italy to meet with Almaviva;

- Gatti, acting for her own benefit and as an agent of the other Defendants, misstated the nature of work to be performed by DiNapoli and Micoli in order to place them inside the Company's offices where they could obtain valuable information from the Company while working for competitors;

- DiNapoli and Micoli acted as agents of the Defendants in furtherance of their fraud by asserting that they were using the Company's office space for development of a microchip business;

COMPLAINT

- Gatti, acting for her own benefit and as an agent of the other Defendants, misled the Company into allowing her to lead communications with Investment Fund 2 so that she could sabotage that relationship, as well as the developing relationship with Investment Fund 3;

- Gatti, acting for her own benefit and as an agent of the other Defendants, made numerous misstatements of fact to the Company's newly hired marketing director in an attempt to prevent her from being hired and, subsequently, from performing the job for which she was hired;

- Gatti, acting for her own benefit and as an agent of the other Defendants, fraudulently claimed that if she were to be removed from her participation in the communications with Investment Fund 4, with whom the Company was negotiating, the Company was likely to lose the investment;

- Gatti, acting for her own benefit and as an agent of the other Defendants, told the other founders of the Company that Investment Fund 4 required that they not bring any other investors to the company; and

- When Investment Fund 4 pulled out, Gatti, acting for her own benefit and as an agent of the other Defendants, initially represented to the Company that she did not know why Investment Fund 4 pulled out, and subsequently represented that she had simply misunderstood their request.

166.    In addition to these items, Defendants also committed fraud through the activities described in detail in ¶ 131, *see Supra*.

167.    The Defendants knew these misrepresentations and omissions were false.

168.    By making these misrepresentations and omissions, the Defendants intended to deceive the Company and induce reliance on their misstatements and omissions.

169.    The Company justifiably relied on the Defendants' misrepresentations and omissions, including, but not limited to, by:

- Making an employment offer to Gatti, which included a cash and stock compensation package that Gatti could never have obtained but for her fraudulent

representations;

- Continuing to employ Gatti in various capacities;

- Paying a salary to Gatti;

- Conveying shares of stock in the Company to Gatti;

- Sharing confidential, proprietary, and trade secret information with Gatti;

- Funding Gatti's trip to Italy to meet with Almaviva purportedly on behalf of the Company;

- Relying on Gatti as a primary point of contact for numerous investors;

- Following Gatti's instructions regarding investor requests, including, but not limited to, not seeking, and actively turning down, further investors while courting Investment Fund 4; and

- Allowing Gatti to place DiNapoli and Micoli in the Company's offices.

170. As a direct and proximate result of these fraudulent acts, the Company has suffered and will continue to suffer further harm, including the loss of proprietary information and competitive position, investor goodwill, past and future existing and prospective business relations, and reduced profitability. The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

171. The other Defendants acted jointly and in conspiracy with Gatti, and repeatedly undertook steps in furtherance of the conspiracy and intended to deceive the Company for as long as possible.

172. To the extent Defendants were willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, they are also liable for punitive damages in an amount to be determined at trial.

173. To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by the Defendants, the Company is further entitled to preliminary and permanent injunctive relief enjoining the Defendants from using any information improperly obtained from the Company through their fraudulent acts.

COMPLAINT

**SIXTH CAUSE OF ACTION**

**(Breach of Contract against Anna Gatti)**

174.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

175.     Gatti's employment by the Company was contingent upon her execution of the Executed OL and the CIIAA, in which Gatti agreed to keep confidential, hold in trust, not duplicate, and not disclose to any third parties all of the Company's confidential and trade secret information without the Company's consent.  Through the CIIAA, Gatti also agreed to devote her full-time and best efforts to the Company's interests, to not accept concurrent employment from anyone else, let alone actual or potential competitors, without the Company's prior written consent, and to not solicit any employees, advisors, consultants, investors or other service providers of the Company.

176.     Gatti also executed several other contracts with the Company, including the SPA, the Executed OL, and an Application for Employment.

177.     Gatti breached the SPA by fraudulently maintaining an appearance that she remained in Continuous Services Status, when in fact she was not, and concealed her breaches of the Employment Agreements that would have caused her immediate termination and would have precluded her from vesting shares in the Company.

178.     Gatti breached the Application for Employment by falsely executing a certification that the information Gatti provided was true, correct, and complete.  The information presented by Gatti in the Application for Employment contained numerous material misstatements and misrepresentations that were subsequently relied on by the Company to its detriment.

179.     Gatti breached Section 7 of the Executed OL through the numerous acts described herein, including but not limited to, acceptance of employment as CEO of Co-Defendant Almawave USA while still employed by the Company, her founding of the IQS Defendants while still employed by the Company, her consulting work with The Needs Inc., her diversion of opportunities, investors, engineers, advisors, and confidential information to other businesses, including actual or potential competitors, and her solicitation of the Company's employees and

consultants, including but not limited to, DV, on behalf of and for the benefit of the other Defendants.

180.     Gatti breached Section 2 of the CIIAA through her business relationship and acceptance of employment from the Almaviva Defendants, including her acceptance of a position as CEO of Almawave USA while still employed by the Company, her founding of the IQS Defendants while still employed by the Company, her consulting work with The Needs Inc., her other business undertakings for other companies in violation of the contractual obligations to the Company, her diversion of opportunities, investors, engineers, advisors, and confidential information to competitors, her regular and extended absences from work, her regular failure to complete her work for the Company, which includes her intentional failure to procure, and her subsequent sabotage of funding opportunities for the Company, her solicitation of the Company's employees, advisors, and consultants, including but not limited to, DV on behalf of the Company's competitors, and by diverting her time and energy away from the best interests of the Company and toward competitors' interests.

181.     Gatti breached Section 3(a) of the CIIAA by forwarding all emails received at her work email address to her personal email address, and by sharing confidential information contained in those emails and elsewhere with the Company's competitors, including several Co-Defendants.

182.     Gatti breached Section 5 of the CIIAA by failing to return company property in her possession, including the laptop computer provided to her, to the Company within a reasonable time after her employment with the Company was terminated.

183.     Gatti breached Section 6 of the CIIAA by failing to sign and deliver a termination certification to the Company upon termination of her employment relationship with the Company.

184.     Gatti breached Section 8(a) of the CIIAA by soliciting numerous individuals, including but not limited to, advisors to the Company, employees of Company, consultants engaged by the Company, and others to perform work for one or more of the competitor companies with which Gatti became affiliated during her employment with the Company.

185.     Gatti breached Section 8(b) of the CIIAA by working for and soliciting investors, customers, and employment prospects on behalf of numerous competitors, including but not limited to the Almaviva Defendants and The Needs Inc., while still employed by the Company.

186.     Gatti breached Section 10(b) of the CIIAA by failing to list all activities engaged in by her, and by entering into further agreements, which may be in conflict with the CIIAA, including those enumerated above.

187.     Gatti breached Section 10(c) of the CIIAA by failing to comply with all provisions in the CIIAA, as enumerated herein.

188.     As a direct and proximate result of Gatti's breach of these contracts, the Company has suffered and will continue to suffer further harm, including the loss of proprietary information and competitive position, investor goodwill, past and future existing and prospective business relations, and reduced profitability.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Breach of Duty of Good Faith and Fair Dealing against Anna Gatti)

189.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

190.     California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

191.     By executing the SPA, ATA, Executed OL, CIIAA, and Application for Employment, Gatti entered into several California contracts with the Company.

192.     By virtue of her wrongdoing described above, including, but not limited to, improperly copying the Company's confidential information and trade secrets, improperly disclosing the Company's confidential information and trade secrets to competitors and other third parties, improperly sabotaging the Company's attempts to raise funds from actual and potential investors, improperly obtaining and continuing employment with other business while still employed by the Company, improper appropriation of Almaviva's interest to invest in the Company by preventing that investment and instead procuring for herself generous compensation

and an executive position at Defendant Almawave USA in exchange for the Company's confidential and trade secret information, improperly diverting numerous investors, opportunities, engineers, employees and advisors to competitors of the Company, improperly founding the IQS Defendants without disclosing them to the Company, improperly accepting varied positions with numerous businesses including, but not limited to, a consultant position with The Needs Inc., improperly conveying false information to shareholders of the Company following her termination, and all other wrongdoing alleged above, Gatti improperly interfered with the Company's right to receive the benefits it is due under its various contracts with Gatti, thereby breaching the covenant of good faith and fair dealing implied in these contracts.

193.    As a result of these breaches, the Company is entitled to damages in an amount to be determined at trial.

194.    To the extent Gatti's conduct was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

195.    To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by Gatti, the Company is further entitled to preliminary and permanent injunctive relief enjoining Gatti from competing with the Company, from using the Company's confidential and trade secret information, and from soliciting the Company's present and future employees, investors, and customers.

## EIGHTH CAUSE OF ACTION

### (**Theft of Corporate Opportunity, against Anna Gatti**)

196.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

197.    Gatti misappropriated the Company's corporate opportunities through her acts described above.  This misappropriation includes, but is not limited to,

- Gatti's use of the Company's connection to Investment Fund 1 to gain an introduction to Pansa to discuss becoming involved with TheNeeds Inc.;

- Gatti's scuttling of the Company's investment opportunity with Investment Fund

2, after which Gatti proceeded to invite Investment Fund 2 to an event with the Almaviva Defendants;

• Gatti's scuttling of Almaviva IT's attempt to invest in the Company by preventing that investment and converting it to a highly paid position for herself at Almawave USA in exchange for the Company's confidential and trade secret information;

• Gatti's misappropriation of the Company's confidential or trade secret information on behalf of the Company's competitors in exchange for direct payment, board membership, or employment with other competitors of the Company.

198. Gatti knew that the opportunities she continuously misappropriated were reasonably incident to the Company's present and future business and were opportunities that the Company was pursuing or could have pursued, itself.

199. Through Gatti's acts, the Company has suffered and will continue to suffer significant harm, including but not limited to the loss of past and future existing and prospective business relations, and lost profitability.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

200. To the extent Gatti was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

201. To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by Gatti, the Company is further entitled to preliminary and permanent injunctive relief enjoining Gatti from competing with the Company, from using the Company's confidential and trade secret information, and from soliciting the Company's present and future employees, investors, and customers.

## NINTH CAUSE OF ACTION

(**Intentional Interference with Prospective Economic Advantage against All Defendants**)

202. The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

203.    Prior to and during the events recounted above, the Company maintained economic relationships with numerous current and prospective investors, which had the probability of future economic benefit to the Company based upon the likelihood of those parties' investment in the Company.

204.    Prior to and during the events recounted above, the Company also maintained economic relationships with its employees and contractors, which had the probability of future economic benefit to the Company based upon those individuals' future work for the Company.

205.    Gatti was fully aware of these relationships, and was in fact primarily responsible for cultivating certain of them.

206.    The other Defendants were likewise fully aware of these relationships.

207.    Gatti and the other Defendants intentionally acted to disrupt and harm relationships between the Company and numerous potential and actual investors through a variety of acts, including but not limited to:

- Gatti's use of the Company's investment opportunity with Investment Fund 1 to gain an introduction to Pansa to discuss becoming involved with TheNeeds Inc.;

- Gatti's scuttling of the Company's investment opportunities with Investment Fund 2 and Investment Fund 3 through unwarranted and improper disclosure of information to the potential investors;

- Gatti's scuttling of the Company's investment opportunities with Investment Fund 4 by telling the Company that Fund 4 demanded that the Company not procure any other funding if it wanted funding from Fund 4, when Fund 4 actually requested precisely the opposite;

- Following destruction of the Company's relationship with Investment Fund 2, Gatti and the Almaviva Defendants met with Investment Fund 2 in order to procure their investment;

- Gatti's scuttling of Almaviva IT's attempt to invest in the Company by preventing that investment and converting it to a highly paid position for herself at Almawave USA in exchange for the Company's confidential and trade secret information;

208.     Gatti and the other Defendants intentionally acted to disrupt and harm the relationships between the Company and the Company's employees, consultants and advisors, by soliciting them to work for competitors of the Company.

209.     These acts were independently violative of numerous state and federal laws, as well as contractual and common-law obligations owed by Gatti to the Company.  The Defendants acted in concert with Gatti, and provided her substantial assistance in committing these violations.

210.     This behavior by Gatti caused numerous potential and actual investors to not invest in the Company, or to invest lesser amounts than they otherwise would have.

211.     This behavior further caused the Company's employees and contractors, including, but not limited to, DV, to fail to perform work for the Company, and to instead perform work for the Company's competitors.

212.     As a result of Gatti and the Almaviva Defendants' disruption of the Company's relationship with potential and actual investors and with employees and contractors, the Company has suffered and will continue to suffer great harm.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

213.     The Company is entitled to permanent and preliminary injunctive relief prohibiting Gatti and the Almaviva Defendants from interfering with the Company's current and prospective business relationships, from competing with the Company based upon any prior interference, and from soliciting the Company's present and future employees, investors, and customers.

## TENTH CAUSE OF ACTION

(**Tortious Interference with Contract, against Anna Gatti and the Almaviva Defendants**)

214.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

215.     At all times relevant to this dispute, a contractual relationship existed between the Company and Anna Gatti, and between the Company and DV.

216.     At all times relevant to this dispute, Gatti and the Almaviva Defendants had actual knowledge of these contractual relationships.

217.     The Almaviva Defendants intentionally or recklessly interfered with the contractual relationship between the Company and Anna Gatti, including but not limited to, by inducing her to breach numerous restrictive covenants and obligations set forth in the CIIAA, including §§2, §(a), 5, 6, 8(a), 8(b), 10(b), and 10(c) and the Executed OL, including §7.

218.     Gatti and the Almaviva Defendants intentionally or recklessly interfered with the contractual relationship between the Company and DV, including but not limited to, by inducing him to breach numerous restrictive covenants and obligations set forth in his various contracts with the Company, including §§2, 8, and 10(c) of his Consulting Agreement, and §3(a) of his CIIAA.

219.     As a direct and proximate result of the Defendants' actions, the Company has and will continue to be irreparably harmed, including but not limited to, by the loss of confidential information, investor goodwill, past and future existing and prospective business relations, lost profitability, and damage to its ability to procure further business.  The Company has no adequate remedy at law.

220.     The Company is entitled to permanent and preliminary injunctive relief prohibiting Gatti and the Almaviva Defendants from interfering with the Company's contracts, from competing with the Company based upon any prior interference, from using the Company's confidential and trade secret information obtained through their interference, and from soliciting the Company's present and future employees, investors, and customers.

221.     As a direct and proximate result of Gatti and the Almaviva Defendants' misconduct, the Company has further suffered damages, including but not limited to, the loss of confidential and trade secret information, past and future existing and prospective business relations, and a loss of profitability.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

222.     To the extent that the conduct of Gatti and the Almaviva Defendants was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**

(**Misappropriation of Trade Secrets, Cal. Civil Code §§ 3426 *et seq.*, against All Defendants**)

223.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

224.    The Company's trade secret materials comprise documents and information that are not generally known to the public or to other persons who can obtain economic value from their disclosure or use.  These documents and information are the subject of reasonable efforts by the Company to maintain their secrecy, and they derive independent economic value from not being generally known.  Some or all of the documents and information comprising the Company's trade secrets constitute "trade secrets" under California Civil Code Section 3426.1.

225.    Defendants willfully and maliciously misappropriated the Company's trade secrets, which include but are not limited to, proprietary computer programs, business plans, and investor lists and contact information.

226.    By reason of the above-alleged acts and conduct of Defendants, the Company has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and the Company will be without an adequate remedy at law.

227.    The Company is entitled to recovery of statutory monetary damages from Defendants for the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation that is not taken into account in computing damages for actual loss. The amount of such relief will be determined at trial.

228.    If damages or unjust enrichment are not provable, the Company is entitled to an order for payment of a reasonable royalty from Defendants for the period of time the use of the Company's trade secrets could have been prohibited.

229.    Because Defendants' acts of misappropriation were both willful and malicious, the Company is also entitled to an award of statutory exemplary damages and attorneys' fees against Defendants.

230.     The Company is entitled to a permanent and preliminary injunction restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling the Company's trade secrets, or any product or services based on or incorporating all or part of the Company's trade secrets, and restraining them from obtaining any commercial advantage or unjust enrichment from the misappropriation of the Company's trade secrets.

231.     The Company is further entitled to an order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to the Company any and all of its trade secrets and confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's trade secrets and confidential, proprietary information, and a preliminary injunction requiring that Defendants preserve any and all such information, as well as the computers, networks, data storage devices, and/or other means by which such information has been obtained, received, collected, or stored by Defendants, or which could contain or embody any evidence relating to the Company's allegations as set forth herein.

## TWELFTH CAUSE OF ACTION

### (Conversion, against All Defendants)

232.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

233.     The Company is the sole owner of all confidential, proprietary information at issue in this Complaint.  Defendants wrongfully acquired the Company's confidential and proprietary business information.

234.     Through the above-alleged acts and conduct of Defendants, the Company has been damaged, and will continue to suffer great and irreparable harm and damage.  Defendants' conversion includes, but is not limited to, numerous items of confidential and proprietary information, as well as the Company's physical property.  The full amount of this irreparable harm will be difficult or impossible to ascertain, and the Company will be without an adequate remedy at law.

COMPLAINT

235.     The Company is therefore entitled to a preliminary and permanent injunction restraining Defendants, their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling the Company's confidential, proprietary information, or any product that is based on or incorporates part or all of such material, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of the Company's confidential and proprietary information.

236.     The Company is entitled to an order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to the Company any and all of its confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's confidential proprietary information, and to preserve any and all such information, as well as the computers, networks, data storage devices, and/or other means by which such information has been obtained, received, collected, or stored by Defendants or which could contain or embody any evidence relating to the Company's allegations as set forth herein.

237.     The Company is further entitled to recover damages from Defendants suffered by reason of the aforesaid acts in an amount to be determined at trial.

238.     To the extent Defendants were willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

(**Unfair Competition, *Cal. Bus. & Prof. Code* §§ 17200 *et seq.*, against All Defendants**)

239.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

240.     The acts of Defendants, as herein alleged, constitute unlawful, unfair and deceptive business practices in violation of California Business & Professional Code § 17200 *et seq*.

241.     The acts of Defendants, as herein alleged, are unlawful because they violate federal and state statutes, including but not limited to California Penal Code §§ 502 *et seq.*

COMPLAINT

1   (California Comprehensive Computer Data Access and Fraud Act), 18 U.S.C. §§ 1030 *et seq.*

2   (Computer Fraud and Abuse Act), 18 U.S.C. 1962 *et seq.* (Racketeer Influenced and Corrupt

3   Organizations), and California Civil Code §§ 3426 *et seq.* (Misappropriation of Trade Secrets).

4   242.    The unlawful, unfair and deceptive business practices of Defendants described

5   above present a continuing threat to the Company's business and intellectual property portfolio.

6   243.    As a direct and proximate result of these acts, Defendants have been unjustly

7   enriched, and in the future will continue to be unjustly enriched by, among other things, their use

8   of the Company's confidential and proprietary information and business processes and methods.

9   244.    The unlawful, unfair and deceptive business practices that Defendants have

10  engaged in to date have given them an enormous "head start" that a new entrant company

11  competing by legitimate means would not have.  This head start will allow each of the Defendants

12  to compete with the Company for funding and customers, whereas if they had conducted

13  themselves lawfully they would not be in a position to compete for many months, if not years.

14  245.    The Company has suffered damage by Defendants' unlawful, unfair and deceptive

15  conduct as alleged herein, and will continue to be damaged by Defendants' conduct until it is

16  enjoined.  Defendants have misappropriated the Company's valuable confidential and proprietary

17  information, including its trade secret information, and have used that information to gain an

18  undue advantage.

19  246.    The Company has been irreparably injured by Defendants' unlawful, unfair and

20  deceptive conduct.

21  247.    The Court should find that Defendants' actions violate California Business &

22  Professional Code § 17200 *et seq.*, and award Plaintiff such restitution, disgorgement and/or

23  damages as are permitted by statute as well as injunctive relief, including preliminary and

24  permanent injunctive relief restraining Defendants, as well as their employers, agents, employees,

25  and all persons acting in concert with them, from using, copying, publishing, disclosing,

26  transferring, or selling the Company's trade secrets, or any product or services based on or

27  incorporating all or part of the Company's trade secrets, and restraining them from obtaining any

28  commercial advantage or unjust enrichment from the misappropriation of the Company's trade

COMPLAINT

secrets.

## FOURTEENTH CAUSE OF ACTION

### (**Unjust Enrichment, against All Defendants**)

248.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

249.     As a result of Defendants' actions, alleged in detail above, including but not limited to their misappropriation and use of confidential information, interference with contractual and other relationships, and fraudulent misrepresentations to the Company, Defendants have profited at the Company's expense.

250.     Defendants' receipt of these benefits is at the direct expense of the Company, which has invested years in the development of proprietary, confidential, and trade secret information that was misappropriated by Defendants for their own use.

251.     It would be against equity and good conscience to allow Defendants to retain any of the profits, opportunities, or other benefits they have and will continue to realize – at the direct expense of the Company – by means of their wrongdoing described herein.

252.     Should the Company's claim for breach of contract against Gatti, set forth above, not be awarded for any reason, in the alternative, the Company is entitled to recover pursuant to its claim for unjust enrichment set forth herein.

253.     The Company is entitled to recovery of compensatory damages from Defendants for the losses resulting from their wrongful conduct and any unjust enrichment they may have obtained.

## PRAYER FOR RELIEF

WHEREFORE, the Company prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1.     A permanent injunction, and during the pendency of this action, a preliminary injunction, prohibiting Defendants, as well as their employers, agents, employees, and all persons acting jointly, in concert or in participation with them, from:

a.     interfering with the Company's current and prospective business

relationships, interfering with the Company's contracts, competing with the Company through use of the misappropriated tangible and intangible assets of the Company, including its confidential information and trade secrets, from soliciting the Company's present and future employees, investors, and customers, from any further use of the confidential information and trade secrets information misappropriated from the Company to engage in any such solicitations or for any other purpose, and from making false and misleading statements to anyone regarding the Company;

b.    restraining Gatti from any making any further statements, through social media or otherwise, that she is or was associated with the Company;

c.    from using, copying, publishing, disclosing, transferring, or selling any of the Company's confidential information and trade secrets, or any product or services based on or incorporating all or part of the Company's trade secrets, and restraining them from obtaining any commercial advantage or unjust enrichment from the misappropriated trade secrets and confidential information of the Company

d.    granting a preliminary injunction to preserve any and all trade secrets and confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's trade secrets and confidential, proprietary information, as well as the computers, networks, data storage devices, and/or other means by which such information has been obtained, received, collected, or stored by Defendants, as well as their employers, agents, employees, and all persons acting in concert or in participation with them;

2.    An order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to the Company any and all of its trade secrets and confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's trade secrets and confidential, proprietary

COMPLAINT

information;

3.    An order requiring Gatti to return to the Company all property conveyed to her in the SPA, and otherwise in connection with her work for the Company, including all stock in the Company currently owned or possessed by Gatti, as well as the laptop conveyed to her by the Company and that remains in her possession;

4.    An award of nominal, compensatory, rescissionary and all other damages available at law against each of the Defendants, jointly and severally;

5.    An award of equitable relief, including, but not limited to, rescission of the SPA, or in the alternative a declaration that the shares awarded Gatti under the SPA never vested as a result of her breaches and wrongdoing, or in the alternative a transfer to the Company as restitution of all of the vested shares awarded to Gatti under the SPA; disgorgement, and restitution;

6.    An award of aggravated, treble and punitive damages against each of the Defendants, jointly and severally;

7.    Statutory damages;

8.    An award of interest as allowed by law;

9.    Attorneys' fees, costs and expenses;

10.    All costs of the Company's investigation and of the suit herein; and

11.    Such other and further relief as the court may deem just and proper.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

| | |
|---|---|
| 1 | **JURY DEMAND** |
| 2 | Loop AI Labs, Inc. requests a trial by jury for all issues so triable. |
| 3 | Respectfully submitted, |
| 4 | |
| 5 | Dated: February 20, 2015 |

FREITAS ANGELL & WEINBERG LLP

*/s/Daniel J. Weinberg*
DANIEL J. WEINBERG (SBN 227159)
dweinberg@fawlaw.com
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California  94065
Telephone:      (650) 593-6300
Facsimile:      (650) 593-6301


VALERIA CALAFIORE HEALY (*pro hac vice* pending)
valeria.healy@healylex.com
HEALY LLC
154 Grand Street
New York, New York  10013
Telephone:      (212) 810-0377
Facsimile:      (212) 810-7036


Attorneys for Plaintiff
LOOP AI LABS, INC.