DANIEL J. WEINBERG (SBN 227159)
dweinberg@fawlaw.com
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California 94065
Telephone: (650) 593-6300
Facsimile: (650) 593-6301

VALERIA HEALY (*pro hac vice*)
valeria.healy@healylex.com
HEALY LLC
154 Grand Street
New York, New York 10013
Telephone: (212) 810-0377
Facsimile: (212) 810-7036

Attorneys for Plaintiff
LOOP AI LABS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ANNA GATTI, an individual, ALMAVIVA S.p.A., an Italian corporation, ALMAWAVE S.r.l. an Italian corporation, ALMAWAVE USA, Inc., a California corporation, IQSYSTEM LLC, a California limited liability company, IQSYSTEM Inc., a Delaware Corporation,<br><br>Defendants. | Case No. 3:15-cv-00798-HSG<br><br>**DECLARATION OF VALERIA C. HEALY IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND RELATED APPLICATIONS** |

I, Valeria C. Healy, based upon my personal knowledge, information and belief, hereby declare under penalty of perjury as follows:

1. I am an attorney duly admitted to practice law in the State of New York and have been admitted *pro hac vice* by this Court in this proceeding. I am a member of Healy LLC, counsel for Plaintiff Loop AI Labs Inc. (the "Company") in the above-captioned action. I submit this declaration in support of Plaintiff's Motion for a Temporary Restraining Order and related submissions. I am familiar with the investigation and proceedings relating to the above captioned action.

2. Where necessary to assist the Court in reviewing the contents of certain evidence submitted herewith, which was originally written in Italian or in a mix of Italian and English, I provide below a translation of the relevant language set forth in the document. I am a native Italian speaker and competent to translate from English to Italian. I hereby certify that any translation provided by me below is an accurate and faithful translation from the Italian language to the English language. The Company will submit certified translations of additional relevant evidence as the Court may request or as will be otherwise required in the course of the proceedings.

3. Because some of the evidence contains a mix of Italian and English, to assist the Court in determining where words or sentences quoted from evidence have been translated, this declaration will reflect any translation from Italian to English by bolding and underscoring the translated parts.

**I. GATTI AND THE OTHER DEFENDANTS ARE LIKELY TO CONTINUE SECRETING AND DISSIPATING ASSETS, INCLUDING BY HIDING THEM IN SWISS BANK ACCOUNTS.**

4. Although the Company's investigation is ongoing, the Company has discovered evidence of numerous bank accounts created by Defendant Gatti in multiple geographic locations,

in her name as well as in the name of Defendants Almawave USA, IQSystem LLC and/or IQSystem Inc. and others. The accounts discovered to date, include:

   i. Three foreign bank accounts, as follows:

   i. One bank account in the name of Defendant Gatti at UBS in Switzerland, account number xxx-xx5026;

   ii. One bank account in the name of Defendant Gatti at Credit Swiss in Switzerland, account number xxxx11-20;

   iii. One bank account in the name of Defendant Gatti at Banca Intesa San Paolo in Italy, account number xxxx5111;

The Swiss bank accounts contained substantial sums as of 2014.

   ii. Five U.S. Bank Accounts, as follows:

   i. One bank account in the name of Defendant Gatti at Bank of the West, San Francisco, California;

   ii. One bank account in the name of Defendant Almawave USA, Inc. at Bank of the West, San Francisco, California;

   iii. One bank account believed to be in the name of IQSystem LLC at unknown banking institution, US West Coast branch, number xxxxx3189;

   iv. One bank account believed to be in the name of IQSystem LLC at unknown banking institution, US East Coast branch, number xxxxx6379;

   v. One or more bank accounts in the name of Defendant Gatti and/or the other Defendants and co-conspirators at Wells Fargo, in San Francisco;

5. Despite the fact that Gatti has been a resident of the United States since at least 2004, in addition to the foregoing foreign accounts she holds in her name, Gatti is believed to also have opened additional bank accounts at UBS in Switzerland in late 2014, as well as other accounts earlier that year.

6. For instance, on February 10, 2014, shortly after the Defendants had began the Almawave USA and IQSystem operation in San Francisco, Defendant Gatti made a note to herself to "**Open a Bank Account in the Cantonal State.**" Attached hereto as Exhibit 23 is a

true and correct copy of the calendar entry made by Defendant Gatti reflecting this note, part of which is written in the original Italian language. In the same note, Defendant Gatti writes: "**Transfer** in kind." *See id.* The reference to a "Cantonal State" is likely a reference to Switzerland, which has regions subdivided in "Cantons."[1]

7. As to UBS Bank, on October 17, 2014, Ms. Gatti sent a reminder to herself to provide a copy of her driver's license and passport to UBS. A true and correct copy of this note is attached hereto as Exhibit 18. These identification documents are typically associated with the opening of a new account.

8. Gatti also appears to have a close and atypical relationship with UBS's bankers in Switzerland. Gatti was in close contact with Fabrizio Pilotti, a UBS banker based in Geneva, Switzerland, as well as other bankers at UBS in Geneva. Some of Defendant Gatti's most recent activities with these UBS bankers from Switzerland, also include unusual meetings. For instance, on December 5, 2014, Gatti met a UBS banker, at the Omni Hotel in San Francisco beginning at 9:30am. A true and correct copy of the calendar entry reflecting this meeting is attached hereto as Exhibit 19.

9. On January 30, 2015, Gatti had a call with a UBS banker. A true and correct copy of the calendar entry reflecting this call is attached hereto as Exhibit 20. On **February 23, 2015**, Gatti then met with the UBS banker again *in person* in San Francisco. A true and correct copy of the calendar entry reflecting this meeting is attached hereto as Exhibit 21. Also on **February 23, 2015**, Defendant Gatti was reported to have engaged in banking transactions at Bank of the West, San Francisco, 295 Bush Street branch. Mr. Gonzales, a Bank of the West business account representative, who handles Defendant Almawave USA's bank account, provided this information to the Company during a visit on February 24, 2015 as a result of his confusion

---

[1] *See, e.g.,* "Cantons of Switzerland," http://en.wikipedia.org/wiki/Cantons_of_Switzerland, last accessed on March 1, 2015.

relating to Gatti's affiliation with Almawave USA as well as the Company (which also has an account in that bank), and his belief that Gatti's handling of those various accounts related to one and the same business operation. *See* Company Decl. dated March 2, 2015, being submitted concurrently herewith. During the same conversation, Mr. Gonzales also reported that when Defendant Gatti went to the branch on February 23, 2015, she appeared agitated.

10. Perhaps not coincidentally, the Omni Hotel in which Defendant Gatti previously met with the UBS Banker is within a few minutes walk from the Bank of the West branch that Gatti visited on February 23, 2015, the same day that she also had an in person meeting with the UBS banker in San Francisco:



11. Gatti's meeting with the UBS banker on February 23, 2015 and her engaging in banking transactions at Bank of the West on the same day may lead to the inference that Gatti was engaging in banking activities designed to secret of assets.

12. Defendant Gatti is also believed to have used other people to open additional bank accounts in their names but for her benefit. For instance, Gatti recently used an elderly aunt resident in Italy who was visiting her for a few weeks to open a bank account in her name at Bank of the West. Upon information and belief, Gatti used other people as well to open additional accounts, and discovery will be necessary to locate the full spectrum of accounts opened by Gatti and the other Defendants and others at their direction.

13. There is also other evidence that Gatti and the other Defendants have a habit of moving assets in atypical ways and lying to make them look like they belong to others, among other things. Just by way of example, attached hereto as Exhibit 33 are true and correct copies of relevant excerpts of email correspondence by Gatti in which discussing ways in which she could obtain a visa for "Gennaro" (DiNapoli's son), Gatti states that she is "open to being creative," and that she "decided to go for an E visa with the purchase of my current consulting and investing company," making it look as though the funds come from Gennaro. Attached hereto as Exhibit 31 is a true and correct copy of an email in which Gatti and DiNapoli discuss accessing three bank accounts located in undisclosed countries (and in the name of others) at BNP Paribas and First Investment Bank.

14. Gatti's banking activities, numerous bank accounts, and unusual interactions with UBS bankers, including their traveling to San Francisco from Geneva, Switzerland make clear that Gatti would be able, and would be likely, to secret assets abroad to become judgment proof in this case.

15. In addition, Gatti has a history of lying about her financial condition and her assets. For instance, Gatti repeatedly pled poverty to a Company employee who was newly hired in November 2014, lying about how she could not afford sending her child to a particular (and inexpensive) school in San Francisco because she claimed she had no money. This employee was

so concerned about Gatti's alleged inability to support herself that she reported Gatti's statements regarding her financial wherewithal to Company's other management, only to later learn those statements were false. In fact, as of the time of these statements, Gatti had just bought a Maserati.

16. The Company has discovered that Gatti has a dangerous history of lying, even to people as important as the father of her child, to whom she repeatedly concealed her true financial status. *See* Declaration of Charles H. Ferguson dated March 2, 2015 ("CHF Decl.").

17. In addition to concealing her assets by engaging in questionable banking maneuvers through the use of a multitude of accounts in the names of multiple account holders, Defendant Gatti and the other Defendants and co-conspirators that she controls, including, but not limited to, the IQSystem Defendants and Almawave USA, are very likely to continue to engage in a substantial dissipation of the assets that they gained through the illegal activities described in the Complaint. For instance, Gatti and her boyfriend DiNapoli, purchased, within a short period of time, a Maserati, a Porsche, a Bentley, and a Tesla. More recently, Gatti purchased yet another car for her nanny.

18. On January 31, 2015, Gatti made an offer for an amount over $1.5 million to purchase (in the name of IQSystem) an apartment at the Ritz Carlton in San Francisco. Attached hereto as Exhibit 27 is a true and correct copy of the documents reflecting said offer. Previously, on October 24, 2014, Gatti sent an email to an individual in Italy indicating she wanted to make an offer for a house in Florence, Italy and wanted to understand how to "optimize" the transaction. Attached hereto as Exhibit 32 is a copy of one of the emails relating to the Florence real estate.

19. In light of Gatti's history, and her experience in banking maneuvers across continents, there is a substantial likelihood that Gatti and her co-defendants IQSystem and Almawave USA, which she controls, will secret and/or dissipate assets in order to become

judgment proof.

20. Unless this Court grants an Order restraining the sale, pledging or other disposition of the Defendants' assets, including any additional assets that the Company may find through discovery, the Company will be irreparably harmed in its right to receive from the Defendants restitution and damages resulting from the wrongdoing described in the Complaint.

**II.   OTHER RELEVANT FACTS, INCLUDING GATTI'S IMMINENT DEPARTURE TO ITALY.**

21. In the recent past, Defendant Gatti and her boyfriend, Tony DiNapoli ("DiNapoli") who assisted Gatti and participated in the illegal enterprise described in the Complaint, have traveled extensively to Italy and other places. Attached hereto as Exhibits 25 and 26 are true and correct copies of tickets reflecting their most recent travels relevant here.

22. As reflected in Exhibit 25, Gatti is again scheduled to leave the United States for Italy on March 9, 2015.

23. In the course of the Company's investigation following Gatti's termination on February 3, 2015, the Company discovered that Gatti had activated an auto-forward feature on her Company' email and that she had forwarded to her personal email large amounts of Company documents, which all include confidential and trade secret information covered by the employment agreement that she signed.

24. As reflected in Exhibit 35, the Company's investigations have further uncovered that Gatti planned to bring her Company computer to a forensic computer expert named Gaetano on February 6, 2015. Gatti has made use of such computer experts in the past. Attached hereto as Exhibit 36 is a true and correct copy of an excerpt from a different legal proceeding involving Gatti and DiNapoli referencing her use of computer experts.

25. Based on my review of the evidence discovered to date, in addition to a Company computer, Gatti has misappropriated materials ranging from the highly confidential patent

applications, and all manners of communications and documents containing confidential information and trade secrets of the Company, including, but not limited to investors contacts, communications and strategies, know-how and technology details relating to the Company's technology, research, product and service ideas and plans, a 300+ contact list, information and documents relating to all aspects of the Company's business, methodologies, finances, pricing, partnerships, marketing plans, contract information and business plans, financial forecasts among other things.

26. Gatti has also stolen attorney-client privileged information of the Company, which she has not hesitated to use in her quest to persuade the Company not to sue her, including by sending, after being terminated by the company, email correspondence to the undersigned enclosing attorney-client privileged advice given to the Company in 2014 in reference to a matter having nothing to do with her.

27. Gatti has revealed to be a dangerous and reckless person, who instead of cooperating and doing the right thing after being caught, has raised the ante by engaging in spoliation of highly relevant evidence, harassing the Company's employees, investors as well as third party witnesses repeatedly by email, phone and text messages.

28. On February 12, 2015, the undersigned emailed Gatti and requested that she stop harassing individuals relating to the Company and cease to send her employees at Almawave to the Company's office, as she had done a few days earlier using false pretenses. A true and correct copy of this notice is attached hereto as Exhibit 34. Shortly thereafter, co-counsel sent Gatti a second email reminding her of her obligations to preserve all relevant evidence.

29. Despite these requests, on February 18, 2015, at approximately 11:20p.m. PST, Gatti found a way to access the electronic calendar maintained by the Company in Gatti's former electronic account with the Company, even though the password had been changed by the

Company following her termination.  Gatti then proceeded to wipe clean from it critical evidence of her wrongdoing, including, but not limited to, deleting details of her illicit meetings, highly relevant to this action.  Attached hereto as Exhibits 11-12 are true and correct copies of a sampling of the evidence before and after Gatti's computer attack.

30.     In addition, Gatti has continued to harass Company employees, investors, and witnesses, as well as using the information taken by the Company to contact investors with whom she dealt while she was at the Company.  Gatti's conduct makes clear that unless she is restrained by a Court order she will not likely stop her misconducts.

### III.     ALMAVIVA S.P.A.'S AND ALMAWAVE S.R.L'S US ACTIVITIES ARE EXTENSIVE, CONTINUOUS AND SYSTEMATIC.

31.     Defendants Almaviva S.p.A. and Almawave S.r.l. (together referred to as Almaviva IT, and with Almawave USA referred to as the "Almaviva Group) are corporations headquartered in Rome.[2]  Almaviva S.p.A. is a private company that directly owns and controls all aspects of its subsidiaries, including the other Almaviva Defendants in this action.  As alleged in the Complaint, Almaviva IT operates internationally and their top-level officers participated, directed, financed and substantially benefitted from the wrongdoing committed against the Company in San Francisco.

32.     Some exemplary evidence relating to the foregoing Defendants' direct participation in the wrongdoing described in the Complaint and their activities towards the forum is set forth below:

  i.     Upon commencing their relationship with Gatti, Almaviva IT touted on its website the fact that Gatti was concurrently CEO of the Company in San Francisco, as well as the new CEO of their newly launched subsidiary Almawave USA.  Specifically,

---

[2] http://www.almaviva.it/EN/Pagine/default.aspx and http://almawave.com/ last accessed on March 1, 2015.

in the bio published, they state as follows:

"**Anna Gatti - Chief Executive Officer of Almawave USA**
Lives in San Francisco, *where she is co-founder and CEO of a start-up using artificial intelligence applied to big data*. []."

(Emphasis added). A true and correct copy of the cached internet page published by Almaviva IT, in its original Italian language form, is attached hereto as Exhibit 4(a). A true and correct copy of the same document available in Word format from the Almaviva IT website is attached hereto as Exhibit 4(b)

ii. Top-level management of Almaviva IT are also officers of Almawave USA. Attached hereto as Exhibits 5-7 are true and correct copies of pages from the Almaviva Defendants' website showing that the same management is in charge and controls the companies relevant here. For instance Valeria Sandei, who was intimately involved in and participated in the wrongdoing described in the Complaint is the Chief Executive Officer of Almaviva IT, the President of Almawave USA, and the Chief of Strategic Marketing of Almaviva IT. Attached hereto as Exhibit 37, as well as at Exhibits 5-7 above, are true and correct copies from the Almaviva Defendants website reflecting some of these titles.

iii. Attached hereto as Exhibit 3 is a true and correct copy of a document showing that the CFO of Almaviva IT in Italy was communicating from Italy to San Francisco in furtherance of the wrongdoing described in the Complaint. The CFO was the one overseeing the financial affairs of Almawave USA's business and its financing from Italy. Almaviva IT was also "currently funding" Almawave USA with a "$100K/month," of which "$70K" a month went to Gatti, through the IQSystem Defendants.

iv. Some time in 2014, Almaviva IT hosted a very large function at the Italian

Consulate in San Francisco to officially announce the launch of Almawave USA. Attached hereto as Exhibit 24 (and excerpted below) is a true and correct copy of a document discussing Almaviva's sponsorship of this large commercial event in San Francisco:



33. Attached hereto as Exhibit 13, is a true and correct copy of a document discussing the event and reporting that Almaviva was launching Almawave USA in San Francisco, California to "present[] the features of […a] semantic platform technology" along with Anna Gatti.

34. In addition to Valeria Sandei and Marco Tripi, who are the top level officers of all Almaviva Defendants here, Almaviva IT directly participated in the wrongdoing described in the Complaint through ongoing and continuous electronic, wire and postal communications with Gatti and the other Defendants in San Francisco, as well as through numerous in person meetings

in San Francisco and elsewhere in California by the following sample list of employees discovered from the evidence:

i. As to Almaviva S.p.A.:

  i. Antonio DiBitonto, accounting;

  ii. Angela Nicollella, treasury and financial planning;

  iii. Mariantonietta Perri, director of legal affairs;

  iv. Sergio Calserara, Chief Contracts Counsel;

  v. Sabrina Nobili, Head of Corporate Affairs;

  vi. Christian DeFelice, Chief Financial Officer;

  vii. Andrea Rossetti, Director of Planning & Control;

ii. As to Almawave S.r.l.:

  i. Luca Ferri, Information Management;

  ii. Raniero Romagnoli, Technology Labs;

  iii. Raffaella Boldini, Director of IT Presale and Sale Services.

35. Attached hereto as Exhibits 28 and 29 are true and correct copy of some examples of the foregoing activities by Defendants Almaviva S.p.A. and Almaviva S.r.l. with Gatti in San Francisco.

36. Almaviva IT also has general systematic contacts with California. Among other things, Almawave USA San Francisco office is described on the Almaviva IT's website as its US branch office. *See* attached Exhibits 4-5, and 16 reflecting true and accurate copies of Almaviva's website. As already discussed above, Almaviva IT and Almawave USA have substantial overlap of high-level management. *See* Exhibits 7 attached hereto. The officers of the two Italian Defendant companies have made frequent visits to California, including by making business presentations at the San Francisco Italian consulate, as well as at numerous other

businesses and events in California. Attached hereto as Exhibits 13 and 24 are true and correct copies of additional examples relating to these activities.

### IV. NOTICE OF THE LAWSUIT AND THE INTENT TO APPLY FOR A TRO.

37. All Defendants were promptly and repeatedly notified of the action, the Summons, the Complaint and related filings, and the Company's intention to move for a TRO.

38. Specifically, Almaviva IT and Almawave IT were promptly notified of the lawsuit immediately after its filing, on February 21, 2015. *See id.*, Ex. 8. A second notice of the action, enclosing the executed summons, as well as all other relevant documents filed in the action, was sent to Almaviva IT and Almawave IT by Electronic Certified Mail, known in Italian as "Posta Elettronica Certificata" or "PEC" on February 24, 2015. *See* Exhibits 9-10 hereto.

39. In the transmittal letter of February 24, 2015, Almaviva IT and Almawave IT were also informed that in light of the urgency of the matters set forth in the Complaint, the Company intended to move the Court for emergency relief. *See* Exhibit 10.

40. As set forth in the declaration of Italian counsel Gianluigi Muscas, transmission of process and other legal documents through the Italian Certified Electronic Mail — known in Italian as "Posta Elettronica Certificata" or "PEC" — has legally binding value under Italian law. *See* Exhibit 9 hereto. Almaviva IT's and Almawave IT's official PECs (as defined in Attorney Muscas' declaration and shown in his accompanying exhibits) confirmed receipt and accepted the notice of the Company transmitting process and other documents through the Italian PEC system. *See id.*

41. In further support of its application for alternative service of process pursuant to Rule 4(f)(3) by means of the Italian PEC system (Certified Electronic Mail), the Company has also commissioned a certified translation of the Complaint from English into Italian. Attached hereto as Exhibit 1 is a true and correct copy of said certified translation of the Complaint.

42. Notice and service of process on the other Defendants is addressed in the March 2, 2015 Declaration of counsel D.J.Weinberg.

43. As set forth therein, while all US corporate Defendants have been served, Defendant Gatti's whereabouts remain undetermined.

44. Nonetheless, the Company has received confirmation that Gatti duly received the notice provided to her by the Company of its intent to move for a TRO. Specifically, the undersigned notified Gatti of the Company's intent to so move on February 21, 2015. Defendant Gatti confirmed receipt of this notice on February 22, 2015. A true and correct copy of Defendant Gatti's email of February 22, 2015 is attached hereto as Exhibit 15

45. On February 26, 2015, the undersigned also gave notice of the Company's intent to move for a TRO to attorney Richard Levine, who contacted the undersigned on February 26, 2015 and indicated that he had been consulted by Gatti and that he was currently representing Gatti for limited purposes, but was "not certain" if he "will be representing her in the action." Mr. Levine confirmed receipt of said notice of the Company's intent to move for a TRO on February 27, 2015.

**V.     OTHER EVIDENTIARY MATERIALS.**

46. Attached hereto as Exhibit 3 is a true and correct copy of an email chain between Anna Gatti and Gary R. Price.

47. Attached hereto as Exhibit 14 is a true and correct copy of one of Gatti's agreements with the Company.

48. Attached hereto as Exhibit 17 is a true and correct copy of an email chain dated May 30, 2014.

49. Attached hereto as Exhibit 22 is a true and correct copy of a calendar entry created by Gatti and stored in her Company account.

50. Attached hereto as Exhibit 30 is a true and correct copy of the Whois domain registrar information for Defendants IQSystem.

Dated: March 3, 2015

                                                   /s/ Valeria C. Healy  
                                          VALERIA CALAFIORE HEALY