THOMAS J. LOSAVIO, SBN 51023
JAMES F. REGAN, SBN 252199
LOW, BALL & LYNCH
505 Montgomery Street, 7th Floor
San Francisco, California 94111
Telephone: (415) 981-6630
Facsimile: (415) 982-1634
Email: tlosavio@lowball.com
Email: mbeuselinck@lowball.com

Attorneys for Defendants
ANNA GATTI and IQ SYSTEMS, LLC

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS, INC., a Delaware Corporation,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>ANNA GATTI, et al.,<br><br>　　　　　　Defendants. | Case No. 3:15-CV-00798-HSG<br><br>**OPPOSITION OF DEFENDANTS ANNA GATTI and IQ SYSTEMS, LLC TO PLAINTIFF'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER; ASSET RESTRAINING ORDER; AND EXPEDITED DISCOVERY** |

Defendants ANNA GATTI ("GATTI") and IQ SYSTEMS, LLC ("IQ") oppose the ex parte motion of plaintiff LOOP AI LABS, INC. ("LOOP") for a temporary restraining order, asset restraining order and expedited discovery for each of the following reasons set forth in detail below. This Opposition is based on the Memorandum of Points and Authorities below and the accompanying Declarations of Anna Gatti, Dario Vignudelli and Gabriele Pansa.

## I. INTRODUCTION

While the plaintiff's moving papers are not lacking in quantity (57 page Complaint with 253 paragraphs; approximately 53 different documents and exhibits filed in support of the temporary restraining order), they are sorely lacking in quality, specifics and admissible evidence. Of the 14 different causes of action alleged, virtually all other than the trade secrets claim and possibly one or two

others are subject to a motion to dismiss based on the holding of *Sunpower Corp. v. SolarCity Corp.*, No. 12–CV–00694–LHK, 2012 WL 6160472, at *5 (N.D. Cal. Dec. 11, 2012) ["…in order to state a claim based on the taking of information, a plaintiff must show that he has some property right in such information (i.e. that the information is proprietary). **If the basis of the alleged property right is in essence that the information is that it is "not … generally known to the public," (Cal. Civ.Code § 3426.1(d)(1)), then the claim is sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that the information fails to meet the definition of a trade secret. To permit otherwise would allow plaintiffs to avoid the preclusive effect of CUTSA (and thereby plead potentially more favorable common-law claims) by simply failing to allege one of the elements necessary for information to qualify as a trade secret.** (emphasis added)."]. Plaintiff has alleged various wrongdoings relating to generalized "confidential information" at Complaint paragraphs: 18,45,79,81,83,86,89,90,92,97,122,125,129,131,132,136,141,144,175,179,180,181, 192,195,197,201, 207,219,220,221,231,233,234,235,236,243,245,249 and 250.

Perhaps the most egregious example of the lack of substance in the "evidence" submitted in support of the TRO is the Declaration of Charles Ferguson, the self-described father of GATTI's daughter, who complains that GATTI made over $350,000 in improvements on a home (purchased in his name) for which GATTI and his daughter are not paying rent. See, Charles Ferguson Declaration, at ¶5 and ¶8. At the same time, Mr. Ferguson offers no percipient or other knowledge whatsoever regarding any of the allegations of the 253 paragraph complaint.

Plaintiff seeks an asset restraining Order, but nowhere in the Complaint nor in the TRO moving papers is an amount of alleged money damage specified. Indeed, the gravamen of the TRO is that there is no amount of money damages capable of rectifying the alleged harm caused and that is why injunctive relief is necessary. Plaintiff argues that there is something nefarious about a citizen of Italy, residing in the United States, having bank relationships in both countries. There is no allegation in the Complaint or in the TRO moving papers that any funds of plaintiff, in any amount, are missing or even allegedly have been misappropriated by plaintiff.

Plaintiff's moving papers argue for the necessity of expedited discovery, but no showing of necessity has been made in that regard. Ms. Gatti has voluntarily cancelled her planned trip to Italy that

was set for March 9 in order to make herself available to deal with plaintiff's allegations.

## II. ARGUMENT

### A. The Court Has Not Been Provided With the Basis to Make An Informed Decision

While plaintiff has asserted the misappropriation of every type of trade secret known to mankind (Complaint, p.16, ¶70), plaintiff has offered no documentary evidence of any trade secret or other confidential information to the court for its independent in camera inspection to determine the reasonableness of the trade secret claim. Since all of the other claims hinge on the validity of the trade secret claim, this is a significant omission. "*[I]n camera* inspection is a commonly-used procedural method for determining whether information should be protected or revealed to other parties. *See Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1222–23 (9th Cir.2001) (reviewing district court's Freedom of Information Act determination based only on *in camera* inspection of the government records); Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence §§ 216, 222 (1994 & Supp.2001) (noting use of *in camera* inspection to determine whether trade secrets privilege or state secrets privilege applies). *But cf. Natta v. Zletz*, 405 F.2d 99, 101 (7th Cir.1968) (criticizing *in camera* review in context of claim of trade secrets privilege on ground that counsel seeking disclosure had no opportunity to rebut the trade secrets claim). In cases such as this, there are few, if any, alternatives to *in camera* inspection that do not defeat the purpose of the rules and privileges protecting confidential material. As a result, we rely in the first instance upon the district court conducting the *in camera* inspection to assess critically the arguments of the party opposing disclosure. Meaningful appellate review, made possible by the district court's articulation of compelling reasons for its decision supported by specific factual findings, provides a second line of defense. *Hagestad*, 49 F.3d at 1434–35." *Foltz v. State Farm Mut. Auto. Ins. Co.* (9th Cir. 2003) 331 F.3d 1122, 1136.

This absence alone is sufficient ground to deny the requested temporary restraining order.

### B. Plaintiff Has Failed to Provide Evidence of Independent Economic Value

Additionally, while Plaintiff concedes that "independent economic value" is one element of the definition of a trade secret (see TRO Memorandum, p.9, ll.11-13), none of the Declarations, Exhibits or other documents submitted offers anything of an objective nature to quantify either the amount of investment made in the alleged trade secrets, the value put on the trade secrets by third parties such as

-3-
OPPOSITION OF DEFENDANTS ANNA GATTI and IQ SYSTEMS, LLC TO PLAINTIFF'S EX PARTE MOTION
FOR A TEMPORARY RESTRAINING ORDER; ASSET RESTRAINING ORDER; AND EXPEDITED DISCOVERY
K:\2500\sf0173\TRO_Opp.docx                                                        Case No. 3:15-CV-00798-HSG

customers or investors, or any other objective indicia of economic value. When information has no independent economic value, a claim for misappropriation lacks merit. *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, (2000) 83 Cal.App.4th 409, 429.

**C. No Trade Secret or Other Information Was Given to Dario Vignudelli, TheNeeds or The Almaviva Defendants**

The business models of Loop AI Labs, Inc. and the Almaviva defendants are fundamentally different. The Almaviva defendants have a product already in the market, the focus for which is primarily speech-recognition software designed to assist call center operators assist customers in efficiently responding to inquiries. Loop AI Labs, Inc. does not have a product in the market, is attempting to develop a product which is primarily text-recognition software to be focused on the identity of certain concept models in various forms of social media, the precise customer niche for which has not yet been determined. See, Declaration of Dario Vignudelli in Opposition to Motion for Temporary Restraining Order, at p. 2, ¶5 and Declaration of GATTI at p. ¶24-25.

It is not true that Mr. Vignudelli took Loop AI Labs, Inc. confidential information and trade secrets. It is not true that he used Loop AI Labs, Inc. confidential information and trade secrets for the Almaviva defendants. Vignudelli Dec. ¶3. He did not take or use Loop AI Labs, Inc. confidential information and trade secrets for the benefit of any person or entity. Vignudelli Dec. ¶4. There was no overlap between the work that he did for Loop AI Labs, Inc. and the work he did for the Almaviva defendants. The work he did for the Almaviva defendants was a market assessment of their product compared to other products already in the market. The work he did for Loop AI Labs, Inc. in 2014 was a university project (together with other classmates) to better understand students behavior on online purchasing and pro bono work formatting slides for their pitch deck and formatting the business plan. In 2013 he delivered for Loop AI a first draft of value proposition deck and the business plan. These last two activities were completed in 2013. Vignudelli Dec. ¶6. The work performed for Almaviva never hindered his ability to perform additional activities. Vignudelli Dec. ¶7.

Gabriele Pansa is the Chief Executive Officer of TheNeeds. The Needs is a software application which provides news content to individual users based on their interests, somewhat comparable to the competing applications Flipboard and Feedly. TheNeeds software application

launched in 2013. Pansa Dec. ¶2.

Neither Anna Gatti nor anyone else associated with Loop AI Labs, Inc. has ever provided any confidential proprietary or trade secret information to anyone at TheNeeds nor has she or anyone else provided access to such information. No business opportunities, software engineers or advisors of Loop AI Labs, Inc. were ever diverted to TheNeeds by Anna Gatti or anyone else. Pansa Dec. ¶3.

At some point, a potential Investor who knew Mr. Pansa and who knew Anna Gatti told him that he should get in touch with her because she was another Italian who was familiar with Silicon Valley. Mr. Pansa believed this was an entirely spontaneous communication made in the context of the conversation. Subsequently, Mr. Pansa believes this Investor sent an email providing an introduction of him to Anna Gatti. Pansa Dec. ¶4.

Mr. Pansa believes it is misleading and inaccurate to state that TheNeeds and Loop AI Labs, Inc. operate in "virtually identical technology space" because they both move unstructured data to structured data in the internet area. The same could be said for Google and TheNeeds. Pansa Dec. ¶5.

While it is true that there were discussions between TheNeeds and Anna Gatti regarding a possible advisory role, no advisory or consulting agreement, oral or written, was ever reached. Anna Gatti has never received 10% of the shares of TheNeeds nor was an offer in that amount ever made to her. She has never held any shares in TheNeeds. Pansa Dec. ¶6.

The concept of the "digital DNA" is not a concept that TheNeeds obtained directly or indirectly from Loop AI Labs, Inc. or Anna Gatti. "Digital DNA" is a term in different industries and a Google search reveals such applications as: a public art sculpture in Palo Alto, a boutique brokerage and advisory firm that specializes in domain name analysis and a Digital DNA Games. In several cases, DigitalDNA or variation such as digitalDNA Technology is a registered trademark. Pansa Dec. ¶7.

At some point, Mr. Pansa believes he and Anna Gatti had a conversation about a potential strategic fit with Almawave. Almawave was not interested. Pansa Dec. ¶8.

**D. Plaintiff Has Failed to Provide Evidence of Economic Harm**

As noted above, Plaintiff seeks an asset restraining Order, but nowhere in the Complaint nor in the TRO moving papers is an amount of alleged money damage specified. The non-existent showing of economic harm does not justify an asset restraining order sought by plaintiff.

### E. Plaintiff Has Failed to Show the Necessity for Expedited Discovery

As noted above, Ms. Gatti has voluntarily cancelled her planned trip to Italy that was set for March 9 in order to make herself available to deal with plaintiff's allegations. See Declaration of GATTI, at p. 9, ¶28.

### F. Plaintiff and GATTI Agreed That Gatti Could Consult with Other Companies

Notwithstanding the terms of the written employment agreement which required GATTI to devote full time to plaintiff, GATTI and Gianmauro Calafiore, majority shareholder of plaintiff, acting on behalf of Plaintiff, had an oral agreement which permitted each of them to consult for other companies while working for plaintiff. By way of example, Mr. Calafiore is the President of SMSit.it, a messaging firm, and he founded the Amici World School in San Francisco. See Declaration of GATTI, p. 10, ¶29.

### G. Background of Anna Gatti

Anna graduated with Laude in "Economia Aziendale" (Business and Economics) in the academic year 1995-1996 from Bocconi University, based in Milano, Italy. She was awarded the gold medal as an honor student. After graduating, she applied for the PhD in Business Administration and Management at Bocconi University which she started in 1997. Subject to passing the qualifying exams, the Bocconi PhD program required an invitation from a foreign institution to work on the PhD Thesis . Towards the end of 1999, she received an invitation from Stanford University to work on her PhD Thesis. The Thesis was completed in 2000, and the formal discussion (Esame di Stato) to officially receive her PhD title was held at Bocconi University in 2001. On completion of her PhD Thesis, Professor James March offered her the opportunity to continue her post-doctorate research training at Stanford. Gatti Dec., ¶2.

In late 2001 she received an offer from University of California at Berkeley to work on a research project. She worked at Berkeley only few months since she received an offer from the World Health Organization ("WHO") and she moved to Geneva (Switzerland) in April 2002. She worked for WHO from April 2002 to the end of August 2004. During those years, she opened her bank account at UBS when her WHO salary was paid, and she bought two small apartments. In order to buy those apartments, she obtained a mortgage from UBS and a mortgage from Credit Suisse. Both mortgages are

still open, which is the reasons she keeps her Swiss Bank accounts. There is no secret or strange relationship with UBS. She simply is a US tax payer and as such, UBS requires her to have separate processes from the rest of the Swiss clients, including sending a manager to meet his American clients in person to have documents signed. Her Swiss bank accounts are regularly reported on her tax return (FBARs) and they have not benefited from any transfer from her US bank account or any account of the defendants. The money held in her Swiss bank accounts is the result of her work in Switzerland and the interest gained from investing it. Gatti Dec., ¶3.

Her job at WHO was not very demanding, so she decided to get her second PhD. She applied and got admitted to the International PhD in Criminology at the University of Trento, Italy, in consortium with other Italian and foreign University. She completed the required exams in 2005 and defended the Thesis in March 2008. Gatti Dec., ¶4.

In September 2004 she joined myQube, a venture capital fund specialized in telecommunications and related technologies, and she moved back to the Silicon Valley. She worked for myQube till April 2007, when she joined Google. She worked at Google for four and a half years, during which she had several responsibilities. One of her key roles was Head of International Online Sales and Operations for YouTube that gave her responsibility for YouTube Online Business outside North America. In that capacity, she was responsible for teams in Europe, India, Japan and South America. In 2007 she also got her first Non-Executive Director ("NED") position at a public company traded on the Italian Stock Market, Buongiorno. Gatti Dec., ¶5.

She left Google/YouTube around March 2011 to join Skype. She was hired as Director of Marketing to work on advertising and new monetization. Microsoft acquired Skype in May 2011. With a robust past experience at Google, Microsoft was not her ideal work environment. Moreover, the advertising business at Microsoft was not core for the company. Despite a good raise in her salary, she was not interested in continuing her career at Microsoft. Her contract had a double trigger clause that opened up the opportunity to discuss a mutual agreement that allowed her to leave Microsoft in April 2012 with a fully vested four-year stock option plan. Gatti Dec., ¶6.

In October 2011, Emanuele Preda, founder of the Italian Company SMSIT.it whose President was and still is Gianmauro Calafiore, reached out to her to ask if she could meet with him and

Gianmauro. Emanuele got her email from Gianmauro's wife, Jaana, whom she knew from her work at myQube. This was the first time she met Gianmauro. Emanuele and Gianmauro were both living and working in Italy, and they had no professional experience in the USA. They explained to her that they were planning to start a company and they asked if she would be interested in being an advisor. Since Skype was going under the typical post-acquisition paralysis, she accepted to be an advisor of the start-up-to-be. No conditions were discussed. They simply exchanged a Nondisclosure Agreement ("NDA") to allow future discussions. At the beginning of January 2012, Gianmauro organized another meeting in the Bay Area. Emanuele was no more part of it, but Gianmauro introduced her to Bart Peintner. He explained that he decided to start the company without Emanuele, that Bart would be the scientist co-founder, and that he would move to the Silicon Valley in the next few months. On that occasion he offered to permit her to be the third co-founder and he offered her the CEO role. She pointed out that she had never worked in a start-up and that she had no previous CEO experience. Gianmauro shared his point of view about the benefit of having a woman CEO in the Valley, about her strong past professional experience in the Valley and he also pointed out that he did not have a visa nor a SSN that would allow him to take on the CEO position. Gianmauro did not ask her about her education, details of her past experience or comPansation. He clearly had already in mind an employment offer which he made. He explained the terms of his offer on January 6. She accepted on January 7th without any negotiation. She was simply very excited to start a new venture, a dream she always had. She was grateful for the opportunity. On January 9th Gianmauro sent out an email to her and Bart confirming the founding team. On January 10th, Gianmauro sent an email to her suggesting a reduction in her previously promised pool of shares from 30% to 25%, which she accepted without discussion. Gianmauro's offer was totally independent of any information he asked her, since when Gianmauro offered to have her become the CEO of the new venture with 30% of the stock granted, there was no question about her experience, education or salary, contrary to what the complaint states at page 2 point 8. They started collaborating via email and getting to know each other during Gianmauro 's visits to Silicon Valley. Gatti Dec., ¶7.

**H. The Beginnings of Loop AI Labs, Inc.**

They incorporated the company (at the time named Soshoma) in March 2012. She left Skype in

-8-

April 2012 and start being more involved with shaping the Soshoma venture, working remotely with Gianmauro. On April 13, 2012 she bought a Mac Air Laptop using her credit card to start working on the new project and as her personal laptop. The laptop has never been reimbursed or paid by the company. It is still her personal property. Gatti Dec., ¶8.

She has always been totally transparent with Gianmauro about her other business commitments, since the very beginning. Gianmauro was always informed about her other business commitments, contrary to the allegations of the complaint. Gatti Dec., ¶9.

In October 2012, after several months working together, they had some funds to start paying some salaries, so she signed the Job Offer. Since the very beginning they considered the job offer more a formality for their records for future due diligence occasions, than an enforced document. First, the indicated salary of $150,000/year was never paid to her. So, technically, there was a breach of contract done by the company from the very beginning. Second, it was common knowledge than Gianmauro was holding other important business roles, like President of SMSIT.it and no written agreement was ever requested nor mentioned. Gianmauro was also timely informed about her advisory role at Koozoo, but there was the implicit agreement that verbal agreement was enough because Gianmauro never said otherwise. As founders, they all felt the responsibility to make the company succeed and they never considered themselves employees. Gatti Dec., ¶10.

The application for employment was presented as a formality to her. As such, she filled it only partially and without double checking all the information or signing it as requested. When she asked Gianmauro if she was supposed to provide precise information, he said that since they were founders, they were not supposed to fill the application precisely. It was simply a formality. She has never seen an application filled by Bart either. Gatti Dec., ¶11.

Gianmauro opted for having the company pay for his housing instead of being on the payroll. So the company has been paying for his house at the Infinity Towers since late 2012. For the first month, the Company was also paying for Gianmauro's Zipcar. She believes that in June 2014 Gianmauro was been added to the payroll as well, but she has never seen his application for employment nor his job offer. Gatti Dec., ¶12.

**I. Gatti's Role As CEO**

Because Gianmauro has always been leading every aspect of the company, her CEO role was more of a formality, an empty role, without any report. Gianmauro requested that she cancel her one-on-one sessions with Bart and later with the other two employees (Patrick and Giampiero) and asked her to limit her role to non-critical or strategic actions. She has no idea where the code of Loop is stored. She has never seen a single line of code. She has never been allowed to have direct interaction with current or prospective partners. The majority of interactions with Venture Capitalists were led by Gianmauro alone for the first meeting. She was involved only in the second or third meeting. Gatti Dec., ¶13.

It was very difficult for her to adapt to this new working environment. She was used to working in a team and making joint decisions. At Loop, the only one in charge of every decision was Gianmauro. In March 2013 her working relationship with Gianmauro started deteriorating. It was then clear to her that her role was totally empty and there was no opportunity to work as a real CEO. Gianmauro was leading the company as the sole owner and founder, and she was kept progressively out from any critical decision and key knowledge. Gatti Dec., ¶14.

**J. Conflict Between the Founders**

The first real clash between Gianmauro and her happened when he announced that he hired the Chief Technology Officer (CTO). Neither Bart nor she were involved in the interview process. The communication was provided basically once the offer was out. The candidate was a very strong engineer and he did an excellent job, however the way the hiring process was handled was clearly a signal that Gianmauro was unable to work in a team. The new CTO, Giampiero, took on another consulting job, with the verbal agreement of Gianmauro because the Company was always short of money to pay the salary agreed in Gianmauro's offer letter. Giampiero ended up leaving the company a few months later. Shortly after that Gianmauro started claiming that Giampiero was selling the Company's traded secrets to competitors. Gatti Dec., ¶15.

At the end of March 2013, when she discovered that Gianmauro had applied for a working visa for his wife, Jaana, without even consulting her, they had the second strong clash. While she understood his desire to provide his wife with a working visa, she found it dangerous for the company to provide a working visa to his wife. Gianmauro wrote her stating that the Company has made an offer to the

"prospect employee" Jaana and that she was crazy in making such a noise for business as usual. No one had seen the job offer for Jaana at that point, nor this was discussed in advance. Gatti Dec., ¶16.

After March 2013, her role and exposure to the Company's decisions was progressively less. In 2013 she accepted to become the NED of a publicly traded company in Italy, Piquadro, and Gianmauro was informed in advance. While it is true that they never enforced the written consent requirement stated in the job offer, it is also true that they never enforced the job offer itself: from the agreed level of salary to her real responsibilities. Gatti Dec., ¶17.

**K. The Beginning of IQSystem, LLC**

Meanwhile, towards the end of 2013 her boyfriend, Tony di Napoli, was experiencing some challenges with his employer, Fabio Ficano, who was not paying any salary. Tony was working on developing a Thin Film Transistor ("TFT") fingerprint technology on glass substrate and he was looking for a more favorable working environment to do so. At the same time, Manuela Micoli, a colleague of Tony she has known for years, told Ms. Gatti that her employer, Mr. Ficano, was threatening to take her visa away if she was not willing to take on administrative work. Manuela has a masters degree and she is a very strong analyst and consultant. Since Ms. Gatti was turning down several consulting opportunities, she decided to open IQsystem LLC, hiring Manuela, contracting Tony and providing them with a more favorable working environment. Her professional commitment to the LLC was about an hour/week. She never spent any time on it, other than introducing potential clients who were approaching her for consulting jobs. For her IQsystem LLC was an investment, not a job. IQsystem LLC has never received any money from Almawave or any other defendant. IQsystem LLC has never worked on projects close or even related to Loop. IQsystem LLC was simply a personal investment started from the opportunity to have two strong professionals working on it. All the allegations made in the complaint against IQsystem LLC are false. Gatti Dec., ¶18.

Around February, Tony's nephew, Gennaro di Napoli, an Italian attorney who spent about a year in San Francisco with a law firm and to attend an ELS program, decided to stay for good in San Francisco. Since his law degree was not recognized to practice in the USA, his idea was to start a company that could leverage his knowledge of Italian and USA landscape to provide consulting to Italian companies interested in entering the US market. There were few other companies in the Bay

Area started by Italians providing similar kind of services and the model was successful. Tony and she agreed to help him in building a new business. She agreed to be a financial advisor for IQsystem Inc. with the role to review their P&L once a month (time commitment: 1 hour/month), to investigate potential company loans and lines of credit as needed and to support getting financial processes up and running (time commitment:1 hour/month). Tony agreed to help him with Business Development. This project would have also allowed Genearo di Napoli to apply for an E visa the next year. Gatti Dec., ¶19.

**L. The Role of Almawave**

At the beginning of February 2014, an Italian Head Hunter reached out to her asking if she could have a conversation with one of his clients who was working on internationalizing her company. She agreed and few days later she had a very brief phone call with Valeria Sandei. During the call, Valeria Sandei explained to her that she successfully brought her company, Almawave, in South America and she was now thinking to expand to other regions. She found her brilliant and driven. She was very impressed by her energy, but it was simply a social call without action items. About a week later, on 02/12/2014, she was in Italy for a board meeting, a second meeting was cancelled for the day after and the Head Hunter organized a last minute meeting between her and Valeria Sandei. In that meeting she tried to understand if Almawave would have any appetite to invest in Loop. Valeria described what Almawave does, its solutions, its 200+ engineers lab, and her need to invest in sales and Business Development ("BD") since Almawave had already invested several million dollars in developing its own technology. It was clear that there was no appetite in investing in a very early stage cutting edge technology start up such as Loop AI Labs. Also, it was clear that Almawave technology was very well developed and it was not open to integrate any disruptive technology that Loop.ai might have developed. Almawave was clearly looking for sales and BD partners to bring into the US market the solutions that they have already developed and successfully sold both in Italy and South America. Valeria asked her if she knew someone with BD experience in the East or West Coast. She also asked if she had any recommendation of law firm to work with. She did not have connections on the East Coast, but she suggested Valeria talk with Tony Di Napoli's team for the BD opportunity since Tony and his team did it successfully for other tech companies. On 02/21/14, she facilitated a phone call between Valeria (and her team) and Tony and his team. She had no formal involvement in the project at that

time. She simply made introductions and she had no role or monetary return. Her goal was to connect two parties who were looking for business opportunities. Gatti Dec., ¶20.

On March 13 and 14, 2015 Valeria and her team came to the Bay Area to meet with the people she suggested they meet and with other prospective collaborators suggested by head hunters. Valeria Sandei met with both the BD team and the legal firm she had suggested. Valeria later on decided to sign a Business Development Agreement with the BD Team (IQsystem Inc.) and she decided to opt for a different law firm than the one Ms. Gatti suggested. Gatti Dec., ¶21.

While Valeria was in discussions with IQsystem Inc., she also asked Ms. Gatti I she had any interest in being involved in the project. Ms. Gatti really liked Valeria Sandei, she found Almawave solutions really innovative and she was also feeling accountable for the BD team she introduced to her, so she was keen to have some kind of role to supervise how the project was moving forward. The role that she could have had was not discussed in detail until April 2014. At that point Valeria asked if she had any interest in being either on the board of Almawave USA or the CEO. She was looking for someone who could make sure that the BD team was executing on the plan, support closing more partnerships and being a physical presence in the Valley for Almawave. She told Valeria that she was already the CEO of Loop.ai (at the time still named Soshoma) and that she would have to discuss it with her co-founder Gianmauro. Gatti Dec., ¶22.

Sometime in late April, at the old office of Soshoma/Loop.ai located in Illinois street in San Francisco, she told Gianmauro about this opportunity. She also told him that if she would had taken the part-time role, there would be some press coverage in Italy. On that occasion, she also told Gianmauro that she was feeling accountable with Almawave since they hired IQsystem Business Development team lead by her boyfriend Tony, and she really wanted to make sure that the project was successful. He was sitting at his desk. He simply answered: "No problem". Gatti Dec., ¶23.

On June 6 2014 she signed the agreement with Almawave USA as part-time CEO. Her role was mainly to make sure that the Business Development team was focusing on the right priorities and to source additional partnerships with System Integrators. The Almawave solutions offered in the US market are exactly the same offered for years in the Italian and South America markets. Almawave had no interest in scouting any new technology. Almawave had interest in partnership with well-established

players in the US market in order to penetrate big clients. Almawave solutions are for large enterprises with contact centers with more than 100 agents. Almawave was not looking for venture capital investments nor for acquisition of small technology start up. Gatti Dec., ¶24.

**M. The Loop AI Business**

Loop.ai did not yet have a defined product (Loop.ai launched its beta Key Performance Indicator solution in November 2014), it did not have clients, partners or other active commercial contacts. Loop.ai was a team of four people, three co-founders and one employee still working on testing the core technology developed and trying to raise the first institutional capital. She never passed, sold, shared Loop.ai trade secrets or confidential information in favor of the Defendants or anyone else. she never poached employees, consultants, investors or partners of Loop.ai in favor of the Defendants or other entities. Her role at Loop.ai was marginal with no exposure to the code and very limited exposure to business. For example, Gianmauro has always led personally without any involvement from her side the relationship with partners. She never interacted directly with Cafepress or any other partners. She had no visibility on the results of testing Loop.ai technology. Gatti Dec., ¶25.

Her lack of involvement and understanding of critical Loop.ai activities was also making her efforts at fund raising very difficult. Gianmauro was always involved in any fund raising effort since ultimately he was the only one with the key information venture capitalists were interested in (i.e. test results, partners, prospect clients, et cetera). In most of the critical venture capital discussions she was only marginally involved (i.e. Intel Capital, Horizons Venture, Tencent, et cetera). They pitched about 20 venture capital firms and they were not able to find traction with venture capitalists. This was not due to any sabotaging action from her side, but simply to the fact that there is a lot of competition in raising capital in Silicon Valley and the Loop.ai value proposition apparently was not convincing to the VCs we spoke with. Gatti Dec., ¶26.

**N. The Claims of Wrongdoing Are False**

She has seen the Complaint in this matter and the moving papers in support of plaintiff's Motion for a Temporary Restraining Order ("TRO"). In the approximately 72 hours (including 48 hours over a weekend) that she and her counsel have had prior to this Opposition being due, they have not had the time to prepare a systematic refutation of all the false charges contained in the Complaint and the TRO

moving papers. Nevertheless, she denies all claims of wrongdoing of any type by her made in the Complaint and in the papers supporting the Motion for a TRO. Gatti Dec., ¶27.

She has no intention to flee or hide. She has voluntarily cancelled her planned trip to Italy to attend Bord meetings that were scheduled for March 9 and March 12 in order to make herself available to deal with plaintiff's allegations. Gatti Dec., ¶28.

Gianmauro Calafiore, the majority holder of shares in plaintiff and she, as a 25% shareholder in plaintiff, had an oral agreement by which they each could perform consulting jobs with other companies while working for plaintiff. For example, Mr. Calafiore is the President of SMSit.it, a messaging firm, and he founded the Amici World School in San Francisco. Gatti Dec., ¶29.

It is not true that she took Loop AI Labs, Inc. confidential information and trade secrets. It is not true that she used Loop AI Labs, Inc. confidential information and trade secrets for the Almaviva defendants. Gatti Dec., ¶30. She did not take or use Loop AI Labs, Inc. confidential information and trade secrets for the benefit of any person or entity. Gatti Dec., ¶31.

### III. CONCLUSION

For each of the foregoing reasons, plaintiff's motion for a temporary restraining order, in all the respects requested, should be denied in its entirety, without the necessity of a hearing. Should the court believe a hearing is necessary, counsel for Ms. Gatti requests that it be set for a date other than March 12- March 13 when counsel will be out of state.

Dated: March 7, 2015

          LOW, BALL & LYNCH

          By _____
          THOMAS J. LOSAVIO
          JAMES F. REGAN
          Attorneys for Defendants
          ANNA GATTI and IQ SYSTEMS, LLC