THOMAS J. LOSAVIO, SBN 51023
JAMES F. REGAN, SBN 252199
LOW, BALL & LYNCH
505 Montgomery Street, 7th Floor
San Francisco, California 94111
Telephone: (415) 981-6630
Facsimile: (415) 982-1634
Email: tlosavio@lowball.com
Email: mbeuselinck@lowball.com

Attorneys for Defendants
ANNA GATTI and IQ SYSTEMS, LLC

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ANNA GATTI, et al.,<br><br>Defendants. | Case No. 3:15-CV-00798-HSG<br><br>**DECLARATION OF ANNA GATTI IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Anna Gatti, declare:

1. I make the following declaration on my own knowledge and could, if sworn, testify competently to the matters set forth herein.

2. I graduated with Laude in "Economia Aziendale" (Business and Economics) in the academic year 1995-1996 from Bocconi University, based in Milano, Italy. I was awarded the gold medal as an honor student. After graduating, I applied for the PhD in Business Administration and Management at Bocconi University which I started in 1997. Subject to passing the qualifying exams, the Bocconi PhD program required an invitation from a foreign institution to work on the PhD Thesis . Towards the end of 1999, I received an invitation from Stanford University to work on my PhD Thesis. The Thesis was completed in 2000, and the formal discussion (Esame di Stato) to officially receive my PhD title was

held at Bocconi University in 2001. On completion of my PhD Thesis, Professor James March offered me the opportunity to continue my post-doctorate research training at Stanford.

3. In late 2001 I received an offer from University of California at Berkeley to work on a research project. I worked at Berkeley only few months since I received an offer from the World Health Organization ("WHO") and I moved to Geneva (Switzerland) in April 2002. I worked for WHO from April 2002 to the end of August 2004. During those years, I opened my bank account at UBS when my WHO salary was paid, and I bought two small apartments. In order to buy those apartments, I obtained a mortgage from UBS and a mortgage from Credit Suisse. Both mortgages are still open, which is the reasons I keep my Swiss Bank accounts. There is no secret or strange relationship with UBS. I simply am a US tax payer and as such, UBS requires me to have separate processes from the rest of the Swiss clients, including sending a manager to meet his American clients in person to have documents signed. My Swiss bank accounts are regularly reported on my tax return (FBARs) and they have not benefited from any transfer from my US bank account or any account of the defendants. The money held in my Swiss bank accounts is the result of my work in Switzerland and the interest gained from investing it.

4. My job at WHO was not very demanding, so I decided to get my second PhD. I applied and got admitted to the International PhD in Criminology at the University of Trento, Italy, in consortium with other Italian and foreign University. I completed the required exams in 2005 and defended the Thesis in March 2008.

5. In September 2004 I joined myQube, a venture capital fund specialized in telecommunications and related technologies, and I moved back to the Silicon Valley. I worked for myQube till April 2007, when I joined Google. I worked at Google for four and a half years, during which I had several responsibilities. One of my key roles was Head of International Online Sales and Operations for YouTube that gave me responsibility for YouTube Online Business outside North America. In that capacity, I was responsible for teams in Europe, India, Japan and South America. In 2007 I also got my first Non-Executive Director ("NED") position at a public company traded on the Italian Stock Market, Buongiorno.

6. I left Google/YouTube around March 2011 to join Skype. I was hired as Director of Marketing to work on advertising and new monetization. Microsoft acquired Skype in May 2011. With

a robust past experience at Google, Microsoft was not my ideal work environment. Moreover, the advertising business at Microsoft was not core for the company. Despite a good raise in my salary, I was not interested in continuing my career at Microsoft. My contract had a double trigger clause that opened up the opportunity to discuss a mutual agreement that allowed me to leave Microsoft in April 2012 with a fully vested four-year stock option plan.

7. In October 2011, Emanuele Preda, founder of the Italian Company SMSIT.it whose President was and still is Gianmauro Calafiore, reached out to me to ask if I could meet with him and Gianmauro. Emanuele got my email from Gianmauro's wife, Jaana, who I knew from my work at myQube. This was the first time I met Gianmauro. Emanuele and Gianmauro were both living and working in Italy, and they had no professional experience in the USA. They explained to me that they were planning to start a company and they asked if I would be interested in being an advisor. Since Skype was going under the typical post-acquisition paralysis, I accepted to be an advisor of the start-up-to-be. No conditions were discussed. We simply exchanged a Nondisclosure Agreement ("NDA") to allow future discussions. At the beginning of January 2012, Gianmauro organized another meeting in the Bay Area. Emanuele was no more part of it, but Gianmauro introduced me to Bart Peintner. He explained that he decided to start the company without Emanuele, that Bart would be the scientist co-founder, and that he would move to the Silicon Valley in the next few months. On that occasion he offered to permit me to be the third co-founder and he offered me the CEO role. I pointed out that I had never worked in a start-up and that I had no previous CEO experience. Gianmauro shared his point of view about the benefit of having a women CEO in the Valley, about my strong past professional experience in the Valley and he also pointed out that he did not have a visa nor a SSN that would allow him to take on the CEO position. Gianmauro did not ask me about my education, details of my past experience or compensation. He clearly had already in mind an employment offer which he made. He explained the terms of his offer on January 6. I accepted on January 7th without any negotiation. I was simply very excited to start a new venture, a dream I always had. And I was grateful for the opportunity. On January 9th Gianmauro sent out an email to me and Bart confirming the founding team. On January 10th, Gianmauro sent an email to me suggesting a reduction in my previously promised pool of shares from 30% to 25%, which I accepted without discussion. Gianmauro's offer was totally independent of any

information he asked me, since when Gianmauro offered to have me become the CEO of the new venture with 30% of the stock granted, there was no question about my experience, education or salary, contrary to what the complaint states at page 2 point 8. We started collaborating via email and getting to know each other during Gianmauro's visits to Silicon Valley.

8. We incorporated the company (at the time named Soshoma) in March 2012. I left Skype in April 2012 and start being more involved with shaping the Soshoma venture, working remotely with Gianmauro. On April 13, 2012 I bought a Mac Air Laptop using my credit card to start working on the new project and as my personal laptop. The laptop has never been reimbursed or paid by the company. It is still my personal property.

9. I have always been totally transparent with Gianmauro about my other business commitments, since the very beginning. Gianmauro was always informed about my other business commitments, contrary to the allegations of the complaint.

10. In October 2012, after several months working together, we had some funds to start paying some salaries, so I signed the Job Offer. Since the very beginning we considered the job offer more a formality for our records for future due diligence occasions, than an enforced document. First, the indicated salary of $150,000/year was never paid to me. So, technically, there was a breach of contract done by the company from the very beginning. Second, it was common knowledge than Gianmauro was holding other important business roles, like President of SMSIT.it and no written agreement was ever requested nor mentioned. Gianmauro was also timely informed about my advisory role at Koozoo, but there was the implicit agreement that verbal agreement was enough because Gianmauro never said otherwise. As founders, we all felt the responsibility to make the company succeed and we never considered ourselves employees.

11. Also the application for employment was presented as a formality to me. As such, I filled it only partially and without double checking all the information or signing it as requested. When I asked Gianmauro if I was supposed to provide precise information, he said that since we were founders, we were not supposed to fill the application precisely. It was simply a formality. I've never seen an application filled by Bart either.

12. Gianmauro opted for having the company pay for his housing instead of being on the

payroll. So the company has been paying for his house at the Infinity Towers since late 2012. For the first month, the Company was also paying for Gianmauro's Zipcar. I believe (but I am not sure) that in June 2014 Gianmauro has been added to the payroll as well, but I have never seen his application for employment nor his job offer.

13. Because Gianmauro has always been leading every aspect of the company, my CEO role was more of a formality, an empty role, without any report. Gianmauro requested that I cancel my 1:1 sessions with Bart and later with the other two employees (Patrick and Giampiero) and asked me to limit my role to non-critical or strategic actions. I have no idea where the code of Loop is stored. I have never seen a single line of code. I have never been allowed to have direct interaction with current or prospective partners. The majority of interactions with Venture Capitalists were led by Gianmauro alone for the first meeting. I was involved only in the second or third meeting.

14. It was very difficult for me to adapt to this new working environment. I was used to working in a team and making joint decisions. At Loop, the only one in charge of every decision was Gianmauro. In March 2013 my working relationship with Gianmauro started deteriorating. It was then clear to me that my role was totally empty and there was no opportunity to work as a real CEO. Gianmauro was leading the company as the sole owner and founder, and I was kept progressively out from any critical decision and key knowledge.

15. The first real clash between Gianmauro and me happened when he announced that he hired the Chief Technology Officer (CTO). Neither Bart nor I were involved in the interview process. The communication was provided basically once the offer was out. The candidate was a very strong engineer and he did an excellent job, however the way the hiring process was handled was clearly a signal that Gianmauro was unable to work in a team. The new CTO, Giampiero, took on another consulting job, with the verbal agreement of Gianmauro because the Company was always short of money to pay the salary agreed in Gianmauro's offer letter. Giampiero ended up leaving the company a few months later. Shortly after that Gianmauro started claiming that Giampiero was selling the Company's traded secrets to competitors.

16. At the end of March 2013, when I discovered that Gianmauro had applied for a working visa for his wife, Jaana, without even consulting me, we had the second strong clash. While I understood his

desire to provide his wife with a working visa, I found it dangerous for the company to provide a working visa to his wife. Gianmauro wrote me back stating that the Company has made an offer to the "prospect employee" Jaana and that I was crazy in making such a noise for business as usual. No one had seen the job offer for Jaana at that point, nor this was discussed in advance.

17. After March 2013, my role and exposure to the Company's decisions was progressively less. In 2013 I accepted to become the NED of a publicly traded company in Italy, Piquadro, and Gianmauro was informed in advance. While it is true that we never enforced the written consent requirement stated in the job offer, it is also true that we never enforced the job offer itself: from the agreed level of salary to my real responsibilities.

18. Meanwhile, towards the end of 2013 my boyfriend, Tony di Napoli, was experiencing some challenges with his employer, Fabio Ficano, who was not paying any salary. Tony was working on developing a Thin Film Transistor ("TFT") fingerprint technology on glass substrate and he was looking for a more favorable working environment to do so. At the same time, Manuela Micoli, a colleague of Tony I have known for years, told me that her employer, Mr. Ficano, was threatening to take her visa away if she was not willing to take on administrative work. Manuela has a masters degree and she is a very strong analyst and consultant. Since I was turning down several consulting opportunities, I decided to open IQsystem LLC, hiring Manuela, contracting Tony and providing them with a more favorable working environment. My professional commitment to the LLC was about an hour/week. I never spent any time on it, other than introducing potential clients who were approaching me for consulting jobs. For me IQsystem LLC was an investment, not a job. IQsystem LLC has never received any money from Almawave or any other defendant. IQsystem LLC has never worked on projects close or even related to Loop. IQsystem LLC was simply a personal investment started from the opportunity to have two strong professionals working on it. All the allegations made in the complaint against IQsystem LLC are false.

19. Around February, Tony's nephew, Gennaro di Napoli, an Italian attorney who spent about a year in San Francisco with a law firm and to attend an ELS program, decided to stay for good in San Francisco. Since his law degree was not recognized to practice in the USA, his idea was to start a company that could leverage his knowledge of Italian and USA landscape to provide consulting to

-6-
DECLARATION OF ANNA GATTI IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
Macintosh HD:Users:Macair:Downloads:TRO_Gatti Dec.docx  Case No. 3:15-CV-00798-HSG

Italian companies interested in entering the US market. There were few other companies in the Bay Area started by Italians providing similar kind of services and the model was successful. Tony and I agreed to help him in building a new business. I agreed to be a financial advisor for IQsystem Inc. with the role to review their P&L once a month (time commitment: 1 hour/month), to investigate potential company loans and lines of credit as needed and to support getting financial processes up and running (time commitment:1 hour/month). Tony agreed to help him with Business Development. This project would have also allowed Genearo di Napoli to apply for an E visa the next year.

20. At the beginning of February 2014, an Italian Head Hunter reached out to me asking if I could have a conversation with one of his clients who was working on internationalizing her company. I agreed and few days later I had a very brief phone call with Valeria Sandei. During the call, Valeria Sandei explained to me that she successfully brought her company, Almawave, in South America and she was now thinking to expand to other regions. I found her brilliant and driven. I was very impressed by her energy, but it was simply a social call without action items. About a week later, on 02/12/2014, I was in Italy for a board meeting , a second meeting was cancelled for the day after and the Head Hunter organized a last minute meeting between me and Valeria Sandei. In that meeting I tried to understand if Almawave would have any appetite to invest in Loop. Valeria described what Almawave does, its solutions, its 200+ engineers lab, and her need to invest in sales and Business Development ("BD") since Almawave had already invested several million dollars in developing its own technology. It was clear that there was no appetite in investing in a very early stage cutting edge technology start up such as Loop AI Labs. Also, it was clear that Almawave technology was very well developed and it was not open to integrate any disruptive technology that Loop.ai might have developed. Almawave was clearly looking for sales and BD partners to bring into the US market the solutions that they have already developed and successfully sold both in Italy and South America. Valeria asked me if I knew someone with BD experience in the East or West Coast. She also asked if I had any recommendation of law firm to work with. I did not have connections on the East Coast, but I suggested she talk with Tony Di Napoli's team for the BD opportunity since Tony and his team did it successfully for other tech companies. On 02/21/14, I facilitated a phone call between Valeria (and her team) and Tony and his team. I had no formal involvement in the project at that time. I simply made introductions and I had no

role or monetary return. My goal was to connect two parties who were looking for business opportunities.

21. On March 13 and 14, 2015 Valeria and his team came to the Bay Area to meet with the people I suggested they meet and with other prospective collaborators suggested by head hunters. Valeria Sandei met with both the BD team and the legal firm I had suggested. She later on decided to sign a Business Development Agreement with the BD Team (IQsystem Inc.) and she decided to opt for a different law firm than the one I suggested.

22. While Valeria was in discussions with IQsystem Inc., she also asked me if I had any interest in being involved in the project. I really liked Valeria Sandei, I found Almawave solutions really innovative and I was also feeling accountable for the BD team I introduced to her, so I was keen to have some kind of role to supervise how the project was moving forward. The role that I could have had was not discussed in detail until April 2014. At that point Valeria asked if I had any interest in being either on the board of Almawave USA or the CEO. She was looking for someone who could make sure that the BD team was executing on the plan, support closing more partnerships and being a physical presence in the Valley for Almawave. I told Valeria that I was already the CEO of Loop.ai (at the time still named Soshoma) and that I would have to discuss it with my co-founder Gianmauro.

23. Sometime in late April, at the old office of Soshoma/Loop.ai located in Illinois street in San Francisco, I told Gianmauro about this opportunity. I also told him that if I would had taken the part-time role, there would be some press coverage in Italy. On that occasion, I also told Gianmauro that I was feeling accountable with Almawave since they hired IQsystem Business Development team lead by my boyfriend Tony, and I really wanted to make sure that the project was successful. He was sitting at his desk. He simply answered: "No problem".

24. On June 6 2014 I signed the agreement with Almawave USA as part-time CEO. My role was mainly to make sure that the Business Development team was focusing on the right priorities and to source additional partnerships with System Integrators. The Almawave solutions offered in the US market are exactly the same offered for years in the Italian and South America markets. Almawave had no interest in scouting any new technology. Almawave had interest in partnership with well-established players in the US market in order to penetrate big clients. Almawave solutions are for large enterprises

-8-
DECLARATION OF ANNA GATTI IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
Macintosh HD:Users:Macair:Downloads:TRO_Gatti Dec.docx    Case No. 3:15-CV-00798-HSG

with contact centers with more than 100 agents. Almawave was not looking for venture capital investments nor for acquisition of small technology start up.

25. Loop.ai did not yet have a defined product (Loop.ai launched its beta KPI solution in November 2014), it did not have clients, partners or other active commercial contacts. Loop.ai was a team of four people, three co-founders and one employee still working on testing the core technology developed and trying to raise the first institutional capital. I never passed, sold, shared Loop.ai trade secrets or confidential information in favor of the Defendants or anyone else. I never poached employees, consultants, investors or partners of Loop.ai in favor of the Defendants or other entities. My role at Loop.ai was marginal with no exposure to the code and very limited exposure to business. For example, Gianmauro has always led personally without any involvement from my side the relationship with partners. I never interacted directly with Cafepress or any other partners. I had no visibility on the results of testing Loop.ai technology.

26. My lack of involvement and understanding of critical Loop.ai activities was also making my efforts at fund raising very difficult. Gianmauro was always involved in any fund raising effort since ultimately he was the only one with the key information venture capitalists were interested in (i.e. test results, partners, prospect clients, et cetera). In most of the critical venture capital discussions I was only marginally involved (i.e. Intel Capital, Horizons Venture, Tencent, et cetera). We pitched about 20 venture capital firms (at the best of my recollection) and we were not able to find traction with venture capitalists. This was not due to any sabotaging action from my side, but simply to the fact that there is a lot of competition in raising capital in Silicon Valley and the Loop.ai value proposition apparently was not convincing to the VCs we spoke with.

27. I have seen the Complaint in this matter and the moving papers in support of plaintiff's Motion for a Temporary Restraining Order ("TRO"). In the approximately 72 hours (including 48 hours over a weekend) that my counsel and I have had prior to this Opposition being due, we have not had the time to prepare a systematic refutation of all the false charges contained in the Complaint and the TRO moving papers. Nevertheless, I hereby deny all claims of wrongdoing of any type by me made in the Complaint and in the papers supporting the Motion for a TRO.

28. I have no intention to flee or hide. I voluntarily cancelled my planned trip to Italy to attend

DECLARATION OF ANNA GATTI IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
Macintosh HD:Users:Macair:Downloads:TRO_Gatti Dec.docx                           Case No. 3:15-CV-00798-HSG

Bord meetings that were scheduled for March 9 and March 12 in order to make myself available to deal with plaintiff's allegations.

29. Gianmauro Calafiore, the majority holder of shares in plaintiff and I, as a 25% shareholder in plaintiff, had an oral agreement by which we each could perform consulting jobs with other companies while working for plaintiff. For example, Mr. Calafiore is the President of SMSit.it, a messaging firm, and he founded the Amici World School in San Francisco.

30. It is not true, as stated in that paragraph, that I took Loop AI Labs, Inc. confidential information and trade secrets. It is not true, as stated in that paragraph, that I used Loop AI Labs, Inc. confidential information and trade secrets for the Almaviva defendants.

31. I did not take or use Loop AI Labs, Inc. confidential information and trade secrets for the benefit of any person or entity.

I declare under penalty of perjury under the laws of the state of California that the foregoing declaration is true and correct.

Executed this 5th day of March, 2015,

Anna Gatti