1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Donna M. Ryu, Magistrate Judge

4

5  LOOP AI LABS, INC.,            )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                            )    No. C 15-00798-HSG
                                  )
8  GATTI, et al.,                 )
                                  )
9           Defendants.           )
   _____)
10

11                                Oakland, California
                                  Thursday, July 23, 2015
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING 2:38 - 3:56/4:33 - 5:23 =   120 MINUTES
14

15 APPEARANCES:

16 For Plaintiff:
                              Healy, LLC
17                            154 Grand Street
                              New York, New York 10013
18                      BY:   VALERIA CALAFIORE HEALY, ESQ.

19 For Almawave:
                              Venable, LLP
20                            505 Montgomery Street
                              Suite 1400
21                            San Francisco, California
                               94111
22                      BY:   THOMAS E. WALLERSTEIN, ESQ.
                              KIMBERLY COLT, ESQ.
23

24
                  (APPEARANCES CONTINUED ON NEXT PAGE.)
25

2

1 APPEARANCES:   (Cont'd.)

2 For the Orrick Firm:
                          Orrick, Herrington &
3                           Sutcliffe, LLP
                          405 Howard Street
4                         San Francisco, California
                            94105
5                     BY:  WILLIAM F. ALDERMAN, ESQ.
                          KIMBERLY COLT, ESQ.
6
  For IQ Systems:
7                         Law Offices of Janet Brayer
                          230 California Street
8                         Suite 600
                          San Francisco, CA 94111
9                     BY:  JANET M. BRAYER, ESQ.

10                        Low Ball & Lynch
                          505 Montgomery Street
11                        San Francisco, California
                            94111
12                    BY:  THOMAS J. LOSAVIO, ESQ.

13 For Russell Reynolds:
                          Ogletree, Deakins, Nash,
14                          Smoak & Stewart
                          One Market Plaza, Suite 1300
15                        San Francisco, California
                            94105
16                    BY:  BECKI GRAHAM, ESQ.

17
  Transcribed by:         Echo Reporting, Inc.
18                        Contracted Court Reporter/
                          Transcriber
19                        echoreporting@yahoo.com

20

21

22

23

24

25

3

1 <u>Thursday, July 23, 2015</u>                    <u>2:38 p.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Calling Civil Case C-15-0798-HSG, Loop

5 Al Labs, Incorporated versus Gatti, et al.

6      Counsel, please approach the podium and state your

7 appearances.

8          MS. HEALY:  Good afternoon, your Honor.  Valeria

9 Calafiore Healy for Loop AI Labs, Inc., the Plaintiff.

10         THE COURT:  Good afternoon.

11         MR. WALLERSTEIN:  Good afternoon, your Honor.  Tom

12 Wallerstein with Venable for Defendant Almawave USA.

13         THE COURT:  Good afternoon.

14         MS. COLT:  Good afternoon, your Honor.  Kimberly

15 Colt (phonetic) with Venable, for Almawave USA.

16         THE COURT:  Good afternoon.

17         MS. GRAHAM:  Good afternoon, your Honor.  Becki

18 Graham representing Russell Reynolds Associates.

19         THE COURT:  Good afternoon.

20         MR. ALDERMAN:  Good afternoon, your Honor.

21 William Alderman of Orrick, Herrington and Sutcliffe,

22 appearing for the Orrick Firm, a non-party.

23         THE COURT:  Good afternoon, and thank you for

24 being here on short notice.

25         MR. ALDERMAN:  You're welcome.

*Echo Reporting, Inc.*

4

1          THE COURT:  I think I have an appearance via Court

2  Call, is that correct?

3          MS. BRAYER (telephonic):  Yes, thank you.  Good

4  afternoon, your Honor.  Janet Brayer, appearing on behalf of

5  IQ Systems, Inc., and thank you for allowing my Court Call.

6          THE COURT:  Okay.  Welcome everybody, and I'd like

7  you to actually come to the podium.  I want you to address

8  the Court from the microphone up here.  And, Mr. Alderman, if

9  I could have you come nearby as well, because I'm going to

10  have a few questions for you.

11     Let me note for the record that Ms. Sara Geckler

12  (phonetic).  Good afternoon, Ms. Geckler.  And she is here as

13  a court reporter that's been hired by one of the parties.

14  Who is DTI Global?

15          MR. WALLERSTEIN:  DTI is her employer, your Honor.

16          THE COURT:  Oh.

17          MR. WALLERSTEIN:  She was hired by my client,

18  Almawave USA.

19          THE COURT:  Okay.  So Ms. Geckler is welcome to be

20  here, but the official record of the court is actually the

21  tape recording that I'm making right now, and should a party

22  seek a transcription or if the Court needs to refer to the

23  official record, then that's that -- what we call the FTR

24  system recording will be transcribed, and so that will be the

25  official record and not Ms. Geckler's record.  Okay.

5

So thank you for being here. After reviewing the filings in the case, it seemed to me that a discovery management conference was in order so that we can get everybody on the same page and working on the merits. There were -- there was just a lot of disorder. So that's today's agenda, to work through some of these outstanding disputes, at least to figure out when and where and how they're going to be resolved and then focus on some things that the parties need to do going forward. Okay.

So let me start with the motion -- the motion or motions concerning the Orrick subpoena. So my view is that we should really get to the merits of the subpoena, not today, but the parties should queue that up. If they can't come to a resolution, they should queue it up for a court intervention, but there's always skirmishes on the side.

So the motion for contempt, Ms. Healy, is denied without prejudice, and that's because the parties failed to meet and confer in person or by phone, which is my order. It's in -- it's in the discovery referral order. That's part of this case. And the meet and confer did not seem adequate, and, again, it's going off on the side issues instead of getting at what the objections are and whether there are responsive documents that should be produced or whether there's claims of privilege that should be upheld or denied, all of those things.

6

1      So here's what I think should happen, and, Mr.

2  Alderman, I'd like your views on this, but I think that

3  Plaintiff and Orrick should just agree on re-service, okay,

4  so that Orrick is served and Orrick can then object.  Once

5  Orrick objects, then we also have objections that have been

6  raised through the joint letter -- or not joint letter, sorry

7  -- original ex parte letter that was filed by Defendants that

8  I then instructed you to file a motion on but which never

9  happened.

10      So let's have a discussion among the lawyers about

11  what's going to happen in response to that subpoena, okay.

12      Mr. Alderman, on behalf of Orrick, would Orrick be

13  willing to agree to re-service and then in a reasonable time,

14  a perhaps shortened time at this point to file your

15  objections?

16          MR. ALDERMAN:  Very much so, your Honor.  I had

17  actually invited Ms. Healy to serve me by -- to serve the

18  firm by E-mail service on me back on June 18th.

19          THE COURT:  Okay.

20          MR. ALDERMAN:  Instead of doing that, she filed

21  the contempt --

22          THE COURT:  I did see that.

23          MR. ALDERMAN:  -- application.

24          THE COURT:  Can -- Ms. Healy, did you want to say

25  something?

1            MS. HEALY:  Your Honor, I didn't want to interrupt

2   the Court, obviously, but I know the Court, you know, called

3   us here for a discovery management conference, and she just

4   issued a ruling on a motion that's not even complete.  So I'd

5   like to be heard if possible on that motion because --

6            THE COURT:  The motion for contempt is denied

7   without prejudice because the Court requires that you meet

8   and confer in person or by -- or by phone --

9            MS. HEALY:  I'd like to be heard if possible.  If

10  the Court has already made the decision, it's not -- the meet

11  and confer did happen, and, you know, there's a couple of

12  points I would like --

13           THE COURT:  Did it happen in person or by phone?

14           MS. HEALY:  By phone, yes.  I even submitted --

15  with the motion for contempt, there is a record of the call.

16  It lasted 35 minutes, accompanied by a record of what

17  happened during the call, and Mr. Alderman did not want to

18  meet and confer.  I attempted my best to meet and confer.

19      Your Honor, a couple of things.  We served -- in March

20  of 2014, we were notified by Orrick, the Court is aware, that

21  they were suddenly withdrawing from their representation of

22  our client.  I advised them we would be serving a subpoena.

23  So they had three months to prepare.

24      Before I served the subpoena, as a professional

25  courtesy, I reached out to Mr. Lowe (phonetic) to ask Mr.

8

1 Lowe if he would accept service.  Mr. Lowe never said to me
2 "I'm not authorized to accept service."  Because in the past,
3 when we asked for things, they dragged their feet and made us
4 wait and then refused to respond, I proceeded to serve in
5 accordance with Rule 45.  I never got a call.  They received
6 the subpoena.  They acknowledged that they received the
7 subpoena.  We served it in person at Orrick's offices.
8                THE COURT:  I did read that part of the motion.
9                MS. HEALY:  Yeah.  And so the subpoena was
10 received June 1st.  There's a time stamp even in Orrick's
11 files.
12                THE COURT:  There's a question of whether it was
13 properly served.
14                MS. HEALY:  Your Honor, I -- I actually reached
15 this.  There's plenty of case law, and --
16                THE COURT:  I took a look at the -- you know, I
17 have not -- it's not been briefed, and I have not fully
18 considered the record, but let me just point this out Ms.
19 Healy.
20                MS. HEALY:  Yes, we did --
21                THE COURT:  Hold on.
22                MS. HEALY:  Go ahead.
23                THE COURT:  I know that you're charged up about
24 this, and I don't mean to cut off what you want to
25 accomplish, but it appears to me from your filings that what

9

1 you -- it seems like your client's goal was to get to the

2 heart of the matter.  Don't you want the materials or at

3 least find out whether you're entitled to the materials?

4          MS. HEALY:  Yeah, I agree with -- with the Court.

5          THE COURT:  Okay.  So --

6          MS. HEALY:  But --

7          THE COURT:  Let me just say -- hold on.

8          MS. HEALY:  Yes.  Sure.

9          THE COURT:  -- that in looking at the service

10 argument -- again, this is just my preliminary review --

11 you're going to spend a bunch of time litigating that service

12 question, and, quite frankly, Ms. Healy, it looks like an

13 uphill battle to me.

14     So then what ends up happening is you spend money, time

15 getting -- getting at something that you may lose and Mr.

16 Alderman may win, in which case there may be -- he's asked

17 for sanctions, okay, versus resetting everything -- hold on.

18          MS. HEALY:  Yes.

19          THE COURT:  Let me -- you're shaking your head,

20 which makes me think you're not listening to what I'm saying.

21          MS. HEALY:  I'm just concerned that the Court is

22 rewarding behavior that we believe is highly inappropriate,

23 and I would like just the opportunity to be heard on

24 something that we proceeded in accordance with the Rules.  We

25 researched how to serve.  We have plenty of case law that

10

1  confirms that our service was appropriate.  They've been
2  playing games, your Honor, for months to delay this.  If they
3  -- if they weren't served, the day after Mr. Lowe received
4  the documents on his desk, he should have called me up and
5  said "Re-serve me."  Instead, they delayed and delayed and
6  delayed.  And, in addition, your Honor -- and that's why I'm
7  very concerned because I believe, you know, they know, and
8  Mr. Wallerstein knew, when they applied to the Court, the
9  recognized that if they weren't going to object on time, they
10 would waive their objection.  That's the law.

11        THE COURT:  Okay.  Here's what -- here's what
12 we're going to do, all right, because I think, again, for
13 case management purposes, to get this case moving so that you
14 can get answers for your client and so that we can get the
15 discovery that both sides are asking for or sort out what --
16 what they are or aren't entitled to, instead of these side
17 skirmishes, I want to proceed on the -- figure out a way to
18 proceed on the merits of that.

19     Now, I'm going to reserve for you and for Mr. Alderman
20 the issue of sanctions.  If at the end of all of this we get
21 through and we -- and the parties either agree to or I
22 adjudicate the issue of what should be produced in response
23 to the subpoena to Orrick, if we get to the end of that and
24 either side believes that they have grounds to file for some
25 form of sanctions, whether it's contempt or monetary

11

1 sanctions, then each party or non-party will have the
2 opportunity to send a letter to me, a one-page letter saying
3 "Judge, you reserved the question of sanctions.  Here's my
4 pitch.  Here's why I think you should allow me to file my
5 motions for sanctions and LOU it."  And I will pay attention,
6 and I -- if -- it makes sense that I'm going to allow you to
7 file on that.  Okay.
8           MS. HEALY:  Your Honor, I believe that -- you
9 know, I didn't know that the Court was calling us here to
10 rule on the motion.  I believed that motion was coming in
11 front of Judge Gilliam.  I believe I followed --
12           THE COURT:  He referred it to me, and I'm denying
13 it without --
14           MS. HEALY:  I under --
15           THE COURT:  -- prejudice.
16           MS. HEALY:  I understand.  Your Honor, I'd just
17 like the opportunity to be heard.  I don't have a problem --
18 all -- like the Court recognized, all we want is a discovery.
19 I do have a problem, however, with them being rewarded, all
20 of them, for coming together and delaying this process two
21 months since the subpoenas passed, and I'm going to be
22 suffering the consequences of following the rules, and if the
23 Court wants sanctions, that's fine.  I believe -- I take my
24 responsibilities very seriously.  I would never have filed a
25 motion for contempt that I believe wasn't warranted.  I

12

1 waited and waited because Mr. Alderman -- and I have the

2 exhibit here with me -- told me that regardless of how he was

3 served, he would produce the documents belonging to Loop AI

4 with or without the subpoena.  Two months later nothing has

5 been produced.

6      So for the Court to say that I'm going to be punished

7 for pursuing this and that he's going to have an opportunity

8 to object I believe the --

9           THE COURT:  What is the punishment that the Court

10 is meting out here, because I'm not understanding?

11          MS. HEALY:  The Court is allowing --

12          UNIDENTIFIED SPEAKER:  Judge, I'm sorry.  You guys

13 cannot talk over top of each other.

14          MS. HEALY:  Sorry.  The Court is allowing Orrick

15 to get away with not responding to a subpoena, which I've

16 never heard.  Your Honor, I practiced for quite a few years.

17 I've never heard of a party just refusing in toto to respond

18 to a subpoena, not even an objection.  Everyone knows that if

19 you don't respond to a subpoena, you waive certain

20 objections.  I'm very willing to work this out, but they

21 shouldn't be allowed to be able to make objections two months

22 later, which is only going to take two more months to

23 resolve.

24      If they wanted to object, they should have reserved the

25 right to re-service, and they -- I mean, that's the process

13

1 that's set forth in Rule 45.  There is a procedure that Rule

2 45 says the parties have to follow.  I did follow the

3 procedure.  I was very scrupulous, your Honor.  We're talking

4 about two subpoenas.  We know we're going against parties

5 that are trying to protect their interests.  There is a very

6 difficult situation that Orrick is facing.  They're trying to

7 protect their interests, and they're doing that by delaying.

8 I don't think it's appropriate.

9      If the Court wants to order -- I understand she denied

10 my motion for contempt, but I don't think it's appropriate

11 that they be allowed two months later to assert objections.

12 I served that subpoena.  There is nothing in the rules -- and

13 I'm happy to address the service issue if the Court wants me

14 to, to explain, because the service issue is completely

15 different than what he's portraying.

16      First of all, Rule 45 has a specific service provision

17 which serves -- states to deliver, a person over the age of

18 18 must deliver the subpoena to the person.  It doesn't say

19 personally, like Rule 4 which governs service of process and

20 service of summons and a complaint.

21      So the two rules -- and there's court decisions that

22 have analyzed these two rules and have found that even when

23 somebody delivers a subpoena by registered mail, I mean

24 courts allow a subpoena to be delivered by registered mail,

25 and the reason for that is because Rule 45 does not have the

14

1 language personally which is found obviously in the service

2 of process of a summons and complaint which is original

3 process and requires different measures.

4      There is nothing in the rule that's required me to say

5 that we sent somebody over the age of 18 to deliver this

6 subpoena in hand to Orrick.  They come up with this rule,

7 internal rule.  How am I supposed to know that the general

8 counsel, the chief legal officer, which is prima -- he's

9 prima facie the representative of Orrick, and he's claiming

10 that only subordinates can accept subpoenas.  I mean, first

11 of all, Mr. Alderman changed even who was, you know, capable

12 of accepting service for Orrick.  So I -- I don't believe I

13 violated anything.  I believe I was only too scrupulous about

14 service.  I was courteous to them.  I called them up.  I

15 asked them, and the only reason why they -- he's saying, "Oh,

16 you can serve me by E-mail," he said that after the time to

17 respond to the subpoena was expired.  He never asked me for

18 more time.  In fact, Ms. Graham, who represents Russell

19 Reynolds, they asked me for more time, and I readily said

20 yes, of course.  You know, they asked me for a week, and I

21 gave it to them.  We have other issues with them, but it

22 doesn't mean that, you know, now, two months later -- it's

23 the end of July.  The subpoena was served on June 1st.  So I

24 agree with your Honor that -- excuse me, your Honor.  I'm

25 sorry.

1          THE COURT:  It's okay.

2          MS. HEALY:  I -- I don't mean to be -- you know,

3 this has been an issue because I've never faced -- I know

4 that big firms, you know, think they can get away with

5 things, and I was in one of them for many years myself, but I

6 don't --

7          THE COURT:  Okay.  Ms. --

8          MS. HEALY:  -- think it's appropriate that they

9 should be able to object.

10          THE COURT:  All right.  I've heard you out, Ms.

11 Healy.

12          MS. HEALY:  Yes.

13          THE COURT:  You've made your record.

14          MS. HEALY:  Uh-huh.

15          THE COURT:  And I've told you now probably four

16 times --

17          MS. HEALY:  Okay.

18          THE COURT:  -- the motion is denied without

19 prejudice.  I've told you that after we finish adjudication,

20 if that's necessary, on the merits of the subpoena, then --

21 then if you want to raise the motion for contempt, if you

22 want to re-raise it, okay.  Then, you know, you're kind of

23 making gestures at me because you think that because of --

24 you know, I'm allowing them to object, otherwise you would

25 have had access to all of those documents.  That's just

16

1 wrong, okay.  So we're going to put it aside.  You reserve

2 the right to subpoena Mr. Alderman and serve as of today.

3     Is there any objection to that?

4         MR. ALDERMAN:  There is not.

5         THE COURT:  What reasonable and shortened time

6 does Orrick need to file a response to the subpoena?

7         MR. ALDERMAN:  We appreciate your --

8         UNIDENTIFIED SPEAKER:  I'm sorry, sir.

9         THE COURT:  That's -- can you do it sooner?  It's

10 been outstanding, and this dispute has been in the wind for a

11 long time.

12         MR. ALDERMAN:  The only reason I ask for two

13 weeks --

14         THE COURT:  Oh, I'm sorry, Mr. Alderman, I hate to

15 -- there's a mic on the table if it's hard for you to come to

16 the podium.  Great.  Thank you.  Let's give that a try.

17         MR. ALDERMAN:  Your Honor, the only reason I'm

18 requesting two weeks rather than one is that I'm not going to

19 be in my office next week.  I can do it -- I can have the

20 work done while I'm gone, but I would like at least until

21 sometime the week after next to file the written response.

22         THE COURT:  Is there anyone else who's -- this has

23 been at Orrick now for sometime, correct?

24         MR. ALDERMAN:  It has.

25         THE COURT:  Okay.  So I think one week is

1 sufficient, and I understand that that means you may need to
2 look at it remotely or have one of your partners take a look
3 at it, but I don't think that this is a response that -- that
4 is going to be very complicated.  It seems to be there's a
5 couple of big issues here that you could state the objections
6 to, and then we can move forward on it.  So one week to the
7 -- to the response.
8      And then the parties need to meet and confer.  There
9 appears to be a pretty big issue about whether these
10 documents are attorney-client privilege and, if so, there's
11 some kind of waiver or some other way in which these are
12 producible.  Okay.  I don't know.  That hasn't been briefed
13 yet.  The parties need to meet and confer, and when I say
14 that, I mean really meet and confer.  I have a big concern in
15 this case that the parties are having difficulties doing that
16 in a meaningful way, and I don't know why that is happening.
17 I just know that it is happening.
18      We -- we have guidelines on professional conduct.
19 They're on the website.  Every lawyer who appears in this
20 Court is deemed to have read them and understood them.  They
21 are not to form the basis for a motion for sanctions.  It's
22 not -- you don't use it as a sword, but it's meant to guide
23 counsel's behavior.  When they're meeting and conferring,
24 they're to actually have good discussion, professional,
25 courteous, not personal, and you can agree to disagree, but

18

1 you have to try to reach compromises.  You always have to

2 bear in mind what would the Court do here because that's the

3 backdrop against which a dispute would be measured.  And if

4 somebody takes a position that is not substantial justified,

5 of course, they may open themselves up to Rule 37 sanctions

6 or other sanctions.

7       So there are some incentives to be reasonable and open

8 in talking to each other.  Okay.  So that meet and confer

9 needs to happen, and I'm not going to set a date for it right

10 this second because after we're done on the record, I'm going

11 to have the parties meet and confer about a schedule because

12 all of this needs to be scheduled.  We've -- and we need to

13 get moving because the parties have spent a long time on

14 these skirmishes, and we have a discovery cutoff that's

15 coming up, you know, sooner than everybody thinks.

16       So I'm going to set aside the scheduling for now, but

17 that's something you're going to work on this afternoon.

18             MS. HEALY:  Your Honor, is the Court going to

19 issue an order on the denial of the motion for contempt?

20             THE COURT:  The denial without prejudice?  Yes.

21             MS. HEALY:  Okay.

22             THE COURT:  That will be part of my order.

23             MS. HEALY:  And she will indicate that -- so,

24 because the waiver that happened in connection with the

25 motion, she's going -- the Court is going to indicate the

1 service issue?  Because the motion for contempt is not even

2 fully briefed yet.

3            THE COURT:  That is correct.

4            MS. HEALY:  I haven't had an opportunity to even

5 respond to --

6            THE COURT:  So --

7            MS. HEALY:  -- their -- to what they filed two

8 days ago.

9            THE COURT:  I have the -- the discretion to manage

10 discovery in a way that's consistent with Rule 1 of the

11 Federal Rules of Civil Procedure, just, speedy, and

12 inexpensive.  I have not ruled on your motion on the merits.

13 I have postponed it pending getting to the meat of what your

14 client needs.

15            MS. HEALY:  But the waiver arises also in

16 connection with their failure to respond to that subpoena

17 that was served.

18            THE COURT:  I understand that.

19            MS. HEALY:  Okay.  So is -- I mean, I just don't

20 want to make arguments in future filings that the Court has

21 already ruled on.  Is the Court allowing me to raise the

22 waiver in connection with the first subpoena in future

23 filings when they respond?

24            THE COURT:  In the future filing, if you want to

25 make the argument that you properly served it and they should

20

1  never have been allowed to respond because they waived all

2  their objections, if you really want to make that argument,

3  you can.  I'm not sure if it's a winner, but I haven't seen

4  everything on it, and I would proceed with caution, quite

5  frankly.  I thought I was doing you a favor, but you have not

6  waived that.  If you want to make that argument, you can

7  later.  Okay.

8       All right.  So --

9            THE CLERK:  (Indiscernible.)

10            THE COURT:  Yes?

11            THE CLERK:  (Indiscernible.)

12            THE COURT:  Well, we have Ms. Brayer here on the

13  phone, right, for Ms. Gatti?

14            THE CLERK:  Actually, she represents --

15            MS. BRAYER:  No, no.  Mr. LoSavio represents Ms.

16  Gatti.  I represent IQ Systems, Inc.

17            THE COURT:  Oh, I see.  Well, apparently Mr.

18  LoSavio is on his way in.  He's late.  I didn't realize we

19  were expecting him.  So let's keep going.

20       So that is how we're going to handle the Orrick

21  subpoena issue.  Now, I need to back up and mention one more

22  thing.

23       It was originally queued up as an ex parte letter, and

24  I ordered -- after seeing both sides of it, I ordered a

25  motion, and that's because I -- I normally proceed by joint

21

1 letter, as explained in my referral, because it's flexible,

2 it's faster, and usually I can get you in quicker than 35

3 days, but when it raises something like privilege where it

4 takes a little more time to argue the issues and the Court

5 would benefit from fuller briefing, then I tell the parties I

6 want this fully briefed, which is what I did here.  So

7 normally you file a joint motion -- joint letter is the

8 format, and then if I want a full motion I'll let you know.

9        So for the subpoena, if there ends up being motion

10 work, the Orrick subpoena should be queued up with a motion,

11 okay.  And, again, if that's going to be a motion for a

12 protective order or a motion to compel, whatever it might be,

13 you'll meet and confer first, and we'll decide on the -- you

14 will decide on a schedule, and I'll rule on it after we

15 finish up the part on the record here.

16            MS. HEALY:  Your Honor, may I say something --

17            THE COURT:  Yes.

18            MS. HEALY:  -- about the motion to quash?  Because

19 it goes back to the point of delaying.  So we have a fairly

20 tight schedule.  I'm in total agreement.  All we want is a

21 production.  The Court acted immediately on his request to

22 file a motion to quash.  It's more than a month later, and he

23 hasn't filed anything.

24            THE COURT:  That's why I said just now, Ms. Healy,

25 the parties are going to have to come to an agreement on --

22

1 on filing.  I'm not going to allow delays in the schedule.

2 I'd like you to come to an agreement.  If you can't, I will

3 order the timing.

4          MS. HEALY:  No, I understand, but there's case law

5 that says a motion to quash has to be filed within a certain

6 time line.  He's past all those time lines.  So, you know, we

7 can come to an agreement, but I would like to reserve my

8 rights because, again, the Court acted immediately.  Your

9 Honor was very kind to grant them immediately the right to

10 move to quash, and for somebody to sit on his rights --

11          THE COURT:  It's not a granting.  He filed a -- a

12 discovery letter --

13          MS. HEALY:  I understand.

14          THE COURT:  -- which acts as -- which acts in the

15 Local -- in the Federal Rules as a motion, just like, you

16 know, normally if you had a motion to compel in a joint

17 letter forum, that's a motion.  I would consider that -- I'd

18 look at that motion date to see whether it was timely.  I

19 then ordered a motion.  I didn't say -- I should have but

20 didn't say when it should be filed by.  I don't know why you

21 took so long.  I don't need to hear why you took so long, but

22 we're going to set a date today on when that motion is going

23 to be filed so we can get this done, okay.

24     Now, moving on to the motions on the RRA subpoena, are

25 you Mr. LoSavio?

23

1          MR. LOSAVIO:  Yes, your Honor.  I apologize for my
2 tardiness.
3          THE COURT:  Please make your appearance on the
4 record.
5          MR. LOSAVIO:  Tom LoSavio appearing for Anna Gatti
6 and IQ Systems, LLC.  I believe Ms. Brayer has already
7 appeared.
8          THE COURT:  Yes, she's on the phone.  Thank you.
9     Okay.  On the motions regarding the RRA subpoenas --
10 and I -- I say subpoenas because I can't tell, but it appears
11 to be more than one.  Is there a document?
12          MS. HEALY:  Your Honor, yes.  I'd be happy to
13 address this point.
14          THE COURT:  Well, all I want to know right now, I
15 just have one question which is how many RRA subpoenas are
16 there?
17          MS. HEALY:  So there is one subpoena duces tecum.
18 The subpoena was served -- was issued on June 2nd and served
19 on June 3rd.
20          THE COURT:  Okay.
21          MS. HEALY:  And this is the subpoena that's
22 subject of the SDNY proceeding.
23          THE COURT:  Okay.
24          MS. HEALY:  There is a second subpoena to RRA ad
25 testificandum which was issued on I believe July -- I have

*Echo Reporting, Inc.*

24

1 the document at counsel table.  I think it was issued July

2 1st.  I mean, it's for a deposition on July 30th in New York,

3 RRA's principal place of business.  So those are the two

4 subpoenas on the table for that party.

5             THE COURT:  And that's the Mr. Pepe (phonetic)

6 subpoena?

7             MS. HEALY:  Yes.  That's where we designated under

8 Rule 30(b)(1) Mr. Pepe as the corporate designee.

9             THE COURT:  Okay.  And that's the subject of the

10 dispute filed by Defendants in front of this Court, correct?

11            MS. GRAHAM:  May I speak, your Honor?

12            THE COURT:  Please identify yourself for the

13 record since --

14            MS. GRAHAM:  Sure.  This is Becki Graham for

15 Russell Reynolds.  There's actually -- just to clarify for

16 the time renders, there were three subpoenas.  The first was

17 the document subpoena.  The second was a deposition subpoena

18 for Mario Pepe which was served on him individually.  Then

19 she unilaterally took that off calendar.  And then there was

20 a -- then she served another subpoena for him, but this one

21 went to Russell Reynolds and asked -- asking Russell Reynolds

22 to produce Mario Pepe for deposition in two different

23 locations.

24            THE COURT:  Okay.  So but --

25            MS. HEALY:  That's not correct, and I'd be happy

1 to address.  The Court I believe asked what are the current

2 subpoenas pending before your Honor.

3          THE COURT:  Okay.

4          MS. HEALY:  So that's the subpoena to RRA ad

5 testificandum, corporate designation under 30(b)(1) of Mario

6 Pepe.  In June I issued a subpoena after -- and I -- I don't

7 know if the Court wants all the detail.

8          THE COURT:  Not at this point.

9          MS. HEALY:  Right.  It's not before --

10          THE COURT:  All I want --

11          MS. HEALY:  The subpoena she claims was served was

12 not served, and it's not before the Court.  It's not before

13 anyone.  It doesn't exist.

14          THE COURT:  Okay.  Thank you.

15      So it looks -- it looks like everyone agrees -- I could

16 be wrong -- that the disputes are that the RRA subpoenas can

17 be handled here, and this is how I reach that conclusion, but

18 I could be wrong.  You'll let me know.

19      The Defendants filed here.  So I assume the Defendants

20 want it heard here.  Plaintiff's counsel indicated it would

21 consent to have the matter in SDNY transferred here as long

22 as RRA consented to jurisdiction for adjudication and

23 enforcement of that subpoena.  Is that correct, Ms. Healy?

24          MS. HEALY:  That's correct, with a caveat that I'd

25 be happy to address when the Court pleases.

1          THE COURT:  Okay.  And then, finally, RRA in the
2   SDNY matter filed a consent pleading saying it consented to
3   jurisdiction for the Northern District of California with
4   respect to -- well, personal jurisdiction for adjudication of
5   the subpoena, correct?
6          MS. GRAHAM:  That is correct.  We filed a motion
7   for transfer.
8          THE COURT:  So, Ms. Graham, does RRA want the
9   subpoenas issued to it adjudicated here to the extent there's
10  disputes?
11         MS. GRAHAM:  That is correct, your Honor.
12         THE COURT:  Okay.  Ms. Healy, what --
13         MS. HEALY:  Yes.
14         THE COURT:  -- does Plaintiff want to see happen?
15         MS. HEALY:  Your Honor, I want to see happen the
16  quickest -- I would like to find the quickest way to get our
17  production.  So we worked with the general counsel of RRA
18  even before Ms. Graham got involved in the matter and tried
19  to accommodate like we did with Orrick.  We called them ahead
20  of time, subpoenas issuing, want to discuss that -- the
21  contents of the subpoena.  It's a very narrow subpoena.
22  There's a few categories of information, 13 requests.
23      We served the subpoena.  They asked for an extension.
24  We -- when they asked for an extension the day before the
25  subpoena was returnable, they never told me we're not going

27

1  to produce anything.  "They said we just need additional

2  time.  We have to look at the documents."  I said fine.  I

3  mean, that's normal.

4      So the next day after I granted the extension, they

5  served me objections on everything, and when the extension

6  came due, they served zero.  They didn't serve anything.

7  When this happened, I began telling them you have to produce

8  or I'm going to move to compel.  RRA, as the Court knows, is

9  a business located in New York.  That's it's principal place

10 of business.

11     So throughout that time, we went back and forth, and

12 she never told me -- in fact, she specifically told me she's

13 not comfortable submitting to the personal jurisdiction of

14 this Court, and if the Court reviews the filings that they

15 made, they said "I consent to the transfer," but they never

16 actually indicated that RRA hereby consents to the personal

17 jurisdiction of the Northern District of California in

18 respect to the matter pending before the Court.  Now --

19          THE COURT:  Just one -- just one --

20          MS. HEALY:  Yes.

21          THE COURT:  -- moment.  Well, they don't -- they

22 say RRA consents to jurisdiction of the Northern District of

23 California for purposes of resolving the discovery dispute

24 raised in its motion to compel, which it has to do with RRA.

25 And Ms. Graham has now just said that RRA consents to

1 personal jurisdiction of RRA in the Northern District of

2 California for purposes of adjudicating any -- can I say any

3 of the subpoenas or both of the subpoenas issued to RRA in

4 this case?  Is that correct, Ms. Graham?

5          MS. GRAHAM:  Yes, that is correct.

6          MS. HEALY:  Also for Mario Pepe?  You're

7 consenting to this Court having personal jurisdiction over

8 Mario Pepe in this District?

9          MS. GRAHAM:  I -- let me clarify that because --

10          THE COURT:  Okay.

11          MS. GRAHAM:  -- I think what she is trying to get

12 at is where his deposition will be located.

13          MS. HEALY:  No.

14          THE COURT:  Okay.  So the question is Mario Pepe

15 is going to -- it sounds like he's going to be the deponent

16 who was produced pursuant to the subpoena.  And does he

17 consent to the power of the Court to make decisions about his

18 attendance, wherever that may be, and his participation in

19 that deposition?

20          MS. GRAHAM:  This is Ms. Graham.  Yes, your Honor.

21 Both RRA and Mario Pepe consent to this Court's jurisdiction

22 over adjudicating matters associated with the document

23 subpoena and the deposition subpoena.

24          THE COURT:  Okay.  Including enforcing the

25 subpoenas?

29

1          MS. GRAHAM:  Including enforcing the subpoena.

2          THE COURT:  Okay.  So, with that clarification --

3          MS. HEALY:  Yes.

4          THE COURT:  -- Ms. Healy, does -- is your client

5 comfortable with having everything heard here on the RRA

6 subpoenas?

7          MS. HEALY:  Of course.  We're just following the

8 rules.  I would only add one additional issue.  So that's

9 completely covered now.

10          THE COURT:  Okay.

11          MS. HEALY:  The additional issue is that we gave

12 them additional time and waited to file the motion to compel,

13 which is now due to be heard next Tuesday.

14          THE COURT:  Right.

15          MS. HEALY:  So my only concern is that I don't

16 want to delay any further, and we have -- so because on

17 Tuesday the Court potentially could decide our pending motion

18 to compel.  It's a very simple motion.  There's not that much

19 to it.  So I wouldn't want this process to then place us at

20 another month from now they have to travel again.  Obviously,

21 it's not the Court's burden whether I am on the east coast or

22 west coast.  I mean, we'll never make it the Court's burden,

23 but there is case law that when a party asks for a transfer

24 of such a motion, they have to pay the expenses associated

25 with counsel, you know, having to go to a different court.

30

1     So in that -- in that case, I would -- you know, Ms. --
2 because I'm there in New York, there is a motion pending in
3 New York that is due to be heard next Tuesday, and now at her
4 request everything is being transferred here, and I would
5 potentially have to return here for another hearing on that
6 motion.  So that's -- that's what I would be asking, that she
7 pay for the expenses of us having to return here.
8          THE COURT:  Okay.  Well, it's sort of two
9 different things because the first question is -- and I think
10 we have an answer that the RRA subpoenas are going to be
11 adjudicated here, correct?
12          MS. HEALY:  No, your Honor.  I would like to
13 ensure that there's the other issues because the motion to
14 transfer also takes into account the expense of the parties.
15 Here we have a party that's presumptively in New York.  He --
16 the motion to compel was filed there.  It's a very simple
17 narrow motion.  I mean, I can't imagine that the Southern
18 District is not capable of resolving such a motion,
19 especially because Rule 45 allows the judge there to speak to
20 your Honor, and that's specifically set forth in the advisory
21 committee notes, that the Court can confer with the court
22 presiding over the entire matter.
23     So to me it's just a matter of if we wait some more,
24 we're going to be subject to further expense, having gone
25 through the burden of having to file a motion to compel, and

1 we're going to be subject to having to travel here again,

2 which is fine because obviously we filed here, but in this

3 case we didn't cause this.

4           THE COURT:  Okay.

5           MS. GRAHAM:  May I be heard?

6           THE COURT:  Ms. Graham.

7           MS. GRAHAM:  This is Ms. Graham.  First, Ms. Healy

8 represents the Plaintiff, who has filed in this Court.  We --

9 my client retained myself in California because the case is

10 here.  The subpoena was issued by this Court.

11          THE COURT:  Rule 45 would dictate that the

12 subpoena is adjudicated in New York absent exceptional

13 circumstances.

14          MS. GRAHAM:  I understand.

15          THE COURT:  She was well within her rights to file

16 there.

17          MS. GRAHAM:  I understand that.  I'm not

18 contending that she was wrong in filing in that courtroom.

19 The -- motions to transfer are usually with respect to third

20 parties.  Now, the -- the burden is being placed on us.  She

21 wants to shift the burden on us, but -- but for a third

22 party, the burden is really -- should be shifted to the party

23 who is issuing the subpoena, not the third party.  The -- in

24 this case, the Plaintiff.

25      I don't understand -- I don't see how big of a burden

1 it is for her in comparison to my client who has spent hours
2 and thousands of dollars to try and resolve this.  So I would
3 request that -- that my client not be imposed with the
4 additional expense of having to adjudicate it here.  Where
5 she had filed here and the case itself was being adjudicated
6 here --

7        THE COURT:  Here is what I'm going to propose.
8 Again, it's not perfect, but it's -- the situation is a
9 little messy.  Let me play it out.  If you don't want to drop
10 your motion in SDNY, then you can go forward with it in New
11 York on the 28th.  That Court may or may not adjudicate it or
12 may transfer it here if they're -- if they are successful in
13 arguing for a motion to transfer it here, and at that point
14 you could also ask that as a -- as a condition that they pay
15 and you can make your arguments and put your legal cases in
16 front of that court, but it may end up here, right.  And that
17 court may also decide that there's no fees that should be
18 allowed.

19     Here's what I'm going to suggest, that it's going to --
20 only -- you can go forward with your SDNY if you want or you
21 can decide let's just do it here.  But with respect to an --
22 but you can brief the issue in front of me about whether or
23 not I should shift some of those costs given that you
24 originally filed there and you're now having to come here.

25     I don't know the answer to that.  I'd actually want to

33

1  see the cases and evaluate whether that is -- what's

2  appropriate there.

3          MS. HEALY:  Also, your Honor, the other issue is

4  that we waited to file this motion because she kept saying

5  she would be complying.  They -- they had the opportunity to

6  come to your Honor right away, and then we wouldn't have had

7  to expend the money to move to compel.

8      So I'll think about it, your Honor.  I think if the

9  Court is not prepared to -- I mean, I don't think our -- I

10 can --

11         THE COURT:  Well --

12         MS. HEALY:  -- proceed in SDNY with what -- they

13 presented SDNY with briefs full of statements --

14         THE COURT:  I'm going to get to that part in a

15 moment.  But as to, Ms. Healy, the decision on behalf of your

16 client, I'll need to know what you want to do.  I'll need

17 your decision --

18         MS. HEALY:  We think your Honor should decide

19 everything.  We -- we don't need any fees.

20         THE COURT:  Okay.  So as to the statements made by

21 Venable -- who is Mr. Myerhoff?

22         MR. WALLERSTEIN:  That is my associate, your

23 Honor.

24         THE COURT:  Okay.  I was very disturbed by the

25 statements made by Mr. Myerhoff to the court in New York.

34

1          MR. WALLERSTEIN:  I --

2          THE CLERK:  I'm sorry.  You have to state your

3 name.

4          MR. WALLERSTEIN:  Tom Wallerstein, your Honor.  I

5 believe any statements made to the Court were made by me

6 under my signature.  So I am happy to bear your Honor's

7 wrath.

8          THE COURT:  I am looking at the document filed in

9 that court on July 20th that talks about how this Court has

10 decided that I'm going to -- you know, that I'm going to

11 decide everything, and it made all kinds of representations

12 that were not correct.

13          MR. WALLERSTEIN:  The responsibility is mine, your

14 Honor, not Mr. Myerhoff's.  He is barred in New York, which

15 is why he signed it and filed it.

16          THE COURT:  What is the basis for telling that

17 judge that -- for example, that this Court ordered that the

18 resolution of the right to designate confidential documents

19 produced by RRA will be resolved here by this Court on this

20 date?

21          MR. WALLERSTEIN:  The confidentiality order -- the

22 confidentiality protective order, your Honor, is one of the

23 several issues we raised in our July letter which led to this

24 conference.

25          THE COURT:  I have -- tell me where I said

1 anywhere that I was going to be adjudicating the issues that

2 are currently before the SDNY.

3          MR. WALLERSTEIN:  What our July -- your Honor's

4 order setting this conference said that your Honor was going

5 to consider three prior docket entries in particular.

6          THE COURT:  What did it say about that, Mr.

7 Wallerstein?  What was the Court going to do with respect to

8 those three prior orders?

9          MR. WALLERSTEIN:  I don't have your Honor's first

10 order in front of me.

11          THE COURT:  That's a problem because the order

12 which was filed prior to the order that you filed or the

13 representations you made to the Court said that today I'm

14 going to discuss the how, when, and where the disputes were

15 going to be handled because it was confusing and there was

16 one filed in New York and one filed here.  I made no

17 statement or ruling that the RRA subpoena issue currently

18 before the New York court would be decided by this Court.

19          MR. WALLERSTEIN:  I agree with that, your Honor,

20 and I don't -- certainly did not intend to be misleading.

21 What -- what I understood will be decided by this Court, I

22 still understand will be decided by this Court, is a

23 confidentiality order which will either allow or disallow my

24 client the right to make objections to -- or, rather, to make

25 designations of confidentiality about the RRA production, and

36

1 that's really our only agenda in that, your Honor.  It's not

2 -- not the scope of the production per se, but it's a

3 confidentiality issue as to whether we can designate our own

4 confidential documents produced by RRA as confidential or

5 not.

6           THE COURT:  There are numerous statements in this

7 pleading you put before SDNY that lead that judge or that

8 court to have the impression that all of the -- all of the --

9 the third party subpoena issues have been -- are going to be

10 decided by me.  So -- and they've been laid out in Ms.

11 Healy's letter.  I'm not inviting more letters but in that

12 letter that I think you submitted on the -- I get one every

13 day, if not --

14           MS. HEALY:  The 21st, your Honor

15           THE COURT:  -- not more than one a day.  So I

16 think you know which letter I'm talking about, where she says

17 here are the misstatements made by -- by the Defendant to

18 that Court.  They were misstatements.  They're

19 misrepresentations.  They lead that Court to believe that --

20 and they argued in favor of exceptional circumstances being

21 present.  So, for that reason, here's what Venable is being

22 ordered to do.

23     Venable shall file something by today in that court and

24 also in this court apologizing to the judge in the Southern

25 District of New York for making misrepresentations to that

37

1 Court about which -- which may have led that Court to believe
2 that this Court had already assumed jurisdiction over those
3 -- over the subpoena currently before that judge.  I don't
4 want a wishy washy apology or something that says we hope we
5 didn't say something that might have misled you.  It's that
6 we made misrepresentations that may have led that judge to
7 believe the following.  Okay.  I don't want sanctions motions
8 filed on this.  I just want to correct the record.  That is
9 to be done today.

10      And, by the same token, Ms. Healy, please withdraw the
11 motion in front of that judge so she -- and please do that
12 today, if you can, or first thing tomorrow morning so that
13 that judge doesn't then spend time trying to prepare on that
14 subpoena.  We got one judge working on it and the record
15 being corrected.  Okay?

16           MR. WALLERSTEIN:  Understood, your Honor.  I want
17 to make sure you are referring to a letter from Ms. Healy
18 that lists statements.  I believe the prefatory language to
19 the letter is referring to statements made either by -- by
20 Venable or by Russell Reynolds' attorney.  So I want to be
21 certain that the -- and perhaps they're all misleading, not
22 by my intent but I want to be certain that I am not
23 apologizing for a statement I didn't make.

24           THE COURT:  Okay.  I'm looking at the -- the
25 pleading signed by Mr. Myerhoff.  So that's what I -- it's

38

1 Venable on behalf of the Defendants.  And, just to make

2 certain -- sorry.  Ms. Beard (phonetic), can I ask you to

3 come up here.

4     (Pause.)

5         MR. WALLERSTEIN:  Your Honor?

6         THE COURT:  Yes.

7         MR. WALLERSTEIN:  So I'm -- I have our brief in

8 front of us.

9         THE COURT:  Yes.

10         MR. WALLERSTEIN:  And I'm looking at our page

11 three where we make the representations that Loop's counsel

12 quoted for your Honor in her letter.  And --

13         THE COURT:  Yes?

14         MR. WALLERSTEIN:  -- we make three sentences -- we

15 say three sentences, specifically:

16             "At the July 23 discovery

17             management conference, the California

18             court will address resolution of

19             Almawave's right to designate as

20             confidential certain documents produced

21             by RRA pursuant to Loop's subpoena."

22     I believe that is a true statement.  That was one of

23 the issues in our letter which your Honor specifically

24 referred here.

25         THE COURT:  Okay.  Mr. Wallerstein, you need to do

39

1  closer reading of my orders, okay.  I didn't -- I did not say
2  it, and actually I said the opposite.  Now I'm going to read
3  form my order.  This is, for example, and order of July 19th,
4  which is before you filed your pleading.
5              "The Court notes it will discuss
6              how, when, and where the outstanding
7              discovery disputes will be resolved at
8              the conference.  It will not address the
9              merits of any of the parties' disputes."
10     So I don't know where you got the -- the notion that I
11  was going to rule today about confidentiality and who gets to
12  designate what.  And also how you -- how you got to the
13  conclusion that I'm going to address the scope of documents
14  subpoenaed to RRA, again, that might lead that judge to
15  believe that I had taken jurisdiction away from her.  It's
16  appropriately before her.  It's for her to decide whether it
17  should be transferred.
18          MR. WALLERSTEIN:  If your Honor was confused, that
19  judge may have -- I mean, I appreciate what you're saying,
20  and I will do what you're suggesting.
21          THE COURT:  I'm not confused.  It's a
22  misstatement.  Okay.  So I'm leaving Venable to do this.
23  RRA's were a little more equivocal.  It was -- it came close
24  to the line.  I'm not going to order, Ms. Graham, for your
25  client to make a corrective statement to that judge.  But,

40

1 Mr. Wallerstein, that should happen by -- by the end of the

2 day today.  Okay.  It's a simple letter, and you can file

3 until midnight.  So make sure that that's done so that that

4 judge knows what's going on and the motion will be withdrawn

5 so the judge also knows record corrected and I don't need to

6 worry about this, California is going to deal with it.  Okay?

7          MR. WALLERSTEIN:  We will make the most

8 unequivocal statement, your Honor.  May I have another day.

9 It is three hours different in New York.  I do need my

10 colleague in New York I believe to sign and file it because

11 Mr. -- maybe I'm wrong about that but -- because I'm not

12 admitted in New York, we were under the impression that he

13 had to -- we needed a New York barred attorney.

14          THE COURT:  You've got until 9:00 o'clock tomorrow

15 morning California, which gives your colleague in New York

16 until noon.  Okay?

17          MR. WALLERSTEIN:  Thank you, your Honor.

18          THE COURT:  All right.  Same thing for you, Ms.

19 Healy.

20          MS. HEALY:  Your Honor, that's -- perhaps --

21          THE COURT:  Okay.

22          MS. HEALY:  -- we can also call the clerk in the

23 morning to explain briefly that we're withdrawing because

24 your Honor is -- just so that the Court --

25          THE COURT:  Right.  My main concern on that is

41

1 just that I don't want Judge Skofield to have to prep on --

2      MS. HEALY:  Sure.  We'll try to file it tonight.

3 That's not a problem.

4      THE COURT:  Yes.  And if you want to notify the

5 clerk that that's being withdrawn, that's fine.  Okay.

6      MS. HEALY:  Yes.  So and the only other issue, and

7 I believe the Court is going to address the timing of how

8 this is going to move.

9      THE COURT:  Yes.  Yes.

10      Okay.  July 22nd, 2015 joint letter on RFPs, rogs and

11 deposition notice served by the Defense.  So, Ms. Healy, your

12 motion for protective order is denied without prejudice.  So

13 you're seeking protection from even having to respond?

14      MS. HEALY:  No.

15      THE COURT:  No?

16      MS. HEALY:  Perhaps I wasn't clear.  No, no.

17 We're going to respond to that obviously because we're not

18 objecting on everything, but Rule 56 does permit us to even

19 before the time to respond is due, move for a protective

20 order on matters that are objectionable.  So that's what

21 we're doing.  And, in particular, your Honor, because there

22 is a 30(b)(6) notice, if we don't move for a protective order

23 before the time for the notice is due, we actually could be

24 sanctioned, and we looked into this.  So I tried to move as

25 quickly as I could, but we are going to respond to certain --

42

1 to the -- you know, we're going to produce discovery and

2 respond as -- there's other requests that are not

3 objectionable.  We're not objecting to --

4          THE COURT:  Okay.

5          MS. HEALY:  -- everything.

6          THE COURT:  Okay.  Yes, I saw that you weren't

7 objecting to everything, and I agree that some of the -- some

8 of the requests are over-broad and otherwise objectionable

9 but not so objectionable that you can't file a response.  So

10 please file a --

11          MS. HEALY:  Oh, yes.

12          THE COURT:  -- response, okay.  File the response,

13 and then you meet and confer so that the parties can discuss

14 what is it exactly that you're looking for that seems over-

15 broad, scope of time, people, and you have a discussion.  You

16 try to reach agreements.  Most people do, folks.  Most people

17 do.  And, in fact, I quote to you from the guidelines for

18 professional conduct in discovery and motion practice:

19               "Motions should be filed or opposed

20          only in good faith and when the issue

21          cannot be otherwise resolved.  In

22          particular, civil discovery motions

23          should be filed sparingly."

24     In this case, it seems like the parties are going for a

25 world record on filing motions.  Please stop.  Just stop.

43

1 Talk.  I promise that I will be a good steward of your case,

2 that I'm going to make sure it's managed and that we go

3 forward in a reasonable -- at a reasonable pace and in an

4 organized way.  I want this to be fair, but it takes -- it

5 takes so much energy for the parties to just object to each

6 other instead of actually trying to reach agreements.

7    My joint letter process requires the parties to do a

8 few things.  One, it has to be joint.  I'm not going to allow

9 any more ex parte letters.  Two, it actually has to be here's

10 issue one, here's what we think, and here's what the other

11 party thinks.  Here are the compromises we tried to make.  My

12 letter requires that.

13    What I saw in your July 22nd one -- I'm not blaming

14 anyone because I don't know why it happened this way, and I

15 don't need to know, but it looks like, you know, here's one

16 side saying what they had to say and here's another side, and

17 we glued those two pieces of paper together.

18    That's not meet and conferring.  That's -- and that

19 would be in violation of my rules.  So you need to do better

20 than that.  You also need my -- my order says proceed and

21 plan ahead in a fashion that both sides can meaningfully

22 participate in a joint letter.  You don't sandbag somebody.

23 You give each other time.  Everybody should know what the

24 disputes are.  If you want me to decide them, then I need to

25 know what the parties' positions are, okay.

1           MR. WALLERSTEIN:  Your Honor --

2           THE COURT:  Mr. Wallerstein?

3           MR. WALLERSTEIN:  There has been a complete and

4 utter breakdown of the ability to meet and confer in this

5 case.  I view it as my professional responsibility to not

6 bring before your Honor the kinds of disputes that we have

7 put before your Honor, and it's unfortunate.

8           THE COURT:  It is unfortunate.  It's not going to

9 happen that way anymore.  Okay.

10           MR. WALLERSTEIN:  Part of the issue, your Honor,

11 we're not allowed to send E-mails.  We're not allowed to talk

12 to local counsel.  We're not allowed -- Loop will not talk to

13 Ms. Colt, who's running the case.  So the only way we are

14 permitted to communicate -- and -- and Loop will not put its

15 positions in writing.  So the first time we hear about a

16 dispute is on a telephone call, after which we're told you

17 now have two days to file the joint letter, you know, "I'll

18 give you the letter."

19     But Loop's counsel has taken the position that meeting

20 and conferring in writing is prohibited by your Honor and

21 that we are -- we're not allowed to send E-mails.  Venable's

22 E-mails have been blocked, and we're not allowed to talk to

23 local counsel.

24           THE COURT:  Okay.  So --

25           MS. HEALY:  Your Honor --

1          THE COURT:  Hold on. Hold on.  Ms. Healy, and

2 then, Mr. LoSavio, if you want to be heard, you need to come

3 up to the microphone.

4      Go ahead.

5          MS. HEALY:  Your Honor, before I address this

6 noise -- and it's unfortunate that these kinds of topics have

7 to be brought to the Court's attention.  I would like to

8 address actually the merits of the protective order that we

9 were just discussing for just one minute because the

10 discovery requests that were served are -- I mean, they asked

11 for our entire work product.  There's so many discovery

12 requests that are just so facially inappropriate under the

13 law of any district.

14      So I would like to understand, you know, how the Court

15 would like us to proceed in that regard.

16          THE COURT:  Sure.

17          MS. HEALY:  We just object.  I don't want to be

18 subject to a motion to compel.  Honestly --

19          THE COURT:  Right.

20          MS. HEALY:  -- you know, my goal --

21          THE COURT:  Here's what you should do.  You should

22 file your objections so that they -- you know, whatever it

23 is, that these are over-broad or this calls for work product,

24 whatever they might be, as long as they're tailored to

25 particular requests, and then -- and you should have

1 discussions.  So, for example, if some -- and there were a

2 number that were over-broad.  "All documents relating to X

3 person," that's ridiculously over-broad but not so burdensome

4 that you shouldn't respond.  So you should have a discussion,

5 well, what -- you know, what exactly are you looking for

6 here, can we narrow this in some fashion.  But discussion

7 means you're getting at what you're looking for and -- and

8 you're having a better understanding of what you need to

9 search for, and I know that's not always an easy

10 conversation, but actually our profession requires that those

11 conversations take place.

12       Now, if -- if we -- if they say -- if they stand on

13 their objection, "We're not going to produce -- we're

14 requesting all of this" -- sorry, not stand on their

15 objection -- "We're requesting all of this and shame on you.

16 It's not over-broad," and that came to me, okay, they are

17 likely to face sanctions because they're taking a

18 substantially wrong or not substantially justified position.

19 That's how that works, okay.  So there is actually a way that

20 -- there's a rule of law here that's going to govern the

21 scope of discovery, and everybody should know what that is.

22 Let's just get down to, you know, the merits of things.

23           MR. WALLERSTEIN:  It's really just impossible,

24 unfortunately, to communicate.

25           THE COURT:  Okay.  So here's --

1          MS. HEALY:  Your Honor, I'd like to address --

2 sorry.

3          THE COURT:  Here's how this works.  Sometimes

4 there are E-mails because you can't -- you know, it's

5 convenient to at least get people thinking about, you know,

6 here is the subject matter, the things that we'd like to talk

7 about, okay.  And that -- that's a normal way of

8 communicating, but the real meet and confer when you're

9 getting down to discuss the issues, that should happen in

10 person or on the phone and not through this sort of distanced

11 medium.  It can also happen between an associate and an

12 associate or a partner and associate, whatever it might be,

13 but at the end of the day, the lead lawyer needs to sign any

14 joint discovery letter that gets put in front of me so that I

15 know the lead person has taken a look at the positions taken

16 by his or her side and feels comfortable that they're

17 justified.  Okay.

18          MR. WALLERSTEIN:  Understood, your Honor.  So --

19          MS. HEALY:  And, your Honor, I'd be happy to

20 address the E-mail issue very briefly because I know the

21 Court doesn't care.  You know, Mr. Alderman has been very

22 kind.  We -- other than we have disputes over the merits, but

23 we had the professional, you know, exchange, and I do use E-

24 mail.  I think it's a very convenient tool sometimes.  It's

25 also very easy to abuse E-mail.  When the E-mail becomes a

1 tool for harassment, I don't believe it is appropriate.  It's
2 my job to run this case as efficiently as I can, and your
3 Honor's order provides telephone or in person.  So when the
4 E-mails became abusive and they were not productive, your
5 Honor, and I know that the Court doesn't want to see all this
6 back and forth.  So I have no problem to -- yes, we're
7 communicating right now, but I do believe we're entitled to
8 put an end to harassing E-mails.  So I -- I -- in that sense,
9 we don't enjoy their communications right now, and we prefer
10 to communicate by telephone.  There's no rule that requires
11 us to be forced to be subjected to harassing E-mails by an
12 opposing counsel.  So that's really the background.
13       I don't think the Court really -- it's not a matter
14 before the Court, and I personally have called Mr.
15 Wallerstein many times.  I've had my associates call him.  I
16 am in charge of the discovery.  We're trying to resolve
17 things efficiently.  If I'm dealing with one of these
18 associates, I don't know if she's making representations for
19 the clients, for which client.  Most of the time when we get
20 on the phone, they didn't even want to identify which client
21 they're representing.  It's the three of them.  It's the one
22 of them.  That's -- I completely agree that there was a
23 breakdown, and it's not -- when I came to court here today, I
24 asked him if I could call off my -- my court reporter because
25 the Court ordered to bring -- me to go to -- of transcribing.

49

1 So I had a court reporter on call, and he didn't want to

2 respond to that simple question.  So I do try.  There is no

3 way of communicating, and I have professional communications

4 with many opposing counsel.  So I am following the rules,

5 phone and in person.  I'm not here in person, so I'm left to

6 phone and fax to respond, but I'm not going to be subjected

7 to, you know, a barrage of E-mails constantly.  So --

8             THE COURT:  Okay.

9             MS. HEALY:  So I don't think we're required to,

10 you know, have E-mail exchanges with Mr. Wallerstein.

11            THE COURT:  Okay.  Mr. LoSavio?

12            MR. LOSAVIO:  With respect to the process only,

13 your Honor, we in the past have been able to -- we have had

14 E-mails issued from our office to Ms. Healy's office.  I'm

15 holding in my hand the confirmation that their office has

16 blocked E-mails from my office.  As the Court has indicated,

17 there are times when setting an agenda of topics to be

18 discussed or to avoid any ambiguity or subsequent dispute

19 about what my position is, I like to express myself in

20 writing.  E-mail is the efficient way to do it, and E-mails

21 that -- with which counsel may disagree are not harassing E-

22 mails.  So I would just request -- I just put that forth for

23 the Court's consideration.

24            UNIDENTIFIED SPEAKER:  I would like --

25            MS. HEALY:  And, your Honor, some -- I'm sorry.

1 You're not a party -- if I may, at the outset of the case, I
2 actually -- it's funny.  They raised this issue because
3 before we had any communications, I sent them an E-mail
4 asking if they would consent to service by E-mail, and they
5 said no, and after all of this, I -- I cannot be a part, your
6 Honor -- there's no rule that says I have to be a party to be
7 subject to these E-mails.  There's facts -- we haven't had --
8 there's been no prejudice to communicating by fax, letter,
9 and phone.  They can call me any time.  I'm very prompt in
10 responding.  Mr. Alderman can confirm that, you know, he sent
11 me correspondence.  I called him.  My associates have called
12 him.  Did you confirm that?

13            MR. WALLERSTEIN:  I confirmed it.  When I wrote
14 you the E-mail inviting you to discuss the scope of the
15 subpoena with me, you called me back right away.

16            MS. HEALY:  Right away.

17            THE COURT:  Okay.  So --

18            MS. GRAHAM:  May I be heard?

19            THE COURT:  Go ahead, briefly, Ms. Graham.

20            MS. GRAHAM:  Very briefly.  I too have been
21 blocked, and I've never once sent a harassing E-mail to her,
22 and I'll just leave it at that.

23            THE COURT:  Okay.  It seems -- have you ever
24 blocked an E-mail from other opposing counsel?

25            MS. HEALY:  Yes.

1           THE COURT:  Okay.

2           MS. HEALY:  Once only in a pro bono case.  We do

3  also a lot of pro bono work.

4           THE COURT:  Okay.

5           MS. HEALY:  But only because it was being used

6  self-servingly, and it was -- she wouldn't accept certain E-

7  mails, but then she would send some E-mails.  So when -- when

8  things get out of control with E-mails --

9           THE COURT:  Uh-huh.

10          MS. HEALY:  -- E-mails is very intrusive, there's

11 -- there has to be a process that we cannot be -- he sends E-

12 mails, and two seconds later if you're not responding, he

13 starts threatening.  Your Honor, I can show the Court --

14          THE COURT:  Okay.  So here's what I'm going to

15 suggest.  Although -- well, E-mails is a normal way of

16 communicating these days.  I agree with you it can be

17 abusive.  What I'd like to see if a fresh start.  If at all

18 possible, I'm going to suggest a fresh start, which means

19 that you begin, again, being willing to accept E-mails from

20 them, but the E-mails need to be useful.  They need to be --

21 you know, if there are things like setting an agenda or

22 confirming a time that you're going to talk or, you know,

23 confirming a position taken briefly so that there's no

24 miscommunication, then fine, but if it gets to the point

25 where anybody believes the E-mail communication is harassing,

52

1 then I would hear that motion.  I don't want to hear the

2 motion, but I will because you've told me, Ms. Healy, that

3 there's a record here that I should consider.

4          MS. HEALY:  Yes.

5          THE COURT:  And so what I'm doing is resetting.

6 We're starting fresh.  Everybody knows I'm going to keep an

7 eye on it if I have to.  So watch your tone.  Watch your use.

8 Understand that E-mail -- I'm specifying the ways in which it

9 should be used and not in the whole, you know, constant

10 barrage that sometimes -- I don't know if that happened here

11 but that --

12          MS. HEALY:  Yes.

13          THE COURT:  -- can sometimes happen, so that going

14 forward, if I have to police that, I will.  I didn't invite

15 it, but I will.  Okay.  Are you okay with that?

16          MS. HEALY:  I'm sorry, your Honor.  I can't accept

17 that because I worked my way for many months accepting all of

18 their correspondence.  We have a system.  There's fax.  It's

19 very easy.  Fax goes -- it's very easy to do.  It hasn't

20 prejudiced anyone.  I'm not willing at this stage, especially

21 because Mr. Wallerstein, he's really representing the entire

22 group also certain known parties.  So he creates all these

23 confusions, all these questions.  I have to run the case

24 efficiently, your Honor.  My client is a very small startup.

25 There's no reason -- there's no -- if he wants to send me an

53

1 agenda, which I doubt very much because normally he just
2 sends threats, there is a fax.  He sent me the fax.  There's
3 no problem.  We have many tools.  We delivered documents by
4 electronic transfers.  It's very easy.  There's no reason for
5 him to E-mail me.  You know, I've really never done this.
6 The issue I was talking to the Court before about the Family
7 Court that I did this pro bono case, it was like one time
8 with this one opposing counsel about one thing.  I never had
9 a situation like this before, never ever.  And, you know, for
10 full disclosure, March 5th I had a telephone call with Mr.
11 Wallerstein, during which he told me that if my client didn't
12 go away, discovery will be very expensive and we would not
13 get any discovery.

14     So since that date he E-mails our local counsel without
15 -- you know, that was before the block because the block was
16 very recent.  He was threatening us with everything,
17 threatening us to -- it's just -- I love this job, honestly.
18 I love the law.  I don't love all these things.  I want to
19 practice in a way that's efficient that doesn't make me
20 really hate this profession.  That's what gives lawyers,
21 unfortunately, a bad name, and I don't think E-mail sometimes
22 is helpful because people immediately respond.  Then they
23 expect you to -- I'm not his associate.  I'm not there to
24 respond to every single thing that comes through his mind.
25 Ms. Becki Graham also -- we were communicating by E-mail with

54

1 their general counsel.  Recently she told me she didn't want

2 to get stuff by E-mail.  She's sending E-mails with stream of

3 consciousness, you know --

4             THE COURT:  Okay.

5             MS. HEALY:  It's not --

6             THE COURT:  Let's.  Let's stop.  You're not

7 willing to reset.  You're not willing to say "Okay, the past

8 is the past.  Judge said she promises to police this if it

9 gets to be a problem.  Let's try again," because people

10 clearly aren't communicating.  I mean, this is -- this is a

11 sad state of affairs, and I'm not blaming anybody.  I think

12 sometimes we get in a position where lawyers' chemistry and

13 issues and the clients really make things difficult, okay.

14 But I am really asking you to consider a reset because

15 otherwise it makes it even harder to meet and confer.

16             MS. HEALY:  I think your Honor is being unfair to

17 me because I -- you know, I already lost everything today,

18 and every single motion was denied.  This is a matter of

19 respect.  In <u>Reconvergent</u>, a case from this District, held

20 that lawyers have a duty to take the high road.

21             THE COURT:  That's right.  That's what I'm asking

22 you to do.

23             MS. HEALY:  And -- and -- right.  And we can't --

24 in order for me to comply with that duty, I'm just using, you

25 know, the means that are required by the courts, by the

55

1 rules, which is fax mail.  It is an exceptional situation,

2 and I -- your Honor, I'm sorry that the Court feels I'm not

3 willing to reset, because I have agreed to withdraw the

4 motion, and --

5           THE COURT:  Okay.

6           MS. HEALY:  -- I've agreed to everything the Court

7 asked.

8           THE COURT:  Here's what we'll do -- here's what

9 we'll do.  No E-mail for now.  If you have something you want

10 to send, fax it, okay.  And because she can receive it, and

11 that means you do the same, right?

12          MS. HEALY:  Yes.

13          THE COURT:  Of course.  And I -- I'm going to

14 reserve the right to come back and look at how this meet and

15 confer process is going and whether I need to impose other

16 kinds of communication to make it work out smoothly.  But for

17 now, given your objection and your -- your very vehement

18 objection, I don't think that, frankly, if I allow -- if I

19 ask you to reset, I'm not sure it's going to be useful

20 because you feel really strongly about it.  So I'm willing to

21 respect that.  We'll go by fax or other means for now, open

22 to reconsideration later if things really aren't working out.

23      I'm hoping, just looking for a way --

24          MS. HEALY:  Yes.

25          THE COURT:  -- that you all can move forward more

56

1 productively, okay.

2          MR. WALLERSTEIN:  Your Honor --

3          MS. HEALY:  And, your Honor, I do have a request

4 at this time because he's made all the requests.  He -- I --

5 I'm designated as lead counsel.  I asked him -- he can call

6 me at any time.  I'm very responsive.  If I'm not in a

7 meeting, I'm not in court, I will respond as soon as I can.

8 That's something that I can do.  He cannot go behind my back

9 seeking other counsel.  He -- if I am telling you I'm the one

10 handling the discovery --

11          THE COURT:  Is the other counsel your local

12 counsel?

13          MS. HEALY:  Yes.  He goes to ask --

14          THE COURT:  Okay.  So if he calls a local counsel,

15 then you should tell your local counsel to say, if that's

16 really how you want to run it, okay, "Please talk with Ms.

17 Healy about this," if that's really how you want to run it.

18 I am guessing, Ms. Healy, that one of the reasons why Mr.

19 Wallerstein is calling your co-counsel is because you all --

20 the two of you have hit a wall, so you try to go around the

21 wall.  That's not -- that's not logical.

22          MS. HEALY:  Your Honor, I called -- I honestly am

23 not like that.  I have tried my absolute best because I want

24 to get my production.  So I have no interest in picking

25 fights with him.  We're -- you know, it's -- I want to be --

1 have the --

2          THE COURT:  My ruling --

3          MS. HEALY:  Yes, your Honor.

4          THE COURT:  -- is that I'm not going to order Mr.

5 Wallerstein --

6          MS. HEALY:  I understand.

7          THE COURT:  -- to only call you.  I have already

8 said the lawyers should, you know, associate to associate,

9 partner to associate, whatever it might be, as long as it's

10 productive.  If what you want to do is take the lead in all

11 of the discovery, then just have your co-counsel say "Sorry.

12 I can't help you on that.  Call Ms. Healy," if that's really

13 how -- how you want to -- how to proceed, okay.  But the

14 joint letters would -- if they're filed, need to be signed by

15 lead counsel.

16          MR. WALLERSTEIN:  Your Honor, that's -- I

17 appreciate that.

18          THE CLERK:  Please state your name.

19          MR. WALLERSTEIN:  Tom Wallerstein, your Honor.

20 One related issue is that as I understand Loop's position,

21 they will not set forth their legal positions in writing.

22 They will only do that on the phone.  So for -- for example,

23 we served our discovery requests.  Loop's counsel then wanted

24 to have a telephonic meet and confer about all the requests.

25 I responded in writing, probably in E-mail but also by some

58

1 other method, probably hand delivery, and said "Can you set

2 forth your objections in writing?"  No.  No.  We have to do

3 it on the phone.

4           THE COURT:  Okay.  So I have just ordered her to

5 go ahead and file her objections --

6           MR. WALLERSTEIN:  Well --

7           THE COURT:  -- to those discovery requests so you

8 know what she's saying is objectionable about your discovery

9 request, and then you're going to have to actually have

10 conversations.

11           MR. WALLERSTEIN:  And I --

12           MS. HEALY:  Your Honor --

13           MR. WALLERSTEIN:  -- I guess my --

14           MS. HEALY:  -- I'm sorry --

15           THE COURT:  Stop.

16           MS. HEALY:  -- there is a --

17           THE COURT:  Stop.  Stop.  I have been very patient

18 here today, folks.  I've allowed you to have plenty to say

19 and to speak your minds, but I am really disappointed that

20 this is -- you know, you all went to law school.  You all

21 spent a lot of time training for this profession, and this is

22 where you're at?  Whose phone is that?

23           UNIDENTIFIED SPEAKER:  I think it's an alarm.

24           THE COURT:  Oh, okay.  Let us just take a pause.

25 Ms. Beard, could you go investigate.

59

1          MS. HEALY:  Your Honor --

2          THE COURT:  Just one moment.

3          UNIDENTIFIED SPEAKER:  I think it might be Court

4 Call.

5          MS. BRAYER:  Your Honor, this is Ms. Brayer

6 speaking.  It's quiet on my end, and when it's appropriate,

7 I have one question.

8          THE COURT:  We are investigating a -- some kind of

9 alarm or noise, Ms. Brayer.  So hold on.

10         MS. BRAYER:  Okay.  I don't hear it on my end.

11     (Pause.)

12         THE COURT:  Give us just one more moment.

13     (Pause.)

14         MR. WALLERSTEIN:  Well, it says "An emergency has

15 been reported in the building.  Please cease operations and

16 leave the building.

17         THE COURT:  Okay.

18         MR. WALLERSTEIN:  It doesn't appear to be --

19         THE COURT:  Directed to us, okay.  So one of my

20 clerks is going to go investigate.  Hold on just one moment

21 so that my law clerk can be present.

22     (Pause.)

23         THE COURT:  Okay.

24         MS. HEALY:  Your Honor, I just wanted to direct

25 the Court's attention -- it seems like perhaps the Court

60

1  doesn't think that we did give them the objections --

2          THE COURT:  Well --

3          MS. HEALY:  -- in annotated form the key

4  questions, and I wanted -- to the Court's point, we can --

5          THE COURT:  I did see it.

6          MS. HEALY:  Okay.

7          THE COURT:  And but what I read your letter to say

8  is that these are so outrageous that we shouldn't even have

9  to respond, and then I saw the -- you know, but obviously you

10 were able to interlineate some responses and some objections,

11 and I could see that you didn't object to all of them.  So

12 what I'm saying is they're not so outrageous that you

13 shouldn't respond.  You should respond, and then you should -

14 - but, you know, there are some objections that are

15 appropriately interposed because they're objectionable on a

16 number of grounds, but --

17      (Pause.)

18          THE COURT:  Hold just one moment, and could you

19 please call the clerk's office.  Sorry, Counsel.

20      (Pause.)

21          THE COURT:  I'm very sorry.  Let's go outside the

22 building.  I'll make sure that I -- please stay near the

23 front unless they tell you to go somewhere further, and I'll

24 make sure that I get word out to you -- actually, bring your

25 things.

*Echo Reporting, Inc.*

61

1          MS. HEALY:  We can have a meet and confer.

2          THE COURT:  Bring your things out just so that you

3 have them, and I'll -- I'll come and -- we'll need to get

4 your cell phones or something so we know how to contact you.

5          MS. HEALY:  Yes.

6          MR. WALLERSTEIN:  Your Honor, will you be

7 immediately staying around or am I --

8          THE COURT:  Can you participate by phone later on

9 the meet and confer with them, because you'll need to set

10 some dates.

11          MR. WALLERSTEIN:  I'll stay around if you'd like

12 me to.  I just didn't know if I was needed.

13          THE COURT:  Yeah.  It's just that we need to set a

14 schedule, and I'll need you for that part.

15          MR. WALLERSTEIN:  All right.

16          THE COURT:  Thank you.

17     (Proceedings recessed briefly.)

18          THE CLERK:  Recalling Civil Case C-15-00798-HSG,

19 Loop AI Labs, Incorporated versus Gatti, et al.  Counsel,

20 please restate your appearances.

21          THE COURT:  Well, actually, I see that all counsel

22 that were here earlier have made it back from our -- our

23 evacuation drill.  Sorry about that, and thanks for your

24 patience, and Ms. Brayer is also back on the phone here.  So

25 let's pick up where we left off.

62

1    As we were leaving, I had -- well, during the
2 evaluation, the parties were to talk about meeting and
3 conferring to schedule -- to reach a proposed schedule on all
4 of the items that have gone through so far.  So I don't know
5 how much progress the parties have made.
6    Mr. Wallerstein?
7          MR. WALLERSTEIN:  Zero, your Honor.  We started to
8 talk about the scheduling of Mr. Pepe's deposition, could not
9 agree on location or time, and that's it.
10          THE COURT:  Okay.  Well, that's pretty
11 disappointing.  What I was going to do and I think what I
12 will do is have the parties -- we're going to go off record.
13 You're going to be here meeting and conferring.  The first
14 thing to take up is the Orrick subpoena.  Mr. Alderman can be
15 involved in that, and then he's going to go.  This is just to
16 schedule.  We're not going to meet and confer on the guts of
17 that subpoena.  So I've already ordered that service is as of
18 today and that Orrick will respond with their objections and
19 their responses within a week from today.
20    So the next deadline will be when the meeting and
21 conferring will conclude, because it should begin immediately
22 after -- after the objections come in, and I don't know, Mr.
23 Alderman, whether you're going to be involved in those meet
24 and confer sessions or whether that's really in the
25 Defendant's hands.

63

1          MR. ALDERMAN:  Your Honor, I think I will be
2 involved to the extent an attorney-client privilege is not
3 made by counsel for the Almawave parties.
4          THE COURT:  Okay.
5          MR. ALDERMAN:  I don't know what their -- the
6 scope of their objections will be.  I will honor those when I
7 file my responses, and to the extent that there are
8 objections other than based on attorney-client privilege,
9 I'll be -- I'll be the one on behalf of Orrick conducting
10 those discussions with Ms. Healy.
11          THE COURT:  Okay.  Then I'm just going to order
12 the following, that the responses are filed by the 30th.
13 Meet and confer shall happen immediately.  I understand Mr.
14 Alderman is not there the next week, but at least with
15 respect to Almawave those discussions which is where I'm
16 guessing most of the discussions will be, that should -- that
17 should happen so that if the parties have not reached
18 agreement on -- on certain things, then a motion will be
19 filed by September 10th.  Sorry.  I'm looking -- sorry.  I've
20 got the wrong month in front of me.  So, let's see, the
21 following week will be -- okay, by August 13th motion will be
22 filed.  And I don't know if that's going to be a joint motion
23 by Orrick and the Defendants or separate, but whatever it's
24 going to be, anything on  motion for protection should be
25 filed by the 13th.

*Echo Reporting, Inc.*

64

1        I don't think you need to file a separate motion, Ms.

2 Healy.  I think if you're moving to compel, that will just be

3 part of your opposition, correct?

4            MS. HEALY:  Well, I think there's a few procedural

5 issues.  I think for us to be able to preserve our objections

6 to the motion for contempt, I don't think we can just abandon

7 the motion for contempt.

8            THE COURT:  I've told you --

9            MS. HEALY:  Oh, that's reserved for later?

10           THE COURT:  It's reserved.  We'll deal with it

11 later.  You haven't abandoned it.  You haven't waived

12 anything.

13           MS. HEALY:  Okay.

14           THE COURT:  Okay.

15           MS. HEALY:  So the Court is not going to issue an

16 order, because the order would require me to then appeal

17 within a certain amount of days.

18           THE COURT:  All I'm going to say in that -- hello?

19 All I'm going to say in the minute order today is that it's

20 denied without prejudice.  Your objections are -- your

21 arguments are preserved, and you may raise it at a later date

22 after -- after I've ruled on the merits.

23           MS. HEALY:  Right.  I think just procedurally I

24 would waive the appellate rights because refiling without

25 prejudice, essentially a denial without prejudice --

65

1          THE COURT:  Do you mean an appeal to Judge

2 Gilliam?

3          MS. HEALY:  Yes, so that he --

4          THE COURT:  Okay.  I promise you you won't be

5 waiving those rights.  Okay?

6          MS. HEALY:  Okay.  Maybe you can -- would your

7 Honor mind --

8          THE COURT:  Sure.

9          MS. HEALY:  -- indicating that, you know --

10          THE COURT:  Absolutely.  Absolutely.  I think part

11 of the problem, Ms. Healy, is that I don't know how much you

12 practice in our District.  So it may be that you're used to

13 doing things differently and that's why it's confusing

14 because I don't -- you're asking questions that usually don't

15 come up, which is fine, but --

16          MS. HEALY:  Well, no.  I've seen an order by your

17 Honor indicating that if an order by a magistrate judge is

18 not appealed within the 14 days, it's waived.  So I've read

19 all of the revisions here.  You know, I don't practice in

20 this --

21          THE COURT:  I understand you --

22          MS. HEALY:  I have practiced in many federal

23 courts, and --

24          THE COURT:  I'm not saying that you haven't.  I'm

25 just saying that the points you're raising are quite unusual.

66

1  If you're concerned about it, I'm happy to put that in the

2  order so that you --

3          MS. HEALY:  I'm just --

4          THE COURT:  -- feel covered.

5          MS. HEALY:  -- concerned about our appellate

6  rights because --

7          THE COURT:  Please don't talk over the judge.

8          MS. HEALY:  Sure.  I understand.

9          THE COURT:  Okay.  All right.  We are up against a

10 time limit here.  I'm trying to get through this.  I'm trying

11 to meet the concerns of the parties.  I just met yours, okay.

12         MS. HEALY:  Okay.

13         THE COURT:  So the motions by the Defense and/or

14 Orrick on protective order and documents responsive to the

15 subpoena will be filed by the 13th, and then regular -- it's

16 a regular notice.  So 14 days later your opposition will be

17 due, Ms. Healy, and so on, and I will set the hearing date on

18 that.  Okay.

19     Now, we move to the RRA subpoenas.  You need to meet

20 and confer on them.  Is the issue when Mr. Pepe -- do we know

21 when he's available in general?

22         MS. GRAHAM:  He -- I only know that he returns

23 from out of the country on the 19th.

24         THE COURT:  Of?

25         MS. GRAHAM:  August.

67

1            THE COURT:  August.  Okay.  And when does he
2  leave?
3            MS. GRAHAM:  He's already gone.
4            THE COURT:  He's already gone.  Okay.  So he can't
5  be available until sometime after --
6            MS. GRAHAM:  After August 19th.
7            THE COURT:  -- August 19th.  Okay.  Then the
8  deposition will not be -- obviously be taken prior to that
9  time.  We know that much.  There's a dispute about where it
10 will take place.  So what are the parties' positions?
11           MS. HEALY:  I mean, your Honor, I don't know how
12 Mr. Pepe left when there was a subpoena pending.  Again, we
13 go back to a subpoena doesn't mean anything in the hands of
14 these parties, but --
15           THE COURT:  Under these -- this Court's
16 guidelines, the parties are to meet and confer about
17 scheduling depositions.  They are to do this cooperatively.
18 We don't just serve subpoenas and deposition notices and say,
19 "Well, you better be there or else."
20           MS. HEALY:  Well, I agreed to the general
21 counsel --
22           THE COURT:  You talk about it and say --
23           MS. HEALY:  I --
24           THE COURT:  You talk about it first.  You say, you
25 know, when is this person available, when are you available,

68

1 here's when I'm available, let's block out this date

2 tentatively.

3          MS. HEALY:  That's why I called the general

4 counsel, and he told me after July the 4th, and I

5 accommodated him in his every request.  So I don't think now

6 they're saying he's out of the country for over a month.  I'm

7 just surprised, your Honor.  In any event, we can bring him

8 back.

9          THE COURT:  Yeah.  You're not under any prejudice

10 by having it sometime after him being in the country.

11          MS. HEALY:  Yes.

12          THE COURT:  So what other disputes are there?  Is

13 it where it's going to be?

14          MS. HEALY:  Yes.

15          THE COURT:  Okay.

16          MS. GRAHAM:  Correct, your Honor.

17          THE COURT:  Ms. Graham?

18          MS. GRAHAM:  I -- there -- she's had a lot of

19 mischaracterizations of what's gone -- I'm not going to

20 address those.

21          THE COURT:  All I need to know is what's your

22 argument as to where it should be and when?

23          MS. GRAHAM:  He lives in Washington, D.C., and

24 that's where I believe it should be.  That's where she

25 originally agreed to take it.  When she took off the -- when

69

1 she took off the original deposition, which was before he --

2 I believe it was in mid June, but I can't remember, or early

3 July, she re-served it and did it as a subpoena to RRA in --

4 in New York.  So she originally agreed to do D.C.

5          THE COURT:  Okay.  And the reason why you would

6 say it should take place in D.C. is because he lives there

7 and she originally agreed to that, although she's not

8 agreeing to that now?

9          MS. GRAHAM:  Yes, and --

10          THE COURT:  Okay.

11          MS. GRAHAM:  And New York is outside the

12 geographic requirements -- limitations, sorry, 100 miles.

13          THE COURT:  Because you're saying it's served on

14 him?  Where should the 100 miles be drawn around?

15          MS. GRAHAM:  Oh, his residence.

16          THE COURT:  I see.

17          MS. GRAHAM:  Or the district in where -- you know,

18 it's not -- the district is here.  If the district is here,

19 it's not within either of those.

20          THE COURT:  Understood.  Okay.

21      Ms. Healy, what is your argument?

22          MS. HEALY:  Sure.  I accommodated the general

23 counsel's request when he called me and asked me for an

24 extension, asked me to depose the witness after July the 4th

25 and if I wouldn't mind deposing him in Washington, D.C.  I

1 agreed.  I issued a subpoena in his name because I couldn't

2 bring him to New York in his name.  The subpoena was never

3 served because Ms. Becki Graham refused to have the witness

4 sign a certificate of service which --

5          THE COURT:  All I need to know is where you think

6 it should be and why.

7          MS. HEALY:  I think the subpoena should be in New

8 York.  Mr. Pepe is a managing agent within the rule -- Rule

9 30(b)(1).  I'm happy to provide the Court legal authority.

10 Ms. Graham is under a misapprehension of what managing agent

11 means under Rule 30(b)(1).  I know your Honor has ruled on

12 those issues, and it's -- Mr. Pepe is the one most

13 knowledgeable about the issues relating to RRA.  We're not

14 deposing Mr. Pepe in his personal capacity.  We're deposing

15 him as a corporate designee.  So the corporation is

16 principally based in New York, and the subpoena -- I'm

17 willing to take his deposition here if your Honor wishes,

18 but, you know, I -- the fact that I extended a courtesy that

19 wasn't returned to go to Washington, D.C. doesn't mean that,

20 you know, now after all they've done, they've forced me to

21 file a motion to compel and do all these different things to

22 obtain compliance.  I'm not required to go to D.C.

23          THE COURT:  Okay.  Are there any other arguments

24 on where Mr. Pepe's deposition should take place?

25          MS. GRAHAM:  Well, I disagree with her -- her

71

1 characterization of what just happened because --

2          THE COURT:  I don't think I need to hear that part

3 because I think what's important is your main argument is he

4 lives in D.C. and New York is outside of 100 miles --

5          MS. GRAHAM:  Yes.

6          THE COURT:  -- from -- from there, and it's --

7 that's where his residence is.  The primary argument of

8 Plaintiff is that this is a managing -- he's a managing

9 agent.  This is not served on him as an individual but to

10 speak on behalf of RRA and, therefore, New York is

11 appropriate.  Have I heard the arguments?

12         MS. GRAHAM:  And I disagree with that.

13         THE COURT:  Right.  I know you both disagree with

14 each other, and so I'm going to take this under submission.

15 I'll issue an order about where that should take place, but

16 you are to meet and confer about a date --

17         MS. GRAHAM:  Okay.

18         THE COURT:  -- to make sure it's after he's back.

19 It should be soon after he's back, and -- because this has

20 been pending for a while, and, Ms. Healy, you'll need to

21 provide dates that you're available, and so start looking at

22 your calendar.

23      Mr. Alderman, I think --

24         MR. WALLERSTEIN:  Your Honor?

25         THE COURT:  Yes.

72

1            MR. WALLERSTEIN:   I apologize for interrupting.
2 On the schedule, the timing --

3            THE COURT:   Yes.

4            MR. WALLERSTEIN:   -- of Mr. Pepe's deposition,
5 there's some moving parts there that are in dispute.   One is
6 our ability to participate.

7            THE COURT:   Okay.   One moment.   Mr. Alderman, I'm
8 sorry.   I should have excused you because I think at this
9 point you now know what Orrick's duty is with respect to meet
10 and conferring and filing papers and your response.

11      I don't think we need Mr. Alderman for more today, is
12 that correct?

13            MS. HEALY:   Actually, yes, your Honor, just one
14 question --

15            THE COURT:   Okay.

16            MS. HEALY:   -- since the Court wants us to resolve
17 everything.   I've asked Mr. Alderman before to identify the
18 attorneys that were serving Almawave, and they refused to
19 identify them.   So I would just ask that those individuals
20 can be identified so in the meantime I can move the process
21 along if he's willing to take a deposition of certain
22 attorneys at Orrick.   So I'm just asking if he can identify
23 who those attorneys were.

24            THE COURT:   If he wants to do that informally, he
25 may.   If not, then you'll have to get that through discovery.

73

1  I'm not going to order him to answer because he -- he is not

2  obligated to without a request.  But, of course, if Mr.

3  Alderman is willing, then that's fine.

4       Mr. Alderman?

5            MR. ALDERMAN:  I'm happy to talk to Ms. Healy

6  about that.  I don't recall that request being made in any

7  respect other than in the subpoena, which has not been served

8  but which now has been.

9            THE COURT:  Okay.  And I take it are you willing

10 to provide those names pursuant to the subpoena?

11           MR. ALDERMAN:  I think the issue there would be

12 what position is our client, Almawave, taking on that

13 question, if they view that as within their -- the scope of

14 their privilege.

15           THE COURT:  As to which lawyers served --

16           MR. ALDERMAN:  Which lawyers at Orrick were --

17 were providing legal services to Almawave.

18           THE COURT:  I have never heard that argument.  I'm

19 not saying I'm ruling on it because I don't know what

20 argument's going to be made, but --

21           MR. ALDERMAN:  Well, I don't know what argument --

22 what -- what position --

23           THE COURT:  Okay.

24           MR. ALDERMAN:  -- our former client is going to

25 take on that.  So I would like to get their view on it before

74

1  I make a commitment one way or the other.

2          THE COURT:  Okay.  Then he'll be responding as

3  part of his subpoena response or Orrick's.

4          MR. ALDERMAN:  Or sooner.  I have no objection to

5  talking about that informally.

6          THE COURT:  Okay.  Very good.  Any other reason

7  why we need Mr. Alderman here this afternoon?

8          MR. WALLERSTEIN:  I'm not aware of any, your

9  Honor, Tom Wallerstein.

10          THE COURT:  Okay.  Then you are excused.

11          MR. ALDERMAN:  Thank you, your Honor.

12          THE COURT:  Thank you.  Okay.

13      So, Mr. Wallerstein, I interrupted you.  What were you

14  saying about other issues that need to be sorted out for Mr.

15  Pepe's deposition?

16          MR. ALDERMAN:  That -- thank you, your Honor, that

17  specifically influence the timing.  One is the easy -- the

18  big picture one would be Almawave's ability to participate in

19  the deposition, do we -- do we even have standing to care

20  about when it is.  Another is are we allowed to ask questions

21  at the deposition and, if so, how do we allocate the time

22  between Plaintiff, Almawave, and anyone else that's

23  interested.  Another is the language issue.  We have reason

24  to believe that -- I need not be coy.  Loop's counsel has

25  informed us that at least part of the deposition will proceed

75

1 in Italian, and that's not acceptable.

2        THE COURT:  Well, what I've read in the papers --

3 and, again, I just scanned them because there were so many of

4 them, and this is just management, but my understanding from

5 Ms. Healy is she's not intending to conduct it in Italian,

6 but there are some Italian documents, and they include

7 Italian words, and she wants to ask Mr. Pepe about the

8 meaning.

9      Now, there's going to have to be some way to sort that

10 out I agree.  So as to all the issues you're raising, I'm

11 sorry I'm going back and forth on this, but I had hoped that

12 the parties could make more progress on meet and confer.

13 Then I sort of just imposed dates because it became obvious

14 to me that you couldn't, but I need to have some way to have

15 you queue up these issues.  So I'm going to have to have you

16 meet and confer on it.

17        MR. WALLERSTEIN:  Your Honor, our letter request

18 that I'll repeat to you right now is to consider a discovery

19 referee.  I believe that if we had a third party that was on

20 the telephone call or in person or however we did it, my

21 forecast is that we could avoid issues in the future and I

22 would --

23        THE COURT:  A babysitter?

24        MR. WALLERSTEIN:  Yes, your Honor.

25        THE COURT:  On the meet and confer?  Okay.  Well,

76

1 why don't we do this -- and that would be jointly paid or --

2          MR. WALLERSTEIN:  That would be our proposal, your

3 Honor.

4          THE COURT:  -- or Almawave would pay for it?

5          MR. WALLERSTEIN:  We think it should be jointly

6 paid for -- at a minimum for reasons, but, no, we would

7 propose it to be split.

8          THE COURT:  Ms. Healy, do you think that would be

9 helpful to your client?

10          MR. WALLERSTEIN:  Your Honor, that's an absurd

11 offer.

12          THE COURT:  It's not absurd.  Let me tell you why.

13 Okay.  This is the worst combination of -- of sort of

14 chemistry in meeting and conferring that I have seen.  I'm

15 not blaming anybody.  As I said, sometimes it happens.  So

16 it's not crazy to think of a third party trying to mediate

17 those conversations because it's essentially what you're

18 asking the Court to do.  I'm not going to impose it at this

19 time because obviously Ms. Healy is -- thinks it's not a good

20 idea, but I reserve the point because if the parties cannot

21 reasonably meet and confer and reach agreements and only

22 reserve those that are true issues for the Court, then the

23 Court reserves the ability to have the parties get an

24 agreement and costs of having somebody help them through

25 that.  I don't think we're there yet.

1          MS. HEALY:  Your Honor, this means that the
2 demanding party gets to essentially drive a little company
3 out of court --

4          THE COURT:  Ms. Healy, did you hear me?

5          MS. HEALY:  No, I hear --

6          THE COURT:  Excuse me, stop, because I think you
7 don't hear.  I just said I'm not going to issue that.

8          MS. HEALY:  I understand.  But, your Honor --

9          THE COURT:  So why are you arguing?  You just won.

10          MS. HEALY:  No, I understand.  My point is a
11 little bit different, that he can come back to your Honor and
12 ask it --

13          THE COURT:  Well, let me --

14          MS. HEALY:  -- unless I agree to his demands.

15          THE COURT:  No, no.  Let --

16          MS. HEALY:  And a lot of the issues are non-
17 issues.

18          THE COURT:  Let me just give you my impressions.
19 Ms. Healy, I think you're very earnest.  I think you're very
20 passionate about this case.  I think that you believe you are
21 right about every point that you have made here today, and so
22 that can get in the way of real conversation because you have
23 to accept that you may be wrong about some of those things.
24 You have to think about what would the Court do or what makes
25 sense for the client.  That's the nature of meet and confer.

78

1 And I've now interacted with you for over two hours, and I
2 can see how you really believe in your position, and that's a
3 fine thing, but it means that it's difficult to have
4 conversations that accept that there's another view.  The
5 Court should not be in the position of having to adjudicate
6 every single issue.  The Court retains the power to say if
7 the parties cannot resolve this in a reasonable way, looking
8 at all the sides of the dispute and taking into account the
9 parties' resources, and that may be something that the Court
10 looks to, not now, but it gives the incentive to everyone to
11 try to make this happen.  Okay.  That's all I'm saying.

12            MS. HEALY:  I understand, your Honor, but I
13 believe I agreed to withdraw the motion to compel, to -- I
14 agreed to a lot of things today, to withdraw my request for
15 fees for traveling, having everything heard here.  So I do
16 believe I'm cooperative.

17       My papers I filed a proposed compromise in accordance
18 with your Honor's request.  He raises issues that I will
19 (indiscernible) foreign languages.  I have never heard of
20 this issue.  These are now issues that get raised to the
21 Court.  It's very common, and I know your Honor has had a lot
22 of cases involving foreign languages.  I was reading one of
23 your Honor's decisions involving the positions in Taiwan and
24 all over the world.  It is common in this country, especially
25 in California, there is mitigation involving people and

79

1 languages from all over the place.  It's not unusual.  So if
2 he's raising issues that simply should not be raised before
3 the Court, I shouldn't be suffering the burden.  These issues
4 are non-issues.  The documents are produced as they are in
5 the regular course of business.  He's agree to pay for his
6 interpreter and bring him to the deposition.  I'm not -- I
7 mean, I know your Honor --

8          THE COURT:  So this is a really good example of
9 you saying "This is the way the law is.  Judge, I'm sure you
10 agree with me."  I may not agree with you.  On some of the
11 points I might, and some I may not, but that's why you have
12 to talk it through instead of just saying, you know, she's
13 completely unreasonable.  We can't deal with her or they --
14 you know, this side, they -- this has never come up before.
15 If you keep going to those positions, you're not going to get
16 anywhere.  You're just not.

17      I want you to think about me.  I'm the one that has to
18 deal with the decisions.  So what you do, what you've learned
19 in law school is help the court.  If you have a problem you
20 need the court to decide, give helpful information to the
21 court, nothing else.  And I will decide.  I will decide them
22 quickly.  I may decide them on the papers.  I may ask for
23 your participation by phone or in person.  We'll have a
24 regular way to figure these things out, but you have to meet
25 and confer.  It is required, and you have to do it

80

1  meaningfully, and if you don't, I'm going to have to come up

2  with another method.

3            MS. HEALY:  I agree, your Honor, but the one thing

4  is I am guided by the law.  That's -- I do read the case law

5  before taking a position.  If there is a position that's very

6  far fetched and it's not -- it's not supported by the law, I

7  don't know how -- you know, if --

8            THE COURT:  I guess if that's your position, then

9  we'll take that in the papers.  And if you're wrong, you'll

10 be sanctioned, right?  So my counsel to you is if you really

11 want to be that sure about it, make sure you are -- you're

12 correct.

13           MS. HEALY:  I will.

14           THE COURT:  Make sure you're correct, because

15 pretty soon, if you get -- if you start being wrong, you're

16 going to start racking up sanctions.  I'm sure that's not

17 what your intention is.  Okay.  You have to be able to see

18 the other side's point of view, just as they have to be able

19 to see your side and try to move the case forward.  That's

20 all we're trying to do here, folks.

21      Okay.  So the -- I'm going to order the following.  On

22 the RRA subpoenas, including all of the issues that Mr.

23 Wallerstein just queued up -- and maybe there's others that

24 are in the letters around the subpoenas -- you shall meet and

25 confer and file a joint letter on those issues by August

1 13th.

2          MS. GRAHAM:  One clarification.  Is that both the

3 document and the deposition subpoenas?

4          THE COURT:  Yes.

5          THE CLERK:  I'm sorry.  Your name?

6          MS. GRAHAM:  Becki Graham.

7          THE COURT:  That way we've got all of the issues

8 on RRA put in one place at one time because I don't -- I

9 don't know how much they interact, but I'm guessing that they

10 do.

11          MS. GRAHAM:  This is Ms. Graham again.  I just

12 have one -- in the spirit of what you were just talking

13 about, I am -- I can go back to my client and ask them if

14 they would be willing to -- if Mario would be willing to go

15 to New York for the deposition.  I don't have an answer for

16 that.

17          THE COURT:  Great.

18          MS. GRAHAM:  But, in the spirit of compromise, I

19 am absolutely happy to ask.

20          THE COURT:  I very much appreciate that, and it

21 may be that it works out because that's where documents are

22 or that's -- where are you based?

23          MS. GRAHAM:  I'm here in San Francisco.

24          THE COURT:  You're here.  Okay.

25          MS. GRAHAM:  Yeah.

1           THE COURT:  You -- thank you for being willing to

2 ask.  If it works out, great.  If not, then you'll put it in

3 the letter.

4           MS. GRAHAM:  Okay.

5           THE COURT:  Okay.  So when -- how long -- when can

6 you let me know?

7           MS. GRAHAM:  I will reach out after this

8 conference, and I -- the only thing is I'm not sure if I'll

9 be able to get in touch with Mario since he's out of the

10 country.  That's my one question mark.

11           THE COURT:  Okay.

12           MS. GRAHAM:  Assuming I am able to get a hold of

13 him, I would -- in the next 24 hours, I could certainly file

14 a letter with the Court indicating whether or not I was able

15 to confirm or --

16           THE COURT:  Give yourself a reasonable time.  If

17 you think you can't get back in 24 hours, then give yourself

18 a little more time.

19           MS. GRAHAM:  Okay.

20           THE COURT:  Because he won't be here until the

21 19th.

22           MS. GRAHAM:  Yeah.

23           THE COURT:  I'm just going to hold off on ruling

24 until I hear whether or not there's an agreement.

25           MS. GRAHAM:  Oh, okay.  Would a week be

1 reasonable?

2          THE COURT:  A week is reasonable.  So let -- file

3 a very -- you know, a one-line letter I guess for -- so

4 everyone can see whether or not Mr. Pepe agrees to appear in

5 New York, and if the answer is no, then I will issue an order

6 on the case because I've taken your arguments on that.  Okay.

7          MS. HEALY:  Uh --

8          THE COURT:  Yes?

9          MS. HEALY:  I mean, we haven't briefed it, but I

10 was going to suggest to your Honor perhaps the motion to

11 compel, since we need to put in work to file that motion in

12 New York, whether we can just present those papers to the

13 Court.

14          MS. GRAHAM:  I --

15          THE COURT:  Ms. Graham?

16          MS. GRAHAM:  I believe that the meet and confer

17 needs to be reset on this.  I strongly believe that there was

18 not a productive meet and confer on this and that both

19 parties need to really think about compromising.  I am

20 absolutely willing to do that, and I think if we do that, we

21 will get further.

22          THE COURT:  I agree.  I -- based on what I've

23 read, there just has not been -- what it is is, you know,

24 very -- well, let me just say the meet and confer is

25 inadequate.  So I want you to meet and confer.  File a joint

84

1 letter, not a motion, a joint letter on the remaining issues

2 around Mr. Pepe and the deposition, so language issues, who's

3 allowed to ask questions, whether Almawave is allowed to --

4 or, I'm sorry.  I've lost track now, the issues mentioned by

5 Mr. Wallerstein and also raised in the parties' letters since

6 both of you have filed them on these -- on these subpoenas,

7 and I'll see that in one joint letter on August 13th.

8           MS. HEALY:  I haven't filed anything about RRA

9 other than my motion to compel.

10          THE COURT:  Yeah.  Right.  But that's part of it

11 too, right.

12          MS. HEALY:  Oh, so I -- will we bring the motion

13 -- I guess I was a little confused.

14          THE COURT:  I'm going to hear everything that has

15 to do with both RRA subpoenas.  Hopefully you'll be able to

16 work out some of it, and if there's things that you cannot

17 work out by yourselves, then you will file a joint letter to

18 me on any remaining issues on those two subpoenas.  So an

19 issue-by-issue -- so it's a question about here's a problem

20 with, you know, we -- Almawave wants to participate and

21 thinks that they should get X number of hours and Plaintiff

22 disagrees, et cetera, and you set out your arguments back to

23 back so I can see issue by issue, and then I'll either have

24 you amend if I need or call you or just make a ruling.  We'll

25 just lay them out there orderly fashion, and we'll take care

85

1 of it, okay, August 13th.

2      Now --

3           MS. HEALY:  Actually, I'm sorry, your Honor.  I

4 believe I have -- that week I'm going to be out of town.

5           THE COURT:  Okay.

6           MS. HEALY:  So I will not be able to do it by -- I

7 believe either we can meet by August 7 or --

8           THE COURT:  The week after, what day on the -- are

9 you back the week of the 17th?

10           MS. HEALY:  I'm right now scheduled to be out of

11 the country from the 9th until the following Monday.

12           THE COURT:  From the 9th until the 17th, the

13 following Monday?

14           MS. HEALY:  I believe so.

15           THE COURT:  Okay.  So what date on the week of the

16 17th would you like to set as a deadline for filing the joint

17 letter?

18           MS. HEALY:  You know, I'd like the opportunity to

19 check and see if I can change my travel arrangements because

20 obviously I want to be able to resolve the -- can I let the

21 Court know tomorrow morning?

22           THE COURT:  I would hate to have you change your

23 travel.  I know you're anxious to get this all done, but

24 believe me, we've got a long way to go.

25           MS. HEALY:  No, that's fine.

1           THE COURT:  I mean, I'm ordering the 13th.  If you
2 moved it a week, it will not be the end of the world.

3           MS. HEALY:  I'd rather not, your Honor.  So if the
4 Court doesn't mind, I just want to make sure there's no
5 penalty.  So I will -- if I may call the Court in the morning
6 with a schedule or just file a one-line --

7           THE COURT:  Let me just ask you because you seem
8 really upset right now.  What are you concerned about if this
9 slips a week because you're going to be away?  Are you
10 worried that your client's will be compromised in some way?
11 Okay.  I think I -- I put you on the spot.  I didn't mean to.
12 Why don't you let the Court know tomorrow.  Can you file a
13 letter saying whether you want the 13th or whether -- and, if
14 not, then whether it -- we can say the 20th will be the
15 fallback date.  Is that okay?

16           MS. HEALY:  Sure.  I mean, it could be -- if it
17 would be by the 7th, the 7th is a Friday.

18           THE COURT:  No.  I'm moving -- I'm not going to
19 move it forward.

20           MS. HEALY:  Okay.

21           THE COURT:  I will move it out further.  If the
22 13th -- if you want to stick to your travel plans, which I
23 suggest you do, frankly, but it's your choice, then we should
24 pick another date the following week that everybody agrees on
25 now so we have a fallback date.  The week later would be the

1 20th.  Does that work for everybody?  That would be the date

2 for the joint letter on the RRA subpoenas.

3          MR. WALLERSTEIN:  It does, your Honor.  And if it

4 helps any of the parties, we will start meeting and

5 conferring immediately.  So if we can file it earlier, we can

6 do that as well.

7          THE COURT:  Okay.

8          THE CLERK:  I'm sorry.  Your name?

9          MR. WALLERSTEIN:  That was Tom Wallerstein.  I

10 apologize.

11          THE COURT:  Okay.  Sure.  That's the last day to

12 file.  So if for some reason it's ready earlier, then fine,

13 but I want you to at least know that there's a deadline out

14 there that this will get done by, okay.

15      Finally, on the -- well, on the document or the -- the

16 request made by Almawave to which the Plaintiff owes a

17 response, when can you serve a response and objections, Ms.

18 Healy?

19          MS. HEALY:  Oh, is that -- sorry.  I'm sorry.  Was

20 the Court talking to me?

21          THE COURT:  Yes, I was.  For --

22          MS. HEALY:  I think our deadline is not due until

23 -- for a while.

24          THE COURT:  Oh, really?

25          MS. HEALY:  Yes.

88

1           THE COURT:  To the discovery?

2           MR. WALLERSTEIN:  We have a dispute about the

3 service, but -- so I'm not exactly sure.

4           THE COURT:  Okay.  When did you -- when do you

5 think you served them?

6           MR. WALLERSTEIN:  Your Honor, I don't know

7 offhand, and I, frankly, don't care.  Whatever we agree to

8 today is fine.

9           THE COURT:  Okay.

10           MS. HEALY:  I've never heard anybody speak

11 about --

12           THE COURT:  Okay.  When do you need to respond by?

13           MS. HEALY:  I believe that it was served July 1st.

14           THE COURT:  When would you like to respond by?

15           MS. HEALY:  We're ready to respond by the

16 deadline, and we'll be making a volume production.  You know,

17 so we'll present the objections, and we're putting together

18 the documents that need to be produced.  So those will not

19 come right away, but we're in the process of producing

20 everything else.

21           THE COURT:  Okay.  So it -- she's going to take it

22 as July 1 as the service date, which means that --

23           MS. HEALY:  Thirty plus three.

24           THE COURT:  -- your responses will be due 30 days

25 from then.

1          MS. HEALY:  Plus three days because it was served

2 by mail.

3          THE COURT:  Okay.

4          MR. WALLERSTEIN:  That was probably the dispute,

5 but that's fine as well.  I --

6          THE COURT:  Okay.  Fine.  Thank you.  So it will

7 be 33 days from July 1 you'll serve your responses, and then

8 you can start meeting and conferring on that, okay.

9          MR. WALLERSTEIN:  Yes.

10          THE COURT:  I'm not going to set a deadline, but

11 if you need one, then you let me know.  Sorry.  That was Mr.

12 Wallerstein.

13      Go ahead.  You were going to say something?

14          MR. WALLERSTEIN:  Tom Wallerstein.  No, your

15 Honor.  That's acceptable.  Thank you.

16          THE COURT:  Okay.  You need to negotiate a

17 protective order and an ESI protocol.  I know you were

18 working on a protective order, but there's some breakdown on

19 that, and that may be -- I don't know if that plays into

20 subpoenas and the like.  Does it?

21          MR. WALLERSTEIN:  Tom Wallerstein.  It does, your

22 Honor.

23          THE COURT:  Okay.  So you need to include that,

24 and if there's any disputes about the protective order,

25 please role that into the -- the joint letter that would be

90

1  due on either the 13th or the 20th, depending on what we hear

2  from Ms. Healy on her availability.  Okay.

3          MR. WALLERSTEIN:  Tom Wallerstein.  Yes, your

4  Honor.

5          THE COURT:  Because we have a model protective

6  order.  So I'm assuming that will guide most of what the

7  parties will agree to, sort of where the needle is, but

8  there's an additional question about whether -- how third

9  parties can assert confidentiality I think.

10         MR. WALLERSTEIN:  I -- Tom Wallerstein.  I think

11 that's implicit in the model order, your Honor  We tried to

12 make it explicit, and therein lines the dispute I think, but

13 we will brief that if necessary.

14         THE COURT:  Okay.  If there's a dispute, just let

15 me know.  It seems like a pretty simple one to put into that

16 letter, and I can decide it at that time.

17     Okay.  ESI protocol you're going to have to start

18 talking about now as part of your -- just it's going to be

19 part of discovery.  If you are going to figure out search

20 terms and custodians, please be guided by our ESI guidelines

21 from our District -- I know New York has some too.  They're

22 kind of similar -- and our checklist so that you -- everyone

23 understands it's a cooperative process.  It's iterative.  You

24 need to show your work.  So if there's search terms and

25 quality control, you can't just run your search and then say

1 "Well, I did mine, and I'm not going to tell you what
2 happened."  You actually have to talk to each other so that
3 we can make sure that these are good productions and that,
4 you know, in this day and age where there's so much
5 information the parties are coming up with good terms to get
6 what they -- what each side needs.

7     All right.  Now, on the meet and confer going forward,
8 here's what I'm going to do.  I ordered that an audio
9 recording be made of today's session.  I thought we were
10 going to have you meet and confer off the record.  We didn't
11 get to that.  I just imposed deadlines.  The audiotape I
12 think tends to be a good deterrent to people participating in
13 the meet and confer because they know that some day somebody
14 who's going to rule on it may listen, and they want to make
15 sure they sound like they're on their best behavior, and
16 hopefully it encourages that.

17     So given what has gone on so far and given the
18 difficulties that counsel are having with each other, it
19 would be wise I think to have the counsel tape -- audiotape
20 their meet and confer.  You'll have to have a little index,
21 not a long one but just one that says "Okay.  It's now 1:00
22 o'clock and we're going to talk about this subject, and we're
23 marking this, and now it's 1:30 and we've moved to this
24 subject," so that if I need to go back to review anything to
25 see if someone was abusive or taking ridiculous positions,

92

1 then I know how to get there quickly.  It's something that

2 you will need to be able to record and get me a copy of if I

3 need it.  I'm not -- I'm not going to always ask for them.

4 It's more meant to help monitor your interactions.  Okay.

5        MR. WALLERSTEIN:  Tom Wallerstein.  Your Honor, I

6 had proposed something similar several months ago.  Our

7 conference call service -- and there are other conference

8 call services out there -- allow you to press a button, with

9 the consent of all parties, of course, and generate an audio

10 recording which will then instantly be E-mailed at the

11 conclusion of the call by an MPG file, an electronic E-mail

12 file with an audio recording.  I had offered to do that and

13 to distribute the audio recordings to all counsel on the

14 call.  I think we had a dispute.  Ms. Healy wanted us to have

15 a certified court reporter that we paid for, and we balked at

16 that.  But I think it's a -- it doesn't matter what I think,

17 but let's --

18        THE COURT:  It sounds like something that would be

19 very convenient and already in place.  Ms. Healy, what do you

20 think about that?

21        MS. HEALY:  Yes, your Honor.  I advised Mr.

22 Wallerstein that we should get a court reporter, an official

23 court reporter because the audiotape in the hands -- we may

24 be discussing different things.  I don't know what he does

25 with the audiotape.  In light of the relationship that was

1 established, I don't feel comfortable with Mr. Wallerstein

2 having an audiotape of our conversation.  I would like to

3 have an official neutral court reporter record that, and

4 that --

5          THE COURT:  Okay.  A court reporter doesn't really

6 help me because I care about not just what is being said but

7 how it's being said.  So the tone and the -- the courtesy or

8 lack thereof that counsel is showing each other, that won't

9 necessarily show up in writing.  Sometimes it does, and it's

10 way too expensive to have a court reporter.  I want a simple

11 audio recording.  It's just meant to monitor, to be a check

12 on counsel.  If there's concerns -- I think Mr. Wallerstein's

13 system sounds like a good one.  If you are uncomfortable with

14 relying on it, you can always have your own.  So if you want

15 to have a tape recorder and tape it at the same time, then

16 you've got a backup to make sure that there wasn't anything

17 that was being manipulated.

18          MS. HEALY:  But -- but then, you know, we get to

19 issues like your tape recorder is --

20          THE COURT:  Well, hopefully, you won't get there,

21 folks.

22          MS. HEALY:  Perhaps it's better if we have a

23 neutral person like a court reporting agency record if the

24 Court prefers audio but the idea that somebody's making --

25 then which recording is going to get distributed to the Court

1 if the Court --

2          THE COURT:  What if you were in control of the

3 audio recording?  Would you be willing to do that?  It can be

4 something as simple as, you know, on your laptop if it's

5 something that, you know, can pick up -- that's good quality

6 and can capture the conversation and can shoot out the

7 recording to me if I need it, then you don't have to worry

8 that somehow it's out of your control.  Is that -- is that

9 something you would want?

10          MS. HEALY:  I have never recorded calls or -- I'm

11 -- sure, your Honor.

12          THE COURT:  The other way to do it which I think

13 makes more sense but I don't want to force you into it is we

14 use -- try Mr. Wallerstein's system for the first call and

15 then you send a copy over and you'll listen to it and see

16 whether you feel like it's trustworthy.  And if it is, it

17 sounds like it's free or low cost.

18          MR. WALLERSTEIN:  It's -- my firm's conference

19 call system --

20          THE COURT:  Okay.

21          MR. WALLERSTEIN:  -- allows it as a function.  I

22 don't use it --

23          THE COURT:  Okay.

24          MR. WALLERSTEIN:  -- because I don't have consent,

25 but -- Tom Wallerstein -- if I'm given consent, then I just

95

1 press a button and record.

2          THE COURT:  Okay.

3          MR. WALLERSTEIN:  It is free for all intents and

4 purposes, your Honor.

5          THE COURT:  Okay.  Can we try that, Ms. Healy?

6          MS. HEALY:  Sure.

7          THE COURT:  Okay.  So -- and then if there's --

8 then send her a copy of the first one that you do.  If

9 there's any problem, if you feel like you have any concerns

10 about it being trustworthy, then you can raise them, and I

11 will listen carefully because I think that would be a

12 problem.  But let's -- let's have -- let's have the

13 recording.

14     Mr. LoSavio?

15          MR. LOSAVIO:  Tom Losavio, your Honor.  And I

16 hesitate to add to the already full plate before you, but if

17 this is an appropriate time, I have a new so to speak issue

18 which I apologize for not bringing to your attention sooner,

19 and that is there are -- it's the issue of whether any

20 discovery should go forward in the absence of knowing what

21 the trade secret is that's being claimed here and the

22 conjoined issue of whether any discovery should go forward

23 given that there is anti-SLAP motion pending.  I'm just

24 identifying --

25          THE COURT:  Okay.

96

1        MR. LOSAVIO:  -- the issues.

2        THE COURT:  Understood.

3        MR. LOSAVIO:  And I'm sure the Court is aware that

4 under state law, if this were in State Court, there would be

5 no discovery because of the pendency of the anti-SLAP, and I

6 believe regardless of -- and I believe it's equally true in

7 Federal Court that the absence of the trade secret disclosure

8 is a bar to discovery going forward.

9        THE COURT:  They -- they can be.  What I'm going

10 to ask you to do is file those motions with Judge Gilliam

11 since he controls whether discovery -- you know, sort of the

12 case management overall, whether -- what the deadlines are,

13 whether we're going to stop things.  If he wants to refer to

14 me, he'll let me know.

15        MR. LOSAVIO:  Fine.

16        THE COURT:  But you need to raise that with him.

17        MR. LOSAVIO:  Thank you, your Honor.

18        MS. HEALY:  Your Honor, if I may, Judge Gilliam

19 already answered this question.  She said if you wanted to --

20 exactly what your Honor said --

21        THE COURT:  Okay.

22        MS. HEALY:  -- if you believe discovery is stayed,

23 you need to file a motion with the Court.

24        THE COURT:  Okay.

25        MS. HEALY:  He already held that at the May 26th

*Echo Reporting, Inc.*

1 conference, and we are perfectly aware of our obligations in

2 respect to the trade secrets, and we are in the process of

3 producing a trade secret list.

4          THE COURT:  Okay.

5          MS. HEALY:  We have not -- we have not propounded

6 any discovery relating to trade secrets and the application

7 of trade secrets claim yet.  So we are -- the rule

8 specifically states before you propound discovery in these

9 claims.  So we are perfectly aware of those obligations, and

10 we will comply with them.

11          THE COURT:  Okay.  Very good.

12          MR. LOSAVIO:  I was just seeking clarity whether

13 you felt that it had been referred here or not, and I

14 understand it has not.

15          THE COURT:  I didn't see anything.

16          MR. LOSAVIO:  I understand.

17          THE COURT:  They sound like things that he would

18 want to take a look at, and then it may be he sends them to

19 me, but I don't want to presume.  Okay.

20          MR. LOSAVIO:  Appreciate it.  Thank you, your

21 Honor.

22          THE COURT:  All right.  Is there anything further?

23 Ms. Graham, I see you standing up.

24          MS. GRAHAM:  This is Ms. Graham, and I just -- on

25 the recording situation --

98

1           THE COURT:  Yes.

2           MS. GRAHAM:  -- because Almawave may not be on the

3 call every time I confer with Ms. Healy --

4           THE COURT:  Right.

5           MS. GRAHAM:  -- how will you propose we proceed on

6 that.

7           THE COURT:  Okay.  So for -- so, yes, we have a

8 handy way to deal when it's Almawave, at least hopefully if

9 it works well.  For other recordings --

10          MS. GRAHAM:  I --

11          THE COURT:  Go ahead.

12          MS. GRAHAM:  I'm not sure if we have that same

13 function.  I can inquiry.  I'm not sure if she has an

14 objection to that if I even have it, but I can look into

15 that.

16          THE COURT:  Okay.

17           MS. GRAHAM:  If --

18          THE COURT:  Please investigate that.

19          MS. GRAHAM:  Okay.

20          THE COURT:  And then -- and same deal will apply.

21 If Ms. Graham's firm has that capability, I'd like you to try

22 it and let me know if there's any objections to using that as

23 the recording system.  If that doesn't work out, then really

24 it doesn't have to be high-tech as long as it's usable.  I --

25 really, you know, it's on almost every phone and laptop now

1 you can just record it if you make sure that the speaker

2 phone is on and do a little sound check.  And, as I said,

3 make sure you give me a little log.  Keep a little log so

4 that at this time we're discussing this and now we've moved

5 on to another topic so I can know how to find it.  Okay.

6        MS. HEALY:  Your Honor, I just want to address one

7 issue regarding the RRA motion to compel.  I understand the

8 process that the Court wants us to follow.  Ms. Graham has

9 told me on multiple occasions that she would be producing

10 documents.  We have identified very specific documents that

11 were missing.  There is no question and no basis not to

12 produce.  So I understand the Court is giving them more time,

13 but I would like to understand whether there will be some

14 consequence to a party failing to produce documents that were

15 clearly not objectionable because in the meantime, you know,

16 we won't be having a decision by your Honor probably until

17 September on the RRA subpoena.  So I don't know what the

18 basis for -- just to give the Court an example, they produced

19 some E-mails.  They just produced 35 unique documents, and

20 there were E-mails from that -- clearly from the inbox of Mr.

21 Pepe but nothing from the outbox.  I gave very specific

22 detailed explanations, as the Court indicates, as part of my

23 meet and confer, and I just wouldn't want to have --

24        THE COURT:  The usual rules will apply.  If

25 someone took -- did not take a substantially justified

1 position, whether it's in production or position, then

2 they're -- they are subject to sanctions, but if there's a --

3 so if you -- you know, if one side was supposed to be

4 responding and giving documents that clearly weren't

5 objectionable, I'd expect them to turn it over.

6          MS. HEALY:  The only problem is that Rule 45 does

7 not allow sanctions, only contempt.  I looked into this.  So

8 there's no -- the courts have been uniform in saying

9 sanctions can't be applied to non-parties.

10          THE COURT:  You know -- go ahead, Ms. Graham.

11          MS. GRAHAM:  This is Ms. Graham, your Honor.  The

12 issues that she -- the issues that she is raising I believe

13 deal with particular perceived deficiencies with the

14 documents that we did produce, and if there are existing

15 deficiencies, I'm happy to meet and confer and correct those.

16          THE COURT:  Great.  Thank you.  And that's

17 normally how that's done.  If there's a problem -- because

18 sometimes it's iterative.  It doesn't mean they're hiding

19 things.  Sometimes it's just they don't know that there's

20 something missing until someone's helping point them out.

21 They also have their own obligation to -- to look into that,

22 but that's why you talk.  "Gee, this is -- this is referring

23 to another document.  Have you guys located this?"

24          MS. HEALY:  That's why we told them right away.

25          THE COURT:  Rather than accusing them, right.

1          MS. HEALY:  No, we didn't accuse, your Honor.  We

2 -- I can --

3          THE COURT:  And then -- and then you look into it

4 and, you know, respond accordingly.  If there's some problem

5 where I think somebody is acting inappropriately and it --

6 then the subject of sanctions or contempt on an R and R,

7 whatever the appropriate vehicle is.  Okay.

8          MR. WALLERSTEIN:  Tom Wallerstein --

9          MS. GRAHAM:  This is Ms. Graham.  Just really

10 quickly.  I do believe that she did raise a couple of

11 deficiencies that we are currently looking into.  I haven't

12 completely resolved.

13          THE COURT:  Great.  Thank you.

14          MR. WALLERSTEIN:  Tom Wallerstein, your Honor.  If

15 I just -- my comments are intended more for a going forward

16 process basis about meeting and conferring.

17          THE COURT:  Yes.

18          MR. WALLERSTEIN:  One of the -- the difficulties

19 that I perceive is your Honor's standing order quite

20 reasonably says five days after the final phone call the

21 joint letter must be submitted.  What's happened is the phone

22 call is the first time that some issues are being raised.  So

23 when you -- your Honor just used a word that made me

24 remember, iterative process.

25          THE COURT:  Right.

1          MR. WALLERSTEIN:  That's impossible with Loop's

2    conception of your Honor's standing order because we'll hear

3    on the phone about an issue.  There's no time for an

4    iterative process because then we're told but we have to file

5    the joint letter within five days, and --

6          THE COURT:  Okay.

7          MR. WALLERSTEIN:  -- and especially without the E-

8    mail, that makes it extremely difficult.

9          MS. HEALY:  Your Honor --

10          THE COURT:  So my order, which is my order --

11          MS. HEALY:  Yes.

12          THE COURT:  -- so I know how to interpret it, is

13    that it should be -- what I don't want to do is create a

14    situation where somebody is strung along, where somebody --

15    let's say for you you want to move to compel and one side

16    keeps saying oh, no, but let's keep looking and, you know,

17    we're not quite ready.  And so it's meant to put a stop to

18    that kind of behavior, which I'm not accusing you of.  But on

19    the other hand, meet and confer takes some time.  It takes

20    some real discussions and more than one phone call, likely

21    many phone calls.  It's only when the parties say, "Okay,

22    look, we've reasonably reached the end of what we can agree

23    to.  Now let's get our joint letter together."  That's what

24    that's meant to do.  I'm not going to sanction you if for

25    some reason you don't get your letter in within five days.

1 That's not how it's meant to be interpreted.  Okay.

2          MS. HEALY:  I understand, but I think it's also

3 important to be able to call on the phone and say "What do

4 you mean by this request?"  I mean, the purpose of having a

5 call is we're not just reading what's in a letter, and --

6          THE COURT:  Yes.

7          MS. HEALY:  -- I think that's really important

8 because if we can't have that kind of dialogue which is

9 normal when you have discovery, you know, I end up having a

10 letter and somebody on the phone reading it to me and saying

11 do you agree or do you not agree.  That's all we have to do.

12 It's almost like you're checking the box.

13          THE COURT:  Yes.  I did see some reference to

14 that, and I hope that's not going on because that is not

15 appropriate, and I know maybe people are feeling pressed that

16 that's their only choice, but that's not a conversation.  I

17 don't want to see that in any form.  You have to try to have

18 a good conversation on the merits.  You need to treat each

19 other with respect.  You're all due respect.  You're all

20 officers of this Court, and you're representing clients, and

21 you're in a noble profession.  Okay.  So I'm really hoping,

22 and I know you're all capable of it.  You just haven't found

23 it yet in this grouping.  So when you've reached the end of a

24 set of discussions, that will trigger the five days to get me

25 something that you've prepared together so that I can resolve

104

1  the disputes you weren't able to agree on.  Okay.

2          MR. WALLERSTEIN:  Tom Wallerstein.  Very helpful,

3  your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.

5          MS. GRAHAM:  Thank you, your Honor.

6          MS. HEALY:  Thank you, your Honor.

7          THE COURT:  All right.  I know it was a long

8  session.  I really appreciate your patience.  Ms. Garcia,

9  thank you so much for staying late, and, Ms. Geckler, nice to

10  see you.  We are concluded.

11          MS. BRAYER:  Thank you, your Honor.

12          THE COURT:  Thank you, Ms. Brayer.

13      (Proceedings concluded at 5:23 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2       I certify that the foregoing is a true and correct

3 transcript, to the best of my ability, of the above pages of

4 the official electronic sound recording provided to me by the

5 U.S. District Court, Northern District of California, of the

6 proceedings taken on the date and time previously stated in

7 the above matter.

8       I further certify that I am neither counsel for,

9 related to, nor employed by any of the parties to the action

10 in which this hearing was taken; and, further, that I am not

11 financially nor otherwise interested in the outcome of the

12 action.

13

14

15       Echo Reporting, Inc., Transcriber

16       Saturday, July 25, 2015

17

18

19

20

21

22

23

24

25