UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS INC,<br>　　　　　Plaintiff,<br>　　v.<br>ANNA GATTI, et al.,<br>　　　　　Defendants. | Case No. 15-cv-00798-HSG   (DMR)<br><br>**ORDER ON JOINT DISCOVERY LETTER**<br>Re: Dkt. No. 172 |

On August 17, 2015, Plaintiff Loop AI Labs, Inc. ("Loop AI"), Defendants Almawave USA, Inc. ("Almawave"), Anna Gatti, IQSystem, Inc., IQSystems LLC, and third party Russell Reynolds Associates ("RRA") filed a joint discovery letter regarding their disputes about Loop AI's subpoenas to RRA and a protective order in this case. [Docket No. 172 (Joint Letter).] The court finds that this matter may be decided without a hearing pursuant to Local Rule 7-1(b) and enters the following order.

I.   **BACKGROUND**

　　**A.  Factual Background**

Plaintiff filed this action on February 20, 2015 against Defendants Almawave; Almaviva S.p.A. ("Almaviva") and Almawave S.r.l. (the "Italian Almaviva Defendants"); Gatti; and IQSystem, Inc., and IQSystems LLC ("IQSystem Defendants"). Plaintiff is a startup that develops artificial intelligence technology. It alleges that Gatti, its former CEO, conspired with the Italian Almaviva Defendants to misappropriate Plaintiff's trade secrets and sabotage its investor negotiations. Specifically, Plaintiff alleges that it hired Gatti to assist in raising venture capital and establish business partnerships, but that she lied about her true credentials and experience. According to Plaintiff, while Gatti pretended to work full time for Loop AI, she was simultaneously providing advisory services for multiple competing startups and took a concurrent

CEO position with Defendant Almawave. [Docket No. 45 (Am. Compl. ¶¶ 5, 8-10, 14).] Gatti also allegedly established Almawave on behalf of the Italian Almaviva Defendants and domiciled the new startup at her home in San Francisco.[1] (Am. Compl. ¶¶ 15, 16.) According to Plaintiff, Almaviva intended to use Gatti's assistance to buy Loop AI for a "bargain price" or to hire away its key employees and obtain access to its proprietary technology and trade secrets. (Am. Compl. ¶ 17.) Plaintiff alleges that a principal component of Gatti's scheme involved sabotaging its access to funding, including venture capital. (Am. Compl. ¶¶ 26-28.) Gatti also allegedly shared Plaintiff's proprietary information and other property with the other defendants, and used Plaintiff's time, property, and other resources to conduct business on behalf of the Almaviva Defendants. (Am. Compl. ¶ 18.) Plaintiff brings claims for, *inter alia*, RICO violations, fraud, breach of contract, theft of corporate opportunity, misappropriation of trade secrets, and conversion.

### B. Discovery Disputes and Procedural Posture

In June 2015, Plaintiff served a Rule 45 subpoena on third party RRA, seeking the production of thirteen categories of documents. It also served a subpoena demanding the appearance of Mario Pepe, an RRA employee, for deposition. The subpoenas sought compliance in New York City, where RRA is located. On July 10, 2015, Plaintiff moved to compel RRA's compliance with the subpoena for documents in the U.S. District Court, Southern District of New York ("SDNY"). Three days later, Almawave and RRA filed a discovery letter before the undersigned regarding their disputes with Plaintiff about both Pepe's deposition and Plaintiff's demand for documents from RRA. [Docket No. 128.]

On July 23, 2015, the undersigned held a discovery management conference regarding numerous discovery disputes, including the disputes about the RRA subpoenas. At the hearing, RRA and Pepe consented to this court's jurisdiction for purposes of adjudication and enforcement of the subpoenas, and Plaintiff agreed to withdraw its motion to compel pending in the SDNY. The court ordered the parties to meet and confer regarding their outstanding disputes about the

---

[1] Plaintiff alleges that Defendant Almaviva is the parent company of Almawave S.r.l. and Almawave (collectively, the "Almaviva Defendants"). (*See* Am. Compl. ¶¶ 40-42.)

RRA subpoenas and to submit one joint letter that did not exceed eight pages addressing any remaining disputes by August 13, 2015.  [Docket No. 156 (Minute Order).]  The court also ordered the parties to negotiate a protective order and to submit any remaining disputes in the joint letter.

On August 11, 2015, Plaintiff filed an administrative motion seeking permission to exceed the eight-page limit for the joint letter due on August 13, 2015, to which RRA filed an opposition. [Docket Nos. 162, 164.]  On August 12, 2015, the court denied Plaintiff's administrative motion, stating in its order that it "uses an eight-page joint letter process to force the parties to focus on those arguments that are the most important to discovery disputes."  The court granted the parties an extension to August 17, 2015 to file the joint letter.  [Docket No. 165.]

The parties and RRA filed their joint letter on August 17, 2015.  Plaintiff did not provide full argument on several of the remaining disputes presented in the joint letter.  Instead, Plaintiff requested leave to fully brief its position on a protective order, and submitted additional pages of argument in the form of a redline version of Defendants' proposed protective order and one page of annotations explaining its changes.  (Joint Letter Ex. B.)  Plaintiff also asked for leave to brief its arguments regarding the subpoena for documents to RRA, or in the alternative, Plaintiff asked the court to incorporate by reference its previous motion to compel RRA's compliance with its subpoena for documents filed in the SDNY and RRA's opposition thereto.  (Joint Letter 6 n.17.)

As to the protective order dispute, the court ordered Defendants to file a one-page response to Plaintiff's annotated arguments by August 31, 2015.  [Docket No. 175 (Aug. 25, 2015 Order).] Concluding that the filings in the SDNY could be helpful to resolving the disputes about the RRA subpoena for documents, the court also ordered RRA to file a statement by August 28, 2015 indicating whether it had changed its positions on any of the objections briefed in its July 20, 2015 opposition to the motion to compel and explaining any such changes.  It ordered Plaintiff to file a reply to RRA's arguments by September 2, 2015.  (Aug. 25, 2015 Order.)  The parties and RRA timely filed the submissions.  [Docket Nos. 179 (RRA's Statement), 180 (Almawave's Statement), 182 (Pl.'s Reply).]

3

## II. DISCUSSION

### A. Subpoena to RRA for Mario Pepe's Deposition

RRA is "an executive leadership and search firm and advises its clients on recruiting senior-level executives." (Wah Decl. in Support of RRA's Opp'n to SDNY Mot. to Compel, July 20, 2015, ¶ 2.) RRA asserts that it has received two "talent search assignments" from "Almaviva and/or Almawave." (Wah Decl. ¶ 3.) One of the assignments involved RRA's employee, Mario Pepe, placing Gatti in a position with Almawave.[2] (Wah Decl. ¶ 3.)

According to Valeria Sandei, Almawave's Chairman and President, "a headhunter" with RRA introduced Gatti to Sandei by email in February 2014. Sandei states that she offered Gatti the position of CEO of Almawave in April 2014 "through the headhunter." (Sandei Decl. in Support of Opp'n to Pl.'s Mot. for TRO, March 9, 2015, ¶¶ 6, 10.)

Plaintiff disputes RRA's characterization of its actions as "simply placing a candidate with one or another company." (Pl.'s SDNY Mot. to Compel 5 n.4.) According to Plaintiff, RRA played a substantial role in assisting Gatti and the Almaviva Defendants in the alleged wrongdoing at issue in this case. Plaintiff asserts that RRA, through its directors, Mario Pepe and Giulia Belloni, helped place Gatti in various other positions while she continued to work as Loop AI's CEO, including assisting with Almawave's employment of Gatti as CEO. (Pl.'s SDNY Mot. to Compel 6.) Plaintiff also alleges that RRA assisted the Almaviva Defendants "in soliciting Loop AI's employees, contractors, and investors, and aided Gatti in promulgating her misstatements about her academic and employment background." (Pl.'s SDNY Mot. to Compel 6 (citing Am. Compl. ¶ 57).)

Plaintiff served RRA with a Rule 45 subpoena demanding that it produce Mario Pepe for deposition. Although Pepe lives in Washington, D.C., RRA has agreed to produce him for deposition in New York on a mutually convenient date. [Docket No. 155.] The following disputes regarding Pepe's deposition remain.

---

[2] The other assignment "involved placing a position at Almawave," but Joyce Wah, RRA's Contracts & Legal Affairs Coordinator, states that the assignment "did not involve Anna Gatti or any of the other parties" to this action. Wah also states that she identified two search assignments for a Brazilian affiliate of Almawave, but neither involved Gatti or any other parties in this action. (Wah Decl. ¶ 3.)

### 1. Allocation of Time

First, the parties dispute the allocation of time among the parties to question Pepe at his deposition. Although Plaintiff issued the subpoena for Pepe's deposition, Defendants assert that they also have the right to question Pepe. They propose that the presumptive seven hours for Pepe's deposition be split evenly between Plaintiff and Defendants, with the Defendants allocating their collective 3.5 hours amongst themselves.

Plaintiff argues that Defendants are not entitled to 3.5 hours of Plaintiff's deposition time. According to Plaintiff, RRA and Almawave have been working jointly in this litigation, and Plaintiff argues that Almawave has not explained why it needs "such extensive deposition time with a witness that is cooperating with it and filing motions jointly with it." (Joint Letter 2.) Plaintiff states that Almawave would not independently depose Pepe, "its own cooperating witness," and suggests that Almawave is using "the excuse of a purported need for examination to impede" Plaintiff's deposition. (Joint Letter 2.) It also argues that Rule 30 requires a party to notice a deposition that the party wishes to take, and that compliance with this rule is important because the deposition counts against a party's maximum number of depositions allowed while affording that party seven hours in which to question a witness. Finally, Plaintiff argues that Rule 26(b)(2) permits a court to grant additional time for a deposition where necessary, and contends that if Almawave wishes to depose Pepe, it may serve RRA with a subpoena and move the court for additional time for Pepe's deposition. Plaintiff has no objection to Pepe's deposition lasting more than seven hours.

RRA contends that neither RRA nor Pepe "are cooperating witnesses to either party." (Joint Letter 2.) It opposes any request for Pepe's deposition to exceed the presumptive seven-hour limit under Federal Rule of Civil Procedure 30(d), arguing that the parties have not demonstrated good cause for additional time.

Although Plaintiff served a Rule 45 subpoena for Pepe's deposition, Rule 30 governs the procedures for taking depositions by oral examination. "Unless otherwise stipulated or ordered by the court, a deposition is limited to 1 day of 7 hours." Fed. R. Civ. P. 30(d)(1). According to Rule 30(c)(1), "[t]he examination and cross-examination of a deponent proceed as they would at trial

5

under the Federal Rules of Evidence." Moreover, "[t]here is no formal requirement for a party seeking to cross-examine a deponent to serve a notice." *F.C.C. v. Mizuho Medy Co. Ltd*., 257 F.R.D. 679, 682 (S.D. Cal. 2009). Therefore, "[i]n a multi-party lawsuit, one party may notice the deposition and other parties may attend and cross-examine the deponent without also having to notice the deposition." *Id.*; *accord Longino v. City of Cincinnati*, No. 1:12-CV-424, 2013 WL 831738, at *5 (S.D. Ohio Mar. 6, 2013) (Rule 30(c)(1) "means that counsel for both parties of a civil action are permitted to question witnesses during depositions, regardless of which party noticed the deposition."). Therefore, Defendants may question Pepe at his deposition without having to separately notice his deposition or serve a subpoena.

The court notes that none of the parties ask the court to grant additional time for Pepe's deposition; therefore, it will not presently consider whether more time is necessary "for a fair examination" of Pepe. *See* Fed. R. Civ. P. 30(d)(1) ("[t]he court must allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent"). Although Plaintiff contends that Pepe and RRA are "cooperating" with Almawave, Plaintiff does not cite evidence to support this, and RRA denies that they are cooperating. Additionally, Plaintiff does not explain why it needs the full seven hours to depose Pepe, a non-party. Accordingly, the court grants Defendants two hours of the total seven hours allowed for Pepe's deposition, to be allocated among all Defendants. Plaintiff is entitled to the remaining five hours. If, at the conclusion of the seven hours of Pepe's deposition, any party seeks more time to examine him, it must meet and confer with RRA before seeking court intervention.

**2. Use of Italian Language and Italian-Language Documents at Deposition**

Next, the parties disagree about the use of Italian-language documents at Pepe's deposition, as well as the language in which the deposition will be conducted. Litigation counsel for Almawave, Gatti, and the IQSystem Defendants do not speak Italian, nor does counsel for Pepe. Therefore, Defendants assert that they need to be able to contemporaneously review any exhibits that are used in the deposition and fully understand the questions and answers in order to meaningfully participate in the deposition. According to Defendants, they will be unable to do so if exhibits are only in Italian. Defendants make two proposals to address this issue: 1) Plaintiff

6

can prepare English-language translations of any Italian-language exhibits it will use at deposition, and as it introduces an exhibit, simultaneously introduce the English-language translation of the document at the deposition; or 2) Plaintiff can provide all parties in advance any Italian-language documents it intends to use at the deposition, and Defendants can have translations prepared at their expense in advance of the deposition. (Joint Letter 3.) In addition, Defendants assert that Pepe speaks fluent English. Therefore, Defendants ask that Plaintiff commit to speaking only English at the deposition.

Plaintiff argues that "Almawave's purported language issues are manufactured," because the law firm representing Almawave employs Italian-speaking attorneys who could appear at the deposition. (Joint Letter 4.) Plaintiff rejects Defendants' proposals for translations of deposition exhibits, arguing that either proposal would violate its work product protections, impose unwarranted and unjustified translation obligations upon Plaintiff, and/or disrupt Plaintiff's deposition of Pepe. It asserts that "Italian will only be used as necessary to specify certain words in Italian-language documents relevant to Mr. Pepe's deposition." While Plaintiff's counsel's questions will be articulated in English, they may contain Italian words "only to the extent particular words in particular documents are in Italian and require questioning on the record as to the specific meaning of certain words." Therefore, "[t]he only Italian words at the deposition will be read from documents." (Joint Letter 4.) In response, Defendants state that their concerns about the use of Italian at the deposition will be obviated if the parties can reach an agreement on the pre-deposition translation of Italian-language documents and Plaintiff commits to using Italian only when quoting a document, as it appears to do in the joint letter.

Plaintiff's proposed solution is insufficient. Regardless of whether there are Italian-speaking attorneys at the firm representing Almawave, the use of Italian language documents at deposition is problematic because the judge and jury in this matter will need to be able to read and understand the exhibits. There is also no indication in the letter about whether RRA or any of the other Defendants have access to Italian-speaking counsel. Given the potential for confusion, the court finds that translations of the Italian-language exhibits Plaintiff introduces at Pepe's deposition are necessary. The court notes that Plaintiff does not indicate how many Italian-

7

1  language exhibits it plans to introduce at Pepe's deposition. Therefore, it is unable to assess the
2  burden of translating the exhibits in advance.
3     The court notes that Defendants offered two reasonable proposals regarding translations,
4  including a proposal that Defendants bear the cost of translating exhibits. Because Plaintiff
5  rejected both proposals, and insists on protecting its work product by refusing to identify
6  documents in advance so that Defendants can translate them, the court orders that Plaintiff shall
7  prepare certified translations of any Italian-language exhibits it will use at deposition. As it
8  introduces an exhibit, it shall simultaneously introduce the English-language translation of the
9  document. Plaintiff is not required to furnish the translations in advance of the deposition. As to
10 the language of the deposition itself, Plaintiff may use Italian only when reading from a document,
11 as Plaintiff itself proposes, as long as Plaintiff has provided a certified translation of the document
12 in accordance with this order.

### B. Plaintiff's Demand for Documents from RRA

14 As noted, Plaintiff's Rule 45 document subpoena to RRA seeks the production of thirteen
15 categories of documents, described further below. They include requests for documents showing
16 third parties with whom RRA communicated on behalf of Gatti from January 1, 2010 to the
17 present (no. 2), all contracts between RRA and any of the Defendants (no. 6), all documents
18 related to Gatti or Plaintiff from January 1, 2010 the present (no. 9), and all documents provided
19 by RRA to Gatti or any of the Defendants (no. 11). (Healy Decl. in Support of Pl.'s SDNY Mot.
20 to Compel, July 10, 2015, Ex. A.)
21    RRA timely lodged objections to the document demands. (Healy Decl. Ex. C.) Generally,
22 RRA objects to the demands as overbroad as to time and scope and unduly burdensome. It also
23 objects that they call for the production of information protected from discovery by the attorney-
24 client privilege, work product doctrine, and third party rights to privacy. RRA argues that Plaintiff
25 seeks all documents related to any of the Defendants in this case, regardless of whether the
26 documents are related to the claims and defenses at issue in the action, and asks the court to
27 narrow the scope of the documents sought by Plaintiff. It represents that to date, it has produced
28 315 responsive documents. (Joint Letter 6; Graham Decl. in Supp. of RRA's Opp'n to SDNY

1  Mot. to Compel, July 20, 2015, ¶ 7.)

### 1. Legal Standard

Federal Rule of Civil Procedure 45 governs discovery of nonparties by subpoena. Fed. R. Civ. P. 45. The Advisory Committee Notes to Rule 45 state that "the scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules," which in turn is the same as under Rule 26(b). Advisory Committee Notes to 1970 Amendment; Fed. R. Civ. P. 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b)."). Rule 26(b) allows a party to obtain discovery concerning "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006).

Rule 45 provides that "on timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). "[A] court determining the propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Gonzales*, 234 F.R.D. at 680 (citation omitted). The party who moves to quash a subpoena bears the "burden of persuasion" under Rule 45(c)(3). *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (citations omitted).

### 2. Discussion

As noted above, RRA presents evidence that it has been retained by Almaviva, Almawave, or their affiliates for four executive searches. One of those searches involved Pepe coordinating an introduction between Gatti and Almawave, resulting in Almawave hiring Gatti as CEO. The other three searches did not involve Gatti or Plaintiff, and two of the three were search assignments for Almawave's Brazilian affiliate. (Wah Decl. ¶ 3.) RRA acknowledges that Pepe's introduction of Gatti to Almawave "is directly at issue in the instant case," but argues that the remaining three searches bear no relation to this action other than the fact that they were for Almaviva. Accordingly, RRA asks the court to narrow the scope of the subpoena to "documents that relate to Loop and Anna Gatti (separately and jointly), and the search it performed for the

position at Almawave that resulted in the hire by Almawave of Anna Gatti." (Joint Letter 7.)

RRA makes other arguments in support of its objections to the subpoena. First, it argues that as written, Plaintiff's requests call for the disclosure of private matters occurring in multiple countries between RRA's clients and individuals who are candidates for employment. These candidates had a reasonable expectation that RRA would maintain the confidentiality of their personal information. Further, RRA argues that the subpoena poses "an incredible financial burden" which it should not have to bear, given its status as a third party. It has run electronic searches using various search terms, including the names of the parties of this case, resulting in over 30,000 hits. RRA represents that many of the documents returned by the searches are in Italian, and explains it must translate these documents prior to production in order to determine if they are responsive and/or raise privacy or privilege issues. RRA estimates the cost for such translation at more than $100,000.[3] (Joint Letter 7.) According to RRA, it has already incurred fees in excess of $20,000 associated with this matter. (RRA's Statement 2.) RRA asks the court to 1) ensure a protective order is in place prior to RRA's production; 2) shift the financial burden of translating the documents to Plaintiff; and 3) order Plaintiff to "bear the burden of any costs associated with having to produce 30,000+ documents, should this Court find that the proper scope includes such a vast production." (Joint Letter 7-8.)

In response, Plaintiff contends that RRA is a critical participant in some of the material events at issue in this case. Plaintiff cites a number of documents that it claims support "the substantial extent of RRA's involvement with Gatti" in connection with the Defendants and with assisting Gatti in finding additional positions while she was employed by Plaintiff. These documents include emails between RRA and the Italian Almaviva Defendants, and RRA and Gatti. For example, in one email from April 2014, Gatti forwarded to RRA a discussion between Gatti and Almaviva regarding Almaviva's payments to the IQSystem Defendants. (Pl.'s Reply 1.) Plaintiff also describes correspondence between Gatti and RRA in which she discussed "granular

---

[3] The court notes that in its opposition to Plaintiff's SDNY motion to compel, RRA asserted that the cost of translating approximately 31,000 documents would be more than $50,000. (Graham Decl. ¶ 10.) It is not clear if the new $100,000 figure includes the estimated cost of attorney review time for the translated documents.

10

details of the plans and activities with Almawave" and RRA's work to place Gatti in other positions. (Pl.'s Reply 1 n.4.)

These emails appear to indicate that RRA was in close contact with Gatti about matters related to Almaviva and Almawave during the time period at issue in this case. However, they do not support, and Plaintiff does not explain its position that documents related to all of RRA's executive searches for Almaviva or Almawave are relevant, regardless of whether they involved Gatti or Plaintiff. Nor do they support Plaintiff's position that documents related to RRA's contacts with any of the Defendants are relevant, regardless of whether they relate to Gatti, Plaintiff, or any of the issues in this action. Plaintiff states that Almaviva's past practices with RRA are relevant to show whether Almaviva was in the habit of receiving legal advice from RRA for other search assignments, but does not explain what this means or why this is relevant. Moreover, it appears that RRA's proposal to narrow the scope to "documents that relate to Loop and Anna Gatti (separately *and* jointly), [4] and the search it performed for the position at Almawave that resulted in the hire by Almawave of Anna Gatti," (Joint Letter 7 (emphasis added)), would return documents relevant to the claims at issue in this action. Specifically, under RRA's proposal, RRA would produce all documents and communications with or pertaining to Gatti and/or Loop AI, as requested by Plaintiff. Accordingly, the court adopts RRA's proposal to narrow the scope of each of the thirteen categories of documents demanded in the subpoena. The court will address any remaining objections to the demands below.

**Request No. 1**, documents that identify RRA's employees who communicated with, or provided services to the Defendants; **Request No. 3**, the dates upon which RRA began performing services for any of the Defendants; **Request No. 4**, the dates, locations, and substance of all meetings between RRA and any of the Defendants; and **Request No. 5,** email addresses and telephone numbers RRA employees used to communicate with Defendants: As to these four requests, RRA argues that it would be less burdensome to produce the requested information

---

[4] Plaintiff describes RRA's proposed compromise as producing "only documents that *jointly relate* to Anna Gatti and the Defendants," (Pl.'s Reply 3), and claims that this is inadequate, but this is an inaccurate representation of RRA's offer.

11

1   during Pepe's deposition.  Plaintiff argues that documentary evidence is more precise and reliable
2   than a witness's recollection.  The court agrees with Plaintiff.  Subject to the court's order
3   regarding scope as set forth above, the court orders RRA to produce documents responsive to
4   these requests.

**Request No. 2**, documents that identify all third parties whom RRA communicated with on behalf of Gatti: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.  To the extent RRA is withholding responsive documents on the basis of privilege, it shall promptly produce a privilege log.

**Request No. 6,** all contracts or agreements between RRA and any of the Defendants: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.

**Request No. 7**, all invoices and billing records issued by RRA to any of the Defendants, along with communications relating to such invoices: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.

**Request No. 8**, all calendars, agendas, or appointment records evidencing or referring to any meetings with any of the Defendants: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.

**Request No. 9**, all documents and communications sent or received by RRA relating to Gatti, Plaintiff, or Soshoma (Plaintiff's original name) from January 1, 2010 to the present: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.  To the extent RRA is withholding responsive documents on the basis of privilege, it shall promptly produce a privilege log.

**Request No. 10**, all documents and communications sent or received by RRA related to Valeria Sandei, Almaviva, Almawave S.r.l., Almawave, Tony or Antonio DiNapoli, and the IQSystem Defendants from January 1, 2013 to the present: subject to the court's order regarding scope as set forth above, the court orders RRA to produce documents responsive to this request.

**Request No. 11**, all documents provided by RRA to Gatti or any of the Defendants: subject to the court's order regarding scope as set forth above, the court orders RRA to produce

12

1  documents responsive to this request.

2  **Request No. 12**, all documents and communications exchanged by RRA and Valeria
3  Sandei on February 4, 2014 and all documents related to such communications: subject to the
4  court's order regarding scope as set forth above, the court orders RRA to produce documents
5  responsive to this request.

6  **Request No. 13**, all documents related to offers of employment or interviews for
7  employment from RRA to anyone on behalf of Gatti or any of the Defendants: subject to the
8  court's order regarding scope as set forth above, the court orders RRA to produce documents
9  responsive to this request.

### 3. Timing and Expense of Production

RRA asks the court to shift the financial burden of translating responsive documents to Plaintiff. "Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs of compliance with a subpoena, if those costs are significant." *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). First of all, the court has significantly narrowed the scope of the document demands. Moreover, it appears that RRA assumes that it will have prepare certified translations of every document returned by its search in order to determine whether it is responsive and should be produced, but this is a faulty assumption. Since not every document will be responsive or used in the case, there is no need to obtain certified translations of all Italian language documents in RRA's possession that are potentially responsive to the subpoena. Instead, RRA can employ other reasonable and presumably less expensive means to decide whether an Italian-language document should be produced. This includes, for example, hiring an Italian-speaking paralegal or contract attorney to review documents and provide counsel with something short of a certified translation so that counsel can determine what should be produced. RRA shall perform its review and make responsive documents available to Plaintiff for inspection and copying. Plaintiff shall translate documents at its own expense. The court does not know if the 315 responsive documents already produced by RRA included certified translations. If they did, RRA may not seek reimbursement for those translation costs.

The court orders RRA to produce documents in accordance with this order within 21days

of the date of this order.

### C. Protective Order for the Case

Finally, the parties dispute the terms of a protective order governing the production of documents and information in this case. Defendants ask the court to enter the Northern District of California's Model Protective Order for trade secret cases with changes they describe as "minimal." (Almawave's Statement.)

Plaintiff submitted a red-line of proposed changes to Defendants' final draft. It states that the protective order is "crucial" for Plaintiff, since Defendants plan to provide Plaintiff's documents and information to the Italian Almaviva Defendants, who dispute this court's jurisdiction over them. RRA maintains that a protective order must be executed prior to completing any document production in response to Plaintiff's subpoena, and it appears that RRA agrees with Defendants' proposed version of the Model Protective Order. The court will address each of Plaintiff's proposed annotations in turn.

**Annotation 1, § 1, "Purposes and Limitations":** Plaintiff seeks to add a provision that requires that each party and any of its employees, "wherever located in the world, are subject to the personal jurisdiction" of this court or any other United States District Court that may be asked to enforce the protective order. According to Plaintiff, this provision is necessary so that it may have a means of enforcing the protective order against the Italian Almaviva Defendants. In response, Almawave argues that this provision requires that all parties waive personal jurisdiction objections, even though the Italian Almaviva Defendants seek dismissal from this action on that basis.

On September 2, 2015, the Honorable Haywood S. Gilliam denied without prejudice the Italian Almaviva Defendants' motion to dismiss for lack of personal jurisdiction. [Docket No. 183.] Judge Gilliam granted Plaintiff leave to conduct jurisdictional discovery on the subject of "whether the causes of action alleged in the [Amended Complaint] 'arise out' of" the Italian Almaviva Defendants' contacts in California. [Docket No. 183 at 6.] Therefore, whether the Italian Almaviva Defendants are subject to personal jurisdiction in this court is still an open question.

The court is mindful of Plaintiff's concerns about enforcement of the protective order against the foreign Defendants. However, Plaintiff's proposal is unnecessary. Pursuant to section 7.2(b) of the Model Protective Order, "a Receiving Party may disclose any information or item designated 'CONFIDENTIAL' only to . . . (b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the 'Acknowledgement and Agreement to be Bound' (Exhibit A)."[5] An individual who executes the "Acknowledgement and Agreement to be Bound" expressly agrees "to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action." Therefore, the Italian Almaviva Defendants may not disclose Plaintiff's confidential information to their employees *unless* the employees sign an agreement acknowledging this court's jurisdiction over them for purposes of enforcing the protective order. Since this provision already addresses Plaintiff's concerns about enforcement, the court denies the request to add Plaintiff's provision to the protective order.

**Annotation 2, § 2.10, "House Counsel" definition:** Defendants' proposed protective order defines "House Counsel" to mean "attorneys who are employees of a party to this action," consistent with the Model Protective Order. Plaintiff seeks to revise this definition to mean "individuals who are licensed to practice law by any State in the United States and who are employees of a party to this action." According to Plaintiff, attorneys in Italy are required to resign from the Bar before taking on positions as house counsel, and therefore their duties and ethical responsibilities differ from their American counterparts. Almawave responds that all of the Almaviva Defendants "have only Italian house counsel," so they would be excluded from the definition. (Almawave's Statement.)

Plaintiff does not explain how Italian attorneys' duties and ethical responsibilities differ from American attorneys, or how such differences would impact Italian attorneys' obligations

---

[5] Plaintiff proposes some changes to this provision of Defendants' proposed protective order, as well as changes to the Acknowledgement and Agreement to Be Bound. However, as discussed further below, Plaintiff did not provide any explanation or argument to support the proposed changes and the court finds that they are unnecessary.

under the protective order. In particular, it appears that the Italian attorneys who are employees of a party would also fall under the protective order's definition of a "Party," which includes employees, and thus would be permitted to access protected information under certain circumstances under Defendants' version of the Model Protective Order. (*See* Defs.' Proposed Protective Order § 7.2(b).) Therefore, in the absence of a sufficient explanation of why Italian in-house counsel should be excluded from the definition of "House Counsel," the court denies Plaintiff's request to revise this definition and adopts Defendants' proposed definition.

**Annotation 3, § 2:12, "Outside Counsel of Record" definition:** Plaintiff seeks to expand the definition of "Outside Counsel of Record" to include "any person retained by, consulting for, or working under the supervision or acting at the direction of counsel of record to assist counsel of record in any aspect of the prosecution, defense, or preparation for trial of this action." Plaintiff claims that this change is necessary to ensure that its information "is sufficiently protected to the extent" that "vendors and service providers, such as document management software vendors" handle it. However, such vendors and service providers are already included in the definition of "Professional Vendors" at section 2.15, and Defendants' version of the Model Protective Order provides that Professional Vendors may receive information designated "Confidential" or "Highly Confidential" only if disclosure is reasonably necessary for this litigation and only if they have signed the "Acknowledgement and Agreement to be Bound." (*See* Defs.' Proposed Protective Order § 7.2(e); 7.3(e).) Plaintiff's request to expand this definition is denied.

**Annotation 4, § 3, "Scope":** Plaintiff seeks to add extensive language to the provision defining the scope of the protective order. Plaintiff proposes adding that the protective order "is not intended to be used to discover a Party's Outside Counsel of Record work-product investigation of the subject matter of this action," and that "[a] Party or its Outside Counsel of Record is not permitted to interfere with another Party's formal or informal investigation of the subject matter of this case by directing a Non-Party to refuse to respond to . . . requests for cooperation or investigation by a Party . . . or by making unilateral claims of confidentiality that purportedly bar the Non[-]Party from cooperating with the investigation or formal discovery of the subject matter of the case." Plaintiff states that this provision is necessary because the Almaviva

1  //

2  //

3  Defendants have "made it a practice to interfere with Loop AI's third party subpoenas."

4        The court denies Plaintiff's request to expand the scope of the protective order.  To the

5  extent that Plaintiff contends that any party has violated the Federal Rules of Civil Procedure or

6  the court's Civil Local Rules in discovery, it may seek relief from the court in accordance with its

7  Standing Order.  To the extent Plaintiff contends that a party might make improper claims of

8  confidentiality to shield information or documents from discovery, the Model Protective Order

9  contains a provision in section 6 to challenge such designations.

10        **Annotation 5, § 7.1, "Basic Principles":** Plaintiff seeks to add a provision to the "Basic

11  Principles" subsection of Section 7, Access To and Use of Protected Material, that prohibits

12  parties from transmitting by email any Protected Material designed "Attorneys' Eyes Only."

13  Plaintiff proposes that such information be electronically transferred by a system other than email

14  that "permits the logging and easy deletion from one place of the Protected Materials, and that

15  does not disseminate the Protected Materials in a manner that (like electronic emails) may be

16  difficult to trace, log, and destroy following the conclusion of this action."  Plaintiff argues that

17  this provision is necessary to ensure that all copies of protected materials are destroyed at the

18  conclusion of the action, noting counsel's experience that "when protected materials are permitted

19  to be disseminated by email, it becomes extremely difficult, if not impossible" to ensure

20  destruction.

21        Defendants do not object to the inclusion of this provision.  Given Plaintiff's concerns

22  about the successful destruction of protected materials, the court grants Plaintiff's request to

23  include this revision to the protective order.

24        **Annotation 6, § 8, "Prosecution Bar":** Defendants seek to include a prosecution bar that

25  applies to any individual who receives access to "Highly Confidential," "Attorneys' Eyes Only,"

26  or "Highly Confidential-Source Code Information."  The proposed prosecution bar provides that

27  any such individual shall not be involved in the prosecution of patents or patent applications

28  related to artificial intelligence, including the patents or patent applications at issue in this action

//

//

and any patent or application claiming priority to or otherwise related to the patents asserted in this action, for two years after final termination of this action.

Plaintiff objects to the inclusion of the prosecution bar in the protective order, expressing concerns that it would prevent a Loop AI attorney from attempting to protect Plaintiff's own misappropriated intellectual property in any proceedings before the United States Patent and Trademark Office. Defendants seek the inclusion of the prosecution bar but did not provide any support for it. Given Plaintiff's concerns and Defendants' failure to support the provision, the court strikes the prosecution bar from the proposed protective order.

**Other Proposals**: As to Plaintiff's remaining changes to Defendants' proposed protective order, Plaintiff did not provide any explanation or argument to support their implementation. The court has reviewed the proposed changes and finds that they are unnecessary. *See Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. 14-CV-00876-RS (JSC), 2014 WL 6629431, at *2 (N.D. Cal. Nov. 21, 2014) ("[i]n the ordinary course, the court treats the [Northern District's] model protective order as setting forth presumptively reasonable conditions regarding the treatment of highly confidential information." (citation omitted)). Finally, although the procedure for judicial intervention was not addressed in the letter, the court orders the parties to revise Section 6.3, "Judicial Intervention," to reflect the court's Standing Order regarding resolution of discovery disputes. Challenges to confidentiality designations shall be presented to the court for adjudication using the joint letter procedure.

The court orders the parties to create a final version of the protective order in accordance with its rulings set forth above, and to submit it for court approval **within seven days of the date of this order.**

### III.     CONCLUSION

Mario Pepe's deposition shall proceed on a date mutually convenient to the parties and in accordance with this order. RRA shall produce documents responsive to Plaintiff's subpoena within 21 days of the date of this order. The parties shall submit a final version of the protective

order within seven days of the date of this order.

**IT IS SO ORDERED.**

Dated: September 18, 2015



_____
Donna M. Ryu
United States Magistrate Judge