1   VALERIA CALAFIORE HEALY (*phv*)
    valeria.healy@healylex.com
2   HEALY LLC
    154 Grand Street
3   New York, New York  10013
    Telephone:      (212) 810-0377
4   Facsimile:      (212) 810-7036

5   DANIEL J. WEINBERG (SBN 227159)
    dweinberg@fawlaw.com
6   FREITAS ANGELL & WEINBERG LLP
    350 Marine Parkway, Suite 200
7   Redwood Shores, California  94065
    Telephone:      (650) 593-6300
8   Facsimile:      (650) 593-6301

9   Attorneys for Plaintiff
    LOOP AI LABS, INC.
10

11                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
12

13  LOOP AI LABS INC., a Delaware          Case No. 15-798-HSG-(DMR)
    corporation,
14                                         **SECOND AMENDED AND**
                    Plaintiff,             **SUPPLEMENTAL COMPLAINT FOR:**
15
    v.                                        **(1)  RACKETEER INFLUENCED AND**
16                                                  **CORRUPT ORGANIZATIONS ACT, 18**
    ANNA GATTI, an individual,                      **U.S.C. §§ 1962 *ET SEQ.*;**
17  ALMAVIVA S.p.A., an Italian
    corporation, ALMAWAVE S.r.l. an Italian      **(2)  COMPUTER FRAUD AND ABUSE**
18  corporation, ALMAWAVE USA, Inc., a                **ACT, 18 U.S.C. §§ 1030 *ET SEQ.* AND**
    California corporation, IQSYSTEM LLC, a            **UNAUTHORIZED ACCESS TO**
19  California limited liability company,             **COMPUTERS, CAL. PENAL CODE §§**
    IQSYSTEM, Inc., a Delaware corporation,           **502 *ET SEQ.*;**
20
                    Defendants.                    **(3)  FRAUD IN THE INDUCEMENT;**
21
                                                   **(4)  RESCISSION AND RESTITUTION;**
22
                                                   **(5)  FRAUD;**
23
                                                   **(6)  BREACH OF CONTRACT;**
24
                                                   **(7)  BREACH OF DUTY OF GOOD FAITH**
25                                                       **AND FAIR DEALING;**

26                                                 **(8)  THEFT OF CORPORATE**
                                                         **OPPORTUNITY;**
27

28

**(9)  INTENTIONAL INTERFERENCE
WITH PROSPECTIVE ECONOMIC
ADVANTAGE;**

**(10) TORTIOUS INTERFERENCE WITH
CONTRACT;**

**(11) MISAPPROPRIATION OF TRADE
SECRETS, CALIFORNIA CIVIL
CODE §§ 3426 *ET SEQ.*;**

**(12) CONVERSION;**

**(13) UNFAIR COMPETITION, BUS. &
PROF. CODE §§ 17200 *ET SEQ.*;**

**(14) UNJUST ENRICHMENT;**

**(15) TORTIOUS INTERFERENCE AND
AIDING AND ABETTING BREACH
OF FIDUCIARY DUTY;**

**(16) TORTIOUS INTERFERENCE;**

**(18) AIDING AND ABETTING BREACH
OF FIDUCIARY DUTY**


**JURY TRIAL REQUESTED**

Plaintiff Loop AI Labs Inc., formerly known as Soshoma, (the "Company"), with knowledge as to its own conduct and upon information and belief as to all others, complains against Anna Gatti ("Gatti"), Almaviva S.p.A, Almawave S.r.l., Almawave USA Inc. (together, "Almaviva" or "Almawave" or the "Almaviva Defendants"), IQSystem LLC and IQSystem, Inc. (together "IQS" or "IQSystem Defendants"), as well as against their as yet unnamed co-conspirators, as follows:

## I.    SUMMARY AND NATURE OF THE ACTION

1.   This is a case involving multiple acts of fraud and willful misappropriation of proprietary information and trade secrets committed by Gatti, IQS and the Almaviva Defendants, in furtherance of a scheme of racketeering activities directed at the Company.  The Defendants'

racketeering activities involve, among others, multiple acts of commercial bribery, the concealment of which Valeria Sandei, an officer of each of the three Almaviva Defendants, openly discussed with Anna Gatti in connection with the scope of her employment and the scheme alleged herein.  The bribery scheme alleged in this action follows the same *modus operandi* that the Almaviva Defendants knew Anna Gatti and the IQSystem Defendants, including through Tony Di Napoli and other co-conspirators, had previously used and continue to use with other companies, including with other start-ups and with at least one large multinational company where Tony Di Napoli has a high-level insider who assists him in carrying out his illegal activities.  The Defendants' scheme was implemented with the assistance of Attorney Peter Sternberg who participated in structuring multiple contracts that appeared valid on their face, but that instead he knew concealed multiple illegal transactions.  For instance, Attorney Sternberg assisted the Defendants in structuring a contract with the IQSystem Defendants in a way that concealed the illicit activities behind Almaviva's payments.  Through the cover of periodic transfer of money ($70,000 a month) to the IQSystem Defendants, Almaviva was able to keep individual illicit payments "off the books" of the new entity, namely Defendant Almawave USA Inc., and payments of which did not have to be formally "approved" by Almaviva S.p.A. and Almawave S.r.l. (the "Italian Almaviva Defendants").

2.   The Defendants' unlawful activities were committed in violation of various laws as well as contractual obligations.

3.   The Company, a startup founded in 2012, seeks to deploy its proprietary artificial intelligence ("AI") technology, which automatically learns about people and things by understanding the internet-based data related to them, by automatically converting unstructured big data and social data to structured data, which can then be used by companies in a wide variety of industries to understand their customers, products, and more without the need to hire data scientists.  The Company also has developed, among other things, a Digital Genome Platform that works automatically without human intervention to perform speech and text analytics, semantic understanding, data/text mining, information/feature discovery and sentiment analysis on any data set of big data or social data.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.   In this action, the Company seeks legal and equitable relief in respect of the injuries caused by the unlawful conduct of the Company's recently terminated employee, Defendant Gatti, the other Defendants and their co-conspirators, including Gatti's boyfriend Tony Di Napoli.  The Company discovered this wrongdoing only recently, after terminating Gatti as an officer and employee of the Company on February 3, 2015.

5.   Gatti was the Chief Executive Officer of the Company from mid-2012 until late 2014, when Gatti's position was changed to that of President.  When Gatti first joined the Company in 2012, she entered into various written agreements defining the terms of her employment with the Company.  Pursuant to her employment compensation package, Gatti received a large restricted stock grant, covering shares that, before she was terminated and the misconduct was discovered, represented approximately 30% of the Company's outstanding shares.  The employment agreements that Gatti entered into with the Company provided, among other things, that she was required to devote her full-time business efforts to the Company, that she could not engage in any other business activities without the Company's prior written consent, and that she was required to protect the confidentiality of the Company's proprietary information, technology and trade secrets.

6.   Gatti's principal assigned role with the Company was to assist it in its venture capital fund raising activities and securing business partnerships.  Gatti's performance in this role was an abject failure.  As a result of Gatti's failure to perform, the Company recently terminated her employment with the Company.  Gatti was also removed as a director of the Company shortly thereafter.

7.   At the time of Gatti's termination, the Company believed that her failure to perform her assigned duties was the result of her incompetence.  Following Gatti's termination, however, the Company discovered that while Gatti had indeed performed in an incompetent manner, she and the other Defendants (and their co-conspirators) also had engaged in a pattern of intentional wrongdoing designed to defraud the Company and enrich Gatti and the other Defendants at the expense of the Company.  That wrongdoing is more fully described below.

8.   After Gatti was fired, the Company discovered that she had provided materially

false information in applying for employment with the Company in 2012, including, but not limited to, submitting false information in her written application, which she certified to the Company be true and correct.

9.   Gatti *did not* engage in mere puffery while seeking employment with the Company.  The lies Gatti told when she applied for her job at the Company went far beyond improper-but-frequently-expected fibbing.  The Company has now learned, that a substantial, if not the entire picture that Gatti painted of herself in that job application process is false.  Her true credentials and capabilities were utterly different from those she presented.  There can be no doubt that, had Gatti told the truth, her request for employment with the Company would have been summarily rejected.

10. For instance, the Company has learned that during her employment application process, Gatti lied about her academic credentials, which she represented to have included both a PhD and a Post-Doctorate degree from Stanford University, as well as other academic credentials. In fact, Gatti never received these degrees from Stanford University.  Gatti also represented to have been a Visiting Professor at Stanford University, as well as at the University of California, Berkeley.  Gatti never has held such employment in these universities.

11. Gatti misrepresented her employment history by substantially exaggerating her prior compensation, by failing to disclose she had been fired by her previous employer and by misrepresenting the periods of time for which she had been employed, among other material falsehoods.  And Gatti falsely claimed to have skills and connections that would help the Company raise the venture capital funding and the business partnerships it required (and continues to require) when in fact (as demonstrated by her abject failure to obtain any such funding and business partnerships for the Company) she does not have those skills or connections.  In fact, Gatti carefully manufactured this and other information to deceive the Company and induce it to hire her and give her an extremely generous compensation package, which included stock that, before its rescission, represented 30% of the Company.

12. The Company was shocked to learn, in February 2015, of Gatti's lies and other dishonest conduct.  Before Gatti was hired, the Company checked the references she had

provided, which were uniformly positive.  Gatti had carefully cultivated, through deceit and other tactics, a network of supporters in the Northern California technology industry as well as in Italy. Through her deceitful behavior, often deployed through the use of her social networks and activities, Gatti has been able to insinuate herself at the highest level and obtain the support of highly established and reputable professionals, presumably unaware of Gatti's true history.

13. Following the filing of this lawsuit, and as more fully set forth in Declarations filed by Loop AI's witnesses in this action, the Company has learned that Gatti has used the same deceptive means to defraud certain individuals.

14. Throughout the course of her employment with the Company, Gatti wholly failed to perform her principal assigned task of obtaining venture capital funding for the Company and closing business partnerships.  This is *not* the case where an employee did her very best for the Company only to fail for reasons largely outside her control.  Instead, Gatti proved to be an utterly disloyal employee, who was spending her time defrauding the Company and enriching herself at the Company's expense.

15. As the Company has now learned, almost immediately after being hired by the Company into a full-time senior executive position, Gatti began violating the express terms of her employment agreement by seeking and taking on additional positions with other businesses, including competitors.

16. While still pretending to work in a full-time senior executive role for the Company, Gatti now admits that she effectively stopped doing any work for the Company in March 2013.  Instead, Gatti was providing "advisory" services for multiple competing start ups, including TheNeeds Inc.

17. As of March 2014, Gatti was actively negotiating with the Italian Almaviva Defendants to engage in the scheme alleged herein, and to become the CEO of an entity to be formed by the Italian Almaviva Defendants.

18. Beginning in June 2014, Gatti formally began *a concurrent CEO position with Defendant Almawave USA Inc.*, that she held at the same time that she continued to *be employed as the <u>full-time</u> CEO, and later as the <u>full-time</u> President, of the Company*.

19. While Gatti was unlawfully working for Almawave and TheNeeds, both of those companies were actually or potentially competing with the Company.  TheNeeds is a start-up, formed one year after the Company, that is seeking to develop commercial applications based on the same artificial intelligence, language understanding of big data and user profiling technologies as the Company.  Indeed, before retaining Gatti as a consultant, the Chief Executive Officer of TheNeeds questioned Gatti as to whether the consulting arrangement she had pushed TheNeeds to enter into with her would be proper because TheNeeds was a competitor of the Company.  Gatti responded with a lie – she assured TheNeeds' Chief Executive Officer by email that that there was no competitive problem.

20. Similarly, the Italian Almaviva Defendants sought to enter the U.S. market and establish a business in San Francisco that focused the use of artificial intelligence in a manner that is similar to the main thrust of the Company's technology.   Gatti's improper relationship with Almaviva began no later than January 2014 as a result of Gatti's negotiations with officers of the Italian Almaviva Defendants ("Almaviva IT").  Gatti undertook to assist Almaviva IT to implement its strategy of building a U.S. business focused on artificial intelligence and related technologies.  Pursuant to this arrangement, Gatti established Almawave USA in San Francisco on behalf of Almaviva IT, and domiciled the company and the Almaviva Defendants new start-up at her home residence, at 24 Clarendon Avenue in San Francisco, where she lived with Tony Di Napoli who works for her as a purported employee of the IQSystem Defendants.

21. The Almaviva Defendants knew of Gatti's position as the full-time CEO of the Company.  In order to quickly establish a presence in the U.S. AI technology market, the Almaviva Defendants intended, with Gatti's assistance from the inside, to buy the Company for a bargain price or to hire away the Company's key employees and thereby obtain access to the Company's proprietary technology.  A principal objective of the Almaviva Defendants in hiring Gatti was to exploit her knowledge of the Company and to gain access to the Company's proprietary technology and trade secrets.

22. Despite the fact that Almawave and TheNeeds both were actual or potential competitors of the Company, Gatti shared with both Almawave and TheNeeds (as well as with

the other Defendants), and used in the course of providing services to those companies, proprietary information and other property belonging to the Company.  In addition, Gatti repeatedly used the Company's time, property, IT system, work-space and other resources to conduct business on behalf of the Almaviva Defendants and TheNeeds.  Gatti also diverted to the Almaviva Defendants and TheNeeds information belonging to the Company regarding current and prospective investors, business opportunities, software engineers, advisors and a variety of other trade secrets and confidential information.  In doing so, Gatti and the other Defendants, in addition to committing multiple violations under federal and state law, also violated the express provisions of Gatti's employment agreement.

23. The various other positions that the Company recently discovered Gatti to have held while employed for the Company, began at the inception of her employment for the Company in 2012 and continued through her termination. Indeed, as of January 2015, while still employed by the Company, and notwithstanding the already numerous positions that Gatti already held, Gatti actively was negotiating for yet more business relationships, including most recently with a company called IControl Networks.

24. Gatti's employment agreement required her to devote her full-time and best business efforts to the Company and expressly prohibited her from engaging in any other business activities to the detriment of the Company and without the express prior written consent of the Company.  Aware that the Company would never consent to her working multiple jobs at the same time, including jobs involving actual and potential competitors of the Company, Gatti did not seek consent from the Company to her second and third jobs with TheNeeds and Almaviva, as she was required to do.  Nor did she ever seek consent for any of the other positions she held. Instead, Gatti deliberately concealed from the Company her unlawful activities.

25. Gatti and the other Defendants profited handsomely from this unlawful scheme perpetrated against the Company.  Gatti received a grant of a substantial block of stock in TheNeeds.  She received various lucrative benefits from the Almaviva Defendants, including the large cash payments of no less than $70,000 a month.  Gatti also received substantial compensation from other third parties for whom she performed various business services or

provided stolen information and trade secrets, in violation of her contractual and other obligations.

26. Gatti also concealed from the Company that she had set up the two IQS Defendants, as well as the Almawave USA Defendant.  Gatti created the IQS Defendants, also domiciled at her home residence, to funnel the money that she was receiving as compensation for her illegal activities.  That compensation amounted to hundreds of thousands of dollars, if not millions.  The Company is informed and believes that the Almaviva Defendants alone were paying Gatti more than $70,000 a month to participate in this unlawful scheme.  Similarly, the Company is informed and believes that Gatti, through the IQS Defendants, was receiving hundreds of thousands of dollars in other compensation obtained in furtherance of the scheme.

27. To conceal the large compensation that Gatti was receiving through the IQS Defendants, and potentially other entities as yet undiscovered, Gatti, aided by her longtime boyfriend and participant in this scheme, Tony Di Napoli, opened multiple bank accounts in both the East Coast and West Coast, as well as in Italy to make detection of the various unlawful payments as difficult as possible, and, presumably, to conceal the funds if she were caught. Gatti's correspondence reflects that she was even pondering the use of yet other entities to transfer money to her, through the IQS Defendants, in a way that made it look as if the money came from and belonged to her boyfriend's nephew, Gennaro Di Napoli, who was also Gatti's child's babysitter.  Gatti's and the other Defendants' conduct uncovered to date demonstrates the high level architecture and execution of this fraudulent, if not criminal, scheme perpetrated against the Company.

28. The scheme perpetrated by Gatti and her boyfriend Di Napoli and for which the Almaviva Defendants hired these individuals was a tried and true scheme that Gatti, Di Napoli and the IQSystem Defendants were also using with other companies to steal their confidential information and obtain business through the payment of commercial briberies.

29. Presumably aware that her fraudulent and duplicitous behavior in working for competitors, even as she was required to work full-time for the Company could not long evade detection, by February 2014, Gatti, with the assistance and participation of Almaviva and other

conspirators, was actively pursuing the take-the-money-and-run part of her scheme, which was designed to force a premature sale of the Company by sabotaging the Company's access to venture capital funding.

30. This scheme would have allowed Gatti to cash out and move on before being caught. If the Company could have been sold before the Defendants' wrongdoing was discovered, the vesting of Gatti's restricted stock would have accelerated and she would have been able to walk away with a potentially significant sum without compromising the massive cash flow that she was receiving from the Almaviva Defendants and other companies. If instead the Company discovered her duplicitous conduct before it was sold (as has turned out to be the case), Gatti faced the prospect of forfeiting everything and losing her carefully-cultivated reputation in the Northern California technology industry and in the Italian business community. The Almaviva Defendants would profit by being able to access the Company's assets and key employees for a substantially lesser value than they otherwise would have had to pay.

31. A principal component of Gatti's scheme to force a premature sale of the Company involved sabotaging the Company's access to funding, including venture capital. Thus, although Gatti had been singularly unsuccessful in obtaining venture capital funding for the Company, other Company employees proved much more adept, leading to several situations in which the Company was literally on the verge of obtaining funds. But in every one of those situations, Gatti managed to insinuate herself into the potential funding transaction and then prevent it from closing. Gatti then covered up her sabotage by claiming she had made a mistake, or that she had miscommunicated with the investment funds, or that the prospective funding source had disliked one of the other Company employees.

32. In one such instance, for example, after a venture capital fund agreed to provide the Company a substantial amount of funding, which included an immediate bridge amount to be paid in October 2014. In connection with this investment, the venture capital fund commented that "the Loop AI Labs team has built a new generation of AI that puts them a leap ahead." Indeed, the Company had been selected to participate in Beta Track at the Web Summit, and, the bridge funding was going to provide additional support the Company's efforts during that period.

33.   Gatti worked hard to destroy this opportunity and ensure that the funds would not come through.  Some of the wrongdoing in which Gatti engaged to destroy this transaction, included, but was not limited, to repeatedly lying to the Company about the need for the Company to refrain from accepting any other investor money pending this investment.  Gatti told her colleagues at the Company that the venture capital fund would not proceed if other parties invested at the same time.  In reliance on Gatti's misrepresentation of the fund's position, the Company turned down other investors that had asked to invest during that period of time.  Thereafter, the Company learned that the fund, without any reason, had decided not to go through with the funding.  When the Company had a call with the fund to clarify the situation, the Company was shocked to learn of Gatti's lies, which Gatti dismissed during the call as having been a misunderstanding between her and the fund.  As a result of Gatti's fraudulent conduct, she achieved her goal of mining company funding, because the Company lost both investments.

34.  This was just one of several investment transactions that Gatti intentionally destroyed to bring the Company into an immediate financial crisis and be left with no choice but to sell.

35.  The harm suffered by the Company as a result of the funding failures caused by Gatti is substantial. Gatti, acting in furtherance of her scheme with the other Defendants, caused the Company to lose millions of dollars that investors had already committed to providing.  The lack of funding caused by Gatti's scheme, has forced the Company to defer additional investments in its product development, thereby slowing its introduction and marketing of new products and making the Company more vulnerable to competitors.

36.  Gatti's misconduct did not stop after her termination.  After Gatti was terminated from the Company and removed from the Company's Board of Directors, Gatti continued to communicate with the Company's employees and its existing investors with the intent to cause further damage to the Company.  For example, in an email she sent to the Company's current shareholders dated February 13, 2015, Gatti falsely claimed that she had voluntarily stepped down from her executive position at the Company, and that she was appointed Chairman of the Company, which is defined as the most powerful member of the board of directors who provides

leadership to the firm's officers and executives. Gatti claimed that by writing in that impostor capacity she was advising the Company and its investors to remain focused on fundraising. These false and misleading communications have confused the Company's employees and investors, who had been informed that Gatti was terminated. Gatti's continuing wrongdoing has caused further harm to the Company by demoralizing employees and making investors reluctant to provide additional funding to the Company.

37. When the Company informed Gatti, following her termination, that it had uncovered serious wrongdoing by her and the other Defendants, Gatti proceeded to destroy materials belonging to the Company and to take other steps to impede the Company's investigation. This activity on Gatti's part has included retaining a computer expert to delete data on a laptop computer that is owned by the Company (and that she failed to return as she was contractually required) and deleting her calendar and other information from the Company's IT system.

38. Based on the foregoing, it is clear that Gatti's and the other Defendants' unlawful activities, including their use of the wires to engage in multiple acts of fraud against the Company, and their continued use and destruction of stolen Company property are expected to continue unless enjoined by a Court. If those unlawful activities are allowed to continue, they will cause substantial and irreparable harm to the Company.

39. To remedy the Defendants' egregious and unlawful conduct described herein the Company seeks equitable relief in the form of (i) permanent injunctive relief restraining the Defendants' unlawful acts, (ii) rescission of the restricted stock grant made by the Company to Gatti and (iii) disgorgement of all proceeds and other benefits obtained by the Defendants from their unlawful activity. The Company also seeks damages against the Defendants, jointly and severally amongst themselves and with their co-conspirators, such damages to be trebled pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act and any other applicable law or provision, as well as recovery of all costs and expenses incurred in this action.

## II.    THE PARTIES

40. Plaintiff Loop AI Labs Inc. is a Delaware corporation with its principal place of

business located in San Francisco, California.

41. Upon information and belief, Defendant Anna Gatti ("Gatti") is an individual residing at 24 Clarendon Avenue, in San Francisco.

42. Upon information and belief, Defendant IQSystem LLC is a limited liability company established under the laws of the State of California on January 21, 2014, which trhough the filing of the Amended Complaint in this action was domiciled at one of Gatti's personal residences in San Francisco.  Defendant Gatti is the sole member of IQSystem LLC.  Gatti created IQSystem LLC (and IQSystem Inc. below) to receive payments resulting from her wrongdoing committed against the Company.  The Company is informed and believes that during the time period relevant herein, through the IQS Defendants, Gatti received hundreds of thousands of dollars from the Defendants and other parties, in exchange for Gatti's provision of illegal property and services, including the theft of Loop AI's tangible and intangible properties. As a result of the large profits that Gatti was unlawfully making at the expense of the Company, Gatti was able to afford a very luxurious lifestyle, which just in the few months before this action was commenced, included such expenses as making an offer via IQS to buy a luxury condo at the Ritz Carlton costing more than $1.5 million, buying a Maserati for herself and a Porsche for her boyfriend, Tony, going on luxury vacations, and booking very expensive business class tickets to Europe for her and her boyfriend.

43. Upon information and belief, Defendant IQSystem Inc. is a Delaware Corporation that Gatti caused to be created for the same purposes described above in respect of IQSystem LLC.  Gatti used her 26-year old babysitter, Gennaro Di Napoli, who is also her boyfriend's nephew and who lives in Italy, as a front for this company, claiming that he is the Chief Executive Officer the entity.  The two IQSystem Defendants were created in Delaware and California to make detection and discovery of Gatti and the other Defendants' wrongdoing more difficult and to attempt to limit Gatti's personal liability, as Gatti explained to a witness.  For similar purposes, Gatti caused multiple bank accounts to be opened in the name of various Defendants as well as other individuals and entities, in order to safeguard her loot in the event she would be caught. (IQSystem LLC and IQSystem Inc. together referred to as "IQS").

1

2       44. The IQSystem Defendants have identified One Embarcadero Center, Suite 500,

3   San Francisco, California as their principal place of business, which they established in June 2014

4   and from which they continued to operate through the commencement of this action.

5       45. Defendant Almaviva S.p.A. ("Almaviva IT") is an Italian company with its

6   principal place of business in Rome, Italy.  Almaviva IT holds itself out as a top Italian

7   information and technology company, with international operations throughout the world and

8   with offices in around the world including, as advertised on their website until recently, at One

9   Embarcadero Center, Suite 500, San Francisco California 91111, Telephone No. 415-857-3601.[1]

10  Almaviva S.p.A. owns, controls, and manages all aspects of its subsidiaries, including the other

11  two Almaviva Defendants in this action.  Almaviva IT and the other Almaviva Defendants

12  operate as an integrated enterprise with centralized control of labor relations, interrelation of

13  operations, common management, common ownership and financial control.  Almaviva's

14  executives and board members participated, directed, financed, approved and substantially

15  benefited from every aspect of the scheme and conspiracy orchestrated by Gatti against the

16  Company in San Francisco.  Almaviva IT sent their highest-level executives repeatedly to San

17  Francisco to oversee Gatti's unlawful activities against the Company, and in addition to their in

18  person conduct in San Francisco and other parts of the United States, it continuously used the

19  wires (both telephone and email) to carry out the conspiracy with Ms. Gatti and her boyfriend,

20  Tony Di Napoli, against the Company in San Francisco.

21      46. Defendant Almawave S.r.l. ("Almawave IT") is an Italian company with its

22  principal place of business in Rome, Italy.  Almawave IT holds itself out as doing business all

23  over the world, including in the United States directly or through the company created by Gatti.

24  The highest-level executives of Almaviva IT, including Marco Tripi ("Tripi") and his wife

25  Valeria Sandei ("Sandei"), who were the main participants and the ones who authorized and

26  financed the wrongful scheme against the Company, are key executives in both Almawave IT,

27  and its parent company Almaviva IT.  The evidence shows that Marco Tripi, the top executive at

28

---

[1] After the filing of this action, Almaviva IT deleted from its website all evidence of its San Francisco office, presumably in its attempt to claim that this Court's lacks jurisdiction.

Almaviva, was personally involved and directly in touch with Anna Gatti and was overseeing all aspects of her conduct in the United States, which conduct Loop AI alleges to have been in violations of various contractual duties and other laws.  As already alleged above, Almawave IT and the other Almaviva Defendants operate as an integrated enterprise with centralized control of labor relations, interrelation of operations, common management, common ownership and financial control.  Almaviva's executives personally participated, directed, financed, approved and substantially benefited from every aspect of the scheme and conspiracy orchestrated by Gatti against the Company in San Francisco.  Almawave IT sent their highest-level executives repeatedly to San Francisco to oversee Gatti's unlawful activities against the Company, and in addition to their in person conduct in San Francisco and other parts of the United States, it continuously used the wires (both telephone and email) to carry out the conspiracy with Ms. Gatti and her boyfriend, Tony Di Napoli, against the Company in San Francisco.

47. Defendant Almawave USA Inc. is a California corporation that Gatti caused to be incorporated in May 2014, with its principal place of business listed at Gatti's residence at 24 Clarendon Avenue, San Francisco California.  Almawave USA is part of the same integrated enterprise comprised of Almaviva IT and Almawave IT and other entities, which hold themselves out as the Almaviva Group.  Almawave USA is directly managed, controlled and funded by Almaviva IT and Almawave IT, with which it has interrelated operations, centralized control of employment relations, common management, common ownership and common financial control, among other things.  Almawave USA was simply a shell corporation used as a front for the Almaviva and the other Defendants to carry out their illegal activities, behind the cover of a legitimate enterprise.  Following the filing of this action, nothing remains of Almawave USA other than in name.  Today, Almawave USA is simply an empty shell that has no employees and no real business in the United States, its sole activities seemingly being the numerous legal activities and court filigns that the Italian Almaviva Defendants make through the fiction of using the Almawave USA entity.

### III.    OTHER CO-CONSPIRATORS

48.  Antonio or Tony Di Napoli ("Di Napoli"), an individual residing in San Francisco

at 24 Clarendon Avenue with Gatti, actively participated in the conspiracy by aiding and abetting Gatti, IQS and the Almaviva Defendants in misappropriating the Company's tangible and intangible assets and properties, and in concealing from the Company the Defendants' wrongdoing.

49. Manuela Micoli ("Micoli"), an individual residing in San Francisco, also actively participated in the conspiracy and assisted Gatti, Di Napoli and the other Defendants in perpetrating the wrongdoing against the Company, and keeping said wrongdoing concealed from the Company. Among other things, Micoli and Di Napoli, took steps in furtherance of the racketeering scheme being perpetrated against the Company, by intentionally obtaining access to the Company's office through the use of false pretenses and deception.

50. On information and belief, and based upon the company's current investigation other individuals, including Peter Huang ("Huang"), actively assisted Gatti and the other Defendants in the same manner as described in respect of Di Napoli and Micoli. These individuals were hired by Gatti to help her and the other Defendants steal from the Company. Among other things, Gatti gave Huang access to the Company's electronic accounting system, and falsely represented to the Company's bank in San Francisco that Huang was permitted obtain access to the Company's bank.

51. Upon information and belief, Dario Vignudelli is an individual residing in Seattle, Washington. Dario Vignudelli ("DV") is a former consultant of the Company and while employed by the Company, DV aided and abetted Gatti and the other Defendants in her wrongdoing, including by taking the Company's confidential information and trade secrets and using it for the Almaviva Defendants. DV continues to aid and abet the Defendants by, among others, furthering their wrongful conduct and submitting sworn declarations regarding his activities with the Defendants, which contain numerous false statements.

52. On information and belief, The Needs and its Chief Executive officer, Gabriele Pansa, both domiciled in San Francisco, conspired with Gatti and the other Defendants to engage and facilitate the wrongdoing described herein.

53. Jeffrey Capaccio ("Capaccio"), an attorney residing in California is a participant in

the conduct alleged herein regarding the Defendants and the Almaviva relationship from the inception in February 2014.  Jeffrey Capaccio worked with the IQSystem Defendants, Anna Gatti and Tony Di Napoli as a team to carry out the scheme as already described in various filings with this Court and as more fully described below.

54. Peter R. Sternberg, an attorney residing in New York and Russell Reynolds Associates Inc., an entity also based in New York, also participated in the scheme alleged against the Defendants in this action and personally engaged in substantial wrongdoing against the Company, including, but not limited to, by aiding and abetting Gatti and the other Defendants and providing them substantial assistance in implementing material aspects of the wrongdoing alleged herein.  These persons' participation in the wrongdoing was recently discovered and will be more fully described in the actions that the Company is in the process of bringing against these persons before a forum that has personal jurisdiction over them.

55. The Company's investigation is ongoing and additional individuals and entities who are co-conspirators with the Defendants or who aided and abetted the Defendants in the conduct described herein will be further identified in discovery or in court proceedings.

## IV.    JURISDICTION

56.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, based on Plaintiff's claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1964 *et seq*. and the Computer Fraud and Abuse Act, 18 U.S.C.§§ 1030 *et seq.*.

57. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), because all remaining claims are so related to the claims in the action within this Court's original jurisdiction that they form part of the same controversy and because the matter in controversy exceeds $75,000 exclusive of interests and costs.

58. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because  a substantial part of the acts or omissions giving rise to Plaintiff's claims alleged in this Complaint occurred in this district.

59. This Court has personal jurisdiction over all Defendants because, among others, through the time this action was commenced they are domiciled in San Francisco at Gatti's home

residences and at One Embarcadero Center, Suite 500, San Francisco, California.  Specifically, the official incorporation filings of IQSystem LLC and Almawave USA listed as their official address Defendant Gatti's San Francisco's home residence.  Defendants Almaviva IT, Almawave IT advertised at all relevant times thereto having an office in San Francisco at One Embarcadero Center, Suite 500.  IQSystem Inc. has also identified the same address as its office in San Francisco.  Pursuant to the recent pronouncement of the Ninth Circuit,[2] this Court's personal jurisdiction over Defendant Almawave USA is imputed to the Italian Almaviva Defendants as a result of the Italian Almaviva Defendants pervasive and extensive parental control of Almawave USA's internal affairs and of its daily operations.  Almawave USA is not and never was at all times relevant hereto a "really separate entity."

60. The Italian Almaviva Defendants and Almawave USA operated, and repeatedly admitted to have operated, as a single, unified entity and enterprise.

61. The Italian Almaviva defendants reasonably foresaw being subjected to suit in California and the United States as a result of its activities in California through Almawave USA and for that purpose, in 2014 Almaviva S.p.A. procured very broad insurance coverage specifically covering the Almaviva enterprise's activities in the United States directly and through Almawave USA, including coverage for any criminal wrongdoing in the United States.  The 2014 insurance coverage purchased by Almaviva S.p.A. has and is being used by all three Almaviva Defendants to cover the defense costs in this litigation for each of the three Almaviva entities and for Gatti.

62. In actuality, the Italian Almaviva Defendants are not really separate from their domestic affiliate, Defendant Almawave USA.   As evidence by the extensive activities already identified to the Court, the Italian Almaviva Defendants controlled Defendant Almawave USA to such a degree as to render Almawave USA the mere instrumentality of the Italian Almaviva Defendants.  The Italian Almaviva Defendants dictated every facet of Defendant Almawave USA operation — from broad policy to routine matters of day-to-day operation.  Indeed, Gatti described the Italian Almaviva Defendants control over Almawave USA as consisting of their

---

[2] *See Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. July 16, 2015).

"micromanagement Roman style" over every aspect of Almawave USA.  For instance, event though Gatti was appointed CEO of Almawave USA, she described her role in writing as being like that of an administrative "secretary" for the Italian Almaviva Defendants, being directed on a daily basis by the Italian Almaviva Defendants about the most routine operational day-to-day tasks, including for instance, "making hotel booking," "drafting emails in English," "preparing business cards," "buying a telephone card for the US," "booking restaurants for dinners," "ordering USB drives," etc.

63. This Court also has personal jurisdiction over all Defendants because each, directly and through their employees and agents, engaged in and directed a substantial part of their wrongdoing to the Company in San Francisco, and engaged in other activities that give rise to the claims at issue in this action in San Francisco, as well as other parts of California and the United States.

64. Jurisdiction over the Almaviva IT and Almawave IT is also appropriate under the California Long Arm Statute, as well as the Federal Long Arm Statute, Fed. R. Civ. P. 4(k)(2), and the RICO statute, 28 U.S.C. 1965, and because these Defendants' contacts with California and the United States are sufficient to satisfy constitutional due process.

65. Each of the Almaviva Defendants, at all times relevant to this action, also have maintained systematic and continuous contacts with California and with the United States while engaging in the acts described in this complaint.

66. Almaviva IT and Almawave IT general and specific contacts with California and the United States are extensive, continuous and systematic.  These contacts have been so pervasive that these Defendants are essentially at home in California, including by way of their operation of Almawave USA as a single unified enterprise with them.  Among other things, the Italian Almaviva Defendants left Almawave USA undercapitalized and provided it only the funding necessary to implement their decisions and conduct that they each time approved and incurred through Almawave USA.  The Italian Almaviva Defendants are so well established in California that they were able to command the use of the facilities of the Italian Consulate in San Francisco (a virtually impossible endeavor for most companies), to host a commercial

presentation being run by Valeria Sandei and Anna Gatti on behalf of Almaviva IT and Almawave IT, and announcing the launch of Almawave USA.  During the course of this event, as well as numerous other events that the Almaviva Defendants held in California, the Almaviva Defendants invited dozens of representatives of businesses located in Northern California and in Silicon Valley, including businesses whose contact information were misappropriated from the Company, through Gatti.

67. In addition,  Almaviva IT and Almawave IT also have had continuous and systematic general contacts with many United States companies, including with Oracle, Google, TIBCO Software, VMware, WSO2, and Cisco, all of which are headquartered in Northern California.

68. Almaviva IT also engaged in systematic and continues activities with the United States, by soliciting and obtaining substantial funds from General Electric Capital Corporation ("GE Capital"), a corporation with offices throughout the United States.  GE Capital owns a 35% stake of Almaviva IT and the Almaviva Group.

69. In addition, this Court has personal jurisdiction over Almaviva IT and Almawave S.r.l. as a result of their specific contacts with California and the United States, which give rise to and are related to this action, and which are part and parcel of the pattern of wrongful and tortious activities directed to the Company in San Francisco.  For instance, these contacts include, but are not limited to, the following activities by Almaviva IT and Almawave IT.

70. Their top-level officers participated, directed, controlled, approved and financed the activities that Loop AI alleges gave rise to the wrongdoing committed against the Company in San Francisco by Gatti and the IQS Defendants and their co-conspirators, who were acting as the Almaviva Defendants employees and agents, and within the scope of their employment for the Almaviva Defendants, while committing the wrongdoing against the Company.  To the extent any of the wrongful activities undertaken by Gatti, Almawave USA, the IQSystem Defendants and any of their co-conspirators against the Company were not controlled by the Almaviva

Defendants, the Almaviva Defendants acquiesced to, were or should have been aware, and were willfully blind to the wrongdoing.

71. Specifically, Valeria Sandei, acting in her capacity as an officer of Almaviva IT and Almawave IT, solicited and began to engage with Defendant Gatti and the IQSystem Defendants to commit the wrongdoing alleged herein.  Gatti admitted having told Almaviva IT and Almawave IT that she needed the permission of the Company to engage with any of the Almaviva Defendants.

72. Almaviva IT and Almawave IT, through their high-ranking officers, employees and agents, had no less than 100 meetings, calls, presentations and other events with Gatti and the IQSystem Defendants throughout the year of 2014 and through the filing of this action, including calls and meetings with her in San Francisco and other parts of California.  By way of example, some of the specific contacts demonstrating Almaviva IT and Almawave IT's  direct participation in the wrongdoing described in the Complaint and their activities towards the forum, include:

- Beginning in March 2014, the Board of Directors of Almaviva IT met and deliberated to consider, approve, and fund the activities alleged herein, involving the Almaviva Defendants' retention of Gatti and the IQSystem Defendants;

- Beginning as early as March 2014, if not earlier, Almaviva IT's top legal officers, Mariantonietta Perri and Antonio Dibitonto, directly negotiated with Gatti and the IQSystem Defendants, in San Francisco the financial and other terms pursuant to which the Defendants would jointly carry out the wrongful activities against the Company;

- Sabrina Nobili, Head of Corporate Affairs at Almaviva IT directly engaged with Gatti and the IQSystem Defendants in conduct, discussions and negotiations to further the activities alleged herein;

- Raniero Romagnoli, Head of Technology Labs for Almawave IT, repeatedly and

systematically directed, participated and controlled on behalf of Almawave IT the

wrongful activities alleged herein, through numerous in communications being held

with Gatti and the IQSystem Defendants through the wires (including email and

telephone), through the mail, and in person;

- Valeria Sandei, top level officer of all of the Almaviva Defendants, repeatedly and

  systematically directed, participated and controlled on behalf of all three of the

  Almaviva Defendants, the wrongful activities alleged herein being perpetrated against

  the Company, including through more than 100 wire, mail and in person

  communications during 2014 alone;

- Upon commencing their relationship with Gatti, Almaviva IT touted on its website the

  fact that Gatti was concurrently CEO of the Company in San Francisco, as well as the

  new CEO of their newly launched subsidiary Almawave USA.  Specifically in the bio

  published, they state as follows: "**Anna Gatti - Chief Executive Officer of**

  **Almawave USA** Lives in San Francisco, ***where she is co-founder and CEO of a***

  ***start-up using artificial intelligence applied to big data***. []."  (Emphasis added).

- Top-level management of Almaviva IT are also officers of Almawave USA. Almaviva

  Defendants' website shows that the same management is in charge and controls the

  companies relevant here.  For instance Valeria Sandei, who was intimately involved in

  and participated in the wrongdoing described in the Complaint is the Chief Executive

  Officer of Almawave IT, the President of Almawave USA, and the Chief of Strategic

  Marketing of Almaviva IT.

- The CFO of Almaviva IT, Christian De Felice, was communicating from Italy to San

  Francisco in furtherance of the wrongdoing described in the complaint.  The CFO was

  the one overseeing the financial affairs of Almawave USA's business and its financing

  from Italy. Almaviva IT was also funding Almawave USA with a "$100K/month," of

which "$70K" a month went to Gatti, through the IQSystem Defendants, and $30 thousand went to Almawave USA.  In addition, Almaviva IT funded a $120 thousand payment directly to Anna Gatti.

- Some time in 2014, Almaviva IT hosted a very large function at the Italian Consulate in San Francisco to officially announce the launch of Almawave USA.

- Almawave IT retained, through Gatti, Orrick Herrington & Sutcliffe LLP ("Orrick") in California, to represent the Almaviva Defendants in connection with transactions that are at issue in this action;

- Almaviva IT, through its top level officer Angela Nicolella, responsible for Treasury and Financial Planning at Almaviva IT and the other Almaviva Defendants, repeatedly was in touch with the other Defendants in this case in furtherance of the activities alleged herein, including the funding of Defendant Gatti and the IQSystem Defendants;

- Following the Almaviva Defendants' retention of Gatti, and while she continued to work for the Company, Almaviva IT and Almawave S.r.l. applied for the first time for a US Patent which covers the same field of technology of the Company.  In this patent application, Valeria Sandei, who has no technology background and never previously applied for a US patent is listed as the first named inventor of a purported invention that uses an AI semantic engine and purports to use supervised and unsupervised AI approaches, which the Almaviva Defendants are not known to have, and which instead are key aspects of the technology developed by the Company.

73.  The specific contacts by Almaviva IT and Almawave IT with this forum and relevant to this action are numerous and systematic, and fully subject these defendants to personal specific and general jurisdiction in this forum, including by virtue of the actions of Almawave USA.

74. As already forth above, Almawave USA is the alter ego of Almaviva IT and

Almawave IT because it has such unity of interest and ownership that their separate corporate personality should be disregarded and Almawave USA's contacts should be imputed to the Italian Almaviva Defendants.  First, Almawave USA has overlapping directors and officers with Almaviva IT and Almawave IT.  These two defendants regularly, systematically and repeatedly sent their high level executives and officers to San Francisco, or directed them to communicate with San Francisco, to oversee, direct and control the activities of Almawave USA.  For example, Valeria Sandei, who is a top officer at Almaviva IT (Chief Marketing Officer) and Almawave IT (Chief Executive Officer) directly control and oversaw the activities of Almawave USA of which she is the President and Chairman.

75. Almawave USA admits that it was established for the benefit of Almawave IT and that it is funded by Almaviva IT.  Almawave USA was left undercapitalized by the Italian Almaviva Defendants and it would be unfair and unjust to allow the Italian Almaviva Defendants to escape liability in this case by virtue of their use of a front company that was being used by them as an instrumentality for their wrongdoing.

76. Under this and other facts as will be more fully set forth at trial, Almawave USA is considered the alter ego of the other Almaviva Defendants, and an instrument through which the Defendants engaged in the conduct resulting in the wrongful activities alleged herein.

## V. GENERAL ALLEGATIONS COMMON TO ALL COUNTS

**A.     The Company Entered Into The Stock Purchase Agreement In Reliance Upon Gatti's Materially False And Misleading Representations.**

77. Gatti induced the Company to hire her and execute the Stock Purchase Agreement dated August 3, 2012 ("SPA") by intentionally providing the Company's founder materially false information, including about her academic, work, and other credentials.

78. In January 2012, the Company's founder traveled to the United States to hold meetings relating to the launch of the Company.  At that time, the founder, agreed to meet with Gatti because he was seeking someone who could work for the Company in obtaining venture capital funding, find business partnerships and manage the operations.

79. Gatti expressed strong and insistent interest in becoming part of the soon to be formed company.  In order to persuade the Company's founder to consider her, Gatti claimed that

she had extensive academic credentials and significant experience in the field, as well as an extensive network of funding and other business sources in San Francisco and Silicon Valley, and that she would be able to bring funding and business partnerships to the Company.  Gatti claimed that she would be able to bring the funding that the Company would need from her sources. During these meetings and communications, which continued from January 2012 for several months, Gatti repeatedly maintained her story about her background, abilities, and connections in order to persuade the Company's founder to agree that the Company should hire her and join his team in the Company.

80. Having convinced the Company's founder that she had the right credentials and was the right fit for the Company, Gatti proceeded to lie about her then current work.  Gatti claimed that she was a high-level executive at Skype Inc., from which she was receiving cash compensation of $450,000 a year plus stock options.  Gatti claimed that she could not leave such lucrative position to join the start-up Company, unless the Company agreed to give her a compensation package that included a substantial share of the company, in exchange for which she would agreed to a lower than she was allegedly receiving from Skype Inc.

81. Gatti also directed the founder to verify her background and credentials directly by reference to materials available in the public domain, including interviews by highly reputable Italian newspapers and a resume that she submitted under penalty of perjury for filing with the Italian Bourse, as well other materials and interviews that she had given to Italian newspapers.

82. Gatti claimed that she was an independent director in an Italian public company but that that role was ending.  Gatti also claimed that in exchange for the large share of the Company that she demanded (which, when fully vested would have amounted to approximately 30% of the Company) to purportedly leave her job at Skype, and wind down her director position with Italian company Buongiorno, she would focus one hundred percent of her time and effort on the Company, as she subsequently contractually agreed to do.

83. Gatti also claimed that in order for her to carry out her role of bringing funding and business opportunities to the Company, she needed to have the title of Chief Executive Officer.

84. The Company is now informed and believes that Gatti's representations made to induce the Company to hire her, give her a large percentage of shares in the Company, as well as a key executive position, were false.  Gatti made these fraudulent representations to induce the Company to give her that which Gatti could never have received had the Company known the truth.

85. In fact, Gatti had been fired by Skype and that as of April 2012, Gatti was unemployed and was desperately looking for any other employment she could find.  Contrary to Gatti's material misrepresentations to the Company, Gatti was not leaving her employment at Skype to join the Company and was not earning the high compensation she represented to the Company she would have to forego.

86. Gatti's representations regarding virtually the entirety of her past academic, personal, and employment life were a fiction made up by Gatti to defraud the Company.

87. In reliance on Gatti's representations the Company agreed to give her a very expensive compensation package, including by agreeing to give her almost 30% of the Company, to make up for the alleged cut in her cash compensation that Gatti falsely represented she would have had to take.

88. Gatti used these and other materially false representations to defraud the Company and induce it to hire her and enter into the Stock Purchase Agreement.

89. By this conduct, Gatti was able to fraudulently obtain shares in the Company that she would not otherwise have obtained, thereby damaging the Company.

**B.      Gatti's Contractual Obligations To The Company.**

90. The Company's award to Gatti of restricted shares in the Company was made pursuant the SPA.  The award of shares to Gatti was inextricably intertwined and conditioned upon Gatti's employment obligations to the Company.  These agreements were all prepared by the law firm Orrick Herrington & Sutcliffe LLP ("Orrick"), which began representing the Company in April 2012.  Specifically, the vesting of any shares awarded Gatti under the SPA was conditioned on her "Continued Service Status" with the Company and provided a 1-year cliff before any vesting would begin.  After the first year, any additional vesting of shares in the

Company continued to be conditioned on Gatti's Continued Service Status.  The SPA provides that in the event of a voluntary or involuntary termination of Gatti's Continuous Service Status, the Company was entitled to repurchase 100% of the shares that had not yet vested in accordance with SPA's vesting provisions.

91. Gatti's employment obligations with the Company were memorialized in an Offer Letter (the "Executed OL") and in a Confidential Information and Invention Assignment Agreement (the "CIIAA"), both of which were executed by Gatti on October 3, 2012 (the Executed OL and the CIIAA together referred to as the "Employment Agreement").

92. Under the terms of Gatti's Employment Agreement, Gatti agreed among other things, to the following contractual provisions:

- "**Position.**  You will start in a full-time position as Chief Executive Officer…. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligation that would prohibit you from performing your duties with the Company."  Executed OL at § 1.

- "**Outside Activities.**  While you render services to the Company, ***you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company.***  In addition, while you render services to the Company, ***you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company***."  *Id.* at § 7 (emphasis added)

93.  In the CIIAA, Gatti further agreed that as "a condition of [her] becoming employed (or [her] employment being continued) by" the Company, she would be bound by the following obligations relevant to this action:

- "**Relationship**. [] Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship." CIIAA at § 1.

- "**Duties**.  [] During the Relationship, ***I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.*** *Id.* at § 2.

94. Gatti also agreed under the CIIA to extensive confidentiality provisions which covered, but were not limited to, the Company's:

"technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, process, formulas, techniques … engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally or by observation." *Id.* at § 3(b).

95. Gatti's confidentiality obligations continued following termination of her employment.

96. Gatti further agreed to act in the best interest of the Company at all times during the Relationship, including, but not limiting, by agreeing to comply with the following obligations:

- **"8.  Solicitation of Employees, Consultants and Other Parties.**  As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company.  I further agree as follows:

    a.  **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

    b.  **Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.  In addition, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship.  I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. Thereafter, the Company

intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

*Id.* at § 8(a)-(b).

97. Gatti also agreed to be bound by an extensive "No Conflicts" provision, which

provided, in relevant part:

- **"No Conflicts.** [] I acknowledge and agree that I have listed on Exhibit A all agreements … if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

*Id.* at § 10(b).

**C.    Unlawful Activities By Gatti And The Other Defendants And Their Co-Conspirators.**

98. Gatti's vesting of any shares under the SPA was conditioned on her continued employment in compliance with the terms of her agreements.  Under the SPA, had Gatti left or been terminated during the first year of employment, Gatti would not have vested a single share in the Company due to the SPA's 1-year cliff before vesting began.  Thereafter, Gatti's shares were to continue to vest based on her continued employment with the Company for a period of 4 years.

99.  In furtherance of her scheme, from as early as October 2012, Gatti proceeded to engage in, and conceal, the numerous activities she was undertaking in violation of her contractual and other obligations to the Company.  Since at least January 2014, the other Defendants participated and furthered Gatti's scheme against the Company.

100.     Gatti was able to avoid detection for as long as she did because of her role in the Company as CEO and later President in the Company.  Gatti's title and her assigned role of seeking out venture capital funding for the Company inevitably gave her a great deal of flexibility and made it difficult for the other members of the Company's management and Board to effectively oversee her activity on behalf of the Company.  Gatti was expected to network within the venture capital community and the Northern California technology world, with a view to

building awareness of the Company and of the value of its proprietary technology, to gather market intelligence that would be useful to the Company, and to find and close financing from investors.  As a result, her extended absences from the Company's offices, and her regular appointments with people not directly associated with the Company, raised no suspicions because the appearances were consistent with the Company's expectations with respect to her assigned role.  In addition, Gatti is a professional and convincing liar, and was able to perpetrate this fraud through her masterful use of cover-ups and misrepresentations.  Thus, the Company had no basis to question her activities or motives, and she repeatedly cultivated the Companies' employees and their families to perpetrate her deception and ensure they would have no reason to question her. In fact, when Gatti used the Company's premises and other resources to conduct business on behalf of the Company's competitors, she accomplished a double deception -- she improperly concealed the true nature of her disloyal and improper conduct, while at the same time knowingly creating the false impression that she was hard at work on the Company's behalf.

101.    It was Gatti's conduct just before and during the meeting in which she was terminated that caused the Company to begin an investigation.  The Company was utterly shocked to discover evidence of such extensive and egregious, if not criminal, wrongdoing by Gatti and the other Defendants.

102.    For instance, as of October 2012, Gatti had already undertaken consulting positions with at least three separate companies, and was constantly in the process of seeking additional consulting gigs for herself, while she was contractually required to work full time for the Company or else face termination.

103.    With the passage of time, Gatti continued to unlawfully use the Company's confidential information and contacts, including contacts with investors that the Company was approaching to obtain venture capital funding, and potential business partners to seek opportunities for herself.

104.    Although the extent of the Defendants' wrongdoing discovered to date is too extensive to detail in full in this Complaint, below are descriptions of some of the wrongful activities that are part and parcel of the Defendants' scheme to defraud the Company.

1

### 1.     TheNeeds.

2      105.        At the end of August 2013, the Company pitched to Investment Fund 1.

3  Within less than 10 days, Gatti improperly used the Company's contact at Investment Fund 1 to

4  advance her own agenda, and seek to profit from the Company's confidential information and

5  trade secrets.  Specifically, Gatti used Investment Fund 1 to gain an introduction to Gabriele

6  Pansa ("Pansa"), the CEO of TheNeeds, to discuss becoming involved with TheNeeds.

7      106.        At that time, TheNeeds, was a brand new start-up formed in 2013, that

8  sought to begin operating in a virtually identical technology space as the Company, by seeking to

9  use some level of artificial intelligence to transform unstructured social data to structured one in

10  order to provide personalized services in a particular internet arena.

11      107.        TheNeeds presented a perfect opportunity for Gatti to begin cashing in on

12  the back of the Company's work.  Gatti had access to critical confidential business and technical

13  information that would have been invaluable to a company like TheNeeds that sought to enter the

14  same space and that also sought to access the same investors.

15      108.        On October 21, 2013, at Gatti's invitation, Pansa came to the Company's

16  offices in San Francisco to meet with Gatti.  During the course of this meeting, Pansa, on

17  information and belief, discussed with Gatti the issue of her collaboration with TheNeeds while

18  he perceived TheNeeds and the Company to be competitors.

19      109.        In response to this "competitive" concern, in an email dated October 28,

20  2013, Gatti wrote to Pansa as follows:

21          "Here [is] where I think we are:
           - *we are not competitors but we are complementary*
22          - I can see how I can help you: from pitch deck content and format, to pitch rehearsal,
           to introductions to potential investors, to brainstorming on strategy = *this is equal to a*
23          *hands-on advisor commitment*
           - *I don't think it is beneficial for you to list yet another Italian advisor in your deck*.
24          I do think it is beneficial for you to have someone who can help you in getting ready
           to pitch
25          - if you think that having an hands-on advisor *not listed in your deck* would be useful
           to you, we can discuss terms and conditions of the engagement.
26

27  (emphasis added).

28      110.        In the following days, Gatti continued to negotiate with Pansa for a role

and a stake in TheNeeds in exchange for her unlawful delivery of highly confidential information, trade secrets, opportunities and services belonging to the Company.  Pansa and TheNeeds knew that their conduct with Gatti was unlawful, and that Gatti was not permitted to divert to TheNeeds the valuable confidential information, opportunities and services that belonged to the Company.

111.    Within a short period after this meeting, Gatti obtained a consulting agreement from TheNeeds with a compensation offer that provided the award to Gatti of shares equivalent to 10% of TheNeeds.

112.    Since Gatti began her secret and unlawful engagement with TheNeeds, TheNeeds suddenly began to adopt technology, marketing materials, strategies and terminology that, at least as advertised to the public, appear to be virtually identical to those that were being confidentially discussed and used by the Company.  For instance, TheNeeds recent evolution towards the concept of digital DNA of a person happened after Gatti began her engagement with TheNeeds and the Company's patent application was not yet public.  By way of another example, another business strategy involving third parties that the Company was discussing internally before its launch, was thereafter adopted by TheNeeds, as announced by its CEO in an interview.  TheNeeds evolution, at least on the surface, in a direction that is so similar to that of the Company, while the Company's CEO is secretly working with them, cannot be coincidental.

**2.    The Almaviva Defendants.**

113.    Another opportunity for Gatti to profit from the Company's valuable confidential information, trade secrets and other assets, came in the form of the Almaviva Defendants.

114.    The Almaviva Defendants operate a technology company in Italy and in other parts of the world.  The Almaviva Defendants sought to enter the San Francisco and Silicon Valley space with a company that focused on the use of artificial intelligence for speech analytics, semantic understanding, data/text, information discovery and sentiment analysis on big data and social data.  The Almaviva Defendants new proposed venture in Silicon Valley was in the same space as the Company.  As CEO of the Company, Gatti could never have been legitimately involved with the Almaviva Defendants, while also being the CEO of the Company and while

having ongoing access to the Company's trade secrets and confidential information.

115.     The Almaviva Defendants knew that Gatti was already the CEO of the Company with ready access to confidential technological information, business contacts, and marketing strategy relating to the artificial intelligence for speech analytics, semantic understanding, data/text, information discovery and sentiment analysis on big data and social data.

116.     While knowing that their conduct was impermissible, the Almaviva Defendants hired Gatti to serve as their lead executive and CEO of their San Francisco "start up." Gatti and the Almaviva Defendants knew or should have known that Gatti serving simultaneously as the CEO of two Silicon Valley companies working in the same technological space was improper.  Yet, they continued to use her while she was pretending to work for the Company for more than one year, during which Gatti, acting within the scope of her employment and agency activities for the Almaviva and IQSystem Defendants, continued to improperly acquire, use and disclose the Company's confidential information and trade secrets.

117.     Knowing that Gatti could not legitimately operate two offices, the Almaviva Defendants agreed with Gatti that she would domicile the new company, later named Almawave USA, at Gatti's own home residence.  The Almaviva Defendants also agreed that the IQSystem defendants, through Gatti, would deceive the Company into letting Tony Di Napoli and Manuela Micoli access the Company's offices.

118.     But for Gatti's role as CEO of the Company, the Almaviva Defendants would never have hired Gatti, let alone made her the CEO of their start-up concurrently with her existing CEO position at the Company.  Other than her ability to freely access the Company's confidential and proprietary information and property, Gatti had no experience or knowledge in the artificial intelligence space, and had nothing to contribute to the Almaviva Defendants independently of what she was stealing from the Company.

119.     The Almaviva Defendants agreed to participate in this scheme because through Gatti they could immediately gain access to highly proprietary information, technology and strategies, investors, and potential business partners by simply paying a tiny fraction of what

they would have had to pay to even be taken into consideration as a legitimate investor.  The Almaviva Defendants are believed to have paid Gatti at least $70,000 a month, which payments Gatti sought to conceal through the use of the newly formed IQS Defendants.

120.    From the beginning of 2014, Gatti, the Almaviva and the IQSystem Defendants were actively executing their fraudulent scheme against the Company.  Gatti would continue to pretend to be working for the Company, while at the same time using most of her working day preparing to launch Almawave USA.  In the scope of her employment as CEO of Almawave USA and as an employee and agent of the other Almaviva and IQSystem Defendants, Gatti improperly acquired for, used, and disclosed to the IQSystem and the Almaviva Defendants the Company's confidential information and trade secrets, as more fully set forth below.

121.    Concurrently, Gatti would work from the inside of the Company to cause the Company to have to sell itself, instead of seeking investment for its growth.  This strategy would have permitted Gatti to deliver the Company's assets and its key employees to the Almaviva Defendants on the cheap.  At the same time, Gatti would have been able to cash out on all of her shares in the Company (which vesting would have accelerated upon a sale), while she had profited from the Company's property and obtained a new role with the Almaviva Defendants.  A win-win scheme for Gatti and the Almaviva Defendants.

122.    On January 2014, the President of the Company emailed Gatti to request that she make herself available to participate in a critical investor meeting with Investment Fund 2.  Gatti falsely claimed that she could not attend because she was traveling to Italy "to see if Almaviva wanted to invest" in the Company.  Upon her return, Gatti told the President of the Company that in fact she had determined that Almaviva was not interested in investing in the Company.  Gatti's statements were all false.  In fact, as Gatti failed to inform the Company, she was already working with the Almaviva Defendants to steal from the Company.

123.    Upon returning from the meeting with the Almaviva Defendants, and hearing of an approaching investment, Gatti undertook to intentionally sabotage it before its closing date.  A successful investment into the growth of the Company seriously threatened Gatti's scheme, because it would have undermined her ability to persuade the Company that it

needed to sell, instead of continuing to grow and remain independent.

124.     To interject herself into this and another investment opportunity, Gatti claimed that as CEO of the Company, she was the one who had to lead communications with investors.  At the time, this made sense because she had been hired for that role and the rest of the Company was very busy working around the clock to continue advancing the Company's business and products.  In March 2014, in anticipation of a meeting with Investment Fund 2, Gatti unlawfully and in violation of her obligations to the Company revealed confidential Company information to Investment Fund 2, and specifically that the Company was working with Investment Fund 3 to close an investment from them.  Gatti knew that revealing this confidential information could have caused interference and halted the investment by Investment Fund 3, for reasons that were well known to her.  Indeed, shortly after her disclosure, Investment Fund 3 decided to wait in closing the investment.  Gatti justified her behavior to the Company by claiming that her disclosure was accidental.  Thereafter, not long after this incident, and after the Company met multiple times with Investment Fund 2, Gatti proceeded to invite Investment Fund 3 to an event with the Almaviva Defendants, which presumably made it know to Investment Fund 3 that Gatti was working for the Almaviva Defendants as well.  As has now been revealed, Gatti intentionally began to try to sabotage as many investment opportunities of the Company as she could get involved with.

125.     With the aid and assistance of the Almaviva Defendants, Gatti continued perpetrating her unlawful scheme, by sending fraudulent communications through the wires to the Company's other executives and key employees.  In one such communication, Gatti falsely told the Company's President, that in her capacity as CEO and in charge of finding investments for the Company she was directing that the Company stop seeking investments from various sources, as she had knowledge that that would jeopardize investments from institutional sources.

126.     Gatti's need to force the company into a cash crisis in order to limit growth and demoralize employees, and sell became especially urgent when the Company was entering the market, after being selected for the Beta track at the Dublin Web Summit, held in November 2014.  The Web Summit features only a few companies in this category.  The companies invited

are selected based on their display of true innovation and business acumen.

127.     Upon hearing the Web Summit news, Gatti failed to perform initial marketing activities for the launch, and then claimed that she did not have sufficient time to perform the marketing activities and the preparatory work that was needed by the Company to duly prepare to present at the Web Summit.  When the Company sought to immediately hire a senior marketing director to step in and ensure the Company would be able to complete the work required, Gatti intentionally tried to sabotage the hiring of this person by telling this high-level candidate during the interview that she was "not needed" and that as the CEO of the Company she did not want to hire her.  As a result of this incident, Gatti was asked to step down from her position as CEO of the Company, so that the Company could nonetheless proceed with the hiring of the Company and properly prepare for its launch at the Web Summit.  Gatti agreed to step down if appointed President of the Company with no operational role.  Gatti also demanded to continue remaining the point of contact with other investors, including Investment Fund 4, with whom the Company was in the process of negotiating a term sheet.  Gatti fraudulently claimed that if she were to be removed from her participation in the communications with Investment Fund 4, with whom the Company was negotiating, the Company was likely to lose the investment.  In fact, Gatti made these fraudulent representations so that she could continue to further the Defendants' unlawful scheme against the Company.

128.     Negotiations and arrangement with Investment Fund 4 smoothly advanced to its final stages and the Company and Investment Fund 4 executed a term sheet setting forth their agreement. Gatti proceeded to inform the other founders of the Company that she had spoken to Investment Fund 4 and that they told her that they would provide the Company with a large investment, so long as the Company would refrain from seeking or bringing other money from other smaller investors.  Gatti claimed that Investment Fund 4 told her that they would themselves be bringing other investors to the Company to participate in the funding round, that they would have proactively involved other venture capital ("VC") investors that they alone wanted to choose.  Gatti also told the other founders that the Company needed to sit tight and wait to meet with other VC brought by Investment Fund 4 to join the round.

129.     In reliance on Gatti's representations, the Company during a meeting with other investors held in November 2014, turned down their investments, which the new Company's CEO wanted to obtain to ensure the Company had sufficient liquidity in the even of any issue with Investment Fund 4, whose funding was due to be received and closed on in December 2014.  Gatti assured Company management that while additional investments from smaller investors were not acceptable to Investment Fund 4, these investments were not in any event needed because Investment Fund 4 would have wired the funds before the end of November, and the Company could rely on that for its financial planning. The Company was shocked when the day of closing of the investment with Investment Fund 4 arrived, and the Company did not receive the funding that Investment Fund 4 had agreed to make.

130.     Gatti claimed that she did not know why Investment Fund 4 had failed to make the agreed upon transfer.  In fact, during a subsequent call with Investment Fund 4, that Gatti tried to postpone and avoid for as long as she could, but in which the new CEO of the Company required her to participate, Investment Fund 4 explained that they had told Gatti that their investment was contingent on the Company communicating to them that it had found at least another investor on its own to participate in that round.  Investment Fund 4 explained that it would have made some introductions on a best effort basis, but the scouting of additional investors to the round was entirely on the Company.  During the call Gatti claimed that she had misunderstood, and that she thought the Company did not need to do anything other than to wait. When the CEO of the Company confronted Gatti about the contrary information she had given the Company — including that Investment Fund 4 had purportedly demanded that the Company stop accepting investments from smaller investors — Gatti again claimed that she had misunderstood what Investment Fund 4 told her.  Following this incident in mid-December 2014, Gatti disappeared.  Upon her return to the office on February 3, 2014, Gatti was terminated from her executive and employee positions with the Company.  Gatti was removed from her position as director in the Company shortly thereafter.

131.     As the Company discovered following her termination, Gatti's conduct was not the product of incompetence.  It was intentional wrongdoing, part and parcel of the

Defendants' unlawful scheme against the Company.

132.    Indeed, as has now been revealed, in late 2014, Gatti was also working to get her other company, TheNeeds, acquired by the Almaviva Defendants.

133.    The Company also discovered numerous additional acts of wrongdoing that Defendants and their co-conspirators perpetrated against the Company to execute this scheme. For instance, beginning in April 2014, Gatti claimed that Di Napoli, her boyfriend, was launching a new microchip business and that, as he was awaiting office space, he should be able to use some empty desks in the Company's offices. Based on these materially false representations, the Company consented to the use of two desks by Di Napoli and his purported assistant, Micoli.

134.    In fact, as the Company has now learned that Di Napoli and Micoli worked for Gatti and the Almaviva Defendant, through IQS, and assisted those Defendants in misappropriating the Company's property, among other things. Di Napoli and Micoli began using the empty desks in the Company offices pretending that they were working on a microchip business, while in fact, they were working all along for Gatti and the Almaviva Defendants and had fraudulently gained access to the Company's offices.

135.    Thus, Gatti, the Almaviva Defendants and their co-conspirators, in addition to openly stealing from the Company, were now unlawfully using the Company's premises in its San Francisco office to carry out their unlawful enterprise. Concurrently, Gatti formally incorporated Almawave USA, which she domiciled at her home residence, while she in fact was unlawfully operating said fraudulent and competing enterprise, as well as the IQS Defendants, from the Company's offices, without the Company's knowledge or permission.

136.    As a result of this pattern of illegal activities, the Almaviva Defendants launched their new U.S. startup in no time. In connection with the official launch of Almawave USA, Gatti in her capacity as CEO of said new start up, used the Company's trade secrets and contacts to invite numerous people to meet the Almaviva Defendants in San Francisco.

137.    Key executives of the Almvaviva Defendants were involved in every aspect of this scheme and repeatedly traveled to and were in constant communications with Gatti and her co-conspirators in San Francisco to further the execution of this scheme.

138.     As a result of this extensive wrongdoing, it is not surprising that in just a few month, Almawave USA, whose only employee was Gatti and who had no engineers, claimed that it would be focusing on services with the same core technology as the Company.  For instance, Almawave heavily emphasizes its capability for semantics and "natural language-based semantic-ontological interpretation" that is similar to the main thrust of the Company's technology: generating semantics from unstructured text data.  Almawave claims to provide "understanding and interpretation of Customer requirements, by tracking and extracting concepts of interest."  Tracking and extracting concepts of interest from text exactly describes the core technology of the Company.  Aside from analyzing client text data, Almawave also emphasizes using web sources like social media to capture and track semantics and concepts related to the customer interest, claiming that "content retrieved from the Web thus becomes shared information to understand the Customer journey and the setup of consistent and effective models for cross-channel analytics."  This strategy of using large amounts of available web data and social media data has been the Company's strategy from the start.  Finally, there is a great deal of overlap in Almawave claims of sentiment analysis of these data.  Almawave claims it will be able to do "sentiment analysis to understand Customer needs, brand reputation and strategies for information dissemination."  They claim to answer the questions of, "What are people talking about? (products, services, brands, current events, politics)," "With what sentiment? (positive, negative, neutral)," and "On which channels? (blogs, social network, Websites, forums)."  These are exactly the questions and means by which the Company's AI sought to create value from its technology.  The phrase, "enable the semantic analysis of contents retrieved from public sources, by interpreting 'non-structured' contents published by social network users" sounds particularly reminiscent of the main pitch of the Company.

139.     These similarities are not coincidental.  They are the product of Gatti and the Almaviva Defendants' carefully orchestrated theft from the Company, through a carefully orchestrated inside job and cover-up.

140.     Indeed, following the Almaviva Defendants' retention of Gatti, and while she continued to pretend to work for the Company and improperly continued to acquire the

Company's confidential information and trade secrets for the benefit of the Almaviva Defendants, high-level officers and employees of Almaviva IT and Almawave IT applied for its first ever patent in the United States, which patent covers the identical technology field of the Company, i.e. the use of artificial intelligence and semantic technology.

141.    Despite the fact that Valeria Sandei has no technical experience, nor training, in the development of artificial intelligence, let alone the development of unsupervised machine learning technology, she is listed as the first named inventor on the patent application, which means that she is identified as the biggest contributor to the invention.[3]  The Almaviva Defendants first ever US patent application, while they are working with Gatti, and while she continues to solicit and obtain, under false pretenses, highly confidential technical and other information and trade secrets of the Company, and while she is getting paid by the Almaviva Defendants in excess of $100,000 a month (including the payments made to her through the IQSystem Defendants) is not coincidental.  Indeed, the alleged invention disclosed in the Almaviva Defendants' patent application specifically references the possibility of using a semantic engine with a "***robust artificial intelligence (AI) module" that "may be trained via supervised or unsupervised learning to perform various tasks that are part of semantic analysis***."  The Almaviva Defendants, however, have not developed any technology using unsupervised machine intelligence approaches.  Rather, this technology, encompasses the Company's confidential information and trade secrets, more fully described below, which Gatti improperly acquired, and continued to solicit, form the Company, while she was secretly working for the Almaviva Defendants.   Accordingly, the confidential information and trade secrets to which the Almaviva Defendants had access at the Company through Gatti would have been highly valuable to them when developing the purported invention described in the Sandei Application.

142.    The Defendants' wrongdoing has greatly damaged the Company and will

---

[3] In US patent applications, inventors are generally listed either alphabetically or in the order by which they contributed to the invention.  A first named inventor not listed alphabetically, as in the case of the patent application in question, means that the person identified is the biggest contributor to the invention.

continue to damage the Company if not restrained.

### D.     Gatti's Means of Communications

143.     To carry out as well as conceal her fraudulent activities and wrongdoings, Gatti utilized a wide variety of communications means including in-person meetings, teleconference meetings, telephone calls, emails, text messages, and social media messages.   One of Gatti's primary and preferred modes of communication is through text messages, or SMS (short message service).  Both before and after she was terminated by the Company, Gatti engaged in a campaign of text messaging, through which she carried out the conduct alleged herein.  Continuing through today's date, Gatti has continued to use text messaging to solicit the Company's confidential contacts, witnesses, past, current and prospective investors, advisors and their families.  For instance, Gatti recently solicited by text messages key individuals in investment funds that are at issue in this action.  Gatti was also observed frequently using text messages, email and social media, while she worked for the Company and including in connection with what she represented to the Company were activities she was conducting for the Company.  Gatti continues to use the same means of communications to unfairly compete with and engage in further breaches and wrongdoing against the Company through and continuing to today's date.

### E.     Gatti and the Almaviva Defendants' Wrongful and Fraudulent Activities are Ongoing.

144.     Indeed, despite terminating Gatti from any and all roles at the Company, the Defendants wrongful and fraudulent conduct as alleged herein have been continuous and ongoing since the filing of the complaint.

145.     For instance, despite her termination, Gatti continued to unlawfully access the Company's electronic system to continue stealing information and attempting to conceal evidence of the Defendants' wrongdoing.

146.     In February 2015, Gatti and the Almaviva Defendants even sent one of

their employees, Francesca Valentini, to the Company's offices under the false pretense that she sought to speak to a company in the adjacent office space as the Company.

147.     Even after Gatti was informed by the Company that an investigation had revealed serious wrongdoing on her part, and even after Gatti was asked to immediately cease her wrongful activities towards the Company, on February 13, 2014, Gatti responded by sending an email to investors in the Company seeking to cause further damage to the Company.  In this email, Gatti falsely and fraudulently claimed that she had amicably stepped down from the Company and that she now was the Chairman of the Company.

148.     On February 17, 2015, Gatti caused a computer attack to be launched on her former Company account, being preserved under a litigation hold, and caused her calendar records detailing substantial evidence of her wrongdoing to be deleted.  Specifically, upon information and belief, Gatti, at the behest or for the benefit of the Almaviva Defendants, deleted numerous calendar entry on the Company's computer system to conceal the involvement of Sandei and other officers of the Almaviva Defendants.  Although the Company had imaged those records and had separately preserved the evidence, Gatti's conduct demonstrates that unless judicially restrained, Gatti and the Almaviva Defendants will not cease their unlawful activities.

149.     By way of yet another example, while Gatti was still employed at the Company, she falsified and altered various investor proxies to designate herself as a proxy holder and insinuated herself into the Company's relationship with its investors.  After her termination, Gatti perpetuated her fraud and abused her access of the Company's confidential contact information of its current and past investors throughout the world by improperly soliciting, placing calls to, sending text messages to or otherwise communicating with said contacts.  What is more, Gatti has taken the additional step of contacting numerous journalists to make statements regarding the litigation and the Company and referencing those publications to the Company's confidential contacts.

150.     The Almaviva Defendants, too, have persisted in their wrongful activities.

The Almaviva Defendants, despite having knowledge of the claims of this action regarding their wrongful access and use of the Company's confidential information, continue to obtain from Gatti and third party witnesses highly confidential information belonging to the Company to which the Almaviva Defendants are not entitled and which are at issue in this action.

**F.      Gatti's Abuse of Access to the Company's Bank Account, Misuse of the Company's Funds and Secreting of Funds**

151.      Gatti and the other Defendants' pattern of wrongdoing has included repeated breaches and abuses of the Company's trust and assets, including the misuse of the Company's funds. Gatti used the Company's funds to pay for her domestic and international flights to meet the Almaviva Defendants, while she fraudulently represented to the Company that she was conducting meetings on behalf of the Company, when in fact she was working for her own and the other Defendants' benefit.   Additionally, Gatti abused her access to the Company's bank account by giving third parties, including Peter Huang, unauthorized access to the Company's electronic accounting system and to the Company's bank account.

152.      As already alleged in the filings submitted to this Court, Gatti and the other Defendants also set up a system of bank accounts that would assist them avoid detection of the unlawful payments they were receiving.  This method has also been used by Gatti and the IQSystem Defendants in connection with other similar frauds that the Company has now discovered they were engaging in.  For instance, while Gatti pretended to work for the Company, Gatti and the IQSystem Defendant were also working with the insider of another foreign company to receive from him confidential information in exchange for commercial bribe payments that appear to have been made to a Credit Union account of a family member of the insider.  This method of concealing the unlawful payments they receive and make was also likely used in connection with their scheme involving the Almaviva Defendants, as demonstrated by the fact that Gatti was openly discussing with Valeria Sandei, of the Almaviva Defendants that they

needed to keep certain expenses "off the books" of Almawave USA.  The intricate network of

banks and banking accounts they used, involves banks in Switzerland, Italy and on the East and

West Coast of the United States and bank accounts in the names of the Defendants and their

family members.  For instance, in connection with her bank accounts in Switzerland, a Swiss

banker from a Swiss branch of UBS traveled repeatedly to the United the meet her in a San

Francisco hotel, even though Swiss bankers, and in particular UBS, specifically confirmed several

years ago in a deferred prosecution agreement with the US Department of Justice that it no longer

allowed its Swiss bankers to travel to the United States to meet their clients here, and that all UBS

transactions with U.S. based clients must take place through the bank's U.S. offices.

153.     For example, on February 23, 2015, three days after the initial Complaint

was filed, Gatti was observed going to Bank of the West, where she and the other defendants

maintain accounts, and then was scheduled to have a meeting with a UBS banker.  Upon

information and belief, Gatti and the other U.S. based Defendants have engaged in various

transactions to secret and dissipate funds from her various fraudulent activities, including by

arranging for cash pick-ups and utilizing her relationships with bankers such as Elbgal Hazim,

John Gonzales, Vincenzo Mitolo and Fabrizio Pilotti to wire money to her personal overseas bank

accounts.

154.     In addition, Gatti established a close relationship with Vincenzo Mitolo, at

Bank of the West and he was assisting her with organizing an event at the Italian Consulate for

the Almaviva Defendants, and while Gatti continued to pretend to work for the Company, she

was participating in meetings with Mitolo regarding venture capital and investments for the

Almaviva Defendants or others.

**G.     The Confidential Information and Trade Secrets At Issue.**

155.     Through the conduct described above and as will be further described at

trial, the Defendants, acting in concert and as part of a unitary plan and scheme, and using Gatti

and IQSystem within the scope of their employment and agency for the Almaviva Defendants, improperly acquired, used and/or disclosed a substantial amount of confidential information of the Company, a subset of which also contains the Company's trade secrets.

156.    The Company has a property interest in the confidential information that was unlawfully acquired, used, and/or disclosed or otherwise misappropriated by the Defendants, as fully set forth in the Company's contracts with Gatti.

157.    The Company also has a property interest in its trade secrets that were unlawfully acquired, used, and/or disclosed or otherwise misappropriated by the Defendants, as fully set forth in the Company's contracts with Gatti.

158.    The confidential information and trade secrets unlawfully acquired, used, and/or disclosed or otherwise misappropriated by the Defendants includes, but is not limited to, the following categories:

159.    ***Technical information***, including, but not limited to: experiments relating to the Company's proprietary technology, test results, research regarding the state of the art and the development of the Company's technology, detailed analysis and evaluations of the Company's technology, applications, system integration, design concepts underlying the Company's technology, detailed instructions on testing and modeling of the Company's technology, as well as highly confidential information regarding scientific recruiting targets.

160.    ***Business Development/Investor Information***, including, but not limited to: Marketing materials, partners lists and key contact information, pitch decks, presentations, summaries of the Company's technology, employees, and plans; investor contact information, including names, email addresses, and other information for key individuals at numerous investors/business partners, detailed feedback from investors following presentations, including specific clarifications, requests for further information, suggestions; detailed information

regarding partnerships with other entities, including rollout plans, system integration, applications for the technology and related matters.

161.     **Financial/Legal Information**, including, but not limited to: business models, business plans, growth strategy and market entry for companies operating in the AI space, system integration and application, competitive analysis, key operational structures and requirements, costs, recruiting, legal advice, lists of service providers used by the Company, including, but not limited to the Company's attorneys, banks, accountants, and other service providers, and related matters pertaining to all aspects of the financial structure, development and existence of the business.

162.     The evidence shows that Gatti, while working at the direction of the Almaviva Defendants, and/or within the scope of her employment for the Almaviva Defendants, systematically solicited from the Company the foregoing highly confidential and proprietary information, as well as the Company's trade secrets, while she was meeting with the Almaviva Defendants, preparing to meet with the Almaviva Defendants, or had finished a meeting with the Almaviva Defendants.  In addition, the Almaviva Defendants directed Gatti to use the Company's computer, assigned to her, and which the Defendants improperly converted for their own use so that the Defendants could directly access the Company's confidential information and trade secrets that were stored on the Company's computer assigned to Gatti, and which has been a fixed asset of the Company since October 2012.

163.     By way of some examples of the Defendants improper acquisition, use, and/or disclosure of the Company's confidential and proprietary information and trade secrets, the Company provides the following, non-exhaustive examples:

164.     On April 1, 2014, beginning at approximately 2:00pm, Gatti and several other Company employees attended a meeting with Investment Fund ("IF") 6.  The meeting lasted approximately 1 hour.  During this meeting, IF 6 asked questions regarding a specific application of the Company's technology to Customer Relationship Management ("CRM").

After leaving the meeting, Gatti and the other Company employees had an internal discussion regarding integrating the Company' technology with a particular CRM application.  In an email titled "Data to Retrieve" that Gatti sent to herself on April 1, 2014, during the post-meeting internal discussion that occurred shortly after the meeting ended, she noted the specific CRM application under discussion and wrote next to it "Shall we try to test this with Almawave." In addition, right before joining the meeting with the Company, Gatti had a call with the Almaviva Defendants.  The discussions, both with IF 6 and following the meeting, were highly confidential because they addressed specific tests and applications the Company wanted to make with its technology.  Gatti would never have been permitted to participate and to acquire the confidential information that she noted she would be providing the Almaviva Defendants, had the Company known she was taking notes to then use for the Almaviva Defendants.

165.    By way of another example, Gatti was provided, at her request, highly technical details regarding important aspects of the Company's technology.  Although the information provided to her is too voluminous to be listed here, these documents included compilations of Loop AI's analysis and annotations regarding specifications of the development of the Company's technology, of conceptual models, of options for validating technical assumptions, applications with business partners and system integration, experiments and experiment results and the like.  All of these documents were highly confidential, and many contained the Company's trade secrets, which resulted from substantial work-effort, research, development and experimentation for the Company, and were highly valuable to any company working in the same field of technology, like the Almaviva Defendants.  The majority of these documents contained secret information regarding the Company's technology, which was only being shared with two or three people within the Company.

166.    As the Company has now learned, Gatti made copies of all of these documents by forwarding each of these documents to her personal email account and storing

them on accounts controlled through her personal email, which Loop AI cannot access without a Court Order. In addition, Gatti kept a copy of these documents on the Company's laptop that she now claims to be hers, and which the Almaviva Defendants directed her and observed her using while she was working for them. Gatti had no reason to request access to this highly confidential information in light of the fact that she now admits she was no longer actually working for Loop AI since April 2013.

167.    On March 21, 2014, the Company provided Gatti a highly confidential document titled "Soshoma Engineering Innovation." This document was a highly confidential draft and was only shared among a handful of people within Loop AI. As the Company has now learned, on March 21, 2014, Gatti was working with the IQSystem and Almaviva Defendants to set up their business in the United States. Gatti was not permitted to acquire this document from us while she was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants.

168.    On March 19, 2014, Gatti was given a highly confidential document relating to various financial matters regarding the Company. This document also contained highly confidential information regarding the Company that was only shared with Gatti and another senior officer of the Company, based on their senior roles at the Company. At the time the Company provided this document to Gatti, she was already working for the Almaviva Defendants. Gatti was not permitted to acquire this document from the Company while she was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants. In addition, in light of Gatti's admitted "empty role" at the Company since April 2013, she had no legitimate reason to seek access to this highly confidential information.

169.    On May 16, 2014, Gatti sent a message to a senior officer of the Company, claiming that she would be working from Palo Alto because her babysitter was ill and she had to

drive her daughter there.  Shortly thereafter, another senior officer of the Company sent Gatti an email detailing highly confidential results of an experiment and improvements over past experiments.  This communication contained secret information regarding the Company's technology that was not to be shared with anyone.  As the Company has now learned, that day Gatti was working for the Almaviva Defendants, setting up their new business and even using (unbeknownst to the Company) the Company's corporate counsel, Orrick Herrington & Sutcliffe LLP ("Orrick"), to handle the Almaviva Defendants' new venture in the United States.  Gatti was not permitted to acquire this confidential information from the Company while she was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants.

170.     On May 29, 2014, another senior officer of the Company provided Gatti with a copy of one of the Company's patent applications. This patent application was (and continues to be) highly confidential and was to remain confidential for an extended period of time, as permitted by patent laws.  Gatti impermissibly acquired this highly confidential document from the Company while she was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants. Gatti had no legitimate reason to acquire the Company's highly confidential document since she was working for the Almaviva Defendants.

171.     Also on May 29, 2014, Gatti was given, at her request, detailed technical explanations regarding the integration of the Company's technology with Company X, and a list of items needed from Company X to test the integration. Gatti claimed that the CEO of Company X reached out to her and that the information was needed for that purpose.  The information provided to Gatti was highly confidential and secret, in that it discussed specific details for testing the integration of the Company's technology with a prospective business partner, which information was not readily available from public sources.  The day after Gatti requested, and was

provided, this information, she had a call with the Almaviva Defendants and not with Company X. Indeed, following that call, Gatti continued to work on and for the Almaviva Defendants' business. This information would have been highly valuable to the Almaviva Defendants, because Company X is a well-established international business and was likely one of their targets. Indeed, following Gatti's request for this information, she never mentioned Company X again to the Company.

172.    On June 3, 2014, Ms. Gatti requested technical input regarding the Company's technology from another senior officer of the Company. In this correspondence that senior officer describes the Company's technology's use with "call centers" and other data sources and provides other comments regarding the system integration of the Company's technology with a prospective business partner. Gatti impermissibly acquired this highly confidential document while she was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants. Gatti had no legitimate reason to acquire this highly confidential document from the Company since she was working for the Almaviva Defendants.

173.    On June 16, 2014, Gatti solicited updates regarding highly confidential and proprietary experiments from another senior officer of the Company. The following day, that senior officer provided Gatti with a detailed overview of the status and various updates regarding certain experiments and aspects of the Company's technology. As the Company has now learned, when Gatti solicited this information, as well as the day she received it, Gatti was working for the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants, and was conducting various meetings and other business with and for them.

174.    On May 6, 2013, in an email titled "Advisors/engineers" a senior employee of the Company circulated to Gatti certain recommendations for scientific advisors that the Company should consider approaching. The first person on the list was a scientist with a very

specific background relevant to the Company's field ("Scientist 1").  Following that email, a senior officer of the Company added those recommendations to the Company's running recruiting list for researchers and engineers.  This list was also shared with Gatti.  On May 14, 2013, Gatti sent some comments regarding Scientist 1 to another senior employee of the Company. The recruiting list compiled by the Company was highly confidential and was not to be used or shared with anyone for purposes unrelated to the Company's interests.  This list was highly confidential and valuable because it contained the Company's compilation of the skills and competences that it believed were important to its field of technology, and was not known to the public.

175.    On October 10, 2014, a senior employee of the Company received an email from Gatti electronically introducing that employee to Mario Pepe, a recruiter from Russell Reynolds Associates.  In this correspondence Gatti requested that the senior employee introduce Scientist 1 to Russell Reynolds.  On October 18, 2014, Gatti again solicited the senior employee to see if Scientist 1 had responded to Russell Reynolds.  As the Company has now learned, at the time of this correspondence, Gatti was already working as the CEO of the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants.  Russell Reynolds was also working for the Almaviva Defendants, as the Almaviva Defendants have admitted.  Mario Pepe was also referenced by Gatti in one of her notes on the Almaviva Defendants titled "Mail Mario Pepe re: Valeria," where Valeria was the short name Gatti used for Sandei.  But for the Almaviva Defendants' misappropriation of the Company's confidential information, Gatti would not have known to contact Scientist 1 for the benefit of the Almaviva Defendants and would not have sought to use the Company's senior employee to get an introduction.  In addition, during this time period Gatti was discussing with the Almaviva Defendants the hiring of engineers for their business.

176.    On February 1, 2014, at Gatti's request, she was provided access to a proprietary and highly confidential recruitment shortlist of highly skilled engineers that had been

painstakingly compiled by the Company. This list contained the names of key engineers with very specific skills identified by the Company, as well as substantial additional information that the Company believed relevant to its technology development. To maintain the confidentiality of this list, access to this file was given only to Gatti and one other senior officer of the Company. During that time, Gatti was already working with the Almaviva Defendants, and within the scope of her employment and agency for the Almaviva Defendants. This list would have been highly valuable to any company involved in artificial intelligence. In light of Gatti's statement that she had an "empty role" with the Company from April 2013, Gatti did not need this highly confidential list to perform her responsibilities for the Company.

177. Gatti also requested, and was given access to, highly confidential information and data involving unpatented inventions, which was maintained in secrecy and only shared among two or three of the Company's employees with need-to-know. The documents within which this data was contained included technical summaries as well as details for a possible patent application. This information would have been highly valuable to anyone operating in the artificial intelligence and natural language processing fields. In light Gatti's admitted "empty role" at the Company from April 2013, she would have had no legitimate reason to seek access to this highly confidential information, except to benefit the Almaviva Defendants in exchange for large payments they were making to her.

178. Gatti also requested, and was given access to, highly confidential technical information containing the design details, concepts, semantic analysis, and instructions for improvements and development of the Company's technology. Some examples in this category included, for instance, communications in which Gatti requested that other officers and employees of the Company explain certain technical concepts included and/or tested with the Company's technology as well as the test results and the technology's performance with certain specific scientific experiments of automatic understanding of concepts contained in a data set.

Also included in this category were documents and communications containing technical annotations regarding the semantic analysis being performed through the Company's technology, including documents containing specific and detailed instructions on how to perform experiments using aspects of the Company's technology and an extensive compilation of hundreds of pages of technical specifications relating to an experiment. These technical documents were highly confidential and would be very valuable to another company working in the field of semantic analysis, such as the Almaviva Defendants for whom Gatti secretly worked for more than one year.

179.      Gatti also requested, and was given access to, highly confidential technical information containing the Company's research underlying the ongoing development of its technology and was particularly keen on obtaining highly technical details regarding the foundations of the development of the highly valuable unsupervised aspects of the Company's technology.  For instance, on February 17, 2014, Gatti called a senior employee of the Company and asked about the Company's use of "deep learning of language models for speech recognition."  She also requested that the employee provide her certain fundamental research underlying the development of unsupervised aspects of a highly advanced deep learning technique the Company had just begun to fully implement.  Following that call, the employee sent Ms. Gatti two documents that constituted part of the employee's confidential research for the development of the Company's technology.  Until Gatti requested that the employee provide these materials to her, the results of that research were only accessible to that employee and one other senior officer of the Company.  As has now been discovered, Gatti's request for this highly technical information was for the benefit and at the direction of the Almaviva Defendants, and followed immediately from her meeting with the Almaviva Defendants in Italy.  It also preceded additional calls Gatti was preparing to have with the Almaviva Defendants.  It is now clear that the information Gatti requested was for the benefit of the Almaviva Defendants, since Gatti

would have had no use for that information for anything she was supposed to be doing at the Company.

180.     For instance, in her communications to a senior employee of the Company on February 17, 2014, Gatti specifically referred to the use of the Company technology for "speech recognition," which is one of the areas in which the Almaviva Defendants operate, but not one of the applications the Company was then focusing on.  Gatti asked highly technical questions regarding the foundations of the Company's technology and individuals that may be knowledgeable about it, the nature of which she had not previously asked about.  The information provided to Ms. Gatti would have been highly valuable to any company operating in a similar technology space, as it provided ready access to the Company's confidential research and selection of particular research fundamentals of the Company's invention that the Company decided to keep secret, instead of applying for a patent, in order not to disclose to the external world critical aspects of how the Company's technology works.

181.     In early July 2014, the Company was preparing to undergo a due diligence with Investment Fund 4.  Unbeknownst to the Company, while Gatti was acting at the direction of, and within the scope of her employment and agency for the Almaviva Defendants, Gatti requested, and was given access to, a large amount of highly confidential information and trade secrets relating to various aspects of the Company's business and technology for the purpose of preparing for the due diligence.  In the email correspondence on this topic, a senior employee of the Company received a link to a data room that Ms. Gatti had created, stored in an electronic folder titled "Soshoma-XXXXXX Data Room."  The list of documents that were placed in the data room by Gatti covered various confidential aspects of the Company in all three categories of confidential information listed above.  For instance, the list included documents detailing business plans, technical master plans (containing a list of future employees that the Company planned to hire for its scientific and engineering team, with roles and detailed descriptions of the

quarterly technology development goals for each employee); organization of the scientific and engineering team; a deeper description of the technology and comparisons to the state of the art and competitive landscape; partnership and financial overviews and other related matters. Investment Fund 4 was being given access to this data room pursuant to a written confidentiality agreement.

182.     On the morning of July 9, 2014, Gatti forwarded initial correspondence with Investment Fund 4 to a senior officer and senior employee of the Company.  In that correspondence, Gatti requested technical information regarding certain language applications and capabilities of the Company's technology.  In response, Gatti was provided highly confidential information addressing her request.  As the Company has now learned, Investment Fund 4 had not requested the technical and confidential information Gatti sought from the Company.  Rather, the morning she made this request, Gatti was participating in a telephone meeting with the Almaviva Defendants with Mr. Luca Ferri ("Ferri") and Sandei.  Ferri identifies himself as the "Head of the Information Management of Division of Almawave," and "in charge of the coordination of resource, projects, consultancy and partnerships on Big Data, Advanced Analytics" and other things. Ferri also indicates that until November 2014, he was the "Head of International Solutions" for the Almawave Group in "Italy, Brazil and USA" and that in this capacity he was "responsible for the development of Almawave semantic technologies, vertical products … and projects delivery on the national and international market."  The information that Gatti obtained from the Company while she was working for Ferri and Sandei of the Almaviva Defendants would have been extremely valuable to them.  It is now clear that Gatti was acquiring this information from the Company for the benefit of the Almaviva Defendants, and within the scope of her employment and agency.  Indeed, as confirmation that Gatti did not need the information she requested from the Company for the Company's business, several weeks later, on

July 31, 2014, Gatti sent an email indicating that Investment Fund 4 had not reviewed and would likely not review any information for months.

183.     On July 26, 2014 Gatti also requested, and was given access to, the metrics from certain of the Company's experiments and results, explaining that she needed to show the information to Investment Fund 4.  The following day, she also requested access to documents providing the Company's technology overview, as well as other confidential information.  In her correspondence to the Company, Gatti claimed that she needed to show the information requested to Investment Fund 4 in connection with the due diligence.  As the Company has now learned, however, Investment Fund 4 did not request those metrics.  Instead, this and other requests by Gatti for the Company's highly confidential technical and other information preceded her two day meeting with the Almaviva Defendants in San Francisco, during which they were preparing to pitch the same companies that Gatti was supposed to bring to the Company and was instead bringing to the Almaviva Defendants.

184.     The Defendants' improper use and disclosure of the Company's highly confidential and proprietary information and trade secrets is also evidenced by numerous other examples.

185.     For instance, the Company maintained a list of confidential service providers that it was using to conduct its business activities.  Gatti had access to this list and was personally tasked with dealing with these service providers.  Included among those service providers were the Company's law firm, Orrick; the company's accountant; the company's bank; the company's payroll provider; and the Company's expense reimbursement provider, to name a few.

186.     After retaining Gatti, the Almaviva Defendants retained each and every one of the Company's confidential service providers listed above, including Orrick, the company's accountant, the Company's bank, and others.

187.     But for the Almaviva Defendants' improper acquisition and use, through

Gatti, of the Company's confidential information regarding each of its service providers, it would have been impossible for the Almaviva Defendants to select each of the same service providers being used by the Company, particularly in light of the fact that numerous other service providers exist in California for each of their respective fields of service.

188.     The Company also maintained a list of confidential legal documents that the Company paid to have prepared and which Gatti was tasked to maintain. After retaining Gatti, the Almaviva and IQSystem Defendants copied each and every one of the Company's confidential contracts.  For instance, Gatti's employment agreement with the Company is virtually identical to the one she subsequently signed with the Almaviva Defendants.  It would have been otherwise impossible for the Almaviva Defendants to prepare a contract with Gatti that is virtually identical to that she had with the Company.

189.     Similarly, the IQSystem Defendants prepared a contract with Mr. Vignudelli that is also identical (including with the same mistakes) as the Company's consulting agreement, also entered with the same individual more than one year prior to that.

190.     By way of another example, the Company maintained a confidential list of advisors who serve on the Company's advisory board.  The Almaviva Defendants, after retaining Gatti, began to contact and to solicit at least one of the same advisors serving for the Company. But for the Almaviva Defendants' use of the Company's confidential information, acquired through Gatti, it would have been impossible for the Almaviva Defendants to even learn the name of this advisor.

191.     By way of another example, the Company maintained a confidential list of consultants.  One of these consultants was Mr. Vignudelli, retained in 2013.  Mr. Vignudelli was subject to a confidentiality agreement that he signed in 2013.  Mr. Vignudelli's contact information and work experience for the Company was not readily available to the public and was confidential information of the Company.  Following their hire of Gatti, the Almaviva Defendants, not coincidentally, began working with Mr. Vignudelli on the identical topics and tasks for which Mr. Vignudelli had previously been retained by the Company, including research relating to business and go-to market strategies.  The Almaviva Defendants retained Mr.

Vignudelli through the IQSystem Defendants.  But for the Defendants' improper use of the Company's confidential information, it would have been impossible for them to know of the existence of and contact Mr. Vignudelli.

192.    Indeed, following the Almaviva and IQSystem Defendants' hire of Mr. Vignudelli, unbeknownst to the Company, Gatti provided him numerous highly confidential and trade secret documents, including draft business plans and discussions regarding TAM analysis, while Mr. Vignudelli was being tasked to prepare a TAM analysis for the IQSystem and Almaviva Defendants regarding the very same market in which the Company operates.

193.    During this time, Mr. Vignudelli acquired copies of the Company's highly confidential and trade secret materials from Gatti, even though he was no longer working for the Company but was, instead, working for the IQSystem and Almaviva Defendants.

194.    By way of another example, the Company maintained a compilation of highly confidential information and trade secrets relating to key individuals, and their contact information, at specific companies and investment funds.  After the Almaviva Defendants hired Gatti, they proceeded to invite to their events individuals listed on the Company's confidential lists.  But for the Almaviva Defendants' misappropriation, through Gatti, of the Company's confidential information and trade secrets, the Almaviva Defendants would not have known to invite to their events the same individuals that had been approached by the Company.

195.    Similarly, the IQSystem Defendants repeatedly and improperly continued to acquire, use or disclose or otherwise misappropriate, for the benefit of the Almaviva Defendants, the confidential information, proprietary information, and trade secrets of the Company.

196.    For instance, on February 10, 2014, and while Gatti was preparing to meet with the Almaviva Defendants and was recruiting Tony DiNapoli to participate in the scheme with the Almaviva Defendants, Gatti forwarded to her co-conspirators at the IQSystem Defendants, and Di Napoli in particular, highly confidential and trade secret information of the Company regarding aspects of the Company's business pitch.

197.    By way of another example, on numerous occasions thereafter, Gatti

forward to her co-conspirators at the IQSystem Defendants, and Di Napoli in particular, highly confidential and trade secret information of the Company regarding key individuals at certain companies with whom the Company was dealing, including highly confidential communications regarding the Company's business dealings with these third party companies.

198.    By way of another example, on at least one occasion, Gatti and her co-conspirators at the IQSystem Defendants, and Di Napoli in particular, acting on behalf and within the scope of their employment and agency for the Almaviva Defendants, met with a third party company, from whom the Company was expecting receipt of funds following the execution of a term sheet.  Following this meeting between the third party, Gatti, and the IQSystem Defendants, the Company lost its funding.  The Defendants would not have known to contact and meet with this key contact of the third-party company that had signed a term sheet with the Company but for their misappropriation of highly confidential and proprietary information of the Company.

199.    By way of another example, in September 2014, Gatti emailed an officer of the Company to inform him she was traveling to set up a meeting with Company Z.  Although Gatti never actually set up the meeting between the Company and Company Z, within several weeks from that email, the Almaviva Defendants had a meeting with Company Z.

200.    The foregoing examples are not intended to serve as an exhaustive list of all of the confidential information, proprietary information, and trade secrets that the Defendants, acting jointly and/or in concert with one another, improperly acquired, used and/or disclosed or otherwise misappropriated from the Company.

## H.    Actions By The Defendants And Some Of Their Co-Conspirators

201.    Each of the Almaviva Defendants participated in the wrongful activities alleged herein directly, through their officers, and through their employees and agents, who were all acting within the scope of their employment for the Almaviva Defendants.  Specifically, Defendant Gatti was an employee and agent of Defendant Almawave USA, as well as of the other Almaviva Defendants, who are an integrated and consolidated enterprise with Almawave USA, and who directly oversaw, directed, controlled and funded, among other things, all of Gatti's wrongful activities alleged herein, which were activities within the scope of her employment for

the Almaviva Defendants, required by and/or incident to Gatti's duties for the Almaviva Defendants, and were therefore reasonably foreseeable by the Almaviva Defendants.

202.     Each of the Almaviva Defendants had the ability to, and did, direct, control and supervise the activities of Gatti and the IQSystem Defendants as they were committing the wrongdoing alleged herein.  In addition, each of the Almaviva Defendants directly benefitted from the wrongdoing alleged herein, and even widely boasted of the benefits they gained through their hire of Gatti.  Thus, in addition to being in a position to police the conduct of Gatti and the IQSystem Defendants, the Almaviva Defendants' economic interests were entwined with those of Gatti and the IQSystem Defendants.

203.     Each of the Almaviva Defendants knew or should have known that the activities they directed, controlled, and funded Gatti and the IQSystem Defendants to undertake were wrongful.

204.     Indeed, the Almaviva Defendants were expressly informed by Gatti that she could not engage in other activities without the permission of the Company.

205.     The Almaviva Defendants would also have had to have been informed by the Company's counsel, Orrick, who they secretly retained, that their activities were wrongful and would violate the Company's contractual and other rights.

206.     Almawave USA was also acting as an agent of the other Almaviva Defendants and performed activities that were sufficiently important to the other Almaviva Defendants such that they broadly advertised those activities internationally.  Almawave USA was established for, or was engaged in, activities that but for its existence would have been performed by the other Almaviva Defendants themselves.

207.      Almawave USA was, in the alternative, the alter ego of the other Almaviva Defendants.  As set forth in the foregoing allegations regarding the structure and operations of the Almaviva Defendants, there was and is sufficient unity of interest and ownership between these corporations so as to justify, to the extent necessary, that Almawave USA be treated as the alter ego of the other Almaviva Defendants.

208.     The IQSystem Defendants are also agents and/or alter egos of Defendant

Gatti that she created to serve as instruments through which to perpetrate the scheme and fraud alleged herein.  Specifically, Gatti used the IQSystem Defendants to funnel the commercial bribes she received from the Almaviva Defendants, as well as at least one other company, that was similarly being victimized by Gatti and the IQSystem Defendants.  To create the appearance that these companies are legitimate businesses, Gatti claimed that at least one of the IQSystem Defendants was founded by a gentleman named Gennaro Di Napoli.  In fact, Mr. Gennaro Di Napoli is her former babysitter, a first degree relative of her boyfriend, and living in Italy unemployed.  As of February 2015, Gennaro Di Napoli told a witness he remained unemployed and was looking for work.

209.    In addition to their direct actions, the Defendants together conspired, agreed, intended and/or adopted the goal of furthering or facilitating the wrongful activities committed against the Company as alleged throughout this Complaint.  Each of the Defendants, took steps in furtherance of the conspiracy to commit the wrongful activities alleged herein, and successfully achieved the purpose of the conspiracy, by stealing from the Company highly confidential information, trade secrets, industrial secrets and other proprietary materials, among other things.

210.    For their direct, joint, and concerted actions, the Defendants are all jointly and severally liable to the Company for theirs and their co-conspirators' wrongdoing against the Company.[4]

**I.    Jeffrey Capaccio's Role In The Conspiracy**

211.    Jeffrey Capaccio has been a participant in the scheme involving Gatti and the Defendants since its inception.  Jeffrey Capaccio claims to have been a "close friend" of Tony Di Napoli for over ten years.  As the evidence shows, Capaccio and Di Napoli, have a tried and

---

[4] Loop AI respectfully notes that the Almaviva Defendants' purported "see no evil, hear no evil" defense does not excuse any of the Almaviva Defendants for their wrongdoing against the Company, including any wrongdoing they committed alone and/or in concert with their co-conspirators, or which their co-conspirators committed at their direction and/or for their benefit, or any wrongdoing committed while any of the Almaviva Defendants claim to have been in a state of blissful ignorance or willful blindness.

true modus operandi for seeking to force start-ups to sell on the cheap to other companies.  For instance, just a few weeks prior to their project with the Almaviva Defendants, Capaccio and Di Napoli were working with a disloyal insider of another start-up based in Arizona to loot its intellectual property.  In a communication, dated February 13, 2014, Mr. Capaccio writes about his discussion with the disloyal insider of the Arizona start-up:

- "He asked me about forcing the founder into bankruptcy;"

- "I reviewed some litigation approaches with him that could force the founder's hand thereby creating a climate for negotiations."

ECF 28-5 at 1.

212.        This conversation was a follow-up from prior communications involving Tony Di Napoli and the insider, who summarized their discussions as follows:

- "I have not said anything to [the CEO] about our discussions, potential bankruptcy, etc…. When we drop this on him, I expect he will try to convince [creditor] to accept shares by telling him about all the wonderful things happening, etc. When it becomes clear that he will have to come up with the cash, I expect he will make some desperate phone calls to try and raise the money. I doubt he will be successful."

- "[Creditor's] note matures March 24, and [creditor] has indicated he intends to have a conversation with [the Company] before then to let him know he is not interested in accepting shares in lieu of cash. The total, including interest, that [CEO] will need is about $232K and I see no way he can come up with this other than by selling a chunk of the company to [them]….We need to determine how much time he will have to come up with the money to pay [creditor] ***before we can force the company into bankruptcy, but I think if we move quickly we can do this before [the CEO] can come up with money***."

ECF No. 28-6 at 1.

213.        The modus operandi described in this correspondence, is very similar to the scheme that the Defendants and their co-conspirators sought to execute against the Company here.  Immediately after Gatti, IQS, and their co-conspirators began their relationship with Almaviva, Gatti approached the Company to advise them that it was time for the Company to be sold.   When the Company refused to agree with Gatti that it should be sold, Gatti, with the aid

and substantial assistance of the Defendants and her co-conspirators, including Capaccio, began

to do everything she could to cause a cash crisis and to make the Company lose the investments it

was expecting to receive.  Were the Almaviva Defendants seeking to establish a legitimate

presence in San Francisco, as they claim, it is simply not plausible that such an established

company, self-proclaimed as "one of Italy's top information and communication technology

providers," would pursue entry into the US market by not requiring a legitimate office presence

or independent full-time workforce, that it would hire a team of individuals, including Jeffrey

Capaccio, without doing any diligence over any of the individuals, and instead by paying

hundreds of thousands of dollars to individuals with no experience whatsoever in the artificial

intelligence and analysis of big data space, except through Gatti's role as an insider of the

Company.  For instance, the Almaviva Defendants hired Jeffrey Capaccio as part of the purported

"business development" team with Gatti and the IQSystem Defendants, and agreed to pay him

more than $11,000 a month, even though Jeffrey Capaccio claims to be an attorney specializing in

litigation.  In correspondence relating to the scheme alleged herein, however, it is clear that

Jeffrey Capaccio was not providing any legal services.   Jeffrey Capaccio has continued to

conspire, work in concert with and assist Gatti and the IQSystem Defendants throughout the time

relevant to this action, through today's date.

## **FIRST CAUSE OF ACTION**

**(Racketeer Influenced and Corrupt Organizations, 18 U.S.C. §§ 1962 *et seq.*, against All Defendants)**

214.     The Company repeats and realleges each and every allegation contained in

the foregoing paragraphs and incorporates them herein by reference.

215.     By the acts alleged above as well as those set forth below, the Defendants

and their unnamed co-conspirators associated in a joint enterprise engaged in interstate commerce

to conduct the enterprise's affairs through a pattern of racketeering activity, in violation of 18

U.S.C. § 1962 et seq.

216.    All Defendants named in this action were persons within the meaning of 18 U.S.C. § 1961.

### The Enterprise

217.    The enterprise with which the Defendants associated was organized at least as early as January 2014, if not sooner, for the purpose of infiltrating the operations of the Company in order to steal the Company's confidential information, divert the Company's existing and prospective employees, advisors, consultants, and partners, as well as existing and prospective investors, among other things, and force the Company to have to sell itself for a fraction of what the Company is worth for the benefit of the Defendants associated in the enterprise.

218.    In addition to the conduct more fully set forth above, in internal presentation prepared by the Almaviva and IQSystem Defendants they emphasized the need to acquire "disruptive startups" in order to quickly enter the California market, since innovation in the United States was at a much "faster pace" than Europe.  In addition, as a result of the enterprise they formed, the Almaviva Defendants were able for the first time to apply for a US patent, naming Valeria Sandei as the primary inventor of an alleged invention directed to an artificial intelligence semantic analysis engine, that would use a robust unsupervised machine learning approach, even though Valeria Sandei has no technical nor other background that could ever lead her to suddenly become the first named inventor in such an invention.  Not coincidentally, the sudden invention that Ms Sandei came up with, covers the identical field of technology of the Company, and which Gatti continued to acquire, while she was secretly working for the Almaviva Defendants.

219.    Other specific actions taken by the Almaviva Defendants in furtherance of the enterprise are more fully alleged above and incorporated by reference herein.

220.     This enterprise was and is directed chiefly by Defendant Gatti and the Almaviva Defendants, through Ms. Sandei as well as other executives of the Almaviva Defendants, who held primary decision making and operation authority over the enterprise, and who directed the activities and operations of Defendant Almawave USA and the IQS Defendants, in which Gatti is an officer, member and shareholder, and in which the other Almaviva Defendants are also owners.  As chief decision makers in the enterprise, Gatti and the Almaviva Defendants directed the activities of fellow enterprise associates Di Napoli, Micoli, Vignudelli, Huang, and others, who assisted the enterprise in conducting their racketeering activity against the Company.

221.     The Defendants are associates of the enterprise and cause the enterprise to function as a continuing unit by performing their individual roles as described in the foregoing allegations, as a repeated in part below.

222.     Defendant Gatti infiltrated the Company's operations by providing to members of the enterprise, the Almaviva Defendants, the IQS Defendants, Di Napoli, Micoli Huang, TheNeeds and Pansa, the confidential and proprietary information of the Company as described above, and by giving them unlawful access to the Company's offices and property using false pretenses.  The Almaviva Defendants substantially benefitted from the foregoing unlawful actions committed against the Company.  As an officer of the Company, Gatti was integral to the enterprise's operations.  Acting in her capacity as an employee, officer, and agent of the Almaviva and IQSystem Defendants, and within the scope of her employment and agency for each of those Defendants, Gatti coordinated the efforts of the other Defendants and co-conspirators named above in actively concealing the fraudulent activities of the enterprise, which have included, but were not limited to:

- Using the Company's email, computer and other IT systems and accounts for the purpose of running the financial and communications operations of the IQS and

Almawave USA, including the use of phones as the primary method of voice communication for IQS and Almawave USA's operations, creating contracts, managing accounting, conducting meetings of these two entities, and directing the services of the Company's employees and advisors for the benefit of IQS and Almawave USA, and managing these two entities' relationships with third-party suppliers and technicians obtained from the Company's confidential service provider list.

- Gatti repeatedly connected to the Company's accounts from the offices of the IQSystem and Almaviva Defendants, including from their joint office at One Embarcadero Center in San Francisco.

- Gatti repeatedly connected and used the Company's computer, which stored the Company's confidential and proprietary information, while she was working for the IQSystem and Almaviva Defendants.

- Gatti traveled and met in person with various representatives of the Almaviva Defendants, during which meetings she brought the Company's computer that stored the Company's confidential and proprietary information.

- Misappropriating the confidential and proprietary information of the Company, which include the Company's proprietary technology and strategies developed over the course of several years.  The associates of the enterprise used the Company's confidential and proprietary information to also track and monitor the Company's progress and strategies in order to identify opportunities for diverting investments, employees and advisors away from the Company.

- Causing the Company to pay for charges incurred in furtherance of the interests of the Defendants, and not the Company, including thousands of dollars in unlawful expenses for business class tickets to travel to meetings with the Almaviva

Defendants, as well as other substantial expenses that the Defendants jointly defrauded the Company of.

- Defendant Gatti infiltrated the Company by purporting to act as its CEO while simultaneously enlisting the assistance of the Defendants and the other participants in the enterprise to divert the Company's resources toward the end of defrauding the Company of its property, including its confidential information and trade secrets, its sales revenue, and the unfettered use and direction of the Company's assets.

- At the same time as Gatti infiltrated the Company in this manner, she oversaw the operation of the enterprise's separate legal entities Almawave USA and the IQS Defendants.

223.    Gatti actively performed activities on behalf of the enterprise, within the scope of her employment and agency for each of the Defendants that are part of the enterprise, and while also pretending to work for the Company, where she took measures to ensure that the Company did not detect the activities of the enterprise.

224.    The enterprise existed as an entity separate and apart from the pattern of racketeering in which it engaged, in that Gatti and the other Defendants and their associates coordinated the commission of several predicate acts of commercial bribery, mail and wire fraud against the Company, while Defendant Almawave USA and the IQS Defendants simultaneously purported to engage in a legitimate business operation that simply served as a cover up for the unlawful activities of the Defendants' enterprise alleged herein.

### The Pattern of Racketeering Activity

225.    Each of the Defendants, directly, jointly and acting in concert with each other, engaged in a pattern of Racketeering Activity by committing numerous acts of commercial bribery, as well as countless acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and

1343, against the Company, with the common and continuous purpose of conducting the

operations of the enterprise, as set forth in this Complaint, and defrauding the Company.

Defendants' actions were committed on a continuous and regular basis beginning as early as

January 2014, if not earlier, and continue without cessation to the present day.

226.    The continuous nature of Defendants' racketeering activities is clearly

demonstrated by the Defendants repeated use of electronic communications in interstate

commerce to transfer the confidential and proprietary information stolen from the Company, as

well as to transfer the commercial bribes, amounting to monthly payments in excess of $70,000

that the Almaviva Defendants were paying Defendant Gatti and the IQSystem Defendants in

furtherance of Gatti's wrongful activities against the Company, including, but not limited to, her

theft of confidential and proprietary information from the Company for the benefit of the

Almaviva Defendants.  The Defendants' activities were ongoing for at least one year, and

continued through her termination from the Company on February 3, 2015.

227.    Defendants' acts were designed with the ultimate goal of stealing from the

Company its valuable confidential and proprietary information, and forcing the Company out of

business and making off with all of its valuable intellectual property – goals that the Defendants

still seek to effectuate today by, among other activities, using the wires to destroy evidence of

their fraudulent behavior.  For example, on February 17, 2015, Gatti caused an attack on her work

account in an attempt to delete calendar data.  These unlawful acts committed by the Defendants

will continue into the future, unless enjoined, and are designed to continue to damage the

Company's business operations.

228.    Defendant Gatti and the IQSystem Defendants have used a similar modus

operandi to steal intellectual property from other companies, through the use of company insiders,

which they then would deliver to a third company who was paying them commercial bribes for

the stolen information.  For instance, Defendant Gatti and the IQSystem Defendants, in exchange

for a commercial bribe, through an insider of a large corporation that has operations in Northern

California, repeatedly took proprietary information from this company which they then would sell

to a third company paying them handsome returns of hundreds of thousands of dollars, and from

which payments they would kick back a portion to the company insider.

229.     By way of another example, the team that the Almaviva Defendants

retained in early 2014, also was using a similar scheme against a start-up based in Arizona, to

whom they were providing instructions on how to force the start-up into a cash crises, so as to

make the founder more amenable to negotiate to sell the start up.

230.     The Almaviva Defendants knowingly hired the other Defendants, who had

a well established modus operandi for the activities that the Almaviva Defendants were looking to

undertake.

231.     Indeed, a simple search of Tony Di Napoli readily would have revealed,

among other things, that he had already been accused of serious fraudulent activities by other

companies and that at the time the Almaviva Defendants hired him, he had just been kicked out

from his prior employer for embezzlement and other fraud that he was committing with Gatti.

**Commercial Bribery, Mail and Wire Fraud**

232.     Defendants engaged in a scheme to defraud the Company through the

payment of commercial bribes that the Almaviva Defendants paid to Gatti and the IQSystem

Defendants in exchange for Gatti's continued wrongful activities, as an insider of the Company,

including her misappropriation, theft, and other wrongful conduct she committed against the

Company at the direction, control, and for the benefit of the Almaviva Defendants, and as part

and parcel of the common scheme of the Defendants as alleged above.

233.     Each of the Defendants, jointly and through Gatti, while she was acting in

her capacity as an officer, employee and agent of the Defendants, within the scope of her

employment and agency, committed numerous wrongful acts in furtherance of the common

scheme and conspiracy among the Defendants, through the use of the mail and the wires, in interstate commerce, including, but not limited to, by:

- Gatti's active misrepresentations of her own activities, as well as those of her co-conspirators which she brought to the Company's offices, as well as misrepresenting Gatti's whereabouts while a full-time employee of the Company, and actually working in direct competition with and to damage the Company.

- Crafting false pretenses that Gatti, as employee of the Company, was using and accessing the Company's property and resources only for the benefit of the company, when, in reality, Defendants were misappropriating the Company's assets and resources for their own benefit and that of the enterprise;

- Misappropriating for their own benefit, and that of the Almaviva Defendants and the other Defendants, the confidential and proprietary information of the Company;

- Causing the Company to pay for charges that Gatti incurred in furtherance of the interest of Almawave USA and the other Defendants, and not the Company.

234.     As part of their pattern of racketeering activity, Gatti and the other Defendants engaged in innumerable fraudulent acts during the relevant time period.  A small sampling of the Defendants' activities include the following, during which Gatti was acting within the scope of her employment and agency for Almaviva and IQSystem Defendants, at their direction or control, or under their supervision, and for their benefit:

- Gatti repeatedly and continuously used the wires in to transfer to herself and the enterprise confidential and proprietary information of the Company in furtherance of the Defendants' racketeering activities and scheme against the Company;

- On or about February 11, 2014, Gatti sent false and fraudulent statements to the Company by email, in interstate commerce, asserting that she would be meeting

with Almaviva IT to solicit their investment for the Company.  At the time of that email, Gatti was already engaged in her pattern of racketeering activity with the Almaviva Defendants for more than one month, and her false statements were designed to further the Defendants' scheme to misappropriate the Company's confidential, proprietary information and trade secrets;

- On or about February 14, 2014, Gatti sent false and fraudulent statements to the San Francisco branch of Bank of the West by email, in interstate commerce, to fraudulently authorize Bank of the West to give access to the Company's bank account to one of her co-conspirators, Peter Huang, who was a participant in the enterprise with Gatti and the other Defendants.  In the email, Gatti falsely and fraudulently stated to Bank of the West that Huang worked for the Company, when in fact this was another step in furtherance of the Defendants' fraudulent against the Company;

- On or about March 13, 2014, Gatti used the wires, in interstate commerce, to access the Company's electronic calendar and disseminate to the Company false and fraudulent information regarding her activities for the Company, falsely stating that she would be spending all day in Palo Alto to perform work for the Company, when in fact Gatti was in Palo Alto meeting with the Almaviva Defendants to conduct activities in furtherance of the enterprise's racketeering activities and scheme against the Company.

- On or about October 22, 2014, Gatti made false and fraudulent statements to the Company by email, in interstate commerce, demanding to serve as the primary contact with investors for the benefit of the Company, when in fact she was using that communication to further the racketeering activities and scheme of the enterprise against the Company by limiting the Company's access to funding and

diverting funding and other business opportunities to the enterprise;

- On or about November 3, 2014, Gatti used the wires, in interstate commerce, to access the Company's electronic calendar and disseminate to the Company false and fraudulent information regarding her activities for the Company, falsely stating that she was holding a meeting for the Company, when in fact she was having a meeting with the Almaviva Defendants in furtherance of Defendants' racketeering activities against the Company.

- On or about November 13, 2014, Gatti made false and fraudulent statements to the Company by email, in interstate commerce, to an interested investor with whom the Company was due to meet, by falsely and fraudulently telling the investor that the meeting needed to be cancelled because the Company's co-founder and chief scientist was ill, when in fact this was not true.

235.     The foregoing are but a few of the numerous fraudulent activities that the Defendants carried continuously and repeatedly for an extensive period of time, as the Company intends to prove at trial.  In furtherance of this scheme, the Defendants repeatedly perpetrated this fraud through regular wired communications, including, but not limited to, emails and other electronic communications sent to the Company and the Company's agents from various locations both within and outside California, and through interstate commerce.

236.     The Defendants also caused to be placed in the mail, both within and outside of California, and through interstate commerce, instruments of their fraud in furtherance of the scheme described herein.

237.     In furtherance of the same scheme and racketeering activities, the Defendants repeatedly used interstate wire and mail transmissions, in the form of interstate e-mails, telephone calls, faxes, access to electronic repositories, wire transfers, and mail, among other things, to communicate and conduct transactions on behalf and in furtherance of their

racketeering enterprise.

238.     As a direct and proximate result of the Defendants' racketeering activities in violation of 18 U.S.C. § 1962 et seq., the Company has been injured and suffered losses to its business and property, including, but not limited to, loss of confidential information, investor goodwill, past and future existing and prospective business relations, lost assets, and lost profitability.

239.     WHEREFORE, the Company demands judgment against all Defendants, jointly and severally as more fully set forth in the Prayer for Relief below, including, but not limited to preliminary and permanent injunctive relief, damages in an amount to be determined at trial, trebled with interest, attorneys' fees and costs, and any other and further relief as the Court may deem appropriate.

240.     The Company also prays that each the corporate Defendants be found liable for the wrongful activities perpetrated in violation of 18 U.S.C. § 1962 et seq. on the basis of the corporate Defendants' vicarious liability as the employers and principals of Defendant Gatti, whom they controlled, had the ability to control, and whose wrongful activities and damage to the Company were all foreseeable by the corporate Defendants, who also obtained the legal advice of Orrick, who would have had to, or should have, necessarily advised them that the Defendants' activities against the Company were wrongful and illegal under United States laws.

## SECOND CAUSE OF ACTION

**(Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, and Unauthorized Access to Computers, Cal. Penal Code §§ 502 *et seq.* against Defendants Gatti, IQSystem LLC, IQSystem Inc., and the Italian Almaviva Defendants)**

241.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

242.     The Italian Almaviva and the IQSystem Defendants unlawfully directed Gatti, while she was acting within the scope of her employment and agency for those Defendants,

to access the Company's computer that had been assigned to Gatti for their benefit and in violation of Gatti's confidentiality obligations to the Company.  The computer assigned to Gatti by the Company was recorded as a fixed asset of the Company since 2012, and contained critical confidential and proprietary information of the Company.

243.    The Company revoked, rescinded and terminated all permissions and authority to Gatti to access that computer, as well as all of the other electronic accounts of the Company and other electronic devices owned by the company including, but not limited to, one back-up drive, Seagate Goflex 1.5 TB, serial number NAOLHS87, UPC number 763649035573 ("Back Up Drive"), immediately upon termination of her employment by the Company on February 3, 2015.  As of February 3, 2015, Gatti remained an employee, officer and agent of the IQSystem and Almaviva Defendants.

244.    The termination of Gatti's access rights was effectuated, *inter alia*, by personally telling her she no longer was authorized to any further access of the Company's computers, by her pre-existing contractual obligations under the CIIAA § 5, in which she agreed expressly that "at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes... other documents or property..." and by the Termination Certification, which reads, "[t]his is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes... other documents or property..."  Further, immediately following her termination, the Company disabled Gatti's access to all corporate accounts provided to her by the Company.

245.    Notwithstanding that she lost lawful authorization to access the Company's computer and other electronic repositories Gatti, acting within the course of her employment and agency for the Almaviva and IQSystem Defendants, and in conspiracy with them, continued to access the Company's computers, IT and other electronic repositories after her access was

terminated on February 3, 2015.

246.     Among other things, following the termination of her access on February 3, 2015, and while continuing to act as an officer, director, and employee of the Almaviva (until at least March 9, 2015) and the IQ System Defendants and in conspiracy with them, Gatti continued use the Company's computer without authorization, including by using it from the Almaviva Defendants' domicile located in her home, and by also allowing, continuing through today's date IQSystem's employees, including Tony Di Napoli, unauthorized access to the Company's computer.

247.     Further, following the termination of her access on February 3, 2015, and while continuing to act as an officer, director, and employee of the Almaviva (until at least March 9, 2015) and the IQ System Defendants and in conspiracy with them, Gatti circumvented the Company's technical measures to preclude her access to nonetheless enter the Company's system and delete information that was being displayed on her Company account, to which she no longer had access.  Defendant Gatti was able to circumvent the Company's technical barriers to access her account post-termination as a result of her unlawful and unauthorized linking of an internet account that she owned, and from which she was able to continue controlling certain aspects of data that were posted on her Company's account.  For instance, through this feature, Defendant Gatti, could control editing and deletion of calendar entries.  On February 18, 2015, Defendant Gatti, acting within the scope of her employment for the Almaviva and IQSystem Defendants, deleted from her Company account to which she no longer had authorized access critical data relating to her activities while she was employed by the Company.  This access was improper and unauthorized.

248.     By their conduct, the Defendants improperly circumvented the restrictions imposed on Gatti's access to the Company's electronic repositories.

249.     The Defendants, acting through Gatti, without lawful authorization, logged

on the Company's computer from their primary domicile at Gatti's home, from One Embarcadero Center in San Francisco and from other places.  This access was and continues to be improper and unauthorized.

250.    The Defendants used Gatti's unauthorized access to obtain confidential and proprietary trade secret information from the Company for the purpose of unfairly competing with the Company, unjustly enriching themselves, and in violation of state and federal law as well as numerous duties owed to the Company.  For instance, after this action was filed the Almaviva Defendants, knowing that Gatti's access to the Company's computers had been terminated, continued to use Gatti to obtain highly confidential information of the Company, including through her unlawful access to the Company's computer after her permissions were rescinded by the Company.

251.    Gatti also used this unauthorized access on behalf of herself and the other Defendants for whom she was working to destroy or alter evidence of her and the other Defendants' activities, including but not limited to deleting information from her calendar maintained on the Company's IT system following termination of her employment, and erasing information from her work laptop, in violation of state and federal law as well as numerous duties owed to the Company.

252.    As a result of this unauthorized access, the Company has suffered a loss during any one-year period of in excess of $7,000 in value in real economic damages.  The losses incurred include, *inter alia*, costs related to:

- Investigating Gatti's intrusion and conducting a damage assessment to block Gatti from further access;

- Changing access protocols to each such account to prevent further intrusion by Gatti;

- Seeking to preserve evidence of what Gatti deleted and altered subsequent to

her termination by the Company, including the Google Calendar linked to Gatti's former corporate account; and

- the cost of the devices that Gatti failed to return to the Company;

253.    As a further result of Defendants' unlawful and unauthorized access to the Company's computer and electronic repositories, through Gatti, the Company has suffered and will continue to suffer significant harm, including but not limited to the loss of confidential information, investor goodwill, past and future existing and prospective business relations, and lost profitability.

254.    WHEREFORE, the Company demands judgment against all Defendants, jointly and severally as more fully set forth in the Prayer for Relief below, including, but not limited to preliminary and permanent injunctive relief, damages in an amount to be determined at trial, trebled with interest, attorneys' fees and costs, and any other and further relief as the Court may deem appropriate.

255.    Pursuant to Section 502(e)(2) of California's Penal Code, the Company also seeks its attorney's fees associated with the investigation and prosecution of this action.

256.    Pursuant to Section 502(e)(4) of California's Penal Code, to the extent Gatti is guilty of oppression, fraud, and malice, Gatti is also liable for punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Fraud in the Inducement against Anna Gatti)

257.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

258.    Gatti made numerous misrepresentations of fact to the Company in connection with her application for employment with the Company, including, but not limited to the following:

- That she worked as a Visiting Professor and was awarded a PhD and Post-Doc by Stanford University;

- That she worked as a Visiting Professor at the University of California, Berkeley;

- That she earned a salary of $450,000 per year at her prior job at Skype, justifying an award of a large number of shares of stock in the Company to compensate for a lower salary;

- That a bigger stake in the Company was necessary to require her to leave Skype, when in fact Gatti had already been terminated by Skype;

- That she had the ability, skill, connections and intention to procure funding for the Company through her allegedly extensive network.

259.     Gatti at all times knew that the Company would rely on her representations.

260.     Gatti knowingly made these representations in order to extract both employment and unwarranted compensation in the form of stock and salary from the Company.

261.     The Company justifiably relied upon Gatti's representations when it elected to hire Gatti, appoint her as CEO, appoint her to the Company's board, provided her with a significant fraction of potential ownership of the Company, specifically 30% of the Company if all the shares vested, and relied upon her supposed expertise and connections in attempting to grow its business.

262.     As a result of Gatti's fraudulent inducement, the Company has been harmed.

263.     WHEREFORE, the Company demands judgment against Gatti, including rescission of the SPA (as more fully set forth below), and/or a declaration that Gatti stopped vesting any shares in the Company beginning in March 2013, when Gatti admits she stopped actually working for the interest of the Company, had an "empty role" for the Company, but continued to pretend to work for the Company in order to perpetrate the wrongdoing alleged

herein and unlawfully continue to vest shares in the Company;

264.    The Company also respectfully demands judgment against Gatti for the legal damages in respect of the other contracts in which Gatti fraudulently induced the Company to enter into, including restitution of all payments made to Gatti, of all money unlawfully misappropriated by Gatti from the Company, and of all the benefits for which the Company paid for Gatti's account.

265.    Because Gatti acted willfully, purposefully, knowingly, maliciously, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Rescission and Restitution for Failure of Consideration, against Anna Gatti)

266.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

267.    In reliance on Gatti's fraudulent representations described above, the Company was induced into entering in the SPA with Gatti, and was induced to convey under the SPA a large amount of stock in the Company, amounting to approximately 30% of the Company had the stock fully vested.

268.    As a result of Gatti's fraudulent inducement, the Company is entitled to rescind the SPA and obtain a return of all the shares that Gatti has fraudulently vested.

269.    In the alternative, the Company is entitled to a declaration that the shares under the SPA stopped vesting (1) at the time Gatti began breaching her employment agreement and, therefore, would have no longer been in Continues Service Status under the SPA for vesting purposes, because, had the Company known the true facts it would have immediately terminated Gatti, and Gatti could not have lawfully vested a single share in the Company, or (2) at a time no later than March 2013 when Gatti claimed that she held an empty role as the CEO of the

Company and has stopped working for the Company's interest.

270.     The Company is further entitled to rescission of the SPA with Gatti as a result of a complete failure of consideration resulting from Gatti's failure to deliver actual valuable technology or business assets as the SPA required her to convey.

271.     The promised consideration for the stock Gatti received under the SPA therefore never materialized, because it never existed in the first place.  Gatti had no intention to , and did not cure this material defect in the SPA.

272.     As a result of either or both of Gatti's fraudulent inducement and/or failure to provide consideration for the SPA, the SPA between the Company and Gatti is null and void, of no effect, and should be declared rescinded.

273.     As a result of this conduct, the Company also suffered substantial damages and prays for an offset of a token payment made by Gatti to the Company in the amount of $293.33, which payment should serve to offset the rescissionary damages caused by Gatti to the Company.

## **FIFTH CAUSE OF ACTION**

### **(Fraud against all Defendants)[5]**

274.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

275.     The Defendants, through Gatti, made numerous fraudulent representations and omissions to the Company, including, but not limited to the following:

- Gatti misstated key aspects of her qualifications, employment history, and salary history, both in written and verbal communications to the Company, in order to obtain employment from the company;

---

[5] For the avoidance of doubt, the Company's Fraud claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of trade secrets from the Company.

- Gatti fabricated positive employment references and documentation, which she directed the Company to check, to reinforce her own fraudulent misstatements;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for the Defendants, continuously misled the company through ongoing representations that she was acting in the Company's best interests and on the Company's behalf, when that was not true;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for the Defendants, continuously misled the Company by concealing key information as to her relationships with numerous other business, including, but not limited to, her consultancy with The Needs Inc., her creation of the IQS Defendants, her role as CEO of Almawave USA, and her ongoing relationship with the Almaviva Defendants;

- Gatti opened numerous bank accounts in order to conceal the payments she received from the Company's competitors in return for her misdeeds;

- Gatti, acting for her own benefit and as an agent of the Almaviva Defendants, and within the scope of her employment and agency for these Defendants, misrepresented her purpose in going to Italy to meet with Almaviva and then acting at the direction and control of the Almaviva Defendants fraudulently obtained for their benefit from the Company valuable confidential information of the Company, and in which the Company had a property interest;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for these Defendants, misstated the nature of work to be performed by Di Napoli and Micoli in order to place them inside the Company's offices where they could obtain valuable confidential information from the Company, in which the Company had a property interest,

while these individuals were working for IQSystem and Almaviva Defendants;

- Di Napoli and Micoli acted as agents of the Defendants in furtherance of their fraud by asserting that they were using the Company's office space for development of a microchip business, which information was false and used to deceive the Company into giving them access to its offices, for the benefit of the Almaviva Defendants;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for these Defendants, misled the Company into allowing her to lead communications with Investment Fund 2 so that she could sabotage that relationship, as well as the developing relationship with Investment Fund 3, which she then proceeded to invite to participate in commercial activities of the Almaviva Defendants;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for these Defendants, made numerous misstatements of fact to the Company's newly hired marketing director in an attempt to prevent her from being hired and, subsequently, from performing the job for which she was hired;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for these Defendants, fraudulently claimed that if she were to be removed from her participation in the communications with Investment Fund 4, with whom the Company was negotiating, the Company was likely to lose the investment; in fact, Gatti and Di Napoli, subsequently met with a key representative of Investment Fund 4 in Europe, while acting as employees and agents of the Almaviva Defendants, and following this meeting caused Investment Fund 4 to breach its executed term sheet

with the Company to provide the agreed upon funding;

- Gatti, acting for her own benefit and as an agent of the other Defendants, and within the scope of her employment and agency for these Defendants, told the other founders of the Company that Investment Fund 4 required that they not bring any other investors to the company; and

- When Investment Fund 4 pulled out, Gatti, acting for her own benefit and as an agent of the other Defendants, initially represented to the Company that she did not know why Investment Fund 4 pulled out, and subsequently represented that she had simply misunderstood their request.

276.     In addition to these items, Defendants also committed fraud through the activities described in detail above, *see supra*, as well as through numerous other activities as will be provided to the Defendants in discovery and as will be proved at trial.

277.     The Defendants knew these misrepresentations and omissions were false.

278.     By making these misrepresentations and omissions, the Defendants intended to deceive the Company and induce reliance on their misstatements and omissions.

279.     The Company justifiably relied on the Defendants' misrepresentations and omissions, including, but not limited to, by:

- Making an employment offer to Gatti, which included a cash and stock compensation package that Gatti could never have obtained but for her fraudulent representations;

- Continuing to employ Gatti in various capacities;

- Paying a salary to Gatti;

- Conveying shares of stock in the Company to Gatti;

- Sharing confidential, proprietary, and trade secret information with Gatti;

- Funding Gatti's trip to Italy to meet with Almaviva purportedly on behalf of the

Company;

- Relying on Gatti as a primary point of contact for numerous investors;

- Following Gatti's instructions regarding investor requests, including, but not limited to, not seeking, and actively turning down, further investors while courting Investment Fund 4; and

- Allowing Gatti to place Di Napoli and Micoli in the Company's offices.

280.    The fraud committed against the Company was fully foreseeable by each of the corporate Defendants who approved, directed, controlled, and acted jointly with Gatti in the perpetration of the frauds alleged herein, and while she was carrying out activities incident to her employment and agency for the other Defendants.

281.    As a direct and proximate result of these fraudulent acts, the Company has suffered and will continue to suffer further harm, including the loss of proprietary information and competitive position, investor goodwill, past and future existing and prospective business relations, and reduced profitability.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

282.    The other Defendants acted jointly and in conspiracy with Gatti, and repeatedly undertook steps in furtherance of the conspiracy and intended to deceive the Company for as long as possible.

283.    To the extent Defendants were willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, they are also liable for punitive damages in an amount to be determined at trial.

284.    To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by the Defendants, the Company is further entitled to preliminary and permanent injunctive relief enjoining the Defendants from using any information improperly obtained from the Company through their fraudulent acts.

## SIXTH CAUSE OF ACTION

### (Breach of Contract against Anna Gatti)

285.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

286.     Gatti's employment by the Company was contingent upon her execution of the Executed OL and the CIIAA, in which Gatti agreed to keep confidential, hold in trust, not duplicate, and not disclose to any third parties all of the Company's confidential and trade secret information without the Company's consent.  Through the CIIAA, Gatti also agreed to devote her full-time and best efforts to the Company's interests, to not accept concurrent employment from anyone else, let alone actual or potential competitors, without the Company's prior written consent, and to not solicit any employees, advisors, consultants, investors or other service providers of the Company.

287.     Gatti also executed several other contracts with the Company, including the SPA, the Executed OL, and an Application for Employment.

288.     Gatti breached the SPA by fraudulently maintaining an appearance that she remained in Continuous Services Status, when in fact she was not, and concealed her breaches of the Employment Agreements that would have caused her immediate termination and would have precluded her from vesting shares in the Company.

289.     Gatti breached the Application for Employment by falsely executing a certification that the information Gatti provided was true, correct, and complete.  The information presented by Gatti in the Application for Employment contained numerous material misstatements and misrepresentations that were subsequently relied on by the Company to its detriment.

290.     Gatti breached Section 7 of the Executed OL through the numerous acts described herein, including but not limited to, acceptance of employment as CEO of Co-

Defendant Almawave USA while still employed by the Company, her founding of the IQS

Defendants while still employed by the Company, her consulting work with The Needs Inc., her

diversion of opportunities, investors, engineers, advisors, and confidential information to other

businesses, including actual or potential competitors, and her solicitation of the Company's

employees and consultants, including but not limited to, DV, on behalf of and for the benefit of

the other Defendants.

291.    Gatti breached Section 2 of the CIIAA through her business relationship

and acceptance of employment from the Almaviva Defendants, including her acceptance of a

position as CEO of Almawave USA while still employed by the Company, her founding of the

IQS Defendants while still employed by the Company, her consulting work with The Needs Inc.,

her other business undertakings for other companies in violation of the contractual obligations to

the Company, her diversion of opportunities, investors, engineers, advisors, and confidential

information to competitors, her regular and extended absences from work, her regular failure to

complete her work for the Company, which includes her intentional failure to procure, and her

subsequent sabotage of funding opportunities for the Company, her solicitation of the Company's

employees, advisors, and consultants, including but not limited to, DV on behalf of the

Company's competitors, and by diverting her time and energy away from the best interests of the

Company and toward competitors' interests.

292.    Gatti breached Section 3(a) of the CIIAA by forwarding all emails received

at her work email address to her personal email address, and by sharing confidential information

contained in those emails and elsewhere with the Company's competitors, including several Co-

Defendants.

293.    Gatti breached Section 5 of the CIIAA by failing to return company

property in her possession, including the laptop computer provided to her, to the Company within

a reasonable time after her employment with the Company was terminated.

294.     Gatti breached Section 6 of the CIIAA by failing to sign and deliver a termination certification to the Company upon termination of her employment relationship with the Company.

295.     Gatti breached Section 8(a) of the CIIAA by soliciting numerous individuals, including but not limited to, advisors to the Company, employees of Company, consultants engaged by the Company, and others to perform work for one or more of the competitor companies with which Gatti became affiliated during her employment with the Company.

296.     Gatti breached Section 8(b) of the CIIAA by working for and soliciting investors, customers, and employment prospects on behalf of numerous competitors, including but not limited to the Almaviva Defendants and The Needs Inc., while still employed by the Company.

297.     Gatti breached Section 10(b) of the CIIAA by failing to list all activities engaged in by her, and by entering into further agreements, which may be in conflict with the CIIAA, including those enumerated above.

298.     Gatti breached Section 10(c) of the CIIAA by failing to comply with all provisions in the CIIAA, as enumerated herein.

299.     Gatti also breached additional sections of the SPA and CIIA causing damage to the Company.

300.     As a direct and proximate result of Gatti's breach of these contracts, the Company has suffered and will continue to suffer further harm, including the loss of proprietary information and competitive position, investor goodwill, past and future existing and prospective business relations, and reduced profitability.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(Breach of Duty of Good Faith and Fair Dealing against Anna Gatti)**

301.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

302.    California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

303.    By executing the SPA, ATA, Executed OL, CIIAA, and Application for Employment, Gatti entered into several California contracts with the Company.

304.    By virtue of her wrongdoing described above, including, but not limited to, improperly copying the Company's confidential information and trade secrets, improperly disclosing the Company's confidential information and trade secrets to competitors and other third parties, improperly sabotaging the Company's attempts to raise funds from actual and potential investors, improperly obtaining and continuing employment with other business while still employed by the Company, improper appropriation of Almaviva's interest to invest in the Company by preventing that investment and instead procuring for herself generous compensation and an executive position at Defendant Almawave USA in exchange for the Company's confidential and trade secret information, improperly diverting numerous investors, opportunities, engineers, employees and advisors to competitors of the Company, improperly founding the IQS Defendants without disclosing them to the Company, improperly accepting varied positions with numerous businesses including, but not limited to, a consultant position with The Needs Inc., improperly conveying false information to shareholders of the Company following her termination, and all other wrongdoing alleged above, Gatti improperly interfered with the Company's right to receive the benefits it is due under its various contracts with Gatti, thereby breaching the covenant of good faith and fair dealing implied in these contracts.

305.    As a result of these breaches, the Company is entitled to damages in an amount to be determined at trial.

306.     To the extent Gatti's conduct was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

307.     To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by Gatti, the Company is further entitled to preliminary and permanent injunctive relief enjoining Gatti from competing with the Company, from using the Company's confidential and trade secret information, and from soliciting the Company's present and future employees, investors, and customers.

## EIGHTH CAUSE OF ACTION

### (Theft of Corporate Opportunity, against Anna Gatti)

308.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

309.     Gatti misappropriated the Company's corporate opportunities through her acts described above.  This misappropriation includes, but is not limited to,

- Gatti's use of the Company's connection to Investment Fund 1 to gain an introduction to Pansa to discuss becoming involved with TheNeeds Inc.;

- Gatti's scuttling of the Company's investment opportunity with Investment Fund 2, after which Gatti proceeded to invite Investment Fund 2 to an event with the Almaviva Defendants;

- Gatti's scuttling of Almaviva IT's attempt to invest in the Company by preventing that investment and converting it to a highly paid position for herself at Almawave USA in exchange for the Company's confidential and trade secret information;

- Gatti's misappropriation of the Company's confidential or trade secret information on behalf of the Company's competitors in exchange for direct payment, board membership, or employment with other competitors of the Company.

310.     Gatti knew that the opportunities she continuously misappropriated were reasonably incident to the Company's present and future business and were opportunities that the Company was pursuing or could have pursued, itself.

311.     Through Gatti's acts, the Company has suffered and will continue to suffer significant harm, including but not limited to the loss of past and future existing and prospective business relations, and lost profitability. The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

312.     To the extent Gatti was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Gatti is also liable for punitive damages in an amount to be determined at trial.

313.     To the extent that a remedy at law will be insufficient to fully compensate the Company for the harms caused by Gatti, the Company is further entitled to preliminary and permanent injunctive relief enjoining Gatti from competing with the Company, from using the Company's confidential and trade secret information, and from soliciting the Company's present and future employees, investors, and customers.

## NINTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage against All Defendants)**[6]

314.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

315.     Prior to and during the events recounted above, the Company maintained economic relationships with numerous current and prospective investors, which had the probability of future economic benefit to the Company based upon the likelihood of those parties' investment in the Company.

---

[6] For the avoidance of doubt, the Company's Tortious Interference claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of "trade secrets" from the Company.

316.     Specifically the Company had prospective economic relationships with each of the Investment Funds names in this action, as well as other entities to be identified to the Defendants in discovery.

317.     Prior to and during the events recounted above, the Company also maintained economic relationships with its employees and contractors, which had the probability of future economic benefit to the Company based upon those individuals' future work for the Company.

318.     Gatti was fully aware of these relationships, and was in fact primarily responsible for cultivating certain of them.

319.     The other Defendants were likewise fully aware of these relationships.

320.     Gatti and the other Defendants intentionally acted to disrupt and harm relationships between the Company and numerous potential and actual investors through a variety of acts, including but not limited to:

- Gatti's use of the Company's investment opportunity with Investment Fund 1 to gain an introduction to Pansa to discuss becoming involved with TheNeeds Inc.;

- Gatti's scuttling of the Company's investment opportunities with Investment Fund 2 and Investment Fund 3 through unwarranted and improper disclosure of information to the potential investors;

- The Defendants invitation of key individuals of Investment Fund 3 to their commercial events destroying any further opportunity for the Company to do business with this entity, who had now learned, before the Company, of Gatti's unlawful behavior and of her being the CEO of two companies;

- Gatti's scuttling of the Company's investment opportunities with Investment Fund 4 by telling the Company that Fund 4 demanded that the Company not procure any other funding if it wanted funding from Fund 4, when Fund 4 actually requested

precisely the opposite;

- The Defendants interference with the prospective business relationship with Investment Fund 4, who has signed a term sheet, and who was in the process of signing an additional contract for the provision of millions of dollars in funding to the Company.  Despite these contractual and other commitments which were about to be executed, the Defendants, acting through Gatti and Di Napoli, intentionally and tortiously interfered with this relationship by sending Gatti and Di Napoli to meet, in their capacity as employees and agents of the Almaviva Defendants, with a key officer of Investment Fund 4 in Europe, causing the Company's loss of Investment Fund 4 existing and prospective contract that was in the process to be signed and causing the loss of funds that Investment Fund 4 had already confirmed it would be wiring to the Company;

- Following the destruction of the Company's relationship with Investment Fund 2, Gatti and the Almaviva Defendants met with Investment Fund 2 in order to procure their investment;

- Gatti's scuttling of Almaviva IT's attempt to invest in the Company by preventing that investment and converting it to a highly paid position for herself at Almawave USA in exchange for the Company's confidential and trade secret information;

321.     Gatti and the other Defendants intentionally acted to disrupt and harm the relationships between the Company and the Company's employees, consultants and advisors, by soliciting them to work for competitors of the Company.

322.     These acts were independently violative of numerous state and federal laws, as well as contractual and common-law obligations owed by Gatti to the Company.  The Defendants acted in concert with Gatti, and provided her substantial assistance in committing these violations.

323.      This behavior by Gatti caused numerous potential and actual investors to not invest in the Company, or to invest lesser amounts than they otherwise would have.

324.      This behavior further caused the Company's employees and contractors, including, but not limited to, DV, to fail to perform work for the Company, and to instead perform work for the Company's competitors.

325.      As a result of Gatti and the Almaviva Defendants' disruption of the Company's relationship with potential and actual investors and with employees and contractors, the Company has suffered and will continue to suffer great harm.  The Company is therefore entitled to compensatory damages in an amount to be determined at trial.

326.      The Company is entitled to permanent and preliminary injunctive relief prohibiting Gatti and the Almaviva Defendants from interfering with the Company's current and prospective business relationships, from competing with the Company based upon any prior interference, and from soliciting the Company's present and future employees, investors, and customers.

## TENTH CAUSE OF ACTION

### (**Tortious Interference against all Defendants**)[7]

327.      The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

328.      At all times relevant to this dispute, a contractual relationship existed between the Company and Anna Gatti; between the Company and Investment Fund 4, among other and further existing contractual relationships as will be more fully disclosed to the Defendants during the course of discovery.

329.      At all times relevant to this dispute, Gatti and the Almaviva Defendants

---

[7] For the avoidance of doubt, the Company's Tortious Interference claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of "trade secrets" from the Company.

had actual knowledge of these contractual relationships.

330.     The Almaviva and IQSystem Defendants intentionally or recklessly interfered with the contractual relationship, as well as the at will employment relationship, between the Company and Anna Gatti, including but not limited to, by inducing her to breach numerous restrictive covenants and obligations set forth in the CIIAA, including §§2, §(a), 5, 6, 8(a), 8(b), 10(b), and 10(c) and the Executed OL, including §7.

331.     The Almaviva and IQSystem Defendants intentionally or recklessly interfered with the contractual relationship between the Company and Investment Fund 4, including by intentionally inducing Investment Fund 4 to breach the Term Sheet that it had entered with the Company.

332.     Gatti, acting on behalf of the Almaviva and IQSystem Defendants, and subsequently (and continuing through today's date) on behalf of herself continuously engaged in communications with Investment Fund 4 including, but not limited, by using text messages from her phone with high-level representatives of Investment Fund 4 in connection with the unlawful interference alleged herein, and subsequently in connection with her attempt to cover up her illegal conduct.

333.     As a direct and proximate result of the Defendants' actions and the contractual and other breaches tortiously induced by the Defendants, the Company has and will continue to be irreparably harmed, including but not limited to, by the loss of confidential information, investor goodwill, past and future existing and prospective business relations, lost profitability, and damage to its ability to procure further business, loss of its fiduciary relationship with its corporate counsel, among other things.  The Company has no adequate remedy at law.

334.     The Company is entitled to permanent and preliminary injunctive relief prohibiting Gatti and the other Defendants from interfering with the Company's contracts and other relationships, from competing with the Company based upon any prior interference, from

using the Company's confidential and trade secret information obtained through their

interference, and from soliciting the Company's present and future employees, investors, and

customers, and service providers.

335.     As a direct and proximate result of Gatti and the other Defendants'

misconduct, the Company has further suffered damages, including but not limited to, the loss of

confidential and trade secret information, past and future existing and prospective business

relations, and a loss of profitability.  The Company is therefore entitled to compensatory damages

in an amount to be determined at trial.

336.     To the extent that the conduct of Gatti and the other Defendants was

willful, purposeful, knowing, malicious, and without regard for the rights and interests of the

Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets, California Civil Code §§ 3426 *et seq.*, against All Defendants)

337.     The Company repeats and realleges each and every allegation contained in

the foregoing paragraphs and incorporates them herein by reference.

338.     The Company's trade secret materials comprise documents and

information that are not generally known to the public or to other persons who can obtain

economic value from their disclosure or use.  These documents and information are the subject of

reasonable efforts by the Company to maintain their secrecy, and they derive independent

economic value from not being generally known.  Some or all of the documents and information

comprising the Company's trade secrets constitute "trade secrets" under California Civil Code

Section 3426.1.

339.     Each of the Defendants, directly and jointly, through Gatti, while she was

acting an employee, officer and agent of the Almaviva and IQSystem Defendants, and within the

scope of her employment and agency for each of these Defendants, misappropriated the Company's trade secrets, by improperly acquiring or using or disclosing trade secrets that were contained in the categories listed in Section E and elsewhere in this Complaint, and incorporated herein by reference.  A complete list of trade secrets misappropriated by the Defendants will also be provided to them before discovery in accordance with California law.

340.     The Almaviva Defendants and IQSystem Defendants also indirectly misappropriated the Company's trade secrets through Gatti, and knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that Gatti had acquired the Company's trade secrets through improper means (including, but not limited to, through the Almaviva Defendants' payment to Gatti of a commercial bribe) or that Gatti was breaching her duty of confidentiality to the Company by disclosing it.  Indeed, the Almaviva Defendants knew that but for Gatti's role at the Company, she had no experience in artificial intelligence and had nothing to offer the Almaviva Defendants, other than her direct access to the Company's trade secrets.

341.     The IQSystem and Almaviva Defendants also knew or had reason to know, that the information Gatti was acquiring for them and/or using or disclosing to them was a trade secret of the Company and that the disclosure was a mistake.

342.     The Defendants also knew or had reason to know that the Company had not authorized the Defendants' acquisition, use or disclosure of the Company's trade secrets through Gatti.

343.     Defendants willfully and maliciously misappropriated the Company's trade secrets, which include but are not limited to, proprietary computer programs, business plans, and investor lists and contact information, and the other categories of information listed in Section E above and in other parts of this Complaint.

344.     By reason of the above-alleged acts and conduct of Defendants, the

Company has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and the Company will be without an adequate remedy at law.

345.    The Company is entitled to recovery of statutory monetary damages from Defendants for the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation that is not taken into account in computing damages for actual loss. The amount of such relief will be determined at trial.

346.    If damages or unjust enrichment are not provable, the Company is entitled to an order for payment of a reasonable royalty from Defendants for the period of time the use of the Company's trade secrets could have been prohibited.

347.    Because Defendants' acts of misappropriation were both willful and malicious, the Company is also entitled to an award of statutory exemplary damages and attorneys' fees against Defendants.

348.    The Company is entitled to a permanent and preliminary injunction restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling the Company's trade secrets, or any product or services based on or incorporating all or part of the Company's trade secrets, and restraining them from obtaining any commercial advantage or unjust enrichment from the misappropriation of the Company's trade secrets.

349.    The Company is further entitled to an order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to the Company any and all of its trade secrets and confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's trade secrets and confidential, proprietary information, and a preliminary injunction requiring that Defendants preserve any and all such information, as well as the computers, networks, data storage devices,

and/or other means by which such information has been obtained, received, collected, or stored by Defendants, or which could contain or embody any evidence relating to the Company's allegations as set forth herein.

## TWELTH CAUSE OF ACTION

### (Conversion against Gatti and the IQSystem Defendants)[8]

350.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

351.     The Company is the owner of a computer, a back up drive, and various confidential proprietary information at issue in this Complaint, which have been stolen by Gatti and which she maintains in accounts that she improperly created using her personal email address, even though these accounts were directed by the Company to be created for use in the conduct of Company's business, including accounts with Dropbox and other online companies. Gatti and the IQSystem Defendants wrongfully converted for themselves the Company's property in the foregoing tangible and intangible items.

352.     Through the above-alleged acts and conduct of Defendants, the Company has been damaged, and will continue to suffer great and irreparable harm and damage. Defendants' conversion includes, but is not limited to, numerous items of confidential and proprietary information, as well as the Company's physical property.  The full amount of this irreparable harm will be difficult or impossible to ascertain, and the Company will be without an adequate remedy at law.

353.     The Company is therefore entitled to a preliminary and permanent

---

[8] For the avoidance of doubt, the Company's Conversion claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of "trade secrets" from the Company.

injunction restraining Defendants, their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling the Company's confidential, proprietary information, or any product that is based on or incorporates part or all of such material, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of the Company's confidential and proprietary information.

354.    The Company is entitled to an order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to the Company any and all of its confidential, proprietary materials, including but not limited to any and all materials created incorporating or referencing the Company's confidential proprietary information, and to preserve any and all such information, as well as the computers, networks, data storage devices, and/or other means by which such information has been obtained, received, collected, or stored by Defendants or which could contain or embody any evidence relating to the Company's allegations as set forth herein.

355.    The Company is further entitled to recover damages from Defendants suffered by reason of the aforesaid acts in an amount to be determined at trial.

356.    To the extent Defendants were willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

### (Unfair Competition against All Defendants)[9]

357.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

358.    The acts of Defendants, as herein alleged, constitute unlawful, unfair and

---

[9] For the avoidance of doubt, the Company's Unfair Competition claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of "trade secrets" from the Company.

deceptive business practices in violation of California Business & Professional Code § 17200 *et seq.* and common law.

359.     The acts of Defendants, as herein alleged, are unlawful because they violate federal and state statutes, including but not limited to California Penal Code §§ 502 *et seq.* (California Comprehensive Computer Data Access and Fraud Act), 18 U.S.C. §§ 1030 *et seq.* (Computer Fraud and Abuse Act), 18 U.S.C. 1962 *et seq.* (Racketeer Influenced and Corrupt Organizations), and California Civil Code §§ 3426 *et seq.* (Misappropriation of Trade Secrets).

360.     The unlawful, unfair and deceptive business practices of Defendants described above present a continuing threat to the Company's business and intellectual property portfolio.

361.     As a direct and proximate result of these acts, Defendants have been unjustly enriched, and in the future will continue to be unjustly enriched by, among other things, their use of the Company's confidential and proprietary information and business processes and methods.

362.     The unlawful, unfair and deceptive business practices that Defendants have engaged in to date have given them an enormous "head start" that a new entrant company competing by legitimate means would not have.  This head start will allow each of the Defendants to compete with the Company for funding and customers, whereas if they had conducted themselves lawfully they would not be in a position to compete for many months, if not years.

363.     The Company has suffered damage by Defendants' unlawful, unfair and deceptive conduct as alleged herein, and will continue to be damaged by Defendants' conduct until it is enjoined.  Defendants have misappropriated the Company's valuable confidential and proprietary information, and have used that information to gain an undue advantage.

364.     The Company has been irreparably injured by Defendants' unlawful, unfair and deceptive conduct.

365.    The Court should find that Defendants' actions violate California Business & Professional Code § 17200 *et seq.*, and award Plaintiff such restitution, disgorgement and/or damages as are permitted by statute as well as injunctive relief, including preliminary and permanent injunctive relief restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling the Company's trade secrets, or any product or services based on or incorporating all or part of the Company's confidential information, and restraining them from obtaining any commercial advantage or unjust enrichment from the misappropriation of the Company's confidential information.

## FOURTEENTH CAUSE OF ACTION

### (Unjust Enrichment, against All Defendants)[10]

366.    The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

367.    As a result of Defendants' actions, alleged in detail above, including but not limited to their misappropriation and use of confidential information, interference with contractual and other relationships, and fraudulent misrepresentations to the Company, Defendants have profited at the Company's expense.

368.    Defendants' receipt of these benefits is at the direct expense of the Company, which has invested years in the development of proprietary, confidential, and trade secret information that was misappropriated by Defendants for their own use.

369.    It would be against equity and good conscience to allow Defendants to retain any of the profits, opportunities, or other benefits they have and will continue to realize – at the direct expense of the Company – by means of their wrongdoing described herein.

---

[10] For the avoidance of doubt, the Company's Unjust Enrichment claim against the Defendants is not based on any allegation relating to the Defendants' misappropriation of "trade secrets" from the Company.

370.     Should the Company's claim for breach of contract against Gatti, set forth above, not be awarded for any reason, in the alternative, the Company is entitled to recover pursuant to its claim for unjust enrichment set forth herein.

371.     The Company is entitled to recovery of compensatory damages from Defendants for the losses resulting from their wrongful conduct and any unjust enrichment they may have obtained.

## FIFTEENTH CAUSE OF ACTION

### (Tortious Interference and Aiding And Abetting Breach of Fiduciary Duty against Defendants Gatti, IQS, and Almawave S.r.l. re: Orrick)

372.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

373.     The Orrick law firm began representing Loop AI in April 2012.  Orrick's representation of Loop AI continued without interruption until Orrick's sudden withdrawal, communicated to Loop AI on March 11, 2015.  Throughout this time Orrick was Loop AI's primary counsel in connection with virtually all aspects of Loop AI's business.  Orrick's representation of Loop AI covered employment matters and matters related to the issuance of Loop AI stock and included Loop's employment of  Defendant Gatti and its issuance of stock to her.  The Orrick attorneys who did most of the work on the Loop AI account were members of Orrick's Corporate practice group.  While Orrick represented Loop AI —and until he left Orrick in or around February 2015— Attorney Sternberg was a senior member of Orrick's Corporate practice group and worked closely with several of the same Orrick attorneys who worked on the Loop AI account.

374.     Throughout the time of Orrick's representation of Loop AI, as an Orrick partner, Attorney Sternberg owed Orrick's client Loop AI an undivided duty of loyalty and was required to act at all times in the interest of, and not adversely to, Loop AI.

375.     Defendants Gatti, IQS, and Almawave IT knew of the contractual and fiduciary relationship between Orrick and Loop AI and intentionally set out to interfere with it and steal that important relationship for themselves, just like they did by stealing virtually every service provider that Loop AI had selected for its business (including, but not limited, to Loop AI's accounting firm, bank, payroll providers, advisors, to name a few) after substantial efforts in vetting and establishing relationships with critical service providers, such as Orrick, who had been selected by Loop AI in light of the special role and special assistance that Loop AI had determined these service providers could provide it to successfully establish its business.

376.     On March 27, 2014, Gatti, IQS and Almawave S.r.l. intentionally induced Orrick to undertake the concurrent adverse representation of Almawave S.r.l. against the interest of Loop AI.

377.     In the course of its concurrent adverse representation of Almawave S.r.l., which Orrick carried out at the direction and under the supervision of Attorney Sternberg, Orrick negotiated and implemented agreements for the Almaviva Defendants with Anna Gatti and IQS that required Gatti to breach various contractual and fiduciary obligations owed by Gatti to Orrick's client Loop AI (including obligations owed pursuant to the employment agreement with Gatti that was drafted by Orrick for its client Loop AI).

378.     By undertaking and continuing the concurrent adverse representation of Almawave S.r.l. against the interest of Loop AI, Orrick breached its contractual and fiduciary obligations to Loop AI.

379.     As of early April 2014, Gatti boasted that the Almawave IT and its affiliates were now working with the same law firm that represented Loop AI to structure and implement the illegal contracts that the Almaviva Defendants were putting together with Gatti and the IQSystem Defendants.

380.     Gatti, IQS and Almawave S.r.l. with full knowledge of the contractual and

fiduciary relationship and obligations existing between Orrick and Loop AI, set out intentionally to interfere with that important relationship, and induce Orrick to breach its contractual and fiduciary obligations to Loop AI by, among other things, inducing Orrick through the payment of money to prepare contracts designed to violate the preexisting contractual and fiduciary obligations that Gatti owed Loop AI, which were also reflected in contractual agreements previously prepared by Orrick for Loop AI.

381.　　Gatti, IQS and Almawave S.r.l. knew that their actions in retaining Orrick to assist them in implementing agreements with Gatti and the IQSystem Defendants (including with Capaccio) that were in conflict with and against the interest of Loop AI would disrupt and destroy the attorney-client relationship and require Orrick to breach its contractual engagement with Loop AI.  In light of this knowledge, the Defendants asked Orrick to refrain from informing Loop AI of this conflict and induced Orrick to refrain from seeking Loop AI's consent to this conflicted representation.  In order to bypass Orrick's internal conflicts measures, Gatti, IQS and Almawave S.r.l. working in concert with Attorney Sternberg agreed to not include Gatti's name in the conflict clearance form required by Orrick, so that they could avoid detection by Orrick's automated conflict clearance system.

382.　　Gatti, IQS and Almawave S.r.l. knew that Attorney Sternberg and Orrick had explicit contractual and fiduciary obligatiions not to take any action adverse to Loop AI, to immediately inform Loop AI of the conflict before undertaking Almawave S.r.l.'s representation, and to seek a written waiver from Loop AI before proceeding with the representation.

383.　　Orrick's written engagement with and fiduciary obligations to Loop AI required Orrick and Attorney Sternberg to maintain the highest standards of integrity, to avoid even the appearance of conflicts or any impropriety, to conduct an accurate conflict check by including Gatti's name in the conflict form, and to immediately notify Loop AI of the conflict before accepting the Almawave S.r.l. matter.  Orrick breached its obligations to Loop AI by

undertaking the concurrent conflicted representation adverse to Loop AI, without notice to Loop AI and without its written informed consent.

384.     As a result of Gatti's, IQS's, and Almawave S.r.l.'s intentional interference in Orrick's representation of Loop AI, Orrick breached its engagement agreement with and its fiduciary obligations to Loop AI by, among other things, failing to maintain the highest standards of integrity, failing to avoid the conflicted representation of Almawave S.r.l., failing to conduct an truthful and accurate conflict check, and failing to request and obtain the informed written consent of Loop AI before proceeding with the concurrent conflicted representation of Almawave S.r.l. in connection with Gatti, IQS and the patent applications described above.

385.     Gatti, IQS and Almawave S.r.l. had actual and imputed knowledge of Orrick's contractual and fiduciary obligations with Loop AI.

386.     Gatti, IQS and Almawave S.r.l. induced Orrick to breach its contractual and fiduciary obligations to Loop AI by, among others, promising and providing lucrative payments to Orrick.

387.     Gatti, IQS and Almawave S.r.l. also induced Orrick to breach its contractual and fiduciary obligations to Loop AI by working in concert with Attorney Sternberg to not list Gatti in Orrick's conflict clearance form, and by procuring from and using Orrick to provide legal advice and assist them in implementing agreements, arrangements, and in pursuing patent application that were directly adverse to the interest of Loop AI and in breach of Orrick's contractual and fiduciary duties to Loop AI.

388.     Gatti, IQS and Almawave S.r.l. also affirmatively took steps to conceal and prevent Orrick from disclosing to Loop AI its breaches alleged herein.

389.     As a result of the unlawful interference by these Defendants, Orrick terminated its relationship with Loop AI in March 2015, causing substantial damage to Loop AI, including, but not limited to, damages to its reputation and to its business.

390.     As a direct and proximate result of the Defendants' actions and the contractual and other breaches tortiously induced by the Defendants, the Company has and will continue to be irreparably harmed, including but not limited to, by the loss of confidential information, investor goodwill, past and future existing and prospective business relations, lost profitability, and damage to its ability to procure further business, loss of its fiduciary relationship with its corporate counsel, among other things.  The Company has no adequate remedy at law.

391.     All the Defendants acted in concert and benefitted from the breaches alleged herein and they are jointly and severally liable for Orrick's contractual and fiduciary breaches to the Company, which resulted in substantial damage to the Company, including, but not limited to the loss of investment funds from funds that Orrick was directly overseeing.

392.     Based on the conduct described above and in other filings already made in this action, the Defendants also aided and abetted Orrick's breaches of fiduciary duty by providing Orrick substantial assistance and/or encouragement to Orrick, including Attorney Sternberg (while he was a partner of Orrick) and while they owed fiduciary duties to the Company, to breach their fiduciary duties to the Company.  The substantial assistance and/or encouragement provided included the promise of payment and later the payment to Orrick and to Attorney Sternberg of substantial fees for undertaking the representation of Almaviva relating to Gatti, to Almawave USA, to IQSystem and to the patent application in conflict with and directly adverse to the Company, and in breach of Orrick and Attorney Sternberg's (while he was at Orrick) fiduciary duties to the Company.  For example, the Defendants procured, used, and/or received legal advice from Attorney Sternberg, while he was at Orrick, and from Orrick directly adverse to the interests of the Company and in breach of Orrick's and Attorney Sternberg's fiduciary duties to the Company.  As a direct and proximate cause of the Defendants' aiding and abetting the breaches of fiduciary duty by Orrick, including through Attorney Sternberg while he was an Orrick partner, the Company was harmed and suffered damages in an amount to be proven

1  at trial.

2    393.  To the extent that the conduct of Gatti and the other Defendants was

3
4  willful, purposeful, knowing, malicious, and without regard to the rights and interests of the

Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

5
6    394.  The Defendants are jointly and severally liable for the damages resulting

7  from the violations alleged herein.

8  <center>**SIXTEENTH CAUSE OF ACTION**</center>

9  <center>(**Tortious Interference against all Defendants re: Vignudelli**)</center>

10    395.  The Company repeats and realleges each and every allegation contained in

11  the foregoing paragraphs and incorporates them herein by reference.

12
13    396.  The Defendants knew that in 2014 Vignudelli was a consultant of the

14  Company bound by a written confidentiality agreement with the Company.  Indeed, Gatti herself

15  had been tasked by the Company to have Vignudelli execute the confidentiality and consulting

16  agreements governing any of Vignudelli's work for the Company.  The Almaviva and IQS

17  Defendants had actual, imputed, and/or constructive knowledge that Vignudelli was subject to

18  these contractual obligations to the Company.

19
20    397.  The Defendants' identification of Vignudelli as an individual that could

21  provide them consulting services was not coincidental.  Vignudelli's name and contact

22  information were stolen by the Defendants from the Company, just like the Defendants did with

23  other of the Company's service providers, advisors, actual and prospective investors and recruits.

24    398.  Despite knowing that Vignudelli was a Company's consultant bound by

25  written confidentiality agreements, the Defendants solicited him to provide consulting services to

26  the Almaviva Defendants covering a virtually identical type of work that Vignudelli was

27  supposed to do for the Company.

28    399.  As a result of the Defendants unlawful interference, they induced

Vignudelli to breach his obligations to the Company, including his confidentiality obligations, by secretly hiring him to work for them, while he continued to pretend to be providing consulting services to the Company.

400.    In June 2014, Vignudelli was even given by the Defendants a consulting contract copied virtually identically from that of the Company (including with the same errors), and revised to substitute the name of the Company with that of IQSystem.  In connection with the signing of this agreement, Vignudelli began rendering services to the Almaviva and the other Defendants through at least December 2014.

401.    Immediately after the Defendants signed up Vignudelli to work for the Almaviva Defendants, Gatti was providing Vignudelli highly confidential information of the Company that needed to be submitted in connection with a due diligence, and was discussing with him specific items regarding, among other things, market analyses, that he was supposed to do for the Company, but which he instead was doing for the Almaviva Defendants.

402.    In an email to Vignudelli reminding him to keep their deal with the Almaviva Defendants secret, Gatti reminds him not to send his Almaviva work product to the Company's account, to which admonition Vignudelli responds with a "oops."

403.    The Defendants intentionally induced Vignudelli's breaches of his contractual obligations to the Company by the actions described above and throughout this Complaint.

404.    The IQSystem and Almaviva Defendants are liable for this improper interference directly and because Gatti was acting in their behalf as their employee, officer, and/or agent, within the scope of her employment and/or agency, and for the benefit of the Almaviva and IQSystem Defendants at all relevant times.

405.    As a direct and proximate result of the Defendants' actions and the contractual and other breaches tortiously induced by the Defendants, the Company suffered

damages in an amount to be determined at trial, including but not limited to, by the loss of confidential information, investor goodwill, past and future existing and prospective business relations, lost profitability, loss of its fiduciary relationship with its consultant, among other things.

406.     All the Defendants acted in concert and benefitted from the breaches alleged herein and they are jointly and severally liable for Vignudelli's contractual and fiduciary breaches to the Company.

407.     To the extent that the conduct of Gatti and the other Defendants was willful, purposeful, knowing, malicious, and without regard to the rights and interests of the Company, Defendants are also liable for punitive damages in an amount to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION[11]

### (Aiding and Abetting Breach of Fiduciary Duty Against Almaviva Defendants)

408.     The Company repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein by reference.

409.     Anna Gatti owed fiduciary duties to the Company since 2012, and this obligations continued until she was terminated on February 3, 2015.  Following her termination, Gatti continued to owe a residual fiduciary duty to the Company.

410.     Anna Gatti breached her duties to the Company by the conduct already detailed in this Complaint and in numerous filings already made in this Court, including, but not limited to, by concurrently working for the Almaviva Defendants and against the interests of the Company, failing to disclose her involvement and relationship with the Almaviva Defendants and with the IQSystem Defendants, taking affirmative steps to conceal her relationship with the Almaviva Defendants, using false pretenses to plant into the Company's offices those IQSystem employees that had signed up with the Almaviva Defendants without disclosure to the Company

---

[11] The Seventeenth Cause of Action was intentionally omitted from the numbering.

of the true purposes for why she had brought those individuals into its office, stealing information of the Company to provide to and for the benefit of the Almaviva and IQSystem Defendants, as well as by numerous other actions already detailed above and in the record;

411.    The Almaviva Defendants knew that Gatti was employed by the Company and that she owed fiduciary duties to the Company at the time they began soliciting her and throughout the time they employed her until she was terminated by the Company.  Despite this knowledge, beginning on February 2014 and thereafter, the Italian Almaviva Defendants induced and aided and abetted Gatti's breaches of fiduciary.  Defendant Almawave USA began inducing and aiding and abetting Gatti's breaches after it was formed later in 2014.

412.    The Almaviva Defendants knew or should have known that Gatti's conduct constituted a breach of her fiduciary obligations to the Company.  The Almaviva Defendants gave substantial assistance and/or encouragement to Gatti in the breaches of her fiduciary duty.  For example, the Almaviva Defendants procured, used, and/or received information, work-time, services, use of work-space, use of the Company's computer, use of the Company's money to pay for travel and other expenses of Gatti while she was believed to be working for the Company and was instead secretly working with the Almaviva Defendants in breach of her fiduciary duties to the Company.  The Almaviva Defendants provided substantial assistance and/or encouragement to Gatti to engage in these fiduciary breaches including, but not limited to, by facilitating the implementation of the Almaviva arrangement with Gatti and her companies, the IQSystem Defendants, and paying her and the IQSystem Defendants substantial amounts of money to engage in the breaches described above and conceal her fiduciary breaches from the Company.

413.    At all times relevant hereto, Gatti was acting on behalf of the Almaviva Defendants as their employee, officer, manager, and/or agent, within the scope of her employment or agency, and for the benefit of the Almaviva Defendants.

414.    As a direct and proximate result of the Almaviva Defendants' aiding and

abetting Gatti's breaches of fiduciary duty to the Company, the Company has been harmed and suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Company prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1. A permanent injunction, and during pendency of this action, a preliminary injunction, prohibiting Defendants, as well as their employers, agents, employees, and all persons acting jointly, in concert or in participation with them, from:

    a. interfering with the Company's current and prospective business relationships, interfering with the Company's contracts, competing with the Company through use of the misappropriated tangible and intangible assets of the Company, including its confidential information and trade secrets, from soliciting the Company's present and future employees, investors, and customers, from any further use of the confidential information and trade secrets information misappropriated from the Company to engage in any such solicitations or for any other purpose, and from making false and misleading statements to anyone regarding the Company;

    b. restraining Gatti from any making any further statements, through social media or otherwise, that she is or was associated with the Company;

    c. from using, copying, publishing, disclosing, transferring, or selling any of the Company's confidential information and trade secrets, or any product or services based on or incorporating all or part of the Company's trade secrets, and restraining them from obtaining any commercial advantage or

unjust enrichment from the misappropriated trade secrets and confidential

information of the Company

    d.  granting a preliminary injunction to preserve any and all trade secrets and

confidential, proprietary materials, including but not limited to any and all

materials created incorporating or referencing the Company's trade secrets

and confidential, proprietary information, as well as the computers,

networks, data storage devices, and/or other means by which such

information has been obtained, received, collected, or stored by

Defendants, as well as their employers, agents, employees, and all persons

acting in concert or in participation with them;

    2.  An order requiring Defendants, their employers, agents, employees, and all

persons acting in concert with them, to return to the Company any and all of its trade secrets and

confidential, proprietary materials, including but not limited to any and all materials created

incorporating or referencing the Company's trade secrets and confidential, proprietary

information;

    3.  An order requiring Gatti to return to the Company all property conveyed to her in

the SPA, and otherwise in connection with her work for the Company, including all stock in the

Company currently owned or possessed by Gatti, as well as the laptop conveyed to her by the

Company and that remains in her possession;

    4.  An award of nominal, compensatory, rescissionary and all other damages available

at law against each of the Defendants, jointly and severally;

    5.  An award of equitable relief, including, but not limited to, rescission of the SPA,

or in the alternative a declaration that the shares awarded Gatti under the SPA never vested as a

result of her breaches and wrongdoing, or in the alternative a transfer to the Company as

restitution of all of the vested shares awarded to Gatti under the SPA; disgorgement, and

1   restitution;

2        6.   The imposition of a constructive trust over all property misappropriated from the

3   Company, or created through the misappropriation of property from the Company, including over

4   the Almaviva Defendants' patent application to the extent prepared through and on the basis of

5   any information or trade secrets misappropriated from the Company;

6

7        7.   An award of aggravated, treble and punitive damages against each of the

8   Defendants, jointly and severally;

9        8.   Statutory damages;

10       9.   An award of interest as allowed by law;

11       10. Attorneys' fees, costs and expenses;

12

13       11. All costs of the Company's investigation and of the suit herein; and

14       12. Such other and further relief as the court may deem just and proper.

15                              **<u>DEMAND FOR JURY TRIAL</u>**

16   Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial on all issues and claims so triable.

17

18                                              Respectfully submitted,

19

20   September 23, 2015                     By:   /s/ *Valeria Calafiore Healy*

21                                                Valeria Calafiore Healy, Esq. (*phv*)
                                                  Bryan Wolin, Esq. (*phv*)
22                                                Diana Wong, Esq. (*phv*)
                                                  HEALY LLC
23                                                154 Grand Street
                                                  New York, New York 10013
24                                                Telephone:     (212) 810-0377
                                                  Facsimile:     (212) 810-7036
25
                                                  Daniel J. Weinberg, Esq. (SBN 227159)
26                                                FREITAS ANGELL & WEINBERG
                                                  LLP
27                                                350 Marine Parkway, Suite 200
                                                  Redwood Shores, California 94065
28                                                Telephone:     (650) 593-6300
                                                  Facsimile:     (650) 593-6301

1

2          Attorneys for Plaintiff
          LOOP AI LABS, INC.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28