JANET BRAYER, ESQ. #117397
LAW OFFICES OF JANET BRAYER
230 California Street, Suite 600
San Francisco, California 94111
Telephone: (415) 445-9555
Facsimile: (415) 445-9541

Attorney for Defendant IQSYSTEM, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS, INC.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ANNA GATTI, an individual, ALMAVIVA S.p.A., an Italian corporation, ALMAWAVE S.r.l an Italian corporation, ALMAWAVE USA, Inc., a California corporation, IQSYSTEM LLC, a California limited liability company, IQSYSTEM, Inc., a Delaware corporation,<br><br>                    Defendants. | **Case No. 3:15-cv-00798-HSG-DMR**<br><br>**IQSYSTEM, INC.'S MOTION AND NOTICE OF MOTION FOR SUMMARY JUDGMENT**<br><br>**DATE: July 21, 2016**<br>**TIME: 2:00 P.M.**<br><br>**ACTION FILED: February 20, 2015**<br>**TRIAL DATE: September 19, 2016**<br><br>**JUDGE:  HAYWOOD S. GILLIAM, JR.** |

**IQSYSTEM, INC.'S MOTION AND NOTICE OF MOTION FOR SUMMARY JUDGMENT**

1

**TO PLAINTIFF LOOP AI LABS, INC. AND ITS ATTORNEY OF RECORD:**

NOTICE IS HEREBY GIVEN THAT on July 21, 2016, at 2:00 P.M., in Courtroom 10 – 19th floor, 450 Golden Gate Avenue, San Francisco, California, IQSystem, Inc. will and hereby do move the Court for summary judgment.

IQSystem, Inc. ("IQS") moves for an order granting final summary judgment against Loop AI Labs, Inc. ("Loop") as to one or more of the following causes of action; RICO, Computer Fraud and Abuse Act, Fraud, Intentional Interference, Tortious Interference, CUTSA, Conversion, Unfair Competition, Unjust Enrichment, Tortious Interference re Orrick, Tortious Interference re Vignudelli.

Summary judgment is proper in this case because there is no genuine dispute as to any material fact and because IQS is entitled to judgment as a matter of law.

Summary judgment is appropriate as a matter of law, including but not limited to the following reasons:

(a) Summary judgment must be granted as there is no evidence of conspiracy.

(b) Summary judgment must be granted as to Loop's RICO claim as there is no evidence of the requisite predicate acts.

(c) Loop's Computer Fraud and Abuse Act claim fails as lacking in evidence that IQS accessed Loop's computer.

(d) Summary judgment must be granted as to the fraud claim because there is no evidence of requisite intentional misrepresentation or causation.

(e) The interference with contract and economic relationship claims are unsupported by the evidence, and there was no contract to interfere with or breach of any contract induced by IQS.

(f) Summary judgment is appropriate as to the CUTSA claim because Loop has not described its alleged trade secret with reasonable particularity, has not complied with CA CCP Section 2019.210, and there is no evidence of misappropriation by IQS.

(g) The conversion claim is subject to summary judgment because there is no evidence that IQS misappropriated any Loop property, whether that be tangible or intangible.

(h)   The unjust enrichment claim and unfair competition claim are subject to summary judgment because there is no evidence of wrongdoing by IQS to support any tort claim, and said claims based on misappropriation of confidential proprietary information are preempted by CUTSA.

This motion is based on the attached memorandum of points and authorities in support, declaration of Antonio Di Napoli in support, declaration of Janet Brayer in support, the attached summary judgment evidence, the attached request for judicial notice, and all pleadings and papers on file.

Dated: June 15, 2016

/S/   Janet Brayer_____
JANET BRAYER

IQSYSTEM, INC.'S MOTION AND NOTICE OF MOTION FOR SUMMARY JUDGMENT

3

JANET BRAYER, ESQ. #117397
LAW OFFICES OF JANET BRAYER
230 California Street, Suite 600
San Francisco, California 94111
Telephone: (415) 445-9555
Facsimile: (415) 445-9541

Attorney for Defendant IQSYSTEM, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS, INC., | **Case No. 3:15-cv-00798-HSG-DMR** |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT** |
| vs. | |
| ANNA GATTI, an individual, ALMAVIVA S.p.A., an Italian corporation, ALMAWAVE S.r.l an Italian corporation, ALMAWAVE USA, Inc., a California corporation, IQSYSTEM LLC, a California limited liability company, IQSYSTEM, Inc., a Delaware corporation, | **DATE: July 21, 2016** **TIME: 2:00 P.M.** **JUDGE:  Hon. Haywood S. Gilliam, Jr.** |
| Defendants. | |

i

**TABLE OF CONTENTS**

1.   INTRODUCTION  ................................................................... 1

2.   STANDARD OF REVIEW  ......................................................... 2

3.   STATEMENT OF FACTS  .......................................................... 3

4.   THERE IS NO EVIDENCE SUPPORTING A CONSPIRACY THEORY   4

5.   SUMMARY JUDGMENT MUST BE GRANTED AS TO LOOP'S
     RICO CLAIM AS THERE IS NO EVIDENCE OF THE REQUISITE
     PREDICATE ACTS  ................................................................ 6

6.   LOOP'S COMPUTER FRAUD AND ABUSE CLAIM FAILS AS
     LACKING IN EVIDENCE THAT IQS ACCESSED LOOP'S
     COMPUTER  ........................................................................ 9

7.   SUMMARY JUDGMENT MUST BE GRANTED AS TO THE FRAUD
     CLAIM  .............................................................................. 9

8.   THE INTERFERENCE WITH CONTRACT OR ECONOMIC
     RELATIONSHIP CLAIMS ARE UNSUPPORTED BY THE EVIDENCE   10

     A.   There is No Evidence Supporting the Claim That IQS Interfered
          with Anna Gatti's Employment Contract with Loop  .................... 11

     B.   There was No Contract Between Wi Harper and Loop, and
          No Evidence of IQS Interference  ......................................... 11

     C.   There Was No Interference with Horizons Ventures Interference   14

     D.   IQS Had no Involvement with Orrick  .......................................... 14

     E.   IQS Did Not Interfere with Any Contract with Individual
          Vignudelli  ................................................................... 14

9.   SUMMARY JUDGMENT IS APPROPRIATE AS TO THE CLAIM OF
     MISAPPROPRIATION OF TRADE SECRETS  ..................................... 15

     A.   Summary Judgment is Appropriate as Loop has not Identified
          the Trade Secret with Particularity  ....................................... 15

     B.   Summary Judgment is Appropriate as there is no evidence of
          Misappropriation  .......................................................... 20

10.    THE CONVERSION CLAIM, THE UNFAIR COMPETITION CLAIM, AND THE UNJUST ENRICHMENT CLAIM ARE SUBJECT TO SUMMARY JUDGMENT    ....................................................................    23

11.    CONCLUSION.................................................................................................    25

## TABLE OF AUTHORITIES

### FEDERAL AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................... 2

*Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) ......... 2

*BladerRoom Grp. Ltd. v. Facebook, Inc.*,
  2015 U.S. Dist. LEXIS 164602, *12 (N.D. Cal. Dec. 7, 2015) .................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................... 2, 3

*Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980
  (S.D. Cal. 1999) ............................................................................................ 16

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099
  (9th Cir. 2007) .............................................................................................. 10

*Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000) ........... 19

*Galen v. Cnty. of L.A.*, 477 F.3d 652 (9th Cir. 2007) ......................................... 2

*Hardisty v. Moore*, 2015 U.S. Dist. LEXIS 144014 (S.D. Cal. Oct. 22, 2015) .. 4

*H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ......................................... 6

*IMAX Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161
  (9th Cir. 1998) (citation omitted) ................................................................ 16, 17

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) .................................................. 2

*Lachapelle v. Kim*, 2015 U.S. Dist. LEXIS 123859, *21-22
  (N.D. Cal. Sept. 16, 2015) ........................................................................... 5

*Lazo v. Summit Mgmt. Co., LLC*, 2014 U.S. Dist. LEXIS 95637,
  *51-52, 2014 WL 3362289 (E.D. Cal. July 9, 2014) .................................. 4

*Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353
  (9th Cir.2005)................................................................................................ 6

*MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 522 (9th Cir. 1993) ............. 23

*Native Am. Servs. v. Givens*, 2000 U.S. App. LEXIS 5045,
   \*5-6 (9th Cir. Idaho Mar. 23, 2000) ............................................................ 16

*Obeng-Amponsah v. Chase Home Fin., LLC*, 624 Fed. Appx.
   459 (9th Cir. Cal. 2015) .................................................................. 6, 8

*Pixion, Inc. v. Placeware, Inc.*, 421 F. Supp. 2d 1233 (N.D. Cal. 2005) ............ 16

*Princess Cruises, Inc. v. Amrigon Enters.*, 51 Fed. Appx.
   626 (9th Cir. Cal. 2002) .................................................................. 16

*Regent Properties v. Mercedes Benz of N.A.*,
   2000 U.S. App. Lexis 14092 (9th Cir. 2000) ................................................ 13

*Rivera v. Philip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005) ............................ 2

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) ................................ 6

*Steckl v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1983) ..................................... 2

*SunPower Corp. v. SolarCity Corp.*,
   2012 U.S. Dist. LEXIS 176284, \*20 (N.D. Cal. Dec. 11, 2012) ................... 23

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ........................................ 5

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ............................................................ 2

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2015
   U.S. Dist. LEXIS 152806, \*84 (N.D. Cal. Nov. 10, 2015) .......................... 5

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
   707 F.Supp. 1170 (C.D. Cal. 1989) ............................................................. 16

*Vaughn v. Teledyne, Inc.*, 628 F.2d 1214 (9th Cir. 1980) .................................. 9

*Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006) .............. 5

*Watterson v. Garfield Beach CVS LLC*, 120 F. Supp. 3d 1003
   (N.D. Cal. 2015)........................................................................................... 2

*Wilcox v. First Interstate Bank,* 815 F.2d 522 (9th Cir.1987) ........................... 6

**STATE AUTHORITIES**

*Advanced Modular Sputtering, Inc. v. Superior Court*,
    132 Cal. App. 4th 826 (2005) ........................................................ 16, 23

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*
    47 Cal. App. 4th 464 (1996) ............................................. 11

*Brescia v. Angelin*, 172 Cal. App. 4th 133 (2009) ............................................. 17

*CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*,
    160 Cal. App. 4th 288 (2008) ........................................ 15

*Korea Supply Co. v. Lockheed Martin Corp*, 29 Cal. 4th 1134 (2003) ............... 10

*Lazar v. Superior Court*, 12 Cal. 4th 631 (1996) ................................................. 9, 10

*Mitchell v. Gonzales* 54 Cal. 3d 1041 (1991) ......................................................... 13

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26 (1998) ........................... 10

*Service By Medallion, Inc. v. Clorox Company*, 44 Cal.App.4th at p. 1816 ...... 9

*Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153 (1991) ............. 9

**STATUTES**

Fed. R. Civ. P. 56(a) ........................................................................................... 2

Fed. R. Civ. P. 56(c) ........................................................................................... 2

18 U.S.C. §1962, et. seq. ..................................................................................... 6

18 U.S.C. § 1961(5) ........................................................................................... 6

18 U.S.C. § 1030(a)(2)(C) ................................................................................... 8

CA CCP 2019.210 ..................................................................…… *passim*

California's Uniform Trade Secret Act ("CUTSA") ........................................ *passim*

California Civil Code section 3426.1 ................................................................ 15

Cal. Civ. Code § 3426.1(d) ............................................................... 15, 23

\* \* \*

## 1) INTRODUCTION

Defendant IQSystem, Inc. ("IQS") was incorporated on April 22, 2014 and is a legitimate, ongoing business providing services to its clients. In the Second Amended Complaint (Dkt. 210, "SAC"), Plaintiff Loop AI Labs, Inc. ("Loop") characterizes IQS as a sham organization created with the purpose of making detection and discovery of other Defendants' alleged wrongdoing more difficult. IQS is named in eleven causes of action, but not one cause of action is directed at IQS alone. Instead, the allegations against IQS emanate from a conspiracy theory. The only individual discrete acts allegedly engaged in by IQS were that of (1) stealing Loop's confidential information while sitting in the office of Loop for a period of weeks (while waiting on other office space) during which time IQS was provided internet access but not access to information on Loop's server, (2) an alleged meeting in Europe with a representative of investment company WI Harper (at which IQS employees/officers were not present), and (3) alleged wrongdoing directed at an Arizona based company named Intex. Loop has no evidence supporting the alleged wrongdoing in the three discrete alleged acts for one simple reason – the wrongdoing never occurred.

There is simply no evidence supporting any conspiracy theory, or from which reasonable inference can be made, and the evidence provided by Loop during discovery does not support the allegations. The arguments below address IQS-specific allegations in RICO (cause of action 1), Computer Fraud and Abuse Act (cause of action 2), Fraud (cause of action 5), Misappropriation of Trade Secrets (cause of action 11, 12, 13, and 14), and Intentional Interference (cause of action 9, 10, 15, and 16). Not only has Loop, after over a full year of discovery, failed to present evidence supporting its claims against IQS, but Loop has failed to identify its trade secrets with particularity despite Court Order to do so.[1] [See Dkt. 331, 372, 459]. Loop's discovery responses are either non-existent or based entirely on unsupported conjecture or unreasonable inferences that are insufficient to withstand a summary judgment motion.

///

---

[1] Loop publicly filed its statement of trade secrets [Dkt. 372], thus negating any claim of confidentiality. The sufficiency of the trade secret disclosure is the subject of a pending motion. [Dkt. 459].

1

**MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT**

## 2) STANDARD OF REVIEW

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. On an issue for which the opposing party will have the burden of proof at trial, however, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The nonmoving party must present affirmative evidence to make this showing. *Liberty Lobby, Inc.*, 477 U.S. at 257. A "mere scintilla of evidence" supporting the nonmoving party's position is insufficient to withstand summary judgment. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

Unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Watterson v. Garfield Beach CVS LLC*, 120 F. Supp. 3d 1003 (N.D. Cal. 2015). Furthermore, it is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary

judgment. *See id.* If the nonmoving party fails to make this showing, "[t]he moving party is entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

### 3) STATEMENT OF FACTS

IQS will more specifically address the facts below in relation to the causes of action presented.

IQSystem, Inc. was incorporated in April, 2014 and is an ongoing business. [Declaration of Janet Brayer filed herewith, Exhibit 39, Gennaro Di Napoli depo 15:18-24; Dkt. 23-1, Declaration of Antonio Di Napoli, Request for Judicial Notice filed herewith at ¶1; Declaration of Antonio Di Napoli filed herewith at ¶13]. Loop AI is a startup company focused on developing artificial intelligence technology. In this case, it alleges that it was the victim of a conspiracy undertaken by Anna Gatti, IQ System LLC, IQ System, Inc., Almaviva S.p.A., Almawave S.r.l., and Almawave USA (the "Defendants"). There is no evidence whatsoever that IQS had anything to do with Gatti's alleged violation of her employment agreement with Loop by way of acceptance of a position as the CEO of an alleged competing company called Almawave USA ("AW USA"). There is no evidence that AW USA competes in the same arena as Loop. There is no evidence supporting the claim that IQS by way of a conspiracy with Gatti (1) secretly provided the other Defendants with Loop AI's business information or attempted to steal Loop's confidential business information and trade secrets; or (2) actively frustrated Loop AI's attempts to fundraise in order to force an eventual sale of Loop AI to Almawave USA; there is certainly no evidence that IQS engaged in such acts or conspired to do so.  IQS did not conspire with anyone to misappropriate Loop AI's trade secrets and did nothing to frustrate the success of Loop - indeed a principal of IQS introduced Loop to the venture capital firm Founders Fund. [Di Napoli Decl. at ¶6]. As to Loop's claim that IQS interfered with funding by WI Harper, IQS never met with the same.

Loop has no evidence supporting the requisite elements to support its RICO claim, fraud claim, and interference claim against IQS. As to RICO, Loop cannot show the requisite elements of a pattern of racketeering activity. As to fraud or trade secret misappropriation, there is no evidence that IQS even had access to Loop information and IQS certainly did not make any

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

representations to induce Loop to hire Gatti or to induce Gatti's alleged breach of contract. Loop's interference claims are contradicted by the affirmative evidence of an uninterested third-party that does not implicate IQS in any conspiracy or effort to interfere with Loop's economic relationships, a third party that testified that there was no contract to invest with Loop and ultimately no interest in an investment in Loop due to problems with Loop – not the actions of defendants. The entire case against IQS fails as a matter of law because Loop is unable to connect IQS to the commission of any tort.

IQS does not deny that it entered into a contractual relationship with AW USA, as a consultant helping AW USA penetrate the US market and develop business (the contract with AW USA was terminated in March, 2015). Likewise, AW USA does not deny that it entered into a contractual relationship with Gatti while she was working as the CEO of Loop AI before Almawave USA was formed. The fallacy of this case is that there was nothing wrong with the actions taken by defendants as they were not undertaken for an improper purpose. Like it or not, Loop's problems emanate from the fact that it did not have a product or a trade secret that any investment firm determined to be worthy of investment. Money never flowed into Loop except from friends and family such as Valeria Healy. There is no causal relationship between the acts of defendants and the alleged damages sustained by Loop.

### 4)   THERE IS NO EVIDENCE SUPPORTING A CONSPIRACY THEORY

Loop's conspiracy theory against IQS fails as a matter of law. In the SAC Loop alleges that Anna Gatti and "the other Defendants (and their co-conspirators) also had engaged in a pattern of intentional wrongdoing designed to defraud" Loop. [SAC at ¶7, RFJN at ¶4]. Furthermore, Loop alleges that the conspiracy against Loop was "orchestrated" by Anna Gatti. [SAC at ¶45]. Although not named as parties, Loop alleges that four current and former IQS personnel, Tony Di Napoli, Manuela Micoli, Peter Huang, and Jeffrey Capaccio, are co-conspirators. [SAC at ¶¶48-53]. Loop's conspiracy theory collapses, however, because Loop has no evidence supporting the requisite elements of a conspiracy claim.

Civil conspiracy is easy to allege, but Loop has a "weighty burden to prove it." *Hardisty v. Moore*, 2015 U.S. Dist. LEXIS 144014 (S.D. Cal. Oct. 22, 2015). To state a claim for a civil

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

conspiracy, Loop must prove: (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages. *Lazo v. Summit Mgmt. Co., LLC*, 2014 U.S. Dist. LEXIS 95637, *51-52, 2014 WL 3362289 (E.D. Cal. July 9, 2014). Importantly, Loop must plead a claim for civil conspiracy "with particularity" when the object of the agreement is fraudulent, in compliance with Rule 9(b). See *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 990-92 (9th Cir. 2006). The Ninth Circuit explained, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007). For each element of conspiracy, "[b]are allegations and rank conjecture do not suffice[.]" *Lachapelle v. Kim*, 2015 U.S. Dist. LEXIS 123859, *21-22 (N.D. Cal. Sept. 16, 2015) (dismissing plaintiff's complaint for failure to allege with particularity a conspiracy to defraud claim). Loop never properly pled a conspiracy claim, and has no evidence of an agreement to a common plan on the part of IQS or a wrongful act by IQS in accord with the plan.

Loop is unable to present evidence of a conspiracy involving IQS with any particularity because IQS never agreed to enter into a conspiracy to defraud Loop. Loop "must show that each member of the conspiracy came to the agreement." *Lachapelle*, 2015 U.S. Dist. LEXIS 123859 at *22. Loop must have "proof of a mutual understanding to accomplish a common and unlawful plan; it is not enough that defendants knew of an intended wrongful act—they must agree-expressly or tacitly-to achieve it." *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2015 U.S. Dist. LEXIS 152806, *84 (N.D. Cal. Nov. 10, 2015).

Loop's conspiracy theory against IQS is wholly lacking in particularity, and is unsupported by the evidence. Loop does not state when IQS entered into an agreement to defraud, how IQS came to reach such an agreement, or indicate that IQS had any knowledge of a wrongful act with the intent to aid in it. IQS has been lumped in with other Defendants absent particular facts that support the formation and operation of a conspiracy involving IQS. According to Loop, the mere creation of IQS was enough to create a conspiracy liability for IQS,

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

but Loop does not argue alter ego or attempt to pierce the corporate veil to impute the actions of others onto IQS. [SAC at ¶43]. In addition, Loop's conspiracy allegations against current and former IQS personnel rely on conclusory statements without any detail of when or how the four individuals agreed to harm Loop. Absent particularity and admissible evidence, Loop cannot show the requisite elements of a conspiracy and summary judgment is appropriate as to all claims against IQS based on a conspiracy theory.

**5) SUMMARY JUDGMENT MUST BE GRANTED AS TO LOOP'S RICO CLAIM AS THERE IS NO EVIDENCE OF THE REQUISITE PREDICATE ACTS**

Loop's RICO claim, 18 U.S.C. §1962, et. seq., is subject to summary judgment because Loop cannot show the basic elements of a pattern of predicate acts by IQS. To recover under § 1962(c), a plaintiff must prove; (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir.2005). A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation, but may not be sufficient. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous" *Id.*; *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (pattern requires more than one scheme with a "single purpose which happen[s] to involve more than one act taken to achieve that purpose"). Predicate acts must be proved by a preponderance of the evidence. *See Wilcox v. First Interstate Bank,* 815 F.2d 522, 531–32 (9th Cir.1987). Alleging underlying fraud as to a single victim is insufficient for RICO. *Obeng-Amponsah v. Chase Home Fin., LLC*, 624 Fed. Appx. 459, 462 (9th Cir. Cal. 2015).

Loop's RICO claim fails as a matter of law because Loop is unable to show that IQS exhibits a pattern of racketeering activity with evidence of predicate acts. Loop's alleged predicate act of IQS is a conspiracy to steal the intellectual property of an Arizona company that IQS would then deliver to a third company paying IQS bribes. In response to interrogatories, Loop failed to present affirmative evidence that IQS acquired the intellectual property of this

6

Arizona company or received commercial bribes. Conversely, IQS does have affirmative evidence from Jeffery Capaccio's deposition testimony contradicting Loop's allegations. As testified to by Mr. Capaccio, he did not work with Tony Di Napoli to acquire the intellectual property of an Arizona company or receive intellectual property from the disloyal insider of an Arizona company. [Declaration of Janet Brayer filed herewith, Exhibit 1, Loop response to IQS Special Interrogatories 1, 2, 4, and 9, and Exhibit 32, Capaccio depo 110:21-111:3, 131:23-24, 132:1-10, 132:22-133:10, 143:25-144:7].[2]

The responses provided by Loop to IQS interrogatory numbers 1, 2, 4, and 9, are lacking in factual evidence to support a claim that IQS has engaged in the requisite modus operandi of stealing confidential information from other companies and receiving commercial bribes. Instead, the responses to interrogatories 1 and 2 refer broadly to "each payment made, sent or received by Gatti, or which Gatti caused others (including each of the other Defendants, as well as Tony Di Napoli, Jeff Capaccio, Manuela Micoli and others) to make," general broad and unsupportable conclusions regarding discussions of how to structure the consulting contract between IQS and AW USA, unsupported conclusions regarding work with a "disloyal insider" of an Arizona company, and statements that have no bearing on the elements of a RICO case such as, "the transaction alleged in paragraph 152 of the Complaint is a transaction that Ms. Gatti perpetrated through IQSystem LLC, a company that Ms. Gatti told the Court she had created as an alleged 'investment,' (see Dkt. 24-1 at ¶ 18:20), involving The Pike Company." [Exhibit 1].

As to documents supporting the RICO claim, Loop cites to six individual documents in the record to support its allegations; IQSINC000236-240, IQSINC000298-300, RRA000219-220, Dkt. 600-1, Dkt. 28-5, and Loop-00042272. [Exhibit 1, Interrogatories 1, 2, 4, and 9]. However, the individual documents cited by Loop fail to indicate any predicate wrongful acts; documents RRA000219-220, IQSINC000236-240, and IQS000298-300 involve the business relationship between IQS and Almawave USA but do not evidence the alleged predicate acts involving another startup. [Exhibits 25, 30, 31]. Another document identified, Loop-00042272,

---

2 Unless otherwise noted, all exhibits referred to herein are attached to the Declaration of Janet Brayer.

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

similarly fails to evidence commercial bribery or modus operandi. [Exhibit 23]. It is Loop's modus operandi to present documents in a vacuum without any context and then conclude that something nefarious was afoot; such non-fact based theories wholly dependent on counsel's unreasonable inferences will not defeat a summary judgment motion.

Loop's chief piece of "evidence" of predicate acts is a reference to docket 28-5, a February 13, 2014 email from Jeffrey Capaccio to Fabio Ficano and Mr. Di Napoli detailing a phone conversation with David Brooks. [Exhibit 37]. According to Loop, David Brooks is a disloyal insider of an Arizona start-up called Intex that Mr. Di Napoli and Jeffery Capaccio forced into bankruptcy in order to acquire its intellectual property. [SAC ¶211-212]. However, there is simply nothing to support Loop's conjecture and Loop's theory is contradicted by the deposition testimony of Jeffrey Capaccio wherein he testified that his discussions regarding Intex were limited to "one phone call, one email" and that he did not delve deeper into Intex after sending the email at docket 28-5 [Exhibit 32, Capaccio depo 55:4-56:23; 110:21-111:3]. Furthermore, Mr. Capaccio denied ever working with Mr. Di Napoli to acquire startups and that Mr. Di Napoli had nothing to do with Intex, "if anything, [Tony] seemed disinterested." [Exhibit 32, Capaccio depo 132:1-10; Di Napoli Decl. at ¶3].

As is the normative in this case, Loop's counsel has built a grandiose story characterizing two emails as evidence of bribery, corporate raiding, and kickbacks. But outside of counsel's theories, Loop is unable to present any affirmative evidence that IQS or Mr. Di Napoli ever received commercial bribes to loot the intellectual property of another company, or provided kickbacks to a disloyal insider of another company.

Even assuming for the sake of argument that Loop could produce evidence of some type of wrongdoing perpetrated on Loop by IQS, summary judgment would be appropriate on Loop's RICO claim as Loop must present evidence of more than one victim. *Obeng-Amponsah,* 624 Fed. Appx. at 462. Loop has failed to present particular evidence of predicates acts of racketeering activity involving another company. Loop's RICO claim therefore fails as a matter of law.

///

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

### 6) LOOP'S COMPUTER FRAUD AND ABUSE CLAIM FAIL AS LACKING IN EVIDENCE THAT IQS ACCESSED LOOP'S COMPUTER

To prevail on its claim against IQS, Loop must demonstrate that IQS intentionally accessed Loop's computer without authorization or exceeded authorized access, and thereby obtained information from Loop's computer. 18 U.S.C. § 1030(a)(2)(C). In paragraph 246 of the SAC, Loop generally alleges that Anna Gatti allowed IQS employees unauthorized access to Loop's computer because Loop's computer was at Anna Gatti's house. [SAC at ¶246]. Loop does not allege that IQS accessed Loop's computer, only that IQS employees had the opportunity to because both were in Anna Gatti's home.

In discovery, IQS asked Loop for evidence that IQS accessed Loop's computer. [Exhibit 1; Interrogatories 20-22]. Loop failed to identify even one occasion wherein IQS accessed Loop's computer. Without affirmative evidence in support of its pleadings, Loop's Computer Fraud and Abuse claim against IQS must be summarily dismissed.

### 7) SUMMARY JUDGMENT MUST BE GRANTED AS TO THE FRAUD CLAIM

A complaint for fraud must allege the following elements; (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages. *Service By Medallion, Inc. v. Clorox Company*, 44 Cal.App.4th at p. 1816. "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. [Citations.]" *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 157 (1991). In order to avoid summary judgment on a fraud claim, the plaintiff must produce evidence establishing that the defendant made a false representation, which at the time he made it, he had no intent to honor. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). When opposing a motion for summary judgment, "the plaintiff must present significant probative evidence relevant to the issue of intent, e.g., the time, place, or nature of the alleged fraudulent activities; mere conclusory allegations are insufficient to require that the motion for summary judgment be denied." *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980).

9

In this case, Loop's fraud claim against IQS fails as a matter of law because Loop has no evidence that IQS made a false representation. Loop's alleges that it justifiably relied on Defendants' misrepresentations and omissions "allowing Gatti to place Di Napoli and Micoli in the Company's offices." [SAC ¶279]. In interrogatory number 7, IQS asked Loop:

> Identify all facts, witnesses and documents in support of paragraph 49 of the SAC: "Among other things, Micoli and Di Napoli, took steps in furtherance of the racketeering scheme being perpetrated against the Company, by intentionally obtaining access to the Company's office through the use of false pretenses and deception."

[Exhibit 1]. In response to interrogatory number 7 Loop cites bates numbered document Loop-00009306, which is a June 2, 2014 email where Tony thanks Loop employees for hosting him and offers office space in the future if anyone needs it. [Exhibit 4]. The parties do not dispute that Tony Di Napoli and Manuela Micoli temporarily worked in Loop's offices. Loop's single piece of evidence merely confirms that undisputed fact. Loop's evidence does not support a conclusion that any false statement, or any fraudulent intent by Mr. Di Napoli or Ms. Micoli, existed when they "shared" space with Loop, or that IQS made any representation whatsoever to gain access to Loop's alleged proprietary information. Absent evidence of a false representation, that actually *caused* Loop damage, Loop's fraud allegation against IQS cannot survive summary judgment. *Lazar*, 12 Cal. 4th at 638.

### 8) THE INTERFERENCE WITH CONTRACT OR ECONOMIC RELATIONSHIP CLAIMS ARE UNSUPPORTED BY THE EVIDENCE

Loop claims that IQS, by way of a conspiracy, interfered with contracts between Loop and Anna Gatti, Founders Fund, Horizons Ventures, WI Harper, Orrick, and Mr. Vignudelli. As set forth above, the only affirmative "interfering act" alleged by Loop as to IQS consists of an allegation that Mr. Di Napoli's attended a meeting in Europe where the principal of WI Harper was also in attendance, but Mr. Di Napoli did not attend that meeting. [Di Napoli Decl. at ¶9].

"California provides a cause of action against a defendant who interferes with a contract between the plaintiff and a third party." *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007). To state a claim for intentional interference with contract, a plaintiff must allege facts to support the following elements: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional

10

acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Id*. (quoting *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 55 (1998)); *see also Korea Supply Co. v. Lockheed Martin Corp,* 29 Cal. 4th 1134 (2003).  In addition, a party seeking to recover on an interference claim must plead and prove "intentional wrongful acts on the part of the defendant designed to disrupt the relationship." *Id.* at 1154. The conduct on the part of the defendant must be "wrongful by some legal measure other than the fact of interference itself," *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* 47 Cal. App. 4th 464 (1996).

### A)  THERE IS NO EVIDENCE SUPPORTING THE CLAIM THAT IQS INTERFERED WITH ANNA GATTI'S EMPLOYMENT CONTRACT WITH LOOP

IQS did not intentionally interfere with Anna Gatti's agreements with Loop and Loop does not have evidence of intentional acts by IQS to induce Anna Gatti's alleged breach. As set forth below, there is no evidence that Gatti misappropriated trade secrets or confidential information, and hence any claim of breach of contract premised on Defendant Gatti's alleged misappropriation must fail.

### B)  THERE WAS NO CONTRACT BETWEEN WI HARPER AND LOOP, AND NO EVIDENCE OF IQS INTERFERENCE

Loop alleges that IQS intentionally and tortuously interfered with Loop's contractual and economic relationship with third-party WI Harper. [SAC ¶320, ¶331]. Loop alleges that Mr. Di Napoli, along with Anna Gatti, met with a key officer of WI Harper in Europe (an untrue statement, once again unsupported by the evidence), causing Loop to lose funds that WI Harper had already confirmed it would be wiring to Loop. [SAC ¶320]. In addition, Loop alleges that IQS interfered with Loop's contractual relationship with WI Harper by inducing WI Harper to breach a term sheet that it had signed with Loop. [SAC ¶331].

The evidence provided by Loop in support of its claim of interference has been identified by Loop as three specific bates numbered documents: Loop-0034458, Loop-34771, and Loop-30691. [Exhibits 1, Interrogatory 19]. The three documents are each part of the same email chain of December 1, 2014 wherein Anna Gatti asks employees of WI Harper about the status of the

11

convertible notes agreement, wherein Derrick Hsiang of WI Harper responds that WI Harper is still "going through the legal documents" and that WI Harper should "be able to sign in the next couple days," to which Anna Gatti thanks Mr. Hsiang for the update. [Exhibits 13, 18, and 19]. Not only do these document fail to support Loop's claim, but no reasonable inference can be made from said documents that Gatti did anything wrong, or that IQS conspired with her to interfere with WI Harper's non-existent contract with Loop.

Loop asserts that something nefarious took place when Mr. Di Napoli met with Peter Liu of WI Harper in Europe, but Mr. Di Napoli did not meet Peter Liu in Europe, or elsewhere. [Di Napoli Decl. at ¶9]. In addition, WI Harper's representative stated that Anna Gatti and Peter Liu did not discuss Loop or Almawave at their Thanksgiving meeting in Europe. [Exhibit 33, Ghanem depo 209:4-210:1]. After the Thanksgiving meeting in Europe, WI Harper still was considering the syndicated funding of Loop as noted above, and it is clear that WI Harper had not yet committed to Loop's funding because in December WI Harper was still "going through the legal documents." [Exhibit 18].

The potential funding of Loop by WI Harper was still in negotiation well after the Thanksgiving meeting in Europe. [Exhibit 33, Ghanem depo 313:22-314:4, 319:9-24]. WI Harper's decision not to fund Loop ultimately came in 2015 when WI Harper decided that Loop was not a good investment to make. [Exhibit 33, Ghanem depo 21:2-17, 25:3-9 139:9-14, 225:14-24, 239:17-240:4, 249:25-250:6, 265:9-266:2, 313:22-314:4]. Contrary to Loop's theory of the case, Gatti "was very persistent in trying to close the rounds" to fund Loop. [Exhibit 33, Ghanem depo 73:14-74:11, 211:15-16].

Loop has no evidence that anyone at IQS disrupted the relationship between Loop and WI Harper, or that IQS conspired with anyone to do so. The evidence shows that WI Harper was not influenced by anyone at IQS, but actually came to an independent decision when it realized Loop would simply burn through WI Harper's investment. [Exhibit 33, Ghanem Depo 225:14-24].

Loop alleges that IQS induced WI Harper to breach the Term Sheet it had with Loop (SAC ¶331), but the Term Sheet between Loop and WI Harper was not a binding contract. The

**MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT**

WI Harper Term Sheet contains the following language: "This Summary of Terms represents only the current thinking of the parties with respect to certain of the major issues relating to the proposed private offering and does not constitute a legally-binding agreement," and further includes language stating that "[t]he undersigned acknowledge that this Summary of Terms does not constitute a binding agreement." [Exhibit 24, Loop-00043947]. The Ninth Circuit has held that when parties sign an agreement with unambiguous language that the parties do not intend to be bound by the agreement, then the agreement does not create a contract. *Regent Properties v. Mercedes Benz of N.A.*, 2000 U.S. App. Lexis 14092 (9th Cir. 2000) (affirming summary judgment that no contract existed between the parties where letter of intent stated "this is not intended to be a binding agreement"). Without a contract between the parties, Loop's claim for tortious interference fails as a matter of law.

Summary Judgment is also appropriate as Loop is unable to present evidence of harm proximately caused by IQS in support of its interference claims. Causation requires that Loop produce evidence that IQS' conduct was a "substantial factor" in bringing about the harm to Loop. *Mitchell v. Gonzales* 54 Cal. 3d 1041, 1052-1053 (1991). IQS asked Loop to identify all facts, witnesses and documents in support of paragraph 35 of the Second Amended Complaint: "The harm suffered by the Company as a result of the funding failures caused by Gatti is substantial. Gatti, acting in furtherance of her scheme with the other Defendants, caused the Company to lose millions of dollars that investors had already committed to providing." [Exhibit 1; Interrogatory 5]. In response to this discovery request, Loop identified three documents: Loop-00034408, WI Harper 000246, and Loop-00030727. [Exhibits 14, 17, and 27]. The three document evidence negotiations between WI Harper and Loop regarding a potential investment and the draft convertible notes, but do not evidence any commitment by WI Harper to fund Loop. More importantly, the documents do not evidence any harm proximately caused by IQS. It is not disputed that WI Harper and Loop were in talks regarding a potential investment by WI Harper, but Loop is unable to present any evidence that IQS (or anyone else) disrupted those negotiations or that Loop was harmed by the conduct of IQS. As discussed above, WI Harper chose not to invest in Loop for reasons independent of IQS. Loop has no evidence of IQS

conduct detrimental to Loop, and certainly has no evidence that IQS conduct was a substantial factor in bringing about harm to Loop.

In interrogatories, IQS also asked Loop to "Identify each document indicating that any person or entity had confirmed that they would be wiring funds to the company or would be investing in the Company." [Exhibit 1, Interrogatory 24]. Loop did not answer Interrogatory 24, save for a circular reference to the allegations in the SAC. Loop's theory that IQS interfered with Loop's relationships to cause funding failures is defeated by Loop's inability to show that any company actually decided to fund Loop. Quite simply, there was no funding to disrupt.

### C)  THERE WAS NO INTERFERENCE WITH HORIZONS VENTURES

Loop alleges that Defendants intentionally disrupted Loop's relationship with Horizon Ventures through "invitation of key individuals of [Horizons Ventures] to their commercial events destroying any further opportunity for" Loop. [SAC at ¶320]. There is no evidence, and it cannot be inferred, that a simple invitation was the cause of the decision by Horizons Ventures to not fund Loop. Loop's allegations regarding IQS and Horizons Ventures should be summarily dismissed.

### D)  IQS HAD NO INVOLVEMENT WITH ORRICK

It is not alleged that IQS had any involvement with referring AW USA to the law firm of Orrick, assuming for the sake of argument that such a referral took place. IQS joins in AW USA's motion for summary judgment as to this issue.

### E)  IQS DID NOT INTERFERE WITH ANY CONTRACT WITH INDIVIDUAL VIGNUDELLI

It is alleged that Mr. Vignudelli's consulting agreement with Loop precluded him from taking concurrent consulting work with businesses that are competitive with Loop. [Exhibit 16; Loop-00033408 at ¶8]. Loop and IQS are not competitors, and Loop has not presented evidence to show that Loop and IQS are competitive in the same business. Mr. Vignudelli's concurrent work for IQS did not cause him to breach his agreement with Loop. Also, as shown below, IQS did not receive or misappropriate Loop's alleged trade secrets or confidential information. Therefore, Mr. Vignudelli did not breach any confidentially agreements with Loop. IQS did not

induce Mr. Vignudelli to breach any of the provisions of his agreement with Loop because Mr. Vignudelli did not breach his agreement with Loop. Without breach, summary judgment is appropriate.

### 9)   SUMMARY JUDGMENT IS APPROPRIATE AS TO THE CLAIM OF MISAPPROPRIATION OF TRADE SECRETS

Pursuant to CA CCP 2019.210, this Court ordered Loop to file a statement identifying trade secrets. [Dkt. 331, RFJN at ¶5]. In response, Loop filed a trade secret submission ("Submission") identifying Loop's alleged trade secrets. [Dkt. 372, RFJN at ¶6]. On March 9, 2016, IQS filed a motion challenging the sufficiency of Loop's Submission arguing that Loop failed to disclose its trade secrets with reasonable particularity. [Dkt. 459, RFJN at ¶7]. Loop filed a non-substantive opposition (Dkt. 541, RFJN at ¶8) to which IQS replied (Dkt. 579, RFJN at ¶9). The Court's resolution of IQS' TS Motion is still pending. Loop's state tort claims that sound in misappropriation of trade secret are preempted by California's Uniform Trade Secret Act ("CUTSA"). The Court previously ruled on CUTSA preemption but did not dismiss the entirety of Loop's state tort claims because Loop mingled misappropriation of non-secret items with the trade secret misappropriation claim. [Dkt. 185 at 6:6-15, RFJN at ¶3]. The entirety of Loop's state tort claims are now ripe for summary judgment because the claims of both misappropriation of trade secret and misappropriation of non-trade secrets (computer, etc.) fail as a matter of law – and are unsupported by evidence.

### A)   Summary Judgment is appropriate as Loop has not Identified the Trade Secret with Particularity

California Civil Code section 3426.1 defines a trade secret as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(1)   Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
(2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d)

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

"Under the UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 297 (2008) (internal quotations and citation omitted).

CA CCP §2019.210 requires Loop to identify or designate the trade secrets at issue with "sufficient particularity" to limit the permissible scope of discovery by distinguishing the trade secrets "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005) (quoting *IMAX Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (citation omitted)). One of the purposes behind Section 2019.210 disclosure is to "enable defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation." *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 985 (S.D. Cal. 1999). Loop is beholden to its descriptions in the Submission/trade secret disclosure because a plaintiff cannot defeat summary judgment by providing further details not included in its section 2019.210 statement. *See Pixion, Inc. v. Placeware, Inc.*, 421 F. Supp. 2d 1233, 1242 (N.D. Cal. 2005) (granting summary judgment, in part, based on plaintiff's failure to describe alleged web conferencing technology trade secrets with reasonable particularity in its section 2019(d) statement). A plaintiff's failure to adequately designate an alleged trade secret constitutes a failure to carry their burden on this necessary element of their claim and is grounds for summary judgment. *See Imax*, 152 F.3d at 1164-65 (affirming summary judgment against plaintiff who failed to identify its alleged trade secrets with particularity); *see also Princess Cruises, Inc. v. Amrigon Enters.*, 51 Fed. Appx. 626 (9th Cir. Cal. 2002) (affirming summary judgment against plaintiff for failure to properly specify its asserted trade secrets); *Native Am. Servs. v. Givens*, 2000 U.S. App. LEXIS 5045, *5-6 (9th Cir. Idaho Mar. 23, 2000) (affirming summary judgment where plaintiff's "generalized and conclusory" assertions constitute trade secret insufficient to create a triable issue); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F.Supp.

16

**MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT**

1170, 1177 (C.D. Cal. 1989) (granting summary judgment in trade secrets case where defendant established that plaintiff failed to describe allegedly misappropriated trade secrets).

As argued in the motions pending before the Court on the trade secret disclosure, Loop's Submission improperly relied on self-serving pleadings and declarations, and uses improper catch-all language to describe its trade secret. Judge Ryu previously rejected Loop's attempts to rely on pleadings and declarations, but Loop ignored that directive, incorporating its pleadings and declarations in the Submission. [Dkt. 331, 6:20-22, citing to *Brescia v. Angelin*, 172 Cal. App. 4th 133, 150 (2009); Dkt. 372, 4:2-8]. Loop's Submission also lacks particularity because numerous times throughout the Submission Loop uses the word "all information" to describe its trade secret. Such catch-all phrasing does not rise to the level of specificity required for a 2019.210 disclosure and fails to give Defendants notice of what Loop alleges was misappropriated. See e.g., *IMAX Corp.*, 152 F.3d at 1167; *Brescia*, 172 Cal. App. 4th at 147.

Loop's Submission additionally lacks particularity because in discovery Loop has been unable to consistently describe its trade secret. In deposition, Loop's counsel and Loop's scientist, Patrick Ehlen, disagreed on how to describe Loop's trade secret. In addition, both failed to describe Loop's trade secret in a manner consistent with Loop's Submission – the Submission does not list any algorithm as a trade secret.

During Mr. Ehlen's deposition, Loop's counsel Valeria Healy stated that "what's at issue in this case is what Ms. Gatti and your clients have taken, which is not the algorithm." [Exhibit 34, Ehlen depo 95:10-12]. Contrary to Ms. Healy's statement that the algorithm is not the trade secret, Mr. Ehlen has declared that "[b]y January 2014, we had already developed a first working prototype of a natural language processing **algorithm** that was able to learn from and understand concepts within data without any supervision or configuration. We decided to keep this invention as a trade secret. . ." [Dkt. 50, Patrick Ehlen Declaration at ¶7, emphasis added, RFJN at ¶2]. When asked about this paragraph at his deposition, Mr. Ehlen confirmed that "we had some conversations about whether to put this into a patent, but putting it into a patent puts the algorithm in public domain, so it was better for us to keep it as a trade secret." [Exhibit 34, Ehlen depo 176:3-7]. Mr. Ehlen also stated that value in Loop's technology is derived from its

17

algorithm. [Exhibit 34, Ehlen depo 136:5-8]. Loop's scientist believes Loop's trade secret is an algorithm, but Loop's counsel clearly stated that Defendants did not take Loop's algorithm and that the algorithm was not the basis of the trade secret claim. By Loop's own admission, Defendants did not steal Loop's trade secret.

Loop's counsel further stated that Loop's trade secrets are the "technical codes" that were taken by Ms. Gatti. [Exhibit 34, Ehlen depo 97:1-4]. Mr. Ehlen was then asked if he knew what "technical codes" meant, to which he responded "I'm not sure that I do." [Exhibit 34, Ehlen depo 97:9-11]. Loop's own scientist does not understand what Loop's alleged stolen trade secret is. More inconsistent statements describing Loop's trade secrets are found in Mr. Ehlen's deposition wherein he describes the trade secrets to be "**a long line of conversations** about developing different algorithms, about the data to use, about evaluation metrics, about results of experiments." [Exhibit 34, Ehlen depo 98:8-13, emphasis added]. There is no evidence that the "long line of conversations" were shared with IQS or that such conversations can be deemed trade secrets. Each time Loop is asked about its trade secret Defendants receive a different answer, but most telling is the fact that Loop publicly filed its Submission, thus conceding that there was no trade secret to protect, and the fact that every trade secret identified by Mr. Ehlen is nowhere to be found in the Submission belies the conclusion that trade secrets were misappropriated.

Similar inconsistencies are found when Mr. Ehlen's statements are compared to Loop's Submission. The trade secret Submission describes two patent publications despite Mr. Ehlen's sworn testimony that Loop decided not to include its valuable technology in a patent. [Dkt. 50 at ¶7; Exhibit 34, Ehlen depo 176:3-7]. At paragraphs 9 and 13 of Loop's Submission/trade secret disclosure, Loop describes its trade secret as embodied in two published patent applications. [Dkt. 372 at ¶¶9, 13]. Paragraph 9 points to Loop-00019998-Loop-00020016, which is Exhibit 24 to Mr. Ehlen's declaration previously filed at docket 50-31. [Exhibit 10]. The document is a United States Patent Application Publication published on September 18, 2014. [Exhibit 10]. Paragraph 13 of the Submission describes "the invention disclosed at documents produced by Plaintiff at Bates Numbers Loop-00019975 to Loop-00019992. [Dkt. 372 at ¶13]. The

18

corresponding document at bates number Loop-00019975 is Exhibit 22 to Mr. Ehlen's declaration previously filed at docket 50-29. [Exhibit 9]. The document is a United States Patent Application Publication published on August 8, 2013. [Exhibit 9]. According to Loop's Submission/trade secret disclosure Loop's valuable trade secrets can be found in published patent applications, but according Mr. Ehlen, valuable algorithms that embody Loop's inventions were not included in a patent. [Exhibit 34, Ehlen depo 176:3-7]. The inconsistencies in Loop's descriptions of the alleged trade secrets are indicative of Loop's inability to describe its trade secret with any reasonable particularity, which leaves Defendants guessing at what Loop claims was stolen, and the continued public disclosure by way of the public Submission of the alleged trade secrets belies any attempt to "maintain its secrecy."

Loop also has no evidence to prove that its trade secrets are not generally known to the public. To maintain a trade secret claim Loop must show that its trade secret is "not generally known to the public or to other persons who can obtain economic value from its disclosure." Cal. Civ. Proc. Code § 2019.210.2. In regards to the Submission/trade secret disclosure at paragraphs 9 and 13 describing Loop's technology as identified in published patent applications, "it is well established that the disclosure of a trade secret in a patent places the information comprising the secret into the public domain." *BladerRoom Grp. Ltd. v. Facebook, Inc.*, 2015 U.S. Dist. LEXIS 164602, *12 (N.D. Cal. Dec. 7, 2015) (citing *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000)). Loop may argue that not all of its alleged technology is disclosed in its patent applications, but Loop has the burden to describe its trade secrets with particularity. Neither Defendants nor this Court can be expected to parse through Loop's allegations to determine which aspects are publicly known and which are not. *Id*.

Loop has also failed to distinguish any innovation by Mr. Ehlen from what was already in the public domain. In deposition, Mr. Ehlen stated in relation to developing Loop's technology that he "was looking at different possibilities of things that are going on in the research field, thinking of different ways to put them together to solve the particular problems that we're trying to solve." [Exhibit 34, Ehlen depo 181:23-182:2]. Mr. Ehlen would use the information gleaned from public research papers to "inspire" Loop's experiments. [Exhibit 34, Ehlen depo 126:15-18,

186:14-187:3].  In Loop's Submission, Loop points to Loop's confidential research identified at Loop-00019868-19890. [Dkt. 372 at ¶16]. Loop-00019868 is a February 17, 2014 email from Patrick Ehlen to Anna Gatti wherein he states that he is describing Loop's deep learning technology. [Exhibit 5]. Attached to the email are two public research papers written by Google employees, which Mr. Ehlen explains as follows: "These 2 papers describe the technique we implemented last week." [Exhibit 5]. Mr. Ehlen was inspired by public research papers and he allegedly integrated ideas from two public research papers written by Google employees into his deep learning technology, but absent particularity, Loop is unable to distinguish its alleged innovation from public information. Loop has not met its burden to describe its trade secret(s) with reasonable particularity, therefore, Loop's trade secret claim should be summarily dismissed.

**B)**      **Summary Judgment is Appropriate as there is No Evidence of Misappropriation**

Loop is unable to present evidence that IQS misappropriated Loop's trade secrets or confidential information. IQS asked Loop for evidence in support of its misappropriation allegations in three interrogatories. [Exhibit 1; Interrogatory 8, 10, and 12]. Each request is as follows:

No. 8: Identify all facts, witnesses and documents in support of paragraph 120 of the SAC: "In the scope of her employment as CEO of Almawave USA and as an employee and agent of the other Almaviva and IQSystem Defendants, Gatti improperly acquired for, used, and disclosed to the IQSystem and the Almaviva Defendants the Company's confidential information and trade secrets."

No. 10: Identify all facts, witnesses and documents in support of paragraph 155 of the SAC: "The Defendants, acting in concert and as part of a unitary plan and scheme, and using Gatti and IQSystem within the scope of their employment and agency for the Almaviva Defendants, improperly acquired, used and/or disclosed a substantial amount of confidential information of the Company, a subset of which also contains the Company's trade secrets."

No. 12: Identify all facts, witnesses and documents in support of paragraph 195 of the SAC: "Similarly, the IQSystem Defendants repeatedly and improperly continued to acquire, use or disclose or otherwise misappropriate, for the benefit of the Almaviva Defendants, the confidential information, proprietary information, and trade secrets of the Company."

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

In response to interrogatory number 8, Loop points to a large swatch of its own, unsupported declarations filed in support of the temporary restraining order, which mostly parrot Loop's complaint. Specifically, Loop lists in response the Declaration of Patrick Ehlen at ¶¶35-50, the Declaration of Gianmuaro Calafiore at ¶¶60-83, and the Declaration of Bart Peintner at ¶¶34-54, in addition to individual bates numbered docs Loop-0001981, Loop-0019893, Loop-00019921, and Loop-00019925. [Exhibit 1, Interrogatory 8]. The first document, Loop-0001981, is a calendar entry titled Bank of the West that does not evidence misappropriation of Loop technology. [Exhibit 2]. Loop-00019893 is a July 9, 2014 email where Paul Chau of WI Harper thanks Anna Gatti for sharing information during their pitch meeting, and is not evidence of misappropriation of Loop technology by IQS (Exhibit 6), particularly in light of the fact that WI Harper did not sign a non-disclosure agreement with Loop. [Exhibit 33, Ghanem Depo 88:12-21]. Loop-00019925 is a July 27, 2014 email where Loop employees are preparing due diligence materials for WI Harper. [Exhibit 8]. Loop-00019921 is a July 9, 2014 calendar entry for a weekly meeting between Anna Gatti, Almawave employees, and IQS employees. [Exhibit 7]. Again, the documents are not evidence of misappropriation by Defendants in this case, let alone IQS' conspiracy to do the same.

Loop's theory of misappropriation is that Gatti collected Loop's information, as evidenced in Loop-00019925, under the false pretense that WI Harper requested the information, but in reality Anna Gatti planned to share the information with IQS at the AW weekly meeting evidenced in Loop-00019921. [SAC ¶¶181-182]. Loop's allegation fails for two reasons. First, Anna Gatti did not request Loop's information under false pretenses because on July 17, 2014 WI Harper did request more business and technical information from Loop (Exhibit 26, WI Harper 000003, Exhibit 68 to Ghanem depo), because in WI Harper 000003, Ben Hu of WI Harper asks for multiple items, including "technical overview (including any IP or unique differentiators of deep learning approach vs other competitors)." [Exhibit 26]. In Loop-00019925, dated ten days after WI Harper requested a technical overview, Loop employees are preparing what WI Harper asked for; a "Soshoma Technology Overview." [Exhibit 8; *see also* Ehlen depo 254:24-255:4]. Again, WI Harper did not sign a non-disclosure agreement, and as

MEMORANDUM OF POINTS AND AUTHORITES OF DEFENDANT IQSYSTEM, INC. IN SUPPORT OF SUMMARY JUDGMENT

such there was no "effort to maintain secrecy" on the part of Loop. [Exhibit 33, Ghanem Depo 88:12-21].

Second, Loop's misappropriation theory is based on unsupported conjecture because Loop's theory relies on one simply premise; that Anna Gatti's meetings with AW USA occurred in the same temporal space as Loop preparing for WI Harper's due diligence and thus one may assume that there was misappropriation of trade secrets that Loop provided to WI Harper, even though such trade secrets were not protected by a non-disclosure agreement. The theory and the misappropriation claim must fail as Loop has no affirmative evidence that Anna Gatti misappropriated Loop technology and provided the same to the defendants in this case, or that IQS conspired with Anna Gatti to do the same, let alone evidence that Loop was protecting its trade secrets that were freely given to WI Harper.

In response to interrogatories 10 and 12, Loop lists six overlapping documents that evidence meetings with Trae Stephens of Founders Fund, but do not in any fashion evidence misappropriation of Loop's technology. Loop lists the following:

Loop-00036356: February 21, 2014 Anna Gatti and Trae Stephens schedule a meeting.

Loop-00036369: February 21, 2014 Anna Gatti says Mr. Calafiore will handle Loop's meeting with Founders Fund.

Loop-00036394: February 25, 2014 Anna Gatti thanks Trae Stephens for meeting with the Loop team.

Loop-0005500: On February 26, 2014, after Anna Gatti Schedules a March 10 meeting with Trae Stephens, Tony Di Napoli sends Anna Gatti a Yahoo! url link regarding artificial intelligence applications.

FF-00235: March 17, 2014 meeting accepted between Soshoma and Trae Stephens.

FF-00239: March 4, 2014 meeting accepted between Anna Gatti and Trae Stephens. [Exhibits 3, 20, 21, 22, 28, and 29].

It is undisputed that Tony Di Napoli introduced Trae Stephens of Founders Fund to Loop. [Exhibit 35, Stephens Depo 29:24-30:3; Exhibit 36, Tony Di Napoli Depo 83:20-84:3]. But nowhere in the Second Amended Complaint does Loop implicate Trae Stephens in its

22

misappropriation allegations (given the fact that Founders Fund did not sign a non-disclosure agreement with Loop [Exhibit 35, Stephens depo 24:20-23]). In response to interrogatories 10 and 12, however, Loop cites only to documents that evidence meetings with Trae Stephens. Loop has failed to present any affirmative evidence to support the misappropriation allegations in the Second Amended Complaint and summary judgment must be granted.

Loop has not met its burden of proving a violation of UTSA. There is no evidence that Loop undertook reasonable efforts to maintain the secrecy of its business information, it has not identified what business information was allegedly misappropriated, or submitted evidence that particular business information taken constitutes a trade secret under California law. *See MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 522 (9th Cir. 1993) ("[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist."); *see also* Cal. Civ. Code § 3426.1(d) (defining a trade secret to include information that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").

There is no evidence showing that IQS, in conspiracy with Gatti or any defendant in this case, has taken any files, or that Gatti shared those files with IQS, or that the information contained in the alleged files qualify as trade secrets under California law. Summary Judgment as to the CUTSA claim must be granted.

**10)   THE CONVERSION CLAIM, THE UNFAIR COMPETITION CLAIM, AND THE UNJUST ENRICHMENT CLAIM ARE SUBJECT TO SUMMARY JUDGMENT**

Loop's Conversion, Unfair Competition, and Unjust Enrichment causes of action against IQS contain allegations regarding misappropriation of intangible confidential proprietary information, and misappropriation of other tangible items, buttressed by Loop's other failed causes of action. In regards to the misappropriation of confidential proprietary information allegations, the California Court of Appeal has "h[e]ld that Code of Civil Procedure section 2019.210. . . is not limited in its application to a cause of action under the Uniform Trade Secrets

23

Act (UTSA)) . . . for misappropriation of the trade secret, but extends to any cause of action which relates to the trade secret." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 830 (2005). Districts Courts have similarly held that "CUTSA supersedes claims based on the misappropriation of information that does not satisfy the definition of trade secrets under CUTSA." *SunPower Corp. v. SolarCity Corp.*, 2012 U.S. Dist. LEXIS 176284, *20 (N.D. Cal. Dec. 11, 2012) (holding that common law claims based on "the wrongful taking and use of confidential business and proprietary information, regardless of whether such information constitutes trade secrets, are superceded by the CUTSA"). CUTSA supersedes claims based on the misappropriation of confidential proprietary information that does not satisfy the definition of trade secret under CUTSA, absent a property interest conferred on that information by some other provision of law. [Dkt. 185, 5:2-5].

The remaining allegations in paragraph 351 of Loop's conversion cause of action (non-trade secret related) list two tangible items; a computer and a back up drive that were allegedly misappropriated. [SAC at ¶351]. IQS did not take Loop's computer or back up drive. IQS asked Loop in interrogatory number 25 to identify the property IQS allegedly converted. [Exhibit 1; Interrogatory 25]. In response, Loop provided a statement that parroted paragraph 351 of the SAC and listed four documents; Loop-00033077, Loop-00029815, Loop-00029752, and FF-00235. [Exhibit 1; Interrogatory 25]. Loop's documents in response to IQS interrogatory number 25 do not evidence IQS taking or using Loop's computer or back up drive. Loop-00033077 is a January 11, 2014 email where Anna Gatti electronically meets Gabriele Pansa. [Exhibit 15]. Loop-00029815 is an October 17, 2014 email from Anna Gatti to Loop employee Krista Glantschnig listing analysts and their current occupations/employers. [Exhibit 12]. Loop-00029752 is an April 21, 2014 email chain where Luca Paderni electronically introduced Anna Gatti to Scott VanDeVelde. [Exhibit 11]. FF-00235 is an accepted March 17, 2014 meeting invitation between Loop employees and Trae Stephens. [Exhibit 28]. Loop has no evidence to support its conversion claim because IQS did not convert any Loop property. [Di Napoli Decl. at ¶14]. Summary judgment on Loop's conversion claim must be granted.

Loop's unfair competition claim is based on Loop's failed Computer Fraud and Abuse Act claim, failed RICO claim, and failed CUTSA claim. [SAC at ¶ 359]. Absent any underlying wrongdoing, Loop's unfair competition claim against IQS likewise fails and should be summarily dismissed.

Loop's unjust enrichment claim is based on preempted allegations of misappropriation of confidential proprietary information, Loop's failed fraud cause of action, and Loop's failed interference claims in causes of action numbers 9 and 10. [SAC at ¶367]. IQS did not receive any benefit from Loop other than a few weeks of free office space. IQS did not commit any wrongdoing, and was not conferred a benefit at Loop's expense. Summary judgment as to Loop's unjust enrichment claim must be granted.

## 11) CONCLUSION

IQS is entitled to summary judgment on all eleven of Loop's causes of action naming IQS as a defendant. Loop cannot satisfy the requisite elements to support its RICO claim, Computer Fraud and Abuse Act claim, fraud claim, interference claims, misappropriation of trade secret claim, or conversion claim. Loop's unfair competition and unjust enrichment claims against IQS are based on Loop's other failed causes of action, and correspondingly fail. Loop's SAC constructs a complex hypothesis shunting blame onto Defendants for Loop's inability to procure funding in the venture capital marketplace, but ultimately the source of Loop's "problems" lies within Loop's own problematic business structure, its lack of a marketable idea, its own failure to present a cohesive pitch to gain funding, and Loop's failure to protect trade secrets with a non-disclosure agreement. There was no conspiracy leading to Loop's downfall.

Dated: June 16, 2016

/S/    Janet Brayer_____
JANET BRAYER
Attorney for IQSystem, Inc.

25