JANET BRAYER, ESQ. #117397
LAW OFFICES OF JANET BRAYER
230 California Street, Suite 600
San Francisco, California 94111
Telephone: (415) 445-9555
Facsimile: (415) 445-9541

Attorney for Defendant IQSYSTEM, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ANNA GATTI, an individual, ALMAVIVA S.p.A., an Italian corporation, ALMAWAVE S.r.l., an Italian corporation, ALMAWAVE USA, Inc., a California corporation, IQSYSTEM LLC, a California limited liability company, IQSYSTEM, Inc., a Delaware corporation,<br><br>Defendants. | Case No. 3:15-cv-00798-HSG-DMR<br><br>**DECLARATION OF ANTONIO DI NAPOLI**<br><br>DATE: July 21, 2016<br>TIME: 2:00 PM<br><br>ACTION FILED: February 20, 2015<br>TRIAL DATE: September 19, 2016<br><br>JUDGE: HAYWOOD S. GILLIAM, JR. |

1. I, Antonio Di Napoli, declare as follows:

2. I am the Director of Business Development for IQSystem, Inc., a defendant in the above-captioned case. I have been engaged by IQSystem, Inc. since April, 2014. I started as an unpaid advisor, and then became a 1099 contractor, before becoming a W-2 employee in April, 2015. I am responsible for business development and all semiconductor related activities, and I enjoy

DECLARATION OF ANTONIO DI NAPOLI

1

25 years of experience in the high-tech equipment industry. I have personal knowledge of the facts below, and if called to testify, can and will competently do so.

3. Prior to my engagement with IQSystem, Inc. I was an employee of Elettranova, which was owned and operated by Fabio Ficano. In early 2014, an Elettranova engineer in Arizona contacted myself and Fabio Ficano regarding an Arizona company called Intex that was seeking financial help. In or about February, 2014 I participated in a conference call about Intex, but did not consider Intex a worthwhile opportunity and did not want to waste my time on Intex, particularly as I was paid on a commission and Intex was not looking for advice within my area of consultation. I did not have any further involvement or follow-up with Intex, and in March, 2014, I left Elettranova.

4. I have not acquired nor ever attempted to acquire the intellectual property of a company called Intex. I did not solicit or receive bribes or payment in any manner in exchange for the intellectual property of a company called Intex. I did not have any involvement, or in any way force Intex into bankruptcy, if it did in fact go into bankruptcy. To my knowledge, I have not worked with a disloyal insider of any company.

5. IQSystem, Inc. is in no way involved or connected to a company called Intex, and I have not communicated with anyone at Intex while engaged with IQSystem, Inc.

6. In early 2014, as a favor I introduced Anna Gatti to my personal friend Trae Stephens, who works at the venture capital firm Founders Fund, with the intention that Loop AI Labs could pitch itself as an investment target to Founders Fund.

7. In the Spring of 2014, Loop AI Labs allowed IQSystem, Inc. employees, including myself and Manuela Micoli, to temporarily work in unused portions of Loop AI Labs' offices. Consistent with my experience in the high-tech equipment industry, while at Loop AI Labs' offices I worked on developing a new biometric microchip device. Loop AI Labs provided myself and Ms. Micoli with desks and the office Wi-Fi network password to access the internet. Access to the office WI-Fi network did not allow me access to Loop AI Labs' files or documents; just the internet. I used my own computer while at Loop AI Labs' offices, and Ms. Micoli used her own computer as well.

8. After a few weeks, Ms. Micoli and I found our own office space for IQSystem Inc. I sent an email to Loop AI Labs employees thanking them for allowing IQSystem Inc. to use their

offices. At the time I felt that they had done me a favor by allowing me to temporarily use their excess office space. It seemed appropriate to offer the same in return if the need ever arose.

9. For the 2014 Thanksgiving holiday, I travelled to Europe with Anna Gatti. While on this trip to Europe I did not meet Peter Liu of WI Harper. To my knowledge I have never met Peter Liu, whether that be in Europe, the United States, or anywhere else.

10. In June, 2014 IQSystem, Inc. contracted with Almawave USA to engage in business development consulting services. To this end, IQSystem, Inc. engaged consultants and arranged multiple meetings with a variety of companies to present Almawave S.r.l.'s products, which Almawave USA was marketing in the United States. IQSystem, Inc.'s relationship with Almawave USA was in no way related to Loop AI Labs and was not formed in order to access Loop AI Labs' information. The funds received pursuant to the contract with Almawave USA were used to pay overhead operations of IQSystem, Inc., including payments to consultants and other expenses associated with introducing Almawave S.r.l.'s products as marketed by Almawave USA to potential customers in the United States by way of meetings and promotional events.

11. My and IQSystem, Inc.'s scope of work was to sell already developed existing and commercialized products that Almawave S.r.l was already selling in other markets. The interaction with Almawave USA centered around existing products, pricing of those products, and prospect clients for those existing products. IQSystem, Inc. was never involved in any R&D activities or development of new features for existing products or solutions. The scope of work for IQSystem, Inc. did not include procurement of intellectual property from any source, and identification of potential acquisition targets was never discussed with Almawave.  IQSystem, Inc. was never asked to securing capital funding or interact with investors, and did not do so. It was always my understanding, based on the scope of my work, that Almawave USA was established to market Almawave S.r.l.'s existing products, based on its existing intellectual property, and was not seeking venture capital, as was wholly owned subsidiary of Almaviva Group. In March, 2015 Almawave USA terminated the consulting relationship with IQSystem, Inc. as a result of this lawsuit being filed.

12. Almawave USA was not IQSystem, Inc.'s only client. IQSystem, Inc. is engaged by a Bay Area company that has over $30 million in annual revenue to develop a biometric microchip, which is what I worked on while at Loop AI Labs' offices. Starting in 2014, IQSystem, Inc. has been under an engagement to provide high-tech industrial design consulting services to a New York-based construction company. From 2015 to the present, IQS has been engaged by a Fremont-based engineering company, that does over $250 million in annual revenue, to design high-tech industrial facilities. Just recently, in 2016, a German company that does over $4 billion in annual revenue signed a term sheet with IQSystem, Inc. to provide industrial engineering consulting services.

13. IQSystem, Inc. continues to operate as a consulting company providing technical and business development services to its clients. IQSystem, Inc. is an ongoing concern employing a variety of high-tech professionals to service the needs of IQSystem, Inc.'s clients, primarily in the arena relating to high-tech industrial design and development.

14. I have never seen anything identified as Loop AI Labs' hard drive or back up drive.

15. I never tried to acquire Loop AI Labs' technology nor have I any interest in acquiring Loop AI Labs' technology.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, is of my own personal knowledge, except as stated on information and belief, in which case I believe it to be true, and it is information which I am competent to testify if called upon to do so.

Executed on June 15, 2016, at San Francisco, California.

By: _____
Antonio Di Napoli

DECLARATION OF ANTONIO DI NAPOLI

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF ANTIONIO DI NAPOLI

5