# EXHIBIT A

# Loop AI Labs, Inc. vs. Gatti, et al.

## Deposition of
## ROBERTO PIERACCINI
## July 15, 2016



Exhibits    Transcript    Media Included    Word Index

866.999.8310 | aptusCR.com

**Roberto Pieraccini**                                          **Loop AI Labs, Inc. vs. Gatti, et al.**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


LOOP AI LABS, INC., a Delaware   )
corporation,                     )
                                 )
         Plaintiffs,             )
                                 )
         vs.                     ) Case No.
                                 ) 3:15-cv-00798-HSG
ANNA GATTI, an individual,       ) (DMR)
ALMAVIVA S.p.A. an Italian       )
corporation, ALMAWAVE S.r.l.,    )
an Italian corporation,          )
ALMAWAVE USA, Inc., a            )
California corporation,          )
IQSYSTEM LLC, a California       )
limited liability company,      )
IQSYSTEM, Inc., a Delaware       )
corporation,                     )
                                 )
         Defendants.             )
_____ )




DEPOSITION OF ROBERTO PIERACCINI

60 State Street, Boston, MA 02109

Friday, July 15, 2016 9:54 a.m.






Reported by:

Janet Sambataro, RMR, CRR, CLR

Job No. 10025478

**Roberto Pieraccini**                                              **Loop AI Labs, Inc. vs. Gatti, et al.**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOOP AI LABS, INC., a Delaware    )
corporation,                      )
                                  )
          Plaintiffs,             )
                                  )
          vs.                     ) Case No.
                                  ) 3:15-cv-00798-HSG
ANNA GATTI, an individual,        ) (DMR)
ALMAVIVA S.p.A. an Italian        )
corporation, ALMAWAVE S.r.l.,     )
an Italian corporation,           )
ALMAWAVE USA, Inc., a             )
California corporation,           )
IQSYSTEM LLC, a California        )
limited liability company,        )
IQSYSTEM, Inc., a Delaware        )
corporation,                      )
                                  )
          Defendants.             )
_____ )

July 15, 2016

9:54 a.m.

Deposition of ROBERTO PIERACCINI, held at the offices of Regus, 60 State Street, Boston, Massachusetts, pursuant to Agreement before Janet Sambataro, a Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and a Notary Public within and for the Commonwealth of Massachusetts.

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

APPEARANCES:


HEALY LLC

(By Valeria Calafiore Healy, Esquire)

154 Grand Street

New York, New York 10013

212.810.0377

vch@healylex.com

Counsel for the Plaintiff



VENABLE LLP

(By Thomas E. Wallerstein, Esquire)

505 Montgomery Street, Suite 1400

San Francisco, California 94111

415.653.3750

twallerstein@venable.com

Counsel for the Almawave entities

**www.aptusCR.com**

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

I N D E X

WITNESS          DIRECT     CROSS      REDIRECT

ROBERTO PIERACCINI

By Mr. Wallerstein 5


        E X H I B I T S

Number          Description                     Page

Exhibit 1  E-mail chain with top e-mail

           dated February 26, 2016 from

           Thomas E. Wallerstein              30

Exhibit 2  E-mail dated February 12, 2016

           from Roberto Pieraccini           53

Exhibit 3  Declaration of Roberto

           Pieraccini                         56

Exhibit 4  Declaration of Thomas E.

           Wallerstein in Support of

           Almawave USA, Inc.'s Opposition

           to Plaintiff's Emergency Application

           for a Protective Order            57

Exhibit 5  Loop AI Labs, Inc., Advisory

           Board Agreement, dated

           October 16, 2015                  71

Exhibit 6  E-mail dated January 11,

           2013 from Russell Reynolds

           Associates                        77

**Roberto Pieraccini**                                    Loop AI Labs, Inc. vs. Gatti, et al.

P R O C E E D I N G S

ROBERTO PIERACCINI,

having been duly sworn, after presenting

identification in the form of a driver's license,

deposes and says as follows:

DIRECT EXAMINATION

BY MR. WALLERSTEIN:

Q.   Hello, sir.  I introduced myself off
the record.  I'm Tom Wallerstein.  I represent
Almawave, several Almawave entities.

You are Mr. Roberto Pieraccini?

A.   Yes, I am.

Q.   Where do you live, sir?

A.   I live in Boston.

Q.   What address?

A.   15 Sleeper Street, Apartment 203.

Q.   Sleeper?

A.   Sleeper.  Yeah.

Q.   When did you move there?

A.   A month ago.

Q.   More precisely?

A.   Early June.

(Reporter clarification.)

A.   Early June.

Q.   Before that, you lived in San

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

Francisco?

A.    Mm-hmm.

Q.    And where do you work?

A.    I work at a company called Jibo Incorporated.

Q.    And where, physically, do you work?

A.    Two blocks from here.  Congress -- the address of the company is 230 Congress Street.

Q.    How long have you worked at that physical address?

A.    At the physical address, I worked for -- since I moved here, but I worked for the company since January 2014.  Yeah.

Q.    And where did you work -- what was their physical address before you moved to Boston?

A.    It was 805 --

MS. CALAFIORE HEALY:  Excuse me, you don't have to give your home address.

A.    Oh, my physical address?

Q.    Go on.

MS. CALAFIORE HEALY:  Excuse me, I'm sorry.  You're asking for his home address?

MR. WALLERSTEIN:  I'm going to ignore any distractions today, including anything that

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

she says.  So I'm just not going to --

MS. CALAFIORE HEALY:  I'm going to videotape this because you're harassing the witness already.

MR. WALLERSTEIN:  I object to the videotape.

A.   I don't have to give you my home address.  I prefer not to do it.

Q.   No.  You --

MS. CALAFIORE HEALY:  He's not going to give his home address.

Q.   That's not true that you don't have to, number one.  Number two, I'm asking for your business address before you moved to Boston.

A.   The business address is easily found, you know, because it's a private company, but -- and the business is 805 Veterans Boulevard, Redwood City, California.

Q.   Thank you.  And your home address when you were in San Francisco?

MS. CALAFIORE HEALY:  Objection.

MR. WALLERSTEIN:  It's on the record so I don't need that.

Q.   Have you ever had your deposition taken?  We're in a deposition.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.    No.

Q.    Have you ever done this before?

A.    No.

Q.    Have you ever testified in a court of law?

A.    No, I didn't.

Q.    You understand you are under oath?

A.    Yes, I do.

Q.    If I ask you a question and you don't understand what I mean, will you please just tell me, and I will try to rephrase it?

A.    Of course.  Yeah.

Q.    The most important thing that I want to say in preface I've already said, which is if Ms. Healy speaks today, I'm not responding to her.  I'm here to talk to you.  She may have something to say.  She often does, but I'm going to ignore that.

MS. CALAFIORE HEALY:  Objection.  The witness is not here to talk to you.  The witness is here to answer questions.

Q.    And while she's speaking, it's not my time running.  I have a certain amount of time, and that doesn't count as my time.  So the more she talks, the longer we're here.

Roberto Pieraccini                                Loop AI Labs, Inc. vs. Gatti, et al.

Is there any reason you can't testify truthfully and fully today?

A.    No.

Q.    Okay.  Are you aware that the Court has ordered your deposition to be taken?

A.    Yes, I do.

Q.    More than once?  Are you aware that the Court has done that more than once?

A.    I think I remember another time.  It was received in an e-mail.

(Reporter clarification.)

A.    I received an e-mail from your office, and it was -- I don't remember the date.  It was some time ago.

Q.    Okay.  You are represented by a lawyer here today?

A.    Yes.

Q.    And that's Ms. Healy?

A.    Yes.

Q.    When did you first, ever, speak to Ms. Healy?

A.    It would have been probably sometime -- I don't remember how long -- a few days after I received the subpoena to produce documents to you.

www.aptusCR.com

Roberto Pieraccini                                      Loop AI Labs, Inc. vs. Gatti, et al.

Q.   And, in fact, it was after you spoke to me on the telephone.  Right?

A.   Yes.  That's true.

Q.   Okay.  So when we first spoke on the telephone, you had never spoken to Ms. Healy before?

A.   I had never spoken to Ms. Healy before.

Q.   How is it that you came to first speak to Ms. Healy?  Did she call you?

A.   No.  I think I was -- yes, I was contacted, because -- by Ms. Healy a few days after you and I spoke.

Q.   How did she contact you?

A.   I don't remember exactly.  It could have been by e-mail or by telephone.

Q.   If by e-mail, do you still have that e-mail?

MS. CALAFIORE HEALY:  Objection.  Calls for privileged information.  I instruct the witness not to answer.

BY MR. WALLERSTEIN:

Q.   I'm asking a "yes" or "no" question, whether you possess an e-mail or not?

A.   I don't remember.  I receive hundreds of e-mails every day.  I don't keep all of this

Roberto Pieraccini                                Loop AI Labs, Inc. vs. Gatti, et al.

big amount of mails.

Q. Okay. I will ask you not to delete any e-mails to or from Ms. Healy or having anything to do with Loop in any way. Okay?

MS. CALAFIORE HEALY: Objection. The witness is not here to take instructions from you. Do you have a question?

Q. What is your e-mail address?

THE WITNESS: Is it something I can disclose?

MS. CALAFIORE HEALY: Yes. Go on.

A. Roberto@jibo.com.

Q. At -- say it again, please.

A. Jibo is the name of the company that I work for, J-I-B-O.

Q. Any other e-mail addresses you use?

A. I may have other e-mail addresses. I work for different companies. I am alumni in different academic associations, so I have several e-mail addresses.

Q. Do you have a Gmail address?

A. No, I don't.

Q. Are there any other e-mail addresses -- do you have a Yahoo! e-mail address?

A. Yes, I do.

Q.    What is that?

A.    It's my first name, last name at yahoo.com.

Q.    When Ms. Healy first called you -- and she called you.  Correct?

A.    It could have been e-mail.  It could have been a call.  I don't remember.

Q.    At some point, you spoke to her on the phone?

A.    Yeah.

Q.    Who placed that phone call?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.    I don't remember.

Q.    Okay.  What did she tell you?

MS. CALAFIORE HEALY:  Objection.  Calls for attorney-client privileged information. Instruct the witness not to answer.

Q.    Sir, we've -- you don't need to respond to this.  I'm going to tell you that if you refuse to answer questions today, I'm going to go to court, I'm going to get a court order, and we're going to have the judge decide.  And if we have to do it again, we'll do it again, and I will seek sanctions.

Roberto Pieraccini                               Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection.

MR. WALLERSTEIN:  Counsel, don't interrupt me.  We can talk in a moment.

BY MR. WALLERSTEIN:

Q.   **This has happened many times in this case.  I'm not going to argue today, but your counsel is incorrect.**

**The first time she called you, she was not your lawyer.  Right?**

MS. CALAFIORE HEALY:  Objection.  I instruct the witness not to answer as to what was discussed during our first call.

MR. WALLERSTEIN:  That wasn't the question.

MS. CALAFIORE HEALY:  Do you have another question?

MR. WALLERSTEIN:  Counsel, that wasn't the question.

Q.   **I asked:  When Ms. Healy first called you, she was not your lawyer.  Right?**

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion, and it has nothing to do with the case.  So please move on, Counsel.

Q.   **Can you answer, please?**

MS. CALAFIORE HEALY:  No.  He's -- the

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

witness is instructed not to answer.

BY MR. WALLERSTEIN:

Q.   Okay.  I want to be -- I want to have a clear record.  The question is whether or not, when Ms. Healy first called you, if she was representing you.  And you won't answer that?

MS. CALAFIORE HEALY:  He will not answer that question.

MR. WALLERSTEIN:  Okay.

Q.   When did Ms. Healy first represent you? When did she become your lawyer?

A.   I think when we talked on the phone.

Q.   Whose idea was that?

MS. CALAFIORE HEALY:  Objection. Objection.  What does that have to do with anything, Mr. Wallerstein?

MR. WALLERSTEIN:  I'm not answering you.

MS. CALAFIORE HEALY:  No.  You're not going to answer that question.

MR. WALLERSTEIN:  Okay.

MS. CALAFIORE HEALY:  You're clearly here to harass the witness, so we can do two things:  Either you have questions that you told the Court you were going to disturb this very

important scientist to ask him questions about the case.  It seems like you're here to harass him, and I'm not going to allow that.

So we can either call the Court or we can interrupt this deposition and come another day.

MR. WALLERSTEIN:  Neither of those things are happening.

MS. CALAFIORE HEALY:  I'm going to call Judge Gillian, because what you're doing is inappropriate.  You're harassing -- he is a very important scientist.  He canceled important meetings to be here today.

Why don't you ask him questions about the case instead of harassing him?

BY MR. WALLERSTEIN:

**Q.   Sir, I'll respond to you.  I'm entitled to know when the privilege began so that I can see what is privileged and what is not.**

MS. CALAFIORE HEALY:  And he already told you, during the first call.  So if you don't like his answer, please move on.

**Q.   Whose idea was it --**

MS. CALAFIORE HEALY:  Objection.  That lacks relevance.  And instruct the witness not to answer.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

MR. WALLERSTEIN:  Well, I didn't even finish the question.

MS. CALAFIORE HEALY:  You already asked this question.  Asked and answered.  Please ask questions about the case.

MR. WALLERSTEIN:  I want to ask a question and get a clear instruction.

MS. CALAFIORE HEALY:  No.  You already got it.  Please move on.

MR. WALLERSTEIN:  I'm going to try it again.

MS. CALAFIORE HEALY:  Please move on. The witness is here voluntarily.  He's not appearing again.  And I'm asking you to please ask questions about the case like you falsely told the judge that you were calling this witness here to ask him questions about the case instead of harassing him.

MR. WALLERSTEIN:  Are you done?  Can I speak?

BY MR. WALLERSTEIN:

    Q.   I want to get a clear question and an instruction not to answer so that when I file my motion with the Court, they understand what's going on.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

The question I'm trying to ask, and I hope I can finish it without being interrupted, whose idea was it for you to engage Ms. Healy as your lawyer?

MS. CALAFIORE HEALY:  Objection.  Lacks relevance.  Instruct the witness not to answer.

Q.   You won't tell me today what you spoke -- what Ms. Healy told you on that first phone call?

A.   No.

Q.   You won't tell me today when -- well, I strike that.

You believe that Ms. Healy became your lawyer during that first phone call?

A.   Yes.

Q.   Do you have a written engagement letter with Ms. Healy?

A.   No.

Q.   Do you have a fee agreement with Ms. Healy?

A.   No.

Q.   Do you pay her any money?

A.   No.

Q.   She's doing it for free?

A.   That's not my business.  She's

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

representing me as an adviser of Loop.AI.

Q.   For free?  At no cost to you, rather?

A.   I don't know.

Q.   Well, you know if it's a cost to you?

A.   Oh, no cost for me.  Definitely.

Q.   Have you invested money into Loop AI?

A.   No.

Q.   Do you own any stock?

A.   No.

Q.   Do you own stock options?

A.   Yes.

Q.   Are the stock options that you own pursuant to the advisory agreement you signed with Loop?

A.   Yes, they are.

Q.   Any others?

A.   No.

Q.   Have you seen a stock option plan from Loop AI?

A.   Not that I remember.

Q.   How many options do you own?

A.   I don't remember.

Q.   What are they worth?

A.   It depends very much on the valuation of the company.  I don't know.

www.aptusCR.com

Roberto Pieraccini                                        Loop AI Labs, Inc. vs. Gatti, et al.

Q.   Right.   What is your opinion of what they're worth today?

A.   I have no idea.

Q.   Is Loop paying you for your time here today?

A.   Absolutely not.

Q.   You canceled important meetings to be here?

A.   Yes, I did.

Q.   Has Loop ever or Soshoma -- today I'm going to say "Loop" and "Soshoma" pretty much interchangeably.  If it ever matters, I will try to clarify.  But, generally speaking, I use them synonymously.

A.   I don't know the term "Soshoma."

Q.   Oh, fair enough.  So that makes it easy.

Has Loop ever paid you any money?

MS. CALAFIORE HEALY:  Objection. "Loop" is not the name of the company.  The company is called "Loop AI."

MR. WALLERSTEIN:  That's actually not an objection.  That's a statement.

BY MR. WALLERSTEIN:

Q.   But go on, sir.  Has Loop ever paid you

any money?

A.   No.

Q.   Have you ever spoken on the phone or in person with Gianmauro Calafiore?

A.   Yes.

Q.   How many times?

A.   A few times.  I don't remember the number.

Q.   When was the last time?

A.   The last time was probably a couple of months ago.

Q.   What was it about?

MS. CALAFIORE HEALY:  Objection to the extent counsel was present, and it was a communication involving counsel.  Then that communication is privileged, and the witness cannot discuss that.

MR. WALLERSTEIN:  That's not true.

Q.   But was counsel present?

A.   Yes.

Q.   Who?  Ms. Healy?

A.   Ms. Healy.

Q.   Was it a phone call?

A.   No.  It was in person.

Q.   Where?

Roberto Pieraccini                    Loop AI Labs, Inc. vs. Gatti, et al.

A.    It was in San Francisco.

Q.    Where?

A.    It was a cafe.  I don't remember exactly which one.

Q.    Who else was there, you, Gianmauro, Valeria?

A.    That's it.

Q.    You know they're related?

A.    Oh, yes.

Q.    When did you learn that?

A.    I learned that by simply looking at the last name of Ms. Calafiore Healy and then it was obvious, but probably during the first phone call.

Q.    Actually, I told you on the phone call, didn't I?

A.    I don't remember that.

Q.    Have you ever spoken to Bart Peintner?

A.    No.

Q.    Have you ever spoken with Anna Gatti?

A.    Never.

Q.    You talked about the last time you spoke to Gianmauro.

A.    Mm-hmm.

Q.    How long was that conversation?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   Probably about half an hour, one hour, the time while having a coffee.

Q.   Were -- were you seeking legal advice?

A.   No.

Q.   Was he?

A.   No.

Q.   You were talking to Gianmauro.  Why was Ms. Healy there?

A.   Because she happened to be there.  I don't know what they were doing in San Francisco. It's not my business.

Q.   Okay.

A.   And we decided to have a friendly meeting to see each other, to know each other, you know, face-to-face.  I knew Gianmauro before. I met Gianmauro before.

Q.   Okay.  Your counsel is not going to let you answer this question, but I want to have a clear record, because it's not privileged, in my opinion.  So I want to be clear.

What did you talk about with Gianmauro at that meeting?

MS. CALAFIORE HEALY:  So let me just object.  Calls for attorney-client privileged information.  Anything regarding any discussion

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

that I was involved in regarding the case, that you cannot disclose.  Anything else that we discussed, that was discussed that did not relate to the case, you can, of course, disclose.

BY MR. WALLERSTEIN:

Q.   Sir, you should -- I guess you've got to follow your counsel's advice.  That's just flat out wrong.  It's just not true that her presence means that the conversations between you and Gianmauro becomes privileged.  Otherwise --

MS. CALAFIORE HEALY:  That's absolutely not what I said.

Q.   Otherwise, a lawyer --

MS. CALAFIORE HEALY:  Mr. Wallerstein, that's absolutely not what I said.  I said to the extent the discussion involved my communications regarding the case, he's not to disclose them. To the extent he remembers any other conversation with Mr. Calafiore not involving counsel, that did not relate to the counsel, that he can absolutely discuss it.

BY MR. WALLERSTEIN:

Q.   So that's not true.  And if that's the position your counsel is taking, so be it.  I just want to get a clear answer.

Roberto Pieraccini                                 Loop AI Labs, Inc. vs. Gatti, et al.

Will you tell me anything that you said to Mr. Calafiore at that coffee meeting?

A.   Yes.   We spoke about our families, children.   We spoke about our life.   We are from Italy.   We moved to the United States.   The companies we have worked for.   And these type of things.

Q.   Including Loop?

A.   We didn't speak much about Loop, because I'm not -- I'm interested in technical aspects.   So I understand Gianmauro, as a CEO, is more related to business, so it is not a topic that I have much interest in.

Q.   He doesn't know much about the technology?

A.   Oh, he does.   Yes.   We spoke, you know, about general -- generality about the technology.

Q.   What did you say?

A.   I don't remember what I said.

Q.   What did he say?

A.   I can't remember.

Q.   Okay.   Did you talk about this case?

MS. CALAFIORE HEALY:   Objection.   Calls for attorney-client privileged information.

Q.   Are you going to answer the question?

I assume not, and I don't mean to imply otherwise.

A. No. I'm not going to answer the question.

Q. When was the prior time, the next time before that, that you spoke to Gianmauro?

A. I spoke on the telephone in regard to my engagement as an adviser for the company.

Q. That was -- so there was a coffee meeting and, I'm sorry, I think you said a few months ago?

A. Yeah. I think so, a couple.

Q. I'm sure. And there was a time when you spoke to him about becoming an adviser?

A. I already decided to become an adviser. We spoke about the -- you know, we're Italians so we like to speak together. So it's easy to, especially for -- I don't know if you have ever lived in a foreign country, but when you find someone that speaks the same language, it's nice to talk to them, especially a nice person like Gianmauro.

So we had a chance to speak on the phone. He told me he'd send me the documents to sign for me to formally accept the position of adviser.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

And then we had a general chitchat about, you know, personal issues.  Yeah.

Q.    And then you didn't speak to him again until the -- a few months ago?

A.    Yeah.  Probably this is true.  Yeah.

Q.    I'm sorry.  That is true?

(Reporter clarification.)

A.    Yeah.  I didn't speak to him.

Q.    You did or did not?

A.    I did not.

Q.    I apologize for my ears.

MR. WALLERSTEIN:  Counsel, I object to being videotaped or recorded.

BY MR. WALLERSTEIN:

Q.    Did you give him advice about the company at that earlier meeting?

A.    I believe that too.  I'm not an expert in -- what I do, I'm an expert in speech recognition and natural language understanding for interactive machines --

(Reporter clarification.)

A.    -- engaged in dialogue interactions with users.

Q.    And so, no, you did not give him any advice?

Roberto Pieraccini    Loop AI Labs, Inc. vs. Gatti, et al.

A.   I wasn't asked for any particular advice.

Q.   **Have you ever given him advice about Loop?**

MS. CALAFIORE HEALY:  Objection.  He's addressing a company that is not the same company on which you're an adviser of.  The company is not called Loop.

A.   I did give advice in relation to the deposition of Mr. Roman.

Q.   **Roman, R-O-M-A-N.  We'll get there. Prior to the deposition of Mr. Roman, I believe he pronounced his name Roman, did you give any advice to Loop?**

A.   Not that I remember.

Q.   **When is the last time you spoke to Patrick Ehlen, E-H-L-E-N?**

A.   A few days ago.

Q.   **What about?**

A.   We are personal friends, so we keep in touch sometimes.

Q.   **What did you talk about?**

A.   We talked about his family, his daughter and his wife.  They're traveling in Europe, and he was, you know, interested in

knowing how I'm doing in my new move in Boston. And that's what we spoke about.

Q.    Did you talk about this deposition?

A.    He knows that I was going to come to have a deposition.

Q.    What did he have to say about that?

A.    Nothing in particular.  He invited me to say the truth, which I'm doing.  It's not -- it's kind of preposterous, because I generally say the truth.

Q.    That's good advice, nonetheless.  And if you're going to give someone advice, that's the advice I would give, as well.

What else did he tell you about his deposition?

A.    I don't think we talked about his deposition.

Q.    Okay.  Did he talk about this litigation in any way?

A.    Not -- not really.  We don't discuss -- didn't discuss about the litigation.

Q.    He knew you were going to be deposed this week?

A.    Yup.

Q.    And that's why he called you?

Roberto Pieraccini                                      Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.   No.  We talked --

Q.   **Do you think it was just a coincidence that he called you this week?**

A.   Yeah.  We're friends.  Do you ever talk to your friends?

Q.   **When was the time, before this, that he called you?**

A.   It was probably a few weeks ago, before he left for Europe, before I moved to Boston.  It was probably a little bit over a month ago.  We had dinner together with a common friend.

Q.   **Where?**

A.   In San Francisco.

Q.   **Why were you in San Francisco?**

A.   I was living in San Francisco.

Q.   **Oh, that's before you moved here?**

A.   Yes, exactly.

Q.   **I see.  Have you ever given Patrick Ehlen advice about Loop?**

A.   No.  Except regarding the deposition of Mr. Roman.

Q.   **Right.  We'll get there.**

MR. WALLERSTEIN:  Can you mark this for

Roberto Pieraccini                                                    Loop AI Labs, Inc. vs. Gatti, et al.

me, please.

            (E-mail chain with top e-mail
   dated February 26, 2016 from Thomas E.
   Wallerstein marked Exhibit 1.)
BY MR. WALLERSTEIN:
    Q.   I'm handing you a series of e-mails
that I have had the court reporter mark as
Exhibit 1, and I just ask that you look that over
and see if it's familiar to you.
    A.   Okay.
    Q.   Did you send and/or receive the e-mails
in Exhibit 1?
            MS. CALAFIORE HEALY:  Objection.
Please identify which one.
    A.   Which one?
    Q.   All of them.
    A.   Yes.  I am familiar with this.  Yes.
    Q.   Is it helpful for me to clarify which
one?
                (No response.)
    Q.   Let's start at the back on Page 2.  It
says on February 10, 2016 -- pardon my reach.
Right here (indicating).  Do you see that?
    A.   Yeah.  I see it.
    Q.   Did you receive that e-mail from me?

Roberto Pieraccini                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   Yes.  I believe so.

Q.   Did you read it when you received it?

A.   I think so.

Q.   You read that before you spoke to me.
Right?

MS. CALAFIORE HEALY:  Objection.  Calls
for speculation.  Lacks relevance.

Q.   I'm sorry.  Go on.

A.   I definitely read the e-mail.

Q.   Okay.  Before you spoke to me?

A.   Yeah.

Q.   Do you see in the second paragraph, I
wrote, "If you have a lawyer, have him or her
contact me"?

A.   Mm-hmm.

Q.   You saw that --

A.   Yeah.

Q.   -- before you spoke to me?

A.   Yeah.

Q.   Did you have a lawyer at the time?

A.   I don't have a lawyer.

MS. CALAFIORE HEALY:  Objection to the
verb.  You said "I don't."

THE WITNESS:  I didn't.  I didn't.
Sorry.  I didn't have a lawyer.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

BY MR. WALLERSTEIN:

Q.   If you look at the first page, on the very bottom, you see it says on February 10, 2016 --

A.   Right.

Q.   -- I wrote, "Thanks, Roberto.  I'll be happy to tell you everything I know.  Call me at my office number below any time.  I'll be here until at least 6:00 or 7:00."

A.   Mm-hmm.

Q.   Does that refresh your recollection that we spoke on February 10, 2016?

A.   Yeah.

Q.   That's when we spoke.  Correct?

A.   Right.

Q.   We've only spoken, you and I, one time on the telephone.  Right?

A.   That's correct.

Q.   That was about ten minutes long?

A.   Pretty much, yeah.

Q.   Shortly before 4:00 p.m.?

A.   It's possible.

MS. CALAFIORE HEALY:  Objection.  Lacks relevance.

MR. WALLERSTEIN:  That's not an

Roberto Pieraccini                                           Loop AI Labs, Inc. vs. Gatti, et al.

objection you're allowed to make, and that's
actually -- the Court has ordered that counsel
that does that will be sanctioned.  It's not an
objection.

Q.   Who called who on February 10th?

A.   You know, it's hard to remember, but
apparently I called you, probably.

Q.   Did you record the call?

A.   No.

Q.   Do you know if I did?

A.   I don't know, because you would have
told me if you recorded the call.  I don't think
you can record my call if you didn't tell me in
advance.

Q.   Did you take notes?

A.   No.  We didn't talk about too many
things, so I -- you know, it was a ten-minute
call, not enough needed to take notes.

Q.   Do you know if I took notes?

A.   How could I know?

Q.   Do you know if I sent an e-mail to my
entire firm or my entire team, documenting what
we spoke about on the call?

A.   I have no idea.

Q.   You don't.  Do you have anything in

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

writing, in writing, that would corroborate what you and I spoke about on that phone call?

A.   I don't think so.  Yeah.

Q.   When I spoke to you on the phone call, I told you my name.  Yes?

A.   Mm-hmm.

Q.   I told you my law firm?

A.   Mm-hmm.

Q.   Yes?

A.   Yeah.  I think so.

Q.   I told you who I represented?

A.   Yeah.  I think so.

Q.   I told you specifically that I did not represent Anna Gatti.  True?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I don't remember that.

Q.   Did I tell you that I do not represent Loop?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I don't think you -- it was explicit, but I don't remember.

Q.   Did I tell you that I don't represent you?

MS. CALAFIORE HEALY:  Objection. Leading.

Q.  I told you that, didn't I?

A.  I don't recall that.  You know, it could be, but I don't recall, you know.

Q.  You told me that you understood that I'm not your lawyer --

MS. CALAFIORE HEALY:  Objection.

Q.  -- didn't you tell me that?

MS. CALAFIORE HEALY:  Objection. Leading.  You're putting words --

A.  I don't remember everything what I say. I don't remember.  You don't -- you're not my lawyer at the time, so it was clear that you didn't represent me.  So I never had any thought about you representing me.

Q.  I asked you if you had a lawyer, didn't I?

MS. CALAFIORE HEALY:  Objection. Leading.  You can answer.

A.  Yeah.  I think you did.  Yeah.

Q.  And you told me "no"?

A.  I didn't have a lawyer at the time. Yeah.

Q.  Do you know if I was reading off a

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

script that I use whenever I talk to a
third-party witness?

        MS. CALAFIORE HEALY:  Objection.  Lacks
knowledge, lacks relevance.

    A.   I don't know.

    Q.   You don't know.  Right?

    A.   How could I know?

    Q.   You told me that you were not aware of
the lawsuit, and I don't mean -- let me rephrase
that.

    Did you tell me that you were not aware of
the lawsuit, this lawsuit?

        MS. CALAFIORE HEALY:  Objection.
Leading.

    A.   I was not aware until I received a
subpoena.  And then I did a quick Google search
on the names on the subpoena, and I found a few
articles regarding those.  That's the only thing
I knew.

    Q.   Was that the first -- I don't -- I
don't -- have you ever seen a copy of the
Complaint?

    A.   No.

    Q.   I told you on that phone call that my
clients were adverse to Loop, did I not?

Roberto Pieraccini                              Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I can't remember that.

Q.   I told you that Loop was suing not only my clients, but Anna Gatti.  Right?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I really don't remember that.

Q.   Okay.  I told you that Loop was represented by Valeria Healy, did I not?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I don't remember that.

Q.   You don't remember me telling you that Loop was represented by Valeria Healy, the sister of Gianmauro?

A.   I don't remember that.

Q.   I asked you if you were an employee of Loop, did I not?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   You could have asked, but I was not an employee, employee.

Q.   Did I ask you if you were an officer or director of Loop?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I don't remember that.

Q.   **Are you?**

A.   I am not.

Q.   **You told me that you had no confidential information of Loop, did you not?**

MS. CALAFIORE HEALY:  Objection. Leading.

A.   No.

Q.   **You did not say that?**

A.   I did not.  Yeah.

Q.   **Did I ask you whether you had any confidential information of Loop?**

A.   I don't recall that.

Q.   **Did you tell me that your only interaction with Loop -- strike that.**

**Did you tell me that your only interaction about Loop was a single conversation you had with Patrick Ehlen?**

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I knew about Loop before.  I met Patrick Ehlen many times before, but we explicitly met for him to ask me to be the

Roberto Pieraccini                                     Loop AI Labs, Inc. vs. Gatti, et al.

adviser, to be an adviser for Loop a few months before this call.  Yeah.

Q.    Did I tell you that you were listed on Loop's website under the advisory board?

MS. CALAFIORE HEALY:  Objection. Leading.

A.    I knew that.

Q.    You knew that?

A.    Of course.

Q.    You didn't look it up with me on the phone?

MS. CALAFIORE HEALY:  Objection. Leading.

A.    No, I didn't.

Q.    You didn't chuckle?

A.    Absolutely not.  I was proud to be on the website.  I was so proud that I put that on my resume, and I put that on LinkedIn as one of my affiliations.

Q.    Well, let's be clear.  I want to be clear.  I'm not talking about your association with Loop or your service on the advisory board. I'm talking about the Loop website.

A.    Mm-hmm.

MS. CALAFIORE HEALY:  Objection.

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

That's not the question --

            MR. WALLERSTEIN:  It's not, Counsel.
So please be quiet.

            MS. CALAFIORE HEALY:  Please don't
give -- if you say that again, we're going to
walk out of this deposition.

            MR. WALLERSTEIN:  Be quiet.

     Q.    Sir --

            MS. CALAFIORE HEALY:  I'm going to call
the Court.  We're going to stop this.  I'm going
to call the Court.  Let's just go.  Let's go.

            MR. WALLERSTEIN:  I don't advise that,
sir.

            MS. CALAFIORE HEALY:  Let's just go.
I'm not going to be here.  I have the video of
you insulting me.

            MR. WALLERSTEIN:  Sir, I don't advise
it, but you need to do what you need to do.  But
it's contempt.  You're under an order, a court
order to be here.

            MS. CALAFIORE HEALY:  You're not under
court order.  I'm not going to be here with
you --

            MR. WALLERSTEIN:  I'd be happy to show
you the court order, two of them.

Roberto Pieraccini                          Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  We're not going to be here with you insulting us.  I have the video here.

MR. WALLERSTEIN:  Sir, I think you should take five and think about it.

MS. CALAFIORE HEALY:  No.  I think you should take a fucking break.  You should take --

(Interruption in proceedings.)

MR. WALLERSTEIN:  Oh, my goodness.

MS. CALAFIORE HEALY:  Take a fucking break.

MR. WALLERSTEIN:  I need help.  She just threw her coffee at me.  She's going crazy.

Sir, you should get a lawyer.  You're a witness.  Oh, my God.

Sorry about that.  We're going to go off the record.

(A recess was taken.)

BY MR. WALLERSTEIN:

**Q.   Are you ready, sir?**

A.   Ready.

**Q.   Your counsel just threw a cup of coffee at me.  Is that true?**

A.   I don't want to talk about that.

**Q.   I don't care.  Is it true?**

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   Can I not talk about this?

Q.   **No.  You're going to talk about it.**

MS. CALAFIORE HEALY:  Yeah.  You're entitled to say whatever you want.

A.   But I saw exactly the thing that you saw.

Q.   **What did you see?**

A.   That you insulted her.

Q.   **How so?**

A.   You told her to shut up.

Q.   **Did I say "shut up"?**

A.   I don't know exactly the words you said.

Q.   **I said something.**

A.   To not talk.

Q.   **Okay.**

A.   And she somehow was -- somehow felt insulted.

Q.   **Yes.**

A.   And she threw a cup of coffee.

Q.   **She threw a cup of coffee at me?**

A.   Yeah.  In your direction.

Q.   **It hit me.  Right?**

A.   I couldn't see.

Q.   **I'm still wet.  Right?**

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection.

Q.   Sir, you can look.  Can you look?

MS. CALAFIORE HEALY:  I did throw a cup of coffee at you.  You insulted me repeatedly. You told me to be quiet.  I have a video.

I'm tired of being bullied by you, Mr. Wallerstein.  I am tired of being bullied.

Mr. Pieraccini is here to be questioned. If you want to --

THE WITNESS:  Can I say something?  I am a scientist.  I'm a technologist.  I'm a very important person, and I'm here responding to questions that are not relevant to what you called me for.  Whether I talked to her on the phone?  What did I say to Mr. Gianmauro Calafiore?

Let's get to the chase of it.  I'm answering stupid questions that have no bearing on what -- I have work to do.  Like you have work to do, I have work to do.  I'm here just -- I don't even know why.

I don't know anything about the case. And then just, please, let's get it over.  I cannot really continue this.  I'm not involved in anything.

I knew that I was on the website.  I was proud to be on the website.  You can tell how many times you want.  I knew I was on the website.

How could I not know that my profile was there and that my picture was there?  That I'm an adviser of this company.  How could I not know that?

So let's get over with this and let me get back to work.  That's what I want to do.

Please ask me relevant questions, not questions with no relevance.  I'm not involved in anything.  I didn't do any wrongdoing.

So I want to get this over, please, and get back to my life.

Q.   **Did you submit a declaration in this case?**

A.   Yes, I did.

Q.   **Recently?**

A.   Yes, I did.

Q.   **Why?**

A.   Because I was asked to advise Loop.AI, as an adviser, regarding something that this Roman, whatever his name is, said.

COURT REPORTER:  I'm sorry, who?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

THE WITNESS:  Roman, R-O-M-A-N.

Q.    I'm wet with coffee, am I not?

A.    I'm wet with sweat.

Q.    Okay.  That's not the question.  Do you see coffee on me?

MS. CALAFIORE HEALY:  Objection.

A.    I don't know if it's coffee or sweat. I don't know.

Q.    Did your counsel throw her cup of coffee?

A.    This is not relevant to what you called me for.  Okay.

Q.    It is now.  It is now.  So you're either going to answer the question or you're not.

MS. CALAFIORE HEALY:  Objection.  He's already answered the question.

A.    I answered the questions.  Yeah.

Q.    Did she throw coffee on my computer?

MS. CALAFIORE HEALY:  No, I did not throw coffee on your computer.

Q.    I'm asking you.

A.    I don't know what she aimed at.

MS. CALAFIORE HEALY:  I have a video.

A.    I'm not in her brain.  I saw a coffee

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

flying.  Okay?

Q.   Where did it fly to?

A.   To the table, and it splashed.  That's what I saw.

Q.   It splashed on my computer?

A.   It is possible.  It splashed on -- probably it was splashed on me too.

Q.   All over?

A.   Coffees splash.

Q.   All over my bag.  Correct?

A.   That possible.

Q.   It's not possible.  It's true.  Right?

A.   Okay.

MS. CALAFIORE HEALY:  Objection.

Q.   You know what a fact is?  Right, sir? You're a scientist.  It's a fact, is it not?

A.   What I saw is not part of my --

Q.   Yes.  Did you see coffee on my bag?

A.   Yes, I did.

Q.   What's so hard about that?  Did you see it on my computer?

A.   Yes.

Q.   And on me?

A.   Yes.

Q.   Okay.  It's not that hard.

MS. CALAFIORE HEALY:  It is hard.  I did not throw coffee on you.  I threw coffee on the table.

MR. WALLERSTEIN:  Your time will come, Counsel.

**Q.   When we spoke on the phone, sir --**

A.   Yeah.

**Q.   -- you told me -- strike that.**

**When we spoke on the phone, did you tell me that "companies sometimes like to use my name to bolster their credibility"?**

MS. CALAFIORE HEALY:  Objection.

A.   Are you --

MS. CALAFIORE HEALY:  Leading.

A.   That doesn't sound true to me.

**Q.   What doesn't -- it doesn't sound true that you said it?**

A.   That I'd say that.  I definitely, Loop.AI didn't do that, because I was on their website, and I was proud.  I was on the LinkedIn.  I know Patrick Ehlen very well, so that can happen, in general.

**Q.   I'm just talking about our phone call.**

A.   I don't remember our phone call.  I can't remember a phone call that happened months

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

ago, ten-minutes' phone call.  I don't remember word-by-word what we said.

Q.   I'm not asking you word-by-word.  In fact, you submitted a statement under oath about that phone call, did you not?

A.   Yes.  I submitted a statement.  It was not about the phone call, but about your declaration of things it was saying, and I was really shocked to see that you say that I didn't even know about the website.  Really shocked. Okay?

Q.   We'll get there.  Right now, I'm talking about the phone call.

A.   So I don't remember if I said that company does it.  It is true that companies can do that, but definitely not Loop.AI.

Q.   So you didn't tell me that about Loop AI?

A.   I don't remember.  I don't remember if I told you that companies do that.  I don't remember.

Q.   But you're certain -- at least today, you're certain that your memory is you did not tell me that Loop AI was using your name to make itself --

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   Oh, of course.  I was their adviser.
How could I tell you that?

Q.   You were their adviser, but you have
never given them any memory advice.  Right?

MS. CALAFIORE HEALY:  Objection.

A.   Do you know how it works, adviser?

Q.   Listen --

A.   I work for a startup, okay, and very
important adviser.

Q.   You're very important.  I know.  You're
very important.  You've told me that three times.

A.   I am.  I am.

Q.   You know, generally, when some people
have to say that, there's a reason.

A.   Yeah.  Google me up, please.  Yup.

Q.   I'm not going to answer your questions.
I just want you to answer mine.

A.   You don't have to.

Q.   Correct.  Before that phone call, you
had never given Loop AI any advice.  Isn't that
true?

A.   Not for money as an adviser.  I may
have talked to Patrick several times, because we
know each other.

Q.   But not about Loop?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.    Not specifically about Loop.  About technology.

Q.    Did he tell you about Loop's technology?

A.    Yes.  Many times, even before that.  We participated together in conference.  There are pictures on the web of Patrick and I talking at the --

Q.    The Dublin Summit?

A.    The what?

Q.    Go on.

A.    Well, it was a conference in San Francisco organized by -- it was called the Deep Learning Summit.

Q.    And he spoke to you about Loop's technology?

A.    Say it again, please.

Q.    He spoke to you about Loop's technology?

A.    Yes, he did.  Yeah.

Q.    And when was that?

A.    It was January 2014, probably.

Q.    Okay.  Did he tell you how it works?

A.    We talked about it, you know, but not the details, of course.

Q.   Well, why do you say "of course"?  It's not "of course" to me.

A.   It's confidential information.  I was not an adviser of the company, so I was not -- there's no reason why he would tell me confidential information.

Q.   Do you, today, know confidential information?

A.   We -- I don't know confidential information.  I don't need to know confidential information about Loop.AI.

Q.   I heard you say -- I want to make sure --

A.   Yes.

Q.   -- we heard the same thing.  You don't know any confidential information about Loop today?

A.   No, I don't.

Q.   You signed an agreement with Loop. Right?

A.   Yes, I did.

Q.   Did you consider that document to be confidential?

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   I think it's confidential.

Q.   Did you tell me on the phone call that you don't believe it is confidential, and you would send it to me?

MS. CALAFIORE HEALY:   Objection. Leading.

A.   I might have.   I didn't know if it was confidential or not, but probably it is.   Yeah.

Q.   I'm not asking if --

A.   I'm not a lawyer.

Q.   Exactly.   Precisely.

A.   I don't know things.

Q.   I'm not asking whether, legally speaking, it is confidential or not.   I'm asking about your head.   When you spoke to me on the phone call, did you believe that it was confidential?

A.   I was confused about the confidentiality of -- of an advisory role, so I --

Q.   Did you tell me you were confused?

MS. CALAFIORE HEALY:   Objection. Leading.

A.   No, I did not.   I don't know the extent of the confidentiality for a document that states

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

my advising.

Q.   I'm not asking you what you know.  I'm asking you what you said.

A.   I don't remember what I said.

Q.   Okay.  You might have said that?  You might have told me, "I don't believe it's confidential"?  You might have said that?

A.   I don't think so.  I treat these documents with high regard.  So I don't give them to anyone, especially a person I never met before.

Q.   You sent it to me that very day or two days later, did you not?

A.   I don't remember I sent you that.

Q.   Okay.  Do you remember sending me an e-mail with documents attached?

A.   I sent a document that you requested, the subpoena for e-mails, mostly.

Q.   Okay.

MR. WALLERSTEIN:  Can you mark this for me, please.

(E-mail dated February 12, 2016 from Roberto Pieraccini marked Exhibit 2.)

BY MR. WALLERSTEIN:

Q.   You've been handed an e-mail that's

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

been marked Exhibit 2.

        Do you have Exhibit 1, by the way, sir, from earlier this morning?

        A.   My declaration?

        Q.   No, no.  Sir, in this deposition, I marked a document.  I put a -- the court reporter put a blue sticker on it, and we gave it to you. It was in front of you before your counsel left.

        A.   I don't have it with me now.  Yeah.

        Q.   We need that back.

        MS. CALAFIORE HEALY:  Where is it?  Did you --

        THE WITNESS:  Probably.  Yes, it's in my bag.

        MR. WALLERSTEIN:  Thank you.  Leave that handy, and the court reporter will take those at the end of the session.

BY MR. WALLERSTEIN:

        Q.   Do you see Exhibit 2 is an e-mail from you to me, copying my colleague?

        A.   Say that, please.  Repeat it again.

        Q.   Exhibit 2, did you send that e-mail?

        A.   Yeah.

        Q.   And do you see it has attachments, several attachments?  Do you see that?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   Yeah.

Q.   You attached those e-mails -- sorry.
You attached those documents --

A.   Yeah.

Q.   -- to me?

A.   Yeah.

Q.   Yes?

A.   Yes.

Q.   You sent me the Loop advisory
agreement.  Correct?

A.   Yeah, I did.  Yeah.  Apparently,
according to this e-mail.  Yeah.  As I told you,
I didn't remember.

Q.   Sure.  That's why we're here.  Now, you
remember that you sent me an e-mail on
February 12th, attaching certain documents?

A.   Yeah.  Yeah.

Q.   Does that refresh your recollection
that, as of February 12th, you did not believe
that document to be confidential?

A.   Yes.  Probably, I was wrong about that.

Q.   Well, I don't know.  I don't think you
were wrong.  I think you were right.

MS. CALAFIORE HEALY:  Objection.  You
need to listen to his instructions.  Just answer

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

the questions.

THE WITNESS:  Okay.

MR. WALLERSTEIN:  Okay.  Let's do this.
Can you mark this, please.

(Declaration of Roberto
Pieraccini marked Exhibit 3.)

BY MR. WALLERSTEIN:

Q.   I've handed you a document marked as
Exhibit 3.  It's entitled "Declaration of Roberto
Pieraccini."

A.   Mm-hmm.

Q.   You can look it over and tell me if you
remember it.

A.   Yeah.

Q.   You signed that?

A.   Yes.

Q.   In Boston?

A.   I was in San Francisco at the time.

Q.   If you look at the second page, please,
by your signature.

A.   Yeah.

Q.   Do you see it says "executed
February 26, 2016"?

A.   Oh, I was probably traveling to Boston
at the time, yeah, but I was living in San

Francisco.

Q.   If you look at -- let's look at Paragraph 3 of your declaration, Exhibit 3.  You say, "During my telephone call with Mr. Wallerstein, which he requested, he did not tell me that I should consider consulting with Loop AI's attorney or with any attorney before speaking to him about Loop AI."

A.   Yeah.  You told me if I had an attorney, which I answered I didn't.  That's what I remember.

MR. WALLERSTEIN:  Can I mark this too, please.

(Declaration of Thomas E. Wallerstein in Support of Almawave USA, Inc.'s Opposition to Plaintiff's Emergency Application for a Protective Order marked Exhibit 4.)

MR. WALLERSTEIN:  Thank you.

BY MR. WALLERSTEIN:

Q.   I've handed you a document that is marked as Exhibit 4.  It is my "Declaration of Thomas Wallerstein."  It's three -- it's got a caption --

A.   Sorry.

Q.   It's got a caption, three pages, and then exhibits.  My declaration, itself, is three pages long.

A.   Mm-hmm.

Q.   Did you -- you've read my declaration before?

A.   Yes.

Q.   You read it before you signed your declaration.  Correct?

A.   Yes, I did.

Q.   So now I'm going to go back to yours.

A.   Mm-hmm.

Q.   Your Paragraph 3, "During my telephone call with Mr. Wallerstein, he did not tell me that I should consider consulting with Loop AI's attorney"?

A.   Yeah.

Q.   Did I ever say otherwise?

A.   I don't recall you telling me to consult with Loop.AI attorney.

Q.   Did I ever tell anyone that I did tell you to consult with Loop AI's attorney?

        MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

A.   Probably not.  No.

Roberto Pieraccini                          Loop AI Labs, Inc. vs. Gatti, et al.

Q.   So your Paragraph 3, the statement in your Paragraph 3, that does not render anything in my declaration false, does it?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.  The witness has already indicated what he believed was false in what you told him.

MR. WALLERSTEIN:  That's improper and has been sanctioned by the judge.

A.   So I don't understand.  What can you explain to me?

Q.   Sure.

A.   Okay.

Q.   If you look at your Paragraph 2 --

A.   Yeah.

Q.   -- your second sentence, it says, "Mr. Wallerstein's statements regarding my communications with him and what I allegedly told him regarding Loop AI are totally false."

Do you see that?

A.   Paragraph 2?

Q.   Sure.  Your Paragraph 2.

A.   Yeah.

Q.   It says that my statements are false?

A.   Yeah.

Q.   Okay.  Your Paragraph 3 then talks

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

about something that I did not say on the phone

call.

    A.   During my telephone call with

Mr. Wallerstein, which he requested, he did not

tell me.  That's a statement from me, yes.

    Q.   About what I did not say?

    A.   Yeah.

    Q.   Does the fact that I did not say that

to you on the phone call render anything in my

declaration false?

    A.   Does it -- whatever paragraph here

doesn't mean that it is addressing --

    Q.   Okay.

    A.   -- the fact that you're false.  It's a

statement.

    Q.   Sure.

    A.   I say during my phone call, you didn't

tell me to consult with attorney.  I didn't say

that there was any false.

    Q.   Okay.

    A.   I didn't claim there was any false

thing.

    Q.   Fine.  I'm asking you today.

    Is there anything in my declaration that

contradicts your Paragraph 3?

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

MS. CALAFIORE HEALY:  Objection.  Are you asking the witness to compare?

A.    I have to read it all together, but this was not -- I don't think it was addressing in particular here.  It was a statement.  Like, I'm a member of Loop.AI doesn't contradict anything that you said.  Right?  It is a statement.  Number three is a statement that I believe I don't remember you telling me that I should consult with Loop.AI counsel.

**Q.    I understand that.  Is there anything in my declaration that contradicts that?**

A.    I need to reread it.

MR. WALLERSTEIN:  Go ahead.  I'm going to take a five-minute break.  You do that.

THE WITNESS:  Okay.

(A recess was taken.)

BY MR. WALLERSTEIN:

**Q.    Did you have a chance to look that over?**

A.    Yes.

**Q.    Is there anything in my declaration that contradicts that, sir, Paragraph 3?**

A.    Not this one.  This was a statement I made.  My falsehood was what is in boldface here.

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

My claim is false is Paragraph 2 here.  So that's what I say.  That I was shocked by this.  I didn't know the false because --

          (Reporter clarification.)

     A.   I'm saying Paragraph 2 is the one that I referred to here as a false statement.  Okay.

     Q.   I understand that.  I'm asking about Paragraph 3.

     A.   Paragraph 3 is a statement.

     Q.   Correct.

     A.   At the time, Loop.AI is a statement.  It doesn't contradict anything I just said.

     Q.   Thank you.  Thank you.

     A.   And number three doesn't have to necessarily contradict anything you say.

     Q.   Okay.

     A.   I state that, simply, you didn't tell me to consult -- I didn't even know that there was an attorney that was representing in this case.

     Q.   Oh, is that true?  I didn't tell you that there was an attorney representing Loop named Valeria Healy?

     A.   I don't remember that.

     Q.   I may have.

Roberto Pieraccini                                        Loop AI Labs, Inc. vs. Gatti, et al.

A.   I don't remember.

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

Q.   When you say you don't remember means --

A.   I don't remember.

Q.   So maybe yes, maybe no?

A.   I don't recall.

Q.   You don't have notes, though?

A.   I don't have notes.

Q.   Okay.  Do I?

A.   How do I know if you have notes?

Q.   You're right.  Correct.  Correct. Paragraph 4, your Paragraph 4, during your telephone call with me, "I told Mr. Wallerstein that I had signed an NDA."

A.   Mm-hmm.

Q.   "Mr. Wallerstein did not tell me that I should be careful not to tell him or give him anything about Loop AI Labs."

Do you see that?

A.   Yes.

Q.   Does that contradict anything in my declaration?

A.   As I said before, not necessarily

everything has to contradict your declaration. The point of contradiction is this statement in bold.

(Reporter clarification.)

A.   The point that I say is not true is the number two here.

Q.   I understand that.  And, you know, you can tell me that four, five, six times today, but I just want an answer to my question.

I understand what you're telling me.

A.   Yeah.  So I say no.

Q.   Okay.  Paragraph 5 says, "During my telephone call with Mr. Wallerstein...", and it goes on to say what it says.

Does that contradict anything in my declaration?

MS. CALAFIORE HEALY:  Objection.

A.   Why do you keep asking me these things?

Q.   Just get it over with.

A.   I'll just state it again.  What I wrote here is referring to Paragraph 2.

Q.   That's not my question.

A.   It's shocking -- you can ask me all the questions you want, of course.

Q.   Just answer --

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.    So, you know, talking about Paragraph 5.

(Witness reading document.)

A.    This is a plain statement.  How can I -- it doesn't contradict Paragraph 3.  You don't say that you didn't ask me about it.

**Q.    Thank you.**

MS. CALAFIORE HEALY:  Excuse me.  I want to make an objection, because the witness is not reviewing the entirety of what you said in the declaration and in the brief to the Court.

So the witness can give you information about what he wrote in his declaration, but not comparing one document with another.  So I just want to put that objection on the record, and I would request also that you move on to other questions.

BY MR. WALLERSTEIN;

**Q.    Paragraph 6, does your Paragraph 6, what you say in your Paragraph 6 about my statements -- I understand that you believe -- well, I'll come back to that, because I think I understand your testimony on that.**

THE WITNESS:  Can I have some water?

MR. WALLERSTEIN:  Of course.

Q.   Paragraph 7 says, "I have no objection to the way I am presented on Loop AI's website."

Does that contradict anything in my declaration?

A.   I said before, since you ask repetitive questions, I gave repetitive answers.  This is not the point of things.  This declaration is to the point of claiming that statement number two is not true.

Q.   I'm not asking about statement number two, sir.

A.   But I'm saying that.

MS. CALAFIORE HEALY:  He's entitled to his answer, Mr. Wallerstein.

A.   So this doesn't concern -- this is the statement.  The fact that "my name is Roberto Pieraccini" doesn't contradict anything that you say.

Q.   Neither does Paragraph 7.  Correct?

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion.

A.   It doesn't literally contradict, but you might infer that from what you say in No. 2.  Since I didn't know -- you claim I didn't know that I was on the website.  I say that I don't

have any objections to the fact that I am represented on the website.  So my statement refers to the inference that I object to the name is on the website.

Q.   You drew that inference my declaration.

A.   Yes.

Q.   That I was claiming that you objected?

A.   I inferred that.  Yeah.

Q.   Paragraph 8, "Mr. Wallerstein made me believe there was some pressure to immediately speak to him."

How did I do that?

A.   The e-mail said, you know, give me a call.  It says clearly in the e-mail that you sent me.

Q.   And no, nothing else besides the e-mail I sent you?

A.   Well, no.  You understand that I never received a subpoena before.  I was in a very anxious state.  I haven't done anything wrong, and you are sending me an e-mail saying, give me a call.  I will be happy to talk to you.  And I felt pressure of doing that.

Q.   Beyond sending you the e-mail, did I do anything else to pressure you to speak to me?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   No.

Q.   Okay.  You regret that I twisted and misrepresented my call with you.

Have you told me, today, all the ways in which I misrepresented my phone call with you?

A.   Yes.  Paragraph No. 2.

Q.   Okay.  The website?

A.   Yeah.  And that I was not aware that -- that, you know, somehow Loop AI used my name without me knowing about that.

Q.   On the website?

A.   On the website.  Yeah.

Q.   Okay.  Is there anything beyond the fact that you -- I understand you think it's false.  You're saying it's false that you did not tell me you were not aware that you were on the website.

Is there any other way in which I misrepresented our call?

MS. CALAFIORE HEALY:  Objection.  The witness has already pointed you to his declaration.

Q.   We just went through it paragraph by paragraph.

A.   So that was the point.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

Q.    Okay.  Is there anything else?

MS. CALAFIORE HEALY:  Objection.

A.    I don't think so.  No.

Q.    When did you -- when did your name get listed on the Loop website?

A.    Probably shortly after I signed the advisory agreement.

Q.    How do you know?

A.    I probably looked at it.  I'm very -- we like to see our pictures on websites, don't we?

Q.    Some people do.

A.    I do.

Q.    You say "probably."  Do you remember when you first saw it?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.    You know how many websites I visit every day?  Probably you do too.  I can't remember.  But, definitely, I was really happy to see my profile, my picture there.

Q.    Do you remember what year?

A.    It was --

Q.    I'm sorry.  I apologize.  Let me ask a complete question so I make a record.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

Do you remember what year it was in which you first saw your website -- your profile on the Loop website?

A.   It must have been definitely after I signed the agreement with them, which was, if I'm not wrong, November 2014.  So it must be after that.

Q.   Do you remember what year?

A.   The year?  I just said it could be 2014 or early 2015.  I don't remember that.  Yeah.

Q.   Okay.  Are you certain it was in 2015 and not 2016?

A.   Oh, you're right.  So it was 2015 and 2016.  You know, I'm confused about the year.  So I signed the agreement.  It definitely was after I signed the agreement.

Q.   For sure?

A.   I made a mistake.  It was 2015 I signed the agreement, so it should have been 2015 or 2016.  Sorry about that.

Q.   No.  No.  I don't want you to be confused.  I believe you signed the agreement in 2014 -- no.

A.   Yeah.  Yeah.  I think -- today is 2016.

MR. WALLERSTEIN:  Can we mark this,

please.

A.   It was 2015, probably.  Right.

(Loop AI Labs, Inc., Advisory Board Agreement, dated October 16, 2015 marked Exhibit 5.)

BY MR. WALLERSTEIN:

Q.   **Is this the agreement, Exhibit 5 --**

A.   October 2015.

Q.   **-- that you're talking about.**

A.   Yes.  October 2015.

Q.   **You signed this in October of 2015?**

A.   Mm-hmm.

Q.   **Didn't you tell me on the phone that after you signed this you never heard back and never got -- never heard back from them?**

A.   Oh, yeah.  Probably, it's possible. Actually, I didn't talk to them after that.  I -- it's normally a practice not to call the advisers all the time.  You know, I have advisers that are listed in my company, and I didn't talk to them since they agreed to be adviser, but are serving to call them when I need them.  So adviser is like a retainer.  Right?  So if they don't need me -- you know, everyone is very busy.  They are very busy with their client.  I am busy with my

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

company.  So if they need me, questions regarding my expertise, which is different from Loop expertise, I would be happy to respond to those questions.

Q.    Did you ever see a signed, a countersigned version of Exhibit 5 or 4?

A.    I might -- probably, I did.  Probably in my records.  Yeah.

Q.    Where would those records be?

A.    Probably some computers.

Q.    What computer?

A.    I have a laptop computer, which I changed.  I had a desktop computer.

(Reporter clarification.)

A.    I have a home computer.  I have a laptop and a home computer.

Q.    Did you look on that computer for documents before you sent me the e-mail with the documents?

A.    I -- probably.  Yeah.  Yeah.

Q.    Did you send me everything you found?

A.    I sent you everything I found at the time, but I have multiple copies of that.  I may have mistaken one for the signature.  I have multiple files for everything that I do.  So

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

advisory board, I could have probably multiple files, one signed, one countersigned.

Q.    But you only sent me the one?

A.    Yeah.  By mistake.  Yeah.  You didn't ask me to send the countersigned.

Q.    You received a written subpoena. Correct?

A.    Yes, I did.

Q.    You read it?

A.    Yes, I did.

Q.    All documents that are responsive to that subpoena must be produced to me.

MS. CALAFIORE HEALY:  Objection.  Don't take instructions from him.  He's here to depose you and ask you questions, not to give you orders.

Q.    So if you have documents, multiple copies that are different in any way, shape or form, they are responsive to the subpoena.

If you have a version of a document that is not signed by anybody, a different version that is signed by one person, a different version that is signed by someone else, those are three different documents, all of which are responsive.

Is it your understanding that you have --

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

**with that understanding of responsive documents,**

**you believe you have responsive --**

MS. CALAFIORE HEALY:  Objection.  I

object.

MR. WALLERSTEIN:  Counsel, please be

quiet when I'm speaking.  Wait until I'm done.

MS. CALAFIORE HEALY:  If you insult me

again like that, I'm really -- now the court is

open, and I want to call the court.

MR. WALLERSTEIN:  Be quiet when I'm

speaking, Counsel.  Don't interrupt me.

MS. CALAFIORE HEALY:  I am going to

object to your instruction.

MR. WALLERSTEIN:  Wait until I'm

finished with my question, and you can say

whatever it is you want to say.

BY MR. WALLERSTEIN:

   **Q.   With that understanding of "responsive**

**documents," sir, do you have responsive documents**

**to the subpoena?**

MS. CALAFIORE HEALY:  I object.

MR. WALLERSTEIN:  Counsel.

MS. CALAFIORE HEALY:  I object to the

instruction that you're giving the witness.

Mr. Wallerstein is not your lawyer, and you are

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

not to take his instructions as to what you need
to do and what you don't need to do.

          MR. WALLERSTEIN:  Counsel, please stop
interrupting my question.  I've tried three
times.  I'm going to try it again.  Please do not
interrupt me.

BY MR. WALLERSTEIN:

     Q.    Sir, with the understanding of
"responsive documents" that I just gave you, do
you have documents that are responsive to the
subpoena that you did not produce to me?

     A.    Probably not.  If I didn't send it, I
didn't have it or I lost it.

     Q.    Didn't you just tell me that you have
multiple copies?

     A.    I might have.  I don't know what is on
my computer.  There are thousands of files on my
computer.  So -- and I searched, to the best of
my knowledge, what I needed to give you.  And I
might have decided to send you these because
either I didn't find another one or I believed
that the difference was irrelevant.

     Q.    I understand that.  I understand that.
I'm not accusing you of misconduct.

     A.    I don't know.  I don't know.  I don't

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

know the state of the files on my computer.

Q.   Are there other documents that you thought were related to Loop but not important that you did not send me?

A.   No.  I don't have any other documents.

Q.   But in those thousands of documents on your computer, none of them relate to Loop AI, except what you sent me?

A.   Yes.

MR. WALLERSTEIN:  I request that you send me all responsive documents, meaning any document that has anything to do with Loop or Almawave or Anna Gatti.

MS. CALAFIORE HEALY:  Objection.  Don't even respond.  This is not a question, so --

MR. WALLERSTEIN:  It's not a question.

Q.   You sent me an e-mail you received from Russell Reynolds Associates?

A.   I believe so.

Q.   Okay.  Was that your only communication with Russell Reynolds?

A.   I didn't have any communication back. It was an e-mail delivered, automatically generated.  It was a marketing, spam e-mail.

Q.   Do you know how they got your name?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   I have no idea.

**Q.   And you said you did not respond to it?**

A.   I don't think so.

**Q.   Okay.**

A.   I didn't find -- that was typical of recruiter e-mails.  I receive recruiter e-mails. They find my name on the web.  That's how they find me.  I have no idea.

**Q.   And that came in January 2013?**

A.   I have to look back.  If you say so.  I don't remember the particular e-mail.

MR. WALLERSTEIN:  We'll mark this, please.

(E-mail dated January 11, 2013 from Russell Reynolds Associates marked Exhibit 6.)

MR. WALLERSTEIN:  Thank you.

BY MR. WALLERSTEIN:

**Q.   Exhibit 5 [sic] is an e-mail from Russell Reynolds to you, it looks like.  Do you remember receiving this e-mail?**

A.   I looked for it, because you asked me to, and I searched on my e-mail and I found it. I -- at the time, I didn't remember it and pay attention to this mail.  It seems to be, you

know, spam e-mail.  It seems to be a spam e-mail.

Q.   You kept it, though.  I mean, do you keep everything?

A.   I keep all the e-mails.  Yeah.

Q.   And does this refresh your recollection that the e-mail from Russell Reynolds was in January of 2013?

A.   So in January 2013, there was a very harsh time in my life because my girlfriend passed away.

Q.   I'm sorry to hear about that.

A.   So I don't know what I remember about that.

Q.   But looking at the e-mail, Exhibit 5, do you see it's dated January 11, 2013?

A.   Yes, I do.  Yeah.

Q.   Does that refresh your recollection that the e-mail from Russell Reynolds came to you in January of 2013?

A.   Because it's written here, I believe it's true.

Q.   Have you ever attended a meeting with the other members of the Loop advisory board?

A.   No, I didn't.

Q.   Have you ever had a conference call

Roberto Pieraccini                                         Loop AI Labs, Inc. vs. Gatti, et al.

with the other members of the Loop advisory board?

A.   No, I didn't.  It's not common practice to have these type of meetings, especially in a busy startup.  I am an adviser in this company, and I am an adviser for another company.  And they contact me only when they need me.

Q.   And until the Roman deposition issue, they never needed you or at least never contacted you?

A.   Yeah.  They never did need me.  Yeah.

Q.   In exchange for serving on the advisory board, you received a grant to purchase 5,000 shares of the company's common stock?

A.   That's written on the agreement, I believe.  Yeah.

Q.   Did you ever exercise those options?

A.   No, I didn't.

Q.   Have you ever seen any paperwork regarding those options?

A.   I don't think so.  Even in the company now, I have a lot of options because I'm one of the early employees, but the paperwork that I received was only a couple of years after.

Q.   I'm sorry?

Roberto Pieraccini                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   It's normal practice to receive the
paperwork, if any, some time -- you know, it
could be years after.

Q.   You're not referring to Loop AI when
you received the paperwork later?  You were
talking about --

A.   No.  I'm referring to other companies.

Q.   Have you ever seen Loop AI's 2012 stock
plan?

A.   No, I didn't.

Q.   Has Gianmauro or anyone ever given you
an opinion as to what your options would be
worth, what your stock would be worth if you
exercised your options?

A.   No.

Q.   Do you have any opinion?

A.   No, I don't.  I don't do this for the
options.  I do it because I'm a friend of
Patrick, a friend of the company, and I'm willing
to help them, if they need me.

Q.   You were supposed to do two hours a
month or something.  Does that sound right?

A.   Let me see where they say that.

Q.   Schedule A.  The last page.  Schedule A
says --

Roberto Pieraccini                          Loop AI Labs, Inc. vs. Gatti, et al.

A.   Yeah.  I see.

Q.   I'm going to just read it.  "The adviser commits to perform the advisory services a monthly average of two hours per month.  The hours won't be equally distributed during every week," etc.

A.   I commit, if they need me, to provide two hours of my service, but not if they don't need me.  That's normal practice in all advisory agreements I had in the past.  So --

Q.   Did you assist the company during and after the fundraising process?

A.   No, I didn't.

Q.   Did you assist the company in the go-to-market stage?

A.   No.

Q.   Did you advise on the strategic and tactical planning for the design of the company's technology?

A.   No.

Q.   Did you make introductions to and assist in the acquisition of strategic partners?

A.   No.

Q.   Did you ever attend meetings with such potential partners and key contacts?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   No.   Again, I say that it's normal.   I am advising for other companies and only occasionally I get contacted for technical questions.   I am a go-to person if they need my expertise, as are all advisers for a company. And that's what happens.

**Q.   If a Loop competitor were to hire you and you were to work with a Loop competitor --**

A.   I have an NDA with Loop, so I --

**Q.   Sure.   If you didn't have an NDA, or for whatever reason, if you wanted to help a competitor of Loop, could you give that competitor confidential information about Loop?**

MS. CALAFIORE HEALY:   Objection.   Calls for speculation.

A.   I do not.

**Q.   Let me ask, do you possess confidential information of Loop?**

MS. CALAFIORE HEALY:   Objection.   Calls for a legal conclusion.   Calls for speculation.

**Q.   Go ahead.**

A.   If I possess -- I don't possess technical confidential information.

**Q.   Do you possess any kind of confidential information of Loop?**

Roberto Pieraccini                                           Loop AI Labs, Inc. vs. Gatti, et al.

A.   I don't think that I -- if it's confidential, I don't have to disclose it, right?

**Q.   Well, first of all, it's a "yes" or "no" question.  So we'll start with that.**

MS. CALAFIORE HEALY:  Objection.  Objection to the instruction it's a "yes" or "no" question.  The witness is entitled to provide his answer.

A.   So, no, I don't possess any confidential information, except maybe this agreement, which I don't know if it's confidential or not.

**Q.   That's fine.  Who are Loop's competitors?**

A.   I don't know.  There is a big -- there's a large ecosystem of companies in the machine learning space, so there are big companies.  The obvious one, like Google, like Baidu, or like other companies like that.  And there's more than one, which I may or may not.  So potentially, you know, everyone can.  But I don't know if they're a specific competitor.

**Q.   Was that Baidu, B-A-I-D-U?**

A.   Yeah.

**Q.   Do you think Loop is going to win the**

competition with Google?

A.   First of all, I'm not Nostradamus --

(Reporter clarification.)

A.   -- Nostradamus, so I don't know that. It's not a head-to-head competition.  It's more competitive in a way other companies compete with the large companies.  There are many things that can happen in the future.  It could be in a competition.  It could be acquired by a bigger company.  It could have a partnership with a bigger company.  So it's not a head-to-head competition.

Otherwise, there would be no sense in creating a startup today.  Right?  Google does pretty much everything.  So, you know, also my startup.  You know, we know that there are a lot of startups, right, around.  So...

Q.   Do you know how many patents have issued to Loop or -- well, strike that.

Do you know how many patents have issued to or been assigned to Loop?

A.   No, I don't.

Q.   Have you helped Loop with any of their patent applications?

A.   No, I didn't.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

Q.   Have you read any of them?

A.   No, I didn't.

Q.   Have you read any published patents of Loop?

A.   No.

Q.   Of Almawave?

A.   No.

Q.   Do you know anything -- do you know anything about Almawave's technology?

A.   No, I don't.

Q.   You cannot in any way compare and contrast Almawave's technology with Loop's technology?

A.   No, I cannot.  I don't know specifics. So yeah.

Q.   You cannot in any way compare and contrast Almawave's patent or patent applications with Loop's technology?

A.   No, I don't.

Q.   You've never spoken to Anna Gatti?  I may have asked you.

A.   Never.  You asked that already.

Q.   Do you know if Anna Gatti stole any confidential information of Loop?

A.   I don't know her.  I don't know what

she did, what she didn't.

Q.    When did you first become aware that you were going to offer an -- testimony about Kendall Roman?

A.    It was probably a couple of weeks, one or two weeks prior to my declaration.

Q.    Okay.  How many drafts of the declaration were there before you signed it?

MS. CALAFIORE HEALY:  Objection.  Calls for attorney-client privileged information.

THE WITNESS:  Yeah.

MR. WALLERSTEIN:  No, it does not.

MS. CALAFIORE HEALY:  Yes, it does.

A.    So I was distracted.

Q.    Just you were distracted.  You're not going to answer the question?

A.    No.

MR. WALLERSTEIN:  Was that a "no"?  Do you have a "no"?

COURT REPORTER:  Yes.

Q.    I just need clear --

A.    I was distracted, that I don't have to answer questions on privileged information between me and the attorney that represents me.

Q.    That's true.

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

A.   So that's privileged information.

Q.   I disagree with that, but that's neither here nor there.

A.   Well, I'm not a lawyer.  The only person I can trust in this room is my counsel.  So, you know --

Q.   So precisely so.  And rightfully so.  You should trust your counsel.  I didn't mean to make light of that.  You should.

For my purposes, I just need to know what you're answering or what you're not.  So if the answer is I'm not going to tell you --

A.   That's fine.

Q.   -- we'll move on.

Who wrote the first draft?

MS. CALAFIORE HEALY:  Objection.  Calls for attorney-client privileged information.

A.   Is it privileged information?

MS. CALAFIORE HEALY:  You can share just without sharing --

A.   I worked with Valeria on the telephone, and I got the draft.

Q.   How long did you work with her on the telephone?

A.   Probably one hour or so.  Yeah.

Roberto Pieraccini

Loop AI Labs, Inc. vs. Gatti, et al.

Q.    You had a -- any other conversations about your declaration?

A.    There would have been e-mail conversations, of course.  Yeah.

Q.    Well, were there?

MS. CALAFIORE HEALY:  Objection.  Don't guess.

A.    Oh, I don't remember.

Q.    Were you writing while you were speaking to her on the phone?

A.    I generally don't do that.

Q.    She was writing?

A.    I cannot -- I don't know what other people are doing on the other side.

MS. CALAFIORE HEALY:  Objection.

Q.    At some point --

MS. CALAFIORE HEALY:  Excuse me, don't share any information about our communications.

THE WITNESS:  Okay.

MS. CALAFIORE HEALY:  Thank you.

A.    I understood your question if I was writing something else.

Q.    No, no.  Did you write, physically write your declaration?

A.    No, I didn't.  Yeah.

Roberto Pieraccini                                     Loop AI Labs, Inc. vs. Gatti, et al.

Q.   You read it before you signed it?

A.   Yes.  Many times.

Q.   Make corrections?

A.   Yes, I did.

Q.   How many times did you have corrections to make?

A.   I don't recall.

Q.   Have you read -- you read the transcript of Mr. Roman?

A.   Yes, I did.

Q.   His deposition?

A.   Yes, I did.

Q.   How long did you spend doing that?

A.   Probably a few hours.

Q.   Did you watch the videotape?

MS. CALAFIORE HEALY:  What videotape?
Objection.  Calls for speculation.  Can you identify which videotape?

MR. WALLERSTEIN:  Of his.

Q.   Did you watch any videotapes related to this case?

A.   No, I didn't.  Yeah.

Q.   Did you read any other documents that have been filed in this case?

A.   Not that I recall now.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

Q.   You didn't read any declarations from my client?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

A.   No.  I don't think so.

Q.   Are you aware of the allegation that Loop AI has made against my client?

A.   I am vaguely aware.

Q.   They say that we did bad things to Loop.  Right?

MS. CALAFIORE HEALY:  Objection.

A.   I don't know the details.

MS. CALAFIORE HEALY:  Objection.  Misstates the record.

Q.   Do you care?

A.   I care about my personal professional, and my serious commitment to Loop AI as an adviser.

Q.   You wouldn't want Loop AI to make false allegations about another company, would you?

A.   Of course not.  Yeah.

Q.   You wouldn't want to be associated with that, would you?

A.   I wouldn't be.

Q.   Well, don't you think you might want to

find out what the allegations are and whether they're true?

A.   I'm not -- that's not my business.  I trust the company I am an adviser for.  I trust the people I know, because I know Patrick Ehlen is a friend of mine.  I've known him for a long time, so I trust that he's in good faith here.

Q.   People can be in good faith and still be wrong, though.  Right?

A.   Yeah.  I don't have the time to go and do research whether they're right or wrong.  So the only thing that I know is, I trust people. Yeah.  It's your job to determine whether right or wrong.  Not mine.

Q.   Wow.  Do you know if Loop has ever completed a Series A funding?

A.   No.  I don't know.

Q.   You don't know one way or the other?

A.   I don't know.

Q.   What's the most amount of money that anyone has ever invested into Loop?

A.   I have no idea.

Q.   Has Loop ever tried to get investments?

A.   If they are -- I can infer if they're alive, they probably did.  Yeah.

Roberto Pieraccini                                     Loop AI Labs, Inc. vs. Gatti, et al.

Q.   Do you know why they weren't able to?

A.   I have no idea.

MS. CALAFIORE HEALY:  Objection.

Q.   Do you care?

MS. CALAFIORE HEALY:  Excuse me.
Objection.  Misstates the witness's testimony.

MR. WALLERSTEIN:  It was a question.  I
don't know how on earth it might misstate
anything.

BY MR. WALLERSTEIN:

Q.   Do you know why Loop was not able to?

A.   No, I don't.

Q.   Do you care?

A.   No.

Q.   Okay.  Do you think my clients hurt
Loop in any way?

A.   I don't know.

MS. CALAFIORE HEALY:  Objection.  Calls
for speculation.

Q.   You don't know?

A.   (Witness nodded.)

Q.   Is that what you said?

A.   Yeah.  I don't know.  Yeah.

Q.   But you submitted a declaration about
Mr. Roman in this case.  Right?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.    That was uniquely a technical declaration.

Q.    Do you know what the purpose of it was?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation and calls for attorney-client privileged information.

A.    I don't.

Q.    Do you know if that declaration was filed with the court?

A.    Yeah.

Q.    You do know that?

A.    (Witness nodded.)

Q.    And do you know, but you don't know why?

A.    I think it was related to this case.

Q.    Right.

A.    I don't know why.  I am not following the case.  I don't have the luxury or the time to follow this case.

Q.    You had the luxury of the time to do a long declaration.

A.    Well, I am an adviser, and I committed to two hours every month.  So I spent three or four hours, which I didn't spend before.  It's okay.

Roberto Pieraccini                                      Loop AI Labs, Inc. vs. Gatti, et al.

Q.   Did Loop tell you you were contractually obligated to do what you did?

A.   No.

Q.   Do you intend to testify at the trial?

A.   I hope not.  As I told you, I would like this to be it.  I am not involved in this case.  I am an adviser to the company.  I advise on technical matters.

Q.   Well --

A.   And that's it.  Yup.

Q.   Your declaration was over 13, it went on to 14 pages.  Right?

A.   Mm-hmm.  A big part of it is about my biography.

Q.   Did you read Mr. Roman's expert report that he submitted?

A.   I read the parts of it that concerned to my expertise.

Q.   How long did you spend doing that?

MS. CALAFIORE HEALY:  Objection.

A.   I answered already the question.

Q.   No, I don't believe so.

A.   A couple of hours.  A few hours.

Q.   Well, okay.  So let me be clear.  He submitted an expert report --

A.   Mm-hmm.

Q.   -- and he had his deposition taken, which resulted in a transcript of the deposition.

A.   Right.

Q.   In total, how much time did you spend reviewing both of those documents?

A.   A few hours.

Q.   A few hours, total?

A.   Yeah.

Q.   And then you spent how much time working on your declaration?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.   Again.

MS. CALAFIORE HEALY:  Asked and answered.

MR. WALLERSTEIN:  It's just meaningless noise.  Go ahead.

A.   A few hours.

Q.   Okay.  So, in total, you've spent six, seven hours?

A.   That's possible.  Yeah.

MR. WALLERSTEIN:  I have no questions. That's all.  Can we go off the record?

MS. CALAFIORE HEALY:  You're done?

Roberto Pieraccini                              Loop AI Labs, Inc. vs. Gatti, et al.

MR. WALLERSTEIN:  Yeah.  I'm trying to go off the record.

MS. CALAFIORE HEALY:  Done for the day or done with the questions?

MR. WALLERSTEIN:  I'm done for the day.

MS. CALAFIORE HEALY:  Okay.  Are we done?

(Discussion off the record.)

MS. CALAFIORE HEALY:  Excuse me, excuse me, take this down on the record. Mr. Wallerstein was just threatening the witness, and --

MR. WALLERSTEIN:  Not true.

MS. CALAFIORE HEALY:  Roberto, didn't he just tell you if they're making false accusations --

THE WITNESS:  Yeah.

MS. CALAFIORE HEALY:  -- he was threatening you?

MR. WALLERSTEIN:  No.

MS. CALAFIORE HEALY:  Yes, you were.

MR. WALLERSTEIN:  I'd like the deposition to be over.  Counsel, can you agree to that?

MS. CALAFIORE HEALY:  If you're going

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

to threaten him, do it on the record.

MR. WALLERSTEIN:  I'm not threatening anybody.  I want the deposition to be over.

MS. CALAFIORE HEALY:  Okay.  Then it's over.  You can leave.

MR. WALLERSTEIN:  Thank you.  Can you please go off the record.  Please.  Yes?

COURT REPORTER:  Yes.

MR. WALLERSTEIN:  Thank you.

(Deposition concluded at 11:36 a.m.)

**Roberto Pieraccini**                          **Loop AI Labs, Inc. vs. Gatti, et al.**

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. Sambataro, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT ROBERTO PIERACCINI, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of July, 2016.

_____
JANET M. SAMBATARO
Notary Public

My Commission Expires:

July 16, 2021

**Roberto Pieraccini**                                  **Loop AI Labs, Inc. vs. Gatti, et al.**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Loop AI Labs, Inc. vs. Gatti, et al.

Date of Deposition: 07/15/2016

Job No.: 10025478


            I, ROBERTO PIERACCINI, hereby certify

under penalty of perjury under the laws of the State of

_____ that the foregoing is true and correct.

            Executed this _____ day of

_____, 2016, at _____.




                        _____

                        ROBERTO PIERACCINI


NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on

this _____ day of _____, 20__,

by_____,     proved to me on the

basis of satisfactory evidence to be the person

who appeared before me.

Signature: _____ (Seal)

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

DEPOSITION ERRATA SHEET

Case Name: Loop AI Labs, Inc. vs. Gatti, et al.
Name of Witness: Roberto Pieraccini
Date of Deposition: 07/15/2016
Job No.: 10025478
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

**Page 100**

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____
ROBERTO PIERACCINI

**Page 101**

Roberto Pieraccini

Loop AI Labs, Inc. vs. Gatti, et al.

**1**

**1** 30:4,8,12 54:2

**10** 30:22 32:3,12

**10th** 33:5

**11** 77:14 78:15

**12** 53:22

**12th** 55:16,19

**13** 94:11

**14** 94:12

**15** 5:16

**16** 71:4

**2**

**2** 30:21 53:23 54:1, 19,22 59:13,20,21 62:1,5 64:21 66:23 68:6

**2012** 80:8

**2013** 77:9,14 78:7,8, 15,19

**2014** 6:13 50:22 70:6, 9,23

**2015** 70:10,11,13,18, 19 71:2,4,8,10,11

**2016** 30:3,22 32:4,12 53:22 56:23 70:12, 14,20,24

**203** 5:16

**230** 6:8

**26** 30:3 56:23

**3**

**3** 56:6,9 57:3 58:13 59:1,2,25 60:25 61:23 62:8,9 65:5

**4**

**4** 57:18,22 63:14 72:6

**4:00** 32:21

**5**

**5** 64:12 65:2 71:5,7 72:6 77:19 78:14

**5,000** 79:13

**6**

**6** 65:19,20 77:16

**6:00** 32:9

**7**

**7** 66:1,19

**7:00** 32:9

**8**

**8** 67:9

**805** 6:17 7:17

**A**

**absolutely** 19:6 23:11,15,21 39:16

**academic** 11:19

**accept** 25:25

**accusations** 96:16

**accusing** 75:24

**acquired** 84:9

**acquisition** 81:22

**address** 5:15 6:8,10, 11,15,19,20,23 7:8, 11,14,15,19 11:8,21, 24

**addresses** 11:16,17, 20,23

**addressing** 27:6 60:12 61:4

**advance** 33:14

**adverse** 36:25

**advice** 22:3 23:7 26:15,25 27:2,3,9,14 28:11,12,13 29:21 49:4,20

**advise** 40:12,17 44:22 81:17 94:7

**adviser** 18:1 25:8,14, 15,25 27:7 39:1 44:7, 23 49:1,3,6,9,22 51:4 71:21,22 79:5,6 81:3 90:18 91:4 93:22 94:7

**advisers** 71:18,19 82:5

**advising** 53:1 82:2

**advisory** 18:13 39:4, 22 52:19 55:9 69:7 71:3 73:1 78:23 79:1, 12 81:3,9

**affiliations** 39:19

**agree** 96:23

**agreed** 71:21

**agreement** 17:19 18:13 51:19 55:10 69:7 70:5,15,16,19, 22 71:4,7 79:15 83:11

**agreements** 81:10

**ahead** 61:14 82:21 95:18

**AI** 18:6,19 19:21 48:18,24 49:20 57:8 59:18 63:20 68:9 71:3 76:7 80:4 90:7, 17,19

**AI'S** 57:7 58:15,22 66:2 80:8

**aimed** 45:23

**alive** 91:25

**allegation** 90:6

**allegations** 90:20 91:1

**allegedly** 59:17

**allowed** 33:1

**Almawave** 5:10 57:15 76:13 85:6

**Almawave's** 85:9,12, 17

**alumni** 11:18

**amount** 8:23 11:1 91:20

**and/or** 30:11

**Anna** 21:20 34:14 37:5 76:13 85:20,23

**answering** 14:17 43:18 87:11

**answers** 66:6

**anxious** 67:20

**Apartment** 5:16

**apologize** 26:11 69:24

**apparently** 33:7 55:11

**appearing** 16:14

**Application** 57:17

**applications** 84:24 85:17

**argue** 13:6

**articles** 36:18

**aspects** 24:11

**assigned** 84:21

**assist** 81:11,14,22

**Associates** 76:18 77:15

**association** 39:21

**associations** 11:19

Roberto Pieraccini                                           Loop AI Labs, Inc. vs. Gatti, et al.

assume 25:1

attached 53:16 55:2,3

attaching 55:16

attachments 54:24, 25

attend 81:24

attended 78:22

attention 77:25

attorney 57:7,10 58:16,20,22 60:18 62:19,22 86:24

attorney-client 12:17 22:24 24:24 86:10 87:17 93:5

automatically 76:23

average 81:4

aware 9:4,7 36:8,11, 15 68:8,16 86:2 90:6, 8

**B**

B-a-i-d-u 83:23

back 30:21 44:10,15 54:10 58:11 65:22 71:14,15 76:22 77:10

bad 90:9

bag 46:10,18 54:14

Baidu 83:19,23

Bart 21:18

bearing 43:18

began 15:17

believed 59:6 75:21

big 11:1 83:15,17 94:13

bigger 84:9,11

biography 94:14

bit 29:12

blocks 6:7

blue 54:7

board 39:4,22 71:4 73:1 78:23 79:2,13

bold 64:3

boldface 61:25

bolster 47:11

Boston 5:14 6:16 7:14 28:1 29:11 56:17,24

bottom 32:3

Boulevard 7:17

brain 45:25

break 41:7,11 61:15

bullied 43:6,7

business 7:14,15,17 17:25 22:11 24:12 91:3

busy 71:24,25 79:5

**C**

cafe 21:3

Calafiore 6:18,22 7:2, 10,21 8:19 10:18 11:5,11 12:12,16 13:1,10,15,21,25 14:7,14,19,22 15:8, 19,23 16:3,8,12 17:5 19:19 20:4,13 21:12 22:23 23:11,14,19 24:2,23 27:5 29:1 30:13 31:6,22 32:23 34:15,20 35:1,8,10, 19 36:3,13 37:1,6,11, 20 38:1,8,21 39:5,12, 25 40:4,9,14,21 41:1, 6,10 42:3 43:1,3,16 45:6,16,20,24 46:14 47:1,12,14 49:5 51:24 52:5,22 54:11 55:24 58:23 59:4 61:1 63:2 64:17 65:8 66:13,20 68:20 69:2, 16 73:13 74:3,7,12,

21,23 76:14 82:14,19 83:5 86:9,13 87:16, 19 88:6,15,17,20 89:16 90:3,11,13 92:3,5,18 93:4 94:20 95:12,15,25 96:3,6,9, 14,18,21,25

California 7:18

call 10:9 12:7,11 13:12 15:4,8,20 17:9, 14 20:23 21:14,15 32:7 33:8,12,13,18, 23 34:2,4 36:24 39:2 40:9,11 47:23,24,25 48:1,5,7,13 49:19 52:2,16 57:4 58:14 60:2,3,9,17 63:15 64:13 67:14,22 68:3, 5,19 71:18,22 74:9 78:25

called 6:4 12:4,5 13:8,19 14:5 19:21 27:8 28:25 29:5,9 33:5,7 43:14 45:11 50:13

calling 16:16

calls 10:18 12:16 13:21 22:24 24:23 31:6 51:24 58:23 66:20 82:14,19,20 86:9 87:16 89:17 90:3 92:18 93:4,5

canceled 15:11 19:7

caption 57:24 58:1

care 41:25 90:15,16 92:4,13

careful 63:19

case 13:6,23 15:2,14 16:5,15,17 23:1,4,17 24:22 43:22 44:17 62:20 89:21,24 92:25 93:15,18,19 94:7

CEO 24:11

chain 30:2

chance 25:23 61:19

changed 72:13

chase 43:17

children 24:4

chitchat 26:1

chuckle 39:15

City 7:18

claim 60:21 62:1 66:24

claiming 66:8 67:7

clarification 5:23 9:11 26:7,21 62:4 64:4 72:14 84:3

clarify 19:13 30:18

clear 14:4 16:7,22 22:19,20 23:25 35:14 39:20,21 86:21 94:24

client 71:25 90:2,7

clients 36:25 37:5 92:15

coffee 22:2 24:2 25:9 41:13,22 42:20,21 43:4 45:2,5,7,10,19, 21,25 46:18 47:2

Coffees 46:9

coincidence 29:4

colleague 54:20

commit 81:7

commitment 90:17

commits 81:3

committed 93:22

common 29:13 79:3, 14

communication 20:15,16 76:20,22

communications 23:16 59:17 88:18

companies 11:18 24:6 47:10 48:15,20

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

80:7 82:2 83:16,18,
19 84:6,7

**company** 6:4,8,13
7:16 11:14 18:25
19:20,21 25:8 26:16
27:6,7 44:7 48:15
51:4 71:20 72:1 79:5,
6,21 80:19 81:11,14
82:5 84:10,11 90:20
91:4 94:7

**company's** 79:14
81:18

**compare** 61:2 85:11,
16

**comparing** 65:14

**compete** 84:6

**competition** 84:1,5,9,
12

**competitive** 84:6

**competitor** 82:7,8,12,
13 83:22

**competitors** 83:14

**Complaint** 36:22

**complete** 69:25

**completed** 91:16

**computer** 45:19,21
46:5,21 72:11,12,13,
15,16,17 75:17,18
76:1,7

**computers** 72:10

**concern** 66:15

**concerned** 94:17

**conclusion** 13:22
51:25 66:21 82:20

**conference** 50:6,12
78:25

**confidential** 38:7,14
51:3,6,7,9,10,16,23
52:1,3,8,14,17 53:7
55:20 82:13,17,23,24
83:2,10,12 85:24

**confidentiality** 52:19,
25

**confused** 52:18,21
70:14,22

**Congress** 6:7,8

**consult** 58:20,22
60:18 61:10 62:18

**consulting** 57:6
58:15

**contact** 10:13 31:14
79:7

**contacted** 10:11 79:9
82:3

**contacts** 81:25

**contempt** 40:19

**continue** 43:24

**contractually** 94:2

**contradict** 61:6
62:12,15 63:23 64:1,
15 65:5 66:3,17,22

**contradiction** 64:2

**contradicts** 60:25
61:12,23

**contrast** 85:12,17

**conversation** 21:25
23:18 38:19

**conversations** 23:9
88:1,4

**copies** 72:23 73:18
75:15

**copy** 36:21

**copying** 54:20

**correct** 12:5 32:14,18
46:10 49:19 55:10
58:9 62:10 63:13
66:19 73:7

**corrections** 89:3,5

**corroborate** 34:1

**cost** 18:2,4,5

**counsel** 13:2,7,17,23
20:14,15,19 22:17
23:19,20,24 26:12
33:2 40:2 41:22 45:9
47:5 54:8 61:10 74:5,
11,22 75:3 87:5,8
96:23

**counsel's** 23:7

**count** 8:24

**countersigned** 72:6
73:2,5

**country** 25:19

**couple** 20:10 25:12
79:24 86:5 94:23

**court** 8:4 9:4,8 12:22
14:25 15:4 16:24
30:7 33:2 40:10,11,
19,22,25 44:25 54:6,
16 65:11 74:8,9
86:20 93:9

**crazy** 41:13

**creating** 84:14

**credibility** 47:11

**cup** 41:22 42:20,21
43:3 45:9

— — —

**D**

**date** 9:13

**dated** 30:3 53:22 71:4
77:14 78:15

**daughter** 27:24

**day** 10:25 15:5 53:12
69:19 96:3,5

**days** 9:23 10:11
27:18 53:13

**decide** 12:23

**decided** 22:13 25:15
75:20

**declaration** 44:16
48:8 54:4 56:5,9
57:3,14,22 58:2,5,9

59:3 60:10,24 61:12,
22 63:24 64:1,16
65:11,13 66:4,7 67:5
68:22 86:6,8 88:2,24
92:24 93:2,8,21
94:11 95:11

**declarations** 90:1

**Deep** 50:13

**delete** 11:2

**delivered** 76:23

**depends** 18:24

**depose** 73:14

**deposed** 28:22

**deposes** 5:5

**deposition** 7:24,25
9:5 15:5 27:10,12
28:3,5,15,17 29:22
40:6 54:5 79:8 89:11
95:2,3 96:23

**design** 81:18

**desktop** 72:13

**details** 50:25 90:12

**determine** 91:13

**dialogue** 26:22

**difference** 75:22

**dinner** 29:13

**DIRECT** 5:6

**direction** 42:22

**director** 37:25

**disagree** 87:2

**disclose** 11:10 23:2,
4,17 83:2

**discuss** 20:17 23:21
28:20,21

**discussed** 13:12 23:3

**discussion** 22:25
23:16 96:8

**distracted** 86:14,15,
22

Roberto Pieraccini                                      Loop AI Labs, Inc. vs. Gatti, et al.

distractions 6:25

distributed 81:5

disturb 14:25

document 51:22
52:25 53:17 54:6
55:20 56:8 57:21
65:3,14 73:20 76:12

documenting 33:22

documents 9:24
25:24 53:9,16 55:3,
16 72:18,19 73:11,
17,24 74:1,19 75:9,
10 76:2,5,6,11 89:23
95:6

draft 87:15,22

drafts 86:7

drew 67:5

driver's 5:4

Dublin 50:9

duly 5:3

_____

**E**

_____

E-h-l-e-n 27:17

e-mail 9:10,12 10:15,
16,17,23 11:8,16,17,
20,23,24 12:6 30:2,
25 31:9 33:21 53:16,
22,25 54:19,22
55:12,15 67:13,14,
16,21,24 72:18
76:17,23,24 77:11,
14,19,21,23 78:1,6,
14,18 88:3

e-mails 10:25 11:3
30:6,11 53:18 55:2
77:6 78:4

earlier 26:16 54:3

early 5:22,24 70:10
79:23

ears 26:11

earth 92:8

easily 7:15

easy 19:17 25:17

ecosystem 83:16

Ehlen 27:17 29:21
38:20,24 47:21 91:5

Emergency 57:16

employee 37:18,23

employees 79:23

end 54:17

engage 17:3

engaged 26:22

engagement 17:16
25:8

entire 33:22

entirety 65:10

entities 5:10

entitled 15:16 42:4
56:9 66:13 83:7

equally 81:5

Europe 27:25 29:11

EXAMINATION 5:6

exchange 79:12

excuse 6:18,22 65:8
88:17 92:5 96:9

executed 56:22

exercise 79:17

exercised 80:14

Exhibit 30:4,8,12
53:23 54:1,2,19,22
56:6,9 57:3,18,22
71:5,7 72:6 77:16,19
78:14

exhibits 58:2

expert 26:17,18
94:15,25

expertise 72:2,3 82:5
94:18

explain 59:10

explicit 34:22

explicitly 38:25

extent 20:14 23:16,18
52:24

_____

**F**

_____

face-to-face 22:15

fact 10:1 46:15,16
48:4 60:8,14 66:16
67:1 68:14

fair 19:16

faith 91:7,8

false 59:3,6,18,23
60:10,14,19,21 62:1,
3,6 68:15 90:19
96:15

falsehood 61:25

falsely 16:15

familiar 30:9,17

families 24:3

family 27:23

February 30:3,22
32:3,12 33:5 53:22
55:16,19 56:23

fee 17:19

felt 42:17 67:23

file 16:23

filed 89:24 93:9

files 72:25 73:2 75:17
76:1

find 25:19 75:21 77:5,
7,8 91:1

fine 60:23 83:13
87:13

finish 16:2 17:2

finished 74:15

firm 33:22 34:7

five-minute 61:15

flat 23:8

fly 46:2

flying 46:1

follow 23:7 93:19

foreign 25:19

form 5:4 73:19

formally 25:25

found 7:15 36:17
72:21,22 77:23

Francisco 6:1 7:20
21:1 22:10 29:15,16,
17 50:13 56:18 57:1

free 17:24 18:2

friend 29:13 80:18,19
91:6

friendly 22:13

friends 27:20 29:6,7

front 54:8

fucking 41:7,10

fully 9:2

funding 91:16

fundraising 81:12

future 84:8

_____

**G**

_____

Gatti 21:20 34:14
37:5 76:13 85:20,23

gave 54:7 66:6 75:9

general 24:17 26:1
47:22

generality 24:17

generally 19:13 28:9
49:13 88:11

generated 76:24

Gianmauro 20:4
21:5,23 22:7,15,16,
21 23:10 24:11 25:6,
22 37:16 43:15 80:11

**Roberto Pieraccini**                                            **Loop AI Labs, Inc. vs. Gatti, et al.**

**Gillian** 15:9

**girlfriend** 78:9

**give** 6:19 7:7,11 26:15,24 27:9,13 28:12,13 40:5 53:9 63:19 65:12 67:13,21 73:15 75:19 82:12

**giving** 74:24

**Gmail** 11:21

**go-to** 82:4

**go-to-market** 81:15

**God** 41:15

**good** 28:11 91:7,8

**goodness** 41:9

**Google** 36:16 49:15 83:18 84:1,14

**grant** 79:13

**guess** 23:6 88:7

**H**

**half** 22:1

**handed** 53:25 56:8 57:21

**handing** 30:6

**handy** 54:16

**happen** 47:22 84:8

**happened** 13:5 22:9 47:25

**happening** 15:7

**happy** 32:7 40:24 67:22 69:20 72:3

**harass** 14:23 15:2

**harassing** 7:3 15:10, 14 16:18

**hard** 33:6 46:20,25 47:1

**harsh** 78:9

**head** 52:15

**head-to-head** 84:5,11

**Healy** 6:18,22 7:2,10, 21 8:15,19 9:18,21 10:5,7,9,11,18 11:3, 5,11 12:4,12,16 13:1, 10,15,19,21,25 14:5, 7,10,14,19,22 15:8, 19,23 16:3,8,12 17:3, 5,8,13,17,20 19:19 20:13,21,22 21:12 22:8,23 23:11,14 24:23 27:5 29:1 30:13 31:6,22 32:23 34:15,20 35:1,8,10, 19 36:3,13 37:1,6,10, 11,15,20 38:1,8,21 39:5,12,25 40:4,9,14, 21 41:1,6,10 42:3 43:1,3 45:6,16,20,24 46:14 47:1,12,14 49:5 51:24 52:5,22 54:11 55:24 58:23 59:4 61:1 62:23 63:2 64:17 65:8 66:13,20 68:20 69:2,16 73:13 74:3,7,12,21,23 76:14 82:14,19 83:5 86:9,13 87:16,19 88:6,15,17,20 89:16 90:3,11,13 92:3,5,18 93:4 94:20 95:12,15, 25 96:3,6,9,14,18,21, 25

**hear** 78:11

**heard** 51:12,15 71:14, 15

**helped** 84:23

**helpful** 30:18

**high** 53:9

**hire** 82:7

**hit** 42:23

**home** 6:19,23 7:7,11, 19 72:15,16

**hope** 17:1 94:5

**hour** 22:1 87:25

**hours** 80:21 81:4,5,8 89:14 93:23,24 94:23 95:7,8,19,21

**hundreds** 10:24

**hurt** 92:15

**I**

**idea** 14:13 15:22 17:3 19:3 33:24 77:1,8 91:22 92:2

**identification** 5:4

**identify** 30:14 89:18

**ignore** 6:24 8:18

**immediately** 67:10

**imply** 25:1

**important** 8:13 15:1, 11 19:7 43:12 49:9, 10,11 76:3

**improper** 59:7

**inappropriate** 15:10

**Inc.'s** 57:16

**including** 6:25 24:8

**Incorporated** 6:5

**incorrect** 13:7

**indicating** 30:23

**infer** 66:23 91:24

**inference** 67:3,5

**inferred** 67:8

**information** 10:19 12:17 22:25 24:24 38:7,14 51:3,6,8,10, 11,16 65:12 82:13, 18,23,25 83:10 85:24 86:10,23 87:1,17,18 88:18 93:6

**instruct** 10:19 12:18 13:11 15:24 17:6

**instructed** 14:1

**instruction** 16:7,23

74:13,24 83:6

**instructions** 11:6 55:25 73:14 75:1

**insult** 74:7

**insulted** 42:8,18 43:4

**insulting** 40:16 41:2

**intend** 94:4

**interaction** 38:17,18

**interactions** 26:22

**interactive** 26:20

**interchangeably** 19:12

**interest** 24:13

**interested** 24:10 27:25

**interrupt** 13:3 15:5 74:11 75:6

**interrupted** 17:2

**interrupting** 75:4

**interruption** 41:8

**introduced** 5:8

**introductions** 81:21

**invested** 18:6 91:21

**investments** 91:23

**invited** 28:7

**involved** 23:1,16 43:24 44:12 94:6

**involving** 20:15 23:19

**irrelevant** 75:22

**issue** 79:8

**issued** 84:19,20

**issues** 26:2

**Italians** 25:16

**Italy** 24:5

**Roberto Pieraccini**                                          **Loop AI Labs, Inc. vs. Gatti, et al.**

---

**J**

---

**J-i-b-o** 11:15

**January** 6:13 50:22 77:9,14 78:7,8,15,19

**Jibo** 6:4 11:14

**job** 91:13

**judge** 12:23 15:9 16:16 59:8

**June** 5:22,24

---

**K**

---

**Kendall** 86:4

**key** 81:25

**kind** 28:9 82:24

**knew** 22:15 28:22 36:19 38:23 39:7,8 44:1,3

**knowing** 28:1 68:10

**knowledge** 36:4 75:19

---

**L**

---

**Labs** 63:20 71:3

**lacks** 15:24 17:5 31:7 32:23 36:3,4

**language** 25:20 26:19

**laptop** 72:12,16

**large** 83:16 84:7

**law** 8:5 34:7

**lawsuit** 36:9,12

**lawyer** 9:15 13:9,20 14:11 17:4,14 23:13 31:13,20,21,25 35:7, 14,17,23 41:14 52:10 74:25 87:4

**Leading** 34:16,21 35:2,11,20 36:14

37:2,7,12,21 38:2,9, 22 39:6,13 47:14 52:6,23

**learn** 21:10

**learned** 21:11

**learning** 50:14 83:17

**Leave** 54:15

**left** 29:11 54:8

**legal** 13:22 22:3 51:25 66:21 82:20

**legally** 52:13

**letter** 17:16

**license** 5:4

**life** 24:4 44:15 78:9

**light** 87:9

**Linkedin** 39:18 47:20

**listed** 39:3 69:5 71:20

**listen** 49:7 55:25

**literally** 66:22

**litigation** 28:19,21

**live** 5:13,14

**lived** 5:25 25:19

**living** 29:17 56:25

**long** 6:9 9:23 21:25 32:19 58:3 87:23 89:13 91:6 93:21 94:19

**longer** 8:25

**looked** 69:9 77:22

**loop** 11:4 18:6,14,19 19:4,10,11,18,20,21, 25 24:8,9 27:4,8,14 29:21 34:19 36:25 37:4,9,15,19,25 38:7, 14,17,19,23 39:1,22, 23 48:17,24 49:20,25 50:1 51:16,19 55:9 57:7,8 58:15,22 59:18 62:22 63:20 66:2 68:9 69:5 70:3

71:3 72:2 76:3,7,12 78:23 79:1 80:4,8 82:7,8,9,12,13,18,25 83:25 84:19,21,23 85:4,24 90:7,10,17, 19 91:15,21,23 92:11,16 94:1

**Loop's** 39:4 50:3,15, 18 83:13 85:12,18

**Loop.ai** 44:22 47:19 58:20 61:6,10 62:11

**Loop.ai.** 18:1 48:16 51:11

**lost** 75:13

**lot** 79:22 84:16

**luxury** 93:18,20

---

**M**

---

**machine** 83:17

**machines** 26:20

**made** 61:25 67:9 70:18 90:7

**mail** 77:25

**mails** 11:1

**make** 33:1 48:24 51:12 65:9 69:25 81:21 87:9 89:3,6 90:19

**makes** 19:16

**making** 96:15

**mark** 29:25 30:7 53:20 56:4 57:12 70:25 77:12

**marked** 30:4 53:23 54:1,6 56:6,8 57:17, 22 71:5 77:15

**marketing** 76:24

**matters** 19:12 94:8

**meaning** 76:11

**meaningless** 95:17

**means** 23:9 63:5

**meeting** 22:14,22 24:2 25:10 26:16 78:22

**meetings** 15:12 19:7 79:4 81:24

**member** 61:6

**members** 78:23 79:1

**memory** 48:23 49:4

**met** 22:16 38:23,25 53:10

**mine** 49:17 91:6,14

**minutes** 32:19

**misconduct** 75:24

**misrepresented** 68:3, 5,19

**misstate** 92:8

**Misstates** 90:14 92:6

**mistake** 70:18 73:4

**mistaken** 72:24

**Mm-hmm** 6:2 21:24 31:15 32:10 34:6,8 39:24 56:11 58:4,12 63:17 71:12 94:13 95:1

**moment** 13:3

**money** 17:22 18:6 19:18 20:1 49:22 91:20

**month** 5:20 29:12 80:22 81:4 93:23

**monthly** 81:4

**months** 20:11 25:11 26:4 39:1 47:25

**morning** 54:3

**motion** 16:24

**move** 5:19 13:23 15:21 16:9,12 28:1 65:16 87:14

**Roberto Pieraccini**                                        **Loop AI Labs, Inc. vs. Gatti, et al.**

**moved** 6:12,15 7:14 24:5 29:11,18

**multiple** 72:23,25 73:1,17 75:15

---

**N**

---

**named** 62:23

**names** 36:17

**natural** 26:19

**NDA** 63:16 82:9,10

**necessarily** 62:15 63:25

**needed** 33:18 75:19 79:9

**nice** 25:20,21

**nodded** 92:21 93:12

**noise** 95:18

**nonetheless** 28:11

**normal** 80:1 81:9 82:1

**Nostradamus** 84:2,4

**notes** 33:15,18,19 63:9,10,12

**November** 70:6

**number** 7:13 20:8 32:8 61:8 62:14 64:6 66:8,10

---

**O**

---

**oath** 8:7 48:4

**object** 7:5 22:24 26:12 67:3 74:4,13, 21,23

**objected** 67:7

**objection** 7:21 8:19 10:18 11:5 12:12,16 13:1,10,21 14:14,15 15:23 17:5 19:19,23 20:13 24:23 27:5

29:1 30:13 31:6,22 32:23 33:1,4 34:15, 20 35:1,8,10,19 36:3, 13 37:1,6,11,20 38:1, 8,21 39:5,12,25 43:1 45:6,16 46:14 47:12 49:5 51:24 52:5,22 55:24 58:23 59:4 61:1 63:2 64:17 65:9, 15 66:1,20 68:20 69:2,16 73:13 74:3 76:14 82:14,19 83:5, 6 86:9 87:16 88:6,15 89:17 90:3,11,13 92:3,6,18 93:4 94:20 95:12

**objections** 67:1

**obligated** 94:2

**obvious** 21:13 83:18

**occasionally** 82:3

**October** 71:4,8,10,11

**offer** 86:3

**office** 9:12 32:8

**officer** 37:24

**open** 74:9

**opinion** 19:1 22:20 80:12,16

**Opposition** 57:16

**option** 18:18

**options** 18:10,12,21 79:17,20,22 80:12, 14,18

**order** 12:22 40:19,20, 22,25 57:17

**ordered** 9:5 33:2

**orders** 73:16

**organized** 50:13

---

**P**

---

**p.m.** 32:21

**pages** 58:1,3 94:12

**paid** 19:18,25

**paperwork** 79:19,23 80:2,5

**paragraph** 31:12 57:3 58:13 59:1,2,13,20, 21,25 60:11,25 61:23 62:1,5,8,9 63:14 64:12,21 65:2,5,19, 20 66:1,19 67:9 68:6, 23,24

**pardon** 30:22

**part** 46:17 94:13

**participated** 50:6

**partners** 81:22,25

**partnership** 84:10

**parts** 94:17

**passed** 78:10

**past** 81:10

**patent** 84:24 85:17

**patents** 84:18,20 85:3

**Patrick** 27:17 29:20 38:20,24 47:21 49:23 50:7 80:19 91:5

**pay** 17:22 77:24

**paying** 19:4

**Peintner** 21:18

**people** 49:13 69:12 88:14 91:5,8,12

**perform** 81:3

**person** 20:4,24 25:21 43:12 53:10 73:22 82:4 87:5

**personal** 26:2 27:20 90:16

**phone** 12:9,11 14:12 17:9,14 20:3,23 21:13,15 25:23 34:2, 4 36:24 39:11 43:15 47:6,9,23,24,25 48:1, 5,7,13 49:19 52:2,16 60:1,9,17 68:5 71:13

88:10

**physical** 6:10,11,15, 20

**physically** 6:6 88:23

**picture** 44:6 69:21

**pictures** 50:7 69:10

**Pieraccini** 5:2,11 43:8 53:23 56:6,10 66:17

**plain** 65:4

**Plaintiff's** 57:16

**plan** 18:18 80:9

**planning** 81:18

**point** 12:8 64:2,5 66:7,8 68:25 88:16

**pointed** 68:21

**position** 23:24 25:25

**possess** 10:23 82:17, 22,24 83:9

**potential** 81:25

**potentially** 83:21

**practice** 71:18 79:3 80:1 81:9

**precisely** 5:21 52:11 87:7

**preface** 8:14

**prefer** 7:8

**preposterous** 28:9

**presence** 23:9

**present** 20:14,19

**presented** 66:2

**presenting** 5:3

**pressure** 67:10,23,25

**pretty** 19:11 32:20 84:15

**prior** 25:5 27:12 86:6

**private** 7:16

**Index: moved–private**

**Roberto Pieraccini**                                            **Loop AI Labs, Inc. vs. Gatti, et al.**

**privilege** 15:17

**privileged** 10:19 12:17 15:18 20:16 22:19,24 23:10 24:24 86:10,23 87:1,17,18 93:6

**proceedings** 41:8

**process** 81:12

**produce** 9:24 75:11

**produced** 73:12

**professional** 90:16

**profile** 44:5 69:21 70:2

**pronounced** 27:13

**Protective** 57:17

**proud** 39:16,17 44:2 47:20

**provide** 81:7 83:7

**published** 85:3

**purchase** 79:13

**purpose** 93:3

**purposes** 87:10

**pursuant** 18:13

**put** 39:17,18 54:6,7 65:15

**putting** 35:11

**Q**

**question** 8:9 10:22 11:7 13:14,16,18 14:4,8,20 16:2,4,7,22 17:1 22:18 24:25 25:4 40:1 45:4,14,17 64:9,22 69:25 74:15 75:4 76:15,16 83:4,7 86:16 88:21 92:7 94:21

**questioned** 43:8

**questions** 8:21 12:21 14:24 15:1,13 16:5,

15,17 43:13,18 44:11,12 45:18 49:16 56:1 64:24 65:17 66:6 72:1,4 73:15 82:4 86:23 95:23 96:4

**quick** 36:16

**quiet** 40:3,7 43:5 74:6,10

**R**

**R-o-m-a-n** 27:11 45:1

**reach** 30:22

**read** 31:2,4,9 58:5,8 61:3 73:9 81:2 85:1,3 89:1,8,23 90:1 94:15, 17

**reading** 35:25 65:3

**ready** 41:20,21

**reason** 9:1 49:14 51:5 82:11

**recall** 35:4,5 38:15 58:19 63:8 89:7,25

**receive** 10:24 30:11, 25 77:6 80:1

**received** 9:10,12,24 31:2 36:15 67:19 73:6 76:17 79:13,24 80:5

**receiving** 77:21

**Recently** 44:19

**recess** 41:18 61:17

**recognition** 26:19

**recollection** 32:11 55:18 78:5,17

**record** 5:9 7:22 14:4 22:19 33:8,13 41:17 65:15 69:25 90:14 95:24 96:2,8,10

**recorded** 26:13 33:12

**records** 72:8,9

**recruiter** 77:6

**Redwood** 7:18

**referred** 62:6

**referring** 64:21 80:4,7

**refers** 67:3

**refresh** 32:11 55:18 78:5,17

**refuse** 12:21

**regard** 25:7 53:9

**regret** 68:2

**relate** 23:3,20 76:7

**related** 21:8 24:12 76:3 89:20 93:15

**relation** 27:9

**relevance** 15:24 17:6 31:7 32:24 36:4 44:12

**relevant** 43:13 44:11 45:11

**remember** 9:9,13,23 10:14,24 12:7,14 18:20,22 20:7 21:3, 17 24:19,21 27:15 33:6 34:17,23 35:12, 13 37:3,8,13,14,17 38:3 47:24,25 48:1, 14,19,21 53:4,14,15 55:13,15 56:13 57:11 61:9 62:24 63:1,4,6 69:14,20,22 70:1,8, 10 77:11,21,24 78:12 88:8

**remembers** 23:18

**render** 59:2 60:9

**Repeat** 54:21

**repeatedly** 43:4

**repetitive** 66:5,6

**rephrase** 8:11 36:9

**report** 94:15,25

**reporter** 5:23 9:11

26:7,21 30:7 44:25 54:6,16 62:4 64:4 72:14 84:3 86:20

**represent** 5:9 14:10 34:14,18,24 35:15

**represented** 9:15 34:11 37:10,15 67:2

**representing** 14:6 18:1 35:16 62:19,22

**represents** 86:24

**request** 65:16 76:10

**requested** 53:17 57:5 60:4

**reread** 61:13

**research** 91:11

**respond** 12:19 15:16 72:3 76:15 77:2

**responding** 8:15 43:12

**response** 30:20

**responsive** 73:11,19, 24 74:1,2,18,19 75:9, 10 76:11

**resulted** 95:3

**resume** 39:18

**retainer** 71:23

**reviewing** 65:10 95:6

**Reynolds** 76:18,21 77:15,20 78:6,18

**rightfully** 87:7

**Roberto** 5:2,11 32:6 53:23 56:5,9 66:16 96:14

**Roberto@jibo.com.** 11:12

**role** 52:19

**Roman** 27:10,11,12, 13 29:23 44:24 45:1 79:8 86:4 89:9 92:25

**Roman's** 94:15

**Index: privilege–Roman's**

Roberto Pieraccini                                                    Loop AI Labs, Inc. vs. Gatti, et al.

**room** 87:5

**running** 8:23

**Russell** 76:18,21 77:15,20 78:6,18

---

**S**

---

**San** 5:25 7:20 21:1 22:10 29:15,16,17 50:12 56:18,25

**sanctioned** 33:3 59:8

**sanctions** 12:25

**Schedule** 80:24

**scientist** 15:1,11 43:11 46:16

**script** 36:1

**search** 36:16

**searched** 75:18 77:23

**seek** 12:25

**seeking** 22:3

**send** 25:24 30:11 52:4 54:22 72:21 73:5 75:12,20 76:4, 11

**sending** 53:15 67:21, 24

**sense** 84:13

**sentence** 59:15

**series** 30:6 91:16

**service** 39:22 81:8

**services** 81:3

**serving** 71:21 79:12

**session** 54:17

**shape** 73:18

**share** 87:19 88:18

**shares** 79:14

**sharing** 87:20

**shocked** 48:9,10 62:2

**shocking** 64:23

**shortly** 32:21 69:6

**show** 40:24

**shut** 42:10,11

**sic** 77:19

**side** 88:14

**sign** 25:24

**signature** 56:20 72:24

**signed** 18:13 51:19 56:15 58:8 63:16 69:6 70:5,15,16,18, 22 71:11,14 72:5 73:2,21,22,23 86:8 89:1

**simply** 21:11 62:17

**single** 38:19

**sir** 5:8,13 12:19 15:16 19:25 23:6 40:8,13, 17 41:4,14,20 43:2 46:15 47:6 54:2,5 61:23 66:11 74:19 75:8

**sister** 37:15

**Sleeper** 5:16,17,18

**Soshoma** 19:10,11, 15

**sound** 47:15,16 80:22

**space** 83:17

**spam** 76:24 78:1

**speak** 9:20 10:8 16:20 24:9 25:17,23 26:3,8 67:11,25

**speaking** 8:22 19:13 52:14 57:8 74:6,11 88:10

**speaks** 8:15 25:20

**specific** 83:22

**specifically** 34:13 50:1

**specifics** 85:14

**speculation** 31:7 58:24 82:15,20 89:17 90:4 92:19 93:5

**speech** 26:18

**spend** 89:13 93:24 94:19 95:5

**spent** 93:23 95:10,20

**splash** 46:9

**splashed** 46:3,5,6,7

**spoke** 10:1,4,12 12:8 17:8 21:23 24:3,4,16 25:6,7,14,16 27:16 28:2 31:4,10,18 32:12,14 33:23 34:2, 4 47:6,9 50:15,18 52:15

**spoken** 10:5,7 20:3 21:18,20 32:16 85:20

**stage** 81:15

**start** 30:21 83:4

**startup** 49:8 79:5 84:14,16

**startups** 84:17

**state** 62:17 64:20 67:20 76:1

**statement** 19:23 48:4,6 59:1 60:5,15 61:5,8,24 62:6,9,11 64:2 65:4 66:8,10,16 67:2

**statements** 59:16,23 65:21

**states** 24:5 52:25

**sticker** 54:7

**stock** 18:8,10,12,18 79:14 80:8,13

**stole** 85:23

**stop** 40:10 75:3

**strategic** 81:17,22

**Street** 5:16 6:8

**strike** 17:12 38:17 47:8 84:19

**stupid** 43:18

**submit** 44:16

**submitted** 48:4,6 92:24 94:16,25

**subpoena** 9:24 36:16,17 53:18 67:19 73:6,12,19 74:20 75:11

**suing** 37:4

**Summit** 50:9,14

**Support** 57:15

**supposed** 80:21

**sweat** 45:3,7

**sworn** 5:3

**synonymously** 19:14

---

**T**

---

**table** 46:3 47:3

**tactical** 81:18

**taking** 23:24

**talk** 8:16,20 13:3 22:21 24:22 25:21 27:22 28:3,18 29:6 33:16 36:1 41:24 42:1,2,15 67:22 71:17,20

**talked** 14:12 21:22 27:23 28:16 29:3 43:14 49:23 50:24

**talking** 22:7 39:21,23 47:23 48:13 50:7 65:1 71:9 80:6

**talks** 8:25 59:25

**team** 33:22

**technical** 24:10 82:3, 23 93:1 94:8

**Roberto Pieraccini**                                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

**technologist** 43:11

**technology** 24:15,17 50:2,4,16,19 81:19 85:9,12,13,18

**telephone** 10:2,5,15 25:7 32:17 57:4 58:13 60:3 63:15 64:13 87:21,24

**telling** 37:14 58:19 61:9 64:10

**ten** 32:19

**ten-minute** 33:17

**ten-minutes'** 48:1

**term** 19:15

**testified** 8:4

**testify** 9:1 94:4

**testimony** 65:23 86:3 92:6

**thing** 8:13 36:18 42:5 51:15 60:22 91:12

**things** 14:24 15:7 24:7 33:17 48:8 52:12 64:18 66:7 84:7 90:9

**third-party** 36:2

**Thomas** 30:3 57:14, 23

**thought** 35:15 76:3

**thousands** 75:17 76:6

**threatening** 96:11,19

**threw** 41:13,22 42:20, 21 47:2

**throw** 43:3 45:9,19,21 47:2

**time** 8:23,24 9:9,14 13:8 19:4 20:9,10 21:22 22:2 25:5,13 27:16 29:8 31:20 32:8,16 35:14,23 47:4 56:18,25 62:11

71:19 72:23 77:24 78:9 80:2 91:7,10 93:18,20 95:5,10

**times** 13:5 20:6,7 38:24 44:3 49:11,23 50:5 64:8 75:5 89:2,5

**tired** 43:6,7

**today** 6:25 8:15 9:2, 16 12:21 13:6 15:12 17:7,11 19:2,5,10 48:22 51:7,17 60:23 64:8 68:4 70:24 84:14

**told** 14:24 15:20 16:16 17:8 21:15 25:24 33:12 34:5,7, 11,13 35:3,6,22 36:8, 24 37:4,9 38:6 42:10 43:5 47:8 48:20 49:11 53:6 55:12 57:9 59:6,17 63:15 68:4 94:5

**Tom** 5:9

**top** 30:2

**topic** 24:12

**total** 95:5,8,20

**totally** 59:18

**touch** 27:21

**transcript** 89:9 95:3

**traveling** 27:24 56:24

**treat** 53:8

**trial** 94:4

**true** 7:12 10:3 20:18 23:8,23 26:5,6 34:14 41:23,25 46:12 47:15,16 48:15 49:21 62:21 64:5 66:9 78:21 86:25 91:2 96:13

**trust** 87:5,8 91:4,7,12

**truth** 28:8,10

**truthfully** 9:2

**twisted** 68:2

**type** 24:6 79:4

**typical** 77:5

---

**U**

**understand** 8:7,10 16:24 24:11 59:9 61:11 62:7 64:7,10 65:21,23 67:18 68:14 75:23

**understanding** 26:19 73:25 74:1,18 75:8

**understood** 35:6 88:21

**uniquely** 93:1

**United** 24:5

**USA** 57:15

**users** 26:23

---

**V**

**vaguely** 90:8

**Valeria** 21:6 37:10,15 62:23 87:21

**valuation** 18:24

**verb** 31:23

**version** 72:6 73:20, 21,22

**Veterans** 7:17

**video** 40:15 41:3 43:5 45:24

**videotape** 7:3,6 89:15,16,18

**videotapes** 89:20

**visit** 69:18

**voluntarily** 16:13

---

**W**

**Wait** 74:6,14

**walk** 40:6

**Wallerstein** 5:7,9 6:24 7:5,22 10:21 13:2,4,13,17 14:2,9, 16,17,21 15:6,15 16:1,6,10,19,21 19:22,24 20:18 23:5, 14,22 26:12,14 29:25 30:4,5 32:1,25 40:2, 7,12,17,24 41:4,9,12, 19 43:7 47:4 53:20, 24 54:15,18 56:3,7 57:5,12,15,19,20,23 58:14 59:7 60:4 61:14,18 63:15,18 64:13 65:18,25 66:14 67:9 70:25 71:6 74:5, 10,14,17,22,25 75:3, 7 76:10,16 77:12,17, 18 86:12,18 89:19 92:7,10 95:17,23 96:1,5,11,13,20,22

**Wallerstein's** 59:16

**wanted** 82:11

**watch** 89:15,20

**water** 65:24

**ways** 68:4

**web** 50:7 77:7

**website** 39:4,17,23 44:1,2,4 47:20 48:10 66:2,25 67:2,4 68:7, 11,12,17 69:5 70:2,3

**websites** 69:10,18

**week** 28:23 29:5 81:6

**weeks** 29:10 86:5,6

**wet** 42:25 45:2,3

**wife** 27:24

**win** 83:25

**witness's** 92:6

**word-by-word** 48:2,3

**words** 35:11 42:12

**work** 6:3,4,6,14

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

11:15,18 43:19,20
44:10 49:8 82:8
87:23

**worked** 6:9,11,12
24:6 87:21

**working** 95:11

**works** 49:6 50:23

**worth** 18:23 19:2
80:13

**Wow** 91:15

**write** 88:23,24

**writing** 34:1 88:9,12,
22

**written** 17:16 73:6
78:20 79:15

**wrong** 23:8 55:21,23
67:20 70:6 91:9,11,
14

**wrongdoing** 44:13

**wrote** 31:13 32:6
64:20 65:13 87:15

---

### Y

**Yahoo** 11:24

**yahoo.com.** 12:3

**year** 69:22 70:1,8,9,
14

**years** 79:24 80:3

**Yup** 28:24 49:15
94:10