Roberto Pieraccini                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

ago, ten-minutes' phone call.  I don't remember word-by-word what we said.

Q.   I'm not asking you word-by-word.  In fact, you submitted a statement under oath about that phone call, did you not?

A.   Yes.  I submitted a statement.  It was not about the phone call, but about your declaration of things it was saying, and I was really shocked to see that you say that I didn't even know about the website.  Really shocked.  Okay?

Q.   We'll get there.  Right now, I'm talking about the phone call.

A.   So I don't remember if I said that company does it.  It is true that companies can do that, but definitely not Loop.AI.

Q.   So you didn't tell me that about Loop AI?

A.   I don't remember.  I don't remember if I told you that companies do that.  I don't remember.

Q.   But you're certain -- at least today, you're certain that your memory is you did not tell me that Loop AI was using your name to make itself --

**Roberto Pieraccini**                              **Loop AI Labs, Inc. vs. Gatti, et al.**

A.  Oh, of course.  I was their adviser.
How could I tell you that?

Q.  You were their adviser, but you have
never given them any advice.  Right?

MS. CALAFIORE HEALY:  Objection.

A.  Do you know how it works, adviser?

Q.  Listen --

A.  I work for a startup, okay, and very
important adviser.

Q.  You're very important.  I know.  You're
very important.  You've told me that three times.

A.  I am.  I am.

Q.  You know, generally, when some people
have to say that, there's a reason.

A.  Yeah.  Google me up, please.  Yup.

Q.  I'm not going to answer your questions.
I just want you to answer mine.

A.  You don't have to.

Q.  Correct.  Before that phone call, you
had never given Loop AI any advice.  Isn't that
true?

A.  Not for money as an adviser.  I may
have talked to Patrick several times, because we
know each other.

Q.  But not about Loop?

A.  Not specifically about Loop.  About technology.

Q.  Did he tell you about Loop's technology?

A.  Yes.  Many times, even before that.  We participated together in conference.  There are pictures on the web of Patrick and I talking at the --

Q.  The Dublin Summit?

A.  The what?

Q.  Go on.

A.  Well, it was a conference in San Francisco organized by -- it was called the Deep Learning Summit.

Q.  And he spoke to you about Loop's technology?

A.  Say it again, please.

Q.  He spoke to you about Loop's technology?

A.  Yes, he did.  Yeah.

Q.  And when was that?

A.  It was January 2014, probably.

Q.  Okay.  Did he tell you how it works?

A.  We talked about it, you know, but not the details, of course.

Roberto Pieraccini                              **Loop AI Labs, Inc. vs. Gatti, et al.**

Q.   Well, why do you say "of course"?  It's not "of course" to me.

A.   It's confidential information.  I was not an adviser of the company, so I was not -- there's no reason why he would tell me confidential information.

Q.   Do you, today, know confidential information?

A.   We -- I don't know confidential information.  I don't need to know confidential information about Loop.AI.

Q.   I heard you say -- I want to make sure --

A.   Yes.

Q.   -- we heard the same thing.  You don't know any confidential information about Loop today?

A.   No, I don't.

Q.   You signed an agreement with Loop.  Right?

A.   Yes, I did.

Q.   Did you consider that document to be confidential?

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion.

**Page 51**

Roberto Pieraccini                                      **Loop AI Labs, Inc. vs. Gatti, et al.**

A.   I think it's confidential.

Q.   Did you tell me on the phone call that you don't believe it is confidential, and you would send it to me?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   I might have.  I didn't know if it was confidential or not, but probably it is.  Yeah.

Q.   I'm not asking if --

A.   I'm not a lawyer.

Q.   Exactly.  Precisely.

A.   I don't know things.

Q.   I'm not asking whether, legally speaking, it is confidential or not.  I'm asking about your head.  When you spoke to me on the phone call, did you believe that it was confidential?

A.   I was confused about the confidentiality of -- of an advisory role, so I --

Q.   Did you tell me you were confused?

MS. CALAFIORE HEALY:  Objection. Leading.

A.   No, I did not.  I don't know the extent of the confidentiality for a document that states

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

my advising.

Q. I'm not asking you what you know. I'm asking you what you said.

A. I don't remember what I said.

Q. Okay. You might have said that? You might have told me, "I don't believe it's confidential"? You might have said that?

A. I don't think so. I treat these documents with high regard. So I don't give them to anyone, especially a person I never met before.

Q. You sent it to me that very day or two days later, did you not?

A. I don't remember I sent you that.

Q. Okay. Do you remember sending me an e-mail with documents attached?

A. I sent a document that you requested, the subpoena for e-mails, mostly.

Q. Okay.

MR. WALLERSTEIN: Can you mark this for me, please.

(E-mail dated February 12, 2016 from Roberto Pieraccini marked Exhibit 2.)

BY MR. WALLERSTEIN:

Q. You've been handed an e-mail that's

**Page 53**

been marked Exhibit 2.

Do you have Exhibit 1, by the way, sir, from earlier this morning?

A.  My declaration?

Q.  No, no.  Sir, in this deposition, I marked a document.  I put a -- the court reporter put a blue sticker on it, and we gave it to you. It was in front of you before your counsel left.

A.  I don't have it with me now.  Yeah.

Q.  We need that back.

MS. CALAFIORE HEALY:  Where is it?  Did you --

THE WITNESS:  Probably.  Yes, it's in my bag.

MR. WALLERSTEIN:  Thank you.  Leave that handy, and the court reporter will take those at the end of the session.

BY MR. WALLERSTEIN:

Q.  Do you see Exhibit 2 is an e-mail from you to me, copying my colleague?

A.  Say that, please.  Repeat it again.

Q.  Exhibit 2, did you send that e-mail?

A.  Yeah.

Q.  And do you see it has attachments, several attachments?  Do you see that?

Roberto Pieraccini                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

A.  Yeah.

Q.  You attached those e-mails -- sorry. You attached those documents --

A.  Yeah.

Q.  -- to me?

A.  Yeah.

Q.  Yes?

A.  Yes.

Q.  You sent me the Loop advisory agreement.  Correct?

A.  Yeah, I did.  Yeah.  Apparently, according to this e-mail.  Yeah.  As I told you, I didn't remember.

Q.  Sure.  That's why we're here.  Now, you remember that you sent me an e-mail on February 12th, attaching certain documents?

A.  Yeah.  Yeah.

Q.  Does that refresh your recollection that, as of February 12th, you did not believe that document to be confidential?

A.  Yes.  Probably, I was wrong about that.

Q.  Well, I don't know.  I don't think you were wrong.  I think you were right.

MS. CALAFIORE HEALY:  Objection.  You need to listen to his instructions.  Just answer

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

the questions.

THE WITNESS:  Okay.

MR. WALLERSTEIN:  Okay.  Let's do this.
Can you mark this, please.

(Declaration of Roberto
Pieraccini marked Exhibit 3.)

BY MR. WALLERSTEIN:

Q.  I've handed you a document marked as
Exhibit 3.  It's entitled "Declaration of Roberto
Pieraccini."

A.  Mm-hmm.

Q.  You can look it over and tell me if you
remember it.

A.  Yeah.

Q.  You signed that?

A.  Yes.

Q.  In Boston?

A.  I was in San Francisco at the time.

Q.  If you look at the second page, please,
by your signature.

A.  Yeah.

Q.  Do you see it says "executed
February 26, 2016"?

A.  Oh, I was probably traveling to Boston
at the time, yeah, but I was living in San

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

Francisco.

Q.   If you look at -- let's look at Paragraph 3 of your declaration, Exhibit 3.  You say, "During my telephone call with Mr. Wallerstein, which he requested, he did not tell me that I should consider consulting with Loop AI's attorney or with any attorney before speaking to him about Loop AI."

A.   Yeah.  You told me if I had an attorney, which I answered I didn't.  That's what I remember.

MR. WALLERSTEIN:  Can I mark this too, please.

(Declaration of Thomas E. Wallerstein in Support of Almawave USA, Inc.'s Opposition to Plaintiff's Emergency Application for a Protective Order marked Exhibit 4.)

MR. WALLERSTEIN:  Thank you.

BY MR. WALLERSTEIN:

Q.   I've handed you a document that is marked as Exhibit 4.  It is my "Declaration of Thomas Wallerstein."  It's three -- it's got a caption --

A.   Sorry.

Roberto Pieraccini                    **Loop AI Labs, Inc. vs. Gatti, et al.**

Q.  It's got a caption, three pages, and then exhibits.  My declaration, itself, is three pages long.

A.  Mm-hmm.

Q.  Did you -- you've read my declaration before?

A.  Yes.

Q.  You read it before you signed your declaration.  Correct?

A.  Yes, I did.

Q.  So now I'm going to go back to yours.

A.  Mm-hmm.

Q.  Your Paragraph 3, "During my telephone call with Mr. Wallerstein, he did not tell me that I should consider consulting with Loop AI's attorney"?

A.  Yeah.

Q.  Did I ever say otherwise?

A.  I don't recall you telling me to consult with Loop.AI attorney.

Q.  Did I ever tell anyone that I did tell you to consult with Loop AI's attorney?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

A.  Probably not.  No.

Q.  So your Paragraph 3, the statement in your Paragraph 3, that does not render anything in my declaration false, does it?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.  The witness has already indicated what he believed was false in what you told him.

MR. WALLERSTEIN:  That's improper and has been sanctioned by the judge.

A.  So I don't understand.  What can you explain to me?

Q.  Sure.

A.  Okay.

Q.  If you look at your Paragraph 2 --

A.  Yeah.

Q.  -- your second sentence, it says, "Mr. Wallerstein's statements regarding my communications with him and what I allegedly told him regarding Loop AI are totally false."

Do you see that?

A.  Paragraph 2?

Q.  Sure.  Your Paragraph 2.

A.  Yeah.

Q.  It says that my statements are false?

A.  Yeah.

Q.  Okay.  Your Paragraph 3 then talks

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

about something that I did not say on the phone call.

    A.   During my telephone call with Mr. Wallerstein, which he requested, he did not tell me.  That's a statement from me, yes.

    Q.   About what I did not say?

    A.   Yeah.

    Q.   Does the fact that I did not say that to you on the phone call render anything in my declaration false?

    A.   Does it -- whatever paragraph here doesn't mean that it is addressing --

    Q.   Okay.

    A.   -- the fact that you're false.  It's a statement.

    Q.   Sure.

    A.   I say during my phone call, you didn't tell me to consult with attorney.  I didn't say that there was any false.

    Q.   Okay.

    A.   I didn't claim there was any false thing.

    Q.   Fine.  I'm asking you today.

    Is there anything in my declaration that contradicts your Paragraph 3?

**Roberto Pieraccini**                      **Loop AI Labs, Inc. vs. Gatti, et al.**

MS. CALAFIORE HEALY:  Objection.  Are you asking the witness to compare?

A.  I have to read it all together, but this was not -- I don't think it was addressing in particular here.  It was a statement.  Like, I'm a member of Loop.AI doesn't contradict anything that you said.  Right?  It is a statement.  Number three is a statement that I believe I don't remember you telling me that I should consult with Loop.AI counsel.

Q.  I understand that.  Is there anything in my declaration that contradicts that?

A.  I need to reread it.

MR. WALLERSTEIN:  Go ahead.  I'm going to take a five-minute break.  You do that.

THE WITNESS:  Okay.

(A recess was taken.)

BY MR. WALLERSTEIN:

Q.  Did you have a chance to look that over?

A.  Yes.

Q.  Is there anything in my declaration that contradicts that, sir, Paragraph 3?

A.  Not this one.  This was a statement I made.  My falsehood was what is in boldface here.

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

My claim to the fact that is false is Paragraph 2 here.  So that's what I say.  That I was shocked by this.  I didn't know the false because --

(Reporter clarification.)

A.   I'm saying Paragraph 2 is the one that I referred to here as a false statement.  Okay.

Q.   I understand that.  I'm asking about Paragraph 3.

A.   Paragraph 3 is a statement.

Q.   Correct.

A.   At the time, Loop.AI is a statement.  It doesn't contradict anything I just said.

Q.   Thank you.  Thank you.

A.   And number three doesn't have to necessarily contradict anything you say.

Q.   Okay.

A.   I state that, simply, you didn't tell me to consult -- I didn't even know that there was an attorney that was representing in this case.

Q.   Oh, is that true?  I didn't tell you that there was an attorney representing Loop named Valeria Healy?

A.   I don't remember that.

Q.   I may have.

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.  I don't remember.

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

Q.  When you say you don't remember means --

A.  I don't remember.

Q.  So maybe yes, maybe no?

A.  I don't recall.

Q.  You don't have notes, though?

A.  I don't have notes.

Q.  Okay.  Do I?

A.  How do I know if you have notes?

Q.  You're right.  Correct.  Correct. Paragraph 4, your Paragraph 4, during your telephone call with me, "I told Mr. Wallerstein that I had signed an NDA."

A.  Mm-hmm.

Q.  "Mr. Wallerstein did not tell me that I should be careful not to tell him or give him anything about Loop AI Labs."

Do you see that?

A.  Yes.

Q.  Does that contradict anything in my declaration?

A.  As I said before, not necessarily

**Roberto Pieraccini**                              **Loop AI Labs, Inc. vs. Gatti, et al.**

everything has to contradict your declaration. The point of contradiction is this statement in bold.

(Reporter clarification.)

A.  The point that I say is not true is the number two here.

Q.  I understand that.  And, you know, you can tell me that four, five, six times today, but I just want an answer to my question.

I understand what you're telling me.

A.  Yeah.  So I say no.

Q.  Okay.  Paragraph 5 says, "During my telephone call with Mr. Wallerstein...", and it goes on to say what it says.

Does that contradict anything in my declaration?

MS. CALAFIORE HEALY:  Objection.

A.  Why do you keep asking me these things?

Q.  Just get it over with.

A.  I'll just state it again.  What I wrote here is referring to Paragraph 2.

Q.  That's not my question.

A.  It's shocking -- you can ask me all the questions you want, of course.

Q.  Just answer --

Roberto Pieraccini                                   **Loop AI Labs, Inc. vs. Gatti, et al.**

A.   So, you know, talking about Paragraph 5.

(Witness reading document.)

A.   This is a plain statement.  How can I -- it doesn't contradict Paragraph 3.  You don't say that you didn't ask me about it.

Q.   Thank you.

MS. CALAFIORE HEALY:  Excuse me.  I want to make an objection, because the witness is not reviewing the entirety of what you said in the declaration and in the brief to the Court.

So the witness can give you information about what he wrote in his declaration, but not comparing one document with another.  So I just want to put that objection on the record, and I would request also that you move on to other questions.

BY MR. WALLERSTEIN;

Q.   Paragraph 6, does your Paragraph 6, what you say in your Paragraph 6 about my statements -- I understand that you believe -- well, I'll come back to that, because I think I understand your testimony on that.

THE WITNESS:  Can I have some water?

MR. WALLERSTEIN:  Of course.

Q.   Paragraph 7 says, "I have no objection to the way I am presented on Loop AI's website."

Does that contradict anything in my declaration?

A.   I said before, since you ask repetitive questions, I gave repetitive answers.  This is not the point of things.  This declaration is to the point of claiming that statement number two is not true.

Q.   I'm not asking about statement number two, sir.

A.   But I'm saying that.

MS. CALAFIORE HEALY:  He's entitled to his answer, Mr. Wallerstein.

A.   So this doesn't concern -- this is the statement.  The fact that "my name is Roberto Pieraccini" doesn't contradict anything that you say.

Q.   Neither does Paragraph 7.  Correct?

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion.

A.   It doesn't literally contradict, but you might infer that from what you say in No. 2.  Since I didn't know -- you claim I didn't know that I was on the website.  I say that I don't

have any objections to the fact that I am represented on the website.  So my statement refers to the inference that I object to the name is on the website.

Q.   You drew that inference my declaration.

A.   Yes.

Q.   That I was claiming that you objected?

A.   I inferred that.  Yeah.

Q.   Paragraph 8, "Mr. Wallerstein made me believe there was some pressure to immediately speak to him."

How did I do that?

A.   The e-mail said, you know, give me a call.  It says clearly in the e-mail that you sent me.

Q.   And no, nothing else besides the e-mail I sent you?

A.   Well, no.  You understand that I never received a subpoena before.  I was in a very anxious state.  I haven't done anything wrong, and you are sending me an e-mail saying, give me a call.  I will be happy to talk to you.  And I felt pressure of doing that.

Q.   Beyond sending you the e-mail, did I do anything else to pressure you to speak to me?

A.  No.

Q.  Okay.  You regret that I twisted and misrepresented my call with you.

Have you told me, today, all the ways in which I misrepresented my phone call with you?

A.  Yes.  Paragraph No. 2.

Q.  Okay.  The website?

A.  Yeah.  And that I was not aware that -- that, you know, somehow Loop AI used my name without me knowing about that.

Q.  On the website?

A.  On the website.  Yeah.

Q.  Okay.  Is there anything beyond the fact that you -- I understand you think it's false.  You're saying it's false that you did not tell me you were not aware that you were on the website.

Is there any other way in which I misrepresented our call?

MS. CALAFIORE HEALY:  Objection.  The witness has already pointed you to his declaration.

Q.  We just went through it paragraph by paragraph.

A.  So that was the point.

Roberto Pieraccini                          Loop AI Labs, Inc. vs. Gatti, et al.

Q.   Okay.  Is there anything else?

     MS. CALAFIORE HEALY:  Objection.

A.   I don't think so.  No.

Q.   When did you -- when did your name get listed on the Loop website?

A.   Probably shortly after I signed the advisory agreement.

Q.   How do you know?

A.   I probably looked at it.  I'm very -- we like to see our pictures on websites, don't we?

Q.   Some people do.

A.   I do.

Q.   You say "probably."  Do you remember when you first saw it?

     MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.   You know how many websites I visit every day?  Probably you do too.  I can't remember.  But, definitely, I was really happy to see my profile, my picture there.

Q.   Do you remember what year?

A.   It was --

Q.   I'm sorry.  I apologize.  Let me ask a complete question so I make a record.

Roberto Pieraccini                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

Do you remember what year it was in which you first saw your website -- your profile on the Loop website?

A. It must have been definitely after I signed the agreement with them, which was, if I'm not wrong, November 2014. So it must be after that.

Q. Do you remember what year?

A. The year? I just said it could be 2014 or early 2015. I don't remember that. Yeah.

Q. Okay. Are you certain it was in 2015 and not 2016?

A. Oh, you're right. So it was 2015 and 2016. You know, I'm confused about the year. So I signed the agreement. It definitely was after I signed the agreement.

Q. For sure?

A. I made a mistake. It was 2015 I signed the agreement, so it should have been 2015 or 2016. Sorry about that.

Q. No. No. I don't want you to be confused. I believe you signed the agreement in 2014 -- no.

A. Yeah. Yeah. I think -- today is 2016.

MR. WALLERSTEIN: Can we mark this,

please.

A.  It was 2015, probably.  Right.

(Loop AI Labs, Inc., Advisory Board Agreement, dated October 16, 2015 marked Exhibit 5.)

BY MR. WALLERSTEIN:

Q.  Is this the agreement, Exhibit 5 --

A.  October 2015.

Q.  -- that you're talking about.

A.  Yes.  October 2015.

Q.  You signed this in October of 2015?

A.  Mm-hmm.

Q.  Didn't you tell me on the phone that after you signed this you never heard back and never got -- never heard back from them?

A.  Oh, yeah.  Probably, it's possible. Actually, I didn't talk to them after that.  I -- it's normally a practice not to call the advisers all the time.  You know, I have advisers that are listed in my company, and I didn't talk to them since they agreed to be adviser, but are serving to call them when I need them.  So adviser is like a retainer.  Right?  So if they don't need me -- you know, everyone is very busy.  They are very busy with their client.  I am busy with my

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

company.  So if they need me, questions regarding my expertise, which is different from Loop expertise, I would be happy to respond to those questions.

Q.  Did you ever see a signed, a countersigned version of Exhibit 5 or 4?

A.  I might -- probably, I did.  Probably in my records.  Yeah.

Q.  Where would those records be?

A.  Probably some computers.

Q.  What computer?

A.  I have a laptop computer, which I changed.  I had a desktop computer.

(Reporter clarification.)

A.  I have a home computer.  I have a laptop and a home computer.

Q.  Did you look on that computer for documents before you sent me the e-mail with the documents?

A.  I -- probably.  Yeah.  Yeah.

Q.  Did you send me everything you found?

A.  I sent you everything I found at the time, but I have multiple copies of that.  I mistaken sent you the one with the signature.  I have multiple files for everything that I do.  So

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

advisory board, I could have probably multiple files, one signed, one countersigned.

Q.   But you only sent me the one?

A.   Yeah.  By mistake.  Yeah.  You didn't ask me to send the countersigned.

Q.   You received a written subpoena. Correct?

A.   Yes, I did.

Q.   You read it?

A.   Yes, I did.

Q.   All documents that are responsive to that subpoena must be produced to me.

MS. CALAFIORE HEALY:  Objection.  Don't take instructions from him.  He's here to depose you and ask you questions, not to give you orders.

Q.   So if you have documents, multiple copies that are different in any way, shape or form, they are responsive to the subpoena.

If you have a version of a document that is not signed by anybody, a different version that is signed by one person, a different version that is signed by someone else, those are three different documents, all of which are responsive.

Is it your understanding that you have --

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

with that understanding of responsive documents, you believe you have responsive --

MS. CALAFIORE HEALY:  Objection.  I object.

MR. WALLERSTEIN:  Counsel, please be quiet when I'm speaking.  Wait until I'm done.

MS. CALAFIORE HEALY:  If you insult me again like that, I'm really -- now the court is open, and I want to call the court.

MR. WALLERSTEIN:  Be quiet when I'm speaking, Counsel.  Don't interrupt me.

MS. CALAFIORE HEALY:  I am going to object to your instruction.

MR. WALLERSTEIN:  Wait until I'm finished with my question, and you can say whatever it is you want to say.

BY MR. WALLERSTEIN:

Q.   With that understanding of "responsive documents," sir, do you have responsive documents to the subpoena?

MS. CALAFIORE HEALY:  I object.

MR. WALLERSTEIN:  Counsel.

MS. CALAFIORE HEALY:  I object to the instruction that you're giving the witness. Mr. Wallerstein is not your lawyer, and you are

**Loop AI Labs, Inc. vs. Gatti, et al.**

not to take his instructions as to what you need to do and what you don't need to do.

MR. WALLERSTEIN:  Counsel, please stop interrupting my question.  I've tried three times.  I'm going to try it again.  Please do not interrupt me.

BY MR. WALLERSTEIN:

Q.  Sir, with the understanding of "responsive documents" that I just gave you, do you have documents that are responsive to the subpoena that you did not produce to me?

A.  Probably not.  If I didn't send it, I didn't have it or I lost it.

Q.  Didn't you just tell me that you have multiple copies?

A.  I might have.  I don't know what is on my computer.  There are thousands of files on my computer.  So -- and I searched, to the best of my knowledge, what I needed to give you.  And I might have decided to send you these because probably either I didn't find another one or I believed that the difference was irrelevant.

Q.  I understand that.  I understand that. I'm not accusing you of misconduct.

A.  I don't know.  I don't know.  I don't

know the state of the files on my computer.

Q.   Are there other documents that you thought were related to Loop but not important that you did not send me?

A.   No.  I don't have any other documents.

Q.   But in those thousands of documents on your computer, none of them relate to Loop AI, except what you sent me?

A.   Yes.

MR. WALLERSTEIN:  I request that you send me all responsive documents, meaning any document that has anything to do with Loop or Almawave or Anna Gatti.

MS. CALAFIORE HEALY:  Objection.  Don't even respond.  This is not a question, so --

MR. WALLERSTEIN:  It's not a question.

Q.   You sent me an e-mail you received from Russell Reynolds Associates?

A.   I believe so.

Q.   Okay.  Was that your only communication with Russell Reynolds?

A.   I didn't have any communication back. It was an e-mail delivered, automatically generated.  It was a marketing, spam e-mail.

Q.   Do you know how they got your name?

Roberto Pieraccini                          Loop AI Labs, Inc. vs. Gatti, et al.

A.   I have no idea.

Q.   And you said you did not respond to it?

A.   I don't think so.

Q.   Okay.

A.   I didn't find -- that was typical of recruiter e-mails.  I receive recruiter e-mails. They find my name on the web.  That's how they find me.  I have no idea.

Q.   And that came in January 2013?

A.   I have to look back.  If you say so.  I don't remember the particular e-mail.

MR. WALLERSTEIN:  We'll mark this, please.

(E-mail dated January 11, 2013 from Russell Reynolds Associates marked Exhibit 6.)

MR. WALLERSTEIN:  Thank you.

BY MR. WALLERSTEIN:

Q.   Exhibit 5 [sic] is an e-mail from Russell Reynolds to you, it looks like.  Do you remember receiving this e-mail?

A.   I looked for it, because you asked me to, and I searched on my e-mail and I found it. I -- at the time, I didn't remember it and pay attention to this mail.  It seems to be, you

know, spam e-mail.  It seems to be a spam e-mail.

Q.  You kept it, though.  I mean, do you keep everything?

A.  I keep all the e-mails.  Yeah.

Q.  And does this refresh your recollection that the e-mail from Russell Reynolds was in January of 2013?

A.  So in January 2013, there was a very harsh time in my life because my girlfriend passed away.

Q.  I'm sorry to hear about that.

A.  So I don't know what I remember about that.

Q.  But looking at the e-mail, Exhibit 5, do you see it's dated January 11, 2013?

A.  Yes, I do.  Yeah.

Q.  Does that refresh your recollection that the e-mail from Russell Reynolds came to you in January of 2013?

A.  Because it's written here, I believe it's true.

Q.  Have you ever attended a meeting with the other members of the Loop advisory board?

A.  No, I didn't.

Q.  Have you ever had a conference call

with the other members of the Loop advisory board?

A. No, I didn't. It's not common practice to have these type of meetings, especially in a busy startup. I am an adviser in this company, and I am an adviser for another company. And they contact me only when they need me.

Q. And until the Roman deposition issue, they never needed you or at least never contacted you?

A. Yeah. They never did need me. Yeah.

Q. In exchange for serving on the advisory board, you received a grant to purchase 5,000 shares of the company's common stock?

A. That's written on the agreement, I believe. Yeah.

Q. Did you ever exercise those options?

A. No, I didn't.

Q. Have you ever seen any paperwork regarding those options?

A. I don't think so. Even in the company now, I have a lot of options because I'm one of the early employees, but the paperwork that I received was only a couple of years after.

Q. I'm sorry?

A.   It's normal practice to receive the paperwork, if any, some time -- you know, it could be years after.

Q.   You're not referring to Loop AI when you received the paperwork later?  You were talking about --

A.   No.  I'm referring to other companies.

Q.   Have you ever seen Loop AI's 2012 stock plan?

A.   No, I didn't.

Q.   Has Gianmauro or anyone ever given you an opinion as to what your options would be worth, what your stock would be worth if you exercised your options?

A.   No.

Q.   Do you have any opinion?

A.   No, I don't.  I don't do this for the options.  I do it because I'm a friend of Patrick, a friend of the company, and I'm willing to help them, if they need me.

Q.   You were supposed to do two hours a month or something.  Does that sound right?

A.   Let me see where they say that.

Q.   Schedule A.  The last page.  Schedule A says --

**Roberto Pieraccini**                                   **Loop AI Labs, Inc. vs. Gatti, et al.**

A.   Yeah.  I see.

Q.   I'm going to just read it.  "The adviser commits to perform the advisory services a monthly average of two hours per month.  The hours won't be equally distributed during every week," etc.

A.   I commit, if they need me, to provide two hours of my service, but not if they don't need me.  That's normal practice in all advisory agreements I had in the past.  So --

Q.   Did you assist the company during and after the fundraising process?

A.   No, I didn't.

Q.   Did you assist the company in the go-to-market stage?

A.   No.

Q.   Did you advise on the strategic and tactical planning for the design of the company's technology?

A.   No.

Q.   Did you make introductions to and assist in the acquisition of strategic partners?

A.   No.

Q.   Did you ever attend meetings with such potential partners and key contacts?

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

A.  No.  Again, I say that it's normal.  I am advising for other companies and only occasionally I get contacted for technical questions.  I am a go-to person if they need my expertise, as are all advisers for a company. And that's what happens.

Q.  If a Loop competitor were to hire you and you were to work with a Loop competitor --

A.  I have an NDA with Loop, so I --

Q.  Sure.  If you didn't have an NDA, or for whatever reason, if you wanted to help a competitor of Loop, could you give that competitor confidential information about Loop?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

A.  I do not.

Q.  Let me ask, do you possess confidential information of Loop?

MS. CALAFIORE HEALY:  Objection.  Calls for a legal conclusion.  Calls for speculation.

Q.  Go ahead.

A.  If I possess -- I don't possess technical confidential information.

Q.  Do you possess any kind of confidential information of Loop?

A.   I don't think that I -- if it's confidential, I don't have to disclose it, right?

Q.   Well, first of all, it's a "yes" or "no" question.  So we'll start with that.

MS. CALAFIORE HEALY:  Objection.  Objection to the instruction it's a "yes" or "no" question.  The witness is entitled to provide his answer.

A.   So, no, I don't possess any confidential information, except maybe this agreement, which I don't know if it's confidential or not.

Q.   That's fine.  Who are Loop's competitors?

A.   I don't know.  There is a big -- there's a large ecosystem of companies in the machine learning space, so there are big companies.  The obvious one, like Google, like Baidu, or like other companies like that.  And there's more than one, which I may or may not.  So potentially, you know, everyone can.  But I don't know if they're a specific competitor.

Q.   Was that Baidu, B-A-I-D-U?

A.   Yeah.

Q.   Do you think Loop is going to win the

**Roberto Pieraccini**                              **Loop AI Labs, Inc. vs. Gatti, et al.**

competition with Google?

A.   First of all, I'm not Nostradamus --

(Reporter clarification.)

A.   -- Nostradamus, so I don't know that. It's not a head-to-head competition.  It's more competitive in a way other companies compete with the large companies.  There are many things that can happen in the future.  It could be in a competition.  It could be acquired by a bigger company.  It could have a partnership with a bigger company.  So it's not a head-to-head competition.

Otherwise, there would be no sense in creating a startup today.  Right?  Google does pretty much everything.  So, you know, also my startup.  You know, it would be no sense.  We know that there are a lot of startups, right, around.  So...

Q.   Do you know how many patents have issued to Loop or -- well, strike that.

Do you know how many patents have issued to or been assigned to Loop?

A.   No, I don't.

Q.   Have you helped Loop with any of their patent applications?

A.   No, I didn't.

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

Q.   Have you read any of them?

A.   No, I didn't.

Q.   Have you read any published patents of Loop?

A.   No.

Q.   Of Almawave?

A.   No.

Q.   Do you know anything -- do you know anything about Almawave's technology?

A.   No, I don't.

Q.   You cannot in any way compare and contrast Almawave's technology with Loop's technology?

A.   No, I cannot.  I don't know specifics. So yeah.

Q.   You cannot in any way compare and contrast Almawave's patent or patent applications with Loop's technology?

A.   No, I don't.

Q.   You've never spoken to Anna Gatti?  I may have asked you.

A.   Never.  You asked that already.

Q.   Do you know if Anna Gatti stole any confidential information of Loop?

A.   I don't know her.  I don't know what

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

she did, what she didn't.

Q.   When did you first become aware that you were going to offer an -- testimony about Kendall Roman?

A.   It was probably a couple of weeks, one or two weeks prior to my declaration.

Q.   Okay.  How many drafts of the declaration were there before you signed it?

MS. CALAFIORE HEALY:  Objection.  Calls for attorney-client privileged information.

THE WITNESS:  Yeah.

MR. WALLERSTEIN:  No, it does not.

MS. CALAFIORE HEALY:  Yes, it does.

A.   So I was distracted.

Q.   Just you were distracted.  You're not going to answer the question?

A.   No.

MR. WALLERSTEIN:  Was that a "no"?  Do you have a "no"?

COURT REPORTER:  Yes.

Q.   I just need clear --

A.   I was distracted, that I don't have to answer questions on privileged information between me and the attorney that represents me.

Q.   That's true.

A.   So that's privileged information.

Q.   I disagree with that, but that's neither here nor there.

A.   Well, I'm not a lawyer.  The only person I can trust in this room is my counsel.  So, you know --

Q.   So precisely so.  And rightfully so.  You should trust your counsel.  I didn't mean to make light of that.  You should.

For my purposes, I just need to know what you're answering or what you're not.  So if the answer is I'm not going to tell you --

A.   That's fine.

Q.   -- we'll move on.

Who wrote the first draft?

MS. CALAFIORE HEALY:  Objection.  Calls for attorney-client privileged information.

A.   Is it privileged information?

MS. CALAFIORE HEALY:  You can share just without sharing --

A.   I worked with Valeria on the telephone, and I got the draft.

Q.   How long did you work with her on the telephone?

A.   Probably one hour or so.  Yeah.

Roberto Pieraccini                    Loop AI Labs, Inc. vs. Gatti, et al.

Q.   You had a -- any other conversations about your declaration?

A.   There would have been e-mail conversations, of course.  Yeah.

Q.   Well, were there?

MS. CALAFIORE HEALY:  Objection.  Don't guess.

A.   Oh, I don't remember.

Q.   Were you writing while you were speaking to her on the phone?

A.   I generally don't do that.

Q.   She was writing?

A.   I cannot -- I don't know what other people are doing on the other side.

MS. CALAFIORE HEALY:  Objection.

Q.   At some point --

MS. CALAFIORE HEALY:  Excuse me, don't share any information about our communications.

THE WITNESS:  Okay.

MS. CALAFIORE HEALY:  Thank you.

A.   I understood your question if I was writing something else.

Q.   No, no.  Did you write, physically write your declaration?

A.   No, I didn't.  Yeah.

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

Q.  You read it before you signed it?

A.  Yes.  Many times.

Q.  Make corrections?

A.  Yes, I did.

Q.  How many times did you have corrections to make?

A.  I don't recall.

Q.  Have you read -- you read the transcript of Mr. Roman?

A.  Yes, I did.

Q.  His deposition?

A.  Yes, I did.

Q.  How long did you spend doing that?

A.  Probably a few hours.

Q.  Did you watch the videotape?

MS. CALAFIORE HEALY:  What videotape?  Objection.  Calls for speculation.  Can you identify which videotape?

MR. WALLERSTEIN:  Of his.

Q.  Did you watch any videotapes related to this case?

A.  No, I didn't.  Yeah.

Q.  Did you read any other documents that have been filed in this case?

A.  Not that I recall of.

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

Q.  You didn't read any declarations from my client?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

A.  No.  I don't think so.

Q.  Are you aware of the allegations that Loop AI has made against my client?

A.  I am vaguely aware.

Q.  They say that we did bad things to Loop.  Right?

MS. CALAFIORE HEALY:  Objection.

A.  I don't know the details.

MS. CALAFIORE HEALY:  Objection. Misstates the record.

Q.  Do you care?

A.  I care about my personal professional, and my serious commitment to Loop AI as an adviser.

Q.  You wouldn't want Loop AI to make false allegations about another company, would you?

A.  Of course not.  Yeah.

Q.  You wouldn't want to be associated with that, would you?

A.  I wouldn't be.

Q.  Well, don't you think you might want to

**Roberto Pieraccini**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

find out what the allegations are and whether they're true?

A.   I'm not -- that's not my business.  I trust the company I am an adviser for.  I trust the people I know, because I know Patrick Ehlen is a friend of mine.  I've known him for a long time, so I trust that he's in good faith.

Q.   People can be in good faith and still be wrong, though.  Right?

A.   Yeah.  I don't have the time to go and do research whether they're right or wrong.  So the only thing that I know is, I trust people.  Yeah.  It's your job to determine whether right or wrong.  Not mine.

Q.   Wow.  Do you know if Loop has ever completed a Series A funding?

A.   No.  I don't know.

Q.   You don't know one way or the other?

A.   I don't know.

Q.   What's the most amount of money that anyone has ever invested into Loop?

A.   I have no idea.

Q.   Has Loop ever tried to get investments?

A.   If they are -- I can infer if they're alive, they probably did.  Yeah.

Roberto Pieraccini                              Loop AI Labs, Inc. vs. Gatti, et al.

Q.  Do you know why they weren't able to?

A.  I have no idea.

MS. CALAFIORE HEALY:  Objection.

Q.  Do you care?

MS. CALAFIORE HEALY:  Excuse me. Objection.  Misstates the witness's testimony.

MR. WALLERSTEIN:  It was a question.  I don't know how on earth it might misstate anything.

BY MR. WALLERSTEIN:

Q.  Do you know why Loop was not able to?

A.  No, I don't.

Q.  Do you care?

A.  No.

Q.  Okay.  Do you think my clients hurt Loop in any way?

A.  I don't know.

MS. CALAFIORE HEALY:  Objection.  Calls for speculation.

Q.  You don't know?

A.  (Witness nodded.)

Q.  Is that what you said?

A.  Yeah.  I don't know.  Yeah.

Q.  But you submitted a declaration about Mr. Roman in this case.  Right?

Roberto Pieraccini                                    Loop AI Labs, Inc. vs. Gatti, et al.

A.   That was uniquely a technical declaration.

Q.   Do you know what the purpose of it was?

MS. CALAFIORE HEALY:  Objection.  Calls for speculation and calls for attorney-client privileged information.

A.   I don't.

Q.   Do you know if that declaration was filed with the court?

A.   Yeah.

Q.   You do know that?

A.   (Witness nodded.)

Q.   And do you know, but you don't know why?

A.   I think it was related to this case.

Q.   Right.

A.   I don't know why.  I am not following the case.  I don't have the luxury or the time to follow this case.

Q.   You had the luxury of the time to do a long declaration.

A.   Well, I am an adviser, and I committed to two hours every month.  So I spent three or four hours, which I didn't spend before.  It's okay.

Q.   Did Loop tell you you were contractually obligated to do what you did?

A.   No.

Q.   Do you intend to testify at the trial?

A.   I hope not.  As I told you, I would like this to be it.  I am not involved in this case.  I am an adviser to the company.  I advise on technical matters.

Q.   Well --

A.   And that's it.  Yup.

Q.   Your declaration was over 13, it went on to 14 pages.  Right?

A.   Mm-hmm.  A big part of it is about my biography.

Q.   Did you read Mr. Roman's expert report that he submitted?

A.   I read the parts of it that concerned to my expertise.

Q.   How long did you spend doing that?

MS. CALAFIORE HEALY:  Objection.

A.   I answered already the question.

Q.   No, I don't believe so.

A.   A couple of hours.  A few hours.

Q.   Well, okay.  So let me be clear.  He submitted an expert report --

A.  Mm-hmm.

Q.  -- and he had his deposition taken, which resulted in a transcript of the deposition.

A.  Right.

Q.  In total, how much time did you spend reviewing both of those documents?

A.  A few hours.

Q.  A few hours, total?

A.  Yeah.

Q.  And then you spent how much time working on your declaration?

MS. CALAFIORE HEALY:  Objection.  Asked and answered.

A.  Again.

MS. CALAFIORE HEALY:  Asked and answered.

MR. WALLERSTEIN:  It's just meaningless noise.  Go ahead.

A.  A few hours.

Q.  Okay.  So, in total, you've spent six, seven hours?

A.  That's possible.  Yeah.

MR. WALLERSTEIN:  I have no questions. That's all.  Can we go off the record?

MS. CALAFIORE HEALY:  You're done?

Roberto Pieraccini                                          Loop AI Labs, Inc. vs. Gatti, et al.

MR. WALLERSTEIN:  Yeah.  I'm trying to go off the record.

MS. CALAFIORE HEALY:  Done for the day or done with the questions?

MR. WALLERSTEIN:  I'm done for the day.

MS. CALAFIORE HEALY:  Okay.  Are we done?

(Discussion off the record.)

MS. CALAFIORE HEALY:  Excuse me, excuse me, take this down on the record. Mr. Wallerstein was just threatening the witness, and --

MR. WALLERSTEIN:  Not true.

MS. CALAFIORE HEALY:  Roberto, didn't he just tell you if they're making false accusations --

THE WITNESS:  Yeah.

MS. CALAFIORE HEALY:  -- he was threatening you?

MR. WALLERSTEIN:  No.

MS. CALAFIORE HEALY:  Yes, you were.

MR. WALLERSTEIN:  I'd like the deposition to be over.  Counsel, can you agree to that?

MS. CALAFIORE HEALY:  If you're going

Roberto Pieraccini                                     Loop AI Labs, Inc. vs. Gatti, et al.

to threaten him, do it on the record.

MR. WALLERSTEIN:  I'm not threatening anybody.  I want the deposition to be over.

MS. CALAFIORE HEALY:  Okay.  Then it's over.  You can leave.

MR. WALLERSTEIN:  Thank you.  Can you please go off the record.  Please.  Yes?

COURT REPORTER:  Yes.

MR. WALLERSTEIN:  Thank you.

(Deposition concluded at 11:36 a.m.)

**Roberto Pieraccini**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. Sambataro, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT ROBERTO PIERACCINI, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of July, 2016.

_____
JANET M. SAMBATARO
Notary Public

My Commission Expires:

July 16, 2021