# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOP AI LABS INC., | CASE NO.: 3:15-cv-00798-HSG |
| Plaintiff, | |
| v. | **DECLARATION OF VALERIA CALAFIORE HEALY IN SUPPORT OF LOOP AI LABS INC.'S AND ITS COUNSEL'S MOTION FOR RELIEF FROM NON-DISPOSITIVE PRETRIAL ORDER FINDING COUNSEL'S DEPOSITION CONDUCT SANCTIONABLE** |
| ANNA GATTI, et al, | |
| Defendants. | **[MAGISTRATE'S ORDER AT DKT. 884]** |
| | Action Filed: February 20, 2015 |
| | Trial Date: TBD |
| | Hon. Haywood S. Gilliam, Jr. |

I, Valeria Calafiore Healy, hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am an attorney duly admitted to practice law in the State of New York. I have been admitted *pro hac vice* by this Court as counsel for Plaintiff Loop AI Labs Inc. (the "Plaintiff" or "Loop AI") in this action.

2. I submit this Declaration pursuant to Civil Local Rules 7-2, 7-5 and 72-2 to address matters within my personal knowledge regarding the matters addressed by the Magistrate Judge assigned to this case in her Order filed at Docket 884 ("Order 884").

3. Pursuant to Civil Local Rule 7-5(b), I also provide below the basis for any statement I make based on my information or belief.

**EXHIBITS**

4. Attached hereto as **Exhibit A**, pages A-1 to A-433, are true and correct copies of each the excerpts of this Court's record listed in the Index to Exhibit A included at page A-1 of Exhibit A. Exhibit A at A-21 is a true and correct copy of a video clip in which I try to meet and confer with counsel for Almawave USA ("AW-USA"). Exhibit A at A-59 is a true and correct copy of a letter I received from AW-USA's counsel.

5. Attached hereto as **Exhibit B**, pages B-1 to B-75, are true and correct copies of excerpts of the four deposition transcripts cited by Magistrate in Order 884 in reference to my instructions not to answer during those depositions based on privilege. As set forth in the exhibit, lines have been place around the portions of the transcript cited by the Magistrate in Order 884. Covers separating the citations from Order 884 have also been inserted in the exhibit. Where necessary, some additional pages preceding or following the excerpt cited by the Magistrate have been included. Some excerpts have been redacted to protect highly-confidential information of Loop AI. Because the redacted text is not relevant to the issues being addressed with this motion, the redacted documents are not currently being submitted in unredacted form under seal, but can be submitted if they Court so directs.

6. Attached hereto as **Exhibit C**, pages C-1 to C-14, are true and correct copies of excerpts of Loop AI's Rule 30(b)(6) deposition transcripts cited by Magistrate in Order 884 in reference to my objection during that deposition based on the question(s) being outside the scope of the Rule 30(b)(6) notice. As set forth in the exhibit, lines have been place around the portions of the transcript cited by the Magistrate in Order 884. Covers separating the citations from Order 884 have also been inserted in the exhibit.

7. Attached hereto as **Exhibit D**, pages D-1 to D-10, are true and correct copies of excerpts of the deposition transcripts cited by Magistrate in Order 884 in reference to my instructions not to answer a questions for reasons other than privilege. As set forth in the exhibit, lines have been place around the portions of the transcript cited by the Magistrate in Order 884. Covers separating the citations from Order 884 have also been inserted in the exhibit.

8. Attached hereto as **Exhibit E**, pages E-1 to E-82, are true and correct copies of excerpts of the deposition transcripts cited by Magistrate in Order 884 in reference to those objections that she categorizes as "speaking objections" or "coaching." Where necessary, some additional pages preceding or following the excerpt cited by the Magistrate have been included. Some excerpts have been redacted to protect highly-confidential information of Loop AI. As set forth in the exhibit, lines have been place around the portions of the transcript cited by the Magistrate in Order 884. Covers separating the citations from Order 884 have also been inserted in the exhibit.

9. Attached hereto as **Exhibit F**, pages F-1 to F-468, are true and correct copies of excerpts of the transcripts of each jurisdictional depositions I attempted to take in January 2016, including excerpts of the jurisdictional depositions of Almaviva employees Mariantonietta Perri, Valeria Sandei, Angela Nicolella, and Anna Gatti. The excerpts have been grouped by the categories of objections and interruptions by defense counsel. An Index to Exhibit F is set forth at F-1. Lines have been place around the portions of the transcript containing the relevant objection and/or interruptions. I have submitted excerpts of each of the Almaviva employees' jurisdictional depositions to the Magistrate on numerous occasions in connection with my attempt to obtain relief regarding defense counsel's conduct during those depositions. True and

correct copies of my requests submitted to the Magistrate are contained in the record at Dockets 448, 448-1 (summarily denied by Order at Docket 455), 591 and 591-1, (summarily denied by Order at Docket 647). I also have brought the issue to the District Court's attention in other filings.

10. Attached hereto as **Exhibit G** are true and correct copies of other excerpts of depositions addressed in this Declaration.

11. Attached hereto as **Exhibit H** are true and correct copies of another excerpt of a deposition addressed in this Declaration and correspondence with the court-reporting agency that transcribed the depositions addressed in Order 884.

## EXHIBIT CITATIONS

12. References to each of the foregoing exhibits herein is to the Exhibit letter and the page number of the exhibit (i.e., **A-___)**.

## MAGISTRATE'S ORDER 884

13. In Order 884 dated August 25, 2016, the Magistrate states that I engaged in "misconduct" and "improper conduct" based on portions of four deposition transcripts she cites in Order 884. Dkt. 884.

14. Order 884 was issued in response to an administrative motion and a 3-page letter brief brought by Almawave USA Inc. ("Almawave USA" or "AW-USA") filed at Docket 858. *See* A-34. Almawave USA did not seek sanctions against me in that motion or in the preceding Administrative Motion filed at Dkt. 610. *See* A-13.

15. Before the issuance of Order 884, I was not aware that the Magistrate was planning to publicly reprimand me, state that I engage in "misconduct" and appear to recommend that I be sanctioned. As a result, I had no opportunity to address any of the matters addressed in Order 884 before Order 884 was issued and do so now.

16. As more fully set forth below, I have acted at all times in good faith, exercised my good faith professional judgment in respect of all the matters addressed by the Magistrate in Order 884, and believe my conduct during the course of the depositions addressed that the

Magistrate impugns was substantially justified and harmless. I provide the basis for my belief below.

17. In the first part of this Declaration I address the facts relating the deposition conduct addressed by the Magistrate in Order 884 and explain why in my good faith professional judgment the Magistrate mischaracterized the record or misunderstood the conduct she cited in Order 884. In the second portion of this Declaration I describe how the Magistrate's analysis and treatment of substantially similar deposition conduct has been inconsistent – the Magistrate has found substantially identical conduct by defense counsel in this case not to be improper or sanctionable. In the third part of this Declaration I set forth the facts within my personal knowledge regarding other statements of the Magistrate in Order 884.

**LOOP AI'S DEPOSITIONS ADDRESSED BY THE
MAGISTRATE IN ORDER 884**

18. Order 884 addresses the following four depositions (the "Deposition at Issue"): (1) the deposition of Dr. Peintner, the Chief Technical Officer of Loop AI noticed by AW-USA and taken on March 29, 2016 (the "Peintner Deposition" or "Dep."), (2) the deposition of Dr. Ehlen, the Chief Scientist of Loop AI noticed by AW-USA and taken on April 6, 2016 (the "Ehlen Deposition" or "Dep."), (3) the second deposition of Mr. Calafiore, Loop AI's CEO, that the Magistrate allowed AW-USA to take as a sanction in an order issued on February 29, 2016 by the Magistrate without notice to Loop AI, without briefing, and without any opportunity to be heard (the "Calafiore Deposition" or "Dep."), (4) the Rule 30(b)(6) deposition of Loop AI noticed by AW-USA, for which Mr. Calafiore was produced again for this third deposition as Loop AI's corporate designee (the "Rule 30(b)(6) Deposition" or "Dep."). *See* A-434.

19. I was the attorney defending each of the foregoing deposition, as well as the first deposition of Loop AI's CEO which the Magistrate taken on January 25, 2016 (the "1st Calafiore Deposition"). The 1st Calafiore Deposition of January 25, 2016 lasted a total of 8 hours and 22 minutes; Mr. Calafiore' testified on the record for a total of approximately 6 hours and 50 minutes. The deposition ended after all defense counsel had completed their questioning and was not ended by me or Loop AI's CEO.

DECLARATION OF VCH

## LACK OF ACCURACY OF TRANSCRIPTS PREPARED BY
## APTUS REPORTING

20. The court reporting agency transcribing the four depositions, Aptus Reporting ("Aptus"), has been working for AW-USA's counsel throughout this case and have not acted in a neutral manner towards me or Loop AI's representatives. Every deposition Aptus has transcribed has been replete with material transcription errors many of which AW-USA has relied in its motions. For instance, in their first letter to the Magistrate resulting in the February 29, 2016 Order, AW-USA attributed to me a line of testimony in the transcript. In fact, I had never spoken the words attributed to me. I was only able to uncover the error because AW-USA relied on it in its motion and because I had my own video of that portion of the deposition. Attached hereto at Exhibit H-3 is a true and correct copy of Aptus' admission that their transcript was inaccurate.

21. After the four depositions addressed in Order 884 were taken, I repeatedly asked both Aptus and AW-USA's counsel to allow me to audit or inspect the deposition videos of Loop AI's witnesses so that we could verify the accuracy of the transcripts, but they have refused to allow us such inspection, unless we expend thousands of dollars to purchase the videos. Attached hereto at Exhibit H-7 is a true and correct copy of one my requests. Several other requests to this effect were made to AW-USA from April through today's date, where I reiterated my request during a telephonic meet and confer.

22. I have carefully reviewed the transcripts of each of the four depositions addressed in Order 884 and believe they are replete with transcriptions errors and misattribution of text. I base my belief on my review of these transcripts, which shows that numerous statements in there do not make sense and that numerous words are incorrect. For instance, attached hereto at H-___ is a true and correct copy of an excerpt of the Rule 30(b)(6) transcript, which attributes an entire page of testimony to Mr. Wallerstein. Without the ability to verify against the audio or video I am not able to represent with certainty the extent of the transcribing errors, but I believe the transcript are materially inaccurate.

23. Where we have been able to verify Aptus transcripts of depositions against the videos, they have been filled with material misstatements. Attached hereto as Exhibit H at H-4-5

3:15-CV-00798-HSG                                            Declaration of VCH

are copies of other correspondence regarding material errors in the deposition of Mr. Pieraccini, which we were able to verify because we had access to the audio and video.

**SUMMARY OF DEPOSITIONS AT ISSUE AND INFRACTIONS IDENTIFIED IN ORDER 884**

24.     I have carefully reviewed the transcripts of the Depositions at Issue and each of the alleged deposition infractions identified the Magistrate in Order 884. Dkt. 884 at 4-9 (the "Alleged Infractions").  Order 884 identifies two categories of infractions in the Depositions at Issue: (1) instructions not to answer, and (2) speaking objections.  *Id.*  Based on my review of each the foregoing transcripts and of Order 884, I have prepared an overview of the Depositions at Issue and the Alleged Infractions and am attaching this summary overview in a chart form at the end of this Declaration for reference ("Overview").

25.     As set forth in the Overview, Loop AI's witness have provided over 33 hours of testimony on the record, of which more than 27 hours was testimony on the record given during the Depositions at Issue.  *See* Overview at 1.  During the Depositions at Issue, the deponents responded to over 4,300 questions and their testimony spans over 1,300 pages.

26.     During each of the Depositions at Issue outside of the Magistrate's Order to allow AW-USA to redepose Mr. Calafiore on April 7, 2016 for five hours, the deponents voluntarily continued to testify for well over the 7 hours of time on the record required by the Federal Rules of Civil Procedure.  In addition, although defense counsel continued to try to prolong the deposition time unreasonably, we remained at the deposition venue, despite the numerous improper breaks that defense counsel continued to take, and did not abruptly end depositions as AW-USA's counsel as done with each of the jurisdictional depositions.

27.     Even though neither I, nor Loop AI, were given notice and an opportunity to be heard before the Magistrate issued the February 29, 2016 Order, I have taken the Magistrate's Order very seriously and have done the utmost to ensure my compliance with the Magistrate's Order.  For instance, in the Order issued on February 29, 2016 the Magistrate chastised me both for simply saying "objection" and for saying more than "objection."  In many jurisdictions, including mine, simply stating "objection" is an acceptable objection form and is viewed as

preserving all objections, unless opposing counsel asks for the basis of the objection. Because the Magistrate indicated I could not just use the word "objection" I have were necessary attempted to explain.

28. The Alleged Infractions identified by the Magistrate, cover a *de minimis* portion of the Depositions at Issue, approximately 1.18%. *See* Overview at 2.

29. I address each of the infractions identified in Order 884 below.

30. The excerpts of depositions transcripts identified in Order 884 have been grouped by category in **Exhibits B-E**.

**A. Order 884 - Instructions Not To Answer On Grounds Of Attorney-Client Privilege And/Or Attorney Work-Product.**

31. The Magistrate cites Peintner Deposition at 92 ("Did you discuss [the first amended complaint or the second amended complaint] with Mr. Calafiore before they were filed?"), as one of the questions on which I allegedly improperly asserted privilege over "questions seeking factual bases of Plaintiff's claims." Dkt. 822 at 7:19-24. The Magistrate also cites page 93 of the same Peintner Deposition for the same reasons. *Id.* at 24. A true and correct copy of these deposition excerpts is attached hereto at Exhibit B-1 to B-3.

32. The depositions excerpts show that the questions which Order 884 characterizes as "factual bases" were not actually addressed to factual bases of Loop AI's claims. *See id.*

33. I instructed Dr. Peintner not to answer the question quoted by the Magistrate, and a similar question on page 93 ("do you know anyone at Loop [AI] that ever read the first or second Amended Complaint before it was filed?"), because in my good faith professional judgment these questions called for attorney work-product and privileged information of Loop AI, regarding the filing of amended complaints in this case. *See id.* A review of the transcript shows that Dr. Peintner answered questions whether he personally "read" the initial complaint before it was filed or read the additional complaints, *see* B-2-3 at 92:5-16 and 93, where those specific questions did not call for information that I believe in my good faith professional judgment to be protected from disclosure.

34. Although the Magistrate accuses me of impeding responses to these questions and therefore impeding discovery as to the "factual bases of Loop AI's claims," I asserted work-product

and privilege in good faith. I also do not believe that these questions sought information regarding any of the factual bases for Loop AI's claims. I base my belief on the fact that whether Dr. Peintner discussed any of the complaints filed in this action with Mr. Calafiore, the CEO of Loop AI, or whether Dr. Peintner knew if anyone at Loop AI had read the complaints is not at issue in any claim or defense and would not make any claim or defense more or less true. I believe that AW-US's defense against Loop AI's claims has in no way been impeded or harmed by not knowing this information.

35. The Magistrate had never addressed our claim of privilege and work-product over this question and had never overruled it.

36. The Magistrate cites page 10 of Dr. Peintner's deposition as the next improper instruction by me. Order 884 at 7:26, B-4 to B-6. Page 10 reflects that I instructed Dr. Peintner not to answer on privilege grounds the following question: "Have you spoken to Gianmauro about his deposition?" *See* B-5 at 10:12-18. As the transcript indicates, I instructed the witness not to answer this question only "to the extent" the question called for communications about this litigation – specifically communications regarding the deposition of Loop AI's CEO – which I believe to be protected from disclosure by privilege and work-product. The witness did not have any non-protected information to disclose and refused to answer.

37. I believe my instruction was appropriate and consistent with innumerable identical instructions of this type that Mr. Wallerstein has given during the few jurisdictional depositions we were allowed to take in this case. *See, e.g.* Exhibit F at F-86, F-2 to F-86.

38. Also on page 10, when Dr. Peintner was asked whether he had "read the transcript of Mr. Calafiore's deposition," Dr. Peintner proceeded to answer following my privilege and work-product objection. *See* B-5 at 10:21-22, 11. I objected to this question to the extent it called for something that the witness did at the request of counsel, which I believe in my good faith professional judgment to be protected from disclosure under both the work-product immunity and the attorney client privilege. Dr. Peintner answered the question to the extent of information he had that was not protected. *See id.* Particularly since Dr. Peintner answered the question, I do not understand how my objection could have been improper.

    

39. In my good faith professional judgment I do not believe that by invoking privilege and attorney-work product in response to these questions, I contravened the teachings of *Upjohn Co. v. United States*, 449 U.S. 383 (1981), or the Federal Rules, or impeded in any way discovery of any "underlying fact," as the Magistrate asserts. Dkt. 884 at 8:1-4. I believe that the type of intra-corporate communications sought by Mr. Wallerstein here are protected from disclosure under *Upjohn* and its progeny, as well as under the Federal Rules.

40. The Magistrate finds that my invocation of privilege "appears to rest on a misunderstanding of what attorney-client privilege protects." Dkt. 884 at 8:14-16. Although it is not possible to know at this stage whether a reviewing court will agree with the Magistrate's statement, my invocation of work-product and privilege was based on my good faith professional judgment that the question called for protected information.

41. I also do not believe that whether Dr. Peintner spoke to Loop AI's CEO about his deposition is a "fact underlying" any of Loop AI's claims in this case. I believe that AW-US's defense against Loop AI's claims has in no way been impeded or harmed by not knowing this information.

42. The Magistrate cites the entirety of page 72 of Dr. Peintner's deposition as an improper instruction. Dkt. 884 at 7:26; B-7 to B-9.

43. Page 71 of the transcript shows that Dr. Peintner was asked about his opinion on whether Mr. Wallerstein's "clients did anything to impede" a potential investment. B-8 at 71. The transcript shows that Dr. Peintner answered the question. *Id.* at 71-72. Dr. Peintner was then asked about his conversations with Loop AI's CEO regarding Mr. Wallerstein's clients – the Almaviva Defendants. I instructed the witness not to answer this question because in my good faith professional judgment this question called for work-product and attorney-client privilege information. *See* Exhibit F at F-2 to F-91. Mr. Wallerstein, in particular, has taken a very broad view of privilege and work product, covering essentially every conceivable intra-corporate and corporate-third party agents communication. *See, e.g., id.* and Exhibit A at A-67.

44. I believe the question above identified by the Magistrate as an alleged infraction did not seek information regarding any "underlying facts" of Loop AI's claims. I base my belief on the

3:15-CV-00798-HSG                                                    DECLARATION OF VCH

fact that Dr. Peintner's discussions with Loop AI's CEO about the litigation are not at issue in any claim or defense. I believe that AW-US's defense against Loop AI's claims has in no way been impeded or harmed by not knowing this information.

45. The Magistrate cites the entirety of page 92 of Dr. Peintner's deposition as an improper instruction. Dkt. 884 at 7:26. Page 92 is the same page of Dr. Peintner's transcript that the Magistrate identified as objectionable at page 7, lines 22-24 of Order 884. I have already discussed this portion of the transcript in my discussion of Exhibit B at B-2, which I incorporate here by reference.

46. The Magistrate cites the entirety of pages 212-13 of Dr. Peintner's deposition as an improper instruction. Dkt. 884 at 7:26; B-19 to B-20.

47. Pages 212 and 213 of Dr. Peintner's deposition, B-19 to B-20, show that Mr. Wallerstein asked him whether Dr. Peintner "talk[ed]" to Mr. Viqar Shariff "ever about the litigation, this litigation?" *Id.* at 212:10-11. Pages 212 and 213 contain four similar iterations of the same question:

- "Did Mr. Calafiore, to your knowledge, ever talk to Mr. Shariff about this litigation?"
- "Did Mr. [sic] [Dr.] Ehlen, to your knowledge, ever talk to Mr. Shariff about this litigation?"
- "Okay. Did Mr. Shariff ever opine on how this -- to you on how this litigation would affect Loop [AI]'s ability to raise further capital?"
- "Did Mr. Shariff ever opine to Mr. Calafiore, as far as you know, as to how this litigation would affect Loop [AI]'s ability to raise capital?"

48. I instructed the witness not to answer these questions because in my good faith professional judgment this question called for work-product and attorney-client privilege information about the company's intracorporate communications regarding this litigation with one of its advisors. As Dr. Peintner testified, Mr. Sharif is a member of Loop AI's Board of Advisors. Mr. Shariff is also an attorney. I know that he is an attorney, because he was my colleague for several years while we both were working for the Clifford Chance law firm, where Mr. Sharif was a partner in its Corporate group.

49. In my Declaration dated August 4, 2016 filed at Dkt. 868, *see* Exhibit A at A-43, I explained to the Magistrate that Mr. Sharif is an attorney and a member of Loop AI's Board of Advisors.

50. In addition to my good faith belief that these questions called for disclosure of protected information, I believe the questions do not relate to anything that could be viewed as relevant to the claims or defenses in this action or calling for the "underlying facts" of the case. I believe these questions were asked for improper purposes, in an attempt to persuade Loop AI not to pursue this case to trial.

51. The portions of the transcript cited by the Magistrate also show that Dr. Peintner was asked extensively about his communications with Mr. Sharif, and that where those communications did not relate to the "litigation," Dr. Peintner answered every question asked. *See, e.g.,* B-20-21.

52. The Magistrate cites the entirety of pages 226-227 of Dr. Peintner's deposition as an improper instruction. Dkt. 884 at 8:1; B-23 to B-24.

53. The only instruction not to answer contained on page 226 relates to the following question: "Have you discussed with Mr. Calafiore the business impact a public trial in this litigation could have?" Exhibit 39 at 226:17-19.

54. I instructed the witness not to answer this question because in my good faith professional judgment this question called for work-product and attorney-client privilege information about the company's intracorporate communications regarding this litigation.

55. In addition to my good faith belief that this question called for disclosure of protected information, I believe the foregoing question does not seek any "underlying fact" or anything that even could be viewed as relating to the claims or defenses in this action. I viewed this question as calling directly for Loop AI's legal strategy.

56. The three questions that appear on page 227 are similar to the question asked on page 226 in that they also seek information about Loop AI's analysis of "how a public trial in this litigation would affect" Loop AI. B-24.

57. I instructed the witness not to answer these questions because in my good faith professional judgment this question called for work-product and attorney-client privilege information

11

about the company's intracorporate communications regarding this litigation. For the reasons already outlined above in reference to Exhibit 39, I viewed these question as calling directly for Loop AI's legal strategy in this litigation, and I do not believe the foregoing question seek any "underlying fact" or information that could even remotely be viewed as relating to the claims or defenses in this action.

58. I believe that AW-US's defense against Loop AI's claims has in no way been impeded or harmed by not knowing the information sought by the foregoing questions.

59. The Magistrate cites the entirety of pages 161-62 of Loop AI''s 30(b)(6) deposition as an improper instruction. Dkt. 884 at 8:1; Exhibit B at B-25-27.

60. The portion of the transcript cited shows that the witness was being asked for information regarding Loop AI's preparations undertaken in connection with this litigation: "Sir, to prepare for today's preparation as Loop [AI]'s corporate representative, did you ask Mr. [sic, Dr.] Ehlen if he knew what documents Loop [AI] provided to" an investment fund? B-26 at 161:19-22.

61. This question directly called for intra-corporate communications regarding this litigation, which I in good faith believed (and believe) to be covered by the attorney work-product and attorney client privilege. Because the witness was being deposed as a Rule 30(b)(6) representative, Mr. Wallerstein could have simply asked the witness "what documents did Loop AI provide to investment fund xxx?" In my good faith professional judgment, a question posed in this terms would have been appropriate, but a question calling directly for my client's communications regarding the preparation for the deposition in this litigation, which was done with counsel, I believe was inappropriate.

62. I do not believe that my good faith instruction to the witness not to answer the foregoing question in any way impeded the discovery of any "underlying fact." I am personally familiar with all the discovery conducted by AW-USA in this case, and am aware that AW-USA obtained extensive documentary and deposition testimony from each of Loop AI's witnesses and from nonparties (including through multiple subpoenas) about the documents provided by Loop AI to the investment fund in question.

63. In addition, Almawave USA took an 8-hour deposition of Dr. Ehlen and could have (and did ask) extensive questions about everything Dr. Ehlen knew regarding the documents given to the investment fund in question. There is no allegation that Dr. Ehlen refused to testify as to what he knew regarding the documents provided to the investment fund at issue.

64. The Magistrate cites the entirety of pages 192-93, 194-195, 197-198 of Loop AI"s 30(b)(6) deposition as an improper instruction. Dkt. 884 at 8:1; Exhibit B at B-28 to B-35.

65. The portions of the transcript cited by the Magistrate shows that the witness was being asked for information regarding what Loop AI's witness "did to prepare" for the deposition. B-29 at 192:12-13. Mr. Wallerstein asked: "Did you speak to Mr. [sic, Dr.] Peintner about whether any of Loop [AI]'s current employees, as of today, worked for other companies while they were Loop [AI's] employees?" *Id.* at 192:20-23. *See also id.* at 193-198.

66. I objected to the foregoing question in good faith and only instructed the witness not to answer to the extent the communications involved preparation for the deposition undertaken at the direction of counsel. *Id.* at 192:24-25-193:1. I believe the information sought by the question called for protected information within the teachings of *Upjohn* and its progeny. As the witness testified "the conversation we had related to this preparation were done with counsel." B-35 at 198:13-15.

67. The portions of the deposition cited show that opposing counsel and I had a disagreement regarding the scope of what the privilege and work-product covered relating to the witness' preparation for deposition. As I advised Mr. Wallerstein, the witness would not be permitted "to reveal attorney-client privilege and work product information," to which Mr. Wallerstein said "Okay. And we obviously have a disagreement as to what that encompasses." B-33 at 196.

68. Although Mr. Wallerstein said he disagreed with my interpretation of the scope of the privilege and work-product protection over deposition preparation, he never brought that issue before the Magistrate and this issue was never resolved by the Magistrate.

69. My instruction, only covered litigation communications regarding the preparation for the deposition and not any underlying facts relevant to the case. I am personally familiar with all the discovery conducted by Almawave USA in this case, and am aware that Almawave USA obtained extensive documentary discovery and deposition testimony from each of Loop AI's witnesses and from nonparties (including through multiple subpoenas) about the second part of his question above, even though whether current Loop AI employees work for other companies is not relevant to any claim or defense in this action.

70. I also believe my objection and instruction based on privilege and work-product is consistent with virtually identical instructions given by Mr. Wallerstein and other counsel to other deponents in this case. *See* Exhibit F at F-2 to F-86.

71. The Magistrate cites the following as improper instructions not to answer: pages 183, 185-187 of Dr. Peintner's deposition; pages 33-34 and 102 of Dr. Ehlen's deposition; pages 444-48, 527 and 534 of Mr. Calafiore's deposition; pages 405-406 of Loop AI's 30(b)(6). Dkt. 884 at 8:10-22; Exhibit B at B-37 to B-71.

72. Page 183, summarized and quoted in part by the Magistrate, *see* Order 884 at 7-12, shows that Dr. Peintner refused to answer solely insofar as he was being asked to reveal what I may have asked him to do for the litigation: "I won't answer about something my attorney has required me to recollect." *See* B-37 at 183. Virtually identical questions were asked in the other cited portions of the transcripts. B-37 to B-44.

73. I objected to allowing Loop AI's employees to disclose what I may have asked them to do in connection with this litigation in good faith. I believe that the questions being posed called for information protected both by privilege and by work-product, and that my instruction is consistent with the teachings of *Upjohn* and its progeny. Mr. Wallerstein has given similar instructions to various witnesses. *See* Exhibit F at F-91 to F-125.

74. As page 184 shows, I explained to Mr. Wallerstein that everything the witnesses did in this litigation was at my direction or the collection of documents for the litigation was managed by counsel. *See* B-38 at 184; B-62 at 444:10-12 ("So, all the documents produced in the litigation was managed by our – the company attorney…"); 444:11-23 ("All I did for this

3:15-CV-00798-HSG                                                    DECLARATION OF VCH

litigation was at the direction of counsel…"); B-63 at 445:18-21 ("all I did for the investigation was at the direction of counsel, and so I cannot answer to this question because the information is privileged.").

75. When Mr. Wallerstein filed AW-USA's administrative motion for leave about these depositions on April 19, 2016, he never challenged, raised or addressed in any fashion in his Motion my assertion of privilege and work-product. *See* Exhibit A at A-13. Until the Magistrate issued Order 884 on August 25, 2016, I had no reason to believe that the Magistrate would find my invocation of privilege and work-product improper, because I did not understand that issue to be before her.

76. My objection to refusing to disclose information regarding things the witness may have done for the litigation at my direction is also consistent with Mr. Wallerstein's numerous and much broader privilege objections. *See* Exhibit F at F-2 to F-125.

77. Page 102 of Dr. Ehlen's deposition, also cited by the Magistrate, shows that I instructed Dr. Ehlen not to answer a question that I believed in good faith called for privileged and work-product information, specifically what the witness did "to prepare the declaration." B-52 at 102. The instruction was limited to the "preparation work" for a court filing, and the witness testified extensively about the contents of his declaration. The second objection I made and that is reflected on page 102 was appropriate, as Ms. Culp had misread a portion of a document into the record. *See id.* at 102:19-103:2. Thereafter, Ms. Culp obtained extensive testimony from Dr. Ehlen, who testified on the record for well over 7 hours. *See* Overview.

**B. Order 884 - Instructions Not To Answer As Outside Rule 30(b)(6) Notice.**

78. The Magistrate cites pages 229-30, 273-74 and 356 as "improper" instructions not to answer as "outside the scope of the noticed Rule 30(b)(6) topics." Dkt. 884 at 5:1-2; Exhibit C at C-1 to C-14.

79. Pages 229-230 show that Loop AI's Rule 30(b)(6) witness, who was Loop AI's CEO, was asked whether he had "ever spoken to Charles Ferguson." C-2 to C-3 at 229-30.

80. I instructed the witness not to answer the above question because this question was outside the scope of the Rule 30(b)(6) Notice, which did not contain any topic in any way

relating to Mr. Ferguson. I gave this instruction based on my good faith professional opinion that the deposition of Mr. Calafiore on April 8, 2016 as a Rule 30(b)(6) designee for Loop AI was limited to the 59 topics identified in Almawave USA's Rule 30(b)(6) deposition notice.

81. I based my instruction also on the fact that Mr. Calafiore had already been deposed in his personal capacity twice for a total of over 11 hours on the record. I believed it was reasonable to assume that the reason the Magistrate ordered that another and separate day of deposition of Loop AI's CEO was required to provide Loop AI's testimony about the matters contained in the Rule 30(b)(6) Notice.

82. Although the Magistrate finds that my instruction was unambiguously improper, the case law cited by the Magistrate indicates that the question of whether a Rule 30(b)(6) deposition is limited to the topics listed in the Rule 30(b)(6) Notice is not settled and that courts have found both ways. I am familiar with the authorities on this topic and in my professional opinion when the witness in question already has been deposed in his personal capacity twice in the preceding weeks, a Rule 30(b)(6) deposition cannot be used as a means to circumvent the time limitations that otherwise apply to testimony a witness can be required to provide in his personal capacity. I believed in good faith that the scope of the Rule 30(b)(6) deposition properly should be limited to topics covered by the Rule 30(b)(6) Notice, which I understood to be the reason why the Magistrate ordered an additional day of deposition to cover the Rule 30(b)(6) aside and apart from the depositions of Mr. Calafiore, Dr. Peintner and Dr. Ehlen.

83. Prior to receiving Order 884 on August 25, 2016, the Magistrate had never ruled on the issue of whether Mr. Calafiore could be required to testify again in his personal capacity at his Rule 30(b)(6) deposition, even though he had already given over 14 hours of testimony in his personal capacity. *See* Overview.

84. Pages 273-74 of the Rule 30(b)(6) deposition transcript show that the witness was instructed not to answer the following question: "Are you aware of the communications that Ms. Healy had – this is a yes-or-no question to start. Are you aware of the communications that Ms. Healy had with Mr. Ficano relating to Almawave or IQSystem or Tony Di Napoli?" C-5 to C-6 at 273:20-24.

85. The transcript shows that I instructed the witness not to answer this question because it "call[ed] for attorney-client privilege and attorney-work product" information. *Id.* at 274:9-10.

86. I made this instruction in good faith because the question specifically asked about what I relayed to Loop AI about my investigation in connection with this litigation. I believe my instruction was appropriate and justified because the question on its face asked for protected information regarding what I did in connection with this litigation.

87. In addition, Mr. Wallerstein's interpretation of privilege and work-product has been much broader than mine. For instance, when I inquired during the jurisdictional depositions about communications between Mr. Ficano, who is Tony DiNapoli's former employer, and the Almaviva Defendants, the jurisdictional deponents were instructed not to answer. *See* Exhibit F at F-80, F-84-85.

88. Page 356 of the Rule 30(b)(6) deposition transcript shows that the witness was instructed not to answer the following question as outside the scope of the Rule 30(b)(6) Notice: "What is Loop [AI]'s board of advisors?" C-8 at 356:6-7.

89. I gave this instruction in good faith for the same reasons identified above – I believed it was appropriate to limit the third deposition of a witness, who is appearing as a Rule 30(b)(6) witness to testify solely about noticed deposition topics.

90. In any event, the witness ignored my instruction and proceeded to testify at length in response to this question. *Id.* at 357-362.

**C. Order 884 - Instructions Not To Answer Based on Other.**

91. The Magistrate cites pages 94-96 of Dr. Ehlen's deposition and page 40 of Dr. Peintner's deposition as "other improper instructions not to answer questions." Dkt. 884 at 5:14, 5:15-25; Exhibit D at D-1 to D-10.

92. In respect of pages 94-96 of Dr. Ehlen's deposition, Order 884 states that after instructing the witness not to disclose how Loop AI's algorithms work, I was asked "to stipulate that the subject matter would not be raised by Plaintiff at trial (i.e., that the matter was truly

irrelevant)" and that I "refused, stating such a request was 'absolutely absurd.'" Dkt. 884 at 5:14-19.

93.     The Magistrate's characterization of events is incorrect.  Because this question was not raised by Almawave USA in any of its briefs, I did not have an opportunity to address it and the Magistrate appears to have overlooked several pages in the transcript which show that I already had agreed on the record to the lack of relevance of the algorithms and that the stipulation requested was not the one described by the magistrate in Order 884.  *See* D-2 to D-6.

94.     When Dr. Ehlen was asked "can you tell us how your particular algorithms work" I instructed him not to answer and stated expressly: "**the specifics of the algorithm are not at issue in this case**."  D-3 at 94:19-20 (emphasis added).  When the question was repeated, I repeated: "No.  **The algorithm is not at issue** --"  *Id.* at 95:4-5 (emphasis added).  I proceeded to explain on the record:

> "*the functioning of the algorithm is not at issue in this case*.  What's at issue in this case is what Ms. Gatti and your clients have taken, which is not the algorithm.  So that's proprietary information that's not at issue in this case, and I'm instructing the witness not to answer.  And we -- if necessary, we'll seek a protective order.
>
> MS. BRAYER: So, is counsel stipulating on the record right now that there is no issue in this case regarding algorithms?
>
> MS. HEALY:· We have always -- *we have never said that the algorithm was at issue in this case*.  We've said that the technical codes that are the step before the algorithm is what is at issue.· We've provided you the documents.  The documents are also referenced in many of the declarations. But the algorithm has never been identified as a trade secret that's at issue in the case.

*Id.* at 95:8-96:3 (emphasis added).

95.     I instructed the witness not to answer this question based on my good faith professional judgment that Loop AI was entitled to protect from disclosure highly confidential information that is not at issue in this case.   The case the Magistrate raised *sua sponte* in Order

3:15-CV-00798-HSG                                                                    DECLARATION OF VCH

884, substantially justifies my instruction and specifically recognizes a litigant's right to protect its confidential information from disclosure.

96. The transcript shows that I repeatedly confirmed, on the record, that the functioning of the algorithm is not at issue in the case. *See* D-2- to D-6. The stipulation I rejected as "absolutely absurd" was a very different stipulation from the one described by the Magistrate. The stipulation I rejected was to the effect that Loop AI does not "maintain" its "algorithms" as "trade secrets." *See* D-5 at 96:16-20. Based on my numerous discussions with defense counsel about this topic, I understood Ms. Brayer to ask me to stipulate that Loop AI does not consider its algorithms to be trade secrets. Indeed, this is the exact argument that the Almaviva Defendants have made in their motion to strike, where they falsely claimed that "when asked at deposition to identify the trade secrets at issue, Loop [AI]'s attorney stated that Loop [AI] is not claiming that the AI algorithm is a trade secret." Dkt. 738 at 4:15-17.

97. These statements reflect an attempt by the Defendants in this case to conflate two separate issues: (1) are Loop AI's algorithms among the trade secrets Loop AI claims were stolen by the Defendants; and (2) does Loop AI maintain its algorithms (along with its other proprietary technology) as trade secrets. Simply because Loop AI has not claimed its algorithms to be among the trade secrets taken, it does not follow that Loop AI does not maintain its algorithms as trade secrets, which Loop AI very much does. This is the basis for my rejection of Ms. Brayer's offer, which I believe I was substantially justified in making.

98. In respect of page 40 of Dr. Peintner's deposition, Order 884 states that I improperly instructed Dr. Peintner not to answer a question about Loop AI's shareholders on relevance grounds, "asserting that the court had 'excluded the topic of stock ownership in Loop from the allowable topics." Dkt. 884 at 5:19-25. Although the Magistrate recognizes that she previously issued a ruling that Loop AI did not need to produce a witness to testify on "the subject of ownership of Loop stock," "the court had not made a broad ruling that the subject was entirely out of bounds." *Id.*

99. The Magistrate's characterization of events in Order 884 is not accurate. Dr. Peintner was asked the question identified by the Magistrate in Order 884 twice: "who are the top three investors in" Loop AI?" D-8 to D-9 at 39:3-4 and 40:3-4. The first time Dr. Peintner

was asked the question, on page 39, **he answered it**: "I don't know who the top three are." D-8 at 39:16-17. The second time he was asked the identical question on page 40, I instructed him not to answer. D-9 at 40:3-4. But Dr. Peintner had already answered the identical question that the Magistrate identified in the prior page. In addition to answering that question, Dr. Peintner answered several other questions around this topic, even though the topic is not relevant to any claim or defense in this case. For instance, Dr. Peintner was asked, who are "some of the top investors in" Loop AI? *Id.* 39:21. Dr. Peintner answered this question and provided at least three names that he remembered. *Id.* at 39:21-24.

100. When I instructed Dr. Peintner not to answer the question about Loop AI's stock ownership I relied on my good faith understanding of the Magistrate where she expressly found that the topic of stock ownership in Loop AI was not "relevant." *Id.* at 40:9-11. Although the Magistrate now states that the topic of Loop AI's stock ownership was permissible, her Order of March 10, 2016 entered at Dkt. 466 ("Order 466") stated as follows: "As to topic no. 34, which is 'ownership of Loop [AI] stock,' Almawave made no argument regarding relevance, and the relevance of this topic is not readily discernable. Therefore, Loop [AI]'s motion for a protective order as to topic no. 34 is granted." Dkt. 466 at 3:14-16 (A-63).

101. Although the Magistrate accused me of "misconduct," I had no way of knowing that the Magistrate's finding that the topic of Loop AI's "stock ownership" lacked relevance did not apply generally to the case, but that her relevance ruling and granting of a protective order on that topic was limited to the Rule 30(b)(6) deposition.

**D. Order 884 – Speaking Objections**

102. The Magistrate cites specific "speaking objections" in each of the Depositions at Issue. Dkt. 884 at 6; Exhibit E. I address these objections by category below.

103. **"Vague and Ambiguous"** – Page 28 of Dr. Peintner's deposition shows that Mr. Wallerstein asked the following question: "Does he do that in pitches?" E-28 at 28:13-18. I objected in good faith stating that the question was "vague and ambiguous" and asked "do what in pitches?" to explain why I believed the question to be vague and ambiguous. I endeavored in good faith to explain the basis for my objection. I had no reason to believe my objection was

improper because Mr. Wallerstein and other defense counsel have made hundreds of virtually identical objections. *See* Exhibit F at F-127 to F-192. Although I submitted excerpts of defense counsel's objections to Magistrate in the past, she has found no improprieties in the conduct of defense counsel.

104. The transcript also shows that my objection did not in any away affect Dr. Peintner's testimony, as he fully answered the questions asked by Mr. Wallerstein, even though those questions did not call for anything relevant to the claims and defenses in this case. E-2 to E-3 at 28-29.

105. **Page 43:19-23** of Dr. Peintner's deposition, E-4 to E-7, shows that I made the same "vague and ambiguous" objection and then explained the basis for my objection. Specifically, the witness was asked "is it true that, in June 2015, Loop [AI] first launched to the public?" E-5 at 43:19-23. I objected to the question as "vague and ambiguous" with respect to the term "launched." I made my objection in good faith to explain what I believed to be vague and ambiguous. Although the witness repeated my objection, the witness provided his testimony in response to the question asked: "If you would say that Loop [AI] launched its cognitive computing platform in June 2015, you would be accurate." E-7 at 45:1-3.

106. **Page 188:12-16** of Dr. Peintner's deposition, E-8 to E-9, shows another question in response to which I objected on the grounds that the question was "vague" and explained the basis for my objection ("Q. Did you ever think about having Loop [AI] purchased by another company?" Healy: "Objection; vague as to time period." Witness: "During which time period?"). I made my objection in good faith to explain the basis for my objection. Although the witness repeated my objection, his testimony was in no way affected or influenced by my objection, and as the transcript shows he proceeded to provide his answers. E-9 at 188.

107. I had no reason to believe my objection was improper because Mr. Wallerstein and other defense counsel have made hundreds of identical objections. *See* Exhibit F at F-127 to F-192.

3:15-CV-00798-HSG                                                    DECLARATION OF VCH

108. Pages 63:7-12 of Dr. Ehlen's deposition shows that I simply stated the words "vague and ambiguous" and nothing else. E-11. I made this objection in good faith. I don't understand why the Magistrate pointed to this objection as an improper speaking objection.

109. Pages 439:9-16 shows that I stated "vague and ambiguous" as to the term "salary." E-13. The witness asked for clarification of the time frame and then answered the question about his salary even though the information requested is entirely irrelevant to this case. E-14.

110. **"Misstates Witness's Testimony"** -- Page 205:16-21 of Dr. Peintner's deposition shows that I objected on the grounds that the question "misstate[d] prior testimony" and explained that the question was not "what the witness stated." E-16. I made this objection in good faith. I had no reason to believe my extremely brief objection was improper because Mr. Wallerstein and other defense counsel have made identical objections repeatedly. Exhibit F at F-327-362.

111. **Other speaking infractions** -- Page 40:21-25 of Dr. Peintner's deposition, E-39, shows that I objected to the question simply stating that the witness lacked personal knowledge and asking Mr. Wallerstein to repeat the question. As the transcript of Dr. Peintner's deposition shows, my objection identified by the Magistrate in no way coached the witness's testimony and the witness proceeded to testify in response to the question asked. *See* E-40 at 40. I made my objection in good faith based on the Magistrate's prior statement in her February 29, 2016 Order that I could not just state the word "objection" and that I had to provide the examining attorney the basis for my objection. I endeavored in good faith to explain the basis of my objection. I had no reason to believe my objection was improper because Mr. Wallerstein and other defense counsel have made virtually identical objections. *See* Exhibit F at F-1 to F-401.

112. Page 60:23-70:5 of Dr. Peintner's deposition shows that I objected to the question on attorney client privilege and work product grounds and asked Mr. Wallerstein to clarify if he was asking for the witness's "opinion." E-60. I asked for this clarification in good faith so that I could assess whether I should instruct the witness not to answer the question. As the transcript shows, after the clarification was received, I instructed the witness that he was not to reveal

3:15-CV-00798-HSG                                                    DECLARATION OF VCH

attorney client privilege or work-product information, and that I further stated "if he wants your opinion, you are free to give it." *Id.* at 70:14-19. The transcript further shows that the witness proceeded to provide his opinion, as he was asked to do. *Id.* at 70-71.

113. Other of alleged infractions identified by the Magistrate contain similar objections, and each one of them has been included in Exhibit E. I made each of those objections in good faith. Based on my review of each of the objections identified, I believe my objections were substantially justified and in no way impeded or harmed AW-USA or any other party.

114. I believe my objections identified as being improper were extremely restrained and limited, particularly when considering what defense counsel has deemed acceptable in terms of objection. As set forth in Exhibit F, the level of objections interposed by AW-USA's counsel made it virtually impossible to obtain any jurisdictional testimony. Exhibit F at F-2 to F-452.

**E. Statements By The Magistrate Regarding The Meet And Confer**

115. In Order 884, the Magistrate states that I "refuse[d] to engage in mandatory substantive, good faith meet and confer session and ignore[d] efforts to participate in the court's joint letter procedure for resolution of discovery disputes." Dkt. 884 at 3:16-19. The Magistrate also states that "Almawave specifically enumerated its unsuccessful efforts to meet and confer with Plaintiff regarding the depositions of its witnesses." *Id.* at 3:13-14. The Magistrate also states that my client, Loop AI, "did not dispute these representations." *Id. See also id.* at 2:25-28.

116. Respectfully, the foregoing statements by the Magistrate are not accurate and are not consistent with the record before the Magistrate.

117. First, Loop AI has vigorously disputed all of AW-USA's accusations as fully set forth in its filings at Dkt. 622, 622-1 and 866. *See* A-17 to A-21. Because the Magistrate's Individual Rules prohibit the filing of exhibits and do not allow briefing, it is impossible in practical terms to address every single accusation made by AW-USA or any other party. I am also not aware of any legal rule or principle that required me on behalf of Loop AI to specifically address every accusation made by AW-USA in administrative motions for leave in order to avoid

a finding that the assertion is deemed admitted. Fed. R. Civ. P. 8 imposes such a requirement as to pleadings, but I was not aware that the Magistrate had a rule that would consider admitted every accusation made in any filing made before her, unless addressed by me with specificity.

118. Since shortly after this case began in February 2015, through the close of merits discovery on March 29, 2016, I, or attorneys at my firm working under my supervision, have participated in extensive meet and confer sessions, by telephone and also in person. I estimate these sessions consumed well over 60 hours, excluding the hours necessary to prepare for those meet and confers. At the direction of the Magistrate, these sessions included conference calls held virtually every Friday for many months through March 25, 2016 (merits discovery closed on March 29, 2016). We resumed our weekly calls in May, at the Magistrate's direction. We have had many other meet and confer calls since then, including for instance today.

119. On March 29, 2016, I met with opposing counsel **in person on five separate occasions in San Francisco**, on March 29, April 4, April 6, 7, and 8, 2016 for various depositions. During this period Mr. Wallerstein, counsel for AW-USA, refused to meet and confer with me about anything, despite my requests to do so. For instance, on April 8, 2016, I asked Mr. Wallerstein to meet and confer during a deposition break. As the video of **my April 8, 2016 attempt to meet and confer** submitted to the Magistrate at Dkt. 622-1 shows, Mr. Wallerstein refused to speak to me. *See* Dkt. 622-1; A-21.

120. In addition to refusing to meet and confer with me while I saw Mr. Wallerstein in person at his office, counsel for AW-US has never called me either before or after the filing of the letter motions resulting in Order 884 to discuss any aspect of AW-US's letter motions. I respectfully submit that after the extraordinary expenditure of time meeting and conferring in this case without any results, there is no basis for the Magistrate's statements that I was the counsel who failed to meet and confer.

121. The Magistrate also had no basis to find that I refused to participate in the joint discovery letter process. First, no joint-discovery letter was ever provided to me about any of the issues addressed by Aw-USA in Motion 610 or Motion 858, the letter motions resulting in Order 884. The Magistrate had no evidence before her regarding any joint discovery letter that the

Magistrate found I refused to join in, because no such letter was provided to me (so I had no opportunity to join in it).

122. In light of this evidence, I respectfully submit there is no basis for the Magistrate's finding that I improperly failed to participate in a joint discovery letter.

**F. Statements By The Magistrate In Order 884 Regarding "Proposed Compromise"**

123. The Magistrate states in Order 884 that Almawave "proposed a compromise to Plaintiff: for questions for which counsel instructed the witness not to answer, Plaintiff could provide written responses instead of deposition testimony. According to Almawave, Plaintiff refused the compromise." Dkt. 884 at 2:17-20. The Magistrate also states that I, or my client, did not dispute that we "rejected Almawave's proposed compromise." *Id.* at 2:25-26.

124. The foregoing statement is incorrect with respect to three of the four depositions addressed by the Magistrate.

125. The only purported offer to compromise I received and rejected related to the deposition of Dr. Peintner, presented to me in a letter dated April 4, 2016 from (the "April 4 Letter"). A true and correct copy of the April 4 Letter is attached hereto at A-59.

126. In the April 4 Letter, AW-USA's counsel asserted that AW-USA wanted Loop AI to respond in writing to a list of questions. I determined in my good faith professional judgment, including by reference to Civil Local Rule 37-3 and to Federal Rule of Civil Procedure 26, that AW-USA's request to obtain written answers to the questions listed in the April 4 Letter was not appropriate and was in fact frivolous. First, the questions listed were not relevant to any claim or defense. The Magistrate does not address the relevance of the information sought by any of the questions cited in Order 884. AW-USA never explained the relevance of any of the questions listed in the April 4 Letter, to me or to the Magistrate. Second, several of the questions listed, which related solely to Dr. Peintner, already had been answered by Dr. Peintner during his deposition. Third, the questions listed called for attorney client privileged and work-product information. AW-USA has never articulated why our invocation of privilege was incorrect and never asked us to specifically address our invocation of privilege or work-product in respect of any particular question. A review of AW-USA's own invocation of privilege and work-product

protection, both in deposition and in its privilege log, shows that AW-USA's counsel has an extremely broad view of what is covered by protected by privilege and work product. *See* Exhibit A at A-67, Exhibit F at F-2 to F-90.

127. Besides the April 4 Letter regarding Dr. Peintner's deposition, I never received from AW-USA's counsel any other letter or email or verbal communication identifying any other question that was improperly objected to and on which they proposed any type of compromise, as the Magistrate states in Order 884. The allegations made by Almawave USA in Motion 858, to the effect that Loop AI improperly refused to respond to other discovery requests, are unsupported by any evidence.

### REQUEST FOR AN EVIDENTIARY HEARING

128. Loop AI and the undersigned respectfully request an opportunity to be heard at an evidentiary hearing to address the matters set forth by the Magistrate in Order 884. The Magistrate has repeatedly impugned my professional reputation and integrity during the course of this proceeding, without basis, without putting me on notice or affording me, or my client, an opportunity to be heard and to present appropriate briefing and evidence. This has resulted in substantial and irreparable damage to my professional reputation and prejudice to my client, Loop AI.

Respectfully submitted,

Executed: September 8, 2016
New York, New York

/s/ Valeria Calafiore Healy

Valeria Calafiore Healy

3:15-CV-00798-HSG                                      DECLARATION OF VCH

# OVERVIEW OF DEPOSITIONS AT ISSUE AND INFRACTIONS IDENTIFIED IN ORDER 884

| Deposition Proceedings | Dr. Peintner Deposition of March 29, 2016 | Dr. Ehlen Dep. April 6, 2016 | Mr. Calafiore 1st Dep. of Jan. 25, 2016 (not at issue) | Mr. Calafiore 2d Dep. of April 7, 2016 | Loop AI Rule 30(b)(6) (Calafiore 3rd) Dep. of April 8, 2016 | Total Depos. Loop AI (hours/minutes) |
|---|---|---|---|---|---|---|
| Total hours at deposition | 9 hours 15 min. | 9 hours 37 min. | 8 hours 22 min. | 6 hours 6 min. | 10 hours 15 min | 35hours13min (43h28m with 1st Dep.) |
| Hours of testimony on the record | 7 hours 22 min. | 7 hours 35 min. | 6 hours 50 min. | 4 hours 26 min. | 7 hours 49 min | 27hours12min (33h02m with 1st Dep.) |
| Total pages (begin to end of testimony) | 351 | 387 | 424 | 225 | 406 | 1369 (1793 pages with 1st Dep.) |
| Total number of questions asked | 1,311 | 1,404 | 1,462 | 596 | 1,001 | 4312 (5,774 with 1st Dep.) |
| Breaks requested by Loop AI | 1 break lasting 8 minutes | 1 break lasting 6 minutes | | none | 1 break lasting 6 minutes | 20 minutes or .95% of total break times imposed during 4 depositions |

| Deposition Proceedings | Dr. Peintner Deposition of March 29, 2016 | Dr. Ehlen Dep. April 6, 2016 | Mr. Calafiore 1st Dep. of Jan. 25, 2016 (not at issue) | Mr. Calafiore 2d Dep. of April 7, 2016 | Loop AI Rule 30(b)(6) (Calafiore 3rd) Dep. of April 8, 2016 | Total Depos. Loop AI (hours/minutes) |
|---|---|---|---|---|---|---|
| **Alleged Infraction Identified in Order 884** | | | N/A | | | |
| **Instruction not to Answer Based on A/C-Work-Product** | 12 | | | | 6 | 18 |
| Percentage of total questions | .92% | | | | .6% | .42% |
| **Instructions not to Answer – Other Reasons** | 1 | | | 1 | 3 | 5 |
| Percentage of total questions | .08% | | | .17% | .3% | .12% |
| **Speaking Objections Identified as Improper** | 6 | 5 | | 8 | 5 | 24 |
| Percentage of total questions | .46% | .36% | | 1.34% | .5% | .56% |
| **Counsel "attempted to answer or characterized witness's testimony or characterized contents of a document in her objection"** | | 4 | | | | 4 |
| Percentage of total questions | | .28% | | | | .09% |
| **Total** | 19 | 9 | | 9 | 14 | 51 |
| Percentage of total questions | 1.45% | .64% | | 1.51% | 1.4% | 1.18% of questions 3.73% of pages |