# EXHIBIT F

**EXAMPLES OF OBJECTIONS
BY ALMAVIVA'S COUNSEL
DURING JURISDICTIONAL DEPOSITIONS**

**Red Lines Denote Defs' Objections or Interruption**

**INDEX OF
EXHIBIT F**

| DESCRIPTION | Page |
|---|---|
| "Exhibit F-Examples Of Objections By Almaviva's Counsel During Jurisdictional Depositions" | F-1-F-468 |
| "Examples Of Privilege Assertions Impeding Testimony On Critical Issues" | F-2 |
| "Activities At The Direct Of Counsel" | F-74 |
| "To The Extent It Calls For Privilege" | F-86 |
| "Examples Of Instructions Not to Answer on Other Than Privilege" | F-91 |
| "Examples Of Speaking Objections and Coaching " Global | F-126-F-400 |
| "Examples Of Speaking Objections and Coaching – ('vague' and/or 'ambiguous' with witness parroting counsel)" | F-127 |
| "Examples Of Speaking Objections and Coaching – compound & witness trained to refuse to answer question as posed" | F-193 |
| "Examples Of Speaking Objections and Coaching – 'asked and answered' plus" | F-215 |
| "Examples Of Speaking Objections and Coaching – counsel interrupting" | F-229 |
| "Examples Of Speaking Objections and Coaching – coaching and impeding testimony") | F-244 |
| "Examples Of Speaking Objections and Coaching – coaching with alleged 'misstatement' objection" | F-250 |
| "Examples Of Speaking Objections and Coaching – sudden interruptions to impede testimony" | F-263 |
| "Examples Of Speaking Objections and Coaching – other improper objections and interruptions" | F-312 |
| "Examples Of Speaking Objections and Coaching – ('misstates' with witness parroting counsel)" | F-327 |
| "Examples Of Speaking Objections and Coaching – (counsel testifying)" | F-363 |
| "Examples Of Speaking Objections and Coaching – (characterizing record)" | F-385 |
| "Examples of Impeding Testimony Altogether" | F-401 |
| "Intentionally Arriving Late" | F-402 |
| Certifications for Excerpts of Deposition Transcripts | F-453 |

**F-1**

# EXHIBIT F

---

**EXAMPLES OF
PRIVILEGE ASSERTIONS IMPEDING
TESTIMONY ON CRITICAL ISSUES**

couple of lines.

A.    Yes.

MS. HEALY:  And just for the record, I am placing in front of Ms. Gatti a privilege log that was produced by the AlmavivA defendants' counsel.

Q.    I would like to point you to page 1, at line three.  The date there is 2/19/2014, and there is an email to Jeff Capaccio and you by Valeria Sandei, and copies for Raniero Romagnoli.

When you received this email, were you -- what was your relationship with Ms. Sandei?  What was the nature of this communication, if you remember?

A.    I don't remember.

MR. WALLERSTEIN:  Objection.  If you are asking for her to disclose the contents of a document that's listed on our privilege log, I am quite confident in claiming privilege and instructing that my clients --

MS. HEALY:  Q.  Were you working --

MR. LOSAVIO:   -- assert privilege.

MS. HEALY:  Q.  Okay.  On this particular day were you working for any of the AlmavivA entities --

A.    No.

Q.    -- in any capacity?

A.    No.

MS. HEALY:  What's the nature of the privilege

that you are asserting?

MR. WALLERSTEIN:  Attorney-client privilege.

MS. HEALY:  With whom?  Who is the attorney and who is the client?

MR. WALLERSTEIN:  One or more of my clients and Mr. Capaccio.

MS. HEALY:  I am sorry.  Ms. Gatti is copied in an email.  So you are saying as of 2/19 Ms. Sandei was retaining Mr. Capaccio?  I am trying to understand the nature of the privilege.

Q.  Ms. Gatti, were you -- was Mr. Capaccio being retained by Ms. Sandei, and why were you copied on this email?

MR. WALLERSTEIN:  Objection; calls for speculation --

MR. LOSAVIO:  Wait.  Wait.

MS. HEALY:  I am asking, why was she copied in the email?  I'm not asking for the contents.

MR. WALLERSTEIN:  All counsel in the room, one at a time, please.

I'm objecting.  Lacks foundation, calls for speculation.  And to extent you are asking the witness to disclose the contents of communication listed on our privilege log, we claim privilege.

MR. LOSAVIO:  And to the extent that you are

**F-4**

asking the witness to characterize the content of the conversation, you have a pretty good clue under subject file name.

MS. HEALY:  Okay.  Thank you.  I don't need you to read.  If he is instructing her not to answer, there is nothing I can do.

Q.  Can you turn to page 5?

MR. WALLERSTEIN:  It's not my witness.

MS. HEALY:  You just instructed her not to answer.  Can she answer the question?

MR. WALLERSTEIN:  We claim privilege.

MS. HEALY:  So you are instructing her not to answer?  I need to understand whether there is an instruction not to answer or not, so that she can answer the question if the instruction is not there.

MR. WALLERSTEIN:  It's not my witness to give instructions to.  I am claiming privilege.

MS. HEALY:  Mr. LoSavio, are you instructing her not to answer?

MR. LOSAVIO:  Well, I am instructing you that there has been a claim of privilege in -- with respect to the entities that Mr. Wallerstein represents.  You are not at liberty to disclose a privileged communication without the consent of those entities. And that's on the corporate side.

On the personal side, if you were going to a lawyer to seek advice regarding, for example, how to form a corporation relative to what it was that Almawave USA was going to do in the United States, then you are consulting a lawyer for the purpose of getting legal advice, and the fact that Sandei also had an interest in that would not necessarily waive your personal privilege. So you also have a personal privilege as to that.

THE WITNESS: Thank you.

So again, my memory is -- this is useful, because I don't remember that email in February 2014. Clearly there was an email. And if I don't read the subject line, I cannot remember what it was about.

MS. HEALY: Q. Sure. So just to spare some time, because there are a lot of emails involving you in this thick document that's over 400 pages, were you ever informed by any AlmavivA entity before you started working for them that any communication you would have with any of their lawyers would be confidential?

A. They are not really lawyers.

MR. LOSAVIO: No, but she is asking a different -- you are being specific and she is being general.

MS. HEALY: Q. Who were the lawyers?

**F-6**

that meeting?

MR. WALLERSTEIN:  Objection.

MS. HEALY:  Q.  I don't want you to tell me the content of the discussion.  I just want to ask you whether legal advice was being sought during that meeting.

MR. WALLERSTEIN:  Thank you, Counsel.  Let me finish my objection, please.

Objection; lacks foundation, calls for speculation.  Object on the grounds of privilege to the extent that the content of the discussion is being disclosed.

To the extent it's a yes-or-no question, I don't object.

THE WITNESS:  Okay.  Can you repeat the question?  Sorry.

MS. HEALY:  Q.  I am just asking whether, when you went to meet with Orrick and Valeria Sandei in the San Francisco office, whether legal advice was being sought.

MR. WALLERSTEIN:  Objection; calls for speculation, lacks foundation, privilege.

MS. HEALY:  Q.  To the extent that you know. I am not asking for the --

MR. WALLERSTEIN:  Objection; calls for

**F-7**

speculation, lacks foundation.  Privileged, to the          16:22:06

extent it's requesting more than a yes or no.               16:22:08

          MR. LOSAVIO:  Ambiguous as to "who."              16:22:10

          MS. HEALY:  Q.  You can answer.                   16:22:13

     A.   My perception of the meeting was that it was a    16:22:17

kind of meet-and-greet meeting with discussion on --        16:22:26

          MR. WALLERSTEIN:  Objection to the extent that    16:22:31

Ms. Gatti is going to purport to reveal the content of a    16:22:32

meeting between my client and Orrick.                       16:22:36

          MS. HEALY:  She is saying there was no legal      16:22:38

advice being given.                                         16:22:40

          MR. WALLERSTEIN:  I disagree.                     16:22:42

          MS. HEALY:  Okay.  So you are instructing her     16:22:43

not to answer?                                              16:22:45

          MR. LOSAVIO:  Ms. Gatti, I am telling you that    16:22:49

you have an invocation of the attorney-client privilege     16:22:52

and you are not going to -- unless it's waived, you are     16:22:54

not at liberty to discuss it.                               16:22:56

          MS. HEALY:  Q.  Did you ever discuss any          16:22:58

conflict of interest in Orrick working for both Soshoma     16:23:00

and --                                                      16:23:06

          MR. WALLERSTEIN:  I am waiting for you to         16:23:07

finish.                                                     16:23:08

          MS. HEALY:  Q.  Did you ever discuss any          16:23:08

conflict of interest relating to Orrick?                    16:23:11

**F-8**

MR. WALLERSTEIN:  Objection; vague as to time, lacks foundation -- well, let me try that again.

Objection; vague as to time.  To the extent that my client was involved in a discussion, it's privileged.

MS. HEALY:  Q.  Did you ever have any discussion, Ms. Gatti, with anyone at Almawave regarding conflicts of interest regarding anyone --

MR. WALLERSTEIN:  Objection.

MS. HEALY:  Q.  -- Orrick, other vendors, employees, anyone?  I am just curious if you had any discussions addressing conflicts of interest.

MR. WALLERSTEIN:  Objection to the extent that that would include conversations with or among counsel, including Orrick.

MS. HEALY:  Q.  You can answer.

MR. WALLERSTEIN:  You can answer to that extent.

MR. LOSAVIO:  If you can answer without disclosing communications where attorneys were present.

THE WITNESS:  I don't have any recollection.

MR. LOSAVIO:  It's past 4:20, and --

MS. HEALY:  Do you need a break?

MR. LOSAVIO:  Well, and I think the reporter deserves a break as well.

name IQSystem?                                          16:24:21

A.    In February 2014.                                 16:24:30

Q.    Who told you about IQSystem?                      16:24:36

A.    I participated in a meeting in which IQSystem     16:24:49
was discussed.                                          16:24:53

Q.    When was this meeting?                            16:24:53

MR. WALLERSTEIN:  Objection.  I don't know              16:24:59
what meeting you are about to refer to, but -- but to   16:25:00
the extent it involves counsel, inside or outside, it   16:25:09
would be privileged.                                    16:25:18

MS. HEALY:  Q.  So you can answer the                   16:25:24
question.  When was this meeting?                       16:25:25

MR. WALLERSTEIN:  Objection.  I don't know if           16:25:29
you can answer the question.                            16:25:31

MS. HEALY:  I am asking a date.                          16:25:33

MR. WALLERSTEIN:  Counsel --                            16:25:35

MS. HEALY:  Please stop interfering with the           16:25:35
deposition.  I am asking for a date.  I am asking for   16:25:37
the date.                                               16:25:55

MR. WALLERSTEIN:  I want to hear what my               16:25:56
witness just answered, Counsel.                         16:25:57

THE WITNESS:  This was an internal meeting in          16:25:59
which the lawyers were present.                         16:26:01

MS. HEALY:  Q.  I am asking for the date of            16:26:03
the meeting.                                            16:26:04

A.   I don't remember precisely the date, but it was February or March 2014.

Q.   Tell me who was present at the meeting.  Tell me all the people you remember being present.

A.   Valeria Sandei, Sergio Calderara.  I don't remember other people.  I remember the two of them.

Q.   Why were you invited to this meeting?

A.   We were talking about the contract with IQSystem.

MR. WALLERSTEIN:  I want to caution you not to reveal or further reveal anything that was discussed at that meeting.  You have indicated that there was counsel present, so you should not disclose anything that was discussed.

MS. HEALY:  Q.  Was the meeting for the purpose of obtaining legal advice?

MR. WALLERSTEIN:  You can answer that yes or no.

THE WITNESS:  Can you repeat the question?

MS. HEALY:  Q.  Was the meeting for the purpose of obtaining legal advice from Mr. Calderara?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.  Go ahead.

MS. HEALY:  Q.  Can you tell me what the --

MR. WALLERSTEIN:  You don't want the answer?

MS. HEALY:  Q.  You will answer?    16:28:39

A.  Yes, it was for legal counsel.    16:28:50

Q.  What was your role in the meeting?    16:28:53

MR. WALLERSTEIN:  Objection; privileged.  You should not respond.    16:29:01 16:29:04

MS. HEALY:  Q.  Can you tell me everything that happened during that meeting?  What was discussed about IQSystem Inc. during that meeting?    16:29:07 16:29:08 16:29:12

MR. WALLERSTEIN:  Objection.  Privileged. Don't respond.    16:29:21 16:29:23

MS. HEALY:  Q.  Are you going to obey the instruction?    16:29:28 16:29:30

A.  No.    16:29:33

Q.  Are you going to obey the instruction?    16:29:33

A.  I don't answer the question because it's privileged.    16:29:39 16:29:41

MS. HEALY:  Which privilege are you invoking? US?    16:29:42 16:29:43

MR. WALLERSTEIN:  It's attorney-client privilege and work product.    16:29:46 16:29:47

MS. HEALY:  Under US law?  Can you clarify, so that we can have a clear record?    16:29:49 16:29:52

Q.  Ms. Nicolella, don't worry about legal stuff.    16:30:05

Can you tell me whether -- did you check    16:30:09

whether IQSystem Inc. existed at the time of this    16:30:12

meeting?

MR. WALLERSTEIN:  Objection; vague, calls for a legal conclusion.

MS. HEALY:  Q.  You can answer.

A.  No, I don't.

Q.  Were you asked to make payments to IQSystem Inc.?

A.  No.

Q.  Did you discuss with anyone at AlmavivA payments to be made to IQSystem Inc.?

MR. WALLERSTEIN:  Objection.  Don't respond to anything that was discussed at the meeting you just described with Sergio.  But if there's some response -- if you can respond other than that --

I need a translation.

THE INTERPRETER:  I know.

MR. WALLERSTEIN:  If you can respond other than that in meetings which did not have counsel present, then you may.

THE WITNESS:  I lost track of the question.

MS. HEALY:  Can you please repeat?  Thank you.

(Record read as follows:

"Q.  Did you discuss with anyone at AlmavivA payments to be made to IQSystem Inc.?")

**F-13**

MS. HEALY:  Yes.

MR. WALLERSTEIN:  No, the witness just asked a question, which I do not see transcribed.  I am sorry.  So the witness just said something.  It was not transcribed, because you spoke over her, Ms. Healy.  So that's inappropriate.

Can you please reask the question and the witness can question you and I can hear what she had to say?

MS. HEALY:  No.

MR. WALLERSTEIN:  Well, then, move on.  I won't let her answer a question --

MS. HEALY:  She answered.

MR. WALLERSTEIN:  Well, I didn't get to hear it, because you wouldn't allow it to be interpreted.

THE WITNESS:  No.  No, I did not speak to anyone.

MS. HEALY:  Q.  What was your understanding of what IQSystem Inc. was supposed to do?

MR. WALLERSTEIN:  Objection.  If you obtained that information at a meeting with counsel, do not answer.  If you obtained it through some other source not involving counsel, you may answer.

THE WITNESS:  I received this information during the meeting, and therefore I'm not answering,

because it's privileged.                                    16:34:07

MS. HEALY:  Q.  So you don't have any                      16:34:12
information that you want to share with us today about      16:34:14
what IQSystem Inc. -- what your understanding of what       16:34:18
IQSystem Inc. was supposed to do was?                       16:34:23

MR. WALLERSTEIN:  Objection.  Misstates the                16:34:38
response.  The witness did not say whether she wants to     16:34:41
share anything or does not.  She wants to testify fully     16:34:44
without revealing privilege, and that's what she has        16:34:47
tried to do all day today.                                  16:34:51

THE WITNESS:  I heard -- I heard about what                16:35:18
IQSystem was supposed to do only within the context of      16:35:34
this meeting, and therefore I cannot reveal it, because     16:35:40
it was in the presence of legal counsel and it's           16:35:45
privileged information.                                     16:35:48

MS. HEALY:  Q.  Is there any communication                 16:35:51
that you had with anyone regarding IQSystem Inc. that       16:35:52
did not involve counsel that you can tell me about?         16:35:57

A.  I have not had any other communication that            16:36:20
includes information other than the one I had involving     16:36:24
Sergio Calderara at the meeting.                            16:36:28

Q.  Were you in charge of removing Anna Gatti from         16:36:32
the Bank of the West account for Almawave USA?              16:36:36

A.  I don't understand what it means when you say          16:36:56
"in charge of removing."                                    16:36:59

notify Anna Gatti that she was getting -- she would be   17:44:25

getting the money into the Bank of the West account?   17:44:28

A.   Sometimes it happens, yes.   17:44:53

Q.   Why would you tell her?   17:44:55

A.   Because she was asking me.   17:45:01

Q.   Did -- do you know -- if Almawave USA goes   17:45:03

bankrupt, do you know who would pay for any debts that   17:45:09

Almawave USA may have?  Who would be responsible?   17:45:17

MR. WALLERSTEIN:  Please just let me object.   17:45:30

Objection; calls for a legal conclusion, lacks   17:45:31

foundation, calls for speculation, and compound.   17:45:33

MS. HEALY:  Q.  I'm asking for your   17:45:45

understanding as head of the treasury.   17:45:47

MR. WALLERSTEIN:  That cures none of the   17:45:59

objections.  I repeat them.   17:46:01

THE WITNESS:  I don't understand the question,   17:46:14

so...   17:46:14

MS. HEALY:  Q.  As head of the treasury --   17:46:17

I will break it down, so you don't have too   17:46:23

long of a sentence.  No, I will break it down for you   17:46:26

before finishing the sentence so that you can translate   17:46:26

more easily.   17:46:27

As head of the treasury, do you have an   17:46:28

understanding of which company would be responsible to   17:46:32

pay any debts of Almawave USA if Almawave USA goes   17:46:38

bankrupt?

MR. WALLERSTEIN:  Objection; calls for a legal conclusion, lacks foundation, calls for speculation.

MS. HEALY:  Q.  You can answer.

A.  I am not really competent to answer this question.

Q.  Have you had any discussions within AlmavivA about the possibility of Almawave USA filing for bankruptcy?

MR. WALLERSTEIN:  Excluding conversations you had with or among counsel.

THE WITNESS:  I haven't had any conversation within the AlmavivA group regarding this topic.

MS. HEALY:  Q.  Without the lawyers present or --

MR. WALLERSTEIN:  No, no.  Don't answer.

I am sorry.  Go ahead.

MS. HEALY:  I am asking if she has had conversations without lawyers present.  You told her not to answer privileged conversations.

MR. WALLERSTEIN:  Don't answer.  It's privileged.

MS. HEALY:  Q.  I am just asking whether there has been any conversation outside of the presence of lawyers regarding this topic.

MR. WALLERSTEIN:  The first question was, were there any conversations?  I instructed the witness only to answer to the extent that the conversations occurred outside the presence of counsel.  The witness said no.

To ask the question now whether there were conversations outside -- with counsel is implicitly getting to the answer.  It's privileged, and I instruct the witness not to answer.

MS. HEALY:  That's fine.

MR. WALLERSTEIN:  All you need to translate for her is I instruct her not to answer.

MS. HEALY:  Please be polite to the interpreter.  She's trying to do her job.

MR. WALLERSTEIN:  I'm just saying all that's relevant for her is --

MS. HEALY:  I am asking you to please not harass her.

MR. WALLERSTEIN:  I don't think that's harassing, Counsel.  I'm trying to --

MS. HEALY:  Please try to be polite, because she is doing her job.

MR. WALLERSTEIN:  I am trying to make it easier by telling her it's not necessary for the witness to understand the legal debate.

I apologize if that was rude.  I am trying to

ANGELA NICOLELLA – 1/21/2016

Page 133

You can ask the witness what she answered. 18:00:02

MS. HEALY:  You just interrupted, saying it 18:00:02
was inaccurate, so -- 18:00:02
MR. WALLERSTEIN:  It's an objection, Counsel. 18:00:02
You misstated her testimony. 18:00:02

MS. HEALY:  I did not. 18:00:06

Q.   Ms. Nicolella, you indicated you received a 18:00:07
declaration and you proceeded to verify that the 18:00:10
statements you made were accurate. 18:00:11

A.   I received this and I checked and I verified 18:00:43
if what I declared was correctly reported in the FAC. 18:00:47

Q.   How did you do that verification? 18:00:54

A.   I read the declaration. 18:01:01

Q.   And did you compare it to anything? 18:01:03

A.   I have checked with my colleagues who are 18:01:14
lawyers. 18:01:18

Q.   Okay.  Did you give those -- did you give a 18:01:20
declaration verbally to anyone about the facts you state 18:01:24
there? 18:01:28

MR. WALLERSTEIN:  Objection.  Do not disclose 18:01:38
anything that you said to an attorney. 18:01:40

THE WITNESS:  I am not answering because I 18:02:01
cannot divulge my conversation with my lawyer. 18:02:03

MS. HEALY:  Q.  Did you do anything else 18:02:07
beyond speaking to your colleagues in the legal 18:02:11

department to verify this declaration?  Did you look at    18:02:16
any documents?  Did you do anything else?                  18:02:35
            MR. WALLERSTEIN:  No, no, Counsel.             18:02:37
            You don't have to answer.                      18:02:37
            THE WITNESS:  What did you mean by other?  Did  18:02:38
you look at documents, for example?  Which other           18:02:41
documents?                                                 18:02:48
            MS. HEALY:  Q.  I am asking you, did you do     18:02:48
anything else to verify your statements in that            18:02:50
declaration beyond speaking to your colleagues in the      18:02:53
legal department?                                          18:02:57
    A.    So I received the declaration.  I checked that    18:03:34
what I declared was -- indeed corresponded, and I talked    18:03:40
to the attorneys, my colleagues, and I signed the          18:03:47
declaration.                                               18:03:52
    Q.    How did you give your first declaration and to    18:03:53
whom?  And how?                                            18:03:57
            MR. WALLERSTEIN:  Objection; vague.            18:04:09
            MS. HEALY:  Q.  You just said that you were     18:04:12
verifying that it corresponded to your first              18:04:13
declaration.                                               18:04:16
            MR. WALLERSTEIN:  Not in my translation.      18:04:22
            THE WITNESS:  I spoke to my colleague.  I       18:04:44
expressed verbally what were my facts.                     18:04:46
            MS. HEALY:  Q.  Which colleague?               18:04:50

English and I read it in English.    18:11:09

MS. HEALY:  Q.  And did you understand the    18:11:12
document?    18:11:14

A.   I spoke with my colleague, who is the    18:11:17
attorney.    18:11:20

Q.   Before you signed or after you signed?    18:11:22

A.   Before signing.    18:11:26

Q.   Okay.  How was this -- where was this    18:11:28
communication?    18:11:31

A.   You want to know where I was?    18:11:41

Q.   Yes.    18:11:42

A.   At the office or at the cafe?    18:11:43

Q.   Mm-hmm.    18:11:45

A.   In the office.    18:11:47

Q.   Whose office?    18:11:49

A.   My office.    18:11:51

Q.   And did he translate for you?    18:11:52

MR. WALLERSTEIN:  Objection.  Calls for    18:11:57
privilege.  Don't disclose anything that Sergio or    18:11:59
anyone else in the legal department communicated to you.    18:12:03

I withdraw the objection.  I apologize.  I    18:12:09
withdraw the objection.    18:12:12

THE INTERPRETER:  You will what?  Withdraw?    18:12:14

MR. WALLERSTEIN:  I withdraw the objection.    18:12:16

THE WITNESS:  When I received the document I    18:12:45

Washington.

Q.   Did you discuss SentiMetrix with anyone at AlmavivA or Almawave?

A.   I don't remember.

Q.   Did you discuss any other possible acquisition of any company based in the United States?

A.   No.

So I am answering this question whether I have spoken or discussed with whom or when?

Q.   You tell me a time frame.  Beginning in January 2014.

A.   The answer is no, anyway.  But I have a hard time following the question.

Q.   Did you reach out to anyone in the United States, let's say in February 2014, to ask for legal advice about coming to the United States or acquiring a company in the United States?

MR. WALLERSTEIN:  It comes close to privilege. I understand it to be a yes-or-no question.  The problem is, if you ask a -- if you include the subject matter of the discussion and she says yes, she implicitly reveals privileged information.  So it's an unfortunate question.

MS. HEALY:  Q.  Are you refusing to answer?

A.   Can you reformulate the question?

Q.   In the period of time between January 2014 through, let's say, April 2014, did you reach out to anyone in the United States to seek legal advice or any other type of advice about entering the United States or acquiring an entity in the United States?

MR. WALLERSTEIN:  Objection; compound.

MS. HEALY:  Yes.

THE WITNESS:  Should I answer the second part of the question?

Can you ask me one question, please, Ms. Healy?

MS. HEALY:  Q.  Between January 2014 and April 2014, did you seek legal counsel anywhere in the United States regarding the possibility of acquiring a company in the United States?

A.   I did not enter into any contract to ask anything from anybody about acquiring a company in the United States.

Q.   Aside from entering into a contract, did you call anyone in the United States or come meet with anyone in the United States to discuss any idea to acquire a company in the United States?

A.   Someone --

Q.   Anyone?

MR. WALLERSTEIN:  I am sorry.  I don't know

what the witness asked.   12:01:03

THE WITNESS:  I am having a hard time   12:01:05
following the thread and understanding the one question.   12:01:12
Can you pose -- ask me one question I can understand?  I   12:01:14
am having difficulty even following the thread of the   12:01:19
translation.   12:01:20

MS. HEALY:  Q.  Did you speak to anyone in the   12:01:23
United States about acquiring a company in the United   12:01:25
States between January 2014 and April 2014?   12:01:33

A.   I do not remember.   12:01:34

Q.   Did you speak to anyone in the United States   12:01:38
about acquiring -- or your idea of potentially acquiring   12:01:43
SentiMetrix?   12:01:45

MR. WALLERSTEIN:  Objection; misstates prior   12:01:47
testimony.  There was no testimony -- that is a complete   12:01:50
misstatement of the testimony, and it's misleading and   12:01:53
abusive.   12:02:04

THE WITNESS:  I never mentioned SentiMetrix to   12:02:07
anyone in the United States.   12:02:09

MS. HEALY:  Q.  Okay.  After April 2014, did   12:02:13
you discuss with anyone the possibility of acquiring a   12:02:19
company in the United States?   12:02:33

MR. WALLERSTEIN:  Excluding lawyers.  My   12:02:35
instruction is to exclude lawyers from that question.   12:02:40

THE WITNESS:  No.

**F-24**

MS. HEALY:  Q.  Did you speak to lawyers about acquiring a company in the United States?

MR. WALLERSTEIN:  Objection; calls for privilege.  Don't answer that.

MS. HEALY:  Q.  Are you refusing to answer my question?

A.  (In English)  Yes.

(Through interpreter)  Yes.

Q.  Whether you spoke to a lawyer about acquiring a company in the United States is not privileged.  I am not asking for the content.

MR. WALLERSTEIN:  No, no, no.

MS. HEALY:  Please let me finish my question.

MR. WALLERSTEIN:  It's not a question.

MS. HEALY:  I am putting it on the record, and if you want to object, you can.

Q.  I am not asking you about the content of your communications with a lawyer.  I am asking you whether you sought legal advice from anyone in the United States in 2014 about acquiring any company in the United States.

MR. WALLERSTEIN:  Objection.  Objection.  If the question ended "in the United States in 2014," it would be fine.  But it goes on to say, "about acquiring any company," et cetera.  In other words, it reveals --

it doesn't matter.  The point is, the question implicitly reveals the content of a communication and asks whether there was a conversation about specific content with an attorney.  It is privileged.

Don't answer it.

MS. HEALY:  Q.  Are you going to answer the question?

A.  No.

MR. LOSAVIO:  Ms. Healy, if it's not your intention to ask for attorney-client privileged matter, the customary way that is done is by saying "excluding any conversations you may have had with any attorneys."

MR. WALLERSTEIN:  Agreed.

MS. HEALY:  Thank you, Tom.

Q.  I want to go back to Russell Reynolds.

How many resumes did Russell Reynolds provide to your company after you asked them to recruit for the general manager position for the USA?

A.  Two.

Q.  Whose resumes did you receive?

A.  Anna Gatti.  I don't remember the name.  Jeff McCormick.

Q.  Did you receive those resumes by email?

A.  I do not remember.

Q.  Where did you understand Anna Gatti was based

Q.   And did you ask anyone, including lawyers, for legal advice about the permissibility of retaining Ms. Gatti to have a second CEO position as your part-time CEO for this new entity?

MR. WALLERSTEIN:  Objection; calls for privilege, instruct the witness not to answer.  She will answer the question if you can take out the "including lawyers" part.

MS. HEALY:  Q.  I am not asking for what the advice was.  I am asking whether you asked -- you sought legal advice regarding the permissibility of your retaining Ms. Gatti to work concurrently as the CEO of the entity to be formed while she already had a CEO position.

MR. WALLERSTEIN:  When you use the word "regarding" -- the first time you asked the question you used the word "about."  The second time you used the word "regarding."  That is asking for the substance of the communication.  It's privileged, and I ask the witness not to answer.

MS. HEALY:  Q.  Are you going to answer the question?

A.   No.

Q.   Did Ms. Gatti -- by the time you offered her -- not directly; through Russell Reynolds -- the

THE INTERPRETER:  "And what"?                        15:43:41

MS. HEALY:  Q.  What did you tell her when she       15:43:41
mentioned the Orrick law firm?                       15:43:41

MR. WALLERSTEIN:  That sounds clearly                15:43:43
privileged to me, and I am going to instruct you not to   15:43:45
answer.  Don't answer, on grounds of privilege and work   15:44:02
product.                                             15:44:03

MS. HEALY:  Q.  What was the business -- what        15:44:06
was the business purpose of the entity that you ended up   15:44:14
forming, Almawave USA?                               15:44:31

A.  The sale and marketing of products that we       15:44:34
developed in our labs in Italy in the preceding years.   15:44:40

Q.  Anything else?                                   15:44:46

A.  No.                                              15:44:47

Q.  When you retained Ms. Gatti -- first of all,     15:44:52
when did you retain her to serve as the CEO of Almawave   15:44:57
USA?                                                 15:45:08

A.  It was June 2014.                                15:45:14

Q.  So up until June 2014 Ms. Gatti was not          15:45:20
working in any -- in any capacity for Almawave?      15:45:30

MR. WALLERSTEIN:  Objection; vague.  Vague as        15:45:34
to Almawave, and vague as to working in any capacity.   15:45:37

MS. HEALY:  Q.  Was she -- prior to                  15:45:39
June 2014 -- do you recall the exact date when she came?   15:45:50

A.  No, I don't remember the exact date.

MR. WALLERSTEIN:  We are taking a break in 30 seconds, Counsel.                                                15:45:56
                                                                                                                15:45:58

MS. HEALY:  Q.  So let me show you Exhibit Number 2, which was marked during Ms. Gatti's deposition.  I believe you were present during Ms. Gatti's deposition earlier this week.               15:45:59
                                                                                                                15:46:05
                                                                                                                15:46:07
                                                                                                                15:46:13

A.   During part of it, yes.                                                                                    15:46:15

Q.   So this is Exhibit Number 2.                                                                               15:46:34

MR. WALLERSTEIN:  And we are going to take our break.  You can ask one question or we can wait, if you prefer.  Counsel, what do you refer?                15:46:36
                                                                                                                15:46:40
                                                                                                                15:46:43

MS. HEALY:  I am going to keep going.                                                                           15:46:45

MR. LOSAVIO:  Sounds like break time.                                                                          15:46:47

MR. WALLERSTEIN:  We are either taking a break now or you can ask one more question.  I am asking your preference.                15:46:50
                                                                                                                15:46:52
                                                                                                                15:46:53

MS. HEALY:  I am going to keep going, ask as many questions as I need to ask.                15:46:54
                                                                                                                15:46:55

Q.   Do you recognize that document?                                                                           15:46:56

MR. WALLERSTEIN:  Do you recognize that document, ma'am?                15:46:57
                                                                                                                15:46:58

THE WITNESS:  Yes, I recognize the document.                                                                   15:47:00

MR. WALLERSTEIN:  We are taking a break. Let's go.                15:47:01
                                                                                                                15:47:02

(Recess taken from 3:47 to 3:58.)

MR. WALLERSTEIN:  Counsel, are we here to write legal briefs?  Why are you talking to me?

MS. HEALY:  I am here to ask her questions.  Please stop interrupting.

MR. WALLERSTEIN:  No, that's not interrupting.  That's an objection, Counsel.

MS. HEALY:  Q.  Did you tell Mr. Sternberg that you wanted to retain Ms. Gatti?

MR. WALLERSTEIN:  Objection; calls for privilege.  Don't answer.

MS. HEALY:  Q.  Are you going to answer the question?

A.  No.

Q.  You are not going to answer the question --

A.  No.

Q.  -- or you didn't tell him?

A.  I will not answer the question.

Q.  Did you tell -- did you or anyone -- did you personally tell or did you ask anyone who worked with or for you to tell Orrick that Ms. Gatti had -- was the CEO of another company?

MR. WALLERSTEIN:  Objection; calls for privilege and work product.  Don't answer.

MS. HEALY:  Q.  In your declaration submitted to the Court on October 20, 2015, you stated that

Page 165

"Orrick was engaged simply to prepare documents
reflecting terms I negotiated without Orrick's
involvement."

MR. WALLERSTEIN:  That's not a question.
Please don't respond.

MS. HEALY:  Q.  No, my question is, is that
agreement you were referencing Exhibit 2?  Is the
agreement that you asked Orrick to prepare that you
referenced in this declaration Exhibit 2?

MR. WALLERSTEIN:  Objection.  Objection.  I
don't know what agreement -- what declaration you are
referring to.  If you would like to mark an exhibit and
show the witness --

MS. HEALY:  I am not going to mark an exhibit.
I am reading from her declaration.

MR. WALLERSTEIN:  Well, I don't know that you
are, Counsel.

MS. HEALY:  I can show it to her but I am not
entering it in as an exhibit.  I am happy to show it to
her if you would like me to.

MR. WALLERSTEIN:  I don't know what the
difference is.  Do you think there is some legal
difference to that?

MS. HEALY:  Q.  Did you ask Orrick to prepare
any agreement other than Exhibit 2 in respect of

Page 166

Ms. Gatti?

MR. WALLERSTEIN:  Objection; calls for privilege and work product.  Don't answer that.

MS. HEALY:  Q.  Did you ask Orrick for legal advice about the legality of retaining Ms. Gatti --

MR. WALLERSTEIN:  Objection; calls for privilege --

MS. HEALY:  Q.  -- while she was already working as the CEO of another company?

MR. WALLERSTEIN:  Objection.  Privilege and work product.  Don't answer.

THE INTERPRETER:  Do you want me to interpret this question?

MR. WALLERSTEIN:  I don't think it's necessary.

MS. HEALY:  Yes, please.

MR. WALLERSTEIN:  She is not going to answer it anyway, and it's not going on the record.  But if you prefer, Counsel, it's fine by me.

MS. HEALY:  What do you mean, it's not going on the record?

MR. WALLERSTEIN:  The Italian is not going on the record.

MS. HEALY:  I want her to understand what --

Q.  Do you understand what I'm saying?

**F-32**

Page 167

MR. WALLERSTEIN: She really doesn't need to. 16:21:39

THE WITNESS: I've lost track. 16:21:39

MR. WALLERSTEIN: Go ahead. I'm sorry. You 16:21:40 can interpret it. It's your time. 16:22:00

(Question retranslated.) 16:22:05

MR. WALLERSTEIN: I object that it's 16:22:07 privileged and work product. Don't answer. 16:22:21

MS. HEALY: Q. Are you going to answer? 16:22:22

A. I'm not answering. 16:22:28

Q. Before hiring Ms. Gatti, did you discuss with 16:22:31 her from which offices she would be working from? 16:23:11

A. I asked her to find a location in San 16:23:12 Francisco that was appropriate. 16:23:14

Q. Did you discuss with Ms. Gatti how she would 16:23:17 be splitting her time between the two jobs that she 16:23:22 would be having, one as the CEO of the startup and one 16:23:27 as the CEO of your company? 16:23:46

A. No. I just asked her to guarantee at least 16:23:49 the 20 hours of week that were contemplated in the 16:23:54 contract. 16:23:55

Q. When you came to California to meet with 16:23:57 Ms. Gatti in 2014 or later, did you ever ask her to meet 16:24:02 anyone else from her startup? 16:24:17

A. Not that I remember. 16:24:18

Q. Why not?

**F-33**

Q.   And did you decide to retain him to represent all three entities, AlmavivA S.p.A., Almawave S.r.l., and Almawave USA?

MR. WALLERSTEIN:   Objection.   Questions about what you decided call for your work product, your mental impressions, and therefore they are privileged.   You may answer whether you did ultimately retain Mr. Sternberg to represent all three entities.

THE WITNESS:   I repeat that I contacted the attorney, Peter Sternberg, asking for legal counsel -- for legal advice, sorry -- with regards to the lawsuit that was started by the company here represented by the attorney, Mrs. Healy.

MS. HEALY:   Q.   Is Mr. Sternberg your main contact in respect of this lawsuit?

MR. WALLERSTEIN:   Objection; vague.

But go ahead.

THE WITNESS:   I don't understand -- I don't understand in terms of major contact, or main contact, excuse me.

MS. HEALY:   Q.   Is he copied in every communication you have with his firm?

A.   Not necessarily.

Q.   Did Mr. Sternberg give you legal advice regarding Ms. Gatti's employment agreement with Soshoma,

now called Loop AI?

MR. WALLERSTEIN:  Objection; vague as to time. There have already been declarations speaking to this subject prior to when the lawsuit was filed.  The question is privileged.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Are you the one in charge of discussions regarding the litigation in which the three entities are involved, this litigation?

MR. WALLERSTEIN:  Objection; vague as to "in charge of discussions."

MS. HEALY:  Q.  Are you the one making decisions regarding what your lawyers, Mr. Sternberg's firm, will do regarding -- will do regarding anything in this lawsuit?

A.  The question was very broad, and I'm not sure exactly what I am asked.  What does it mean, "I am in charge or the one making decisions"?

Q.  If your law firm, Venable, needs to take any action in this case, do they ask your permission or is there somebody else within AlmavivA that they speak to?

A.  The law firm executes the -- so the law firm executes the actions that we agreed on and -- with the autonomy that is typical of a professional attorney.

Q.   Is that an agreement that was drafted by your company?

A.   I don't remember.  This text that I am reading corresponds to the text that had been prepared by my company.

Q.   If you -- do you recall discussing this type of agreement with Sergio Calderara?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Are you going to answer?

A.   No.

Q.   Do you recall receiving this document with Tony Di Napoli's signature?

A.   No, I don't remember.

Q.   Looking at -- is there any way you can check whether this document was prepared by your legal department?

MR. WALLERSTEIN:  Objection; vague.  If you are asking about her physical capability to do something, she can answer, but she is not taking instructions here today.

MS. HEALY:  Q.  I am asking if there is any way you can check whether this document was prepared by your legal department.

MR. WALLERSTEIN:  Would you be able to check?  Yes or no?

Almawave and IQ or Loop or others of this kind.                 15:47:53

Q.   Have you received a request for                            15:48:06
indemnification or payment of any legal costs by Anna           15:48:09
Gatti?                                                          15:48:13

MR. WALLERSTEIN:  If you have a question about                  15:48:22
privilege, then let's step outside and we will discuss          15:48:24
it.                                                             15:48:31

MS. HEALY:  I object, because there's a                         15:48:32
question pending.                                               15:48:33

MR. WALLERSTEIN:  The witness has a question                    15:48:40
about privilege.  We are taking a break.                        15:48:41

MS. HEALY:  I am asking about                                   15:48:45
communications --                                               15:48:46

MR. WALLERSTEIN:  This is why we need to have                   15:49:02
a court-certified interpreter and our own consultant.           15:49:04

MS. WONG:  (Addressing the interpreter)  He                     15:49:17
wants you with him.                                             15:49:18

MR. WALLERSTEIN:  No, I can't do it.  It's the                  15:49:19
problem.  That's the problem.  That's why we respond to         15:49:22
letters.                                                        15:49:25

(Witness and counsel exit at 3:49; return at                    15:49:26
3:52.)                                                          15:52:42

MS. HEALY:  Let the record reflect that the                     15:52:44
witness, Ms. Perri, and her counsel with Venable have          15:52:46
returned to the room, and the time is now 3:53.                 15:52:56

**F-37**

MR. WALLERSTEIN:  My client had a question about the application of privilege.  Anything that my client knows about Ms. Gatti and whether or not she made a claim for insurance comes from communication between my client and their counsel, namely Venable.  She won't answer questions about it because she has no non-privileged information.

MS. HEALY:  Q.  Did you receive a letter by Ms. Gatti or her lawyer asking for indemnification or payment of any of the fees?

MR. WALLERSTEIN:  Counsel, you can ask if she is aware if a letter exists, but you cannot ask what she received from counsel.  And I just said everything she knows came from counsel.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Did you read a letter authored by Ms. Gatti or any one of her counsel or from IQSystem where Ms. Gatti was asking for payment of legal costs in connection with this case, with regard to the payments?

A.  Everything I know with respect to this matter is covered by privilege, because it regards my communications with the legal study -- with a law firm.  Excuse me.  So I think this is enough.

Q.  I am asking if you read a letter by Tom

of any expense or fees incurred in this litigation by AlmavivA?

A.    AlmavivA.

Q.    Which person?

A.    I don't know.

Q.    How did you learn that AlmavivA made a claim to Lloyd's?

MR. WALLERSTEIN:  Objection.  It's obviously privileged, unless you stumbled upon it without a communication.

MS. HEALY:  Q.  Are you going to answer?

A.    No.

Q.    Do you receive the bills for this litigation from your counsel at Venable?

A.    Yes.

Q.    Do you receive bills for three entities or just one bill for one entity?

A.     I receive the bills that are claimed for the three entities.

Q.    Which entity signed the letter of engagement with Venable?

MR. WALLERSTEIN:  Objection; lacks foundation.

MS. HEALY:  Q.  Do you know?

A.    I didn't really understand the question.

Q.    Who signed the letter of engagement with

MARIANTONIETTA PERRI – 1/20/2016

Page 138

Venable regarding this case?  16:02:30

MR. WALLERSTEIN:  Objection; lacks foundation.  16:02:35

THE WITNESS:  I don't understand this.  Maybe we can move on.  Not me.  16:02:47  16:02:50

MS. HEALY:  Q.  Who signed?  16:02:53

A.  I don't know.  I don't remember.  16:02:54

Q.  Who approves the legal bills received from Venable?  16:02:59  16:03:02

MR. WALLERSTEIN:  Objection; vague.  16:03:09

MS. HEALY:  Q.  You can answer.  16:03:14

A.  The bills are paid by whoever has the authorization to release the payment.  16:03:22  16:03:27

MS. HEALY:  Approved, I would say.  She said "approved."  16:03:30  16:03:32

THE INTERPRETER:  Approved for payment.  16:03:37

MS. HEALY:  Q.  Who is that person in connection with the bills from Venable?  16:03:38  16:03:40

A.  These are the heads of the company, so Valeria Sandei and Marco Tripi.  16:03:50  16:03:55

Q.  Anyone else?  16:04:01

A.  No.  16:04:03

Q.  Do you send -- before sending the bill to Ms. Sandei -- so first of all, let's step back.  16:04:04  16:04:08

So every time you receive a bill from Venable do you send it to Ms. Sandei and Mr. Tripi?  16:04:12  16:04:15

**F-40**

THE WITNESS:  This is my declaration.    16:18:58

MS. HEALY:  That's not your declaration.    16:19:00
That's the complaint.    16:19:01

THE REPORTER:  I am sorry.  I didn't get the    16:19:12
witness's answer.    16:19:13

MS. HEALY:  Q.  So, Ms. Perri, you are a    16:19:15
member of the board of directors of AlmavivA S.p.A.;    16:19:17
correct?    16:19:20

A.  From March of 2015.    16:19:31

Q.  We are not talking about the period of time of    16:19:34
2015.  You have told me before that you have been on the    16:19:36
board of directors since 2005; is that correct?    16:19:39

A.  I said 2015.    16:19:45

Q.  Were you not a member of the board of    16:19:47
directors in 2014?    16:19:49

A.  No.    16:19:55

Q.  So how do you know whether they deliberated or    16:19:55
not, if you weren't a member of the board of directors    16:20:00
in 2014?    16:20:02

MR. WALLERSTEIN:  Objection.    16:20:10

THE WITNESS:  I have already answered.    16:20:11

THE INTERPRETER:  I am sorry.    16:20:13
And she said, "As far as I know."  Sorry.    16:20:13

MS. HEALY:  Q.  You said the statement is    16:20:18
false.  I am trying to understand what was the basis for    16:20:20

**F-41**

MARIANTONIETTA PERRI – 1/20/2016

Page 146

your statement.

Did you participate in any meetings or discussions with the board of directors of AlmavivA S.p.A. in 2014 before the formation of Almawave USA?

A. I did not participate.

Q. So you don't know what they discussed?

A. I said I did not participate. I did not say that I knew what they discussed.

Q. Do you get a copy of what is discussed by the board of directors?

A. If it is needed for my work, yes. If not, no.

Q. Have you reviewed all the deliberations or meeting minutes of the board of directors of AlmavivA S.p.A. relating to any aspect of the formation of Almawave USA or the retention of Ms. Gatti?

MR. WALLERSTEIN: What she reviewed or chose to review reveals work product and likely involves attorney-client privilege of the communication.

MS. HEALY: Q. Are you going to answer?

A. No.

Q. Did you have a meeting with the board of directors in your capacity as a board member in 2015, before the lawsuit started, to discuss Almawave USA or Ms. Gatti --

MR. WALLERSTEIN: Objection.

DTI Court Reporting Solutions – San Francisco

800-869-9132                                    www.deposition.com

**F-42**

MARIANTONIETTA PERRI – 1/20/2016

Page 149

A.   No.    16:27:44

Q.   Did you -- is AlmavivA a family-owned company?    16:27:45

MR. WALLERSTEIN:  Objection; vague.    16:27:57

THE WITNESS:  What does it mean?    16:28:00

MS. HEALY:  Q.  Is AlmavivA owned by the Tripi    16:28:01
family?    16:28:04

A.   AlmavivA has a -- in Italian it's called an    16:28:11
articulated social -- company capital.    16:28:18

I didn't understand the question.    16:28:27

Q.   Is AlmavivA a private company?    16:28:29

MR. WALLERSTEIN:  Objection; vague.    16:28:33

THE WITNESS:  Is this another question?    16:28:35

MS. HEALY:  Q.  Yes.  I am trying to    16:28:36
understand what you are trying to say.    16:28:37

A.   It is not a public company, so it's a private    16:28:41
company.    16:28:46

Q.   To your knowledge, is it owned by the Tripi    16:28:46
family?    16:28:49

A.   It is not owned by the Tripi family.    16:28:55

MR. WALLERSTEIN:  That would be my one-hour    16:29:04
marker, so if you have another question...  If not, we    16:29:06
will take a break.    16:29:10

MS. HEALY:  I have a question, yes.    16:29:11

Q.   Are you saying it's not owned -- does the    16:29:13
Tripi family own the majority of shares in the AlmavivA    16:29:15

**F-43**

entities?

A.   So the majority of -- so the majority of the company capital is owned by Almawave -- AlmavivA Technologies.

Q.   And does General Electric own any shares of any AlmavivA entities?

A.   They have a share of the company capital of AlmavivA.

Q.   And that's the -- how big a share do they have, to your knowledge?

A.   Around 35 percent.  It's 34 point something.

MR. WALLERSTEIN:  Let's take a break, please.

THE WITNESS:  Thank you.

MS. HEALY:  No problem.

(Recess taken from 4:30 to 4:45.)

MR. WALLERSTEIN:  What I was saying is, for Ms. Nicolella, she has been here all day.  If Loop is prepared to proceed with her deposition right now, she is willing to begin, and we will stay until 7:00.  If she can't begin now or conclude by 7:00, she is going to leave now and be back tomorrow at 9:00.

MS. HEALY:  We are going to start as soon as possible.  I only have a few more questions for Ms. Perri.

MR. WALLERSTEIN:  Well, it's your choice,

Counsel.  I am telling you she is not doing -- she is not staying more than five minutes, 10 minutes before her deposition begins, she is not staying past 7:00, and she is not doing two days.  With those parameters, you can proceed as you like.

          MS. HEALY:  Your objection is noted.

          Let the record reflect that we just -- counsel, opposing counsel, just came back to the deposition room, and the time was approximately 4:46.

     Q.   Ms. Perri, did you do any due diligence regarding a company called IQSystem Inc. before June 2014?

     A.   What do you mean by due diligence?

     Q.   Any collection -- what's your understanding of the word "due diligence"?

     A.   You are asking my opinion?

     Q.   Mm-hmm.

     A.   In the general language, due diligence refers to the analysis of a company that you are about to acquire or of some other extraordinary operation.

     Q.   My definition of due diligence in this context was whether you collected any -- you or someone at your direction collected any information regarding IQSystem Inc. -- who it was run by, who they are -- before June 2014.

MR. WALLERSTEIN:  It's unfortunate how the question is phrased.  You can't reveal what anyone did at your direction, so I ask you to disregard that part of the question and answer it as best you can, without revealing any directions that you gave to anyone.

THE WITNESS:  I did not collect any documents relating to IQSystems.

MS. HEALY:  Q.  What about information, to verify who they were?

A.  No, I did not research.

Q.  Does your company have a policy to ensure that any agent or consultant it is engaging is not engaged in any improper payments or other matters that may not fit with any -- with anti-bribery compliance?

A.  My company is not an investigation company. My company follows an ethics code which -- it follows the rules of the law, and it behaves in full compliance with the norms.

Q.  As part of your ethics code, is your company, AlmavivA S.p.A. or any of its subsidiaries, required to conduct any due diligence or obtain information regarding agents or consultants who are doing business with a company such as IQSystem Inc.?

A.  The question is very complex.

Q.  Sure.  That's no problem.

A.   Can you rephrase it?

Q.   When AlmavivA hires a consultant, is there any requirement within your company to investigate or obtain information regarding the consultant before you engage in business with the consultant?

A.   There is no procedure.  There is no company procedure that prescribes or requires prior investigation.

Q.   Did AlmavivA S.p.A. obtain any information regarding IQSystem Inc. before engaging in business with them to verify -- okay.  Before engaging in business with them to verify -- to verify what activities IQSystem Inc. had done before doing business with AlmavivA?

MR. WALLERSTEIN:  Objection to the extent it calls for speculation as to what others did.

THE WITNESS:  I do not do any investigation work.

MS. HEALY:  Q.  Regarding IQSystem Inc.?

A.   Regarding IQSystem Inc.

Q.   Do you know Jeff Capaccio?

A.   If you mean that I have met him, I encountered him, no.

Q.   Do you know his name?

A.   I know his name.

Q.   Who is he?                                          16:55:43

A.   He is an attorney.                                  16:55:47

Q.   Where?                                              16:55:48

A.   In the United States.                               16:55:51

Q.   Do you know where?                                  16:55:52

A.   In California, I think.                             16:55:57

Q.   Did you ever consider retaining his services        16:56:00
for anything?                                            16:56:02

MR. WALLERSTEIN:  Do not reveal anything that            16:56:09
you considered.  That's your work product.               16:56:10

MS. HEALY:  Q.  What is your understanding as            16:56:19
to what Mr. Capaccio specializes in?                     16:56:20

A.   So, as far as I understand, in my                   16:56:54
understanding, Mr. Capaccio is an attorney who works for 16:56:58
a law firm, and they consult also in Italy in civil      16:57:03
matters.                                                 16:57:11

Q.   No.                                                 16:57:12

MR. WALLERSTEIN:  It's been 10 minutes.                  16:57:12

MS. HEALY:  I object.  She said what -- I am             16:57:14
sorry.  I object respectfully to the translation.        16:57:17
Let me finish.  Let me state my objection.               16:57:22

MR. WALLERSTEIN:  I am.                                  16:57:24

MS. HEALY:  The witness stated that her                  16:57:25
understanding is that the law firm in which Jeff         16:57:28
Capaccio works is --                                     16:57:34

Go ahead.  You raise your hand?

She just translated correctly because --

THE WITNESS:  So can you maybe --

MR. WALLERSTEIN:  This is precisely why the Court has ordered a certified translator to be here, so that we do not have these conversations amongst counsel.

MS. HEALY:  She didn't say that -- it doesn't matter.  It's not a big deal.  It doesn't matter.

MR. WALLERSTEIN:  It's been 12 minutes. Ms. Healy, if you are ready to --

MS. HEALY:  I have two last questions, and we will proceed.

MR. WALLERSTEIN:  I will allow two further questions.

MS. HEALY:  Q.  Are you aware that AlmavivA entered into any relationship with Mr. Capaccio for any type of business?

MR. WALLERSTEIN:  Objection; vague.

MS. HEALY:  Q.  You can answer.

A.  I can answer as far as what I know.  What AlmavivA in general, without --

Q.  I just want to know what you know.

THE INTERPRETER:  Excuse me.  If you interrupt and go on before I have a chance, I lose the train.

MS. HEALY:  Sure.

THE INTERPRETER:  I asked to repeat what she had just said.

THE WITNESS:  The question, I believe, is very broad and vague to any kind of contact or involvement between the company and the attorney that they named.

Can you reformulate it so that I actually can give you an answer?

MS. HEALY:  Q.  I want to know your understanding of what Mr. Capaccio was hired to do for any of the AlmavivA entities.

MR. WALLERSTEIN:  That's a new question. Please answer if you can.

THE WITNESS:  As far as I know, the attorney Capaccio is an attorney in the law firm, in an American law firm, which offers consulting in civil matters, as I said earlier, and in particular, as far as I know, for the protection of intellectual property.  As far as I know, the Attorney Capaccio is also a businessman.  This is all I know.

MS. HEALY:  Q.  And is this the reason you hired him?  Not you in person.

A.  I did not say that I hired Capaccio.

Q.  What was the reason that Mr. Capaccio was doing business with AlmavivA?

(Ms. Culp and Ms. Nicolella exit.)

THE WITNESS:  I did not say that Mr. Capaccio was doing business with AlmavivA.

MS. HEALY:  Q.  Okay.  What do you know he was doing with AlmavivA, if anything?

MR. WALLERSTEIN:  Objection to --

Objection.  To the extent the answer would require you to reveal a communication you had, you should not do so.  If you have some other source of information about the business of Mr. Capaccio and AlmavivA, if any, go ahead.

THE WITNESS:  I don't have information.

MS. HEALY:  Q.  Were you involved in communications with Mr. Capaccio?

A.  In the sense that you have so far meant with "involved"?

Q.  Yes.

A.  In cc, in cc?

Q.  In email or telephone?

A.  If I remember correctly, I am in copy in some email.

Q.  And what was the purpose of those emails?

MR. WALLERSTEIN:  Objection.

MS. HEALY:  I am talking about emails to Mr. Capaccio or from Mr. Capaccio.

MR. WALLERSTEIN:  The clarification makes it

**F-51**

clear.  The question likely calls for privilege.  Do not disclose any communications between any of the AlmavivA defendants and Mr. Capaccio, unless Mr. Capaccio was serving in his business role as opposed to providing any legal advice.

MS. HEALY:  Q.  You can answer.

A.  Due to the communications in which I am in cc, in copy, these are referring to legal matters and legal assessments which I may not reveal, which I don't have an intention to reveal.

Q.  I am asking whether -- so when you were copied in communications with Mr. Capaccio, was AlmavivA seeking legal services from Mr. Capaccio?

MR. WALLERSTEIN:  Or receiving legal advice or communicating for the purpose of receiving legal advice.

THE WITNESS:  Communications in which I was in copy and which I remember pertain to legal matters, as I already said.

MS. HEALY:  Q.  So you were seeking legal advice from him, or receiving?

MR. WALLERSTEIN:  Objection; asked and answered, and vague as to "you."

MS. HEALY:  No, she indicated it related to legal matters.  She didn't say that she was seeking or receiving legal advice from Mr. Capaccio.

MR. WALLERSTEIN:  Fortunately, I have a translator and a transcript.  I don't need to be told what she said.     17:06:29 17:06:30 17:06:38

MS. HEALY:  Q.  Okay.  Are you going to answer the question?     17:06:48 17:06:54

A.  I have already answered.     17:06:55

Q.  Did Mr. Calderara ever travel to the United States, to your knowledge, in connection with the Almawave USA Gatti project?     17:07:03 17:07:09 17:07:16

A.  No.     17:07:27

Q.  Did you come to the United States before this trip?  Had you traveled to the United States before this trip, other than on vacation?     17:07:31 17:07:36 17:07:40

A.  So if I ever -- the question is if I ever traveled to the United States for work?     17:07:58 17:08:02

Q.  Mm-hmm.  That wasn't my question, but that's -- it's a different version.  Excluding --     17:08:04 17:08:07

A.  These were two questions I have been trying to answer, if possible.  So otherwise can I ask you to please rephrase it?     17:08:11 17:08:13 17:08:18

Q.  Excluding any vacation, did you ever travel to the United States in 2014?     17:08:20 17:08:24

A.  No.     17:08:36

MS. HEALY:  I don't have any other questions.  So we can get started with Ms. Nicolella.     17:08:53 17:08:57

**F-53**

MR. WALLERSTEIN:  Let me take a moment.  I may have a -- let me take a moment.  I may have some questions.

No, I don't.

MS. HEALY:  Okay.  So thank you, Ms. Perri.  This concludes the deposition of Ms. Perri.  And the time is 5:09 p.m., and we are ready to start whenever you are with Ms. Nicolella.

MR. WALLERSTEIN:  We will be back at 10:00, or 9:00.  I am sorry.

I'm sorry.  Are we on the record?

MS. HEALY:  Yes.

MR. WALLERSTEIN:  I am ready to conclude.  I will wait for you to...

THE REPORTER:  Okay. Off?

MS. HEALY:  Thank you.

MR. WALLERSTEIN:  We will be here at 9:00.

MS. HEALY:  The deposition starts at 8:00.

MR. WALLERSTEIN:  I sincerely hope you go on the record at 8:00 and -- I sincerely hope you do.

MS. HEALY:  So we were not able to locate a --

THE REPORTER:  Off the record, or are you making a statement?

MS. HEALY:  I am making a statement to him, that we were not able to locate an interpreter, so we

A.   So who was calling who?

Q.   It doesn't matter.  When you were speaking to Ms. Gatti was she here in the United States?

A.   The very few times during which I spoke with her, maybe.  I don't know.

Q.   What was the purpose of your calls with Ms. Gatti?

MR. WALLERSTEIN:  Objection.  To the extent Ms. Gatti became an agent for any of the AlmavivA defendants and you had conversations with her at that time, those conversations are privileged.

MS. HEALY:  I am asking for the purpose without revealing the content.

Q.   What was the purpose of your communications with Ms. Gatti?

MR. WALLERSTEIN:  Same objection.  To the extent Ms. Gatti was an agent of any of the AlmavivA defendants, you need not reveal the purpose of your conversations with her, except as to whether or not they constituted the provision of legal advice.

MS. HEALY:  Q.  You can answer.

A.   The few times that I spoke with Anna Gatti I gave legal advice.

Q.   Legal advice to whom?  To her personally or to the company?

MR. WALLERSTEIN:  Objection; vague.  Assumes the distinction.

THE WITNESS:  I don't understand the question.

MS. HEALY:  Q.  Were you giving legal advice to Ms. Gatti or to the company she --

A.  I gave it to the person with whom I was speaking.  I did not ask with which hat she was acting.

Q.  So you were -- so in this case we are talking about you speaking to Ms. Gatti.  And your position is that every time you spoke to Ms. Gatti you were giving legal advice?

A.  The few times that I spoke with Anna Gatti it was for legal matters.

Q.  And is it your position today that, because you were giving legal advice, you don't want to tell us the content of the conversations?

MR. WALLERSTEIN:  Ms. Perri is not here to give legal opinions nor advance legal positions.  She is here to answer questions.

MS. HEALY:  I am asking for the content of the communications with Ms. Gatti.  Are you instructing her not to answer?  Because there is no clarity on the record whether you are instructing her not to answer or if you want to let her answer.  I want to know what she said to Ms. Gatti.  And if she doesn't want to answer,

that's fine.                                                    12:59:17

MR. WALLERSTEIN:  To the contrary, you asked    12:59:41
for her position on a legal issue.  But if you have a    12:59:42
further question for her, I'm sure she would love to    12:59:52
answer it.                                                    12:59:56

MS. HEALY:  Q.  I am asking, when was your    12:59:59
first call with Ms. Gatti that you recall?    13:00:01

A.    If I remember, it was in September 2014.    13:00:17

MR. WALLERSTEIN:  We are taking a break now,    13:00:21
Counsel.    13:00:22

MS. HEALY:  Q.  You are not sure?    13:00:26

A.    I need to use the restroom.    13:00:27

MS. HEALY:  Sure.    13:00:30

(Discussion off the record.)    13:00:30

MS. HEALY:  Can you repeat your statement,    13:01:14
please?    13:01:15

MR. WALLERSTEIN:  I said we require a lunch    13:01:16
break, and we are taking that now.    13:01:18

MS. HEALY:  And it's 1:00 o'clock.  And what    13:01:20
time will you be returning?    13:01:22

MR. WALLERSTEIN:  We are trying to be back by    13:01:24
2:00.    13:01:25

MS. HEALY:  And I am asking for you to take a    13:01:26
much shorter lunch break, because we wasted a whole    13:01:28
morning already.    13:01:31

MR. WALLERSTEIN:  I agree we did.  That's unfortunate, Counsel.

MS. HEALY:  And so I am asking you that you please return as soon as possible, because you arrived to the deposition an hour late.

(Lunch recess taken from 1:00 to 2:00.)

MS. HEALY:  The time is now 2:00 p.m., and counsel for the AlmavivA defendants has still not returned to the deposition room.  And there is no witness either, nor counsel, just counsel for Loop AI.  And we are waiting for them to return to resume the deposition of Ms. Perri.

(Recess taken from 2:00 to 2:08.)

MS. HEALY:  We are back on the record.  The time is 2:08 p.m., and this resumes the deposition of Ms. Perri.

Q.   Ms. Perri --

MR. WALLERSTEIN:  Before you begin, Counsel, it is, as you say, 2:00 o'clock, or shortly --

MS. HEALY:  2:08.

MR. WALLERSTEIN:  Touché.

Does that translate?  Is that Italian?

THE INTERPRETER:  You can say -- it's French.

MR. WALLERSTEIN:  French.

I understood that Ms. Nicolella was to be

MR. WALLERSTEIN:  Objection.  Objection; calls for privilege.  Instruct the witness not to reveal the contents of her communications.

MS. HEALY:  Q.  Did she tell you in connection with a request for legal advice about her intent to open a company in the United States?

MR. WALLERSTEIN:  Same objection and instruction.

MS. HEALY:  Instruction?  Instruction not to answer?

MR. WALLERSTEIN:  Yes.

MS. HEALY:  Okay.

Q.  Is there anything -- did you hear about -- so you said you heard for the first time about this Almawave USA project in February 2014?

A.  Are you asking me for confirmation?

Q.  Did you -- when did you first hear that Ms. Gatti would be involved in that project?

A.  March 2014.

MR. WALLERSTEIN:  Counsel, I am looking at the realtime transcription, and I withdraw my objection and my instruction to the question "Did she tell you in connection with a request for legal advice?"  To the extent that's a yes-or-no question, I will allow the witness to answer.

THE WITNESS:  Yes.                                14:16:16

MS. HEALY:  Q.  Yes what?                          14:16:18

Just say the entire sentence, because he was       14:16:21
reading back several questions ago.                14:16:25

A.  So can you please repeat the sentence --        14:16:34

Q.  The question was --                             14:16:39

A.  -- so that I can reply with a full sentence as  14:16:40
well?                                              14:16:42

Q.  I believe the question that Mr. Wallerstein    14:16:42
went back to was whether Ms. Sandei told you about the  14:16:46
Almawave USA project in February 2014 in connection with  14:16:55
a request for legal advice.                         14:16:59

A.  And the answer is yes.                          14:17:25

Q.  Did you have any discussions with anyone        14:17:27
inside AlmavivA in February 2014 or March 2014 regarding  14:17:31
the San Francisco Almawave USA project that did not  14:17:39
involve legal advice?                               14:17:44

A.  No.                                              14:18:10

MS. HEALY:  Are you going to instruct her not       14:18:12
to answer about all the discussions Ms. Perri had    14:18:13
regarding Almawave USA or the retention of Ms. Gatti?  14:18:16

The question is to Mr. Wallerstein.                 14:18:44

MR. WALLERSTEIN:  I am not aware of any             14:18:49
discussions that she had regarding the retention of  14:18:51
Ms. Gatti, and I need to hear a question before I make  14:18:54

Page 102

an objection.

MS. HEALY:  Q.  Can you tell me when you first discussed Ms. Gatti with anyone within Almawave -- within AlmavivA?

MR. WALLERSTEIN:  Objection.  The questions are awkward and call for privilege, because they include the subject matter of the discussion.  To the extent that the question is when you had discussions, if any, with Ms. Gatti, then I think you can answer when without revealing if you did or did not.

MS. HEALY:  That's not my question.

Q.  My question is, did you discuss -- when you -- in February 2014 or in March 2014 did you discuss with Ms. Sandei the retention of Ms. Gatti?

MR. WALLERSTEIN:  That was not the question.  This one is easy.  It's privileged, and I instruct you not to answer.

MS. HEALY:  Q.  Did you -- were your legal services requested in connection with the retention of Ms. Gatti by Ms. Sandei or anyone else at AlmavivA?

MR. WALLERSTEIN:  Objection; it's privileged.

MS. HEALY:  Are you instructing her not to answer?

MR. WALLERSTEIN:  Did you not hear me?

MS. HEALY:  I just want to make sure I

**F-61**

understand correctly.

MR. WALLERSTEIN:  I said, "Objection; it's privileged."

MS. HEALY:  Are you instructing her not to answer?  Because normally when --

Q.  You can answer.  He is not instructing you not to answer.

Let the record reflect that the lawyer is shaking his head.

I need to know whether she is going to answer or not.

MR. WALLERSTEIN:  Ask her.

MS. HEALY:  I asked her.

Q.  Are you going to answer the question?

A.  No.

Q.  Were your legal services requested in connection with the retention of IQSystem in February or March of 2014 regarding the Almawave San Francisco project?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Are you going to answer the question?

A.  No.

Q.  Did you give legal advice to anyone at AlmavivA regarding the permissibility of hiring

**F-62**

Ms. Gatti?

MR. WALLERSTEIN:  Counsel, to the extent you wish to make a record --

MS. HEALY:  Legality, whatever it is.

MR. WALLERSTEIN:  To the extent you wish to make a record as to whether legal advice was sought, that's fine, and the witness has already said that her conversations were legal advice.  If you include the subject matter of an alleged conversation, the witness has no way to answer without disclosing privilege.  So the last question is privileged.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Did there come a point in 2014 when AlmavivA or you decided to retain legal counsel in the United States?

MR. WALLERSTEIN:  Objection; compound.  Objection; compound.

You can answer with regard to AlmavivA, but not as to you personally.

MS. HEALY:  Q.  I am asking about AlmavivA S.p.A., whether you in your capacity as the head of the legal department retained -- decided to retain a law firm in the United States.

MR. WALLERSTEIN:  Objection.  I do not want --

**F-63**

objection.  It's privileged, and the witness will not testify as to what she decided or did not decide.

MS. HEALY:  Q.  Did you discuss with Ms. Sandei the retention of any law firm in the United States in relation to the Almawave USA project in which Ms. Gatti was involved?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Are you going to answer?

A.  No, it's privileged.

Q.  Did you -- were you the one involved in the discussions regarding -- strike that.

Did you ever consider the retention of the law firm of Carr & Ferrell in connection with the Almawave USA project?

MR. WALLERSTEIN:  Objection.  Privileged and work product.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Did you discuss -- whose idea was it to retain the law firm of Orrick, Herrington & Sutcliffe in the United States in connection with the Almawave USA Gatti project?

A.  Mine.

Q.  Are you going to testify about that?

MR. WALLERSTEIN:  Objection.  She will have to

listen to the questions.

MS. HEALY:  Q.  When did you decide to retain the law firm of Orrick, Herrington & Sutcliffe in connection with the Almawave USA Gatti project?

MR. WALLERSTEIN:  Counsel, I make an offer to you.

MS. HEALY:  I object to any offers.

Q.  Please answer the question.  Will you answer the question?

MR. WALLERSTEIN:  I was not finished, Counsel. Please don't interrupt.  I was waiting for the translator.

I make an offer to you that, if you agree that there will not be a subject matter waiver based on the answer to any particular question, our basis for asserting privilege may be narrower.  So that is your option to choose or not.

MS. HEALY:  Q.  Ms. Perri, are you going to answer the question?

I asked a question.  I am the one who is --

MR. WALLERSTEIN:  No, no, Counsel, let the interpreter --

THE WITNESS:  Should I answer to my lawyer or should I answer to you?

MS. HEALY:  Q.  You need to answer my

14:27:37
14:27:40
14:27:42
14:27:47
14:27:57
14:27:59
14:28:03
14:28:05
14:28:08
14:28:08
14:28:10
14:28:13
14:28:15
14:28:19
14:28:33
14:28:41
14:28:50
14:28:55
14:28:57
14:29:07
14:29:12
14:29:14
14:29:16
14:29:18
14:29:20

**F-65**

questions.

A. Which one is the question? Can you please read it back? I lost it.

Q. I will ask another question.

Did you discuss with Ms. Sandei the retention of the law firm of Orrick, Herrington & Sutcliffe in connection with the Almawave Gatti project in the United States?

MR. WALLERSTEIN: Objection; asked and answered. Calls for privilege.

MS. HEALY: Q. Are you going to answer?

A. No.

Q. Did Ms. Sandei tell you about Ms. Gatti's jobs, other jobs, as of February 2014, March 2014?

MR. WALLERSTEIN: Objection; privileged.

MS. HEALY: Q. Are you going to answer?

A. No. It's privileged.

Q. Did anyone at AlmavivA tell you about Ms. Gatti's position as the CEO of a company known as Soshoma in February-March 2014 and thereafter?

MR. WALLERSTEIN: Objection; compound, and calls for attorney-client privilege and work product.

MS. HEALY: Q. Are you going to answer?

A. No.

Q. Did you discuss any conflicts of interest in

14:29:21
14:29:25
14:29:28
14:29:35
14:29:38
14:29:41
14:29:45
14:29:48
14:29:59
14:30:00
14:30:06
14:30:08
14:30:08
14:30:16
14:30:33
14:30:34
14:30:38
14:30:42
14:30:45
14:30:50
14:31:15
14:31:23
14:31:34
14:31:36
14:31:37

DTI Court Reporting Solutions - San Francisco
800-869-9132                              www.deposition.com

F-66

retaining Ms. Gatti for Almawave or AlmavivA while she    14:31:45

was already working as the CEO of another company?    14:31:53

            MR. WALLERSTEIN:  Objection; privilege.    14:32:11

            MS. HEALY:  Q.  Will you answer?    14:32:16

      A.    No.    14:32:17

      Q.    Were you involved in communications with Tony    14:32:18

Di Napoli in March of 2014?    14:32:20

      A.    What do you mean by "involved"?    14:32:36

      Q.    Were you copied in correspondence -- in email    14:32:37

correspondence with Tony Di Napoli?    14:32:39

      A.    Yes.    14:32:47

      Q.    And can you tell me your understanding of who    14:32:49

Tony Di Napoli was?    14:32:52

      A.    Tony Di Napoli was a person who was working    14:33:08

for a company called IQSystems.    14:33:11

      Q.    When did you first learn about Tony Di Napoli?    14:33:16

      A.    March 2014.    14:33:24

      Q.    Who did you learn -- who told you about Tony    14:33:27

Di Napoli?    14:33:30

            MR. WALLERSTEIN:  Objection; privileged.    14:33:32

            MS. HEALY:  Q.  Are you going to answer?    14:33:35

      A.    No.    14:33:36

      Q.    What did -- you can't even identify the person    14:33:37

who told you?    14:33:41

            MR. WALLERSTEIN:  There was no testimony --    14:33:46

**F-67**

excuse me.  I am sorry.                                      14:33:48

There was no testimony that any person told                 14:33:50
her anything, nor will there be, because it's               14:33:52
privileged.                                                 14:33:59

MS. HEALY:  Q.  Are you going to answer?                    14:34:03

A.  No.                                                      14:34:05

Q.  Who identified the name Tony Di Napoli to you            14:34:06
for the first time?                                         14:34:13

A.  I don't remember.  I think maybe Valeria                 14:34:24
Sandei.                                                      14:34:27

Q.  What was the reason why you were copied in              14:34:28
communications with Tony Di Napoli in March of 2014?        14:34:30

MR. WALLERSTEIN:  Objection; lacks foundation,              14:34:43
calls for speculation.  And I caution the witness not to    14:34:45
reveal any privileged communications.                       14:34:54

MS. HEALY:  Q.  You can answer.                             14:35:05

A.  But I don't remember the main question.  What           14:35:10
were you exactly asking?                                    14:35:14

(Record read as follows:                                    14:35:16

"Q.  What was the reason why you were                   14:35:16
copied in communications with Tony Di Napoli in         14:35:16
March of 2014?")                                        14:35:16

MR. WALLERSTEIN:  If you know why you were              14:35:38
copied, without revealing a communication with someone,    14:35:40
then I think you can answer.  Otherwise, it's              14:35:51

MARIANTONIETTA PERRI - 1/20/2016

Page 110

privileged.    14:35:54

THE WITNESS:  If the communications -- if the communications referred to people in my office, I am also added in copy to these communications because I'm the head of the department.    14:36:01 / 14:36:15 / 14:36:19 / 14:36:23

MS. HEALY:  Q.  I am asking about your communications -- communications in which you were copied involving Tony Di Napoli.    14:36:25 / 14:36:27 / 14:36:30

A.    I confirm the answer that I gave.  I also add that I might have been added in copy in, possibly -- but I don't remember exactly if they actually happened -- communications between other colleagues of my company with Tony Di Napoli.    14:36:47 / 14:36:56 / 14:37:06 / 14:37:07 / 14:37:19

Q.    Why was AlmavivA communicating with Tony Di Napoli in March of 2014?    14:37:22 / 14:37:24

MR. WALLERSTEIN:  Objection.    14:37:37

You can answer only to the extent -- only to the extent you can do so without revealing communications that you had.  If you cannot, then it's privileged.    14:37:37 / 14:37:39 / 14:37:41 / 14:37:51

THE WITNESS:  The company, IQSystems, was part of a project, as the Attorney Healy was calling it -- should have been developing the business of the company, and therefore the commercialization on the territory of the United States of products, of Almawave products,    14:38:00 / 14:38:09 / 14:38:13 / 14:38:27 / 14:38:32

period.

MS. HEALY:  Q.  Communications regarding this project were the ones happening in March 2014?

A.  Of course.

Q.  Was Ms. Gatti involved in those communications at that time?

MR. WALLERSTEIN:  Objection; calls for speculation.

MS. HEALY:  I am asking for her knowledge.

MR. WALLERSTEIN:  Counsel, I was not finished with my -- Counsel, I was not finished with my objection.  Please stop interrupting me.  You are taking all day long, just because you lack the courtesy to let the interpreter finish.

The objection was:  Calls for speculation and lacks foundation.

If you know, Ms. Perri, you may answer.

THE WITNESS:  Excuse me.  Can you read it back to me again?

(Record read as follows:

"Q.  Was Ms. Gatti involved in those communications at that time?")

THE WITNESS:  As regards to the communications in which I was copied in during this time period, I don't recall if she was or if she wasn't also copied in.

**F-70**

MARIANTONIETTA PERRI – 1/20/2016

Page 112

MS. HEALY:  Q.  When did you learn that AlmavivA wanted to hire Ms. Gatti for the USA project, as we have been referring to?

A.    Between March and April of 2014.

Q.    Were you -- what type of due diligence did you do regarding Ms. Gatti before you decided to go ahead with the retention of Ms. Gatti?

MR. WALLERSTEIN:  Objection; privilege and work product.

MS. HEALY:  Q.  Are you going to answer?

A.    No.

Q.    What was your understanding of where IQSystem was when you first heard of IQSystem?

MR. WALLERSTEIN:  Objection; vague and ambiguous, and calls for privilege.

MS. HEALY:  Q.  Did you ask -- are you going to answer?

A.    No.

Q.    Did you ask any question of Ms. Sandei or anyone else inside AlmavivA about who is IQSystem?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Are you going to answer?

A.    No.

Q.    Did you discuss with anyone any conflicts of interest regarding the retention of Anna Gatti?

**F-71**

MR. WALLERSTEIN:  Objection; asked and
answered.  Privileged.

MS. HEALY:  Q.  Did Ms. Sandei tell you
that -- do you know the name of -- before today and
before this lawsuit began, did you know the name of the
company that Ms. Gatti worked for that she was the CEO
of?

MR. WALLERSTEIN:  Objection; vague and
ambiguous on several levels.

And, Counsel, I am going to instruct not to
answer, just because the transcript I am reading has two
different questions.  But if you want to rephrase, you
might try.

MS. HEALY:  Q.  Are you going to answer?

A.  If you can ask them in a comprehensible way so
that I can answer them, I will.

Q.  When you first heard of Ms. Gatti, did
Ms. Sandei tell you she was the CEO of Soshoma?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Did you seek legal advice from
the law firm of Orrick, Herrington & Sutcliffe regarding
the employment agreement for Ms. Gatti?

MR. WALLERSTEIN:  If the question was asked
without the "regarding" phrase, I would think it is not
privileged.  But the question as phrased is privileged.

14:43:05
14:43:06
14:43:12
14:43:15
14:43:19
14:43:34
14:43:39
14:43:47
14:43:48
14:43:52
14:43:56
14:44:04
14:44:09
14:44:15
14:44:21
14:44:27
14:44:30
14:44:34
14:44:46
14:44:50
14:44:52
14:44:55
14:45:11
14:45:12
14:45:22

MS. HEALY:  Q.  Are you going to answer?    14:45:34

A.    No.    14:45:35

Q.    Did you communicate with Orrick, Herrington &    14:45:35
Sutcliffe lawyer Scott Strube regarding -- or any other    14:45:39
lawyer at Orrick regarding the legality of hiring    14:45:47
Ms. Gatti?    14:45:54

MR. WALLERSTEIN:  Because of -- the phrase    14:46:11
following "regarding" refers to the substance of    14:46:13
communications, the answer is privileged.    14:46:25

MS. HEALY:  Q.  Are you going to answer?    14:46:33

A.    No.    14:46:34

Q.    Did -- did you send -- so can you identify the    14:46:36
person in your legal department who was -- person or    14:46:47
persons who were involved in communicating with Tony Di    14:46:52
Napoli or Anna Gatti in the period of time from    14:46:57
February 2014 until June 2014?    14:47:02

A.    Of course.  The lawyer Sergio Calderara.    14:47:29

Q.    Anyone else?    14:47:40

A.    That I remember, no.    14:47:41

Q.    And to confirm, at the time he was an employee    14:47:42
of AlmavivA S.p.A.?    14:47:46

A.    Yes.    14:47:54

Q.    Before this lawsuit was filed on February 20,    14:47:55
2015, did you discuss with Ms. Sandei or anyone else at    14:48:12
AlmavivA about the risk of being sued as a result of    14:48:22

# ACTIVITIES AT THE DIRECTION OF COUNSEL

**F-74**

context, and I assume the witness does not as well, because that's what she said.

MS. HEALY:  Q.  Can you tell me everything you did in connection with this declaration?

A.  What do I have to say?  Each and every single activity that I performed?

Q.  Yes, in connection with this declaration.  I want to know anything you did to prepare this declaration.

MR. WALLERSTEIN:  And I will caution the witness -- caution -- not to reveal communications with counsel or activities taken at the direction of counsel.

THE WITNESS:  To answer this question, I presented the facts which I knew, which I also discussed with my lawyers, and then I prepared this declaration.

MS. HEALY:  Q.  So let's look at that.  In what language -- was this translation -- sorry.  Was this declaration translated for you before you signed?

A.  Yes.

Q.  Do you have the translation?

A.  Here?  No.

Q.  Was it emailed to you, the translation?

A.  No.

Q.  Who prepared the translation of this declaration?

Counsel.  I am telling you she is not doing -- she is
not staying more than five minutes, 10 minutes before
her deposition begins, she is not staying past 7:00, and
she is not doing two days.  With those parameters, you
can proceed as you like.

         MS. HEALY:  Your objection is noted.

         Let the record reflect that we just --
counsel, opposing counsel, just came back to the
deposition room, and the time was approximately 4:46.

    Q.   Ms. Perri, did you do any due diligence
regarding a company called IQSystem Inc. before
June 2014?

    A.   What do you mean by due diligence?

    Q.   Any collection -- what's your understanding of
the word "due diligence"?

    A.   You are asking my opinion?

    Q.   Mm-hmm.

    A.   In the general language, due diligence refers
to the analysis of a company that you are about to
acquire or of some other extraordinary operation.

    Q.   My definition of due diligence in this context
was whether you collected any -- you or someone at your
direction collected any information regarding IQSystem
Inc. -- who it was run by, who they are -- before
June 2014.

**F-76**

MR. WALLERSTEIN:  It's unfortunate how the question is phrased.  You can't reveal what anyone did at your direction, so I ask you to disregard that part of the question and answer it as best you can, without revealing any directions that you gave to anyone.

THE WITNESS:  I did not collect any documents relating to IQSystems.

MS. HEALY:  Q.  What about information, to verify who they were?

A.  No, I did not research.

Q.  Does your company have a policy to ensure that any agent or consultant it is engaging is not engaged in any improper payments or other matters that may not fit with any -- with anti-bribery compliance?

A.  My company is not an investigation company. My company follows an ethics code which -- it follows the rules of the law, and it behaves in full compliance with the norms.

Q.  As part of your ethics code, is your company, AlmavivA S.p.A. or any of its subsidiaries, required to conduct any due diligence or obtain information regarding agents or consultants who are doing business with a company such as IQSystem Inc.?

A.  The question is very complex.

Q.  Sure.  That's no problem.

**F-77**

A.    Because our practice is to place companies in reference locations.

Q.    Did you discuss with anyone the possibility of litigation in the United States in respect of Almawave USA's business that Ms. Gatti was running?

MR. WALLERSTEIN:  Other than with lawyers. Other than with lawyers or at the direction of lawyers.

THE WITNESS:  No.

MS. HEALY:  Q.  Ms. Sandei, in July of 2014 I understand that there was an event held at the San Francisco consulate where you participated with Ms. Gatti, announcing Almawave USA.  Is my understanding correct?

A.    Yes.

Q.    And who organized that event?

A.    IQSystem and Anna Gatti.

Q.    Do you know how you were able to obtain the consulate approval to let you use their facilities to host this event for your company?

A.    What do you mean by consulate approval?

Q.    Do you know how you were able to persuade the consulate to let you use their beautiful consulate offices for your event?

A.    Yes, I know.

Q.    Can you tell me how?

retention of Tony Di Napoli or IQSystem Inc. or Jeff

Capaccio?

A.    Not before having received this lawsuit.

Q.    To your knowledge, did Mr. Amati have contacts

in the United States, and specifically in California,

that would have allowed you to verify the credentials of

Mr. Di Napoli and Mr. Capaccio?

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  When?

MS. HEALY:  Q.  At any time.

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  Not before having received this

lawsuit.

MS. HEALY:  Q.  What does that mean?

A.    Before having received this lawsuit I did not

know that Antonio Amati knew anybody here in California.

Q.    And then after the lawsuit started, what did

you learn?

MR. WALLERSTEIN:  Objection.  Obviously do not

reveal things that you learned from counsel.

So the question -- you should understand the

question to be:  "What did you learn, other than from

counsel?"

THE WITNESS:  (In English)  Other than from

counsel?

(Through interpreter)  All this happened when the lawsuit came, so everything happened with a lawyer.

MS. HEALY:  Q.  I am not asking about your communications with lawyers.  I am asking about your communications with Mr. Amati, whether after the lawsuit started he told you he knew anyone in California that could verify the credentials of Tony Di Napoli.

A.  All these conversations have happened in the presence of our attorneys.

Q.  Did Mr. Amati tell you that he called Fabio Ficano about the lawsuit?

MR. WALLERSTEIN:  I understand the witness to have testified that her conversations with Mr. Amati about any of this subject occurred in the presence of counsel, and I instruct her not to answer on that basis. It's privileged.

MS. HEALY:  Q.  Which counsel was present during your communications with Mr. Amati?

A.  It was Mr. [sic] Perri.

Q.  Ms. Perri.

A.  Ms. Perri.

MS. HEALY:  She is right there.

Q.  When was this communication?

The fact that --

A.  It was after we saw this document.

**F-80**

Q.   The fact that Ms. Perri was present doesn't allow for the concealment of a communication coming from Mr. Amati.  I am asking you for what Mr. Amati said to you about calling somebody in California.

MR. WALLERSTEIN:  Counsel --

MS. HEALY:  I am not asking -- please.

MR. WALLERSTEIN:  You just interrupted me.  I waited for you to finish to make my objection.  Please do not interrupt me again.

Number one, do not instruct my witness about the law.

Number two, do not misinstruct her and give her the law incorrectly.  What you told her was wrong.

The question calls for privilege.  I instruct her not to answer.

MS. HEALY:  Q.  And I am asking again, what did Mr. Amati tell you about any communication he had with anyone in California after this lawsuit was started?  I am not asking for any legal advice you received.  I am asking for what you were told by Mr. Amati, who is not a lawyer.

MR. WALLERSTEIN:  Objection.  Calls for privilege.  Instruct the witness not to answer.  And work product.

I use the term "privilege" and "work

product" -- I use the term "privilege" to include work    15:35:31

product often, and I have done so today.  So the precise    15:35:35

objection --    15:35:36

        MS. HEALY:  You have not done so, and I'm    15:35:37

asking you to please --    15:35:38

        MR. WALLERSTEIN:  Counsel, you interrupted me    15:35:39

again, and I am getting really sick of it.    15:35:42

        No.  I am speaking.  Do not interrupt me.  I    15:35:43

am really tired of it, Counsel.    15:35:44

        The objection is privilege and work product.    15:35:47

        MS. HEALY:  Q.  I want to know what Mr. Amati    15:35:50

told you.  I don't want to know anything that any lawyer    15:35:53

told you.    15:35:54

        MR. WALLERSTEIN:  Same objection.  Same    15:35:56

instruction.    15:35:56

        MS. HEALY:  Q.  Please answer the question.    15:36:04

Please answer.    15:36:05

        MR. WALLERSTEIN:  She is not going to answer,    15:36:06

Counsel.    15:36:09

        MS. HEALY:  There is no basis for privilege.    15:36:11

        MR. WALLERSTEIN:  That's not for you and the    15:36:12

witness to decide.    15:36:12

        MS. HEALY:  That's not for you to make abusive    15:36:15

invocation of nonexistent privilege.  You have been    15:36:18

interfering with this deposition all day long.  I am

asking for a simple question --                    15:36:22

MR. WALLERSTEIN:  I have heard the question.       15:36:22

MS. HEALY:  Please stop.                           15:36:22

MR. WALLERSTEIN:  I have a transcript.             15:36:24

MS. HEALY:  Please stop.  Let the witness          15:36:26
answer.  I am not asking --                        15:36:26

MR. WALLERSTEIN:  I am not letting the witness     15:36:28
reveal privilege.  I will not.                     15:36:29

MS. HEALY:  You cannot conceal information         15:36:32
simply by claiming that Ms. Perri was in the room.  15:36:35

Q.   Where was this meeting that you had with      15:36:38
Mr. Amati?                                         15:36:39

A.   In Rome.                                      15:36:40

Q.   Where?                                        15:36:44

A.   At our offices.                              15:36:45

Q.   Which office?                                15:36:52

A.   Via Di Casal Boccone 188.                    15:36:57

Q.   Were you in your office or in Mr. Amati's    15:37:02
office?                                           15:37:09

A.   As far as I remember, it was in the office of  15:37:12
Ms. Perri.                                        15:37:13

Q.   Did Ms. Perri instruct Mr. Amati to make a   15:37:17
call?                                             15:37:21

MR. WALLERSTEIN:  Objection; privilege and        15:37:22
work product.

Don't answer that.

MS. HEALY:  I am asking for what Mr. Amati said outside of any legal advice received.  Mr. Amati is not a lawyer, and I just want to know the basic facts of what he told you.

MR. WALLERSTEIN:  Counsel, there is no ambiguity to me as to your question.  I heard it perfectly well.  I can read it on the transcript.  There is no ambiguity.  I made the objection, and I am making it again.  It's privileged work product, and I instruct the witness not to answer.  Please stop repeating the question.

MS. HEALY:  Q.  Do you know who Fabio Ficano is?

A.  I discovered it in time, but I knew -- I found out only after I received this lawsuit.

Q.  What was his -- how is he relevant to this lawsuit, to your knowledge?

MR. WALLERSTEIN:  Objection; calls for privilege and work product.

I don't want you to reveal anything you learned from me or Ms. Perri or in conversations in which Ms. Perri or I facilitated the communication and instructed the communication.

If you can answer beyond that, say that you

can answer.  Otherwise say that you cannot answer.   15:38:45

THE WITNESS:  I can't reply.   15:38:47

MS. HEALY:  Q.  Did you have any   15:38:49
communications with Mr. Amati not involving Ms. Perri in   15:39:00
which you discussed Fabio Ficano?   15:39:05

MR. WALLERSTEIN:  And in which Ms. Perri did   15:39:07
not instruct the conversation to happen or ask for it to   15:39:11
happen.   15:39:11

THE WITNESS:  Not that I remember.   15:39:12

MS. HEALY:  Q.  Did you ask Mr. Amati to meet   15:39:14
with Mr. Ficano?   15:39:19

MR. WALLERSTEIN:  Objection; privilege and   15:39:21
work product.  The witness just established the clear   15:39:24
work product.  Instruct not to answer.   15:39:26

MS. HEALY:  Q.  Did you want to meet with   15:39:27
Mr. Ficano yourself?   15:39:32

A.  No.  No.  I do not want to meet with   15:39:37
Mr. Ficano.   15:39:39

Q.  I have to ask questions, since you don't want   15:39:42
to give me any responses.   15:39:44

MR. WALLERSTEIN:  Counsel, that's badgering.   15:39:45
Of course she wants to give you responses.  She doesn't   15:39:49
want to reveal the privilege.   15:39:51

MR. LOSAVIO:  She has given responses.  You   15:39:53
just don't like the responses she has given.

# TO THE EXTENT IT CALLS FOR PRIVILEGE

A.   He is.

Q.   Okay.  Did you reach out to Mr. Capaccio to retain him for Almawave?

A.   I was not in the position to do that.

Q.   So why did you reach out to Mr. Capaccio?

MR. WALLERSTEIN:  Objection to the extent it calls for privilege.

MS. HEALY:  Q.  You can answer.

A.   To facilitate a meeting between Mr. Capaccio and his firm and Valeria Sandei.

Q.   What was the reason -- who asked you to do that?

MR. LOSAVIO:  Assumes facts; no foundation.

MS. HEALY:  Q.  Who asked you to call Mr. Capaccio --

MR. LOSAVIO:  Assumes --

MS. HEALY:  Q.  -- to introduce him to Ms. Sandei?

MR. LOSAVIO:  Assumes facts.  No foundation.

MS. HEALY:  Q.  You can answer.

A.   I don't remember anyone asking me for that.

Q.   Why were you reaching out to him?

MR. LOSAVIO:  Asked and answered.

MR. WALLERSTEIN:  Objection to the extent it calls for privilege.

10:32:00
10:32:01
10:32:03
10:32:10
10:32:13
10:32:16
10:32:17
10:32:20
10:32:21
10:32:27
10:32:42
10:32:43
10:32:45
10:32:47
10:32:48
10:32:49
10:32:49
10:32:51
10:32:53
10:32:56
10:32:57
10:33:02
10:33:05
10:33:06
10:33:07

**F-87**

MS. HEALY:  Q.  You can answer.

A.  Valeria Sandei was looking for the legal services --

Q.  Mm-hmm.

A.  -- in California.

Q.  Mm-hmm.

A.  And --

Q.  For herself personally or for her company?

A.  For her company.

Q.  Okay.

A.  And I offered, I believe, to introduce her to the law firm of -- of Mr. Capaccio, because I think it's healthy to meet a different service provider when you enter a market.

Q.  Okay.  So what was there?  What was she looking for?  What kind of assistance was she looking for?

MR. WALLERSTEIN:  Objection.  That is privileged.  I heard the witness testify that Ms. Sandei was looking for legal services, and I object to the disclosure of any details on the basis of privilege.

MS. HEALY:  Q.  Were you working for Ms. Sandei at the time that she asked you for this introduction?

A.  Just for the record, Ms. Sandei never asked me

ANNA GATTI - 1/19/2016

Page 63

A.    So -- when she said what would be the first step to enter the market.    10:40:01 10:40:11

Q.    I am sorry.  The first what?    10:40:13

A.    Step --    10:40:15

Q.    Step.  Okay.    10:40:16

A.    -- to enter the US market.  And, you know, I said -- probably I said that she had to form -- to incorporate a company.    10:40:16 10:40:20 10:40:24

Q.    When did you tell her that?    10:40:25

A.    If I remember correctly, that was part of our very first conversation.    10:40:29 10:40:34

Q.    The one in Rome?    10:40:36

A.    Probably.    10:40:38

Q.    You are not sure?    10:40:38

A.    I am not sure.    10:40:40

Q.    So between Rome and the time you reached out to Mr. Capaccio -- you said in April of 2014?    10:40:41 10:40:45

A.    I don't remember the date.  Certainly before June 2014, but I don't remember when I did it.    10:40:50 10:40:53

Q.    And what did you tell Mr. Capaccio?    10:40:57

MR. WALLERSTEIN:  Objection to the extent it calls for the communication of attorney-client privilege.    10:41:01 10:41:02 10:41:04

MS. HEALY:  Q.  Were you acting on behalf of Almawave S.r.l. when you telephoned Mr. Capaccio?    10:41:06 10:41:07

**F-89**

time before you were fired.

A.    I don't remember that conversation.

Q.    And did you discover after this lawsuit began that there was an insurance policy taken out for Almawave USA?

A.    I had some understanding that there was a policy.

Q.    And did you make a claim to Almawave for -- under the policy or under any policy?

A.    My attorney was leading all this part.  I don't have enough information to provide.

Q.    I am just asking whether you have made a claim, to your knowledge -- I am not asking for the content of the claim.  I am asking whether, to your knowledge, you understand that the claim has been made to Almawave -- any of the AlmavivA entities for a claim under the insurance policy relating to this lawsuit.

MR. WALLERSTEIN:  Objection; asked and answered.

MR. LOSAVIO:  And to the extent you know what you know because your attorney told you, then that would be attorney-client privilege.  So if you know some other way, then you can say that.

MS. HEALY:  Q.  Who is paying your legal fees, for the lawyers in this lawsuit?

# EXHIBIT F

**EXAMPLES OF
INSTRUCTIONS NOT TO ANSWER
ON OTHER THAN PRIVILEGE**

**F-91**

A.    Single.    09:30:13

Q.    Is Mr. Di Napoli your partner?    09:30:16

A.    What do you mean by partner?    09:30:21

Q.    Are you in an intimate relationship with    09:30:23
Mr. Di Napoli?    09:30:26

MR. LOSAVIO:  I am going to object.  You are    09:30:27
supposed to be here for jurisdictional discovery.    09:30:29

MS. HEALY:  I am for jurisdictional discovery,    09:30:33
but I need to ask questions that are related to the    09:30:35
relationship to Mr. Di Napoli as it relates to Almawave.    09:30:37

MR. LOSAVIO:  It's inconceivable to me how --    09:30:42
I understand for purposes of perhaps the merits of the    09:30:44
lawsuit that might very well be relevant.  But this is    09:30:48
so far off the spectrum that I am going to instruct the    09:30:53
witness not to answer.    09:30:56

MS. HEALY:  Can you note all the questions he    09:30:59
is instructing her not to answer?    09:31:00

So what are you instructing her not to answer?    09:31:02

MR. LOSAVIO:  The last question.    09:31:06

MS. HEALY:  Whether she is in a relationship    09:31:09
with Mr. Di Napoli?    09:31:11

MR. LOSAVIO:  It's the exact question as    09:31:13
recorded by the reporter.    09:31:14

MS. HEALY:  Could you read it back, please?    09:31:16

(Record read as follows:    09:31:17

"Q.   Are you in an intimate relationship with Mr. Di Napoli?")                                                09:31:17
                                                                                                              09:31:17

        MS. HEALY:  Q.  Are you in a business relationship with Mr. Di Napoli?                                 09:31:34
                                                                                                              09:31:36

        A.   At the moment?                                                                                   09:31:41

        Q.   Yes.                                                                                             09:31:42

        A.   Yes.                                                                                             09:31:42

        Q.   What kind of a relationship is that?  Can you explain to me what's the nature of your business relationship?   09:31:43
                                                                                                              09:31:45
                                                                                                              09:31:47

        A.   He is an employer of IQSystem Inc., and I am an advisor.                                         09:31:50
                                                                                                              09:31:58

        Q.   He is an employer or an employee?                                                                09:32:01

        A.   An employee.  Sorry.                                                                             09:32:03

        Q.   Okay.  And what's his title?                                                                     09:32:05

        A.   I don't know.                                                                                    09:32:08

        Q.   You don't know what his title at IQSystem Inc. is?                                                09:32:13
                                                                                                              09:32:18

        (Clarification requested by reporter.)                                                                09:32:18

        MS. HEALY:  Q.  You don't know what his title at IQSystem Inc. is?                                     09:32:18
                                                                                                              09:32:18

        A.   I do not, no.                                                                                    09:32:18

        Q.   Who formed IQSystem Inc.?                                                                        09:32:20

        A.   To the best of my knowledge, it was formed by Gennaro Di Napoli.                                 09:32:22
                                                                                                              09:32:29

**F-93**

what you said, Counsel, so that's a different question.    14:08:45

MS. HEALY:  Q.  Did you understand you were    14:08:48
acting as the agent for any AlmavivA entity before    14:08:49
June 1st, 2014?    14:08:54

A.    That was not my understanding.    14:08:55

Q.    Okay.  Before June 1st, 2014, did Sandei tell    14:08:57
you that she had retained Orrick to work on the project    14:09:00
you were working on?    14:09:04

A.    Not that I remember.    14:09:05

Q.    Okay.  Did Ms. Sandei ever tell you the reason    14:09:07
why she did not want to retain Capaccio?    14:09:11

A.    Capaccio firm?    14:09:19

Q.    Right.    14:09:20

A.    Because Capaccio was never --    14:09:20

Q.    As legal counsel, meaning Carr & Ferrell.    14:09:23

A.    Yes.    14:09:28

Q.    What was that reason?    14:09:29

A.    She -- my recollection is that she said that    14:09:36
she had a good meeting with them, that she liked -- she    14:09:43
liked the meeting with them.    14:09:52

MR. WALLERSTEIN:  Ms. Gatti, I caution you not    14:09:54
to reveal communications you had with Ms. Sandei after    14:09:56
you began working for Almawave as to --    14:09:59

MS. HEALY:  That's before.    14:10:01

MR. WALLERSTEIN:  Counsel, please don't    14:10:04

**F-94**

A.    In Italy.                                                     11:41:54

Q.    Could you tell us where you work?                            11:41:55

A.    In AlmavivA.                                                  11:41:59

Q.    Is that the name of a company?                               11:42:03

A.    Yes, it is the name of the company.                          11:42:07

Q.    It's -- could you give us the full legal name                11:42:12
of the company you work for?                                       11:42:15

MR. WALLERSTEIN:  Objection.  Vague as to                          11:42:21
"work for," whether you mean the -- whether you mean the           11:42:22
entity that pays her checks or --                                  11:42:30

MS. HEALY:  Objection.  I -- please don't make                     11:42:31
speaking objections.                                               11:42:35

MR. WALLERSTEIN:  Counsel --                                       11:42:36

MS. HEALY:  You state your objections.                             11:42:37

MR. WALLERSTEIN:  Counsel, I --                                    11:42:40

MS. HEALY:  Excuse me.  Let me just finish                         11:42:40
mine and then you can translate.                                   11:42:41

The Court said no speaking objection.  You are                     11:42:43
not allowed to suggest testimony to the witness.                   11:42:47

MR. WALLERSTEIN:  Thank you.                                       11:42:49

I was not finished.                                                11:42:50

My -- please don't interrupt me, Ms. Healy,                        11:42:52
when I am making my objection.  I am pausing to allow              11:42:56
the interpreter to interpret.                                      11:43:01

MS. HEALY:  No.  I object, because she is                          11:43:10

**F-95**

adding --

MR. WALLERSTEIN:  I am not finished.

MS. HEALY:  She is adding words that were not spoken by you.  I object to the translation.

THE INTERPRETER:  Ms. Healy, I am absolutely sure that I did not add any words to anybody's statement.

MS. HEALY:  There is a video recording.  You added two words to what was said.

MR. WALLERSTEIN:  Ms. Healy, Loop's counsel may have a standing objection to the interpretation.

As for the last question, I will ask that it be restated so that I may make my objections.

MS. HEALY:  Q.  Please answer the question.

MR. WALLERSTEIN:  Don't answer the question.

I need it restated.

MS. HEALY:  It does not have to be reformulated.

Q.  Can you please give me the legal name of the company where you work?

MR. WALLERSTEIN:  Objection; vague and ambiguous as to the phrase "where you work," because it does not distinguish between the company that pays the check and the company or companies to whom you provide services.

You may answer.                                               11:44:36

THE WITNESS:  No.  Can you --                                 11:44:41

MS. HEALY:  Q.  Answer the question.                          11:44:42

A.    -- reformulate?                                         11:44:44

MS. HEALY:  Read back the question.                           11:44:45

THE WITNESS:  Can you reformulate the                         11:44:47
question, please?                                             11:44:49

MS. HEALY:  Q.  No, I am asking the question.                 11:44:49
Please answer -- please -- okay.  We will move on, if         11:44:50
you don't know which company you work for.                    11:44:54

Could you please tell me, what is your title?                 11:45:00

A.    Director of legal affairs.                              11:45:09

Q.    Do you work for AlmavivA S.p.A.?                        11:45:11

MR. WALLERSTEIN:  Objection; vague as to "work                11:45:17
for" on the same basis.                                       11:45:19

Go ahead.                                                     11:45:25

MS. HEALY:  Q.  You can answer.                               11:45:28

A.    I work for AlmavivA S.p.A., and I offer                 11:45:35
consulting services for all the entire group AlmavivA.        11:45:43

Q.    Could you please tell me how big the legal              11:45:48
department of AlmavivA S.p.A. is?                             11:45:51

A.    How big it is in terms of space?                        11:46:04

Q.    In terms of how many people are in the legal            11:46:06
department.                                                   11:46:09

A.    10, plus me.                                            11:46:16

with Christian"?                                    16:53:10

MR. WALLERSTEIN:  Objection.                         16:53:15

MS. HEALY:  Q.  Is that Christian De Felice?        16:53:16

MR. WALLERSTEIN:  Objection; misstates --           16:53:20
objection; misstates testimony.  The witness did not say   16:53:20
that she agreed.  You said that, Counsel.           16:53:23

MS. HEALY:  Right.  I said that in this email       16:53:25
that's what she said.                               16:53:27

MR. WALLERSTEIN:  What email?                        16:53:27

MS. HEALY:  In this email that I am reading         16:53:28
from.                                               16:53:29

MR. WALLERSTEIN:  That is improper and              16:53:30
unacceptable.  I won't allow her to answer the question   16:53:31
if you are reading from an Italian document where I do   16:53:35
not have a certified translation.                   16:53:38

If you want to ask a question without               16:53:45
referring to an Italian language document, that's fine.   16:53:47

MS. HEALY:  Q.  You can answer the question.        16:53:50
You can answer.                                     16:53:58

A.  Can I see the document?                          16:54:03

Q.  Yes.  Sure.                                     16:54:05

And this has been marked as Exhibit Number 10.      16:54:06

MR. WALLERSTEIN:  I am sorry.  I am sorry.  I        16:54:09
do not have a certified translation of this, so I am not   16:54:12
going to allow you to look at it.                   16:54:15

A.    If they were registered with the bar, yes.        12:29:01

Q.    Is it a requirement of Italian law that if you    12:29:04
go work for a company as an employee you have to be        12:29:07
suspended from the bar?        12:29:13

MR. WALLERSTEIN:  Objection; calls for a legal    12:29:23
conclusion.        12:29:25

MS. HEALY:  Q.  You can answer.        12:29:30

A.    The system is very complex, and I'm sure -- as    12:29:34
you know, as a lawyer.  And the answer really requires a    12:29:38
legal assessment and an evaluation that I believe goes    12:29:52
beyond what we are here to achieve today.        12:29:56

Q.    I am only asking for your understanding.        12:29:58

MR. WALLERSTEIN:  Same objection --        12:30:06

MS. HEALY:  I think --        12:30:07

MR. WALLERSTEIN:  -- asked and answered.        12:30:07

MS. HEALY:  I just want to suggest a better    12:30:11
translation.        12:30:13

(Speaks in Italian.)        12:30:16

MR. WALLERSTEIN:  Objection.        12:30:21

MS. HEALY:  She is translating what I am        12:30:22
saying.        12:30:23

MR. WALLERSTEIN:  No.  No.  Unacceptable.        12:30:24

MS. HEALY:  I am just saying --        12:30:26

MR. WALLERSTEIN:  Objection.        12:30:27

Ms. Healy, please don't interrupt.        12:30:28

MR. WALLERSTEIN:  Objection; asked and answered.  Privileged.

MS. HEALY:  Q.  Did Ms. Sandei tell you that -- do you know the name of -- before today and before this lawsuit began, did you know the name of the company that Ms. Gatti worked for that she was the CEO of?

MR. WALLERSTEIN:  Objection; vague and ambiguous on several levels.

And, Counsel, I am going to instruct not to answer, just because the transcript I am reading has two different questions.  But if you want to rephrase, you might try.

MS. HEALY:  Q.  Are you going to answer?

A.  If you can ask them in a comprehensible way so that I can answer them, I will.

Q.  When you first heard of Ms. Gatti, did Ms. Sandei tell you she was the CEO of Soshoma?

MR. WALLERSTEIN:  Objection; privileged.

MS. HEALY:  Q.  Did you seek legal advice from the law firm of Orrick, Herrington & Sutcliffe regarding the employment agreement for Ms. Gatti?

MR. WALLERSTEIN:  If the question was asked without the "regarding" phrase, I would think it is not privileged.  But the question as phrased is privileged.

**F-100**

MS. WONG: Q. Good morning. Could you please state your name and address for the record?

A. Good morning. My name is Angela Nicolella.

MR. WALLERSTEIN: Before Ms. Nicolella discloses her address, I think it's an appropriate time to designate that as confidential pursuant to the protective order.

Further, pursuant to the protective order -- and I am referring to the order dated October 1, 2015, docket number 230, paragraph 5.2, pages 5 through 6 -- the three Almawave defendants that I represent invoke their right to have up to 21 days from the conclusion of this deposition to designate any testimony as confidential or highly confidential, attorneys' eyes only, as the case may be.

MS. WONG: Q. You can state your address.

A. I do not answer the question. It is private. I do not answer the question. The address is --

Q. The witness refuses to answer the question?

THE REPORTER: I'm sorry. I might have to have you switch places, because it's hard for me to hear.

MS. WONG: I will speak up. Is this better?

THE INTERPRETER: It's better.

MS. WONG: Okay. I'll try to speak up, just

because everything is plugged in. 11:17:58

Q. I am sorry. Is the witness refusing to answer the question? 11:18:00 11:18:02

A. I am not refusing to answer the question, but my address is private. 11:18:13 11:18:14

MR. WALLERSTEIN: Could you give your city and country of where you reside? 11:18:18 11:18:20

THE WITNESS: In Rome. I live in Rome. 11:18:28

MS. WONG: Q. And where are you from, Ms. Nicolella? 11:18:32 11:18:34

A. I'm Italian. 11:18:38

Q. And where were you born? 11:18:40

A. Santa Maria Capua, Vetere. 11:18:47

Q. How familiar are you with the English language, Ms. Nicolella? 11:18:55 11:18:58

A. Very little. 11:19:00

Q. Do you speak English? 11:19:03

A. I do not speak English well. 11:19:09

Q. Do you write in English? 11:19:11

A. Sometimes. 11:19:17

Q. Do you use English for your work? 11:19:19

A. Sometimes. 11:19:26

Q. When do you use your work for English, if you use it sometimes? 11:19:32 11:19:35

THE INTERPRETER: Can you rephrase? 11:19:38

Q.   What about Sensiba?  Do you remember that one?    14:56:11

A.   Yes, also.    14:56:20

Q.   Have you interacted with anyone from Sensiba?    14:56:23

THE INTERPRETER:  Can I ask you to spell it    14:56:37
for me?    14:56:38

MS. WONG:  I believe --    14:56:39

MS. HEALY:  S-e-n-s-i-b-a.  Sensiba San    14:56:40
Filippo is the full name of the company.    14:56:46

THE WITNESS:  I had some exchanges of email    14:56:53
with Sensiba.    14:56:55

MS. WONG:  Q.  With whom?    14:57:19

A.   I don't remember quite the name, but it was    14:57:19
somebody who was in charge of accounting at Sensiba.    14:57:22

Q.   Does Gary Price ring a bell?    14:57:27

A.   I heard this name, yes.    14:57:30

Q.   Maybe you can explain what Sensiba is.    14:57:38

A.   From what I understand, it's the accounting    14:57:57
firm that takes care of accounting for Almawave USA.    14:57:59

Q.   How much money is in the Almawave USA bank    14:58:10
account as of today?    14:58:14

A.   So the balance in the checking account?    14:58:25

Q.   Yes.    14:58:28

MR. WALLERSTEIN:  Objection; relevance and    14:58:29
privilege -- I am sorry.  Relevance and privacy,    14:58:30
financial privacy.    14:58:33

MS. HEALY:  Of what?  Of a company?    14:58:35

MS. WONG:  Q.  You can answer.    14:58:43

A.    Today I didn't connect to the account online,    14:58:53
so I don't know how much money is present on the    14:58:56
account.    14:58:58

Q.    What is the last balance that you remember,    14:58:59
last current balance that you remember?    14:59:05

MR. WALLERSTEIN:  Same objections.  Relevance    14:59:07
and privacy.  And I will clarify.  By privacy I am    14:59:09
referring both to United States privacy law, Italian,    14:59:22
and European Union.    14:59:26

MS. HEALY:  Can you explain how the European    14:59:29
Union privacy law applies here?  Just for the record.    14:59:31

MR. WALLERSTEIN:  For the record, you are not    14:59:35
participating in this deposition, for the record.    14:59:36

MS. HEALY:  Would you care to explain how the    14:59:40
European privacy law applies?    14:59:43

MS. WONG:  Q.  Do you remember the question,    14:59:55
Ms. Nicolella?    14:59:58

A.    Can you repeat?    14:59:59

Q.    What is the most recent, most current balance    15:00:00
for Almawave USA, as you remember?    15:00:03

MR. WALLERSTEIN:  Same objections.    15:00:11

THE WITNESS:  So this is private information,    15:00:24
so I don't think I need to give an answer.    15:00:27

MS. WONG: Q. To clarify, you are refusing to answer the question?

MR. WALLERSTEIN: I want to take a break, and we can discuss the privilege and the privacy issue, and maybe we can accommodate you.

MS. HEALY: There is no privilege issue.

MR. WALLERSTEIN: It's a privacy issue, so I'm going to --

MS. HEALY: It's a US bank account, and we have a protective order.

MR. WALLERSTEIN: Okay. So, Counsel --

MS. HEALY: So you don't need to coach the witness. We are -- we have questions pending. Please stop interfering.

MR. WALLERSTEIN: Okay. Counsel, you are interfering with Ms. Wong's deposition. Please desist.

Number two, Ms. Wong, if you would like us to consider giving an answer to the question, I am happy to do that. If you refuse to let us consider, that's your choice. But I am telling you, I am willing to reconsider whether we will provide that information.

MS. WONG: I think the protective order --

MR. WALLERSTEIN: I think you may be right. That's why I think it behooves you to let us reconsider. But it's fine. I will obey Ms. Healy's direction, if

| | |
|---|---|
| 15:00:32 | 15:00:34 |
| 15:00:38 | 15:00:40 |
| 15:00:44 | 15:00:45 |
| 15:00:47 | 15:00:48 |
| 15:00:49 | 15:00:51 |
| 15:00:52 | 15:00:53 |
| 15:00:55 | 15:00:59 |
| 15:01:00 | 15:01:02 |
| 15:01:06 | 15:01:09 |
| 15:01:12 | 15:01:12 |
| 15:01:15 | 15:01:19 |
| 15:01:21 | 15:01:23 |
| 15:01:32 | |

you prefer.

MS. WONG:  I think the protective order is sufficient to alleviate any confidentiality concerns.

MR. WALLERSTEIN:  I think you may be right. That's exactly why I want to --

MS. WONG:  Ms. Nicolella needs to answer the question.

MR. WALLERSTEIN:  That's what I need to discuss.

MS. WONG:  What do you need to discuss about?

MR. WALLERSTEIN:  I need to discuss whether that's accurate and whether that's our position.

MS. WONG:  You have the protective order in front of you.

MR. WALLERSTEIN:  That's fine.

MS. WONG:  Q.  Ms. Nicolella, can you answer the question?

A.  I would like to speak to my attorney before I answer, because I consider this answer private and privileged.

Q.  There is -- it's not privileged.  Can you tell us how much money is in the bank account?

A.  I am not refusing to respond -- to reply, but I would like -- I am asking to speak to my attorney, because I consider this information privileged and

ANGELA NICOLELLA - 1/21/2016

Page 71

private.                                                    15:02:56

Q.    What is the basis of the privilege?           15:02:59

MR. WALLERSTEIN:  Objection; calls for a legal      15:03:04
conclusion.                                                15:03:06

MS. WONG:  Q.  You are refusing to answer on        15:03:07
the basis of privilege.  I don't understand why you        15:03:09
believe that that's the case.                              15:03:13

MR. WALLERSTEIN:  That's not a question.            15:03:14

THE WITNESS:  I repeat, I consider this             15:03:39
information private and privileged, and I would like to     15:03:41
speak to my attorney before I give the answer.             15:03:44

MS. WONG:  Q.  Did you access the account and       15:03:50
see how much money was in the accounts recently?           15:03:51

A.    I consider this information private, and I     15:04:11
would like to speak to my attorney.                        15:04:13

Q.    Whether you accessed the account is not       15:04:16
private.  You just told me you accessed the account        15:04:18
earlier.  So I am just asking you, what -- when was the     15:04:22
last time you accessed the account?                        15:04:26

A.    I don't remember.                             15:04:38

Q.    How often do you check the Almawave USA bank  15:04:40
account?                                                   15:04:46

A.    It depends.                                   15:04:57

Q.    Depends on what?                              15:05:02

A.    If I do check, if there were transfers or     15:05:12

**F-107**

MR. WALLERSTEIN:  The first question was, were there any conversations?  I instructed the witness only to answer to the extent that the conversations occurred outside the presence of counsel.  The witness said no.

To ask the question now whether there were conversations outside -- with counsel is implicitly getting to the answer.  It's privileged, and I instruct the witness not to answer.

MS. HEALY:  That's fine.

MR. WALLERSTEIN:  All you need to translate for her is I instruct her not to answer.

MS. HEALY:  Please be polite to the interpreter.  She's trying to do her job.

MR. WALLERSTEIN:  I'm just saying all that's relevant for her is --

MS. HEALY:  I am asking you to please not harass her.

MR. WALLERSTEIN:  I don't think that's harassing, Counsel.  I'm trying to --

MS. HEALY:  Please try to be polite, because she is doing her job.

MR. WALLERSTEIN:  I am trying to make it easier by telling her it's not necessary for the witness to understand the legal debate.

I apologize if that was rude.  I am trying to

ANGELA NICOLELLA - 1/21/2016

Page 128

make it simple and say you need not translate as far as 17:49:17
I am concerned. 17:49:20

MS. HEALY:  Q.  So was it your understanding 17:49:27
that -- strike that. 17:49:30

Will you tell me how much money you know to be 17:49:34
in Bank of the West's bank account as of today, to the 17:49:41
extent you remember? 17:49:45

MR. WALLERSTEIN:  Objection on grounds of 17:50:00
privacy.  Had you permitted us to look into this 17:50:02
earlier, we would be prepared to give you an answer.  If 17:50:04
you would like us to adjourn and reinvestigate, I again 17:50:07
repeat my offer to do so. 17:50:10

MS. HEALY:  You had many breaks and you had 17:50:11
many opportunities to discuss that. 17:50:14

MR. WALLERSTEIN:  So nothing has changed.  The 17:50:29
objection is privacy. 17:50:31

MS. HEALY:  Which privacy? 17:50:35

MR. WALLERSTEIN:  I apologize.  I thought the 17:50:47
question was to me.  Was it a question to the witness or 17:50:48
for me? 17:50:53

MS. HEALY:  It's for the witness. 17:50:55

MR. WALLERSTEIN:  Objection; calls for a legal 17:50:58
conclusion. 17:50:59

MS. HEALY:  I believe the Court instructed you 17:51:08
at the December 10th hearing that you could only make 17:51:10

**F-109**

objections on privilege grounds.  So I am asking the

witness to answer the question of how much money she

recalls being in the bank account at Bank of the West

the last time she checked.

MR. WALLERSTEIN:  Counsel, the -- the grounds

for the objection do not change by you repeating it

three times.  So we have the same grounds and I have the

same proffer to investigate if you would like us to.  I

understood you were refusing that proffer earlier.  I

repeat it now.

MS. HEALY:  There is nothing to investigate,

because the Court --

Excuse me.  I am just discussing with him.

The Court said that you can only object on

privilege grounds.  So if you are instructing her not to

answer, that's fine.  Go ahead and do it.  But you are

not allowed to confer with the witness about how much

money is in the bank account.  I am asking her a

question.

Q.   Ms. Nicolella, will you answer my question?

How much money is in Bank of the West of Almawave USA's

bank account in San Francisco?

MR. WALLERSTEIN:  The same objection on

grounds of privacy.  And I repeat my offer to counsel.

If you would like us to investigate whether we can

Page 130

provide that information, I am happy to do so, now or          17:52:37

later.          17:52:40

          MS. HEALY:  I want the witness to answer.  The          17:52:40

witness came here to answer questions.          17:52:42

          THE WITNESS:  I don't answer, because it is          17:52:54

privileged -- private information.          17:52:56

          MR. WALLERSTEIN:  Counsel, Mr. Ferri has been          17:53:19

here waiting to be deposed for many, many hours.  May he          17:53:20

be excused today, or do you intend to take his          17:53:25

deposition?          17:53:28

          MS. HEALY:  I intend to take his deposition.          17:53:29

          MR. WALLERSTEIN:  He has a hard stop at          17:53:31

7:00 p.m.          17:53:33

          MS. HEALY:  You took many breaks.  You arrived          17:53:34

super late.  You have been doing this every day.  So I          17:53:35

am continuing the depositions.  If you want to take your          17:53:40

witnesses away -- you have been doing that before.  I am          17:53:42

here and I am staying as long as it takes to take his          17:53:45

deposition, as the Court ordered me.          17:53:49

          MR. WALLERSTEIN:  He was here shortly after          17:53:51

9:00 a.m., Counsel, and he is leaving at 7:00.          17:53:52

          (Deposition Exhibit 12          17:54:18

          was marked for identification.)          17:54:18

          MS. HEALY:  Q.  Ms. Nicolella, I am placing in          17:54:19

front of you what's been premarked as Exhibit Number 12.          17:54:20

Page 130

provide that information, I am happy to do so, now or    17:52:37

later.    17:52:40

MS. HEALY:  I want the witness to answer.  The    17:52:40

witness came here to answer questions.    17:52:42

THE WITNESS:  I don't answer, because it is    17:52:54

privileged -- private information.    17:52:56

MR. WALLERSTEIN:  Counsel, Mr. Ferri has been    17:53:19

here waiting to be deposed for many, many hours.  May he    17:53:20

be excused today, or do you intend to take his    17:53:25

deposition?    17:53:28

MS. HEALY:  I intend to take his deposition.    17:53:29

MR. WALLERSTEIN:  He has a hard stop at    17:53:31

7:00 p.m.    17:53:33

MS. HEALY:  You took many breaks.  You arrived    17:53:34

super late.  You have been doing this every day.  So I    17:53:35

am continuing the depositions.  If you want to take your    17:53:40

witnesses away -- you have been doing that before.  I am    17:53:42

here and I am staying as long as it takes to take his    17:53:45

deposition, as the Court ordered me.    17:53:49

MR. WALLERSTEIN:  He was here shortly after    17:53:51

9:00 a.m., Counsel, and he is leaving at 7:00.    17:53:52

(Deposition Exhibit 12    17:54:18

was marked for identification.)    17:54:18

MS. HEALY:  Q.  Ms. Nicolella, I am placing in    17:54:19

front of you what's been premarked as Exhibit Number 12.    17:54:20

**F-112**

MR. WALLERSTEIN:  Do you have a copy for counsel, Counsel?

MS. HEALY:  Q.  Do you recognize this document, Ms. Nicolella?

A.  I am going to read it, if you can give me a minute.

Q.  Do you recognize this document?

A.  Yes.

Q.  Can you tell me what it is?

A.  It is a declaration.

Q.  Who prepared that declaration for you?

MR. WALLERSTEIN:  Objection; vague as to "prepared."

MS. HEALY:  Q.  You can answer.

A.  The declaration was signed by me.

Q.  Who gave this declaration to you?

A.  Given in which sense?

Q.  To sign.

A.  It was sent to me via email by a colleague in the legal office at AlmavivA.

Q.  Which colleague?  What's the name?

A.  Mariantonietta Perri.

Q.  Is she the lady here in the room?

A.  Yes.

Q.  And what did you do after you received the

THE WITNESS:  Not that I know of.     17:05:45

MS. HEALY:  Q.  Who helped you rent this     17:05:47
office?     17:05:56

A.   The purchasing department of the group.     17:06:01

Q.   When you say "group," you mean AlmavivA     17:06:07
S.p.A.?     17:06:20

A.   When I say group, as I said before, I mean     17:06:23
AlmavivA S.p.A. that offers and gives services for all     17:06:29
the other companies in the group.     17:06:31

Q.   How much money is in Almawave USA's bank     17:06:39
account at this moment at Bank of the West?     17:06:41

MR. WALLERSTEIN:  Objection on grounds of     17:06:43
privacy.  Counsel, if you would like us to caucus, we     17:06:49
are happy to consider whether she will disclose that     17:06:52
information.     17:06:55

MS. HEALY:  Caucus.  Go ahead and caucus.     17:06:58

MR. WALLERSTEIN:  Okay.     17:07:03

MS. HEALY:  We will stay here on the record,     17:07:06
waiting.     17:07:06

Can we mark the time that they are leaving the     17:07:06
room so that we can note it, please?     17:07:07

(The Witness, Mr. Wallerstein, and Ms. Perri     17:07:16
exit at 5:07; return at 5:09.)     17:09:59

(Record read as follows:     17:09:59

"Q.  How much money is in Almawave USA's

bank account at this moment at Bank of the       17:09:59

West?")       17:10:04

THE WITNESS:  I do not want to answer the       17:10:05

question.       17:10:06

MS. HEALY:  Q.  What assets does Almawave USA       17:10:09

have?       17:10:25

A.   Do you mean the --       17:10:27

Q.   Any assets.       17:10:29

A.   Do you mean the capital?  I don't understand       17:10:37

"assets."       17:10:38

Q.   Assets.  You don't understand the word       17:10:39

"assets"?  Assets means anything that the company owns.       17:10:45

Could be money in the bank.  Could be property.       17:10:51

Whatever the company owns.  I don't know.  You tell me.       17:11:04

A.   The company has a checking account.  It       17:11:09

doesn't have property that it owns.       17:11:12

Q.   It doesn't have any other assets other than       17:11:14

the bank account?       17:11:22

A.   Could you qualify them, maybe?       17:11:24

Q.   Other than the bank account that you described       17:11:27

at Bank of the West, does the company have -- own       17:11:31

anything else, Almawave USA?       17:11:44

A.   Not that I know of.       17:11:46

Q.   And you are not willing to tell me how much is       17:11:48

in the bank account?

A.    No.    17:11:54

Q.    Why not?    17:11:58

A.    Because it's private information.    17:12:00

Q.    Private under what law?    17:12:02

MR. WALLERSTEIN:  No, no.  Objection; calls for a legal conclusion.    17:12:04 17:12:11

MS. HEALY:  Q.  Okay.  If you don't want to answer, I am not going to force you.    17:12:13 17:12:22

Did you ever discuss the possibility of Almawave USA filing for bankruptcy?    17:12:24 17:12:36

MR. WALLERSTEIN:  Objection.    17:12:37

With anyone other than a lawyer.    17:12:42

THE WITNESS:  No.    17:12:44

MS. HEALY:  Q.  Just with lawyers?    17:12:45

MR. WALLERSTEIN:  Don't answer.    17:12:50

THE WITNESS:  (In English)  Okay.  Don't answer.    17:12:51 17:12:51

MR. WALLERSTEIN:  It's privileged.    17:12:54

MS. HEALY:  Q.  Does Almawave USA have any revenues?    17:12:56 17:13:01

A.    Not yet.    17:13:03

Q.    Does -- have you -- what was the reason why you chose to launch your, as you indicated, your venture in the United States through a separate entity as opposed to directly through Almawave S.r.l?    17:13:06 17:13:13 17:13:17

A.   Because our practice is to place companies in reference locations.

Q.   Did you discuss with anyone the possibility of litigation in the United States in respect of Almawave USA's business that Ms. Gatti was running?

MR. WALLERSTEIN:   Other than with lawyers. Other than with lawyers or at the direction of lawyers.

THE WITNESS:   No.

MS. HEALY:   Q.   Ms. Sandei, in July of 2014 I understand that there was an event held at the San Francisco consulate where you participated with Ms. Gatti, announcing Almawave USA.   Is my understanding correct?

A.   Yes.

Q.   And who organized that event?

A.   IQSystem and Anna Gatti.

Q.   Do you know how you were able to obtain the consulate approval to let you use their facilities to host this event for your company?

A.   What do you mean by consulate approval?

Q.   Do you know how you were able to persuade the consulate to let you use their beautiful consulate offices for your event?

A.   Yes, I know.

Q.   Can you tell me how?

A.   Anna and IQ have talked to the consulate to ask them to allow -- to do the hosting for our event.

MR. WALLERSTEIN:  This is not an intended --

Well, most lawyers will tell you a deposition is not intended to be a physically -- a physically challenging event.  If you are fatigued, you can take a break every five minutes if you like.  I don't want you to feel like -- I can tell you are having difficulty concentrating and answering questions, and I don't want you to think -- as I say, most lawyers would tell you that they want your best testimony, not your sleep-induced or sleep-deprived testimony.  So if you need a break, please, Ms. Sandei, at any time.

THE WITNESS:  Perhaps now I would like to take a couple of minutes break.

MS. HEALY:  Q.  Have you heard of Michele Valensise?

A.   Yes, I heard of him.

Q.   Can you tell me who he is?

A.   He is the --

Q.   Secretary general?

A.   -- secretary general of Farnesina.

Q.   Did you have anybody reach out to him in respect of the event that was held at the San Francisco consulate?

A.    Yes.                                                    17:17:58

Q.    Who did you have contact him?                           17:18:06

A.    I spoke with his wife, who was so kind.  She            17:18:19
was so kind as to ask him and to make sure that the          17:18:23
event was starting in the best and most opportune way.       17:18:38

Can I take a break now?                                       17:18:41

(Recess taken from 5:18 to 5:23.)                             17:23:37

MR. WALLERSTEIN:  Ms. Sandei is physically                   17:23:39
exhausted and finished.  So I am going to ask you to         17:23:42
finish up.  We have maybe five minutes and just a few        17:23:46
questions.                                                   17:23:46

MS. HEALY:  You have taken many, many breaks.                17:23:48

MR. WALLERSTEIN:  I don't care what you say.                 17:23:49
I am telling you something.  I am giving you information      17:23:52
to use however you like.  You are going to have about        17:23:54
five more minutes and just a few questions.  Please          17:23:58
proceed accordingly.                                         17:23:59

MS. HEALY:  I am here to ask as many questions               17:24:01
as I can.                                                    17:24:02

MR. WALLERSTEIN:  Valeria, you don't need to                 17:24:02
listen to the information.                                   17:24:02

MS. HEALY:  If Ms. Sandei is not feeling well,               17:24:05
we can resume tomorrow.  We are here.                        17:24:07

MR. WALLERSTEIN:  We are not resuming                        17:24:09
tomorrow, but she is ending in about five minutes.  I am

giving you the courtesy of a warning.  That's all.  You can ignore it if you like.

(Deposition Exhibit 16

was marked for identification.)

MS. HEALY:  Q.  Ms. Sandei, I am placing in front of you Exhibit 16, which is a printout from some website regarding the launch of Italian software giant -- sorry.  Let me just read the title, actually. The title is "Italian Software Giant Launches Silicon Valley Operations."

MR. WALLERSTEIN:  Do you want her to read this?  Do you want her to read the document?

MS. HEALY:  If she would like.

MR. WALLERSTEIN:  I suggest you read the document before you answer questions about it.

MS. HEALY:  Q.  Just the first paragraph.  I just want to ask you a question about the first paragraph.

The paragraph states, "Valeria Sandei is the CEO of Almawave, an international software company that is part of Italy's leading AlmavivA group."

AlmavivA group, there is a typo there.

"Tonight Valeria has officially launched Almawave into the highly competitive arena of San Francisco and Silicon Valley from the platform of the

**F-120**

Italian Consulate."

Is that the same event that we were discussing a few minutes ago before you took a break?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.  How could she know?

MS. HEALY:  Q.  Is that the same event?

MR. WALLERSTEIN:  Is what the same event?

MS. HEALY:  Q.  At the San Francisco consulate that we were describing before.

A.  I don't know what it is, this thing that you are showing me, but I suppose yes.

Q.  Ms. Sandei, I am going to place in front of you what I am marking as Exhibit Number 17, which I will be marking as soon as I find a sticker.

MR. WALLERSTEIN:  This is it, Counsel.  This is your last exhibit.  Make it count.

(Deposition Exhibit 17 was marked for identification.)

MS. HEALY:  Q.  Can you please review it?

I just want to ask you some questions about the front.

A.  You asked me to --

Q.  I just want --

MR. WALLERSTEIN:  Can I hear what the witness just said, please, Counsel?

**F-121**

MS. HEALY:  Sure.    17:30:21

THE WITNESS:  You asked me to view the    17:30:23
document, so that's what I am doing, after now six    17:30:27
hours.  I am reviewing the document.    17:30:29

MR. WALLERSTEIN:  It's almost seven, actually,    17:30:30
now.    17:30:31

THE WITNESS:  Six and a half hours.    17:30:33

MS. HEALY:  Q.  I just would like to ask you    17:30:35
whether the company reflected in that document is the    17:30:40
same company you mentioned earlier today, SentiMetrix.    17:30:52

A.  Yes.    17:31:00

MS. HEALY:  If the witness is not feeling well    17:31:03
and we are going to interrupt her, I don't want to put    17:31:06
another question in front of her, if you are going to    17:31:10
take her away.    17:31:11

MR. WALLERSTEIN:  I told you she is done.    17:31:12

THE WITNESS:  No, I feel well.    17:31:14

MR. WALLERSTEIN:  No, Ms. Sandei, we are about    17:31:17
finished.  If she has more questions about this exhibit,    17:31:20
I want to hear them.    17:31:22

MS. HEALY:  I don't have any other questions    17:31:23
about the exhibit.    17:31:24

MR. WALLERSTEIN:  You are moving to a new    17:31:25
subject?    17:31:27

MS. HEALY:  Yes.

MR. WALLERSTEIN:  Okay.  We are done.    17:31:30

MS. HEALY:  Thank you, Ms. Sandei.  Your lawyer is ending the deposition.  I have more questions, but we will ask you at another time.    17:31:31 / 17:31:37 / 17:31:43

MR. WALLERSTEIN:  Don't respond.  Don't respond to comments.    17:31:44 / 17:31:44

MS. HEALY:  Thank you for your time.    17:31:48

MR. WALLERSTEIN:  What are your intentions, Counsel?  Mr. Romagnoli is here.    17:31:49 / 17:31:56

MS. HEALY:  Yes.  I am ready to proceed.    17:33:03

(Whereupon, the deposition was adjourned at 5:33 p.m.)    17:33:03 / 17:33:03

--oOo--    17:33:03

I declare under penalty of perjury the foregoing is true and correct.  Subscribed at _____, this _____ day of _____, 2016.    17:33:03 / 17:33:03 / 17:33:03 / 17:33:03

_____    17:33:03

Valeria Sandei

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  January 29, 2016

SARAH LUCIA BRANN, CSR No. 3887

**F-124**

MARIANTONIETTA PERRI - 1/20/2016

Page 8

interpreter, as we have told you repeatedly.

MS. HEALY:  Would the court reporter please swear the witness?

MR. WALLERSTEIN:  You can try.

THE REPORTER:  Would you raise your right hand, please?

MR. WALLERSTEIN:  The witness is not going to respond to English today, ma'am.

MS. HEALY:  Ms. Perri, do you speak English?

MR. WALLERSTEIN:  She is not responding to English, Ms. Healy, and I instruct her not to answer.

MS. HEALY:  Ms. Perri, will you --

Ms. Court Reporter, will you be kind enough to attempt to swear the witness?  If she doesn't want to answer, that's fine.

MR. WALLERSTEIN:  Okay.  Well, I am going to adjourn the deposition at this point if you don't have an interpreter.

MS. HEALY:  I am asking the court reporter to please attempt to swear the witness.  And if she doesn't understand English, so it will be noted on the record that she doesn't understand English.

MR. WALLERSTEIN:  That's not the point.  I am noting on the record that she is not proceeding with this deposition in English.  We have told the Court

09:05:55
09:05:59
09:06:01
09:06:02
09:06:08
09:06:11
09:06:11
09:06:13
09:06:14
09:06:17
09:06:18
09:06:21
09:06:24
09:06:27
09:06:30
09:06:30
09:06:31
09:06:34
09:06:35
09:06:37
09:06:40
09:06:42
09:06:45
09:06:47
09:06:49

# EXHIBIT F

**EXAMPLES OF
SPEAKING OBJECTIONS & COACHING**

**F-126**

# EXHIBIT F

**EXAMPLES OF
SPEAKING OBJECTIONS & COACHING
("vague" and/or "ambiguous" with witness parroting counsel)**

S.r.l. when you began as its CEO, approximately?     10:33:57

A.    About 10 or 11.     10:33:59

Q.    So was Almawave S.r.l. kind of like a startup     10:34:02
company within the AlmavivA group?     10:34:08

MR. WALLERSTEIN:  Objection; vague.     10:34:10
Objection; vague and ambiguous as to startup.     10:34:15

THE WITNESS:  What do you mean by startup?     10:34:17

MS. HEALY:  Q.  Do you have an understanding     10:34:18
of what a startup company is?     10:34:29

A.    Do you mean a company that starts its own     10:34:31
activity?     10:34:33

Q.    Generally a startup, yes, is a small company     10:34:36
that begins an activity.     10:34:42

MR. WALLERSTEIN:  Is that a statement or a     10:34:43
question, Counsel?  That's your definition?     10:34:46

MS. HEALY:  She asked me for an explanation.     10:34:48

MR. WALLERSTEIN:  And that's your definition?     10:34:49

MS. HEALY:  Yes.     10:35:00

THE WITNESS:  So the company was started     10:35:02
between 2006-2007, so at the time it was starting its     10:35:07
activity.     10:35:08

MS. HEALY:  Q.  Have you ever heard of the     10:35:09
term "startup" in business language?     10:35:18

A.    Yes, I heard it several times.     10:35:20

Q.    What is your understanding of what a startup

of an ontologic semantic engine.     10:58:28

A.   It's because it's part of the methodology, and     10:58:31
so probably it's a slightly bigger definition or naming.     10:58:38

Q.   And what's the methodology that it describes?     10:58:50

A.   It's the methodology with which content is     10:58:53
analyzed.     10:58:58

Q.   To your knowledge, there is not a reason why     10:59:00
the term "ontologic" is used in the context of semantic     10:59:04
engines?     10:59:05

A.   I would not be able to tell you.     10:59:08

Q.   Were you involved in any aspect of the     10:59:12
development of any technical products that you have at     10:59:18
Almawave?     10:59:19

MR. WALLERSTEIN:  Objection; vague.     10:59:30

THE WITNESS:  Can you explain more what you     10:59:32
mean by "involved"?     10:59:39

MS. HEALY:  Q.  Did you have any role, any     10:59:41
involvement in development of technology at Almawave?     10:59:44

MR. WALLERSTEIN:  Same objection.     10:59:52

THE WITNESS:  If you are asking me if I     10:59:53
developed software, the answer is no.     10:59:55

MS. HEALY:  Q.  Did you have any other     10:59:56
involvement in any aspect of development of technology     11:00:00
products at Almawave?     11:00:11

A.   You mean aside from deciding to invest in

A.    It's because Jeff Capaccio, if I remember    13:10:36
correctly, Anna Gatti introduced me to him, or him to    13:10:40
me, in his capacity of business development.    13:10:47

Q.    Why did you bring Mr. Di Napoli to those    13:10:51
meetings?  Was he working for you?    13:10:57

MR. WALLERSTEIN:  Objection; vague as to    13:10:58
"working."    13:10:59

THE WITNESS:  No.    13:11:00

MR. WALLERSTEIN:  "Working for."    13:11:02

MS. HEALY:  Q.  When did you first hear of    13:11:04
Mr. Di Napoli?  Tony Di Napoli, because there are    13:11:08
others.  So I just want to -- Tony Di Napoli.    13:11:19

A.    In the same time frame.  I couldn't give you a    13:11:23
precise date.    13:11:24

Q.    Who told you about Tony Di Napoli?    13:11:35

A.    As I said earlier, Anna Gatti and Jeff    13:11:41
Capaccio introduced him to me.    13:11:44

Q.    Did they send you a resume of Mr. Di Napoli?    13:11:50

A.    Not that I remember.    13:11:52

Q.    Did you ask for a resume of Tony Di Napoli?    13:12:08

A.    No.  His experience was recounted to me, so...    13:12:12

Q.    By whom?    13:12:13

A.    By himself, he himself.    13:12:15

Q.    When did he tell you about his experience?    13:12:22

A.    When I met him.

trusted was Jeff Capaccio.  And we are in the time

period of March 2014.  Had you ever met Mr. Capaccio

before?

MR. WALLERSTEIN:  Objection; misstates prior

testimony.  Move to strike the -- whatever you call that

thing before the question.

MS. HEALY:  Q.  You can answer.

A.  So I met him by phone, and I spoke with him,

and I said that he was a person that inspired trust in

me, not necessarily that he was a trusted person.

Q.  Okay.  And so based on your inspiration, you

followed his recommendation to meet Mr. Di Napoli?

A.  Yes.

Q.  And had you -- up to March 2014, before you

had the meeting at Carr & Ferrell where Mr. Capaccio

works, had you received any -- had you received a resume

about Mr. Capaccio or any other information in writing

about his background?

A.  I did not ask this lawyer to send me a CV.

Q.  Did you ask anyone else to send you

information about Mr. Capaccio?

A.  No.

Q.  Before you met with Mr. Capaccio and invited

Mr. Di Napoli in your legal meetings, did you ask anyone

to do any background checks of Mr. Di Napoli?

A.   No.

Q.   Did you ask that information of anyone other than Ms. Gatti and Mr. Capaccio about Mr. Di Napoli?

A.   No.

Q.   Did you have an understanding of where Mr. Di Napoli worked at the time you met him in California in approximately March 2014?

A.   No.

Q.   Had you heard of a company called Elettranova as of March 2014?

A.   Not that I remember.

Q.   Were you emailing Mr. Di Napoli at his email address at Elettranova?

A.   I learned about it after I received these proceedings.

Q.   What does that mean?

THE INTERPRETER:  "After I learned about these legal proceedings."

MS. HEALY:  Q.  Were you emailing with Mr. Di Napoli in March 2014?

A.   Yes.

Q.   Did you check what email address he had?

A.   No.

Q.   So I can tell you that Mr. Di Napoli was using an email at Elettranova.  Did you not concern yourself

to ask who Elettranova was while you were emailing him    13:24:33

at that address?    13:24:47

A.    No.    13:25:11

Q.    What did Ms. Gatti tell you about    13:25:14

Mr. Di Napoli?    13:25:17

MR. WALLERSTEIN:  When?  Objection; vague as    13:25:19

to time.    13:25:20

MS. HEALY:  Before Ms. Sandei decided as to    13:25:26

bringing him to the meetings in March 2014.    13:25:51

THE WITNESS:  She told me that he was a person    13:25:54

who was extremely -- had great expertise in business    13:25:58

development and that he had had this type of experience    13:26:12

for large companies, important companies, and had a    13:26:19

great success in doing so, and he was a very capable    13:26:27

person, and that it would be a great thing to start and    13:26:52

understand if he would be willing and able to -- as    13:26:57

business development for the products of Almawave that I    13:27:01

wanted to bring to the United States -- AlmavivA that I    13:27:04

wanted to bring to the United States.    13:27:15

MS. HEALY:  Q.  Did you understand where    13:27:17

Mr. Tony Di Napoli lived or was based?  Generally, not    13:27:22

this precise address.    13:27:32

A.    I understood that he lived in San Francisco.    13:27:35

Q.    Did you ask -- when you met Mr. --    13:27:40

Mr. Di Napoli, did you ask to see his office?

A.    Generally.

Q.    What do you mean by normally you would mention it?

A.    Because in social life, if you are next to somebody with whom you have a relationship, this clearly is shown and it shows through.

Q.    Did you ask Ms. Gatti where she lived?

A.    No.

Q.    Did you ask Tony Di Napoli where he lived?

A.    No.

Q.    I'm going to show you what we are going -- one second.  Did you -- when did you make an offer to Ms. Gatti for the position of CEO at Almawave -- at the entity that would be formed later in 2014?

A.    I did not make an offer to Ms. Gatti.

Q.    I don't mean you personally.  Through Russell Reynolds.

A.    Yes, through Russell Reynolds.

Q.    When was that?

A.    About April 2014.

Q.    Before making the offer to Ms. Gatti, did you confirm with anyone that the offer you were about to make her would be within the legality of her then-present position at the startup?

        MR. WALLERSTEIN:  Objection; vague.

VALERIA SANDEI - 1/22/2016

Page 130

THE WITNESS:  What do you mean by legality?

MS. HEALY:  Q.  Did you ask -- so I guess let's start with:  What was the position you offered her?

A.  Ms. Gatti was offered a position of CEO, chief executive officer, as a part-time position.

Q.  And at the time you made this part-time -- what was the reason why you made the offer for a part-time position?

A.  Because I understood that she was involved in other activity, and therefore did not have enough time to devote to a full-time position.  And because I thought that a part-time arrangement would be sufficient to guarantee the starting of the activities in California for my company.

(In English)  In California.

(Through interpreter)  In California.

(In English)  In the US.

(Through interpreter)  In the US.

Q.  And one of the activities that Ms. Gatti had at the time, one of the roles that she had was CEO of the startup known as Soshoma; correct?

A.  You mean in April?

Q.  2014, yes.

A.  As far as I know, yes.

DTI Court Reporting Solutions - San Francisco
800-869-9132                              www.deposition.com

**F-135**

MR. WALLERSTEIN:  Do you have a copy for counsel, Counsel?

MS. HEALY:  Q.  Do you recognize this document, Ms. Nicolella?

A.  I am going to read it, if you can give me a minute.

Q.  Do you recognize this document?

A.  Yes.

Q.  Can you tell me what it is?

A.  It is a declaration.

Q.  Who prepared that declaration for you?

MR. WALLERSTEIN:  Objection; vague as to "prepared."

MS. HEALY:  Q.  You can answer.

A.  The declaration was signed by me.

Q.  Who gave this declaration to you?

A.  Given in which sense?

Q.  To sign.

A.  It was sent to me via email by a colleague in the legal office at AlmavivA.

Q.  Which colleague?  What's the name?

A.  Mariantonietta Perri.

Q.  Is she the lady here in the room?

A.  Yes.

Q.  And what did you do after you received the

Q.   Why not?                                          16:11:46

A.   No, because the position had been offered to      16:11:48
her through a headhunter.                               16:11:51

Q.   Did you ask the headhunter to contact the         16:11:55
startup where she was the CEO -- of which she was the  16:12:02
CEO to make sure that she could have this second       16:12:05
position?                                              16:12:13

A.   Certainly not.                                    16:12:16

Q.   Did you concern yourself about any possible       16:12:22
conflict that Ms. Gatti could have from any perspective 16:12:27
in having two positions as the CEO of two separate     16:12:32
companies at the same time?                            16:12:49

A.   No.                                               16:12:53

Q.   The employment agreement that we reviewed a       16:12:57
moment ago, do you know who prepared that employment   16:13:00
agreement?                                             16:13:06

MR. WALLERSTEIN:  Objection; vague as to               16:13:08
"prepared."                                            16:13:14

THE WITNESS:  Can you explain better what you          16:13:16
mean by "prepare"?                                     16:13:18

MS. HEALY:  Q.  Drafted.                               16:13:26

A.   As far as I know, it was provided to us by our    16:13:30
legal team.                                            16:13:33

Q.   Which legal team?                                 16:13:41

A.   Our legal department.

VALERIA SANDEI - 1/22/2016

Page 163

Q.   So why didn't you ask to see her contract?   16:15:54

MR. WALLERSTEIN:  Objection; asked and   16:15:55
answered.  I will allow number two.   16:16:00

MS. HEALY:  Q.  You can answer.   16:16:28

A.   I assumed that by retaining a headhunter that   16:16:33
does this professionally, also to draft a contract, to   16:16:41
subscribe a contract, that I was doing enough of a good   16:16:46
job in this context.   16:16:48

Q.   So Mr. Sternberg -- are you familiar with him?   16:16:58

A.   Yes, I know Mr. Sternberg.   16:17:02

Q.   Who is he?   16:17:06

A.   A lawyer.   16:17:09

Q.   When -- was he involved in drafting of the   16:17:14
employment agreement that we reviewed at Exhibit   16:17:16
Number 2?   16:17:17

MR. WALLERSTEIN:  Objection; vague and   16:17:18
ambiguous as to "involved in," and obviously treading   16:17:25
close to privilege.   16:17:29

MS. HEALY:  Q.  Was he involved, to your   16:17:31
knowledge?   16:17:35

A.   I don't know if he was involved or not.   16:17:38

Q.   Did you have discussions with Mr. Sternberg   16:17:40
about --   16:17:44

It's in the declaration.  It can't be   16:17:46
privileged.

DTI Court Reporting Solutions - San Francisco
800-869-9132                              www.deposition.com

**F-138**

MR. WALLERSTEIN:  Counsel, are we here to write legal briefs?  Why are you talking to me?    16:17:49 16:17:53

MS. HEALY:  I am here to ask her questions. Please stop interrupting.    16:17:54 16:17:57

MR. WALLERSTEIN:  No, that's not interrupting. That's an objection, Counsel.    16:17:57 16:17:58

MS. HEALY:  Q.  Did you tell Mr. Sternberg that you wanted to retain Ms. Gatti?    16:18:00 16:18:03

MR. WALLERSTEIN:  Objection; calls for privilege.  Don't answer.    16:18:03 16:18:08

MS. HEALY:  Q.  Are you going to answer the question?    16:18:09 16:18:10

A.  No.    16:18:12

Q.  You are not going to answer the question --    16:18:15

A.  No.    16:18:16

Q.  -- or you didn't tell him?    16:18:18

A.  I will not answer the question.    16:18:24

Q.  Did you tell -- did you or anyone -- did you personally tell or did you ask anyone who worked with or for you to tell Orrick that Ms. Gatti had -- was the CEO of another company?    16:18:28 16:18:32 16:18:38 16:18:40

MR. WALLERSTEIN:  Objection; calls for privilege and work product.  Don't answer.    16:18:41 16:19:32

MS. HEALY:  Q.  In your declaration submitted to the Court on October 20, 2015, you stated that    16:19:33

"Orrick was engaged simply to prepare documents reflecting terms I negotiated without Orrick's involvement."

MR. WALLERSTEIN:  That's not a question. Please don't respond.

MS. HEALY:  Q.  No, my question is, is that agreement you were referencing Exhibit 2?  Is the agreement that you asked Orrick to prepare that you referenced in this declaration Exhibit 2?

MR. WALLERSTEIN: Objection.  Objection.  I don't know what agreement -- what declaration you are referring to.  If you would like to mark an exhibit and show the witness --

MS. HEALY:  I am not going to mark an exhibit. I am reading from her declaration.

MR. WALLERSTEIN:  Well, I don't know that you are, Counsel.

MS. HEALY:  I can show it to her but I am not entering it in as an exhibit.  I am happy to show it to her if you would like me to.

MR. WALLERSTEIN:  I don't know what the difference is.  Do you think there is some legal difference to that?

MS. HEALY:  Q.  Did you ask Orrick to prepare any agreement other than Exhibit 2 in respect of

**F-140**

Ms. Gatti?                                                    16:20:56

MR. WALLERSTEIN:  Objection; calls for                        16:20:57
privilege and work product.  Don't answer that.               16:20:58

MS. HEALY:  Q.  Did you ask Orrick for legal                  16:21:00
advice about the legality of retaining Ms. Gatti --           16:21:05

MR. WALLERSTEIN:  Objection; calls for                        16:21:05
privilege --                                                  16:21:05

MS. HEALY:  Q.  -- while she was already                      16:21:05
working as the CEO of another company?                        16:21:08

MR. WALLERSTEIN:  Objection.  Privilege and                   16:21:10
work product.  Don't answer.                                  16:21:14

THE INTERPRETER:  Do you want me to interpret                 16:21:15
this question?                                                16:21:16

MR. WALLERSTEIN:  I don't think it's                          16:21:16
necessary.                                                    16:21:17

MS. HEALY:  Yes, please.                                      16:21:18

MR. WALLERSTEIN:  She is not going to answer                  16:21:19
it anyway, and it's not going on the record.  But if you      16:21:21
prefer, Counsel, it's fine by me.                             16:21:25

MS. HEALY:  What do you mean, it's not going                  16:21:26
on the record?                                                16:21:27

MR. WALLERSTEIN:  The Italian is not going on                 16:21:29
the record.                                                   16:21:33

MS. HEALY:  I want her to understand what --                  16:21:33
Q.  Do you understand what I'm saying?

Q.   So why didn't you ask to see her contract?    16:15:54

MR. WALLERSTEIN:  Objection; asked and    16:15:55
answered.  I will allow number two.    16:16:00

MS. HEALY:  Q.  You can answer.    16:16:28

A.   I assumed that by retaining a headhunter that    16:16:33
does this professionally, also to draft a contract, to    16:16:41
subscribe a contract, that I was doing enough of a good    16:16:46
job in this context.    16:16:48

Q.   So Mr. Sternberg -- are you familiar with him?    16:16:58

A.   Yes, I know Mr. Sternberg.    16:17:02

Q.   Who is he?    16:17:06

A.   A lawyer.    16:17:09

Q.   When -- was he involved in drafting of the    16:17:14
employment agreement that we reviewed at Exhibit    16:17:16
Number 2?    16:17:17

MR. WALLERSTEIN:  Objection; vague and    16:17:18
ambiguous as to "involved in," and obviously treading    16:17:25
close to privilege.    16:17:29

MS. HEALY:  Q.  Was he involved, to your    16:17:31
knowledge?    16:17:35

A.   I don't know if he was involved or not.    16:17:38

Q.   Did you have discussions with Mr. Sternberg    16:17:40
about --    16:17:44

It's in the declaration.  It can't be    16:17:46
privileged.

A.   And why should I have?

Q.   Because you were sharing a CEO.  Didn't you want to meet the company that she is heading, the other company that she is heading?

A.   No.

Q.   What was your -- as of May 2014, right before Ms. Gatti signed the employment agreement, what was your understanding of what Ms. Gatti's startup did?

MR. WALLERSTEIN:  Objection; asked and answered.  This is actually the third strike.  I will allow this the final time.  This was asked and answered twice this morning.

THE WITNESS:  As far as I know, it was development of software for e-commerce and for recommendations or suggestions online.

MS. HEALY:  Q.  Does Almawave work on technology that uses artificial intelligence applied to big data?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Yes, certainly, as we offer -- we offer -- artificial intelligence services seems a vague type of terminology, but yes.

MS. HEALY:  I am sorry.  Can you reread --

MS. GATTI:  This translation is not reflecting what the witness said.  Can you take the time to

actually translate what she said?                    16:26:41

MS. HEALY:  I am sorry.  Can you please --    16:26:43

She is not allowed to make objections.    16:26:45

MR. WALLERSTEIN:  She is as entitled to    16:26:46

translate as you are, Counsel.    16:26:49

THE INTERPRETER:  Can I ask the witness to    16:26:50

repeat the answer, please?  And then I will repeat for    16:26:53

you.    16:26:54

MS. HEALY:  That's completely inappropriate    16:26:56

for Ms. Gatti to --    16:26:58

MR. WALLERSTEIN:  It's inappropriate for you    16:26:59

to translate.  Why is it more appropriate for you than    16:27:02

Ms. Gatti?    16:27:04

THE INTERPRETER:  Do you mind if we just ask    16:27:06

to regroup and I ask the witness to repeat the answer?    16:27:11

MR. WALLERSTEIN:  No, she has repeated it    16:27:12

enough.  Three times today.    16:27:16

MS. HEALY:  Ms. Sarah -- sorry.    16:27:18

Sarah, would you please repeat the question?    16:27:22

Would you please repeat the question and the    16:27:24

translation that she gave of the answer?    16:27:27

MR. WALLERSTEIN:  The witness needs some    16:27:29

water.    16:27:29

(Record read as follows:    16:25:57

"Q.  Does Almawave work on technology that

uses artificial intelligence applied to big data?

"A.   Yes, certainly, as we offer -- we offer -- artificial intelligence services seems a vague type of terminology, but yes.")

THE WITNESS:  So this was not the answer.

MS. HEALY:  Q.  Please give your answer again.

THE INTERPRETER:  The question is:

(Retranslates question.)

THE WITNESS:  Yes, we work on technology that uses artificial intelligence applied to big data.  And it's a vague and ample field, so that I can also say that we work on software as applied to IT.

MS. HEALY:  Q.  And did you ever come to understand that the startup in which Ms. Gatti was a CEO also was working on developing artificial intelligence applied to big data?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  In this vagueness, yes, we could include this in this.

MS. HEALY:  Q.  I am not asking if you want to include it.  I am asking you whether she told you that her startup was developing artificial intelligence technology applied to big data, just like you were describing.

Page 183

(Deposition Exhibit 15                      16:58:02

was marked for identification.).            16:58:11

MR. WALLERSTEIN:  Do you have a copy for me,   16:58:12
Counsel?                                     16:58:13

MS. HEALY:  Let me check.                    16:58:15

MR. WALLERSTEIN:  I want you to wait for me,   16:58:18
Ms. Sandei.                                  16:58:26

MS. HEALY:  Q.  I place in front of you what   16:58:27
we have marked as Exhibit Number 15, which are -- which   16:58:34
is an exhibit that includes certain documents that we   16:58:39
obtained from the California Secretary of State and   16:58:44
which we filed with the court.               16:58:56

And if you look at that page, which is marked   16:59:00
as X3-001 at the bottom right, it indicates that you   16:59:16
are -- Almawave USA's address is at Suite 1400 at 505   16:59:25
Montgomery Street; is that correct?          16:59:27

MR. WALLERSTEIN:  Objection; vague.  When you   16:59:28
say, "is that correct," are you asking if that's what   16:59:30
the document says?                           16:59:32

MS. HEALY:  Yes.                             16:59:42

THE WITNESS:  I remember the address, 505    16:59:45
Montgomery Street.  I don't know the number of the   16:59:48
suite.                                       16:59:48

MS. HEALY:  Q.  Who made this filing for you?   16:59:52

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  Somebody in my business department.  I --

MS. HEALY:  Q.  Somebody in your company?

A.  It's a department that takes care of the company.

Q.  Do you know the name of the person who helped you?

A.  We have a department that takes care of affairs for the company.

(Mr. LoSavio exits.)

MS. HEALY:  Q.  Company affairs?

A.  Maybe it's company affairs, maybe.

Q.  Is that a department of AlmavivA S.p.A. or Almawave S.r.l?  Almawave S.r.l. or AlmavivA S.p.A?

A.  The departments that I mentioned today, this is for AlmavivA S.p.A. that offers services for all the companies in the group.

Q.  So Suite 1400 reflected here, you are stating that you rented an office from Regus at 505 Montgomery?

MR. WALLERSTEIN:  Objection; compound.  Vague and ambiguous.  Incomprehensible.  "Suite 1400 reflected here, you are stating?"

MS. HEALY:  Okay.  You are right.  You know what?  That's a bad question.

Q.  You indicated that you rented an office from

A.   In Italy.                                          11:41:54

Q.   Could you tell us where you work?                 11:41:55

A.   In AlmavivA.                                       11:41:59

Q.   Is that the name of a company?                    11:42:03

A.   Yes, it is the name of the company.               11:42:07

Q.   It's -- could you give us the full legal name     11:42:12
of the company you work for?                           11:42:15

        MR. WALLERSTEIN:  Objection.  Vague as to       11:42:21
"work for," whether you mean the -- whether you mean the   11:42:22
entity that pays her checks or --                      11:42:30

        MS. HEALY:  Objection.  I -- please don't make  11:42:31
speaking objections.                                    11:42:35

        MR. WALLERSTEIN:  Counsel --                     11:42:36

        MS. HEALY:  You state your objections.          11:42:37

        MR. WALLERSTEIN:  Counsel, I --                  11:42:40

        MS. HEALY:  Excuse me.  Let me just finish       11:42:40
mine and then you can translate.                        11:42:41

        The Court said no speaking objection.  You are   11:42:43
not allowed to suggest testimony to the witness.         11:42:47

        MR. WALLERSTEIN:  Thank you.                     11:42:49

        I was not finished.                              11:42:50

        My -- please don't interrupt me, Ms. Healy,      11:42:52
when I am making my objection.  I am pausing to allow     11:42:56
the interpreter to interpret.                             11:43:01

        MS. HEALY:  No.  I object, because she is        11:43:10

adding --

MR. WALLERSTEIN:  I am not finished.

MS. HEALY:  She is adding words that were not spoken by you.  I object to the translation.

THE INTERPRETER:  Ms. Healy, I am absolutely sure that I did not add any words to anybody's statement.

MS. HEALY:  There is a video recording.  You added two words to what was said.

MR. WALLERSTEIN:  Ms. Healy, Loop's counsel may have a standing objection to the interpretation.

As for the last question, I will ask that it be restated so that I may make my objections.

MS. HEALY:  Q.  Please answer the question.

MR. WALLERSTEIN:  Don't answer the question.

I need it restated.

MS. HEALY:  It does not have to be reformulated.

Q.  Can you please give me the legal name of the company where you work?

MR. WALLERSTEIN:  Objection; vague and ambiguous as to the phrase "where you work," because it does not distinguish between the company that pays the check and the company or companies to whom you provide services.

**F-149**

You may answer.    11:44:36

THE WITNESS:  No.  Can you --    11:44:41

MS. HEALY:  Q.  Answer the question.    11:44:42

A.    -- reformulate?    11:44:44

MS. HEALY:  Read back the question.    11:44:45

THE WITNESS:  Can you reformulate the    11:44:47
question, please?    11:44:49

MS. HEALY:  Q.  No, I am asking the question.    11:44:49
Please answer -- please -- okay.  We will move on, if    11:44:50
you don't know which company you work for.    11:44:54

Could you please tell me, what is your title?    11:45:00

A.    Director of legal affairs.    11:45:09

Q.    Do you work for AlmavivA S.p.A.?    11:45:11

MR. WALLERSTEIN:  Objection; vague as to "work    11:45:17
for" on the same basis.    11:45:19

Go ahead.    11:45:25

MS. HEALY:  Q.  You can answer.    11:45:28

A.    I work for AlmavivA S.p.A., and I offer    11:45:35
consulting services for all the entire group AlmavivA.    11:45:43

Q.    Could you please tell me how big the legal    11:45:48
department of AlmavivA S.p.A. is?    11:45:51

A.    How big it is in terms of space?    11:46:04

Q.    In terms of how many people are in the legal    11:46:06
department.    11:46:09

A.    10, plus me.    11:46:16

**F-150**

Tom, the lawyer if -- if he can give you some recommendation on where to go eat in San Francisco or we exchange opinions in easy matters, on topics which you use to make conversation, the answer is yes.

Q.   Did any one of your colleagues who is present in San Francisco, Valeria Sandei, Raniero Romagnoli, Ferri, or Nicolella, help you with English while you were talking to your lawyers?

A.   No.   Sometimes -- some of them were of support during the conversation, and in other instances and cases we have had an interpreter there.

Q.   So you did not have an interpreter for all of your meetings with Venable?

A.   For legal matters that were discussed during these meetings, yes.

Q.   No, I'm asking whether for each meeting that you had with Venable there was a separate interpreter.

MR. WALLERSTEIN:  Objection; vague as to "meeting" in the context of the question.

MS. HEALY:  Q.  Any meeting you had with Venable while you have been here in San Francisco.

MR. WALLERSTEIN:  Objection to "meeting" when there's multiple people present.

But go ahead, if you understand.

THE WITNESS:  I don't understand.

Venable without an interpreter.

MR. WALLERSTEIN:  Including the receptionist?

MS. HEALY:  Q.  You can answer the question.

A.  I repeat, I don't know what you are referring to, if you refer, with the term "meeting," to meeting any person who is -- was at Venable.

Q.  I am intending any discussion, encounter, with any lawyers or paralegals to discuss any matter relating to this case.

A.  I did not count them.  I cannot count.  I did not count them.  I repeat what I said earlier.  Legal topics, legal discussions, took place with the assistance of an interpreter.

Q.  And who was that?  Who was the interpreter?

A.  A consultant of the law firm.

Q.  What's his name?

A.  I don't know.  I don't remember that.

Q.  It was not this lady?

MR. WALLERSTEIN:  Objection; vague as to time.

MS. HEALY:  Q.  It was a different interpreter than the one who is here?

MR. WALLERSTEIN:  Objection; vague as to time.

I am happy to clarify, Ms. Healy.

MS. HEALY:  I am asking the witness, please.

MR. WALLERSTEIN:  Okay.  I am happy to

clarify.

MS. HEALY:  No.

Q.  Please answer the question.

A.  I lost the question.

Q.  What is the name of the interpreter, if you recall?

A.  One is Mrs. Arianna.

Q.  The lady who is interpreting now?

A.  Yes.  And the other one I don't know.

Q.  Ms. Perri, could you tell me, do you communicate in writing in English?  Have you ever written an email for work in the English language?

THE INTERPRETER:  Excuse me.  The last part of the question?

THE WITNESS:  Isn't that two questions?

MS. HEALY:  Just one second.  It sounds like you may make use of their realtime.

THE INTERPRETER:  Sure.

MS. HEALY:  It seems like it's easier for you to read.

THE INTERPRETER:  Yes.

MR. WALLERSTEIN:  I don't think it would hurt.  I am skeptical how much it would help.

MS. HEALY:  Can you repeat the question and ask the witness, please?

DTI Court Reporting Solutions - San Francisco
800-869-9132                                    www.deposition.com

**F-153**

THE WITNESS:  So, these are two questions.  To which should I answer?

MS. HEALY:  Q.  Let's start with the first one.  Have you ever written an email or more than one email in English while working at AlmavivA S.p.A.?

A.  Yes.

Q.  Do you regularly use English?

MR. WALLERSTEIN:  Objection; vague as to "regularly."

MS. HEALY:  Q.  How many times would you say you used English in writing for your work, for instance, in the last year?

A.  In my work I use Italian.  If by "regular" you mean that I write, I always write in Italian or in English, I generally write in Italian, and sometimes I write in English.

Q.  How many times?  What do you mean?  Could you explain to me, just to get an understanding of how many English emails you produce or --

MR. WALLERSTEIN:  Objection; complex, compound, incomprehensible.

THE WITNESS:  Can you reformulate the question?

MS. HEALY:  Q.  Do you understand what I'm asking?

A.    If I had understood, then I would not have asked you kindly to reformulate the question.

Q.    I am asking you to please give me an idea of how many emails you have written in English, for instance, in the last year.

MR. WALLERSTEIN:  Objection; asked and answered, but try to answer her again.

THE WITNESS:  I don't have a number.  I cannot give you a number as to the daily use of the Italian language or the English language.  I just answered to that.

MS. HEALY:  Q.  Have you communicated in English with anyone at Venable?

A.    In writing?

Q.    Yes.

MR. WALLERSTEIN:  Objection.  Objection; asked and answered, beyond the scope of the deposition.  This has nothing to do with jurisdictional discovery.

MS. HEALY:  Q.  You can answer.

I asked you a different question.

A.    I already answered.

Q.    Have you written emails to anyone at Venable in English --

MR. WALLERSTEIN:  Ms. Healy -- Ms. Healy, the witness --

MS. HEALY:  Q.  -- since this lawsuit began?                    12:16:54

MR. WALLERSTEIN:  Ms. Healy, please do not                     12:17:02
interrupt me when I am speaking.                               12:17:04

The witness said something in Italian, and                     12:17:06
then you interrupted and asked the question without            12:17:09
giving me a chance to hear the interpretation, nor did         12:17:16
the court reporter transcribe the Italian, nor the             12:17:22
English, because you did not allow it.  So you are             12:17:28
engaging in a colloquy in Italian --                           12:17:33

THE INTERPRETER:  Pardon me?  You are                          12:17:38
engaging?                                                      12:17:39

MR. WALLERSTEIN:  -- in a conversation without                 12:17:39
allowing the involvement of me or the transcription of         12:17:46
the court reporter.                                            12:17:53

MS. HEALY:  Did I speak Italian?  Because                      12:17:59
sometimes I jump -- did I just say something in Italian?       12:18:01
No, I am asking --                                             12:18:09

MR. WALLERSTEIN:  No.                                          12:18:11

MS. HEALY:  Okay.                                              12:18:11

MR. WALLERSTEIN:  The witness did.                            12:18:11

MS. HEALY:  Q.  Did you write emails to                       12:18:16
Venable since the lawsuit began, in English?                   12:18:18

A.  Yes.                                                      12:18:28

Q.  Could you tell me, when did you -- are you a              12:18:32
lawyer in Italy?                                              12:18:36

A.   Yes.

Q.   Are you admitted to the bar, an Italian attorney bar?

MR. WALLERSTEIN:  Objection; vague and ambiguous.

THE WITNESS:  When?

MS. HEALY:  Q.  Now.

MR. WALLERSTEIN:  Counsel, please allow the interpretation before you ask a question.  Please do not respond before I hear the interpretation.

MS. HEALY:  Q.  You can answer.

A.   Today I am suspended from the --

Q.   Bar?

A.   -- bar association.

Q.   So today you are not officially an active lawyer?

MR. WALLERSTEIN:  Objection; misstates prior testimony and vague and ambiguous.

MS. HEALY:  Q.  Can you explain to me, what does it mean that you are suspended from the Italian attorney bar?

A.   Yes, of course I can explain this.  I am a lawyer.  I am a lawyer also today.  I have the title of a lawyer.

Q.   You mean like the degree?  You have the title

of lawyer.  What does it mean to have the title of lawyer?  What does it mean?

A.   In Italy, in order to have -- to become a lawyer, you have to pass an exam, a state exam.  And it is on a national level, the exam.

Q.   Okay.  And then what happens after the exam? What happens after the exam?

A.   After the exam you -- you become registered with the bar.  You have to go -- do an oath, give an oath, and you perform the --

MS. HEALY:  "And then you can practice" is a better translation.

THE WITNESS:  -- the profession in front of the court and within also the extra-judiciary representation.

MS. HEALY:  Objection.  The correct translation here is -- it's more like solicitors and barristers, which is something that's different than in the United States.  I am just trying to clarify, because you translated "extra-judicial."

Q.   Can you explain to me why you -- why you are suspended from the Italian attorney bar?

A.   Because -- because I'm bound by a work relationship with a company.

Q.   So why do you have to be suspended from the

Italian attorney bar?                                     12:22:52

    MR. WALLERSTEIN:  Objection; calls for a legal     12:22:56
conclusion.                                               12:22:57

    MS. HEALY:  Q.  I am asking for your              12:23:06
understanding.  I am asking for your understanding of     12:23:07
why you are currently suspended from the Italian          12:23:18
attorney bar.                                             12:23:21

    MR. WALLERSTEIN:  Objection; calls for a legal     12:23:27
conclusion.                                               12:23:28

    MS. HEALY:  And she is a lawyer.                  12:23:34

Q.  You just told me you were a lawyer?                    12:23:36

A.  I said I am a lawyer.                                  12:23:41

Q.  Okay.  So I'm trying to understand why you are         12:23:43
suspended from the Italian bar.                           12:23:46

    MR. WALLERSTEIN:  Objection; calls for a legal     12:23:52
conclusion.                                               12:23:54

    MS. HEALY:  Q.  You can answer.                   12:24:01

A.  The question?  Can you read it again?                  12:24:10

    (Record read as follows:                         12:24:20

    "Q.  So I'm trying to understand why you          12:24:20
  are suspended from the Italian bar.")          12:24:20

    THE WITNESS:  So, I have to say why in my         12:24:33
opinion?                                                  12:24:36

    MS. HEALY:  Q.  You explained that you are an     12:24:38
employee of AlmavivA and therefore you could not          12:24:42

practice as a registered attorney.  Is that my -- is my understanding of what you said correct?

A.   No.

Q.   Okay.  Can you explain it again?

A.   I said that I have the title of a lawyer and I am a lawyer.  I am not currently in the bar --

Q.   Registered.

A.   -- of the registered lawyers, because I have a work relation as an employee with the company.

Q.   So currently you can't practice law --

MR. WALLERSTEIN:  Objection.

MS. HEALY:  Q.  -- in Italy?

THE INTERPRETER:  Pardon?  In Italy?

MR. WALLERSTEIN:  Objection; vague and ambiguous as to "practice law," and calls for a legal conclusion.

MS. HEALY:  Q.  You can answer.  When he objects, let him object, and then you answer.

THE WITNESS:  Yes.  What do you mean by "legal practice"?

MS. HEALY:  Q.  That's okay.  Don't worry about it.  We will move on.  It sounds like you are not understanding what I'm saying.

MR. WALLERSTEIN:  Counsel, that is harassing and inappropriate.

MARIANTONIETTA PERRI - 1/20/2016

Page 81

A.    In Italian.

Q.    Are all the attorneys in that legal department Italian?

A.    No.

Q.    Ms. Perri, I would like to ask you about Exhibit Number 1 -- sorry -- Exhibit Number -- Exhibit Number 5 that was placed in front of you at the beginning of the deposition.  Could you please look at the exhibit?  Is that your signature?

A.    Yes.

Q.    Do you recognize this document?

A.    Yes, I recognize it.

Q.    Can you tell me what it is?

A.    It's a declaration.

Q.    By whom?

A.    It was signed by me.

Q.    Did you write this?

MR. WALLERSTEIN:  Object.  Objection; vague as to "write."

THE WITNESS:  What do you mean?  It is signed by me.

MS. HEALY:  Q.  I am asking if you wrote this.

MR. WALLERSTEIN:  Objection; vague as to "wrote."

THE WITNESS:  If you can be specific with what

**F-161**

you want to say, I can --

MS. HEALY:  Q.  Did you write the declaration?

A.  -- reply.

MR. WALLERSTEIN:  Ms. Healy, please wait until the interpreter translates the witness's comments.  You interrupted the translation, which is not fair to me nor the court reporter.

MS. HEALY:  Q.  You can answer.

A.  I think I answered.  I signed this.

Q.  No, that's not the question I asked.  I asked whether you wrote this declaration.

MR. WALLERSTEIN:  Objection; asked and answered, and vague as to "wrote."

THE WITNESS:  I am trying to answer.  I signed this declaration.  What do you mean by "write"?  I went to the PC and I wrote?  What do you mean?

MS. HEALY:  Q.  What do you understand the word "writing" to mean?

A.  You can explain.  I want to understand the question perfectly.  Otherwise it is very difficult for me to reply or to answer -- excuse me -- to answer.

Q.  You are the head of the legal department, and you don't know what "writing" means?

MR. WALLERSTEIN:  Objection; harassing.

I don't know what "writing" means in this

12:34:12
12:34:14
12:34:16
12:34:17
12:34:18
12:34:24
12:34:32
12:34:37
12:34:43
12:34:48
12:34:51
12:34:55
12:34:56
12:35:13
12:35:19
12:35:26
12:35:30
12:35:31
12:35:41
12:35:46
12:35:50
12:35:56
12:36:01
12:36:05
12:36:11

**F-162**

context, and I assume the witness does not as well, because that's what she said.

MS. HEALY:  Q.  Can you tell me everything you did in connection with this declaration?

A.  What do I have to say?  Each and every single activity that I performed?

Q.  Yes, in connection with this declaration.  I want to know anything you did to prepare this declaration.

MR. WALLERSTEIN:  And I will caution the witness -- caution -- not to reveal communications with counsel or activities taken at the direction of counsel.

THE WITNESS:  To answer this question, I presented the facts which I knew, which I also discussed with my lawyers, and then I prepared this declaration.

MS. HEALY:  Q.  So let's look at that.  In what language -- was this translation -- sorry.  Was this declaration translated for you before you signed?

A.  Yes.

Q.  Do you have the translation?

A.  Here?  No.

Q.  Was it emailed to you, the translation?

A.  No.

Q.  Who prepared the translation of this declaration?

**F-163**

your retention of Ms. Gatti?

MR. WALLERSTEIN:  Objection.  The answer to that question is privileged.

MS. HEALY:  Q.  Did you learn from Ms. Sandei at any point before February 20th, 2015, that Ms. Gatti was in the process of getting sued?

MR. WALLERSTEIN:  Objection.

MS. HEALY:  Q.  Are you going to answer?

MR. WALLERSTEIN:  That answer --

THE INTERPRETER:  Pardon?

MR. WALLERSTEIN:  The answer would be privileged.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Were you involved in the decision to procure insurance coverage for any litigation involving Almawave USA and Ms. Gatti?

MR. WALLERSTEIN:  Earlier the term "involved in communications" was defined by Ms. Healy to include copied on emails.  If that's the understanding of the question, that's fine.  Otherwise, vague and ambiguous.

MS. HEALY:  Q.  Involved in any way, email, telephone, in person.

A.  I did not quite understand the question, other than the objection that was presented by my attorney.

THE WITNESS:  No.

MS. HEALY:  Q.  To your knowledge, after -- after you received the complaint, did you retain legal counsel for AlmavivA S.p.A.?

A.  In my mind, this question is a bit ambiguous in the part that it specifies AlmavivA S.p.A.

Q.  Did you enter into a letter of engagement with any law firm specifying -- I guess, let's start from there.

Did you decide to enter into a letter engagement with any law firm?

MR. WALLERSTEIN:  You should not answer whether you decided anything, but you may respond if you did enter into an engagement.

THE WITNESS:  I, in fact, did not enter into an engagement.  I contacted an American law firm.

MS. HEALY:  Q.  Did -- to your knowledge, did Ms. Gatti contact a firm as well on behalf of Almawave USA?

A.  As far as I know, no.

Q.  Did you retain -- first of all, which law firm did you contact?

A.  Orrick.

Q.  And who did you speak to?

A.  With the attorney Peter Sternberg.

now called Loop AI?                                        15:01:33

MR. WALLERSTEIN:  Objection; vague as to time.            15:01:47
There have already been declarations speaking to this     15:01:53
subject prior to when the lawsuit was filed.  The         15:01:59
question is privileged.                                   15:02:08

MS. HEALY:  Q.  Are you going to answer?                  15:02:12

A.  No.                                                   15:02:14

Q.  Are you the one in charge of discussions              15:02:16
regarding the litigation in which the three entities are  15:02:22
involved, this litigation?                                15:02:27

MR. WALLERSTEIN:  Objection; vague as to "in              15:02:42
charge of discussions."                                   15:02:44

MS. HEALY:  Q.  Are you the one making                    15:02:48
decisions regarding what your lawyers, Mr. Sternberg's    15:02:51
firm, will do regarding -- will do regarding anything in  15:02:55
this lawsuit?                                             15:02:59

A.  The question was very broad, and I'm not sure         15:03:25
exactly what I am asked.  What does it mean, "I am in     15:03:32
charge or the one making decisions"?                      15:03:40

Q.  If your law firm, Venable, needs to take any          15:03:45
action in this case, do they ask your permission or is    15:03:49
there somebody else within AlmavivA that they speak to?   15:03:59

A.  The law firm executes the -- so the law firm          15:04:24
executes the actions that we agreed on and -- with the    15:04:35
autonomy that is typical of a professional attorney.      15:04:49

Q.   I understand.  But if they need to ask you something -- if Venable wants to ask anything, for permission to do anything in this case, who do they ask? Do they ask you or is there somebody else within AlmavivA that they write to?

A.   Within AlmavivA?

Q.   Yes, within any of the companies.  Is there anyone else that they write to for authorization to do anything in this case?

MR. WALLERSTEIN:  In the legal department or otherwise?

MS. HEALY:  Q.  Anywhere.  Anywhere.

A.   It depends.

Q.   On what?

A.   On the subject of the request.

Q.   Can you explain?

A.   If it is a legal matter, I am the person of reference.  If it is about taking decisions in this matter --

MS. HEALY:  No, "on the merits," not "in the matter."

THE INTERPRETER:  In this matter, "in merito."

MS. HEALY:  I object to the request.

Q.   Can you explain what you mean by "merito"?

MR. WALLERSTEIN:  I don't understand the

question.  I don't know what the question is. 15:07:03

MS. HEALY:  Q.  Have you given authorization 15:07:09
to Venable to take any action in this case since you 15:07:11
first retained them? 15:07:16

MR. WALLERSTEIN:  Objection.  That calls for 15:07:24
your communications with Venable, and it's privileged. 15:07:26

MS. HEALY:  Q.  Are you going to answer? 15:07:33

A.    No.  To this, no. 15:07:35

Q.    Do you communicate with Venable regarding this 15:07:37
case on a regular basis? 15:07:42

MR. WALLERSTEIN:  Objection.  You can 15:07:48
answer -- you could answer if the question did not say 15:07:50
"regarding this case."  But because it reveals the 15:07:55
subject matter of a communication between you, an 15:08:05
attorney, and your outside counsel, it is privileged. 15:08:16

MS. HEALY:  Q.  Are you going to answer? 15:08:26

A.    No. 15:08:28

Q.    Are you in charge of making decisions 15:08:29
regarding the legal strategy that Venable will pursue in 15:08:32
this matter? 15:08:36

MR. WALLERSTEIN:  Objection; vague as to -- 15:08:48
the whole thing is vague.  It's also asked and answered. 15:08:51

MS. HEALY:  Q.  You can answer. 15:08:57

MR. WALLERSTEIN:  You can answer. 15:09:01

THE WITNESS:  I answered earlier. 15:09:05

MARIANTONIETTA PERRI – 1/20/2016

Page 126

Q.   Is that an agreement that was drafted by your company?   15:31:17 15:31:20

A.   I don't remember.  This text that I am reading corresponds to the text that had been prepared by my company.   15:31:38 15:31:50 15:31:52

Q.   If you -- do you recall discussing this type of agreement with Sergio Calderara?   15:31:53 15:31:59

MR. WALLERSTEIN:  Objection; privileged.   15:32:06

MS. HEALY:  Q.  Are you going to answer?   15:32:10

A.   No.   15:32:12

Q.   Do you recall receiving this document with Tony Di Napoli's signature?   15:32:13 15:32:19

A.   No, I don't remember.   15:32:22

Q.   Looking at -- is there any way you can check whether this document was prepared by your legal department?   15:32:23 15:32:26 15:32:29

MR. WALLERSTEIN:  Objection; vague.  If you are asking about her physical capability to do something, she can answer, but she is not taking instructions here today.   15:32:38 15:32:41 15:32:44 15:32:54

MS. HEALY:  Q.  I am asking if there is any way you can check whether this document was prepared by your legal department.   15:32:56 15:32:58 15:33:01

MR. WALLERSTEIN:  Would you be able to check? Yes or no?   15:33:11 15:33:13

**F-169**

LoSavio or Anna Gatti or any one of any other counsel   15:56:07

other than Venable asking for payment of legal fees   15:56:16

regarding this lawsuit.   15:56:20

MR. WALLERSTEIN:  What she read and did not   15:56:32

read is work product and implicitly privileged.   15:56:33

MS. HEALY:  Q.  Are you going to answer?   15:56:42

A.   No.   15:56:43

Q.   Did you make a claim to Lloyd's for payment of   15:56:45

any expense incurred in this litigation by AlmavivA or   15:56:52

the Almawave entities?   15:57:00

MR. WALLERSTEIN:  Vague as to "you," but go   15:57:12

ahead.   15:57:16

(Several voices at once.)   15:57:27

(Clarification requested by reporter.)   15:57:29

THE WITNESS:  Me, Mariantonietta Perri, have   15:57:31

not presented a claim.   15:57:37

MS. HEALY:  Q.  Are you aware of whether any   15:57:39

AlmavivA entity has made a claim to Lloyd's for the   15:57:41

payment of legal fees for any -- legal fees or expenses   15:57:45

in this litigation?   15:57:50

Are you aware?   15:58:06

And just to translate what she said --   15:58:12

THE INTERPRETER:  The testimony --   15:58:19

MS. HEALY:  The witness.   15:58:20

THE INTERPRETER:  The witness just said that   15:58:21

I, the translator, missed the first part of the question, and I repeated it.

THE WITNESS:  Yes.

MS. HEALY:  Q.  What do you know about that?

A.  The question is vague.  You have to ask me an exact question.

Q.  I want to know everything you know about the submission of a claim to Lloyd's regarding the payment of expenses relating to this litigation.

MR. WALLERSTEIN:  Objection; vague.  Calls for a narrative.  And the witness asked for a more exact question.

MS. HEALY:  Q.  Are you going to answer?

MR. WALLERSTEIN:  I don't think she can.  She said to ask.

MS. HEALY:  Q.  I am asking whether you are going to answer yes or no, and then if you don't answer, then I will ask another question.

A.  If you ask me a question that I can answer with yes or no, I will reply.

Q.  Well, you are not answering any questions.

A.  I will answer.

Q.  I am asking you whether you are aware of someone who -- strike that.

Who submitted the claim to Lloyd's for payment

department, and financial planning and risk management.

Q.   Who is that?

A.   Angela Nicolella.

Q.   Is that the lady present in the room?

A.   Yes.

Q.   We will save this question for her.

A.   Which you indicated.

Q.   Yes, I just pointed to her.  She is in the room with us.  She has been -- she has been with us all day.

A.   And she didn't have much fun.

Q.   Does Almawave USA have an office in -- in the office where you work, where you are based?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  I didn't understand the question.

MS. HEALY:  Q.  So you are not going to answer?

MR. WALLERSTEIN:  She did answer.

THE WITNESS:  If I don't understand the question, I cannot answer it.  It's a bit difficult.

MS. HEALY:  Q.  What was your understanding of what Almawave USA was supposed to do?

No, I object to the translation.  Not "a suo avviso."

A.   No.                                                  16:27:44

Q.   Did you -- is AlmavivA a family-owned company?     16:27:45

MR. WALLERSTEIN:   Objection; vague.               16:27:57

THE WITNESS:   What does it mean?                  16:28:00

MS. HEALY:   Q.   Is AlmavivA owned by the Tripi    16:28:01
family?                                                  16:28:04

A.   AlmavivA has a -- in Italian it's called an    16:28:11
articulated social -- company capital.                  16:28:18

I didn't understand the question.                 16:28:27

Q.   Is AlmavivA a private company?                16:28:29

MR. WALLERSTEIN:   Objection; vague.              16:28:33

THE WITNESS:   Is this another question?          16:28:35

MS. HEALY:   Q.   Yes.   I am trying to           16:28:36
understand what you are trying to say.                  16:28:37

A.   It is not a public company, so it's a private  16:28:41
company.                                                 16:28:46

Q.   To your knowledge, is it owned by the Tripi    16:28:46
family?                                                  16:28:49

A.   It is not owned by the Tripi family.           16:28:55

MR. WALLERSTEIN:   That would be my one-hour      16:29:04
marker, so if you have another question...   If not, we  16:29:06
will take a break.                                       16:29:10

MS. HEALY:   I have a question, yes.              16:29:11

Q.   Are you saying it's not owned -- does the      16:29:13
Tripi family own the majority of shares in the AlmavivA  16:29:15

accounts of some of the companies of the AlmavivA group.    11:41:11

MS. WONG:  Q.  Do you have home banking at    11:41:17
Bank of the West?    11:41:18

MR. WALLERSTEIN:  Objection.  Vague as to    11:41:27
"you."    11:41:28

THE WITNESS:  Can you repeat the question, and    11:41:39
more precise?    11:41:40

MS. WONG:  Q.  In your role as the head of    11:41:42
treasury and financial planning, do you have home    11:41:45
banking access to Bank of the West?  At -- sorry.  Do    11:41:48
you have home banking access at Bank of the West?    11:41:52

A.  Can you specify the time frame?    11:42:11

Q.  Have you ever had access -- home banking    11:42:15
access to Bank of the West?    11:42:18

A.  I have access to Bank of the West since    11:42:38
March 2015.    11:42:44

Q.  2015?    11:42:46

A.  2015.    11:42:49

Q.  And now as well?    11:42:49

A.  Yes.    11:42:56

Q.  Is that the Bank of the West in California?    11:42:57

MR. WALLERSTEIN:  Objection; vague.    11:43:01

But go ahead.    11:43:03

THE WITNESS:  I have seen that here in San    11:43:18
Francisco there is a Bank of the West, but I don't know    11:43:21

MR. WALLERSTEIN: Objection; vague. I am certain she can't tell you everything she knows unless you ask the right questions or, rather, ask questions specific enough for her to answer.

THE WITNESS: That's what I would have asked, to specify -- to better specify what you mean by all I know.

MS. WONG: Q. How about, what's the name of the account?

A. What does it mean, what is the name of the account?

Q. In whose company is the account? For which company is the account?

A. It's Almawave USA.

Q. And when was the account set up?

A. It was set up on -- June 2014, if I remember correctly.

Q. How do you know that?

A. I know it because I asked for a referral within BNP Paribas to give me an indication of a bank that would have a site in California, in the US.

Q. What's the name of the person who gave you the referral?

A. The name of the person that referred the bank? The Italian bank --

for me?

MS. WONG:  Q.  When you were communicating with Anna Gatti about opening an account at Bank of the West, was that account in San Francisco?

A.  I said that I had sent an email to Vincenzo Mitolo telling him that it was our intention to open an account at Bank of the West for Almawave USA, and if he needed information to ask me or Anna Gatti.

Q.  Did you tell Mr. Mitolo that the bank -- that the account at Bank of the West was for Almawave USA's business account?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you reformulate the question, rephrase it?

MS. WONG:  Q.  Sure.  When you were communicating with Mr. Mitolo and Anna Gatti about creating the Bank of the West account, was that account used for business purposes?

MR. WALLERSTEIN:  Objection; lacks foundation. Calls for speculation as to how Anna Gatti used the account.

MS. WONG:  Q.  You can answer.

A.  Can you rephrase it, maybe more precisely?

Q.  As the head of treasury and financial planning, you were communicating with Anna Gatti and

**F-176**

Mr. Mitolo about opening an account in -- through Bank of the West.  Was that account that you were discussing used for purposes -- for business purposes?

MR. WALLERSTEIN:  Same objections.

THE WITNESS:  Sorry.  I repeat, I sent an email to Vincenzo Mitolo that it was our intention to open an account for the newly constituted, newly founded company, Almawave USA.

MS. WONG:  Q.  Did Anna Gatti tell you she was already using this bank for another business?

A.  No.

Q.  Did you do anything to ensure that Ms. Gatti would keep information about this bank secure?

A.  What do you mean, like ways to keep it safe?

Q.  As in to keep it separate from any other business that she was involved in, for example.  That was just an example.

MR. WALLERSTEIN:  Objection; vague.  Keep what separate?

MS. HEALY:  You don't have to qualify.  He can make objections and you stay with your question.

MS. WONG:  Q.  Can you answer my question?

A.  Can you repeat it, please?

Q.  Did you do anything as the head of treasury and financial planning when you were communicating with

MR. WALLERSTEIN:  Objection; vague as to how it would be funded.                                        13:25:28  13:25:30

THE WITNESS:  What I did was requesting the opening of this checking account.  That's what I did.                              13:25:40  13:25:42

MS. WONG:  Q.  Were you involved in the decision of how the account would be funded?                                13:25:49  13:25:50

THE INTERPRETER:  So if I can put a parentheses, I think we might have -- we are just discussing over the correct term for funding.  And the word I'm using, financiamento.                                        13:26:04  13:26:05  13:26:09  13:26:16

MS. HEALY:  I think that's correct.                                        13:26:22

MS. WONG:  Q.  Funding as in putting money into the account.                                        13:26:24  13:26:26

A.  So the account at Bank of the West was opening -- was opened to deposit the company's monies.                                        13:26:27  13:26:45

Q.  How much money would be deposited?                                        13:26:52

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation, vague and ambiguous.                                        13:26:58  13:26:58

THE WITNESS:  Can you specify better the question?                                        13:27:13  13:27:15

MS. WONG:  Q.  Do you not understand the question?                                        13:27:15  13:27:16

A.  Can you be more precise?                                        13:27:18

Q.  Did you discuss with anyone about how much money would be deposited into the account?                                        13:27:21  13:27:26

MR. WALLERSTEIN:  Objection; vague as to time.

MS. HEALY:  I object -- if you instruct the witness and try to suggest answers to her again, I am going to call the Court and move for sanctions.  You have been doing this for three days, and that's completely inappropriate.

So I am encouraging you to state your objection without making a speaking objection.  Every time you make the objection the witness comes back and says, "Oh, I don't understand this."  So I am encouraging you to please let us proceed without interference.

THE WITNESS:  If I understand correctly the question, then I will answer and I will proceed.  Otherwise I cannot answer.

MS. WONG:  Q.  Did you speak to anyone about the first deposit into Bank of the West?

A.  What do you mean by anyone?  It's not clear.

Q.  Anyone.  Any person.

A.  So that was -- what we established was that we would open the account in order to deposit into it the amount which was the company's capital.

Q.  Who decided the amount of money to put into the bank account?

MR. WALLERSTEIN:  Objection; lacks foundation.

need to hear the English translation of what my witness says in Italian, please. 15:34:34 15:34:37

MS. HEALY:  Go ahead.  Hear it. 15:34:39

THE INTERPRETER:  Can you repeat the question? 15:34:41

MS. HEALY:  I am going to change the question, because she doesn't understand. 15:34:43 15:34:46

THE INTERPRETER:  You are going to change the question? 15:34:48 15:34:48

MS. HEALY:  So I am going to ask a new question. 15:34:48 15:34:50

Q.  Did you receive any training -- you have been at AlmavivA since when? 15:34:50 15:34:52

A.  Since 2002. 15:34:55

Q.  So during your 14 years -- during your 14 years at AlmavivA have you received any training about corrupt payment, avoiding corrupt payments, ensuring that you are not dealing with an agent that may use funds for improper purposes? 15:34:57 15:35:02 15:35:07 15:35:12 15:35:15

MR. WALLERSTEIN:  Objection; compound.  Vague and ambiguous as to "corrupt payments." 15:35:37 15:35:39

THE WITNESS:  I don't understand. 15:35:48

MS. HEALY:  Q.  During the 14 years that you have worked at AlmavivA, have you received risk management training, particularly regarding the making of payments to third parties outside of AlmavivA to 15:35:50 15:35:52 15:35:56 15:36:00

ensure the payments are for proper purposes?                  15:36:26

A.   So I have worked at AlmavivA since 2002, but            15:36:49
as in my profile, I work in risk management in                15:36:56
particular since 2008.                                        15:36:59

Q.   I am asking if you received any training               15:37:03
regarding the topic I asked about.                            15:37:05

A.   I don't quite understand what kind of training         15:37:24
I would have to receive.                                      15:37:27

Q.   Let me give you an example.  If AlmavivA is            15:37:29
making a payment to a third party or agent, do you do         15:37:31
anything to ensure the third party -- to check the third      15:37:34
party -- the purpose why the third party is receiving a       15:37:37
payment?                                                      15:37:40

A.   I don't take care of this type of check.               15:38:08

Q.   It's not part of the risk management function?        15:38:12
Understood.                                                   15:38:14

A.   So the type of risk management, the portion            15:38:49
that I'm responsible for, is relations with insurance         15:38:52
companies that provide coverage for -- of risks against       15:38:59
liability, property, employment benefits, and, as we          15:39:04
talked before, about the release of bid bonds.                15:39:08

Q.   Do you have any -- do you -- not you                   15:39:14
personally; you the company -- have any systems to check      15:39:19
the purpose of each payment that is authorized by the         15:39:23
company to third parties?                                     15:39:26

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.

MS. HEALY:  Q.  You can answer.

A.  Two questions.

Q.  It's better if you answer what you understood with a full sentence, so I understand what you are answering.

A.  Can you --

Q.  I can reask the question, then.  Do you have any systems to check that --

MR. WALLERSTEIN:  Ms. Healy, please, you are not allowing the translation to come through.

I am reading the realtime transcript.

MS. HEALY:  My apologies.

MR. WALLERSTEIN:  Please.

MS. HEALY:  Sorry.

MR. WALLERSTEIN:  When the witness gives an answer, Ms. Healy, she is speaking in Italian.  Neither I nor the court reporter can understand Italian.  So that's why it's essential to have an interpreter here, and that's why in fact Judge Ryu ordered that you have an interpreter.

So when the witness finishes speaking in Italian, please allow enough time for the interpreter to speak the answer in English so that both I and the court

reporter can understand the question and we have a clear    15:40:57
transcript.    15:41:03

MS. HEALY:  That's no problem, Mr.    15:41:03
Wallerstein.    15:41:03

Q.  Do you have any system for checking payments    15:41:03
to third parties, agents, consultants where you write    15:41:05
down the purpose for which the payment is made?    15:41:10

MR. WALLERSTEIN:  Objection.  Objection; vague    15:41:29
as to "you."  Lacks foundation.  Calls for speculation.    15:41:32

MS. HEALY:  Q.  You can answer.    15:41:45

A.  I can't quite respond, because I am not quite    15:41:57
understanding.  Can you be a little more specific or    15:41:59
precise, concise?    15:42:03

Q.  As head of the treasury at AlmavivA, do you    15:42:07
keep track in writing of the purpose for which payments    15:42:10
to third parties, agents, and consultants are made?    15:42:15

A.  I don't track, in my responsibility.  I don't    15:42:47
track the payments.  I make them.    15:42:53

Q.  Okay.  So you don't keep track in a general    15:42:56
register of everything that's paid to third parties?    15:42:59

A.  Not me, no.    15:43:11

Q.  Do you know if anyone does at AlmavivA?    15:43:13

A.  If you are asking the movements of money in    15:43:35
accounting terms, it is kept track of.    15:43:39

Q.  I am asking if there is a purpose written next    15:43:42

MS. HEALY:  That's okay.  It's been marked.    16:54:18

Q.  Did you have to agree with Christian De Felice    16:54:20
about making payments from AlmavivA do Brasil to    16:54:24
Almawave USA?    16:54:30

MR. WALLERSTEIN:  Objection; vague as to    16:54:37
"agree."    16:54:38

MS. HEALY:  Q.  You can answer.    16:54:43

MR. WALLERSTEIN:  I don't want you to refer to    16:54:49
this document, ma'am.    16:54:50

MS. HEALY:  Q.  I am asking you.    16:54:55

A.  What do you mean by "agree"?    16:54:56

Q.  I am asking you what you remember discussing    16:54:58
with Christian De Felice about making payments from    16:55:01
AlmavivA do Brasil to Almawave USA.    16:55:06

A.  In which context?    16:55:23

Q.  Since February 2014.    16:55:25

A.  Christian De Felice is the CFO of the AlmavivA    16:55:46
group, and he is my superior, so often I speak with him    16:55:51
and I exchange ideas on issues with regard to my work.    16:56:08

Q.  Did Christian De Felice ever ask you to    16:56:13
contact AlmavivA do Brasil to tell them to make payments    16:56:21
to Almawave USA?    16:56:26

A.  Yes.    16:56:42

Q.  What did he tell you and when?    16:56:43

A.  I don't remember the date.    16:56:54

**F-184**

ANGELA NICOLELLA - 1/21/2016

Page 105

to make.

Q.   Were you the one asking AlmavivA do Brasil how much to transfer to Almawave USA?

A.   I sent the emails to my colleagues in Brazil, but I was not the one deciding on the amount of those transfers.

Q.   So you would just send instructions?

A.   So if I got word or was instructed, I would communicate to Almawave do Brasil to make those transfers to Almawave USA.

Q.   And who would give you those instructions?

A.   The instructions were coming to me from Valeria Sandei.

Q.   And did you also have to agree with Christian De Felice about these transfers?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  In which way "agree"?

(Deposition Exhibit 10 was marked for identification.)

MS. HEALY:  Q.  Well, I can read from an email you wrote.

(Reads in Italian.)

No, I am going to read from the email.  You can translate, because I am reading in Italian, if you don't mind.

**F-185**

"A. I actually understood that she was the founder of Almawave.

"Q. Almawave S.r.l.?")

MS. HEALY: There were some other lines after that I said that she didn't.

THE REPORTER: Then she said, "Almawave?" And then there was colloquy.

MS. HEALY: Q. Ms. Gatti, did you understand whether there was a distinction between Almawave or AlmavivA as different corporations?

MR. LOSAVIO: Object to the form. Ambiguous by what you mean by there was a distinction. In her mind? In somebody else's mind? In fact?

MS. HEALY: If you make any more of these speaking objections I am going to call the judge, because the judge specifically said no speaking objections. And if you want to note an objection for the record you can do so, but you are not allowed to do what you just did. So please stop it, because I am really going to get the Court on the line.

MR. LOSAVIO: I am pointing out to you the nature of the ambiguity so that you can cure it.

MS. HEALY: The client -- the witness can point out any ambiguity if she wants to.

Could you please read the question again?

Q.   Did she tell you she had any roles at any other company within Almawave?

A.   Within Almawave?

Q.   Yes.

A.   No.

Q.   Did you -- did there come a point where you learned Almawave was owned by another company?

A.   No.

Q.   So you never learned whether Almawave had a parent company?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you rephrase, please?

MS. HEALY:  Q.  No.  Do you understand my question?

A.   No.

Q.   Did you ever learn whether Almawave S.r.l., the company that you identified as Ms. Sandei's company, was owned by a parent company?

MR. WALLERSTEIN:  Objection; misstates prior testimony, vague.

MR. LOSAVIO:  I am objecting on the grounds it misstates the testimony with respect to the S.r.l. component.

MS. HEALY:  Q.  You can answer.

A.   Can you rephrase?  Sorry.

Q.   Do you know a company known as AlmavivA S.p.A.?
10:03:03
10:03:06

A.   Are you asking me if I am aware that there is a company named --
10:03:10
10:03:12

Q.   Yes.
10:03:15

A.   -- Almawave?  Yes, I am aware of it.
10:03:15

Q.   How did you learn about AlmavivA S.p.A.?
10:03:19

A.   I -- let me think.  I don't remember.  I don't remember exactly how I knew about it.
10:03:28
10:03:35

Q.   Did Ms. Sandei tell you anything about AlmavivA S.p.A. while she was on the phone?
10:03:39
10:03:42

A.   No.
10:03:46

Q.   Did you --
10:03:49

MR. LOSAVIO:  That last question was ambiguous as to time.  I assume you meant the phone call that's been the subject of the preceding question.
10:03:51
10:03:52
10:03:55

MS. HEALY:  Q.  Did Ms. Sandei tell you anything about AlmavivA S.p.A. between your first call and June 2014?
10:03:58
10:04:00
10:04:06

A.   I don't remember.
10:04:10

Q.   Did you have any other calls with Ms. Sandei after your first call?
10:04:12
10:04:17

A.   The best of my recollection --
10:04:26

Sorry.  Can you rephrase the question?
10:04:30

Q.   No.
10:04:33

I need you to rephrase.

MS. HEALY: Q. No. If you don't understand the question, you can say you don't understand it.

A. I don't understand. Sorry.

Q. You don't understand the question?

A. No, I am confused by the concept of business.

Q. You are confused by the concept of business?

A. Do you want to know if we discussed incorporating?

Q. I want to know everything that you discussed.

A. Ask me.

Q. Everything, between Rome and April, when you spoke to Mr. Capaccio -- first of all, were you in San Francisco when you placed that call?

A. I think so.

Q. And where is Mr. Capaccio?

A. In San Francisco, in the area.

Q. Okay. So between that time period I want to know everything you said to Ms. Sandei or anyone else who works or worked for her.

MR. LOSAVIO: Ambiguous as to time.

MS. HEALY: Q. I am just asking for what you remember.

A. Can you break it down? Really, I don't remember the time.

**F-189**

THE WITNESS:  I am back.

MS. HEALY:  Q.  So you said you turned over your computer to Low, Ball & Lynch?

A.  I did.

Q.  Now, going back -- you were describing the discussion about IQSystem with Ms. Sandei.  Was there anyone else -- you said you don't recall when or how it happened; correct?

A.  Correct.

Q.  So you just -- can you tell me everything you recall telling Ms. Sandei about IQSystem Inc.?

MR. LOSAVIO:  Ambiguous as to time.

MS. HEALY:  Q.  In April.  Before -- before April 1st, 2000- -- we are in the first quarter of 2014, before April 1st, 2014.

A.  I don't even recall if I mentioned the name of the company or the name of the person.

Q.  Okay.  Tell me what you recall.

A.  My recollection is that Ms. Sandei was looking for a business development force.  And my recollection is that at that time there was not even a firm plan in terms of outsourcing the service or hiring full-time people to do that.

Q.  What service?

A.  Business development.

Almawave's website?

A.   Yes, at one point there was.

Q.   Did you approve what was written in that biography?

A.   I believe so.

Q.   So what was stated in that biography would have been correct, to the extent you had conveyed the information about what you were doing to Almawave?

MR. WALLERSTEIN:  Objection; vague.  Vague as to time.

THE WITNESS:  Yeah, I don't remember the process of that.  But I remember the picture was certainly approved.  I don't remember --

MS. HEALY:  Q.  It's the most important.

A.   But I don't remember the content.

Q.   So -- but Ms. Sandei understood that Soshoma would be working in technology development?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.

MR. LOSAVIO:  Join.

THE WITNESS:  If your question is if I told Ms. Sandei that my startup was in technology and my impression was that she understood, the answer is yes.

MS. HEALY:  Q.  Okay.  What did you tell her about that?

F-191

Q.   And how long was the call?

A.   Super brief.

Q.   Did he ask you any questions about your job at Soshoma?

A.   Not that I recall.

Q.   Did Mr. Wallerstein or any of his colleagues ever ask you any questions about your job at Soshoma at any point in time since you met him?

A.   Not that I recall.

Q.   Did you -- how many conversations did you have with Mr. Wallerstein since this lawsuit has begun?  Or any of his colleagues at Venable.

A.   Yeah.  So again, my memory is a little blurred, but I think two.

Q.   Okay.  Did you ever tell Mr. Wallerstein about investors in the company, the names of investors in the company?

MR. LOSAVIO:  Ambiguous as to which company.

THE WITNESS:  Investors -- yeah, which company?

MS. HEALY:  Q.  In Soshoma or Loop AI.

A.   Not that I remember.

Q.   Did you ever give Mr. Wallerstein or anyone else at Venable any information regarding Soshoma or Loop AI?

# EXHIBIT F

**SPEAKING OBJECTIONS/COACHING**
**(compound & witness trained to refuse to answer question as posed)**

MS. HEALY:  Q.  -- or IQSystem Inc.?                16:22:58

MR. WALLERSTEIN:  Objection; compound.              16:23:04

THE WITNESS:  Can you repeat it, please --          16:23:09

MS. HEALY:  Q.  Sure, no problem.                   16:23:12

A.  -- and maybe split it apart?                    16:23:12

Q.  Sure.  That's no problem.  You are having       16:23:14
difficulty --                                       16:23:21

MR. WALLERSTEIN:  No, Counsel, you are having       16:23:21
difficulty posing proper questions.  Knock off the  16:23:25
comments.                                           16:23:29

MS. HEALY:  Q.  Ms. Perri, did you have --          16:23:30
when was the first board meeting you participated in? 16:23:32

A.  I don't remember the date.  I assume it         16:23:47
started in March 2015.                              16:23:53

Q.  Did you -- how does the board keep a record of  16:23:57
what the board members of AlmavivA S.p.A. discuss?  16:24:02

A.  AlmavivA S.p.A., as all other companies, I      16:24:27
believe, has company books.                         16:24:35

Q.  And what do those company books reflect?  What  16:24:37
is discussed during a board meeting?                16:24:40

A.  Yes.                                            16:24:49

Q.  Is there somebody taking minutes during the     16:24:50
meeting?                                            16:24:52

A.  There is the secretary -- there is the          16:25:01
secretary who takes note about what happens during the 16:25:07

alarm on this phone will go off at 7:01. So I am giving you a minute so no one is surprised and unnecessarily upset.

MS. HEALY: Q. Ms. Nicolella, did you receive a claim from Ms. Gatti or her lawyer or IQSystem or its lawyer for a claim for payment for defense costs in this litigation?

A. No.

Q. Are you aware of a claim having been made, or a request having been sent on behalf of Anna Gatti or IQSystem Inc. or IQSystem LLC to any of the AlmavivA entities for payment of legal costs or fees in this case?

MR. WALLERSTEIN: Objection. The question is compound.

THE WITNESS: If you could, I would also have asked you if you could ask me just one question, and not one with many questions, one inside the other.

MS. HEALY: Q. I asked one question, and my question is whether you are aware of Anna Gatti or IQSystem Inc. LLC having made a request for payment of legal fees or legal costs incurred in this case from AlmavivA -- any of the AlmavivA entities.

A. What do you mean by other entities of AlmavivA --

RANIERO ROMAGNOLI - 1/22/2016

Page 23

A.   I think between February and March of 2014.

Q.   And who did you hear about her from?

A.   Valeria Sandei.

Q.   What did she tell you?

A.   I don't remember.  She mentioned her to me for the first time in that period, but I don't remember exactly what she said.

Q.   Is Ms. Sandei your boss?

A.   Yes.

Q.   Did Ms. Sandei tell you that Ms. Gatti was the CEO of a startup that was developing artificial intelligence technology applied to big data?

MR. WALLERSTEIN:  Objection; compound as to time.  It's vague as to time and compound.

THE WITNESS:  In which period are we talking about?

MS. HEALY:  Q.  When she first told you or later.

MR. WALLERSTEIN:  So ever?  The question is ever?

MS. HEALY:  Q.  You can answer.

A.   The first time she spoke to me about Ms. Gatti I don't remember exactly when, but certainly she did not tell me what Ms. Gatti did.

Q.   What did -- what was the next time that you

**F-196**

for me?

MS. WONG:  Q.  When you were communicating with Anna Gatti about opening an account at Bank of the West, was that account in San Francisco?

A.  I said that I had sent an email to Vincenzo Mitolo telling him that it was our intention to open an account at Bank of the West for Almawave USA, and if he needed information to ask me or Anna Gatti.

Q.  Did you tell Mr. Mitolo that the bank -- that the account at Bank of the West was for Almawave USA's business account?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you reformulate the question, rephrase it?

MS. WONG:  Q.  Sure.  When you were communicating with Mr. Mitolo and Anna Gatti about creating the Bank of the West account, was that account used for business purposes?

MR. WALLERSTEIN:  Objection; lacks foundation. Calls for speculation as to how Anna Gatti used the account.

MS. WONG:  Q.  You can answer.

A.  Can you rephrase it, maybe more precisely?

Q.  As the head of treasury and financial planning, you were communicating with Anna Gatti and

MS. WONG:  Q.  And how would it be used?    13:32:30

MR. WALLERSTEIN:  Objection; lacks foundation,    13:32:33
calls for speculation.    13:32:34

THE WITNESS:  I don't know.    13:32:39

MR. WALLERSTEIN:  Counsel, it's 1:32.  We are    13:32:40
going to take a lunch break.  If you want to -- if you    13:32:42
are within five minutes of finishing up the subject, I    13:32:44
am happy to stay five minutes.  Otherwise we are going    13:32:48
to take our break.    13:32:52

MS. WONG:  I just have a few more questions.    13:32:55

Q.  Did you receive any information about why    13:32:59
100 -- approximately $100,000 were placed into the    13:33:02
account?    13:33:05

A.  Information from whom?    13:33:20

Q.  Any information about placing the first    13:33:25
$100,000 into the account from anyone in AlmavivA.    13:33:29

A.  So after the opening of the account it was --    13:34:09
$100,000 were deposited, which represents the    13:34:12
capitalization of the company.    13:34:18

Q.  Did you receive any document explaining why    13:34:22
$100,000 was the sum that was selected to capitalize the    13:34:24
account?    13:34:30

A.  No.    13:34:37

Q.  Did you give instructions to anyone to    13:34:40
transfer the funds into the Bank of the West?    13:34:41

Q.   Okay.  Tell me what you remember that he told you.

A.   I don't remember exactly what he told me about the transfer of money, but he probably asked me to send an email to the colleagues at AlmavivA do Brasil to transfer funds to Almawave USA.

MS. HEALY:  Sorry.  I forget that I am understanding, because I understand what she is saying.  It's difficult -- I am sorry.  I apologize for not giving you space.

Q.   Did he tell you why AlmavivA do Brasil had been selected for wiring or transferring money to Almawave USA?

A.   I don't remember if he told me that.

Q.   Since March or February 2015 has AlmavivA do Brasil stopped making transfers to Almawave USA?

A.   Yes.

Q.   Why?

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  I don't know the answer or the reason.

MS. HEALY:  Q.  Do you know what was the purpose of the payments from AlmavivA do Brasil to Almawave USA?

A.   I don't know the exact answer, but I suppose

He just started exchanging documentation that            16:50:08

regarded -- regarding IQSystem.  So it was documents     16:50:20

that had -- that showed the IQSystem's brand or logo.    16:50:27

    Q.   Did you ask any questions about IQSystem Inc.,  16:50:29

where it was based, what it did?                         16:50:37

    A.   No.                                             16:50:39

    Q.   Did Mr. Di Napoli ever mention to you Gennaro   16:50:43

Di Napoli?                                               16:50:49

    A.   Not that I remember.                            16:50:51

    Q.   Did you ever ask anyone to verify when --       16:50:57

whether IQSystem Inc. was a real company or when it was  16:51:00

incorporated?                                            16:51:01

        MR. WALLERSTEIN:  Objection; compound.  Vague    16:51:03

and ambiguous.                                           16:51:13

        THE WITNESS:  No.                                16:51:14

        MS. HEALY:  Q.  Why not?                         16:51:24

    A.   Because I did not think I was supposed to make  16:51:27

this kind of request.                                    16:51:29

    Q.   So as of the time you signed a contract with    16:51:33

IQSystem Inc., you had not asked anyone to conduct any   16:51:42

sort of due diligence on this company or Tony Di Napoli? 16:51:48

        MR. WALLERSTEIN:  Objection; compound.           16:51:56

Compound.  Half of it has been asked and answered.       16:52:01

        THE WITNESS:  Can you reformulate the            16:52:02

question?

MS. HEALY:  Q.  If you don't understand, that's fine.  I am just asking -- you seem to be a very sophisticated woman, so --

MR. WALLERSTEIN:  That's ridiculous and absurd.

MS. HEALY:  Q.  If you don't understand my question, I can't keep reformulating.

MR. WALLERSTEIN:  Ms. Healy, you seem to be a sophisticated lawyer.  I am sure you can ask a question that doesn't have two parts to it.

MS. HEALY:  You can read the question again, and if she doesn't understand it, we will ask another question.

MR. WALLERSTEIN:  I think she already said that.

THE WITNESS:  Okay.  Sure.  I will do my best.

(Record read as follows:

"Q.  So as of the time you signed a contract with IQSystem Inc., you had not asked anyone who was conducting [sic] any sort of due diligence on this company or Tony Di Napoli?")

MS. HEALY:  "Anyone to conduct."

THE WITNESS:  The meaning of due diligence?

MS. HEALY:  Q.  Verifica.  Verification.  A verification --

16:52:04
16:52:07
16:52:10
16:52:11
16:52:12
16:52:13
16:52:18
16:52:20
16:52:22
16:52:25
16:52:26
16:52:32
16:52:33
16:52:35
16:52:35
16:53:10
16:53:10
16:53:10
16:53:10
16:53:10
16:53:11
16:53:46
16:53:51
16:53:54

**F-201**

ANNA GATTI - 1/19/2016

Page 37

Can you read it back to her?                        10:04:34

(Record read as follows:                            10:04:36

"Q.  Did you have any other calls with Ms.          10:04:36

Sandei after your first call?")                     10:04:36

THE WITNESS:  Can you kindly -- it's -- it's        10:04:48

vague, you know.  It's like from there to now?  After my   10:04:53

first call in my life?                              10:04:58

MS. HEALY:  Q.  When was the -- after the           10:04:59

first call did you have another call at some point in   10:05:00

February, March, April, May, or June with Ms. Sandei or   10:05:03

anyone else at Almawave?                            10:05:08

MR. LOSAVIO:  Compound.                             10:05:15

THE WITNESS:  So I hear two questions.  One is      10:05:15

if I had any call with Ms. Sandei between the first call   10:05:17

and -- when?  June 2014?  I -- I think, at the best of   10:05:23

my recollection, that I had some other calls.       10:05:32

MS. HEALY:  Q.  Okay.  Can you tell me all the      10:05:35

calls you remember having?                          10:05:36

A.  I don't have a precise recollection of the      10:05:40

calls.                                              10:05:42

Q.  Sure.  I understand.                            10:05:43

What was the next step in your relationship         10:05:44

with Ms. Sandei?  Did there come a point where she asked   10:05:46

you to work for her?                                10:05:51

A.  Later -- well, actually, she did not.           10:05:53

DTI Court Reporting Solutions - San Francisco
800-869-9132                              www.deposition.com

**F-202**

MR. LOSAVIO:  Wait for my objection.

MS. HEALY:  You interrupted while she was giving her response.  Please have the courtesy of -- to your own witness.

MR. LOSAVIO:  My objection is that you have again strayed far afield from the topic which -- the only topic which the Court has authorized this witness to be asked about in this deposition session.

MS. HEALY:  And I am asking her about what she told Ms. Sandei about Palantir.

MR. LOSAVIO:  The pending question is not that.

MS. HEALY:  Well, I need to understand what she knew first before I understand what she told her.

MR. LOSAVIO:  Let's have the pending question read.

MS. HEALY:  I am going to reask the question.

Q.   What did you tell Ms. Sandei and where were you when you told her about the Palantir project?

MR. LOSAVIO:  Compound.

THE WITNESS:  I am hearing two questions from you.  The first one is what I told her.  And my recollection is that I told her that Tony Di Napoli worked -- was working or worked on the Palantir business development.

Q.   Did she tell you she had any roles at any other company within Almawave?

A.   Within Almawave?

Q.   Yes.

A.   No.

Q.   Did you -- did there come a point where you learned Almawave was owned by another company?

A.   No.

Q.   So you never learned whether Almawave had a parent company?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you rephrase, please?

MS. HEALY:  Q.  No.  Do you understand my question?

A.   No.

Q.   Did you ever learn whether Almawave S.r.l., the company that you identified as Ms. Sandei's company, was owned by a parent company?

MR. WALLERSTEIN:  Objection; misstates prior testimony, vague.

MR. LOSAVIO:  I am objecting on the grounds it misstates the testimony with respect to the S.r.l. component.

MS. HEALY:  Q.  You can answer.

A.   Can you rephrase?  Sorry.

Q.   Do you know a company known as AlmavivA   10:03:03
S.p.A.?   10:03:06

A.   Are you asking me if I am aware that there is   10:03:10
a company named --   10:03:12

Q.   Yes.   10:03:15

A.   -- Almawave?  Yes, I am aware of it.   10:03:15

Q.   How did you learn about AlmavivA S.p.A.?   10:03:19

A.   I -- let me think.  I don't remember.  I don't   10:03:28
remember exactly how I knew about it.   10:03:35

Q.   Did Ms. Sandei tell you anything about   10:03:39
AlmavivA S.p.A. while she was on the phone?   10:03:42

A.   No.   10:03:46

Q.   Did you --   10:03:49

MR. LOSAVIO:  That last question was ambiguous   10:03:51
as to time.  I assume you meant the phone call that's   10:03:52
been the subject of the preceding question.   10:03:55

MS. HEALY:  Q.  Did Ms. Sandei tell you   10:03:58
anything about AlmavivA S.p.A. between your first call   10:04:00
and June 2014?   10:04:06

A.   I don't remember.   10:04:10

Q.   Did you have any other calls with Ms. Sandei   10:04:12
after your first call?   10:04:17

A.   The best of my recollection --   10:04:26
Sorry.  Can you rephrase the question?   10:04:30

Q.   No.   10:04:33

**F-205**

Can you read it back to her?

(Record read as follows:

"Q.  Did you have any other calls with Ms.

Sandei after your first call?")

THE WITNESS:  Can you kindly -- it's -- it's vague, you know.  It's like from there to now?  After my first call in my life?

MS. HEALY:  Q.  When was the -- after the first call did you have another call at some point in February, March, April, May, or June with Ms. Sandei or anyone else at Almawave?

MR. LOSAVIO:  Compound.

THE WITNESS:  So I hear two questions.  One is if I had any call with Ms. Sandei between the first call and -- when?  June 2014?  I -- I think, at the best of my recollection, that I had some other calls.

MS. HEALY:  Q.  Okay.  Can you tell me all the calls you remember having?

A.  I don't have a precise recollection of the calls.

Q.  Sure.  I understand.

What was the next step in your relationship with Ms. Sandei?  Did there come a point where she asked you to work for her?

A.  Later -- well, actually, she did not.

it.  10:08:59

THE WITNESS:  Yes.  10:08:59

MS. HEALY:  Q.  I am just saying, because the  10:09:00
court reporter can't capture your facial movement.  10:09:02

A.  Yes, we are talking about Almawave.  10:09:06

Q.  We don't want to upset her.  10:09:11

MR. LOSAVIO:  She distinguished an S.r.l.  10:09:14
Almawave from any other Almawave.  So is that the one  10:09:16
you are talking about?  10:09:19

THE WITNESS:  I never got into the S.r.l.  To  10:09:20
me, Almawave -- it's Almawave, you know.  10:09:25

MS. HEALY:  Q.  One company.  It's -- you  10:09:29
don't get into the mix of --  10:09:31

A.  No, I don't know if it's Almawave S.r.l. or --  10:09:33
I never looked at the books.  10:09:38

Q.  Okay.  Do you know a gentleman named Marco  10:09:40
Tripi?  10:09:46

A.  I met him.  10:09:47

Q.  Who is he?  10:09:48

A.  He is the husband of Valeria.  10:09:49

Q.  The lady in the room?  10:09:57

A.  Yes.  10:09:58

Q.  And what's his role at AlmavivA or Almawave,  10:09:59
if any?  10:10:02

MR. WALLERSTEIN:  Objection; calls for  10:10:07

speculation.

MR. LOSAVIO:  No foundation would be my objection.

MS. HEALY:  Q.  You can answer.

A.  Could you rephrase the question?

Q.  Do you have an understanding of what Marco Tripi does at AlmavivA, or Almawave, as you refer to?

A.  At Almawave I -- I don't know.

Your second question was AlmavivA.  The best of my recollection, I think he is the CEO of AlmavivA.

Q.  Okay.  When did you meet Marco Tripi?

A.  Do you want to know when was the first time?

Q.  Yeah, the first time.

A.  I met him on -- in front of the elevator of their house when I was leaving.

Q.  Okay.  That's when you went to see Ms. Sandei in --

A.  Rome.

Q.  When was that?

A.  I don't remember the exact date.

Q.  Was it before you started working for Almawave?

A.  Oh, yeah.

Q.  So was it after you had the first call with Ms. Sandei?

A.   You know, when you ask the question, "Are you acting on behalf of," it's very difficult for me to understand.  What does it mean?  Are you asking if there was a written --

Q.   What's your understanding -- when I ask that question, what do you understand me to mean?

A.   I understand that you want to understand what was my relationship with Almawave --

Q.   Yes.

A.   -- at the time.

Q.   Yeah.  At the time you placed the call to Jeff Capaccio.

A.   And it was -- at that time it was simply a friendly facilitator of the interaction.

Q.   You were not working for them at the time?

A.   No.

Q.   So you were just doing that as a favor?

A.   Yeah.  I really liked what they were doing.

Q.   Before you reached out to Capaccio, had you had any discussions with Ms. Sandei or anyone else who works -- who worked for her about -- about the business that they were going to open in the United States?

A.   So, is your -- can you rephrase?

MS. HEALY:  Can you read that back?

THE WITNESS:  No, I don't need to read back.

I need you to rephrase.

MS. HEALY:  Q.  No.  If you don't understand the question, you can say you don't understand it.

A.  I don't understand.  Sorry.

Q.  You don't understand the question?

A.  No, I am confused by the concept of business.

Q.  You are confused by the concept of business?

A.  Do you want to know if we discussed incorporating?

Q.  I want to know everything that you discussed.

A.  Ask me.

Q.  Everything, between Rome and April, when you spoke to Mr. Capaccio -- first of all, were you in San Francisco when you placed that call?

A.  I think so.

Q.  And where is Mr. Capaccio?

A.  In San Francisco, in the area.

Q.  Okay.  So between that time period I want to know everything you said to Ms. Sandei or anyone else who works or worked for her.

MR. LOSAVIO:  Ambiguous as to time.

MS. HEALY:  Q.  I am just asking for what you remember.

A.  Can you break it down?  Really, I don't remember the time.

Q.   Ms. Nicolella, what was your involvement in the decision to have AlmavivA do Brasil fund the bank account of Almawave USA?    16:42:45 16:42:50 16:43:00

MR. WALLERSTEIN:  Objection; asked and answered.    16:43:19 16:43:19

THE WITNESS:  It's too general.  The question is too general.    16:43:28 16:43:29

MS. HEALY:  Q.  Sure.    16:43:31

A.   If you can be more precise, I can answer.    16:43:31

Q.   Did you have any role in arranging for AlmavivA do Brasil to transfer money to the Bank of the West account of Almawave USA?    16:43:35 16:43:38 16:43:42

A.   So I did have -- I did send an email to my colleagues at AlmavivA do Brasil to transfer the funds, which are the company capital of $100,000, to the account at Bank of the West.    16:44:18 16:44:23 16:44:29 16:44:37

Q.   After this first instance did you have any other involvement in asking AlmavivA do Brasil to transfer funds to Almawave USA's bank account?    16:44:39 16:44:45 16:44:49

A.   There have been other transfers from AlmavivA do Brasil to Almawave USA.    16:45:23 16:45:25

Q.   What was the purpose of those transfers?    16:45:28

MR. WALLERSTEIN:  Objection; lacks foundation.    16:45:33

MS. HEALY:  Q.  You can answer.    16:45:40

A.   It's to make payments that Almawave USA needed    16:45:59

MR. WALLERSTEIN:  I don't hear a question.
There was no question.

MS. HEALY:  Q.  Is that correct?

MR. WALLERSTEIN:  Is what correct?  Objection;
compound.  Vague as to "you."

MS. HEALY:  Q.  Are these the countries where
you tried to bring Almawave's products?

A.  I need to hear -- I am trying to reconstruct
the question that you are trying to ask me.

Can you ask me one question that I can answer?
Perhaps I am having a hard time.

Q.  Did you try to bring Almawave products to any
country other than South Africa, USA, and Brazil?

A.  When?

Q.  At any time.

A.  Yes.

Q.  List all the other countries.

A.  I intend to also focus on the Colombian market
by constituting a legal entity for Almawave there.  It's
something that I haven't yet done as of today.

And I also want to focus my attention on the
Indonesian market.

Similarly, I haven't yet constituted a legal
entity there.

MR. WALLERSTEIN:  I will specifically

designate this portion of the transcript attorneys' eyes only, and again, subject to our 20-day grace period to designate the entire transcript.  But in terms of future business plans in particular, I designate those as attorneys' eyes only.

MS. HEALY:  I wasn't asking about future.  But in any event, I was...

Q.   When did you decide to open --

MR. WALLERSTEIN:  I am sorry, Counsel.  That's our --

MS. HEALY:  Q.  When did you decide --

MR. WALLERSTEIN:  Excuse me, Counsel.

MS. HEALY:  I was asking a question.

MR. WALLERSTEIN:  I am going to let you ask the question, and she can answer.  Then we are taking our break.

MS. HEALY:  Q.  When did you decide to bring your products to the United States?

A.   It was a decision that I matured for a long time and then decided to bring it ultimately in 2014.

MR. WALLERSTEIN:  Let's take our break.

May we have our break, Counsel?

MS. HEALY:  Do what you want, Mr. Wallerstein.

MR. WALLERSTEIN:  May we go off the record, or no?

A.    Yes.

Q.    How many -- what did you ask Russell Reynolds to do?

A.    With respect to what?

Q.    In terms of whatever assignment you were -- what was the assignment you gave Russell Reynolds in respect of the USA?

A.    To recruit a general manager that could support the development plan of sales of the company.

Q.    At the time you contacted Russell Reynolds for this assignment, did you already have a business plan for what you wanted to do in the United States?

A.    We had a business plan for the company, but we had not focused the details specifically for the US.

Q.    Can you clarify what you mean, you had a business plan for the company?  For which company?

A.    For Almawave and the various legal entities that make up Almawave.

Q.    So at the time you contacted Russell Reynolds to recruit this manager, you did not have yet clarity as to how you were going to enter the United States?

MR. WALLERSTEIN:  Objection; vague and ambiguous.

THE WITNESS:  Yes.  Can you help me understand?

**F-214**

# EXHIBIT F

## SPEAKING OBJECTIONS/COACHING
## ("asked and answered" plus)

26th Avenue?

A.   Since January 2010.

Q.   So January 2010 to what?

A.   Since I moved there.

Q.   I just want to tell you that, based on my review of the record -- I make the statement and then you feel free to correct your answers -- I understand that you moved to 24 Clarendon in April of 2014 or around that date.  That's not correct?

A.   It is not correct.

Q.   Okay.  So you are standing by your statement that you moved to 24 Clarendon in January 2015?

MR. LOSAVIO:  Okay.  That's about the third time --

MS. HEALY:  I want to make sure.

MR. LOSAVIO:  I understand.  But there is a line between arguing with the witness because you don't like the answer you are getting and asking questions.  So you are not here to argue.

MS. HEALY:  I'm not arguing.  That's fine.  Your objection is noted.  I just want to make sure that she is recalling.  If she is not recalling, that's a different story.

MR. LOSAVIO:  If you ask, "Are you sure?" after every question that is asked, we will double the

length of this deposition.

MS. HEALY:  I understand.

MR. LOSAVIO:  So the customary manner is just to ask questions.

MS. HEALY:  Tom, the Court said no speeches. Please note your objection for the record and let me ask all the questions I want to ask, so we can proceed.  I waited patiently for you for an hour and 15 minutes.

Q.   So, Ms. Gatti, who owns 24 Clarendon?

A.   Mr. Charles Ferguson.

Q.   And are you renting the home from him?

A.   Yes.

Q.   So you have been living there for approximately one year?

MR. LOSAVIO:  Asked and answered three times.

THE WITNESS:  Yes.

MR. LOSAVIO:  Do you want her to answer again?

MS. HEALY:  Q.  So, Ms. Gatti, at the beginning of this deposition I said I was going to give you some instructions.  I skipped one.  When your counsel objects, when he is done with his objection, you have to answer the question unless there is an instruction not to answer.  Does that make sense?  Do you understand?

A.   I do understand.

ANNA GATTI - 1/19/2016

Page 14

Q.   Okay.                                                    09:27:57

MR. LOSAVIO:  So, Counsel, just so we are                    09:27:58
clear, I follow the three-strike rule.  You get to           09:28:00
answer -- you get to ask the same question three times,      09:28:03
and then I am going to instruct.                             09:28:05

MS. HEALY:  Q.  Ms. Gatti, when did you move                 09:28:13
to the United States?                                        09:28:15

A.   I don't recall the exact date.                          09:28:21

Q.   Approximately?                                          09:28:23

A.   It's either the end of 1999 or beginning of             09:28:28
2000.                                                        09:28:32

Q.   And going back to your living arrangement,              09:28:33
could you tell me who you are living with?                   09:28:36

MR. LOSAVIO:  Objection.  Are you talking                    09:28:40
about now?                                                   09:28:42

MS. HEALY:  Yeah.                                            09:28:44

MR. LOSAVIO:  How is that reasonably                         09:28:45
calculated to lead to the discovery of admissible            09:28:47
evidence?                                                    09:28:51

MS. HEALY:  I am sorry.  Note your objection                 09:28:51
and let her answer the question.                             09:28:53

Q.   Do you live with Mr. Tony Di Napoli?                    09:28:55

A.   Yes.                                                    09:28:57

Q.   How long have you been living with him?                 09:28:58

A.   Probably a year.                                        09:29:02

**F-218**

MS. HEALY:  Ms. Perri --

MR. WALLERSTEIN:  Counsel, stop interrupting me.

If you do not have an Italian interpreter, then we can do this for as long as you like, but the witness will not be responding to questions in English and I will not allow her to respond to you speaking Italian.

MS. HEALY:  Ms. Perri, do you speak English?

MR. WALLERSTEIN:  Asked and answered.

MS. HEALY:  Ms. Perri --

MR. WALLERSTEIN:  That question has been asked --

MS. HEALY:  Don't let me interrupt you. Please go ahead.

MR. WALLERSTEIN:  The question has been asked and answered.  You can respond however you responded the first several times.

MS. HEALY:  Ms. Perri, I put in front of you a declaration that was presented to the Court.  Did you sign that declaration?

THE WITNESS:  (Speaks in Italian.)

MS. HEALY:  Translation:  "I will not respond to a question posed to me in English because English is not my first language and I don't feel comfortable

MR. WALLERSTEIN:  Answer for the third time, please.    15:35:51  15:35:53

THE WITNESS:  We have thousands, if not millions, of contracts that we draft and prepare.  If you are asking me if there is an exact match between this document and a document that we have prepared, I cannot say this.

MS. HEALY:  Q.  I am not asking if there is an exact correspondence.  I am just trying to understand whether this confidentiality agreement originated from AlmavivA and whether the structure of it corresponds to some form agreements that you may have at AlmavivA --

MR. WALLERSTEIN:  Can you answer for the --

MS. HEALY:  Q.  -- adapted --

I am not done with the question.

-- adapted to the IQSystem Inc. situation.

MR. WALLERSTEIN:  Can you answer for the fourth time, please?

THE WITNESS:  I already answered.  I don't know where you want to go with this.  I repeat, within my functions, my roles, there is a role to give legal support, of course, in -- for the reglementation [sic] of the third -- of relationships with third parties -- that third parties have with our company in multiple forms that are allowable by law.  And this includes a

obtain board approval; correct?   15:25:35

A.   I did not need approval by the board.   15:25:38

Q.   So what you told Ms. Gatti and IQSystem Inc.   15:25:41
about the board approval wasn't true?   15:25:58

A.   I said that I told them to speed things up,   15:26:02
and for that reason I put some -- some deadlines.   15:26:09

Q.   But it wasn't true that you needed to get   15:26:11
board approval; correct?   15:26:12

MR. WALLERSTEIN:  Objection; asked and   15:26:13
answered several times.   15:26:15

MS. HEALY:  Q.  Yes, you can answer yes or no.   15:26:19

A.   I did not need approval from the board.   15:26:22

Q.   So what you wrote was a lie?   15:26:24

MR. WALLERSTEIN:  Objection; asked and   15:26:24
answered.  I am going to ask her not to answer the   15:26:27
question.  It's verbatim more than once.   15:26:30

MS. HEALY:  Q.  You can answer.   15:26:31

You cannot instruct her not to answer.   15:26:34

MR. WALLERSTEIN:  I certainly can, but I am   15:26:35
not.   15:26:39

THE WITNESS:  It was an element of pressure   15:26:41
within negotiations, and I do not consider it a lie.   15:26:48

MS. HEALY:  Q.  Okay.  Did the board -- first   15:26:50
of all, which board were you referring to?   15:26:57

A.   To which do you refer?

A.    Almawave --                                    09:58:09

MR. LOSAVIO:  Well, first of all, I don't know       09:58:11
that there is a foundation that she knows the difference   09:58:12
between one Italian designation and another.         09:58:16

MS. HEALY:  What do you mean?                         09:58:18

MR. LOSAVIO:  S.r.l., S.p.A., SPQC.                  09:58:19

MS. HEALY:  Okay.  That's a good point, too.         09:58:22

Q.    Did you ever understand there to be any        09:58:24
distinction between Alma -- like your counsel was    09:58:27
indicating, did you understand there was a distinction   09:58:31
between Almawave S.r.l. or AlmavivA S.p.A., or did you   09:58:33
regard them as just one company?                     09:58:40

MR. LOSAVIO:  I was not -- I was making a more       09:58:42
general proposition, in general that I think you need to   09:58:45
lay the foundation that she knows the difference between   09:58:49
what an S.r.l. is and an SPQ, or whatever the letters   09:58:50
were.                                                09:58:54

MS. HEALY:  I understand.  Can you ask my            09:58:54
question again, please?                              09:58:55

(Record read as follows:                             09:58:56
"Q.  When you spoke to Ms. Sandei, who did           09:57:54
you understand she worked for?")                     09:57:58

MS. HEALY:  Ms. Sandei, S-a-n-d-e-i.                 09:57:59

THE WITNESS:  And my answer was?                     09:57:59

(Record read as follows:                             09:57:59

"A.  I actually understood that she was the founder of Almawave.

"Q.  Almawave S.r.l.?")

MS. HEALY:  There were some other lines after that I said that she didn't.

THE REPORTER:  Then she said, "Almawave?"  And then there was colloquy.

MS. HEALY:  Q.  Ms. Gatti, did you understand whether there was a distinction between Almawave or AlmavivA as different corporations?

MR. LOSAVIO:  Object to the form.  Ambiguous by what you mean by there was a distinction.  In her mind?  In somebody else's mind?  In fact?

MS. HEALY:  If you make any more of these speaking objections I am going to call the judge, because the judge specifically said no speaking objections.  And if you want to note an objection for the record you can do so, but you are not allowed to do what you just did.  So please stop it, because I am really going to get the Court on the line.

MR. LOSAVIO:  I am pointing out to you the nature of the ambiguity so that you can cure it.

MS. HEALY:  The client -- the witness can point out any ambiguity if she wants to.

Could you please read the question again?

(Record read as follows:

"Q.  Ms. Gatti, did you understand whether there was a distinction between Almawave or AlmavivA as different corporations?")

THE WITNESS:  When?

MS. HEALY:  Q.  When you first spoke to Ms. Sandei.

A.  When I first spoke to Ms. Sandei I was only aware of Almawave.

Q.  Okay.

A.  And I was talking to her as -- my understanding was -- the founder of Almawave.

Q.  And when did you -- who told you she was the founder of Almawave?

A.  I believe Mario Pepe.

Q.  Did she explain to you on the phone who she was?

A.  Can you rephrase, please?

Q.  Did Ms. Sandei explain to you on the phone her title, her role?

A.  She introduced herself as the -- I think the -- she told me she founded Almawave.

Q.  Did she tell you whether she had any titles at Almawave?

A.  I don't remember.

Q.   Okay.                                            09:27:57

MR. LOSAVIO:  So, Counsel, just so we are            09:27:58
clear, I follow the three-strike rule.  You get to   09:28:00
answer -- you get to ask the same question three times, 09:28:03
and then I am going to instruct.                     09:28:05

MS. HEALY:  Q.  Ms. Gatti, when did you move         09:28:13
to the United States?                                09:28:15

A.   I don't recall the exact date.                  09:28:21

Q.   Approximately?                                  09:28:23

A.   It's either the end of 1999 or beginning of     09:28:28
2000.                                                09:28:32

Q.   And going back to your living arrangement,      09:28:33
could you tell me who you are living with?           09:28:36

MR. LOSAVIO:  Objection.  Are you talking            09:28:40
about now?                                           09:28:42

MS. HEALY:  Yeah.                                    09:28:44

MR. LOSAVIO:  How is that reasonably                 09:28:45
calculated to lead to the discovery of admissible    09:28:47
evidence?                                            09:28:51

MS. HEALY:  I am sorry.  Note your objection         09:28:51
and let her answer the question.                     09:28:53

Q.   Do you live with Mr. Tony Di Napoli?            09:28:55

A.   Yes.                                            09:28:57

Q.   How long have you been living with him?         09:28:58

A.   Probably a year.                               09:29:02

MR. WALLERSTEIN:  When you say that word, Counsel, I cannot understand you.  CEO, COO?

MS. HEALY:  Okay.  That's fine.

Q.   In October 2014, when you had this encounter with Marco Tripi, what is your understanding of -- what was your understanding back then, when you were meeting with him, of his role and title?

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  So my perception was that he was mainly here as an investor in Almawave USA, I mean, with the perspective that --

MS. HEALY:  Q.  "Here" where?  In San Francisco?

A.   Yeah.

Q.   Okay.  When did he come to San Francisco?

A.   Fall 2014 --

Q.   Okay.

A.   -- with Valeria Sandei.

Q.   Okay.  So he came as an investor?

MR. WALLERSTEIN:  Objection; calls for speculation.

MS. HEALY:  She is explaining her view.

MR. WALLERSTEIN:  Counsel, let me state my darn objections, please.

MS. HEALY:  The Court said no speaking

Q.   I understand.  But if they need to ask you something -- if Venable wants to ask anything, for permission to do anything in this case, who do they ask?  Do they ask you or is there somebody else within AlmavivA that they write to?

A.   Within AlmavivA?

Q.   Yes, within any of the companies.  Is there anyone else that they write to for authorization to do anything in this case?

MR. WALLERSTEIN:  In the legal department or otherwise?

MS. HEALY:  Q.  Anywhere.  Anywhere.

A.   It depends.

Q.   On what?

A.   On the subject of the request.

Q.   Can you explain?

A.   If it is a legal matter, I am the person of reference.  If it is about taking decisions in this matter --

MS. HEALY:  No, "on the merits," not "in the matter."

THE INTERPRETER:  In this matter, "in merito."

MS. HEALY:  I object to the request.

Q.   Can you explain what you mean by "merito"?

MR. WALLERSTEIN:  I don't understand the

15:04:55
15:04:57
15:05:01
15:05:04
15:05:07
15:05:49
15:05:50
15:05:53
15:05:56
15:06:08
15:06:09
15:06:11
15:06:17
15:06:18
15:06:24
15:06:26
15:06:30
15:06:37
15:06:46
15:06:48
15:06:50
15:06:52
15:06:56
15:06:59
15:07:02

**F-227**

question.  I don't know what the question is. | 15:07:03

MS. HEALY:  Q.  Have you given authorization | 15:07:09
to Venable to take any action in this case since you | 15:07:11
first retained them? | 15:07:16

MR. WALLERSTEIN:  Objection.  That calls for | 15:07:24
your communications with Venable, and it's privileged. | 15:07:26

MS. HEALY:  Q.  Are you going to answer? | 15:07:33

A.  No.  To this, no. | 15:07:35

Q.  Do you communicate with Venable regarding this | 15:07:37
case on a regular basis? | 15:07:42

MR. WALLERSTEIN:  Objection.  You can | 15:07:48
answer -- you could answer if the question did not say | 15:07:50
"regarding this case."  But because it reveals the | 15:07:55
subject matter of a communication between you, an | 15:08:05
attorney, and your outside counsel, it is privileged. | 15:08:16

MS. HEALY:  Q.  Are you going to answer? | 15:08:26

A.  No. | 15:08:28

Q.  Are you in charge of making decisions | 15:08:29
regarding the legal strategy that Venable will pursue in | 15:08:32
this matter? | 15:08:36

MR. WALLERSTEIN:  Objection; vague as to -- | 15:08:48
the whole thing is vague.  It's also asked and answered. | 15:08:51

MS. HEALY:  Q.  You can answer. | 15:08:57

MR. WALLERSTEIN:  You can answer. | 15:09:01

THE WITNESS:  I answered earlier. | 15:09:05

# EXHIBIT F

## SPEAKING OBJECTIONS/COACHING
## (counsel interrupting)

**F-229**

A.    Probably less than 10 minutes.

Q.    What did you understand the purpose of the call to be?  Was Ms. Sandei looking to hire somebody here in San Francisco?

A.    No.

Q.    What did she tell you during that call?

A.    She told me that she was expanding Almawave internationally, that she entered already some international markets outside Italy.  She mentioned her presence, Almawave presence, in Brazil.  And -- and she asked how was -- how was my perception of the US market.

Q.    Which market?

A.    Just customer support business.

Q.    For what kind of technology?

A.    We didn't enter any discussion about technology.

Q.    So what kind of market was she discussing with you?

A.    Customer support.

Q.    Did she tell you exactly what they did?

MR. LOSAVIO:  In that conversation?

MS. HEALY:  Mm-hmm.

THE WITNESS:  She described -- you know, it was 10 minutes' conversation.

MS. HEALY:  Q.  Sure.

A.    Yes.                                              09:56:26

Q.    What did he say?                                 09:56:27

A.    I don't recall the exact words, but the          09:56:29
meaning was along the line that he has an Italian client   09:56:32
who was internationalizing a company, and he thought of    09:56:47
me as a -- you know, just to have a chat to have a kind     09:56:59
of brainstorming based on my past experience.  It's very    09:57:05
common that I do this kind of work.                    09:57:13

Q.    And did -- were you in San Francisco when you    09:57:15
got this call?                                         09:57:18

A.    This call, you mean?                             09:57:19

Q.    From Mario Pepe, the one you just described.     09:57:21

A.    I don't remember.                                09:57:25

Q.    But you were living in San Francisco at the      09:57:27
time?                                                  09:57:28

A.    Yes.  Yes.                                       09:57:29

Q.    Did -- did Mario Pepe tell you Ms. Sandei was    09:57:31
looking to hire anyone or just enter the market?       09:57:36

A.    No.  He referred to a job search that he was     09:57:40
working on for the Italian market.  So clearly not...   09:57:46

Q.    When you spoke to Ms. Sandei, who did you        09:57:54
understand she worked for?                             09:57:58

A.    I actually understood that she was the founder   09:57:59
of Almawave.                                           09:58:04

Q.    Almawave S.r.l.?                                 09:58:06

A.    Almawave --

MR. LOSAVIO:  Well, first of all, I don't know that there is a foundation that she knows the difference between one Italian designation and another.

MS. HEALY:  What do you mean?

MR. LOSAVIO:  S.r.l., S.p.A., SPQC.

MS. HEALY:  Okay.  That's a good point, too.

Q.    Did you ever understand there to be any distinction between Alma -- like your counsel was indicating, did you understand there was a distinction between Almawave S.r.l. or AlmavivA S.p.A., or did you regard them as just one company?

MR. LOSAVIO:  I was not -- I was making a more general proposition, in general that I think you need to lay the foundation that she knows the difference between what an S.r.l. is and an SPQ, or whatever the letters were.

MS. HEALY:  I understand.  Can you ask my question again, please?

(Record read as follows:

"Q.  When you spoke to Ms. Sandei, who did you understand she worked for?")

MS. HEALY:  Ms. Sandei, S-a-n-d-e-i.

THE WITNESS:  And my answer was?

(Record read as follows:

you just told us today?

A.   Not that I remember.

Q.   So after this first meeting did there come a point -- you said you reached out to Mr. Capaccio for legal services for Ms. Sandei.  What was the nature of the legal services that you thought she could use?

MR. WALLERSTEIN:  Objection.  Withdrawn.

MR. LOSAVIO:  You can answer.

MR. WALLERSTEIN:  Compound.  Objection; compound.  I am not sure which question.  One of which calls for privilege.  The second does not.

MR. LOSAVIO:  Can I have the question read back?

(Record read as follows:

"Q.  Did you tell her anything else besides what you just told us today?

"A.  Not that I remember.

"Q.  So after this first meeting did there come a point -- you said you reached out to Mr. Capaccio for legal services for Ms. Sandei.  What was the nature of the legal services that she [sic] thought she could use?")

MR. WALLERSTEIN:  Objection.  To the extent --

MR. LOSAVIO:  Wait.  She thought or you thought?

MS. HEALY:  She.  She testified --

MR. LOSAVIO:  No, wait.  The reporter read "she" instead of "you."  So I think you should read -- because it's not clear whether you are asking about the witness or...

MS. HEALY:  That's fine.

Q.   Ms. Gatti, you testified that you believed it would be important for Ms. Sandei to have legal counsel as she was entering the market?

A.   I testified that in my opinion it's important to talk to more than one person when you enter a new market.

Q.   Okay.  What kind of services did you think Ms. Sandei needed, legal services?

A.   My understanding was that she was looking for incorporation of the US entity and she -- my understanding was that she was interested in protecting in the US market all the technology that Almawave has, proprietary technology that Almawave has created in their lab over the previous several years.

Q.   Anything else?

A.   Not that I remember at the moment.

Q.   How did you form this understanding that they needed legal services for these aspects of their business?

First Q?  First quarter of 2014?

A.   You know, I don't -- I remember it was probably before the end of April, but I don't remember the date.  And you told me --

Q.   I told you that it was in March.

A.   Yeah, but my memory is not there.

Q.   I understand.  You don't remember when it was?

A.   Yeah.

Q.   What -- how many meetings happened in -- so Ms. Sandei traveled to San Francisco --

A.   Mm-hmm.

Q.   -- for this meeting, to your knowledge?

A.   To my knowledge, she came here to meet with Tony Di Napoli and with the -- the legal firm of Jeff Capaccio.

Q.   Okay.  Was Jeff Capaccio at that point being considered for a business development position or a legal position?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.

Assuming you mean being considered by any of my clients?

MR. LOSAVIO:  Ambiguous as to who "considered by" means.

MS. HEALY:  Q.  You can answer, Ms. Gatti.

**F-235**

Q.   I am not criticizing.  I am just asking a question.

A.   Yes.

Q.   Okay.  And do you have an understanding -- did you discuss with Mr. Wallerstein, when he terminated you, what was going to be of Almawave USA?

MR. WALLERSTEIN:  What was what?

MS. HEALY:  Q.  What was -- okay.

So to the best of your knowledge, when you left Almawave USA, when you were fired, there were no other employees left at Almawave USA?

A.   That was my recollection.

Q.   And did you -- did IQSystem Inc. at that time, at the time you were fired, have an office at One Embarcadero Center?

A.   No.  At the time I was fired, IQSystem Inc. -- well, IQSystem was terminated right before I did.  So until IQSystem was terminated, was -- IQSystem was using Almawave USA office at One Embarcadero.

Q.   And after they were terminated, where did they move to?

A.   In another office in Regus's office located at One Embarcadero Center.

Q.   So it's in the same building, same floor?

A.   Yeah, the opposite side.

Q.   Can you say it in Italian, please?    11:02:24

A.   I have defined which products to develop, and    11:02:33
which products to invest in.    11:02:42

Q.   Okay.  Thank you.  Any other roles in the    11:02:47
technical development of products for Almawave S.r.l.?    11:03:04

A.   What do you mean by "technical"?    11:03:08

Q.   Design --    11:03:10

A.   Can I repeat what my role within the company    11:03:13
is?    11:03:13

Q.   No.  I am just asking whether, besides what    11:03:16
you already told us, you had any other involvement in    11:03:21
any other aspect of --    11:03:26

MR. WALLERSTEIN:  Of?  Of what?    11:03:27

MS. HEALY:  Q.  -- of the company.    11:03:30

MR. WALLERSTEIN:  Hold on.  Hold on.  Wait.    11:03:33
Wait.  The question on my screen says, "Besides what you    11:03:40
already told us, did you have any other involvement in    11:03:44
any other aspect of the company?"    11:04:02

THE WITNESS:  As CEO I am involved in all    11:04:04
other aspects of the company.  What else?    11:04:08

MS. HEALY:  Q.  I understand.  I am just    11:04:09
trying to get all of your roles.  Thank you.    11:04:12

Ms. Sandei, did you have any -- did you launch    11:04:19
Almawave do Brasil?    11:04:28

A.   Yes.

S.r.l.?                                                    12:48:35

MR. WALLERSTEIN:  Objection; vague.  Was what    12:48:40
Almawave S.r.l.?                                          12:48:42

MS. WONG:  Q.  When you referred to Almawave    12:48:45
earlier in your response, did you mean Almawave S.r.l.?   12:48:46

MR. WALLERSTEIN:  Objection; vague.             12:49:04

THE INTERPRETER:  No, we are specifying the     12:49:11
company, the name of the company that is marketing the    12:49:13
products, that has developed the products.                12:49:15

MR. WALLERSTEIN:  No, ma'am.  I mean, that's    12:49:17
not what she said.  I mean, I understand how you are       12:49:19
reading into what she said, but that's not --              12:49:22

THE INTERPRETER:  No, no, I am just trying to   12:49:25
explain what --                                           12:49:27

MR. WALLERSTEIN:  I don't want you to try to    12:49:28
help.                                                      12:49:30

MS. WONG:  I'm sorry.  How about I rephrase     12:49:31
it, if that clarifies the understanding?                  12:49:34

Q.   Ms. Nicolella, you mentioned that the purpose    12:49:37
of Almawave USA was to -- you had described the products   12:49:41
that Almawave USA markets or -- you were referring to      12:49:44
Almawave's products earlier in your response; correct?     12:49:49

A.   So I will repeat what I said.                    12:50:03

Q.   Okay.  Please.                                   12:50:05

A.   So what I said was that the objective of         12:50:31

constituting Almawave was to market the products developed in Italy based on Almawave technology.

Q. And so when you use the word "Almawave," could you please specify which Almawave entity?

A. It's Almawave S.r.l.

Q. Thank you for the clarification.

I want to ask about before you -- before you were talking about Ms. Sandei telling you about the purpose of Almawave USA, do you know who would be working at Almawave USA?

A. She didn't tell me.

Q. Do you know who, even if she did not tell you, was working at Almawave USA?

A. No, I don't know who.

Q. When did you first hear the name Anna Gatti?

A. I don't recall the exact time, but for sure it must have been after the founding of Almawave USA.

Q. What did you learn about Ms. Gatti?

MR. WALLERSTEIN: At the time? At that time?

THE WITNESS: At that time or when?

MS. WONG: Sure. Let's start there.

Q. When you first heard of Anna Gatti, what did you learn about her?

A. That she was the CEO of Almawave USA.

Q. And who told you that?

Q.   This morning you told us that you are in charge of the treasury and financial planning as reflected in this LinkedIn profile; correct?

A.   Yes, I am in charge of treasury and financial planning.

Q.   And you told us as part of that role you oversee the treasury and the financial planning, but in this profile you have two other duties listed.  Can you tell me about one of those responsibilities of risk management?

MR. WALLERSTEIN:  Objection; vague.  Tell you about?

MS. HEALY:  Q.  You list here as one of your responsibilities -- sorry.  You list on Exhibit 9, your LinkedIn profile, that you have as one of your responsibilities risk management.  Do you see that?  Is that accurate?

A.   Yes.

Q.   Is that one of your responsibilities at AlmavivA?

A.   Yes.

Q.   What does that entail?

A.   My role in the company is treasury and financial planning.  Within my area I'm responsible for the treasury, the financial planning, which are the

Q.   So that would have been confidential to Elettranova at the time?

MR. LOSAVIO:  No foundation.  Object to the form.

MS. HEALY:  Q.  He was working for Elettranova?

A.   Yeah.  But it's the -- he was not -- well, maybe.  I don't know.  It would be confidential of the clients.

Q.   Okay.  So did Ms. Sandei understand in your -- in your perception, obviously -- that the information about Tony Di Napoli's deals would have been confidential?

MR. LOSAVIO:  Object to the form.  No foundation.  Calls for speculation about another's state of mind.

MS. HEALY:  I am just asking her perception.

THE WITNESS:  I think your question was if she asked for a list --

MS. HEALY:  Q.  Yes.

(Clarification requested by reporter.)

THE WITNESS:  I think your question was if Ms. Sandei asked for a list of deals --

MS. HEALY:  Q.  Yes.

A.   -- closed by Tony Di Napoli.  And my answer

and speak Italian with Matteo.  But I don't remember.

Q.   So when Ms. Sandei came here, can you tell me what happened?  Who was she with?  Did she arrive on her own in March or April 2014?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for speculation.

THE WITNESS:  I don't know.

MS. HEALY:  Q.  You can answer.  Anywhere in San Francisco, or anywhere in the Bay Area, if you can remember.

A.   So probably not.

Q.   You don't remember who she was with?

MR. WALLERSTEIN:  Same objections.

THE WITNESS:  I don't remember at the moment. It was a long time ago.

MS. HEALY:  Q.  Okay.  Tell me what you remember her telling you.  Did you have a meeting with her on that occasion when she came to San Francisco?

A.   Yes.

Q.   What was -- where was the meeting?

A.   So I clearly remember a meeting.  I clearly remember that we drove from here to Menlo Park, to the law firm.

Q.   "From here" meaning from San Francisco?

A.   From San Francisco to Menlo Park, to the law

MARIANTONIETTA PERRI – 1/20/2016

Page 153

A.   Can you rephrase it?

Q.   When AlmavivA hires a consultant, is there any requirement within your company to investigate or obtain information regarding the consultant before you engage in business with the consultant?

A.   There is no procedure.  There is no company procedure that prescribes or requires prior investigation.

Q.   Did AlmavivA S.p.A. obtain any information regarding IQSystem Inc. before engaging in business with them to verify -- okay.  Before engaging in business with them to verify -- to verify what activities IQSystem Inc. had done before doing business with AlmavivA?

MR. WALLERSTEIN:  Objection to the extent it calls for speculation as to what others did.

THE WITNESS:  I do not do any investigation work.

MS. HEALY:  Q.  Regarding IQSystem Inc.?

A.   Regarding IQSystem Inc.

Q.   Do you know Jeff Capaccio?

A.   If you mean that I have met him, I encountered him, no.

Q.   Do you know his name?

A.   I know his name.

**F-243**

# EXHIBIT F

## SPEAKING OBJECTIONS/COACHING
### (coaching and impeding testimony)

what you said, Counsel, so that's a different question.

MS. HEALY:  Q.  Did you understand you were acting as the agent for any AlmavivA entity before June 1st, 2014?

A.  That was not my understanding.

Q.  Okay.  Before June 1st, 2014, did Sandei tell you that she had retained Orrick to work on the project you were working on?

A.  Not that I remember.

Q.  Okay.  Did Ms. Sandei ever tell you the reason why she did not want to retain Capaccio?

A.  Capaccio firm?

Q.  Right.

A.  Because Capaccio was never --

Q.  As legal counsel, meaning Carr & Ferrell.

A.  Yes.

Q.  What was that reason?

A.  She -- my recollection is that she said that she had a good meeting with them, that she liked -- she liked the meeting with them.

MR. WALLERSTEIN:  Ms. Gatti, I caution you not to reveal communications you had with Ms. Sandei after you began working for Almawave as to --

MS. HEALY:  That's before.

MR. WALLERSTEIN:  Counsel, please don't

interrupt.

MS. HEALY:  Please don't interrupt the testimony of the witness.

MR. WALLERSTEIN:  I am making my objection and I am going to continue.

MS. HEALY:  No, you are not allowed to make an objection while she is speaking before -- we are strictly in the period before she is starting working for Almawave.

MR. WALLERSTEIN:  Counsel, do not interrupt me when I am making my objection.

Ms. Gatti --

MS. HEALY:  The Court said no speaking objections.

MR. WALLERSTEIN:  Counsel --

MS. HEALY:  If you want to, instruct her not to answer, but don't feed her testimony.  If you want to instruct her not to answer on attorney-client privilege, that's your prerogative, and you can do it, and then we can review the testimony and take to the Court.  But don't interrupt the witness while she is answering about a period of time that she said she was not working for Almawave.

MR. WALLERSTEIN:  I need to hear the question back.  And the instruction stands.  Or you can rephrase

it.

MS. HEALY:  Q.  I am asking you, Ms. Gatti -- you were talking about why Ms. Sandei -- what Ms. Sandei told you as to why she could not or would not retain Carr & Ferrell and was hiring Orrick instead.

MR. WALLERSTEIN:  Objection to the extent that calls for attorney-client communications.  And I caution the witness not to disclose any conversations that Ms. Sandei revealed that she had with or about Carr & Ferrell.

MS. HEALY:  Q.  You can answer.

MR. LOSAVIO:  Object to the form.  It's ambiguous as to time.

MS. HEALY:  Q.  Before June 1st, 2014.  You can answer.

A.  So just to be precise, I do not have any recollection of Ms. Sandei telling me the reason why she did not retain Carr & Ferrell and she instead preferred to retain Orrick.

Q.  Okay.  Did you have a discussion with Ms. Sandei about Orrick being the law firm of Soshoma?

MR. WALLERSTEIN:  Objection; vague as to time.

MS. HEALY:  Q.  At any time.

A.  No, not that I recall.  Not that I recall.

Q.  Did you -- after you signed -- actually,

THE INTERPRETER: "A suo avviso." "What was your understanding?" "A suo asviso?"

MS. HEALY: I object. I think that.

THE INTERPRETER: "A suo avviso," I --

MS. HEALY: "A suo avviso" means --

THE INTERPRETER: "In your opinion."

MS. HEALY: Right. And that isn't what I asked. I said, "What was your understanding?" not "In your opinion."

THE INTERPRETER: "In your opinion" is, in my mind, the same as "your understanding," because if you have an understanding, you have an opinion.

MS. HEALY: Q. What did you think Almawave USA was formed to do?

No, I object to that translation. It's not correct.

What were you told -- so I'll change the question, to help the interpreter.

What were you told were the reasons why Almawave USA was being formed?

Let the record reflect that Mr. Wallerstein just looked at the witness and shaked his head as to indicate no, no, no.

MR. WALLERSTEIN: Because -- because Mr. Wallerstein objects on the basis of privilege.

MARIANTONIETTA PERRI - 1/20/2016

Page 144

MS. HEALY:  Q.  Were you involved in any board meetings relating to Almawave USA?

A.  I'm not a part of the board of Almawave.

Q.  As a member of the board of AlmavivA S.p.A., did you discuss -- was there any discussion within the board of AlmavivA S.p.A. as --

As of before Almawave USA was launched, were there any discussions about Almawave USA hiring Anna Gatti?

MR. WALLERSTEIN:  I will caution the witness not to reveal her own legal advice, if any.

But I have my suspicions that the question may be answered, so go ahead.

THE WITNESS:  As I said at the beginning of my -- of this testimony, the allegation that I have read in the first amended complaint is false, with a view to the deliberations of the board of AlmavivA S.p.A. beginning in March 2014.

MS. HEALY:  Q.  What's false?

A.  There is -- it is not true that there were deliberations of any kind in March of 2014.

MS. HEALY:  Let the record reflect that the witness is reading from Exhibit Number --

THE INTERPRETER:  6.

MS. HEALY:  -- 6.

# EXHIBIT F

## SPEAKING OBJECTIONS/COACHING
## (coaching with alleged "misstatement" objection)

**F-250**

Q.   Did she tell you she had any roles at any other company within Almawave?

A.   Within Almawave?

Q.   Yes.

A.   No.

Q.   Did you -- did there come a point where you learned Almawave was owned by another company?

A.   No.

Q.   So you never learned whether Almawave had a parent company?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you rephrase, please?

MS. HEALY:  Q.  No.  Do you understand my question?

A.   No.

Q.   Did you ever learn whether Almawave S.r.l., the company that you identified as Ms. Sandei's company, was owned by a parent company?

MR. WALLERSTEIN:  Objection; misstates prior testimony, vague.

MR. LOSAVIO:  I am objecting on the grounds it misstates the testimony with respect to the S.r.l. component.

MS. HEALY:  Q.  You can answer.

A.   Can you rephrase?  Sorry.

it.                                                        10:08:59

THE WITNESS:  Yes.                                         10:08:59

MS. HEALY:  Q.  I am just saying, because the              10:09:00
court reporter can't capture your facial movement.         10:09:02

A.  Yes, we are talking about Almawave.                    10:09:06

Q.  We don't want to upset her.                            10:09:11

MR. LOSAVIO:  She distinguished an S.r.l.                  10:09:14
Almawave from any other Almawave.  So is that the one      10:09:16
you are talking about?                                     10:09:19

THE WITNESS:  I never got into the S.r.l.  To              10:09:20
me, Almawave -- it's Almawave, you know.                   10:09:25

MS. HEALY:  Q.  One company.  It's -- you                  10:09:29
don't get into the mix of --                               10:09:31

A.  No, I don't know if it's Almawave S.r.l. or --         10:09:33
I never looked at the books.                               10:09:38

Q.  Okay.  Do you know a gentleman named Marco             10:09:40
Tripi?                                                     10:09:46

A.  I met him.                                             10:09:47

Q.  Who is he?                                             10:09:48

A.  He is the husband of Valeria.                          10:09:49

Q.  The lady in the room?                                  10:09:57

A.  Yes.                                                   10:09:58

Q.  And what's his role at AlmavivA or Almawave,           10:09:59
if any?                                                    10:10:02

MR. WALLERSTEIN:  Objection; calls for                     10:10:07

speculation.

MR. LOSAVIO:  No foundation would be my objection.

MS. HEALY:  Q.  You can answer.

A.  Could you rephrase the question?

Q.  Do you have an understanding of what Marco Tripi does at AlmavivA, or Almawave, as you refer to?

A.  At Almawave I -- I don't know.

Your second question was AlmavivA.  The best of my recollection, I think he is the CEO of AlmavivA.

Q.  Okay.  When did you meet Marco Tripi?

A.  Do you want to know when was the first time?

Q.  Yeah, the first time.

A.  I met him on -- in front of the elevator of their house when I was leaving.

Q.  Okay.  That's when you went to see Ms. Sandei in --

A.  Rome.

Q.  When was that?

A.  I don't remember the exact date.

Q.  Was it before you started working for Almawave?

A.  Oh, yeah.

Q.  So was it after you had the first call with Ms. Sandei?

you were in San Francisco and this meeting that you --
this social meeting in Rome?

A.   At the best of my recollection, in the Q1 2014
I had a phone call with Ms. Sandei while I was driving
in San Francisco, and I met her in Italy.

Q.   Did you have any email correspondence with
her?

A.   I really don't remember.

Q.   Did you have any correspondence with anyone
else during this first Q that we identified on the
record as ending on March 31st, 2014, regarding doing
business with Almawave?

A.   I don't remember.

Q.   Did you discuss with Tony Di Napoli the
prospect of doing business with Almawave?

A.   In Q1?

Q.   Yes.

A.   You know, I don't remember when this
conversation started.

Q.   Do you remember a time -- did you have a
discussion with Jeff Capaccio about Almawave?

MR. WALLERSTEIN:  I am going to object to the
extent that any questions relating to discussions with
Mr. Capaccio implicate the attorney-client privilege of
any of my clients.  Obviously there was a point at which

Page 49

Ms. Gatti became an agent of at least one or more of my clients and had conversations with Mr. Capaccio. To the extent that she did, they may be covered by privilege, so I object to Ms. Gatti revealing any privileged communications with regard to my client.

MR. LOSAVIO: I have a slightly different objection.

MS. HEALY: Okay. Just give me a second. Go ahead.

MR. LOSAVIO: So to the extent Ms. Gatti is talking to an attorney, there is a personal attorney-client privilege that would apply.

If I can have your stipulation that an answer to the pending question does not waive the privilege, then that issue is not presented by the pending question.

MS. HEALY: Your objection is noted.

Q. So, Ms. Gatti, I want to pick up on something Mr. Wallerstein said. Do you understand he is counsel for the AlmavivA entities in this case?

A. I understand --

Q. Do you understand that Mr. Wallerstein represents three different entities under the umbrella of AlmavivA?

A. I think so.

ANGELA NICOLELLA – 1/21/2016

Page 22

Q.   Can you give me more details about what your responsibilities are in respect to financial planning?

A.   So, I consolidate data that comes from individual companies to combine into a report for the group.

Q.   How big is your department?

A.   What do you mean by how big?

Q.   How many people are in the department?

A.   There are 10 people, in addition to myself.

Q.   And are you responsible for ensuring that all money paid and received are approved?

A.   I don't understand the question.  Can you repeat?

Q.   I'm trying to understand what your job responsibilities are and what you are -- you know, what you do at your work.  So if you can give me some more information about what you do, that would...

MR. WALLERSTEIN:  Objection; vague.  The witness is answering questions along the subject.  I think she is doing -- I know she is answering the questions you are asking.  So, Ms. Wong, if you ask questions, she will give you answers, and that's how you will find out about what she does.

MS. WONG:  Q.  Please tell me your duties in respect of financial planning as the head of treasury

answer the question.

Q.   Are you providing coverage -- insurance coverage in this case to Anna Gatti?

MR. WALLERSTEIN:  Objection; vague and ambiguous on several levels.

THE WITNESS:  I repeat that I filed the claim through MAG JLT Lloyd's for AlmavivA S.p.A., Almawave USA, and Almawave S.r.l.

MS. HEALY:  Q.  Did you have any communications with Lloyd's or the broker after this action was filed regarding Anna Gatti or IQSystem Inc. or IQSystem LLC?

MR. WALLERSTEIN:  Objection; vague and ambiguous.

THE WITNESS:  I filed a claim for those three companies, AlmavivA S.p.A., Almawave USA, and Almawave S.r.l.

MS. HEALY:  Q.  I am asking if you had any correspondence or telephonic discussion with Lloyd's or the broker relating to Anna Gatti, IQSystem Inc., or IQSystem LLC.

MR. WALLERSTEIN:  Objection; vague and ambiguous.  Do you include the first amended complaint, Counsel, which refers to those people and entities?

MS. HEALY:  Q.  Please answer the question.

anywhere else.

Q.   I am talking about the business plan that you referenced.  There is no section of that plan in the beginning of 2014 that says, "We are going to go to the US market; that's how we are going to do it."  There is no section in that plan...

A.   So the sections of details regard only the legal entities I had already formed at the time.

Q.   Okay.  So the business plan only addressed specifically entities that were already in existence as of January 2014?

A.   No.

MR. WALLERSTEIN:  No?

THE WITNESS:  It doesn't refer to this.

MS. HEALY:  Q.  Had you decided in January -- or the beginning of 2014 whether you were going to incorporate a company in the United States or -- well, let's start with this question.

Had you decided at the beginning of January 2014 whether you were going to incorporate a company in the United States?

MR. WALLERSTEIN:  Objection; vague.  Are you focused on the corporate form or the location?

MS. HEALY:  (Speaks in Italian.)

Let me ask my question.

California in March of 2014?                           12:59:32

A.   To help me take care of the appointments that   12:59:36
I wanted to have.                                     12:59:42

MS. HEALY:  I don't think "appointment."             12:59:44

THE INTERPRETER: Appointments.  Appointments,        12:59:48
yes.                                                  12:59:59

MS. HEALY:  Q.  What kind of appointments did        13:00:00
you have?                                             13:00:01

A.   Appointments with a law firm.                   13:00:03

Q.   Appointments, you mean meetings?                13:00:08

A.   Yes, I mean meetings.                           13:00:13

Q.   Because "appointment" to me means something     13:00:16
else.                                                13:00:16

MR. WALLERSTEIN:  I disagree with that.              13:00:18

THE INTERPRETER:  I disagree personally.  When       13:00:19
I make an appointment, I make an appointment with the 13:00:22
doctor.                                               13:00:22

MS. HEALY:  Excuse me.  I apologize, then.  My        13:00:25
apologies.                                            13:00:27

Q.   So which firm were you meeting for?             13:00:29
With.  Sorry.                                        13:00:34

A.   Carr & Ferrell.                                 13:00:46

Q.   And during this trip did you meet with          13:00:50
Ms. Gatti?                                            13:00:55

A.   Yes.

period.                                                        14:38:41

        MS. HEALY:  Q.  Communications regarding this         14:38:44

project were the ones happening in March 2014?               14:38:45

    A.   Of course.                                          14:38:59

    Q.   Was Ms. Gatti involved in those communications      14:39:00

at that time?                                                14:39:03

        MR. WALLERSTEIN:  Objection; calls for               14:39:09

speculation.                                                 14:39:11

        MS. HEALY:  I am asking for her knowledge.           14:39:12

        MR. WALLERSTEIN:  Counsel, I was not finished        14:39:17

with my -- Counsel, I was not finished with my               14:39:18

objection.  Please stop interrupting me.  You are taking     14:39:24

all day long, just because you lack the courtesy to let      14:39:30

the interpreter finish.                                      14:39:36

        The objection was:  Calls for speculation and        14:39:40

lacks foundation.                                            14:39:45

        If you know, Ms. Perri, you may answer.              14:39:49

        THE WITNESS:  Excuse me.  Can you read it back       14:40:04

to me again?                                                 14:40:06

        (Record read as follows:                            14:40:15

        "Q.  Was Ms. Gatti involved in those                14:40:15

        communications at that time?")                      14:40:15

        THE WITNESS:  As regards to the communications       14:40:39

in which I was copied in during this time period, I          14:40:41

don't recall if she was or if she wasn't also copied in.     14:40:45

your retention of Ms. Gatti?

MR. WALLERSTEIN:  Objection.  The answer to that question is privileged.

MS. HEALY:  Q.  Did you learn from Ms. Sandei at any point before February 20th, 2015, that Ms. Gatti was in the process of getting sued?

MR. WALLERSTEIN:  Objection.

MS. HEALY:  Q.  Are you going to answer?

MR. WALLERSTEIN:  That answer --

THE INTERPRETER:  Pardon?

MR. WALLERSTEIN:  The answer would be privileged.

MS. HEALY:  Q.  Are you going to answer?

A.  No.

Q.  Were you involved in the decision to procure insurance coverage for any litigation involving Almawave USA and Ms. Gatti?

MR. WALLERSTEIN:  Earlier the term "involved in communications" was defined by Ms. Healy to include copied on emails.  If that's the understanding of the question, that's fine.  Otherwise, vague and ambiguous.

MS. HEALY:  Q.  Involved in any way, email, telephone, in person.

A.  I did not quite understand the question, other than the objection that was presented by my attorney.

THE WITNESS:  No.

MS. HEALY:  Q.  To your knowledge, after -- after you received the complaint, did you retain legal counsel for AlmavivA S.p.A.?

A.  In my mind, this question is a bit ambiguous in the part that it specifies AlmavivA S.p.A.

Q.  Did you enter into a letter of engagement with any law firm specifying -- I guess, let's start from there.

Did you decide to enter into a letter engagement with any law firm?

MR. WALLERSTEIN:  You should not answer whether you decided anything, but you may respond if you did enter into an engagement.

THE WITNESS:  I, in fact, did not enter into an engagement.  I contacted an American law firm.

MS. HEALY:  Q.  Did -- to your knowledge, did Ms. Gatti contact a firm as well on behalf of Almawave USA?

A.  As far as I know, no.

Q.  Did you retain -- first of all, which law firm did you contact?

A.  Orrick.

Q.  And who did you speak to?

A.  With the attorney Peter Sternberg.

# EXHIBIT F

**SPEAKING OBJECTIONS/COACHING**
**(sudden interruptions to impede testimony)**

**F-263**

A.    Yes.                                                    09:56:26

Q.    What did he say?                                        09:56:27

A.    I don't recall the exact words, but the                09:56:29
meaning was along the line that he has an Italian client     09:56:32
who was internationalizing a company, and he thought of      09:56:47
me as a -- you know, just to have a chat to have a kind       09:56:59
of brainstorming based on my past experience.  It's very     09:57:05
common that I do this kind of work.                          09:57:13

Q.    And did -- were you in San Francisco when you          09:57:15
got this call?                                               09:57:18

A.    This call, you mean?                                   09:57:19

Q.    From Mario Pepe, the one you just described.           09:57:21

A.    I don't remember.                                      09:57:25

Q.    But you were living in San Francisco at the            09:57:27
time?                                                        09:57:28

A.    Yes.  Yes.                                             09:57:29

Q.    Did -- did Mario Pepe tell you Ms. Sandei was          09:57:31
looking to hire anyone or just enter the market?            09:57:36

A.    No.  He referred to a job search that he was           09:57:40
working on for the Italian market.  So clearly not...        09:57:46

Q.    When you spoke to Ms. Sandei, who did you              09:57:54
understand she worked for?                                   09:57:58

A.    I actually understood that she was the founder         09:57:59
of Almawave.                                                 09:58:04

Q.    Almawave S.r.l.?                                       09:58:06

A.    Almawave --    09:58:09

MR. LOSAVIO:  Well, first of all, I don't know    09:58:11
that there is a foundation that she knows the difference    09:58:12
between one Italian designation and another.    09:58:16

MS. HEALY:  What do you mean?    09:58:18

MR. LOSAVIO:  S.r.l., S.p.A., SPQC.    09:58:19

MS. HEALY:  Okay.  That's a good point, too.    09:58:22

Q.    Did you ever understand there to be any    09:58:24
distinction between Alma -- like your counsel was    09:58:27
indicating, did you understand there was a distinction    09:58:31
between Almawave S.r.l. or AlmavivA S.p.A., or did you    09:58:33
regard them as just one company?    09:58:40

MR. LOSAVIO:  I was not -- I was making a more    09:58:42
general proposition, in general that I think you need to    09:58:45
lay the foundation that she knows the difference between    09:58:49
what an S.r.l. is and an SPQ, or whatever the letters    09:58:50
were.    09:58:54

MS. HEALY:  I understand.  Can you ask my    09:58:54
question again, please?    09:58:55

(Record read as follows:    09:58:56

"Q.  When you spoke to Ms. Sandei, who did    09:57:54
you understand she worked for?")    09:57:58

MS. HEALY:  Ms. Sandei, S-a-n-d-e-i.    09:57:59

THE WITNESS:  And my answer was?    09:57:59

(Record read as follows:    09:57:59

26th Avenue?

A.    Since January 2010.

Q.    So January 2010 to what?

A.    Since I moved there.

Q.    I just want to tell you that, based on my review of the record -- I make the statement and then you feel free to correct your answers -- I understand that you moved to 24 Clarendon in April of 2014 or around that date.  That's not correct?

A.    It is not correct.

Q.    Okay.  So you are standing by your statement that you moved to 24 Clarendon in January 2015?

MR. LOSAVIO:  Okay.  That's about the third time --

MS. HEALY:  I want to make sure.

MR. LOSAVIO:  I understand.  But there is a line between arguing with the witness because you don't like the answer you are getting and asking questions.  So you are not here to argue.

MS. HEALY:  I'm not arguing.  That's fine.  Your objection is noted.  I just want to make sure that she is recalling.  If she is not recalling, that's a different story.

MR. LOSAVIO:  If you ask, "Are you sure?" after every question that is asked, we will double the

length of this deposition.

MS. HEALY:  I understand.

MR. LOSAVIO:  So the customary manner is just to ask questions.

MS. HEALY:  Tom, the Court said no speeches. Please note your objection for the record and let me ask all the questions I want to ask, so we can proceed.  I waited patiently for you for an hour and 15 minutes.

Q.   So, Ms. Gatti, who owns 24 Clarendon?

A.   Mr. Charles Ferguson.

Q.   And are you renting the home from him?

A.   Yes.

Q.   So you have been living there for approximately one year?

MR. LOSAVIO:  Asked and answered three times.

THE WITNESS:  Yes.

MR. LOSAVIO:  Do you want her to answer again?

MS. HEALY:  Q.  So, Ms. Gatti, at the beginning of this deposition I said I was going to give you some instructions.  I skipped one.  When your counsel objects, when he is done with his objection, you have to answer the question unless there is an instruction not to answer.  Does that make sense?  Do you understand?

A.   I do understand.

**F-267**

A.   Business development for Palantir.

Q.   What did you tell her?  I want to know exactly what you remember telling her about what they did for Palantir.

A.   And I don't remember exactly what I said.

Q.   Where did you learn that Mr. Di Napoli did a project with Palantir?

A.   At Elettranova.

Q.   Okay.  When did you learn that Di Napoli was working on the Palantir project?

A.   It sounds like something that Fabio Ficano was saying a lot, probably a year before.

Q.   Okay.  Tell me everything that Tony Di Napoli told you he did for Palantir.

A.   Tony Di Napoli didn't tell me a lot.

Q.   I am just asking you what he told you.

A.   I believe he -- my recollection is that he told me that he was working on a Palantir project and that Palantir has a very strong technology, and --

Q.   What kind of technology?

MR. LOSAVIO:  Okay.  We're --

MS. HEALY:  I am asking her --

MR. LOSAVIO:  I understand what you are asking her.

MS. HEALY:  Please don't interrupt.

MR. LOSAVIO:  Wait for my objection.

MS. HEALY:  You interrupted while she was giving her response.  Please have the courtesy of -- to your own witness.

MR. LOSAVIO:  My objection is that you have again strayed far afield from the topic which -- the only topic which the Court has authorized this witness to be asked about in this deposition session.

MS. HEALY:  And I am asking her about what she told Ms. Sandei about Palantir.

MR. LOSAVIO:  The pending question is not that.

MS. HEALY:  Well, I need to understand what she knew first before I understand what she told her.

MR. LOSAVIO:  Let's have the pending question read.

MS. HEALY:  I am going to reask the question.

Q.   What did you tell Ms. Sandei and where were you when you told her about the Palantir project?

MR. LOSAVIO:  Compound.

THE WITNESS:  I am hearing two questions from you.  The first one is what I told her.  And my recollection is that I told her that Tony Di Napoli worked -- was working or worked on the Palantir business development.

Q.   Okay.

MR. LOSAVIO:  So, Counsel, just so we are clear, I follow the three-strike rule.  You get to answer -- you get to ask the same question three times, and then I am going to instruct.

MS. HEALY:  Q.  Ms. Gatti, when did you move to the United States?

A.   I don't recall the exact date.

Q.   Approximately?

A.   It's either the end of 1999 or beginning of 2000.

Q.   And going back to your living arrangement, could you tell me who you are living with?

MR. LOSAVIO:  Objection.  Are you talking about now?

MS. HEALY:  Yeah.

MR. LOSAVIO:  How is that reasonably calculated to lead to the discovery of admissible evidence?

MS. HEALY:  I am sorry.  Note your objection and let her answer the question.

Q.   Do you live with Mr. Tony Di Napoli?

A.   Yes.

Q.   How long have you been living with him?

A.   Probably a year.

Q. When was that? 09:32:33

A. I don't remember exactly. 09:32:36

Q. Who is Gennaro Di Napoli? 09:32:37

A. It's the nephew of Tony Di Napoli. 09:32:42

Q. How old is Gennaro Di Napoli? 09:32:46

A. I don't know. 09:32:50

Q. Was Gennaro Di Napoli your babysitter? 09:32:51

A. No, he was not. 09:32:53

Q. He was not? 09:32:54

A. He was not. 09:32:55

Q. Did you ever offer to Ms. Bewsher Gennaro Di 09:32:59
Napoli's services as a babysitter? 09:33:07

A. I don't remember. 09:33:13

Q. But you just said he is not a babysitter; 09:33:15
right? 09:33:17

MR. LOSAVIO: Objection; misstates the 09:33:18
testimony. She said he was not her babysitter. 09:33:20

MS. HEALY: Q. Did Gennaro Di Napoli ever 09:33:24
babysit for your daughter? 09:33:26

A. He didn't. 09:33:31

(Clarification requested by reporter.) 09:33:35

THE WITNESS: He drove her -- it depends what 09:33:38
you mean by babysitting. He drove Athena to her 09:33:40
father's residence, so he was more a driver. 09:33:46

MS. HEALY: Q. Did you ever offer to anyone 09:33:50

Gennaro Di Napoli's services as a babysitter?

MR. LOSAVIO:  Hold on a second.

THE WITNESS:  I don't remember.

MR. LOSAVIO:  Wait, wait, wait.  You really think whether somebody is a babysitter is going to throw light on whether an Italian company has sufficient contacts with America to justify them being sued in America?

MS. HEALY:  Are you done?

MR. LOSAVIO:  It's -- I am just giving notice that I think you are straying widely off the topic that the Court ordered be the subject of these depositions.

MS. HEALY:  Q.  Did you offer Gennaro Di Napoli's services as a babysitter for anyone in 2014?

A.  I don't remember.

Q.  Did you help Gennaro Di Napoli form IQSystem Inc.?

A.  What do you mean by help?

Q.  Did you -- were you involved in any way in Gennaro Di Napoli's forming IQSystem Inc.?

A.  I don't remember.

Q.  Did Tony Di Napoli have a role in forming IQSystem Inc.?

A.  I don't know.

Q.  Do you know what IQSystem Inc. does?

MR. WALLERSTEIN:  Objection; lacks foundation.    16:09:45

MS. HEALY:  Q.  You can answer.    16:09:55

A.    I don't know what this company does.  I make the payment.    16:09:58 / 16:10:01

Q.    Who told you to pay this company?    16:10:04

A.    Valeria Sandei.    16:10:08

Q.    Do you pay them on a monthly basis?    16:10:11

A.    When Valeria Sandei gives me the invoices and the amounts to pay.    16:10:25 / 16:10:31

Q.    What was the reason you took over the Bank of the West account for Almawave USA?    16:10:34 / 16:10:38

A.    What do you mean by --    16:11:02

Q.    You said that --    16:11:07

A.    -- the control?    16:11:07

Q.    You said that in February 2015 you began doing the online banking for Almawave USA's Bank of the West account here in San Francisco.    16:11:09 / 16:11:11 / 16:11:16

MR. WALLERSTEIN:  Objection.  Objection. That's not a question.  And I don't know if that's what she said or not, but it's not a question.    16:11:27 / 16:11:29 / 16:11:33

MS. HEALY:  Q.  You can answer.    16:11:36

MR. WALLERSTEIN:  What's the question?    16:11:37

MS. HEALY:  Q.  You testified earlier that beginning in February 2015 you began doing the online banking, which I think you referred to as home banking,    16:11:38 / 16:11:41 / 16:11:46

**F-273**

opened the claim and it was for the three companies,
AlmavivA S.p.A., S.r.l., and USA.

Q.    Have you received correspondence back from the
broker or the insurer about your claim?

A.    If I received an answer?

Q.    Yes.

A.    Yes.

Q.    What was the answer?

A.    That the claim was not covered.

Q.    When did you receive this response?

A.    The last communication was January 2015.

Q.    How many communications have you had with
them?

A.    I have had several communications with the
broker, but I must first talk to my attorney because
these communications -- there were conversations that
happened through the lawyer.

Q.    Which lawyers?

A.    The Venable lawyers.

Q.    Venable is handling your request to Lloyd's?

MR. WALLERSTEIN:  It's 7:00.

THE WITNESS:  The request -- I made the
request at Lloyd's, from MAG.

MR. WALLERSTEIN:  It's 7:00 p.m., Counsel.
The alarm has gone off.

MS. HEALY:  You interrupted her answer.  She was about to explain what's Venable's role.     19:00:05 / 19:00:07

MR. WALLERSTEIN:  It's not true.  I waited for the interpreter to finish speaking.     19:00:11 / 19:00:13

MS. HEALY:  You interrupted her.  Please stop it.  Please.     19:00:14 / 19:00:14

MR. WALLERSTEIN:  That's false.  I waited for the interpreter --     19:00:14 / 19:00:16

MS. HEALY:  You are spending a lot of money.  You made your witnesses travel here.  Please let them answer.  She wants to give her testimony.  Please let her answer.     19:00:16 / 19:00:18 / 19:00:19 / 19:00:22

MR. WALLERSTEIN:  I waited for the interpreter, which meant the witness was finished.     19:00:22 / 19:00:23

Did I interrupt you, ma'am?  Were you finished?     19:00:26 / 19:00:28

THE WITNESS:  No, I am done.     19:00:38

MS. HEALY:  Q.  Ms. Nicolella, you indicated that Venable has been corresponding with the insurer regarding your claim?     19:00:42 / 19:00:44 / 19:00:49

I understand that --     19:01:17

MR. WALLERSTEIN:  No, no.  You are interrupting the witness, Counsel.  I want to hear the answer.     19:01:17 / 19:01:18 / 19:01:21

MS. HEALY:  That's nonresponsive.  I am asking     19:01:21

**F-275**

the witness to answer my question because we have little time.

MR. WALLERSTEIN:  We have no time.

MS. HEALY:  Q.  Can you please explain?  You said that Venable has been communicating with Lloyd's regarding your claim.

MR. WALLERSTEIN:  What's the question?

MS. HEALY:  Q.  -- is that correct?

MR. WALLERSTEIN:  Is that correct?  Is that what you said?

THE WITNESS:  No, Venable did not write to Lloyd's.

MR. WALLERSTEIN:  Okay.  Let's go.

MS. HEALY:  Q.  What did you mean when you said that?

MR. WALLERSTEIN:  We are done.

MS. HEALY:  I am sorry.  We are still taking her deposition.  Can you please not interrupt the deposition?

MR. WALLERSTEIN:  Mr. Ferri is still here.  Unfortunately he must go.  So he has been here since 9:00 a.m.

MS. HEALY:  I am here ready to continue the depositions.  We are still on the record, and I am here ready to continue.

MR. WALLERSTEIN:  It's 7:00 p.m., and we can't do that, so --

MS. HEALY:  Who said that?

MR. WALLERSTEIN:  Who said that?  I just said it.  I said it all day long.  I told you, like, four times.

(Whereupon, the deposition was adjourned at 7:02 p.m.)

--oOo--

I declare under penalty of perjury the foregoing is true and correct.  Subscribed at _____, this ____ day of _____, 2016.

_____

Angela Nicolella

Q.   Have you ever -- have you ever used English for --

MR. WALLERSTEIN:  Ms. Healy, when the witness is speaking you must wait until I receive the English translation before you comment or ask the next question.

I do not understand Italian, and I have a right to hear my witness's answer before you comment or ask another question.

MS. HEALY:  Q.  You can answer.

A.   I don't speak English well.  When it is necessary, I try to understand English.  I try to explain myself in English with the aid of colleagues who speak it better than myself.

Q.   Understood.  Have you spoken to Mr. Wallerstein in English on your own?

A.   I already answered to this question.

Q.   I am asking again.

A.   And I repeat my answer.

Q.   What is the answer?

A.   The answer that I just gave.  When I speak with Mr. Wallerstein, I use the aid and help of my colleagues who speak English better than myself.

Q.   No, I am talking about during this trip in San Francisco.

A.   If the question refers to this, did you ask

require you to analyze technology or that kind of thing?

A.    To some extent as far as this was functional to developing the business plans of the company.

Q.    Can you give me some examples of any instance in which you were involved in technology-related matters while you were at Accenture?

A.    For example, when we develop an industrial plan for a company, a big component is to develop an assessment of their computer capacity.

MS. HEALY:  I think she meant the IT systems rather than computer capacity.

THE WITNESS:  IT systems.

MS. HEALY:  Q.  Right.  Did you -- can you give me an example where you specifically helped a client assess their IT system, and can you...

A.    For example, one of the times where I developed an industrial plan for a new client regarding -- regarding the assessment of which tools bankers had at their disposal.

Q.    And how would you do the assessment?  By interviewing the bankers?

A.    Among other things.

Q.    What did you -- what was your role in the assessment --

MR. WALLERSTEIN:  That's a problem, Counsel,

**F-279**

and that's why it's inappropriate for you to be audio recording.  It's unacceptable if my colleagues' conversations are being picked up.  Normally a professional would have a microphone.  And we are not supposed to --

MS. HEALY:  Q.  Ms. Sandei, what was your --

MR. WALLERSTEIN:  No, no, no, Counsel --

MS. HEALY:  Q.  Ms. Sandei, what was your --

MR. WALLERSTEIN:  Counsel -- Counsel, do not interrupt me.

MS. HEALY:  Q.  What was your role specifically in connection with the assessment?  You gave an example.  Thank you.  Could you describe your role in connection with the assessment of the tools that the private bankers had?

MR. WALLERSTEIN:  Counsel, I will not interrupt you, and I expect the same courtesy.

MS. HEALY:  Q.  You can answer.

MR. WALLERSTEIN:  Counsel, you are interrupting me.  My colleagues are not wearing microphones for a reason, and that is because they do not wish to be recorded.  I request that you immediately cease audio recording.

MS. HEALY:  Q.  Please answer the question.

THE INTERPRETER:  Can you repeat the question?

**F-280**

Q.   Does this role involve international travel or international interactions of any type?   10:03:21 10:03:29

A.   Yes.   10:03:30

Q.   What kind?   10:03:42

A.   It involves traveling to supervise marketing activities in other contexts.   10:03:45 10:03:49

Q.   What kind of contexts?   10:03:55

A.   In other markets in which we operate.   10:03:57

Q.   In which markets do you operate, AlmavivA S.p.A.?   10:04:05 10:04:17

A.   From what I remember, AlmavivA S.p.A. operates -- is a legal entity that operates in Italy and an international division.   10:04:21 10:04:32 10:04:34

MR. WALLERSTEIN:  We are going to take our break now, Counsel.  It's been over an hour.   10:04:35 10:04:38

May we go off the record?  May we have our break, Counsel?   10:04:41 10:04:42

MS. HEALY:  I want to proceed, because you refused to start at 8:00 as per the notice, and we have urgency to keep going with the deposition.  If Ms. Sandei wants a break, of course we should take a break.   10:04:44 10:04:47 10:04:50 10:04:53 10:04:54

MR. WALLERSTEIN:  Ms. Sandei, would you like a break?   10:04:56 10:04:57

THE WITNESS:  Yes.

hour, so now is the time.

I try to give you warnings.  If you don't want to heed the warnings -- it's up to you whether you open a new line of questions or not.  It's your election to do that.

(Recess taken from 12:31 to 12:50.)

MR. WALLERSTEIN:  Counsel, I am waiting for you -- I am waiting for you to say something, so I am waiting for you to get the record on.

MS. HEALY:  We are on.

MR. WALLERSTEIN:  Okay.  We are going to take a slightly -- we are not going to go quite an hour, because we are going to take a lunch break today.  So I am going to go 50 minutes, five zero.

MS. HEALY:  Today as opposed to which other day?

MR. WALLERSTEIN:  Usually we take a break every hour and five minutes.  This next break we are not going to wait that long, because we want to take our lunch break.  So we are going to go 50 minutes.

MS. HEALY:  Thank you for letting us know, Mr. Wallerstein.

Q.   Ms. Sandei, we were talking about you going back to Russell Reynolds about your interest in Ms. Gatti.  Can you give me a time frame, approximately?

the question that was asked initially?

MS. HEALY:  Sure.

MR. WALLERSTEIN:  You are reading at 12:55, "Did you come"?

THE INTERPRETER:  I can go back to her initial question.

MR. WALLERSTEIN:  Can you tell me the line you are reading, please?

MS. HEALY:  Can you be polite to the interpreter, please?

MR. WALLERSTEIN:  No, I am going to interrupt, because I want to hear what line she is reading from.

THE INTERPRETER:  16.  "Did you come to the Bay Area in California to meet with Ms. Gatti after the meeting in Rome and before you offered Ms. Gatti the CEO position?"

THE WITNESS:  There are two questions here.

MS. HEALY:  Q.  No, one question.

A.  I hear two questions.  First is if I came here.

Q.  Okay.

A.  And second is if I came here to meet with Ms. Gatti.

Q.  No, I think it's one question, but feel free to answer both.

"statement" as "dichiarazione."                    12:46:12

          THE INTERPRETER:  "dichiarazione" is    12:46:14

"statement."  I don't know what --                 12:46:15

          MS. HEALY:  Rather than have a delay, do you    12:46:18

refer --                                           12:46:20

          MR. WALLERSTEIN:  No, no, no.  No, no, no.    12:46:22

          THE INTERPRETER:  Sorry.                 12:46:22

          MR. WALLERSTEIN:  I want to hear what counsel    12:46:22

just said in Italian.                              12:46:24

          THE INTERPRETER:  "Dichiarazione" is    12:46:27

"statement."  There is no other translation for the    12:46:29

word.                                              12:46:34

          MS. HEALY:  I object to the translation of the    12:46:35

word.                                              12:46:37

          MR. WALLERSTEIN:  Arianna -- Arianna, you do    12:46:38

not need to engage in a dialogue with Ms. Healy.    12:46:39

Please, I suggest you just translate.  She said    12:46:43

something in Italian.  I want to hear what she said, in    12:46:45

English.                                           12:46:45

          MS. HEALY:  I am sorry --               12:46:45

          MR. WALLERSTEIN:  No, no, no, do not interrupt    12:46:45

me.                                                12:46:45

          MS. HEALY:  I am sorry if I said something in    12:46:45

Italian, but unfortunately sometimes it's automatic and    12:46:47

I can't stop my own mouth from speaking in this    12:46:51

Almawave USA?                                                 18:20:33

A.   Nothing after the policy went into effect.              18:20:56

And we didn't discuss anything else until we                 18:21:00

received the -- we received the complaint.                   18:21:02

Q.   I just would encourage you to not use that              18:21:10

word in English, because it comes across as a -- you         18:21:13

know, these are court proceedings, so we want to just        18:21:16

make sure it doesn't have words that may be                  18:21:20

misinterpreted.  So I would encourage you to just simply     18:21:22

refer to it as the complaint.                                18:21:25

THE INTERPRETER:  The complaint as opposed to?               18:21:28

MS. HEALY:  The acronym she used.                            18:21:32

MR. WALLERSTEIN:  Or first F-A-C.                            18:21:44

MS. HEALY:  Yes, F-A-C.  Because it has a                    18:21:48

negative meaning in English, so please don't use it,         18:21:51

because we are making an official record.                    18:21:57

MR. WALLERSTEIN:  It's perfectly appropriate,                18:22:02

and you need not obey her admonition.                        18:22:03

MS. HEALY:  I am just asking her, as a                       18:22:07

courtesy and respect to the Court.  Nothing else.            18:22:09

MR. WALLERSTEIN:  (Addressing the witness)                   18:22:14

You have been completely respectful today and the            18:22:14

disrespect to the judicial process is not your problem       18:22:18

here today.  There is a big problem with disrespect of       18:22:21

the judicial process in this room, and it is not your        18:22:24

**F-285**

problem.                                                              18:22:29

          MS. HEALY:  I just asked the witness because        18:22:39
she doesn't know, probably, what it means, so that's the     18:22:41
only reason why I mention it.                                18:22:43

     Q.   After this complaint was filed, what did you       18:22:55
tell your insurance broker in respect of Almawave USA?       18:22:59
Did you file a claim?                                        18:23:05

     A.   I opened a claim with the insurance company        18:23:36
through the broker.                                          18:23:39

     Q.   Did you provide the broker -- or did you           18:23:41
provide the insurance company through the broker a           18:23:45
statement regarding your claim?                              18:23:48

     A.   I transmitted a letter to open this claim, and     18:24:13
the letter was my communication to open this claim.          18:24:19

     Q.   And did you explain in your letter the claim,      18:24:22
and did you ask for payment?                                 18:24:26

     A.   I attached the documents I received, the           18:24:45
complaint.                                                   18:24:48

     Q.   And did you ask for payment?                       18:24:48

     A.   We requested the insurance coverage --             18:24:57

     Q.   And did you --                                      18:25:02

     A.   -- for this claim.                                  18:25:02

     Q.   Thank you.  And did you submit a claim also        18:25:04
involving Anna Gatti?                                        18:25:08

     A.   I opened -- I filed a claim of coverage for --     18:25:36

meeting.

Q.   Did you have any discussions as part of your board meetings with AlmavivA S.p.A. about Ms. Gatti or Almawave USA?

MR. WALLERSTEIN:  If you had discussions that would not involve your legal advice or request for legal advice, then you may answer.

MS. HEALY:  I am asking for her participation in board meetings as a member of the board, not as an attorney.

MR. WALLERSTEIN:  Well, if Ms. Perri speaks in a board meeting in her capacity as a board member, she may still be providing legal advice, in which case it's privileged.  I don't know what she said on this subject.

MS. HEALY:  Privilege under which law?

(Clarification requested by reporter.)

MS. HEALY:  Privilege under which law?

MR. WALLERSTEIN:  If you can answer the question without revealing privilege, you may.

THE WITNESS:  I have not discussed in the board with relation or -- I had no discussion in the board relating to this matter.

MS. HEALY:  Q.  Did you hear anyone at board meetings discuss any issue relating to Ms. Gatti or Almawave USA?

MS. HEALY:  Q.  Okay.

A.  And that was -- my understanding was that that was a transfer from Almawave do Brasil to Almawave USA.

Q.  Where did you get this understanding?  From Ms. Sandei?

A.  If I remember correctly, yes.

Q.  Did you have any direct discussions with Almawave do Brasil regarding the funding?

A.  If I remember correctly, I probably sent a couple of emails, because at the beginning the funds were not coming in.

Q.  Was that -- were those emails to Christian De Felice?

A.  My understanding was that Christian De Felice was the group CFO.

Q.  What do you mean by group?

A.  Almawave and all the affiliates.

Q.  Almawave?

A.  Sorry.  AlmavivA.

Q.  Okay.  Does AlmavivA -- when you say Almawave group, do you mean -- just explain to me what you mean.

A.  I meant AlmavivA.

Q.  Does AlmavivA S.p.A and its subsidiary operate as an integrated company?

MR. WALLERSTEIN:  Objection; lacks foundation,

**F-288**

calls for speculation.    15:12:36

MS. HEALY:  I am asking for her understanding.    15:12:40
She is a double PhD.    15:12:42

THE WITNESS:  One in criminology.    15:12:44

I never had a clear explanation nor an    15:12:44
understanding of how the different companies were    15:12:47
organized.    15:12:56

MS. HEALY:  Q.  Okay.  So let me ask you about    15:12:57
the funding again.    15:12:59

Who did you understand had to -- you    15:13:06
presented -- who did you ask --    15:13:09

Sorry.  I just got distracted.    15:13:10

You put together a budget and then you had to    15:13:14
send it to somebody for approval before you would get    15:13:18
the funds?    15:13:21

A.    Valeria.    15:13:23

Q.    Okay.  She would approve?  You understood that    15:13:24
she was the one approving your budget?    15:13:27

A.    Yes.    15:13:31

Q.    And did you get the approval back in writing?    15:13:31

A.    Probably.    15:13:34

Q.    Did you -- did you feel that you, when you    15:13:35
were the CEO of Almawave USA, were independent in    15:13:39
running Almawave USA, or did you feel you were being    15:13:46
micromanaged Roman style by Sandei or anyone else at --    15:13:51

MR. LOSAVIO:  President?

MS. HEALY:  Q.  Yes.

A.  Executive position?  No.

Q.  She was an officer of Almawave USA?

A.  I believe so.

Q.  How did you know when Ms. Sandei was working in her capacity as an officer of Almawave USA versus Almawave Italy?

A.  She was always working in the capacity of Almawave USA with me.

Q.  Okay.  How did you distinguish, if at all, when she was working in a different capacity?

A.  Because I never had any say in the Italian or Brazilian market, and my focus was really only on selling the product and closing partnership in US.  So that was --

Q.  No, but I am asking a completely different question.  I am asking were you -- how to distinguish when Ms. Sandei was writing to you in her role as an officer of Almawave Italy versus she writing in her role as an officer of Almawave USA.

MR. WALLERSTEIN:  Counsel --

MR. LOSAVIO:  Ms. Gatti, did you finish your prior answer before you were interrupted by that question?

THE WITNESS:  No, I did not.    15:20:26

MR. WALLERSTEIN:  I have an interest in    15:20:27
hearing Ms. Gatti's testimony, as my clients are parties    15:20:28
to this lawsuit.  I have an interest in hearing her full    15:20:32
testimony that's not interrupted as well.    15:20:36

MS. HEALY:  Q.  Can you please tell me how you    15:20:39
distinguished when Ms. Sandei was writing as the CEO of    15:20:42
Almawave S.r.l. versus the president of Almawave USA?    15:20:47

MR. WALLERSTEIN:  Objection; asked and    15:20:52
answered.    15:20:52

MR. LOSAVIO:  It was, and you can complete    15:20:54
your answer now, if you hadn't previously.    15:20:55

THE WITNESS:  So I answer what you last asked,    15:20:59
because I kind of lost the chain.    15:21:02

MS. HEALY:  Q.  No, I am asking this question.    15:21:05
I am asking, how did you distinguish when Valeria Sandei    15:21:06
was writing to you in her capacity as the CEO of    15:21:12
Almawave S.r.l. instead of the president of Almawave    15:21:16
USA?    15:21:20

MR. WALLERSTEIN:  Objection; asked and    15:21:21
answered.    15:21:22

MR. LOSAVIO:  Objection; assumes facts not in    15:21:23
evidence.  Assumes -- and there is no foundation, and    15:21:24
it's contrary to the answer that she just gave.    15:21:28

MS. HEALY:  Q.  You can answer.    15:21:32

**F-291**

MS. HEALY:  The interpreter was not giving a correct translation.  That's why I was trying to help her, because I don't believe that what she --

THE INTERPRETER:  "Understanding" is not the same as "conoscere."  I am sorry.  We can go into semantics here.

(Speaks in Italian.)

MS. HEALY:  Okay.

MR. WALLERSTEIN:  Please, Ms. Healy, do not interrupt me.

I am allowed to have my voice heard on the record.  The witness will not respond to comments.  She is here to answer your questions.

MS. HEALY:  Q.  Does any other company within the AlmavivA group have a legal department?

A.  Yes.

Q.  Which ones?

A.  The Brazilian companies.

Q.  They have a separate legal department?

A.  They have a legal department that reports to me.

Q.  Where is that legal department based?

A.  It's between Sao Paolo and Belo Horizonte.

Q.  And in what language do you communicate with that legal department?

THE INTERPRETER:  Okay.

(Translates Exhibit 6 into Italian.)

MS. HEALY:  Q.  Mariantonietta Perri and Antonio Dibitonto.  Is Antonio Dibitonto a part of your legal department?

A.  It's false.

Q.  What's his title?

A.  He is the director of the fiscal department and of the balance sheet of accounting.

Q.  But we already confirmed with you that you are the top legal officer of AlmavivA; correct?

A.  I said so, yes.

Q.  So, moving on to the rest of the sentence, "directly negotiated with Gatti," did you engage in any negotiations with Gatti beginning since March 2014?

MR. WALLERSTEIN:  Objection; vague as to "directly negotiated."

MS. HEALY:  He is kicking me under the table.  Wrong person.

THE WITNESS:  He kicked me.

MS. HEALY:  Q.  So did you engage in any negotiations with Anna Gatti since March 2014?

A.  Starting as of March 2014 I gave legal support to my --

Q.  I am sorry.  To my what?

MS. WONG:  Q.  When do you use English at work?

A.  I don't understand the question.

Q.  Do you -- I mean, you use English sometimes; correct?  For work.

A.  Yes.

Q.  Under what circumstances do you use English for work?

A.  It depends.

Q.  Depends on what?

A.  If I receive an email in English.

Q.  You would respond in English, then?

A.  It may happen that I answer in English.

MR. WALLERSTEIN:  I object to the line of questioning as beyond the scope of jurisdictional discovery and the jurisdictional deposition.  This has absolutely nothing to do with whether there is jurisdiction over the two Italian entities.

MS. WONG:  Q.  Are you currently employed, Ms. Nicolella?

A.  Yes, I work.

Q.  Who is your employer?

A.  It's AlmavivA S.p.A.

Q.  How long have you been working for AlmavivA S.p.A?

A.   Do I need to tell you what I do every day at work?

Q.   If you can give me some details, that would be great.  Your responsibilities.

A.   I am head of treasury.  That is, I manage the checking accounts of the AlmavivA group and I take care of the relationships with banks of the AlmavivA group.

Q.   What do you mean by AlmavivA group?

A.   You want to know what AlmavivA group is?

Q.   Yes.

A.   It's for -- the group is a set of companies which compose the holding which is AlmavivA.

MS. HEALY:  Objection to the translation.  I think she was saying that it's a set of companies that are under the holding of AlmavivA S.p.A.

MR. WALLERSTEIN:  That's inappropriate, Counsel.  You have no right to object.

MS. HEALY:  I have a right to note my objection to the translation.

MR. WALLERSTEIN:  No, you don't.

MS. HEALY:  My objection is noted.

THE INTERPRETER:  Would you like to have her repeat?

MR. WALLERSTEIN:  No, I want you to say in Italian what is said in English and to say in English

what is said in Italian, please.                          11:25:55

THE WITNESS:  By group I mean to say that it's          11:26:12
a set of companies that are headed by AlmavivA S.p.A.,   11:26:14
which is the holding company.                            11:26:22

MS. WONG:  Q.  Okay.  Is -- Almawave S.r.l.,            11:26:29
Almawave S.p.A., and Almawave USA are underneath this    11:26:34
Alma group that you refer to?                            11:26:43

A.  They are part of the AlmavivA group.                11:26:55

Q.  And that's the Alma group that you just             11:26:59
referred to; correct?                                    11:27:02

A.  There are also other companies that are part        11:27:14
of this group, not only these.                           11:27:18

Q.  Okay.  And you are in charge of keeping             11:27:22
control of money that goes in and out of all bank        11:27:31
accounts?                                                11:27:35

A.  Can you be more precise in your question by         11:27:53
what you mean by control and the parameter of these      11:27:55
companies that you are referring to?                     11:27:59

Q.  When you said that you are in charge -- you         11:28:03
mentioned that you are in charge of financial planning   11:28:06
and treasury.  Does that include being in charge of the  11:28:10
bank accounts of Alma group?                             11:28:15

A.  I don't understand what it means to say in          11:28:40
charge of controlling the bank accounts of the AlmavivA  11:28:43
group.                                                   11:28:50

and financial planning.

A.   I already answered this question.

Q.   You didn't describe your specific duties.

MR. WALLERSTEIN:  Objection; vague.

MS. HEALY:  (Speaks in Italian.)  I didn't hear the word.  Excuse me.

THE WITNESS:  As far as the treasury is concerned, I am responsible to verify all the bank accounts for AlmavivA group.  And regarding the financial planning, I receive the financial flows from the companies of the group in order to consolidate financial data and generate the report.

MR. WALLERSTEIN:  I agreed, at Ms. Healy's request, that Ms. Wong could begin the deposition and that Ms. Healy could conclude it.  I did not agree and will not agree to have more than one attorney participate in this deposition.  I will not allow Ms. Healy to participate in the deposition.

To the extent that Ms. Healy is participating as a translator, I object, pursuant to the court order, that that is improper.  So I ask that -- insist that Ms. Healy remain silent while Ms. Wong is questioning, unless she is ready to take over the deposition, in which case she can conclude it.

MS. WONG:  Q.   How do you verify all bank

ANGELA NICOLELLA - 1/21/2016

Page 31

constituted company, which was Almawave USA.

Q. Did you copy anyone in the email?

A. There were some people copied in this email.

Q. Who else were copied?

MR. WALLERSTEIN:  Why don't you show her the email?

MS. WONG:  Q.  Do you have it with you?

MR. WALLERSTEIN:  I am talking to you, Counsel.

MS. WONG:  I don't have the email.

THE WITNESS:  I'm trying to remember.  So Anna Gatti, Christian De Felice.  Those are the ones I remember.  I don't know if there were other people.

MS. WONG:  Q.  Who is Christian De Felice?

A. He is the CFO of the AlmavivA group.

Q. Do you -- can you spell out what CFO means, for the record?

A. He is the head of financial direction.

Q. Why did you copy Anna Gatti to the email?

A. Because she was the one who would need to open the bank account.

Q. Who told you that?

A. You mean to say who told me to put her copied in the email or that it was her that would have opened the account?

**F-298**

A.   I don't remember it.   12:58:55

Q.   How many email addresses do you have of Ms. Gatti?   12:58:56 12:58:58

A.   I don't remember.   12:59:05

Q.   More than one?   12:59:05

A.   I don't remember it.   12:59:11

Q.   Was Gatti in San Francisco when you contacted her in May 2014?   12:59:19 12:59:21

THE INTERPRETER:  '14?  I am sorry.   12:59:28

MS. WONG:  '14.   12:59:30

THE WITNESS:  I don't know, because I wrote an email, so she could have been anywhere.   12:59:34 12:59:35

MS. WONG:  Q.  What was your understanding of where she is based?   12:59:37 12:59:38

A.   I don't quite understand the question.   12:59:53

Q.   When you contacted Anna Gatti, did you have an understanding of where she was located?   12:59:56 12:59:59

A.   So I have answered the question.  And I sent her an email, so I had no idea where she was.   13:00:17 13:00:24

Q.   So when you were discussing with Anna Gatti about opening an account, was that an account in San Francisco?   13:00:30 13:00:33 13:00:36

MR. WALLERSTEIN:  Object --   13:00:37

I am sorry.  Go ahead.   13:00:38

THE INTERPRETER:  Can you repeat the question   13:00:41

**F-299**

Q.   If you were receiving -- if you were -- sorry.   13:14:49
Strike that.   13:14:53
Did you check the statements that you received   13:14:59
for any reason or purpose?   13:15:01

A.   I am not clear about the question.  It's too   13:15:12
vague.   13:15:14

Q.   You were receiving the statements from Bank of   13:15:15
the -- regarding the Bank of the West accounts.  Did you   13:15:17
check those statements for any -- for any reason?   13:15:21

A.   No, I don't -- I said I did not check them.  I   13:15:43
would receive them and then archive them.   13:15:46

Q.   Why were you receiving them, then?   13:15:50

A.   I -- I would receive them to consolidate the   13:16:18
data from Almawave USA and the group in order to create   13:16:23
the managing report.   13:16:31

Q.   So you would look at the statements?   13:16:37

A.   I would look at the balance of the checking   13:16:49
account.   13:16:52

Q.   How do you -- what does it mean -- how do you   13:16:54
consolidate those statements?   13:16:57

A.   It means to add.   13:17:09

Q.   Did anyone in your department check any   13:17:12
transaction in the statements?   13:17:15

MR. WALLERSTEIN:  Objection; lacks   13:17:26
foundation -- withdrawn.   13:17:26

**F-300**

ANGELA NICOLELLA - 1/21/2016

Page 52

THE WITNESS:  No.  13:17:28

MS. WONG:  Q.  So no one would look at the statements besides --  13:17:31  13:17:38

Let me just -- let me just strike that.  13:17:40

Before opening the account at Bank of the West, did you discuss with anyone regarding the funding of Alma's -- of the Alma accounts?  13:17:46  13:17:48  13:17:52

THE INTERPRETER:  Of -- just the translator would like to know.  Of the Alma accounts?  13:18:01  13:18:03

MS. WONG:  The Almawave accounts.  I am sorry.  13:18:06

THE INTERPRETER:  Can you repeat it for me?  I am sorry.  13:18:09  13:18:11

MS. WONG:  Q.  Yes.  Before opening the accounts, did you discuss with anyone regarding the funding of the Bank of the West accounts?  13:18:12  13:18:13  13:18:18

MS. HEALY:  I just want to clarify the translation, because I don't think it was --  13:18:37  13:18:38

MR. WALLERSTEIN:  That's not your role, Counsel.  13:18:40  13:18:41

MS. HEALY:  I am objecting for the record. The translation was not accurate.  She said --  13:18:42  13:18:45

MR. WALLERSTEIN:  I don't know if you are doing it for the record or why you are doing it.  You are not permitted to translate in this deposition.  13:18:48  13:18:49  13:18:52

MS. HEALY:  Please don't interrupt me.  13:18:55

**F-301**

MR. WALLERSTEIN: No, you have a translator that you have hired, and it is not your role to translate.

MS. HEALY: The translator is a neutral translator, and I am making my objection.

MR. WALLERSTEIN: You are not permitted, because I don't speak Italian. It's not --

MS. HEALY: Please don't yell. I'm making my objection. You have an interpreter next to you.

MR. WALLERSTEIN: I will try to speak a little more softly, ma'am.

You are not permitted to translate in this deposition.

MS. HEALY: I am not translating. I am making an objection for the record.

MR. WALLERSTEIN: Based on the translation?

MS. HEALY: Yes. I'm objecting to the translation.

MR. WALLERSTEIN: That's not your role.

MS. HEALY: It was incorrect.

MR. WALLERSTEIN: That's not your role. You are not permitted.

MS. HEALY: You are not the Court, and I am making my objection.

MR. WALLERSTEIN: The Court has already ruled

13:18:55
13:18:56
13:18:58
13:18:58
13:18:58
13:18:58
13:19:02
13:19:05
13:19:09
13:19:10
13:19:10
13:19:10
13:19:12
13:19:13
13:19:15
13:19:16
13:19:18
13:19:18
13:19:18
13:19:19
13:19:20
13:19:21
13:19:22
13:19:22
13:19:22

on this issue, Counsel.                                          13:19:23

        MS. HEALY:  I am making my objection for the             13:19:24
record.  Please --                                              13:19:26

        MR. WALLERSTEIN:  I don't care.  Saying "for            13:19:26
the record" does not change it and it doesn't make it           13:19:27
proper.  Everything is for the record now.                      13:19:32

        MS. HEALY:  Your objection is noted.  Thank             13:19:32
you.                                                            13:19:34

        MR. WALLERSTEIN:  It's not an objection,               13:19:35
Counsel.  You are not permitted to translate.                   13:19:36

        MS. HEALY:  Please -- can you please -- please         13:19:38
let me speak.                                                   13:19:39

        Ms. Wong stated -- so the translation that was         13:19:40
given --                                                        13:19:44

        MR. WALLERSTEIN:  You are not permitted to             13:19:45
opine on the translation, Counsel.                              13:19:46

        MS. HEALY:  I am stating for the record that           13:19:47
the translation --                                              13:19:49

        MR. WALLERSTEIN:  I don't care if you are              13:19:49
stating it for the record.                                      13:19:51

        MS. HEALY:  Please, you are really, like,             13:19:52
breaking my ears.  Please --                                    13:19:52

        MR. WALLERSTEIN:  Okay.  I will try to say it          13:19:54
more softly.                                                    13:19:55

        MS. HEALY:  Please.                                     13:19:56

MR. WALLERSTEIN:  I don't care if you are saying it for the record --

MS. HEALY:  The translation --

MR. WALLERSTEIN:  -- or if you are saying it for Dianna Wong or if you are saying it for the witness. You are not permitted to translate.

MS. HEALY:  I am making an objection for the record that the --

MR. WALLERSTEIN:  I don't care if you are doing it for the record.

MS. HEALY:  The translator --

MR. WALLERSTEIN:  No, she may not speak and she may not translate.

MS. HEALY:  The translator --

MR. WALLERSTEIN:  No, thank you.  She is not taking this deposition --

MS. HEALY:  The translator --

MR. WALLERSTEIN:  -- and she is not to translate during this deposition.

MS. HEALY:  The translator incorrectly indicated that the --

MR. WALLERSTEIN:  That is not your role to play.

MS. HEALY:  Please.

THE INTERPRETER:  So I would be happy to

repeat the question. Maybe Ms. Wong can repeat the question --

MS. HEALY: Thank you.

THE INTERPRETER: -- and I can --

MR. WALLERSTEIN: It's really not her role to intercede.

MS. HEALY: Please --

THE INTERPRETER: I have a terminology --

MR. WALLERSTEIN: Now she is your translator?

MS. HEALY: Yes.

MR. WALLERSTEIN: That's what I said a moment ago.

MS. HEALY: She is a neutral translator.

MR. WALLERSTEIN: Okay. So either she does her job or not.

MS. HEALY: Please.

MR. WALLERSTEIN: Is that too loud?

MS. HEALY: I know you want to interfere. Please go ahead. You want to take over? It's fine. Go ahead. I mean, these -- these depositions were ordered for your benefit. You don't want your witnesses to testify, we will just sit here and listen to you.

MR. WALLERSTEIN: If you are ready to adjourn, I'm ready to adjourn.

MS. HEALY: I am making my objection to the

record.

MR. WALLERSTEIN:  You are not permitted to.

THE INTERPRETER:  Actually, I would be happy to repeat and reinterpret the question, if you don't mind repeating it.

MS. WONG:  I can repeat the question.

THE INTERPRETER:  Thank you.

MS. WONG:  Q.  Before opening the Almawave USA account in Bank of the West, did you discuss with anyone the funding of this account?

MR. WALLERSTEIN:  Objection; misstates prior testimony about opening the account.

MS. HEALY:  You can answer.  After he objects, you are allowed to answer.

MR. WALLERSTEIN:  Counsel, if you are going to participate in this deposition, then Ms. Wong is not. So you can make your election right now.  If you are taking over, you are taking over.  Otherwise there is only one counsel representing Loop in this deposition at a time.  You make your election.

MS. HEALY:  Thank you.  I didn't know you were appointed to be the Court.  Thank for the clarification.

MR. WALLERSTEIN:  It was a stipulation that we made.

MS. WONG:  Q.  For Sarah's sake, I don't want

**F-306**

THE WITNESS:  I don't know.                          13:29:50

MS. WONG:  Q.  Was Mr. De Felice involved in         13:30:01
the decision to deposit money into the bank account? 13:30:07

MR. WALLERSTEIN:  Objection; lacks foundation.       13:30:12

THE WITNESS:  I don't remember.  I don't know.       13:30:21

MS. WONG:  Q.  Do you report to Mr. De Felice?       13:30:25

A.  Yes.                                             13:30:32

Q.  And did you discuss with Mr. De Felice about     13:30:34
depositing the money into the Almawave USA account in 13:30:40
San Francisco?                                       13:30:44

A.  I do not recall.                                 13:31:00

Q.  And did you -- do you remember when -- how       13:31:01
much money was ever deposited -- was -- sorry.  Let me 13:31:07
strike that.                                         13:31:11

You receive statements from Bank of the West.        13:31:12
Do you remember how much -- how much money was first 13:31:16
deposited into Almawave USA's account?               13:31:19

A.  The amount of the capitalization of the          13:31:40
company?  The capital?                               13:31:44

Q.  Yes.                                             13:31:46

A.  Just about -- I think I remember $100,000.       13:31:58

Q.  What was the purpose of that money?              13:32:05

MR. WALLERSTEIN:  Objection; lacks foundation.       13:32:09

THE WITNESS:  It is the initial deposit of the       13:32:26
capitalization of the company.                       13:32:29

MR. WALLERSTEIN:  Objection; lacks foundation.    15:10:47

THE WITNESS:  I didn't understand the question.  Do you want to know the person who decides or the reasoning or the -- how it's -- how the decision is made?    15:11:10 15:11:11 15:11:19 15:11:22

MS. WONG:  Q.  Both.    15:11:24

A.  So it depends on the invoices, the total invoices for the month that Valeria Sandei tells me are -- is necessary to cover the amounts.  So we transfer the amounts necessary to cover those invoices for the month.    15:11:51 15:11:54 15:11:58 15:12:03 15:12:07

Q.  And so you add up all the bills and then you make a transfer to the Bank of the West?    15:12:08 15:12:14

MR. WALLERSTEIN:  Objection.    15:12:26

THE WITNESS:  I don't understand what you mean by add all the invoices.    15:12:31 15:12:34

MS. WONG:  Q.  You testified earlier that you pay -- you transfer money in order to pay the bills for Almawave USA.  I am asking you, do you transfer just the amount of money that the bills add up to?    15:12:40 15:12:41 15:12:45 15:12:50

A.  Yes.    15:13:11

Q.  And where do the bills to fund the financing come from?  Which bank?    15:13:23 15:13:29

MR. WALLERSTEIN:  Objection.  Incomprehensible.    15:13:35 15:13:37

Page 136

Q.    What did the number represent?    15:14:34

MR. WALLERSTEIN:  Objection; lacks foundation,    15:14:35
calls for speculation.    15:14:43

MS. HEALY:  Q.  I am asking you.  I wasn't    15:14:44
there.  I am trying to understand what she told you this    15:14:47
number represented.    15:14:51

MR. WALLERSTEIN:  Objection; lacks foundation,    15:14:51
calls for speculation.    15:15:13

THE WITNESS:  It means that, for somebody on    15:15:15
the market, this company could have had this value.    15:15:18

MS. HEALY:  Q.  And "this company," you mean    15:15:20
the startup of which she was the CEO?    15:15:26

A.    Yes.    15:15:27

Q.    And why would she be -- why were you    15:15:30
discussing this with her?    15:15:32

MR. WALLERSTEIN:  Objection; misstates prior    15:15:33
testimony.    15:15:43

THE WITNESS:  As I said, it wasn't a topic,    15:15:45
but she mentioned this fact within another conversation    15:15:49
that we were having.    15:15:52

MS. HEALY:  Q.  What was the conversation you    15:15:53
were having?    15:16:06

A.    We were talking about a big American company,    15:16:13
publicly-traded company, and we were talking about its    15:16:16
capitalization.

Q.   I just want to refer to him in his official capacity, since we are talking about business stuff.

MR. WALLERSTEIN:  That's not a question.  And she can refer to him correctly, incorrectly, however she chooses.  You need not comment.

MS. HEALY:  I am just saying how I am referring to him.

Q.   What did you tell him, and why?

A.   I told him, "Why don't we follow this process to have Almawave evaluated?"

Q.   And did you tell him about the number, as you call it, that Ms. Gatti had mentioned to you relating to her startup, 25 million?

A.   No, I did not tell him.  This was not -- the number was not an object of our conversation.

Q.   Did you ever discuss Ms. Gatti's startup -- rather, the startup of which Ms. Gatti was the CEO of at the time -- with Mr. Tripi?

A.   No.

Q.   Did you -- before making an offer to Ms. Gatti and IQSystem, did you have to obtain approval from the board of AlmavivA S.p.A. before going forward with that project?

A.   No.

Q.   Did you tell Ms. Gatti in an email, or Mr. Di

Q.   Ms. Perri, who is sitting over here?   16:13:51

A.   Her organization.  I don't know if her or her   16:13:54
colleagues.   16:13:55

Q.   You mean her department?   16:14:00

A.   It means her department.   16:14:02

Q.   Was it your understanding that the employment   16:14:04
agreement that was being given to Ms. Gatti was a   16:14:12
standard form agreement for the State of California?   16:14:33

A.   I don't have legal experience to know if it   16:14:35
was standard or not standard.   16:14:37

Q.   Did you ask to see Ms. Gatti's employment   16:14:42
agreement with her startup?   16:14:58

A.   As I think I repeated several times, no.   16:15:01

Q.   Why not?   16:15:11

A.   Because I did not see a single reason why I   16:15:13
should make such a request.   16:15:15

Q.   To ensure that there would be no conflicts.   16:15:20

MR. WALLERSTEIN:  That's not a question, so we   16:15:22
can wait for a question.   16:15:28

MS. HEALY:  Q.  You didn't -- as the CEO of   16:15:32
Almawave, you didn't think it would be important to   16:15:34
ensure that the person you were hiring to lead your new   16:15:38
venture in the United States had no conflicts that could   16:15:42
place your company in trouble?   16:15:46

A.   Certainly, yes, I consider it important.

# EXHIBIT F

## SPEAKING OBJECTIONS/COACHING
## (other improper objections & interruptions)

**F-312**

between Almawave's technology and Loop AI's    16:17:36
technology?    16:17:38

MS. BRAYER:  I think this is --    16:17:39

MS. TITOVA:  Objection.  Calls for expert    16:17:40
testimony and speculation.  I'd like Mr. Calafiore    16:17:41
to leave the room before Ms. Gatti answers that    16:17:43
question.    16:17:46

MS. HEALY:  She's talking about Loop AI's    16:17:46
technology.  So --    16:17:49

MS. TITOVA:  She's making a comparison    16:17:50
between Loop AI's technology and Almawave's    16:17:52
technology.  And therefore, it's highly    16:17:54
confidential and should be designated "Attorneys'    16:17:56
Eyes Only."  I'd like Mr. Calafiore to leave the    16:17:58
room.    16:18:00

BY MS. HEALY:    16:18:00

Q.  Before he leaves the room, I need to    16:18:01
understand.  When you used the words "the real    16:18:03
difference," were you referring to the real    16:18:05
difference between Almawave and Loop AI's    16:18:07
technology?    16:18:09

A.  No.  I'm referring to the real difference    16:18:10
between the semantic technologies that Almawave USA    16:18:12
adopted and the next generation of semantic.    16:18:20

MS. TITOVA:  Why don't we take a little    16:18:25

Interrupting during material testimony regarding technology "adopted by Almawave USA"

break here, give everybody a chance to regroup and

do a time check.

BY MS. HEALY:

Q.  Please let me ask another question.

A.  No, we don't have another question.  Let

me take a break.

MS. BRAYER:  I think we're pretty much out

of time anyway.

(Recess from 4:18 P.M. to 4:32 P.M.)

BY MS. HEALY:

Q.  Ms. Gatti --

MS. TITOVA:  I'm going to -- Ms. Healy,

I'm just going to make a statement on the record.

We have very limited time left.  I'm

willing to make a concession with you, and I'm

hoping that you will agree with this.

You can ask Ms. Gatti questions that we

addressed to the Court earlier.  And you may ask

her about that conversation that she had with

Ms. Sandei, so long as -- whether -- I'm not

conceding the conversation existed, but I'm saying,

on that subject matter, so long as you agree there

will be no subject matter waiver as to that topic.

MS. HEALY:  No, I don't agree.  And the

Court has set a scheduling order, so we will

MS. HEALY:  Q.  What's the answer?  Are you in charge?

A.   For legal matters, yes.  If there are matters that don't involve legal issues, then of course not.

MR. WALLERSTEIN:  We have been going for an hour, and we are going to take a five-minute break.

MS. HEALY:  I have -- the time -- it's not even --

MR. WALLERSTEIN:  We have been going for an hour, for one hour, and we are taking a break.

MS. HEALY:  Okay.  Let the record reflect...

THE WITNESS:  Thank you.

(Recess taken from 3:09 to 3:26.)

MR. WALLERSTEIN:  I repeat that I have Ms. Angela Nicolello here today.

MS. HEALY:  Excuse me.  We are back on the record, and the time is 3:26 p.m., and Mr. Wallerstein and his witness just came back to the room after the break.

MR. WALLERSTEIN:  So I am here with Ms. Angela Nicolella.  I need to know whether her deposition is today or tomorrow.  We are willing to stay today until 7:00 p.m., with reasonable breaks, but -- and I am offering to have her come back tomorrow, but I need to know now.

MS. HEALY:  We will be starting her as soon as we finish her.  And we appreciate her coming back, and if she needs to come back tomorrow, we appreciate your offer.

MR. WALLERSTEIN:  That was not the offer.  That was not the offer.  The offer is to have her deposition today or tomorrow, but not both.  If you choose to proceed with her today, she will stay until 7:00 and will not be back tomorrow.

MS. HEALY:  We are asking for her to start today and to continue tomorrow, if necessary.

MR. WALLERSTEIN:  Well, that's not happening, Counsel, so...

MS. HEALY:  That's fine.  You can take it up with the Court.  I would like to continue the deposition, please.

Q.   Ms. Perri, did you -- in March of 2014, did you -- were you copied in email correspondence, sending an agreement to Tony Di Napoli?

A.   Yes.

Q.   Do you recall what kind of agreement you sent Tony -- you or whoever else was -- sorry.  Strike that.

Was Sergio Calderara copied in those emails as well to Tony Di Napoli?

A.   I don't remember if he was a copy.

Almawave and IQ or Loop or others of this kind.                    15:47:53

Q.    Have you received a request for                              15:48:06
indemnification or payment of any legal costs by Anna              15:48:09
Gatti?                                                             15:48:13

MR. WALLERSTEIN:  If you have a question about                     15:48:22
privilege, then let's step outside and we will discuss             15:48:24
it.                                                                15:48:31

MS. HEALY:  I object, because there's a                            15:48:32
question pending.                                                  15:48:33

MR. WALLERSTEIN:  The witness has a question                       15:48:40
about privilege.  We are taking a break.                           15:48:41

MS. HEALY:  I am asking about                                      15:48:45
communications --                                                  15:48:46

MR. WALLERSTEIN:  This is why we need to have                      15:49:02
a court-certified interpreter and our own consultant.              15:49:04

MS. WONG:  (Addressing the interpreter)  He                        15:49:17
wants you with him.                                                15:49:18

MR. WALLERSTEIN:  No, I can't do it.  It's the                     15:49:19
problem.  That's the problem.  That's why we respond to            15:49:22
letters.                                                           15:49:25

(Witness and counsel exit at 3:49; return at                       15:49:26
3:52.)                                                             15:52:42

MS. HEALY:  Let the record reflect that the                        15:52:44
witness, Ms. Perri, and her counsel with Venable have             15:52:46
returned to the room, and the time is now 3:53.                    15:52:56

A.   So I said that Sabrina Nobili sent me an email informing me that Almawave USA had been founded.

Q.   Do you know what the purpose was for the founding of Almawave USA?

A.   Yes.

Q.   What did she say?

A.   You asked me if I am aware or know the objective of why it was founded?

Q.   And what was the objective?  I -- sorry.  What was the objective?

A.   The objective why Almawave USA was founded?

Q.   Yes.

A.   To market products that were developed in Italy with the Almawave technology.

MR. WALLERSTEIN:  Counsel, we have been going for over an hour, so I would like to take a five-minute break.

MS. WONG:  Can I just ask a couple more questions, just to wrap this?

MR. WALLERSTEIN:  Normally I would, but due to the conduct of the depositions over the last two days, no.

MS. HEALY:  The time is now 12:19.

(Recess taken from 12:19 to 12:44.)

MS. WONG:  Q.  Ms. Nicolella, before the break

ANGELA NICOLELLA - 1/21/2016

Page 64

said earlier I spoke to Valeria Sandei or it could have been Christian De Felice, but I don't remember.

MR. WALLERSTEIN:  Counsel, it's been six minutes since my warning.  If you will be concluded with this witness in five minutes, I will give you five minutes more.  Otherwise I am taking our lunch break.

MS. WONG:  I do have a few more questions about this topic, and I don't want to obstruct --

MR. WALLERSTEIN:  You can either represent that you will be concluding the deposition of Ms. Nicolella in the next five minutes or, if you cannot make that representation, then we will take our lunch break now.

MS. WONG:  I cannot make that representation.

MR. WALLERSTEIN:  So we are taking our break.

(Lunch recess taken from 1:40 to 2:50.)

(Mr. Raniero Romagnoli additionally present.)

MS. HEALY:  Back on the record.  The time is now 2:50.  And let the record reflect that counsel for AlmavivA and the witnesses returned to the deposition room at approximately 2:46 p.m.

MR. WALLERSTEIN:  Including with Mr. Luca Ferri, who is ready to be deposed today, as per his notice.  He will not be available tomorrow.  We are ready to proceed with him right now and at any time

A.    I don't remember.                                    15:49:09

Q.    I will look it up.                                   15:49:14

MR. WALLERSTEIN:  We have been going an hour,             15:49:22
so let's take our break now.                               15:49:23

MS. HEALY:  No, I have a question pending.                15:49:26

MR. WALLERSTEIN:  No, you don't.                          15:49:28

MS. HEALY:  Yes, I do.  Yes, I do.  You are               15:49:30
not taking a break, because the witness -- you have been   15:49:31
taking so many breaks.                                     15:49:35

MR. WALLERSTEIN:  We take them no more than               15:49:37
once an hour, and we are taking a break now.               15:49:37

MS. HEALY:  I have to -- I have a question                15:49:39
pending.                                                   15:49:40

MR. WALLERSTEIN:  No, you do not.                         15:49:40

(Recess taken from 3:49 to 4:08.)                         15:49:44

MS. HEALY:  Q.  Ms. Nicolella, we are back on             16:08:51
the record.  You mentioned during your testimony earlier   16:08:54
a company called Interplay?                                16:09:03

A.    Yes.                                                 16:09:13

Q.    You said you made some payments to this             16:09:13
company through the Bank of the West account of Almawave    16:09:16
USA?                                                       16:09:19

A.    Yes.                                                 16:09:36

Q.    What does this company do?  What does               16:09:37
Interplay do?                                              16:09:40

THE WITNESS:  Or the initial question?

MS. HEALY:  If she can read it back, because otherwise it keeps changing.

(Question translated.)

MS. HEALY:  Q.  In her capacity as an officer of Almawave USA.

MR. WALLERSTEIN:  Objection.  Vague and ambiguous.  Instruct the witness not to answer, because the predicate of that question is in Italian so I don't know what is being asked.  I need the question in English.

MS. HEALY:  Q.  Okay.  Let's ask the question again.  Was Ms. Gatti included -- as an officer of Almawave USA, was Ms. Gatti included in the request for coverage that you made in your claim to the insurance company?

MR. WALLERSTEIN:  Objection; lacks foundation, calls for a legal conclusion, vague and ambiguous.

MS. HEALY:  Q.  Are you going to answer?

A.  What I did, I opened the claim through the broker, MAG JLT.  Lloyd's --

MR. WALLERSTEIN:  Excuse me.  That's our --

MS. HEALY:  I am sorry.  She is answering a question.

MR. WALLERSTEIN:  I realize that, Counsel.

**F-321**

MS. HEALY:  Let her answer.

MR. WALLERSTEIN:  I am letting her answer. That was my timer going off, because we have gone well over an hour.

Please finish your answer, and we will take our break.

THE WITNESS:  Through MAG JLT, with the Lloyd's policy for AlmavivA S.p.A., Almawave USA, and Almawave S.r.l.

MS. HEALY:  Q.  Did that include --

MR. WALLERSTEIN:  We are taking a break. Counsel, you can resume when we finish our break.

(Recess taken from 6:31 to 6:42.)

MS. HEALY:  Q.  So, Ms. Nicolella, before you went for a break I was asking you whether you had submitted a claim to the insurance company involving Anna Gatti.

A.  So the -- the file -- the claim I filed was opened through the broker, MAG JLT, for AlmavivA S.p.A., Almawave USA, and Almawave S.r.l.

MS. HEALY:  And I am just going to note for the video recording that the time is now 6:43 and we just came back on the record a few minutes ago.

MR. WALLERSTEIN:  Thank you, Counsel.  That's a good point, because we are stopping at 7:00.  And the

**F-322**

ANGELA NICOLELLA - 1/21/2016

Page 146

MS. HEALY:  Let her answer.                    18:30:13

MR. WALLERSTEIN:  I am letting her answer.      18:30:14
That was my timer going off, because we have gone well   18:30:15
over an hour.                                   18:30:20

Please finish your answer, and we will take    18:30:22
our break.                                      18:30:24

THE WITNESS:  Through MAG JLT, with the        18:30:36
Lloyd's policy for AlmavivA S.p.A., Almawave USA, and    18:30:41
Almawave S.r.l.                                 18:30:57

MS. HEALY:  Q.  Did that include --            18:30:57

MR. WALLERSTEIN:  We are taking a break.        18:30:58
Counsel, you can resume when we finish our break.        18:31:00

(Recess taken from 6:31 to 6:42.)              18:31:12

MS. HEALY:  Q.  So, Ms. Nicolella, before you  18:42:15
went for a break I was asking you whether you had        18:42:17
submitted a claim to the insurance company involving     18:42:21
Anna Gatti.                                     18:42:26

A.  So the -- the file -- the claim I filed was  18:42:55
opened through the broker, MAG JLT, for AlmavivA S.p.A.,  18:43:01
Almawave USA, and Almawave S.r.l.              18:43:10

MS. HEALY:  And I am just going to note for    18:43:12
the video recording that the time is now 6:43 and we    18:43:14
just came back on the record a few minutes ago.         18:43:21

MR. WALLERSTEIN:  Thank you, Counsel.  That's   18:43:24
a good point, because we are stopping at 7:00.  And the  18:43:24

**F-323**

alarm on this phone will go off at 7:01.  So I am giving you a minute so no one is surprised and unnecessarily upset.

MS. HEALY:  Q.  Ms. Nicolella, did you receive a claim from Ms. Gatti or her lawyer or IQSystem or its lawyer for a claim for payment for defense costs in this litigation?

A.  No.

Q.  Are you aware of a claim having been made, or a request having been sent on behalf of Anna Gatti or IQSystem Inc. or IQSystem LLC to any of the AlmavivA entities for payment of legal costs or fees in this case?

MR. WALLERSTEIN:  Objection.  The question is compound.

THE WITNESS:  If you could, I would also have asked you if you could ask me just one question, and not one with many questions, one inside the other.

MS. HEALY:  Q.  I asked one question, and my question is whether you are aware of Anna Gatti or IQSystem Inc. LLC having made a request for payment of legal fees or legal costs incurred in this case from AlmavivA -- any of the AlmavivA entities.

A.  What do you mean by other entities of AlmavivA --

you just told us today?                                    10:37:07

A.    Not that I remember.                                 10:37:09

Q.    So after this first meeting did there come a         10:37:15
point -- you said you reached out to Mr. Capaccio for      10:37:19
legal services for Ms. Sandei.  What was the nature of     10:37:25
the legal services that you thought she could use?         10:37:28

MR. WALLERSTEIN:  Objection.  Withdrawn.                   10:37:32

MR. LOSAVIO:  You can answer.                              10:37:34

MR. WALLERSTEIN:  Compound.  Objection;                    10:37:35
compound.  I am not sure which question.  One of which     10:37:35
calls for privilege.  The second does not.                 10:37:38

MR. LOSAVIO:  Can I have the question read                 10:37:41
back?                                                      10:37:42

(Record read as follows:                                   10:37:42

"Q.  Did you tell her anything else besides                10:37:04
what you just told us today?                               10:37:06

"A.  Not that I remember.                                  10:37:09

"Q.  So after this first meeting did there                 10:37:15
come a point -- you said you reached out to                10:37:17
Mr. Capaccio for legal services for Ms. Sandei.            10:37:21
What was the nature of the legal services that             10:37:27
she [sic] thought she could use?")                         10:37:30

MR. WALLERSTEIN:  Objection.  To the extent --             10:38:13

MR. LOSAVIO:  Wait.  She thought or you                    10:38:15
thought?                                                   10:38:17

MS. HEALY:  She.  She testified --

MR. LOSAVIO:  No, wait.  The reporter read "she" instead of "you."  So I think you should read -- because it's not clear whether you are asking about the witness or...

MS. HEALY:  That's fine.

Q.   Ms. Gatti, you testified that you believed it would be important for Ms. Sandei to have legal counsel as she was entering the market?

A.   I testified that in my opinion it's important to talk to more than one person when you enter a new market.

Q.   Okay.  What kind of services did you think Ms. Sandei needed, legal services?

A.   My understanding was that she was looking for incorporation of the US entity and she -- my understanding was that she was interested in protecting in the US market all the technology that Almawave has, proprietary technology that Almawave has created in their lab over the previous several years.

Q.   Anything else?

A.   Not that I remember at the moment.

Q.   How did you form this understanding that they needed legal services for these aspects of their business?

# EXHIBIT F

---

**EXAMPLES OF
SPEAKING OBJECTIONS & COACHING
("misstates" with witness parroting counsel)**

**F-327**

Q.   At the beginning of 2014, had you already decided to enter the United States by forming a new company?

A.   Yes.

Q.   So the general manager you were recruiting, was that general manager going to be working for this new entity?

A.   Yes.

Q.   And at the time did you consider acquiring any existing entity in the same field of technology in which you were operating?

Excuse me.  At the time, beginning 2014, did you consider acquiring any existing entity in the United States that was already operating in the same field of technology as Almawave?

A.   Yes, they take into consideration one company.

Q.   Which one?

MR. WALLERSTEIN:  Objection; vague.

MS. HEALY:  Q.  Which company did you consider acquiring?

MR. WALLERSTEIN:  Objection; vague.  I believe misstates prior testimony, although I can't swear to that.

THE WITNESS:  Can you define "consider acquiring"?

Page 74

MS. HEALY:  Q.  I am just using your terms. 11:46:35
You told me that you considered acquiring some company 11:46:38
in the United States, and I am asking for the name. 11:46:41
What is the name? 11:46:42

MR. WALLERSTEIN:  Objection.  Not true at all. 11:46:42
The witness said something in Italian.  You are saying 11:46:45
something in English.  She did not use those words or I 11:46:48
would have understood them. 11:46:56

MS. HEALY:  Q.  Ms. Sandei, I think it would 11:46:58
be much easier if you tried to answer in English, 11:47:00
because I think it's -- so I am offering again and I am 11:47:04
asking again that you please answer my questions in 11:47:07
English.  And if you don't understand, she will 11:47:08
translate. 11:47:09

MR. WALLERSTEIN:  That's really neither here 11:47:11
nor there, Counsel, whether she understands.  The 11:47:18
question is whether -- how comfortable she is in 11:47:20
expressing her answers.  Her answers are more important 11:47:24
than your questions. 11:47:36

THE WITNESS:  I prefer to express myself in 11:47:38
Italian. 11:47:40

MS. HEALY:  Q.  So you told me that you 11:47:41
considered acquisition of a company.  I am asking for 11:47:45
the name. 11:47:49

MR. WALLERSTEIN:  Objection.  Objection;

**F-329**

misstates prior testimony.                                    11:47:52

        MS. HEALY:  Q.  You can answer.                       11:48:02

        A.   I did not do any activity of acquisition, of    11:48:09
company acquisition in the United States.  I have            11:48:16
received some information about a company that I have         11:48:20
reviewed.                                                     11:48:21

        Q.   The name of the company?                         11:48:25

        A.   SentiMetrix.                                     11:48:27

        Q.   What does this company do?                       11:48:42

        A.   It offers products for analysis of sentiment     11:48:47
to large American public administrations and large           11:48:55
companies.                                                    11:48:59

        Q.   Do they use artificial intelligence in their     11:49:02
products?                                                     11:49:18

        A.   From what I recall reading about that company,   11:49:20
yes, the field of artificial intelligence is very large.     11:49:27

        Q.   Can you tell me specifically what was your       11:49:29
understanding of the type of technology that SentiMetrix     11:49:33
offered?                                                      11:50:00

        A.   From what I remember and I know, SentiMetrix     11:50:05
still offers, because it's a company that is still in         11:50:08
full activity, as I said before, products for the            11:50:12
analysis of sentiment.                                        11:50:14

        Q.   So analytics solutions to address big data       11:50:18
needs of commercial companies?

A.    To address --                                    11:50:25

THE INTERPRETER:  Can you repeat?                      11:50:28

MS. HEALY:  Q.  Big data needs of commercial           11:50:30
companies.                                             11:50:33

MR. WALLERSTEIN:  Objection; vague.                    11:50:35

Go ahead.                                              11:50:38

THE WITNESS:  And also software.  We could             11:50:50
find any kind of definition, the most ample that you can    11:50:53
find.                                                  11:50:55

MS. HEALY:  Q.  I am asking for your                    11:50:55
understanding of what exactly they do at the time you       11:50:59
were considering them.                                  11:51:00

MR. WALLERSTEIN:  Objection; misstates prior            11:51:01
testimony.                                              11:51:04

It's improper, Counsel, for you to suggest              11:51:06
that the witness said something she didn't say.  It's       11:51:09
essentially, "Have you stopped beating your wife?"  It's    11:51:13
absolutely improper.  It misstates the testimony.           11:51:15

MS. HEALY:  Q.  Can you please tell me again            11:51:16
what was the reason why you considered this company?        11:51:20

MR. WALLERSTEIN:  Objection; misstates prior            11:51:23
testimony.                                              11:51:35

THE WITNESS:  I didn't really consider it,             11:51:36
because then I didn't pursue any other activities to        11:51:39
then acquire this company.

VALERIA SANDEI - 1/22/2016

Page 77

MS. HEALY:  Q.  So what were you doing with the information you received?

A.  I have read them.  I examined them.

Q.  Who provided that information about SentiMetrix to you?

A.  It was an Italian advisor, but I do not remember the name of this advisor.

Q.  What did he tell you?

A.  There was -- he told me that there was a company that might be interested in having someone who could become a shareholder.  And he sent me some information on their earnings, some information on the company.

Q.  Did he discuss financials with you about, you know, what, for instance, would be -- the cost of making an investment or acquiring SentiMetrix would be?

A.  As far as I remember, we didn't get to that point.

Q.  Did you get back to him with any information about -- to further the discussion about SentiMetrix?

MR. WALLERSTEIN:  Objection; vague and misstates prior testimony, to the extent you are using the word "discussion," which I have not heard.

THE WITNESS:  Can you reformulate the question?

Q.   In the period of time between January 2014 through, let's say, April 2014, did you reach out to anyone in the United States to seek legal advice or any other type of advice about entering the United States or acquiring an entity in the United States?

MR. WALLERSTEIN:  Objection; compound.

MS. HEALY:  Yes.

THE WITNESS:  Should I answer the second part of the question?

Can you ask me one question, please, Ms. Healy?

MS. HEALY:  Q.  Between January 2014 and April 2014, did you seek legal counsel anywhere in the United States regarding the possibility of acquiring a company in the United States?

A.   I did not enter into any contract to ask anything from anybody about acquiring a company in the United States.

Q.   Aside from entering into a contract, did you call anyone in the United States or come meet with anyone in the United States to discuss any idea to acquire a company in the United States?

A.   Someone --

Q.   Anyone?

MR. WALLERSTEIN:  I am sorry.  I don't know

what the witness asked.                                    12:01:03

THE WITNESS:  I am having a hard time            12:01:05

following the thread and understanding the one question.  12:01:12

Can you pose -- ask me one question I can understand?  I  12:01:14

am having difficulty even following the thread of the     12:01:19

translation.                                              12:01:20

MS. HEALY:  Q.  Did you speak to anyone in the   12:01:23

United States about acquiring a company in the United     12:01:25

States between January 2014 and April 2014?               12:01:33

A.   I do not remember.                           12:01:34

Q.   Did you speak to anyone in the United States  12:01:38

about acquiring -- or your idea of potentially acquiring  12:01:43

SentiMetrix?                                              12:01:45

MR. WALLERSTEIN:  Objection; misstates prior     12:01:47

testimony.  There was no testimony -- that is a complete  12:01:50

misstatement of the testimony, and it's misleading and    12:01:53

abusive.                                                 12:02:04

THE WITNESS:  I never mentioned SentiMetrix to   12:02:07

anyone in the United States.                             12:02:09

MS. HEALY:  Q.  Okay.  After April 2014, did     12:02:13

you discuss with anyone the possibility of acquiring a    12:02:19

company in the United States?                            12:02:33

MR. WALLERSTEIN:  Excluding lawyers.  My         12:02:35

instruction is to exclude lawyers from that question.     12:02:40

THE WITNESS:  No.

MS. HEALY:  Q.  Did you speak to lawyers about acquiring a company in the United States?

MR. WALLERSTEIN:  Objection; calls for privilege.  Don't answer that.

MS. HEALY:  Q.  Are you refusing to answer my question?

A.  (In English)  Yes.

(Through interpreter)  Yes.

Q.  Whether you spoke to a lawyer about acquiring a company in the United States is not privileged.  I am not asking for the content.

MR. WALLERSTEIN:  No, no, no.

MS. HEALY:  Please let me finish my question.

MR. WALLERSTEIN:  It's not a question.

MS. HEALY:  I am putting it on the record, and if you want to object, you can.

Q.  I am not asking you about the content of your communications with a lawyer.  I am asking you whether you sought legal advice from anyone in the United States in 2014 about acquiring any company in the United States.

MR. WALLERSTEIN:  Objection.  Objection.  If the question ended "in the United States in 2014," it would be fine.  But it goes on to say, "about acquiring any company," et cetera.  In other words, it reveals --

**F-335**

MS. HEALY:  Q.  Did you understand at the time when you were discussing with Mr. Di Napoli that Palantir had developed artificial intelligence technology for the analysis of big data as well?

MR. WALLERSTEIN:  Objection to that it misstates prior testimony.  The use of the word "as well" is misleading and abusive.  As well as what, Counsel?

MS. HEALY:  Q.  You can answer.

A.  If I can repeat the question.

THE INTERPRETER:  I can repeat it.

THE WITNESS:  No, we didn't focus on this terminology.  I think maybe if you work in this field -- and this is a very large definition -- then maybe yes.  But we didn't focus on this kind of terminology.

MR. WALLERSTEIN:  We are going to have to take our lunch break.  If you have another question I will allow it, but we are taking our lunch break.

MS. HEALY:  Q.  Did Mr. Di Napoli tell you that he had -- he was employed by Palantir?

A.  No.

Q.  How did you understand Mr. Di Napoli was assisting Palantir in its business development activities that you described?

MR. WALLERSTEIN:  Objection; misstates prior

testimony.  You are using the present tense, "assisting," as opposed to the past tense, "assisted."

MS. HEALY:  Please stop --

MR. WALLERSTEIN:  No.

MS. HEALY:  -- making speaking objections.

MR. WALLERSTEIN:  Counsel --

MS. HEALY:  Counsel, the Court was very clear that you are allowed to state a form objection.  You are not allowed to make these statements that you have been making all morning.

MR. WALLERSTEIN:  Are you done?

MS. HEALY:  I am not done, and I want to continue my deposition of the witness so that she can finish and leave.

MR. WALLERSTEIN:  Are you done?  I'm not going to interrupt you, Counsel.  Do not interrupt me.

What was misleading was you using the word "assisting" in the present tense.  You are trying to put words in the client's mouth.  It's inappropriate.

MS. HEALY:  And you can fix it after the deposition is over if you believe, as you claim, that I'm misleading.  I am asking a question of Ms. Sandei.

Q.   Did you discuss with -- what was your understanding of how Mr. Di Napoli was providing his business development services to Palantir?

A.   As a third party.                                    13:42:55

Q.   With any company or --                               13:42:57

MR. LOSAVIO:  Well, for the record, it's 1:45.            13:42:59
I am not sure that any restaurants are open serving       13:43:03
lunch at this late hour, but if they are, I would like    13:43:06
to see one before the sun sets.                           13:43:09

MS. HEALY:  Q.  Did you understand that he was            13:43:10
working with another company providing services for       13:43:13
Palantir?                                                 13:43:17

MR. WALLERSTEIN:  When?  Objection.  Vague as             13:43:19
to time, on two levels.  Objection, vague as to time --   13:43:22
objection, vague as to time --                            13:43:26

MS. HEALY:  Please answer.                                13:43:27

MR. WALLERSTEIN:  Stop interrupting me,                   13:43:28
Counsel.  I am not going to tolerate it.                  13:43:30

MS. HEALY:  Q.  Please answer, Ms. Sandei.                13:43:31

MR. WALLERSTEIN:  The objection is it's vague             13:43:33
as to time on two levels, when did she have the           13:43:37
understanding, and when he was working.                   13:43:40

MS. HEALY:  Q.  Please answer.                            13:43:41

A.   Can you repeat the question that I need to           13:43:43
answer?                                                   13:43:43

Q.   Did you understand that Mr. Di Napoli was            13:43:46
providing these business development services to          13:43:48
Palantir as part of a company?

MR. WALLERSTEIN:  Objection; vague as to time, twice.

MS. HEALY:  Please stop it.  I am going to call the Court.  I really have been very patient this week.  You have done everything to disrupt this deposition.  I think it's disrespectful to your own client.  She is not, obviously, used to litigation. Please try to be respectful.  I am asking questions very politely.  Don't be like that.  She is not used to it. So please keep your voice down.  Let me ask the question.

MR. WALLERSTEIN:  I am entitled to make objections, Counsel, and I'm going to --

MS. HEALY:  You are yelling at your own client.

MR. WALLERSTEIN:  You are interrupting me, Counsel.  I am entitled to make objections --

MS. HEALY:  Please stop it.

MR. WALLERSTEIN:  You are interrupting me, Counsel.  I am entitled to make objections.  Do not --

MS. HEALY:  Please --

MR. WALLERSTEIN:  Counsel, you are interrupting me.

I am entitled to make objections, and I am going to continue to do so when the questions are

13:43:51
13:43:52
13:43:54
13:43:56
13:44:00
13:44:02
13:44:07
13:44:10
13:44:12
13:44:16
13:44:16
13:44:18
13:44:18
13:44:19
13:44:19
13:44:19
13:44:22
13:44:22
13:44:23
13:44:27
13:44:27
13:44:28
13:44:29
13:44:31

**F-339**

objectionable.                                                      13:44:34

MS. HEALY:  Q.  Ms. Sandei, did you understand          13:44:35
that Mr. Di Napoli was providing services to Palantir              13:44:39
with any company?                                                  13:44:40

MR. WALLERSTEIN:  Objection; vague as to time,           13:44:42
on two levels.                                                     13:45:01

THE WITNESS:  Which other company?                      13:45:02

MS. HEALY:  Q.  I am asking you if you                  13:45:04
understood there was another company.                             13:45:17

A.  I can't answer this question.                       13:45:20

Q.  And did you do anything to verify Mr. Di            13:45:23
Napoli's work at Palantir?                                         13:45:43

A.  I did not verify -- I did not verify, and it        13:45:48
wasn't, to me -- he -- I didn't -- he didn't tell me              13:45:53
that he was an employee.                                          13:45:55

MR. WALLERSTEIN:  We are taking our break.              13:45:56

MS. HEALY:  Q.  I didn't ask as an employee.            13:45:58
I asked whether --                                                13:45:58

MR. WALLERSTEIN:  We are taking our break.              13:46:00

MS. HEALY:  Please don't --                             13:46:01

MR. WALLERSTEIN:  We are taking a break,                13:46:02
Counsel.  We are taking a lunch break.                            13:46:03

MS. HEALY:  Please let me ask one last                  13:46:05
question.                                                         13:46:06

MR. WALLERSTEIN:  No.  I did that three

questions ago.                                          13:46:09

                Ms. Sandei.                             13:46:11

                We did that three questions ago, Counsel.   13:46:12

                (Lunch recess taken from 1:46 to 2:46.)     14:46:31

                MS. HEALY:  Q.  Ms. Sandei, we are back from   14:46:32
the break.  Before you left we were discussing          14:46:39
whether -- I wanted to ask you whether you had, as of   14:46:45
March 2014, after you met with Tony Di Napoli, you      14:46:52
checked with anyone about Tony's alleged work for       14:46:58
Palantir.  Did you ask anyone about -- try to confirm   14:47:03
the work he told you he had done for Palantir?          14:47:08

                MR. WALLERSTEIN:  You did indeed ask that   14:47:11
before the break, and so now it's asked and answered.   14:47:14

                MS. HEALY:  Q.  You can answer.         14:47:46

        A.  Yes.                                        14:47:50

        Q.  Who?                                        14:47:58

        A.  I asked Anna Gatti and Jeff Capaccio.      14:48:05

        Q.  What did you ask Anna Gatti?               14:48:18

        A.  What she thought about the work that Tony Di   14:48:21
Napoli did for Palantir.                                14:48:25

        Q.  Why would she know?  Was she involved in the   14:48:28
Palantir project, to your knowledge?                    14:48:47

        A.  Because she knew Tony and she had told me that   14:48:50
he was a good business developer.                       14:48:52

        Q.  I understand.  But did you -- other than

MR. WALLERSTEIN:  Well, that's fine, Counsel, but that's not what you asked her.

MS. HEALY:  Please.

MR. WALLERSTEIN:  Did Ms. Gatti ever tell you that?

THE WITNESS:  I don't know if she told me. Perhaps I just took it for granted.

MS. HEALY:  Q.  Before you told me that the only thing she told you was that her startup was only doing e-commerce.

MR. WALLERSTEIN:  That's not a question. Misstates prior testimony.  Wait for a question.

MS. HEALY:  Please, please.

MR. WALLERSTEIN:  "Please, please" what, Counsel?  Ask questions.  Don't make statements about what she said.

MS. HEALY:  I am going to move for sanctions, because your conduct has been very inappropriate.

MR. WALLERSTEIN:  Okay, Counsel.  Please ask questions.

MS. HEALY:  I know you want to interfere.

MR. WALLERSTEIN:  No.

MS. HEALY:  Please stop it.

MR. WALLERSTEIN:  I want the witness to hear questions that she will answer.  I don't want you to

Page 172

tell her what she said or did not say.                16:30:41

MS. HEALY:  I can --                                  16:30:42

MR. WALLERSTEIN:  We have a                           16:30:42

transcriptionist --                                  16:30:42

MS. HEALY:  -- take my deposition every which        16:30:43

way I want.                                          16:30:44

MR. WALLERSTEIN:  No, you may not.                   16:30:44

MS. HEALY:  Q.  Ms. Sandei, you told me              16:30:44

before --                                            16:30:44

MR. WALLERSTEIN:  You may ask questions, but         16:30:45

you may not tell the witness what she said and did not  16:30:51

say.  That is why you have hired this transcriptionist.  16:30:54

That's her job, Counsel.                             16:30:55

MS. HEALY:  Q.  Ms. Sandei, earlier this             16:30:55

morning you testified that Ms. Gatti told you her    16:30:59

startup was working on e-commerce technology.        16:31:04

MR. WALLERSTEIN:  Don't respond to her               16:31:06

comments.  Don't respond.  We are waiting for a      16:31:06

question.                                            16:31:07

MS. HEALY:  Are you instructing her not to           16:31:08

answer?                                              16:31:08

MR. WALLERSTEIN:  No.  There is no question          16:31:09

pending.                                             16:31:10

MS. HEALY:  Q.  Did you tell me this morning         16:31:11

that Ms. Gatti told you her startup was working on

**F-343**

e-commerce technology?

MR. WALLERSTEIN:  Objection; asked and answered.

MS. HEALY:  Q.  We can't see what you said.

Do you remember saying that?

A.  Yes, I remember that I spoke about e-commerce.

Q.  Did you ever -- when did Ms. Gatti tell you that the startup in which she was the CEO in California was working on developing technology involving artificial intelligence applied to big data?

A.  I wouldn't be able to say when she told me.

Q.  Did there come a time that she did tell you, though?

A.  This precise sentence?

Q.  Yes.

A.  I wouldn't know.

Q.  Before you retained Ms. Gatti, before she signed the employment agreement, did you have any discussions with her as to how she would keep information relating to her startup separate from information she may learn from your company?

MR. WALLERSTEIN:  Objection; vague.

Keep separate how?  In her brain?

THE WITNESS:  No.  No.

MS. HEALY:  Q.  Who were the employees of

Almawave USA after it was formed?    16:33:21

A.    Anna Gatti.    16:33:23

Q.    And was there a board created for Almawave    16:33:27
USA?    16:33:32

A.    Yes.    16:33:34

Q.    Who were the members of the board?    16:33:41

A.    Marco Tripi, Valeria Sandei, Christian De    16:33:48
Felice, Anna Gatti.    16:33:58

Q.    And is Christian De Felice the CFO of AlmavivA    16:34:09
S.p.A.?    16:34:11

No, S.p.A.    16:34:14

THE WITNESS:  Christian De Felice is the CFO    16:34:18
of AlmavivA S.p.A.    16:34:21

MS. HEALY:  Q.  When was the board formed?    16:34:29

A.    Between the end of May and June.  I don't    16:34:35
remember the precise dates.    16:34:37

Q.    2014?    16:34:38

A.    2014.    16:34:38

Q.    When was the first meeting of the board?    16:34:45

MR. WALLERSTEIN:  Objection; vague.    16:34:54

MS. HEALY:  Q.  Was there ever a meeting of    16:34:55
the board?    16:34:56

MR. WALLERSTEIN:  Objection; vague.    16:34:59

THE WITNESS:  To which end?    16:35:00

MS. HEALY:  Q.  Any.

**F-345**

A.   I don't remember if there were meetings or not.

Q.   The company was formed less than two years ago.  Do you recall any board meetings within Almawave USA?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  We adopted the methodology of the written consent to manage all the agreements.

MS. HEALY:  Q.  Okay.  So you don't -- there was never an in-person meeting with the board members?

MR. WALLERSTEIN:  Objection.  Objection; vague.

MS. HEALY:  Q.  To your recollection.

MR. WALLERSTEIN:  That doesn't help.  It's still vague.

MS. HEALY:  Q.  You can answer.

MR. WALLERSTEIN:  I don't know that she can, but she may.

MS. HEALY:  Q.  I am asking whether you recall any in-person board meeting ever occurring with the board members that you just listed for Almawave USA.

A.   With the people that belong to the board?

Q.   Yes, the four that you listed, Mr. De Felice, Mr. Tripi, yourself, and Ms. Gatti.

A.   All physically together?  I do not remember

that.                                                      16:37:17

MR. WALLERSTEIN:  Are you okay, Ms. Sandei?               16:37:20

THE WITNESS:  (In English)  I'm okay.                    16:37:22

MR. WALLERSTEIN:  You appear fatigued to me.             16:37:25

THE WITNESS:  (In English)  No.                          16:37:27

MS. HEALY:  Q.  Ms. Sandei, I believe --                 16:37:29

Go ahead.                                                 16:37:32

THE WITNESS:  Can I ask for a brief break?               16:37:34

MR. WALLERSTEIN:  Yes.  Ask me any time,                 16:37:35
please.                                                   16:37:37

(Recess taken from 4:37 to 4:44.)                        16:44:14

MR. WALLERSTEIN:  Ms. Sandei will not stay               16:44:17
past 6:00 p.m. today, which I think will be over the     16:44:22
seven hours in any event, but she is not staying past    16:44:25
6:00.                                                     16:44:28

MS. HEALY:  Q.  Ms. Sandei, did you agree to             16:44:30
pay IQSystem Inc. approximately $70,000 a month for      16:44:47
their services in connection with the Almawave USA/Gatti 16:44:52
project?                                                  16:45:08

A.   The attorney said --                                16:45:27

There was a correction to what the attorney              16:45:30
said, which is Almawave slash -- which is Almawave USA    16:45:36
slash --                                                  16:45:38

THE INTERPRETER:  There was a slash missing in           16:45:40
your statement, in the transcript.  I am reading from

that the question?    12:00:44

Q.   When you wrote -- when you communicated with    12:00:46
Mr. Mitolo by email, what was your understanding of    12:00:49
where he was working from?    12:00:53

A.   I thought he was working at Bank of the West.    12:01:08

Q.   Which branch?  Where?  In which city?    12:01:12

A.   I just assume in San Francisco.    12:01:19

Q.   So you asked him to open the bank account in    12:01:28
San Francisco?    12:01:33

MR. WALLERSTEIN:  Objection; misstates prior    12:01:40
testimony.  But you can answer it, if it's a question.    12:01:42

THE WITNESS:  I didn't understand the    12:01:57
question.  Whom did I ask or...    12:01:58

MS. WONG:  Q.  Let me rephrase that question,    12:02:03
then.  What did you ask Mr. Mitolo to do?    12:02:04

A.   We wanted to open an account at Bank of the    12:02:26
West for AlmavivA USA.    12:02:27

Q.   And what did Mr. Mitolo -- how did Mr. Mitolo    12:02:31
respond?    12:02:36

A.   I do not -- I don't recall if there is a reply    12:02:52
email by Mr. Mitolo.    12:03:03

Q.   Were you overseeing the opening of the account    12:03:08
at Bank of the West?    12:03:14

A.   I did not say really that I was managing the    12:03:39
opening of the account, but I said that I only sent an    12:03:42

Anna Gatti about creating an account for Almawave USA?
Was there any procedure or measure that you took to
ensure that the accounts that she was creating would be
kept separate from the other businesses that Ms. Gatti
was involved in?

    A.    No.  All I sent is an email to Vincenzo Mitolo
saying that we intended to open a checking account for
the newly constituted company Almawave USA at Bank of
the West.

    Q.    When you emailed Ms. Gatti about opening this
bank account, was she already the CEO of Almawave USA?

    A.    I think so.

    Q.    Have you seen the agreement that she signed
with Almawave?

    A.    When?  When would I have seen this contract?

    Q.    Before emailing, for example, emailing her
about opening this account for Almawave USA.

    A.    No.

    Q.    What did you do to confirm that she was
already the CEO of Almawave USA before contacting her
with banking information?

        MR. WALLERSTEIN:  Objection.  Assumes facts
not in evidence.  Potentially misstates the prior
testimony, if that's the implication, but otherwise
assumes facts not in evidence.

MS. WONG:  Q.  You can still answer.    13:09:46

A.    Can you rephrase or repose the question?    13:09:49

Q.    When you contacted Ms. Gatti about opening an    13:09:53
account with Almawave USA, did you -- what did you do to    13:09:58
confirm that she was already employed as the CEO before    13:10:02
you provided banking information to her?    13:10:10

A.    I wrote to Bank of the West saying that we    13:10:45
wanted to open an account.  I didn't write to Anna    13:10:47
Gatti.    13:10:51

Q.    She was cc'd in the email; correct?    13:10:51

A.    Yes.    13:10:55

Q.    Why did she -- why did you cc her in the    13:10:56
email?    13:10:59

A.    In her capacity of the CEO of Almawave USA.    13:11:08

Q.    Did you do anything to confirm that she was    13:11:12
the CEO of Almawave USA before you emailed her?    13:11:15

A.    It's not part of my role or responsibilities.    13:11:28

Q.    Did -- did Ms. Sandei tell you to email her?    13:11:34

A.    Which email?    13:11:53

Q.    The email -- the only email we have been    13:11:54
talking about.    13:11:55

A.    Regarding the opening of --    13:12:00

Q.    Yes.    13:12:02

A.    -- the bank account, the checking account?    13:12:02

Q.    Yes.    13:12:06

F-350

to the payment.

MR. WALLERSTEIN:  Objection; lacks foundation.

THE WITNESS:  When a payment is set up, we set up the amount, and then the beneficiary too.

MS. HEALY:  Q.  Okay.  As head of the treasury, do you know if AlmavivA performs any risk analysis to identify suspicious payments?

A.  What do you mean by suspicious payments?

Q.  To verify -- to ensure that there is no payment that's for an illicit purpose or a mistaken payment.

A.  So AlmavivA is not really an investigative company, but it's a company that makes payments to suppliers.

Q.  Okay.  So if a payment is authorized by someone in the company, it gets done, regardless of the purpose?

MR. WALLERSTEIN:  Objection; misstates prior testimony, argumentative, lacks foundation.

MS. HEALY:  I am asking the question.

MR. WALLERSTEIN:  No, no.  No, no.  The objection goes on the record, Counsel, before you speak, and it gets translated into Italian for the benefit of the witness.

MS. HEALY:  Q.  You can answer.

A.    Can you repeat the question, please?    15:46:10

(Record read as follows:    15:46:26

"Q.    So if a payment is authorized by    15:46:26

someone in the company, it gets done,    15:46:26

regardless of the purpose?")    15:46:26

MR. WALLERSTEIN:    Same objections.    15:46:30

THE WITNESS:    As far as I know, the payments    15:46:54
that are made within the company are only for contracts    15:46:56
or invoices or paying employees.    15:47:00

MS. HEALY:    Q.    Okay.    As head of the    15:47:08
treasury, do you know if AlmavivA has any procedures to    15:47:09
protect the company from being entangled with payments    15:47:12
of money for corrupt services, such as money laundering?    15:47:19

A.    There are procedures within the company that    15:47:52
are according to law 231.    15:47:54

Q.    Which law is that?    15:47:59

A.    So there are -- I am not familiar entirely    15:48:29
with what the law says, 231, but there is somebody    15:48:31
inside the company that is in charge of making sure that    15:48:36
we are conforming to this law 231.    15:48:41

Q.    Can you tell me your understanding of what law    15:48:46
231 covers?    Not the global, just...    15:48:49

A.    I don't remember.    15:48:58

Q.    Is it corrupt payments, or what is it?    What    15:48:59
is law 231?    I don't know.    15:49:02

with Christian"?                                          16:53:10

        MR. WALLERSTEIN:  Objection.                      16:53:15

        MS. HEALY:  Q.  Is that Christian De Felice?      16:53:16

        MR. WALLERSTEIN:  Objection; misstates --         16:53:20

objection; misstates testimony.  The witness did not say  16:53:20

that she agreed.  You said that, Counsel.                 16:53:23

        MS. HEALY:  Right.  I said that in this email     16:53:25

that's what she said.                                     16:53:27

        MR. WALLERSTEIN:  What email?                     16:53:27

        MS. HEALY:  In this email that I am reading       16:53:28

from.                                                     16:53:29

        MR. WALLERSTEIN:  That is improper and            16:53:30

unacceptable.  I won't allow her to answer the question   16:53:31

if you are reading from an Italian document where I do    16:53:35

not have a certified translation.                         16:53:38

        If you want to ask a question without             16:53:45

referring to an Italian language document, that's fine.   16:53:47

        MS. HEALY:  Q.  You can answer the question.      16:53:50

You can answer.                                           16:53:58

    A.  Can I see the document?                           16:54:03

    Q.  Yes.  Sure.                                       16:54:05

        And this has been marked as Exhibit Number 10.    16:54:06

        MR. WALLERSTEIN:  I am sorry.  I am sorry.  I      16:54:09

do not have a certified translation of this, so I am not  16:54:12

going to allow you to look at it.                         16:54:15

documents.

MR. WALLERSTEIN:  Objection; misstates prior testimony, harassing, attempting to mislead the witness.

MS. HEALY:  Q.  Before I asked you what -- before I asked you what did you do to verify your declaration, and you told me you spoke to colleagues. And I asked you if you checked any documents, and you said no.

MR. WALLERSTEIN:  She also said she checked the FAC.  You recall we chuckled, Counsel?

MS. HEALY:  Please don't interfere with her testimony.

Don't translate when he interferes like this, because that's not appropriate.

MR. WALLERSTEIN:  No, no, no, no.  She translates every word, Counsel, every word.

MS. HEALY:  Do you want to suggest all her testimony?  Why don't I depose you?

Q.  Did you check the first amended complaint before signing?

A.  Yes.

Q.  In what language did you read it?

MR. WALLERSTEIN:  Objection; asked and answered.  You can answer again.

THE WITNESS:  I received this document in

**F-354**

Q. What types of agreements do you remember sending Tony Di Napoli in March of 2014?

MR. WALLERSTEIN: Objection; misstates prior testimony. The witness was asked if she was copied, and she said yes. And now she is being asked what agreements she sent. Lacks foundation.

MS. HEALY: No, that changed my question. I am asking whether she was copied in March in correspondence to Tony Di Napoli.

MR. WALLERSTEIN: Asked and answered.

MS. HEALY: Q. Sending an agreement to Tony Di Napoli for IQSystem's signature.

MR. WALLERSTEIN: Answer that again, please.

THE WITNESS: That I was copied in the communications in the correspondence in March of 2014.

MS. HEALY: Q. I am going to show you what's being marked as Loop Exhibit Number 7.

(Deposition Exhibit 7 was marked for identification.)

MS. HEALY: Q. Do you recognize this document? Do you recognize it?

A. Should I read this document?

Q. Yeah, you can read it. Take your time to read it.

A. It is an NDA.

**F-355**

MR. WALLERSTEIN:  Objection.  Implicitly misstates the testimony.  She never said she receives the bills from Venable.  I don't know if she does or not.

MS. HEALY:  Q.  Are you going to answer?

A.  I will reply.  I will answer.  Excuse me.

As to the payment of fees, it is necessary to have the authorization of the people -- excuse me.  It is necessary to have the authorization of the people who are the heads of the company.  And in this case I already named Valeria Sandei and Marco Tripi.

Q.  And my question to you was, you testified that you received the legal bills from Venable.  Did I understand that correctly?

MR. WALLERSTEIN:  Did you testify -- did you testify that you received the legal bills from Venable?

MS. HEALY:  Yes, she did.

MR. WALLERSTEIN:  I am not asking you, Counsel.

THE WITNESS:  I said that I have received the bills from the Venable law firm, the law firm of Venable.

MS. HEALY:  Q.  Regarding this case?

A.  Of course.

Q.  And my question to you is, when you receive

Q.    Just think about it, because part of answering truthfully means also that you have to answer precisely. So I don't want you to -- you know, if you don't remember, that's fine.  But I don't want you to state something that may be incorrect.

So are you sure that you moved to 24 Clarendon in January 2015?

MR. LOSAVIO:  Well, it slightly misstates. She didn't say January.  She said 2015.

MS. HEALY:  Q.  Okay.  When did you move to 24 Clarendon?

A.    January 2015.

Q.    Where were you living before?

A.    226 26th Avenue.

Q.    And is that in San Francisco?

A.    It is.

Q.    Is that an apartment?

A.    Apartment B.

Q.    Who owns that place?

A.    Tiziana Figliolvia.

Q.    Who is she?

A.    Is an old friend of mine.

Q.    Is she Italian?

A.    By birth, yes.

Q.    How long have you lived at that address, 226

A.   The meeting was facilitated by a headhunter.

Q.   So you said this was approximately January 20th?

MR. LOSAVIO:  No.  Misstates the testimony.

MS. HEALY:  Sorry.

MR. LOSAVIO:  She said first quarter of 2014, sometime after January 20th and before the end of March.

MS. HEALY:  Q.  You don't recall an exact date, though, when this meeting happened?

Did you have interactions with Ms. Sandei before you went to see her in Rome?

A.   Yes, I did.

Q.   Can you tell me when?

A.   I don't remember the exact date.  The best of my recollection, it can be something between one or two months before the meeting.

Q.   And how -- how did you first get in touch with her?

A.   It was a phone call.

Q.   She called you?

A.   I think so.

Q.   Were you in San Francisco?

A.   Yes.

Q.   She called you on your phone, your cell phone?

A.   Yes.

Q.    Were you in Italy when you were having those discussions?

A.    I really don't remember.  It's a long time ago, and at that time it didn't look like something I had to remember.

Q.    When you were having those discussions you said you told Ms. Sandei that you were the CEO of a company that was developing an artificial intelligence for e-commerce solution?

MR. WALLERSTEIN:  Objection to the extent it misstates prior testimony.  I don't know if that's a question or a statement.

MS. HEALY:  Q.  Did you ever tell Ms. Sandei that -- did you ever use the phrase that Soshoma was developing artificial intelligence applied to big data?

A.    Maybe.  Big data is everything.  Big data is a buzzword, so maybe.

Q.    You don't recall if you told her?

A.    I don't have a specific recollection.  It seems probable.

Q.    You don't recall discussing with Ms. Sandei Soshoma's product and technology development in artificial intelligence applied to big data?

A.    I really don't remember having done that.

Q.    Was there ever a biography published of you on

A.   No.

Q.   -- things today?  Okay.  That's all I need to know.

So going back to what we were discussing before you broke for lunch, we were talking about your interactions with Ms. Sandei.  So I believe -- I am going to repeat what I believe you said, and if I say anything incorrectly feel free to restate.  I am not here trying to change the record or anything.

So I believe you indicated that -- I asked you whether you had had any discussions with Ms. Sandei about Soshoma and your work at Soshoma.  And I believe your answer was to the effect that you discussed it a few times, your evolving role and involvement with Soshoma, mainly with respect to the time allocation, because the perception expressed by Ms. Sandei was that you were spending more time working for Soshoma than for Almawave.

MR. WALLERSTEIN:  Objection to the extent it misstates the prior testimony.

MS. HEALY:  Q.  Go ahead.

A.   Yeah, I didn't really say more time for Soshoma than Almawave.  I was spending progressively more time on Soshoma.  But basically I was -- when she was calling me I was busy with Soshoma and this kind of

find office space near Soshoma?

A.   I don't remember the way and form that was discussed, but there was the theme, the issue that the Soshoma office was at that time --

Q.   No, I am asking -- I don't mean to interrupt you, but I -- because I have limited time.

A.   Sorry.

Q.   My question was different.  Did you ever suggest to anyone that Almawave find office space near Soshoma?

A.   It's possible, but I don't remember.

Q.   You don't remember having this discussion with Valeria Sandei or anyone else?

A.   I really don't remember.

Q.   Okay.  So you told me a little bit earlier about Ms. Sandei being concerned or expressing concern to you about how much time you were dedicating to Almawave USA?

MR. WALLERSTEIN:  Objection to the extent it misstates prior testimony.  If that's a question, then go ahead.

MS. HEALY:  Q.  If I misstate anything, feel free to correct me.

A.   There was a time where she had a time to reach me over the phone, and, you know, I was not very

Q.   Okay.  Do you understand he represents Almawave S.r.l.?

A.   Yes.

Q.   And AlmavivA S.p.A.?

A.   Yes.

Q.   And Almawave USA?

A.   Yes.

Q.   Okay.  So Mr. Wallerstein just said that during the first Q he objects to you answering any questions regarding Mr. Capaccio because at some point you became an agent of one or more of his clients.

Can you tell me for which -- who you were an agent for?

MR. WALLERSTEIN:  Objection.  Misstates my objection.  I never said that happened during the first Q.  I said at some point.

MS. HEALY:  Q.  Okay.  Can you tell me at what point you became an agent of AlmavivA S.p.A.?

MR. LOSAVIO:  Object to the form; calls for a legal conclusion.

MS. HEALY:  Q.  Mr. Wallerstein said you became an agent of one or more of his clients.  I am asking you to identify specifically, so that we can put some time frames, when did you become an agent of AlmavivA S.p.A.?

# EXHIBIT F

**EXAMPLES OF
SPEAKING OBJECTIONS & COACHING
(counsel testifying)**

**F-363**

documents.                                                    18:09:22

        MR. WALLERSTEIN:  Objection; misstates prior          18:09:24
testimony, harassing, attempting to mislead the witness.      18:09:29
        MS. HEALY:  Q.  Before I asked you what --            18:09:33
before I asked you what did you do to verify your             18:09:44
declaration, and you told me you spoke to colleagues.         18:09:47
And I asked you if you checked any documents, and you         18:09:49
said no.                                                      18:09:53
        MR. WALLERSTEIN:  She also said she checked           18:10:06
the FAC.  You recall we chuckled, Counsel?                    18:10:08
        MS. HEALY:  Please don't interfere with her          18:10:15
testimony.                                                    18:10:16
        Don't translate when he interferes like this,        18:10:18
because that's not appropriate.                               18:10:20
        MR. WALLERSTEIN:  No, no, no, no.  She                18:10:20
translates every word, Counsel, every word.                   18:10:21
        MS. HEALY:  Do you want to suggest all her           18:10:24
testimony?  Why don't I depose you?                          18:10:27
    Q.  Did you check the first amended complaint            18:10:37
before signing?                                               18:10:39
    A.  Yes.                                                  18:10:48
    Q.  In what language did you read it?                     18:10:50
        MR. WALLERSTEIN:  Objection; asked and               18:10:52
answered.  You can answer again.                             18:10:53
        THE WITNESS:  I received this document in            18:11:08

A.   I don't remember.   18:15:01

Q.   Is there any reason why -- are those your   18:15:02
words in the declaration?   18:15:05

MR. WALLERSTEIN:  Objection; vague.  The   18:15:10
document speaks for itself.  It's signed.  They are her   18:15:11
words because it is signed.   18:15:14

MS. HEALY:  Please stop making speaking   18:15:16
objections.  The Court said you are not allowed to do   18:15:18
that.   18:15:21

MR. WALLERSTEIN:  I don't know what -- I need   18:15:41
to hear what she is saying, because I object on grounds   18:15:43
of privilege, but I am not certain.   18:15:47

THE INTERPRETER:  So I am waiting for a   18:15:54
sentence to end before I start.   18:15:55

MR. WALLERSTEIN:  Okay.   18:15:59

THE WITNESS:  When I received the document I   18:16:20
spoke to my colleague, Sergio Calderara.  I described   18:16:22
what my position was.  And later --   18:16:29

MR. WALLERSTEIN:  Please don't discuss   18:16:31
anything that you said, described, implied, or   18:16:32
otherwise, to Mr. Calderara, Ms. Perri, or Venable, or   18:16:35
anything that they said, described, or implied to you,   18:16:42
please.   18:16:45

And I object on grounds of privilege and move   18:16:57
to strike the answer.   18:17:00

Q.   Are you aware --                          18:46:04

A.   -- in this question?                      18:46:05

Q.   I am asking whether you are aware of any  18:46:07
letter or any request having been made on behalf of Anna  18:46:09
Gatti or IQSystem Inc. or IQSystem LLC for payment of  18:46:15
legal costs or fees in this litigation.        18:46:22

A.   I haven't received anything.             18:46:44

Q.   Are you aware of whether any representative of  18:46:47
AlmavivA or any AlmavivA entities has received such a  18:46:50
request from Anna Gatti or IQSystem Inc. or IQSystem  18:46:54
LLC?                                           18:46:58

A.   I don't know.                            18:47:13

Q.   So you have not made a claim specific to Anna  18:47:14
Gatti or IQSystem Inc. to the Lloyd's insurance company?  18:47:17

MR. WALLERSTEIN:  Objection; calls for a legal  18:47:38
conclusion, vague and ambiguous.               18:47:40

MS. HEALY:  I object to the objection because  18:47:42
I did not ask for a legal conclusion.  I asked whether  18:47:43
she has made a specific request to Lloyd's regarding  18:47:46
Anna Gatti.                                    18:47:50

MR. WALLERSTEIN:  I am sorry, Counsel.  I  18:48:00
don't know what it means to object to an objection.  18:48:01

MS. HEALY:  Q.  You can answer.               18:48:04

MR. WALLERSTEIN:  Oh, well, in that case no.  18:48:05
I repeat the objection.                        18:48:06

**F-366**

MS. HEALY:  Q.  Please answer, Ms. Nicolella.

MR. WALLERSTEIN:  Don't interrupt me, Counsel.

I repeat the objections.  Calls for a legal conclusion.  Vague and ambiguous.

MS. HEALY:  Q.  Did you make a specific request to Lloyd's for payment specifically to Anna -- relating to Anna Gatti -- to the claims against Anna Gatti in this case?

MR. WALLERSTEIN:  Objection; calls for a legal conclusion, vague, and ambiguous.

MS. HEALY:  Q.  Please answer.

A.  So I repeat what I did is send a communication to open a claim to Lloyd's through MAG JLT for AlmavivA S.p.A., Almawave S.r.l., and Almawave USA.

Q.  As the person responsible for insurance coverage, in your estimation does your request include Anna Gatti?

MR. WALLERSTEIN:  Objection; calls for a legal conclusion.  The question is also vague and ambiguous.

MS. HEALY:  Q.  Please answer.

A.  Can you formulate the question in a more specific way?

Q.  No.  I am asking very specifically whether you believe your request to Lloyd's includes coverage for Anna Gatti for the claims brought against her in this

18:48:09
18:48:11
18:48:12
18:48:15
18:48:24
18:48:25
18:48:31
18:48:34
18:48:50
18:48:52
18:49:03
18:49:21
18:49:25
18:49:33
18:49:36
18:49:39
18:49:44
18:49:54
18:49:56
18:50:12
18:50:21
18:50:23
18:50:24
18:50:27
18:50:31

**F-367**

case.                                                      18:50:35

MR. WALLERSTEIN:  Objection; calls for a legal              18:50:54
conclusion, vague and ambiguous, harassing.                18:50:56

The witness asked for clarification of the                 18:51:00
question, and counsel is refusing to provide it.           18:51:02

MS. HEALY:  I am not refusing to provide                    18:51:05
clarification.                                             18:51:06

Q.   I asked the question numerous times whether --        18:51:07

MR. WALLERSTEIN:  True.  Thank you for the                  18:51:10
admission.                                                 18:51:11

MS. HEALY:  Q.  -- in her capacity as head of               18:51:12
insurance coverage or the explanation you gave us          18:51:15
before, that you were responsible for obtaining            18:51:18
insurance coverage, you believe your claim to Lloyd's      18:51:20
for this case covers Anna Gatti.                           18:51:24

MR. WALLERSTEIN:  Objection.  Calls for a                   18:51:43
legal conclusion, vague and ambiguous, harassing.          18:51:44

The witness asked for clarification of the                 18:51:48
question, and counsel is refusing to provide it,           18:51:50
actually admitted that she has asked the question          18:51:52
numerous times.  And the witness has requested             18:51:56
clarification, so I repeat my objections.                  18:51:59

MS. HEALY:  Q.  Please answer.                              18:52:07

A.   I asked you to explain the question, and you          18:52:20
are repeating the same question, so I am not able to       18:52:22

answer the question.    18:52:25

Q.   Are you providing coverage -- insurance    18:52:27
coverage in this case to Anna Gatti?    18:52:31

MR. WALLERSTEIN:  Objection; vague and    18:52:43
ambiguous on several levels.    18:52:44

THE WITNESS:  I repeat that I filed the claim    18:53:04
through MAG JLT Lloyd's for AlmavivA S.p.A., Almawave    18:53:08
USA, and Almawave S.r.l.    18:53:14

MS. HEALY:  Q.  Did you have any    18:53:18
communications with Lloyd's or the broker after this    18:53:19
action was filed regarding Anna Gatti or IQSystem Inc.    18:53:23
or IQSystem LLC?    18:53:27

MR. WALLERSTEIN:  Objection; vague and    18:53:44
ambiguous.    18:53:45

THE WITNESS:  I filed a claim for those three    18:53:59
companies, AlmavivA S.p.A., Almawave USA, and Almawave    18:54:02
S.r.l.    18:54:09

MS. HEALY:  Q.  I am asking if you had any    18:54:09
correspondence or telephonic discussion with Lloyd's or    18:54:11
the broker relating to Anna Gatti, IQSystem Inc., or    18:54:15
IQSystem LLC.    18:54:22

MR. WALLERSTEIN:  Objection; vague and    18:54:34
ambiguous.  Do you include the first amended complaint,    18:54:35
Counsel, which refers to those people and entities?    18:54:37

MS. HEALY:  Q.  Please answer the question.    18:54:41

MR. WALLERSTEIN:  I think she already did.

MS. HEALY:  Q.  Please answer the question.

A.  I already answered the question, saying that I opened the claim with those three companies that I listed already.

Q.  I am asking if you had correspondence or telephonic conversations where you discussed specifically the word "Anna Gatti" or "IQSystem Inc." or "IQSystem LLC" with the broker or the insurer.

MR. WALLERSTEIN:  Objection.  Those words are in the complaint, Counsel, and she testified what she did with the complaint.  So I don't know how she can answer the question any better than she has.

MS. HEALY:  Q.  Please answer the question.

A.  In the correspondence that I had with Lloyd's through the broker, MAG JLT, regarding Almawave S.p.A., Almawave USA and S.r.l., I have attached the complaint in which the name Anna Gatti appears.

Q.  Did you discuss with the broker coverage for Anna Gatti by telephone or by email?

A.  No.

Q.  Did you discuss with the broker coverage for IQSystem Inc. by telephone or by email?

A.  No.  The only communication was the one I mentioned more than once.  That was the one when I

18:54:42
18:54:44
18:54:58
18:55:00
18:55:04
18:55:05
18:55:08
18:55:11
18:55:16
18:55:34
18:55:35
18:55:39
18:55:41
18:55:44
18:56:21
18:56:24
18:56:34
18:56:42
18:56:47
18:56:51
18:56:57
18:56:58
18:57:02
18:57:15
18:57:30

Q.   Why did you mention them?                    11:15:17

MR. WALLERSTEIN:  You did, Counsel.              11:15:20

THE WITNESS:  I wouldn't be able to tell you.    11:15:33

MS. HEALY:  Q.  So you didn't do anything in     11:15:35
Colombia, basically?                              11:15:43

A.   Who?                                         11:15:43

Q.   You, as Almawave or AlmavivA.  You tried to 11:15:47
sell Almawave products in Colombia?               11:15:49

MR. WALLERSTEIN:  Objection.  Vague as to         11:15:51
"you."                                            11:15:52

MS. HEALY:  Q.  So let me start again.  We are    11:15:54
trying to talk about the countries where you tried to 11:15:56
bring Almawave products.                          11:16:00

A.   (In Italian)  Si.                            11:16:04

MR. WALLERSTEIN:  Just wait for the question.     11:16:08

THE WITNESS:  (Through interpreter)  Almawave     11:16:11
products.                                         11:16:11

MS. HEALY:  (Speaks in Italian.)                  11:16:15

MR. WALLERSTEIN:  I want you to wait for a        11:16:17
question, Ms. Sandei, not respond to her comments. 11:16:21

MS. HEALY:  I was talking to the interpreter.     11:16:25
Okay.                                             11:16:28

Q.   You mentioned you tried to bring Almawave    11:16:31
products to South Africa, to Brazil, in the USA, and the 11:16:42
other country that was mentioned was Colombia.

Q.   And did you decide to retain him to represent all three entities, AlmavivA S.p.A., Almawave S.r.l., and Almawave USA?

MR. WALLERSTEIN:  Objection.  Questions about what you decided call for your work product, your mental impressions, and therefore they are privileged.  You may answer whether you did ultimately retain Mr. Sternberg to represent all three entities.

THE WITNESS:  I repeat that I contacted the attorney, Peter Sternberg, asking for legal counsel -- for legal advice, sorry -- with regards to the lawsuit that was started by the company here represented by the attorney, Mrs. Healy.

MS. HEALY:  Q.  Is Mr. Sternberg your main contact in respect of this lawsuit?

MR. WALLERSTEIN:  Objection; vague.

But go ahead.

THE WITNESS:  I don't understand -- I don't understand in terms of major contact, or main contact, excuse me.

MS. HEALY:  Q.  Is he copied in every communication you have with his firm?

A.   Not necessarily.

Q.   Did Mr. Sternberg give you legal advice regarding Ms. Gatti's employment agreement with Soshoma,

**F-372**

now called Loop AI?                                        15:01:33

            MR. WALLERSTEIN:  Objection; vague as to time.  15:01:47

There have already been declarations speaking to this      15:01:53

subject prior to when the lawsuit was filed.  The          15:01:59

question is privileged.                                    15:02:08

            MS. HEALY:  Q.  Are you going to answer?        15:02:12

      A.    No.                                             15:02:14

      Q.    Are you the one in charge of discussions        15:02:16

regarding the litigation in which the three entities are   15:02:22

involved, this litigation?                                 15:02:27

            MR. WALLERSTEIN:  Objection; vague as to "in    15:02:42

charge of discussions."                                    15:02:44

            MS. HEALY:  Q.  Are you the one making          15:02:48

decisions regarding what your lawyers, Mr. Sternberg's     15:02:51

firm, will do regarding -- will do regarding anything in   15:02:55

this lawsuit?                                              15:02:59

      A.    The question was very broad, and I'm not sure   15:03:25

exactly what I am asked.  What does it mean, "I am in       15:03:32

charge or the one making decisions"?                       15:03:40

      Q.    If your law firm, Venable, needs to take any    15:03:45

action in this case, do they ask your permission or is     15:03:49

there somebody else within AlmavivA that they speak to?    15:03:59

      A.    The law firm executes the -- so the law firm    15:04:24

executes the actions that we agreed on and -- with the     15:04:35

autonomy that is typical of a professional attorney.       15:04:49

**F-373**

Almawave and IQ or Loop or others of this kind.

Q.   Have you received a request for indemnification or payment of any legal costs by Anna Gatti?

MR. WALLERSTEIN:  If you have a question about privilege, then let's step outside and we will discuss it.

MS. HEALY:  I object, because there's a question pending.

MR. WALLERSTEIN:  The witness has a question about privilege.  We are taking a break.

MS. HEALY:  I am asking about communications --

MR. WALLERSTEIN:  This is why we need to have a court-certified interpreter and our own consultant.

MS. WONG:  (Addressing the interpreter)  He wants you with him.

MR. WALLERSTEIN:  No, I can't do it.  It's the problem.  That's the problem.  That's why we respond to letters.

(Witness and counsel exit at 3:49; return at 3:52.)

MS. HEALY:  Let the record reflect that the witness, Ms. Perri, and her counsel with Venable have returned to the room, and the time is now 3:53.

Q.   No.  I want you to find for me which specific statements in the first amended complaint you claim to be false that you -- as referred in your declaration.

MR. WALLERSTEIN:  Counsel --

MS. HEALY:  Q.  As referred in your declaration, not in general.

MR. WALLERSTEIN:  If we have -- if we have to -- if we have to identify every false statement in this complaint, we don't have enough time today.

MS. HEALY:  I am asking about what she wrote in her declaration.  That's all I am asking.

THE WITNESS:  I declared that all the facts -- all these facts that were deducted against me are false in this document, in this FAC.

And I add -- no, let's leave it.  I limit myself to what has been said against me.

MS. HEALY:  Q.  Okay.  So let's go to paragraph 62, page 18.

A.   Which is the question?

Q.   Okay.  The paragraph referring to you states "Beginning as early as March 2014, if not earlier, AlmavivA's IT top legal officers --"

THE INTERPRETER:  I am -- do you want me to translate the paragraph?

MR. WALLERSTEIN:  Please.

A.   The meeting was facilitated by a headhunter.   09:43:47

Q.   So you said this was approximately January 20th?   09:43:59   09:44:01

MR. LOSAVIO:  No.  Misstates the testimony.   09:44:02

MS. HEALY:  Sorry.   09:44:05

MR. LOSAVIO:  She said first quarter of 2014, sometime after January 20th and before the end of March.   09:44:05   09:44:08

MS. HEALY:  Q.  You don't recall an exact date, though, when this meeting happened?   09:44:13   09:44:13

Did you have interactions with Ms. Sandei before you went to see her in Rome?   09:44:17   09:44:23

A.   Yes, I did.   09:44:24

Q.   Can you tell me when?   09:44:26

A.   I don't remember the exact date.  The best of my recollection, it can be something between one or two months before the meeting.   09:44:33   09:44:44   09:44:51

Q.   And how -- how did you first get in touch with her?   09:44:54   09:44:58

A.   It was a phone call.   09:45:01

Q.   She called you?   09:45:03

A.   I think so.   09:45:13

Q.   Were you in San Francisco?   09:45:14

A.   Yes.   09:45:15

Q.   She called you on your phone, your cell phone?   09:45:17

A.   Yes.   09:45:20

ANNA GATTI - 1/19/2016

Page 39

Q.   Did you ever go see Ms. Sandei in Rome during the first quarter of 2014?    10:07:43  10:07:47

A.   I don't remember exactly when I went to Rome.    10:07:55

Q.   When was the first time that you recall going to Almawave's offices in Rome?    10:08:03  10:08:06

A.   Hmm.  That's a good question.    10:08:13

I don't remember.    10:08:21

Q.   Do you recall ever going to Almawave's offices in Rome?    10:08:22  10:08:25

A.   Yes.    10:08:25

Q.   Where are they?    10:08:26

A.   They are outside Roma.  I don't remember the address, but...    10:08:28  10:08:35

Q.   Is it a big building?    10:08:36

A.   Yes.    10:08:38

Q.   Are there any other companies in the office that you went to for -- we are talking about Almawave S.r.l. --    10:08:38  10:08:40  10:08:44

A.   Yes.    10:08:45

Q.   -- the company that Ms. Sandei works for.    10:08:45

Is that a yes?    10:08:49

A.   What was the question?    10:08:51

Q.   We are talking about Almawave S.r.l.?    10:08:53

A.   Yes.    10:08:56

MR. LOSAVIO:  Well, you are asking her about    10:08:57

**F-377**

it.    10:08:59

THE WITNESS:  Yes.    10:08:59

MS. HEALY:  Q.  I am just saying, because the    10:09:00
court reporter can't capture your facial movement.    10:09:02

A.  Yes, we are talking about Almawave.    10:09:06

Q.  We don't want to upset her.    10:09:11

MR. LOSAVIO:  She distinguished an S.r.l.    10:09:14
Almawave from any other Almawave.  So is that the one    10:09:16
you are talking about?    10:09:19

THE WITNESS:  I never got into the S.r.l.  To    10:09:20
me, Almawave -- it's Almawave, you know.    10:09:25

MS. HEALY:  Q.  One company.  It's -- you    10:09:29
don't get into the mix of --    10:09:31

A.  No, I don't know if it's Almawave S.r.l. or --    10:09:33
I never looked at the books.    10:09:38

Q.  Okay.  Do you know a gentleman named Marco    10:09:40
Tripi?    10:09:46

A.  I met him.    10:09:47

Q.  Who is he?    10:09:48

A.  He is the husband of Valeria.    10:09:49

Q.  The lady in the room?    10:09:57

A.  Yes.    10:09:58

Q.  And what's his role at AlmavivA or Almawave,    10:09:59
if any?    10:10:02

MR. WALLERSTEIN:  Objection; calls for    10:10:07

MR. LOSAVIO:  Object to the form.  It calls for a legal conclusion.  10:25:47 10:25:48

MS. HEALY:  Q.  You can answer.  10:25:50

A.  As far as I know, I never became an agent of AlmavivA S.p.A.  10:25:54 10:25:56

Q.  When did you become an agent of Almawave S.r.l.?  10:25:58 10:26:02

MR. LOSAVIO:  Object to the form; calls for a legal conclusion.  10:26:03 10:26:04

MS. HEALY:  I am just asking what he is saying.  10:26:05 10:26:07

THE WITNESS:  As far as I know, I never became an agent for Almawave S.r.l.  10:26:08 10:26:10

MS. HEALY:  Q.  Okay.  So during the first quarter did you contact Jeff Capaccio to discuss Almawave?  10:26:13 10:26:14 10:26:18

MR. WALLERSTEIN:  Same objection.  10:26:20

MS. HEALY:  What's the objection?  10:26:21

MR. WALLERSTEIN:  I object to the extent that any conversations between Mr. Capaccio and an agent of one or more of my clients is privileged.  10:26:22 10:26:23 10:26:28

MS. HEALY:  And who is the agent?  10:26:30

MR. WALLERSTEIN:  At some point Ms. Gatti became an agent.  10:26:32 10:26:34

MS. HEALY:  Can you please identify the dates?  10:26:35

**F-379**

MR. WALLERSTEIN:  Ms. Healy, do not interrupt me.

At some point Ms. Gatti became an agent of one or more of my clients.  To the extent that an agent of one or more of my clients had a conversation with an attorney, Mr. Capaccio, that conversation is privileged, and I object to the disclosure of it.

MR. LOSAVIO:  And I am reiterating my previous objection that there is a personal relationship between an attorney and a client for which the person is entitled to invoke the attorney-client privilege.

MS. HEALY:  I understand your objection.

MR. LOSAVIO:  And I tried to give you an out, but you didn't take it.  So I am going to instruct the witness, conversations that you have with counsel are protected by the attorney-client privilege and you are privileged not to discuss those.

MS. HEALY:  Maybe, Mr. Wallerstein, the question is better directed to you.  Can you identify some dates in the first Q of 2014 or the second Q of 2014 where Ms. Gatti became an agent of AlmavivA S.p.A. or Almawave S.r.l.?

MR. LOSAVIO:  Ms. Healy, that doesn't address my objection and my concern about the personal privilege, which applies prior to any time that she

became an agent or employee of some other entity.

MS. HEALY:  Q.  Ms. Gatti, did you have communications with Mr. Capaccio about Almawave S.r.l.? I am not asking you about the content of the communications.  I am asking only whether you reached out to Mr. Capaccio in first Q, so January through March 31st, 2014, to tell him about Almawave S.r.l. or AlmavivA S.p.A.

MR. LOSAVIO:  Objection.

MR. WALLERSTEIN:  Objection to the extent it requires disclosure of privileged information.

MS. HEALY:  Are you instructing her not to answer?

MR. LOSAVIO:  May I make my objection?

MS. HEALY:  Sure.

MR. LOSAVIO:  So my objection is only with respect to the component of your question that contains the phrase about Almawave.  That gets into the substance of what the client and the attorney talked about.

MS. HEALY:  Can you explain to me what's the basis for this privilege?

MR. LOSAVIO:  Let me explain the difference. Did you talk to --

MS. HEALY:  No, I don't want to understand.  I am going to call the Court.

**F-381**

MR. LOSAVIO:  Please, please, let me help you.

MS. HEALY:  I don't want -- I don't want your help.

MR. LOSAVIO:  I am going to give you a form of the question --

MS. HEALY:  Mr. LoSavio, you were here one hour and 20 minutes late.  I need to take this deposition.  I want to understand the basis for the privilege so we can call the Court and we can ask the Court to resolve it.  So let me ask some questions to establish the privilege.  I am not asking her about the content of the communications.

Q.   Ms. Gatti, did you ever retain Carr & Ferrell in connection with AlmavivA -- any business relating to AlmavivA in the first quarter of 2014?

A.   No, not that I remember.

Q.   Did you ever retain Jeff Capaccio as a lawyer to help you with anything relating to Almawave S.r.l. or AlmavivA S.p.A. in 2014?

MR. WALLERSTEIN:  Objection; calls for a legal conclusion.

MS. HEALY:  Q.  You can answer.

A.   Not that I remember.

Q.   Did you ever -- so you didn't have any type of attorney-client relationship with Mr. Capaccio relating

**F-382**

Q.   Okay.  After signing the agreement?

MR. LOSAVIO:  No.

THE WITNESS:  No.  It was -- this, I don't remember exactly the date when it happened, but the conversation happened after I met Ms. Sandei and before signing.

MS. HEALY:  Q.  That five-month period, basically, sometime during that five-month period.

When did you sign?

A.   I signed the first of June 2015.  No.  2014.  Sorry.  I am just confused now.

Q.   And when you say, when we are talking about signing, for the record, that means you signed the contract with Almawave USA?

A.   USA.

Q.   Okay.  Where did you sign the contract?

A.   It's a good question.  I don't remember.

Q.   How did you -- did you sign by pen or electronically?

A.   By pen, I think.

Q.   And then did you scan the document and send it back to someone?

A.   I don't remember.  I don't remember.

Q.   I am going to show you an exhibit that we are going to mark as Deposition Exhibit Number 2.  I'm only

Q. Almawave Italy? Which Almawave?

MR. WALLERSTEIN: Objection.

THE WITNESS: Almawave.

MS. HEALY: Q. S.r.l., where Ms. Sandei was working as CEO?

MR. WALLERSTEIN: Objection; misstates prior testimony.

MS. HEALY: Q. So Ms. Sandei's Almawave S.r.l. -- I only use these terms to distinguish between the company you were working for and the company she was working for -- developed products --

A. It's very simple, because the company I was working for is called Almawave USA, so you can call it Almawave USA.

Q. Okay. Perfect. Great. So when you refer to Almawave, that refers to the company Ms. Sandei was working for, the S.r.l.?

MR. WALLERSTEIN: Objection; Ms. Sandei works for more than one company.

MS. HEALY: Okay. Please, I understand. She doesn't seem to know that Ms. Sandei works for S.p.A.

THE WITNESS: She worked also for Almawave USA, because she was the president.

MS. HEALY: Q. So -- and is that an executive position that she had?

# EXHIBIT F

**EXAMPLES OF
SPEAKING OBJECTIONS & COACHING
(characterizing record)**

**F-385**

Q.   Did she tell you she had any roles at any other company within Almawave?

A.   Within Almawave?

Q.   Yes.

A.   No.

Q.   Did you -- did there come a point where you learned Almawave was owned by another company?

A.   No.

Q.   So you never learned whether Almawave had a parent company?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  Can you rephrase, please?

MS. HEALY:  Q.  No.  Do you understand my question?

A.   No.

Q.   Did you ever learn whether Almawave S.r.l., the company that you identified as Ms. Sandei's company, was owned by a parent company?

MR. WALLERSTEIN:  Objection; misstates prior testimony, vague.

MR. LOSAVIO:  I am objecting on the grounds it misstates the testimony with respect to the S.r.l. component.

MS. HEALY:  Q.  You can answer.

A.   Can you rephrase?  Sorry.

Q.   What types of agreements do you remember sending Tony Di Napoli in March of 2014?

MR. WALLERSTEIN:  Objection; misstates prior testimony.  The witness was asked if she was copied, and she said yes.  And now she is being asked what agreements she sent.  Lacks foundation.

MS. HEALY:  No, that changed my question.  I am asking whether she was copied in March in correspondence to Tony Di Napoli.

MR. WALLERSTEIN:  Asked and answered.

MS. HEALY:  Q.  Sending an agreement to Tony Di Napoli for IQSystem's signature.

MR. WALLERSTEIN:  Answer that again, please.

THE WITNESS:  That I was copied in the communications in the correspondence in March of 2014.

MS. HEALY:  Q.  I am going to show you what's being marked as Loop Exhibit Number 7.

(Deposition Exhibit 7 was marked for identification.)

MS. HEALY:  Q.  Do you recognize this document?  Do you recognize it?

A.   Should I read this document?

Q.   Yeah, you can read it.  Take your time to read it.

A.   It is an NDA.

this, having invested and continued to grow the company?    11:00:22

Q.   Yes.    11:00:27

A.   And I also -- aside from also defining what to    11:00:32
invest.    11:00:35

MR. WALLERSTEIN:  Invest?    11:00:37

THE INTERPRETER:  Mm-hmm.  Investment.    11:00:41

THE WITNESS:  Growing the company.    11:00:42

MS. HEALY:  Q.  I just want to make --    11:00:44

If you think her translation is inaccurate,    11:00:47
feel free to provide additional terms, because I want    11:00:51
you to be comfortable that everything is being    11:00:54
translated.  You know what I mean?  So just feel free,    11:00:58
if there is something that you want her to add, to add    11:01:01
it..    11:01:07

A.   I will try, as far as this is a fairly complex    11:01:12
interaction.    11:01:13

Q.   So, aside from those decisions, yes, did you    11:01:17
have any other involvement in development?    11:01:33

A.   If you really mean, as I said, mean software    11:01:37
development on the technical aspect of it, no, I am not    11:01:41
a software developer.    11:01:42

Q.   I am asking for any participation you had in    11:01:46
any aspect, not necessarily coding, of technology    11:01:51
development, if any.    11:02:01

A.   I have defined which products to develop.

VALERIA SANDEI - 1/22/2016

Page 88

information about what technology her startup was working on?

MR. WALLERSTEIN:  Objection; misstates the testimony.  You inserted the word "technology," which was not in the answer.  It's improper.

MS. HEALY:  Q.  You can answer.

A.   Later on we had some more conversations, and I met with her and she gave me additional information about the technology, what the company was working on in e-commerce, and specifically was creating profiles in order to provide advice to customers, recommendations to customers.

Q.   When was this meeting where she gave you this information?

A.   I am sorry.  Where or when?

Q.   When was this meeting where she gave you this information?

A.   I don't remember the date.

Q.   Approximately?

A.   Not much later than this first call, phone call.

Q.   Where was the meeting?

A.   In Rome.

Q.   Can you tell me everything you remember about that meeting?

A.    -- financial evaluations of company.    15:09:37

Q.    So she was sharing with you what Soshoma had    15:09:41
been doing with Orrick?    15:09:44

MR. WALLERSTEIN:  Objection; misstates the    15:09:45
testimony.    15:09:53

THE WITNESS:  Can you repeat the question?    15:09:56

MS. HEALY:  Q.  She was sharing with you    15:09:59
what's -- how Soshoma had been using Orrick?    15:10:05

MR. WALLERSTEIN:  Same objection.    15:10:15

THE WITNESS:  No, she did not explain to me    15:10:16
how Soshoma was using Orrick.    15:10:20

MS. HEALY:  Q.  She just told you that Soshoma    15:10:22
goes to Orrick for evaluations, for companies that    15:10:26
provide evaluations?    15:10:29

MR. WALLERSTEIN:  Objection; misstates prior    15:10:30
testimony.  I don't know where you are seeing the word    15:10:32
"Soshoma," Counsel.    15:10:33

MS. HEALY:  The startup is known as Soshoma.    15:10:34

MR. WALLERSTEIN:  I am not seeing the word    15:10:35
"startup," either.    15:10:37

MS. HEALY:  Please stop interrupting.    15:10:40

MR. WALLERSTEIN:  No.    15:10:40

MS. HEALY:  Please --    15:10:40

MR. WALLERSTEIN:  No.    15:10:40

MS. HEALY:  Please stop interrupting.

VALERIA SANDEI - 1/22/2016

Page 134

MR. WALLERSTEIN:  You are interrupting me.

MS. HEALY:  The Court said you cannot make speaking objections.

MR. WALLERSTEIN:  There is a difference between interrupting and objecting, Counsel.  I am not interrupting you.  You are interrupting me.  The objection is misleading, misstates prior testimony.  She never used the word "Soshoma" or "startup."  You did.

MS. HEALY:  Q.  Tell me exactly what she told you about Orrick, please, again, since your lawyer is unclear.

A.  She told me that through Orrick -- that she asked and received from Orrick names of companies that evaluate companies.

Q.  Did Ms. Gatti --

A.  Startups.

THE INTERPRETER:  I am sorry.  Companies.  I was correct the first time around.

MS. HEALY:  Q.  Did Ms. Gatti tell you that -- did Ms. Gatti share with you the valuation of her startup, the startup of which she was CEO?

A.  She did not share with me the evaluation, but she mentioned to me a value.

Q.  "She mentioned," what does that mean?

A.  She mentioned a number.

**F-391**

declaration?

A.   I checked that what was declared here corresponded to what was listed in the FAC, first amended complaint.

Q.   And how did you verify that?

A.   In what sense?  What do you mean, how I verified?

Q.   What did you do to verify?

A.   I don't understand the question.

Q.   You indicated you verified that the facts you stated there would be -- were accurate.

Facts.  Facts.

THE INTERPRETER:  There is also an F-A-C.

MR. WALLERSTEIN:  Objection.  I don't speak Italian, but my transcription does not say "verified."

MS. HEALY:  What does your transcription say? I don't have the luxury of the realtime feed, so what does it say?

MR. WALLERSTEIN:  I am sorry.  Was realtime feed not made available to counsel for Loop?

THE REPORTER:  No.

MR. WALLERSTEIN:  It's not available for them if they want it?

THE REPORTER:  It's available for them.

MR. WALLERSTEIN:  If they want it.

time is 1:46 p.m., and this is the continuation of the deposition of Ms. Anna Gatti in the case of Loop AI v. Gatti et al., case number 15-798.

Q.   Ms. Gatti, welcome back.  Before we start, I know you -- I asked you this morning whether you had taken any medications that may affect your ability to answer questions during today's deposition.  Do you remember I asked you?

A.   I do.

Q.   I saw that you just took some medications.

A.   It was for my stomach, because I just had lunch.  It's for my stomach.

Q.   That's fine.  I just want to make sure that there is nothing affecting your memory.

A.   There is nothing affecting my memory.

Q.   Okay.  And I know during the first part of the deposition you indicated you have difficulty remembering all of the things.

Did you -- did you have -- is there any reason, any issue that you have encountered recently that may affect your ability to remember in any way, or are you just not remembering because of the time frame?

MR. LOSAVIO:  I'm going to object to the mischaracterization.  She has indicated she doesn't recall dates, she doesn't -- she doesn't recall exact

dates and she has indicated she doesn't recall the mode    13:47:03
of communication in every instance where you asked for    13:47:07
that --    13:47:10

MS. HEALY:  Fair enough.    13:47:11

MR. LOSAVIO:  -- but in some she did.    13:47:12

MS. HEALY:  Fair enough.    13:47:14

Q.  So let me ask this question.  Do you have any    13:47:16
medical condition, like anxiety or anything else, that    13:47:19
may affect your memory?    13:47:22

A.  Not medical -- I am not aware of anything that    13:47:27
would affect my memory condition.  But anyway, I am not    13:47:30
aware of any medical condition that can affect my    13:47:35
memory.    13:47:38

Q.  Okay.  I am just asking these questions    13:47:38
because if there is ever an issue I want to make sure I    13:47:41
have the information.    13:47:43

A.  I will certainly let you know.    13:47:45

Q.  So have you -- or do you suffer or have you    13:47:46
suffered from anxiety at any time in the last six    13:47:49
months?    13:47:51

A.  Yes.    13:47:52

Q.  You have suffered from anxiety?    13:47:52

A.  Yes.    13:47:54

Q.  Is that something that affects your ability to    13:47:54
recall --    13:47:57

ANNA GATTI - 1/19/2016

Page 11

Q.   Just think about it, because part of answering truthfully means also that you have to answer precisely. So I don't want you to -- you know, if you don't remember, that's fine.  But I don't want you to state something that may be incorrect.

So are you sure that you moved to 24 Clarendon in January 2015?

MR. LOSAVIO:  Well, it slightly misstates. She didn't say January.  She said 2015.

MS. HEALY:  Q.   Okay.  When did you move to 24 Clarendon?

A.   January 2015.

Q.   Where were you living before?

A.   226 26th Avenue.

Q.   And is that in San Francisco?

A.   It is.

Q.   Is that an apartment?

A.   Apartment B.

Q.   Who owns that place?

A.   Tiziana Figliolvia.

Q.   Who is she?

A.   Is an old friend of mine.

Q.   Is she Italian?

A.   By birth, yes.

Q.   How long have you lived at that address, 226

09:24:36
09:24:40
09:24:43
09:24:46
09:24:49
09:24:51
09:24:56
09:24:58
09:25:00
09:25:04
09:25:07
09:25:08
09:25:10
09:25:19
09:25:22
09:25:24
09:25:25
09:25:27
09:25:28
09:25:31
09:25:35
09:25:39
09:25:43
09:25:45
09:25:47

**F-395**

Q.   When was that?

A.   I don't remember exactly.

Q.   Who is Gennaro Di Napoli?

A.   It's the nephew of Tony Di Napoli.

Q.   How old is Gennaro Di Napoli?

A.   I don't know.

Q.   Was Gennaro Di Napoli your babysitter?

A.   No, he was not.

Q.   He was not?

A.   He was not.

Q.   Did you ever offer to Ms. Bewsher Gennaro Di Napoli's services as a babysitter?

A.   I don't remember.

Q.   But you just said he is not a babysitter; right?

MR. LOSAVIO:  Objection; misstates the testimony.  She said he was not her babysitter.

MS. HEALY:  Q.  Did Gennaro Di Napoli ever babysit for your daughter?

A.   He didn't.

(Clarification requested by reporter.)

THE WITNESS:  He drove her -- it depends what you mean by babysitting.  He drove Athena to her father's residence, so he was more a driver.

MS. HEALY:  Q.  Did you ever offer to anyone

you just told us today?

A.   Not that I remember.

Q.   So after this first meeting did there come a point -- you said you reached out to Mr. Capaccio for legal services for Ms. Sandei.  What was the nature of the legal services that you thought she could use?

MR. WALLERSTEIN:  Objection.  Withdrawn.

MR. LOSAVIO:  You can answer.

MR. WALLERSTEIN:  Compound.  Objection; compound.  I am not sure which question.  One of which calls for privilege.  The second does not.

MR. LOSAVIO:  Can I have the question read back?

(Record read as follows:

"Q.  Did you tell her anything else besides what you just told us today?

"A.  Not that I remember.

"Q.  So after this first meeting did there come a point -- you said you reached out to Mr. Capaccio for legal services for Ms. Sandei.  What was the nature of the legal services that she [sic] thought she could use?")

MR. WALLERSTEIN:  Objection.  To the extent --

MR. LOSAVIO:  Wait.  She thought or you thought?

MS. HEALY: She. She testified --

MR. LOSAVIO: No, wait. The reporter read "she" instead of "you." So I think you should read -- because it's not clear whether you are asking about the witness or...

MS. HEALY: That's fine.

Q. Ms. Gatti, you testified that you believed it would be important for Ms. Sandei to have legal counsel as she was entering the market?

A. I testified that in my opinion it's important to talk to more than one person when you enter a new market.

Q. Okay. What kind of services did you think Ms. Sandei needed, legal services?

A. My understanding was that she was looking for incorporation of the US entity and she -- my understanding was that she was interested in protecting in the US market all the technology that Almawave has, proprietary technology that Almawave has created in their lab over the previous several years.

Q. Anything else?

A. Not that I remember at the moment.

Q. How did you form this understanding that they needed legal services for these aspects of their business?

declaration?                                                 17:57:50

A.   I checked that what was declared here          17:58:16

corresponded to what was listed in the FAC, first          17:58:27

amended complaint.                                          17:58:31

Q.   And how did you verify that?                   17:58:33

A.   In what sense?  What do you mean, how I         17:58:42

verified?                                                   17:58:45

Q.   What did you do to verify?                     17:58:45

A.   I don't understand the question.               17:58:59

Q.   You indicated you verified that the facts you  17:59:03

stated there would be -- were accurate.                     17:59:09

Facts.  Facts.                                 17:59:28

THE INTERPRETER:  There is also an F-A-C.      17:59:30

MR. WALLERSTEIN:  Objection.  I don't speak    17:59:32

Italian, but my transcription does not say "verified."     17:59:37

MS. HEALY:  What does your transcription say?   17:59:46

I don't have the luxury of the realtime feed, so what      17:59:46

does it say?                                               17:59:46

MR. WALLERSTEIN:  I am sorry.  Was realtime    17:59:47

feed not made available to counsel for Loop?               17:59:50

THE REPORTER:  No.                             17:59:53

MR. WALLERSTEIN:  It's not available for them  17:59:54

if they want it?                                           17:59:56

THE REPORTER:  It's available for them.        18:00:00

MR. WALLERSTEIN:  If they want it.             18:00:02

**F-399**

You can ask the witness what she answered.

MS. HEALY:  You just interrupted, saying it was inaccurate, so --

MR. WALLERSTEIN:  It's an objection, Counsel. You misstated her testimony.

MS. HEALY:  I did not.

Q.   Ms. Nicolella, you indicated you received a declaration and you proceeded to verify that the statements you made were accurate.

A.   I received this and I checked and I verified if what I declared was correctly reported in the FAC.

Q.   How did you do that verification?

A.   I read the declaration.

Q.   And did you compare it to anything?

A.   I have checked with my colleagues who are lawyers.

Q.   Okay.  Did you give those -- did you give a declaration verbally to anyone about the facts you state there?

MR. WALLERSTEIN:  Objection.  Do not disclose anything that you said to an attorney.

THE WITNESS:  I am not answering because I cannot divulge my conversation with my lawyer.

MS. HEALY:  Q.  Did you do anything else beyond speaking to your colleagues in the legal

**F-400**

# EXHIBIT F

**IMPEDING TESTIMONY ALTOGETHER**

**F-401**

# EXHIBIT F

## INTENTIONALLY ARRIVING LATE

**F-402**

SAN FRANCISCO, CALIFORNIA; WEDNESDAY, JANUARY 20, 2016

8:48 A.M.

--oOo--

P R O C E E D I N G S

MS. HEALY:  The time is now 8:48.  Counsel for Loop AI Labs is here at the deposition site for the deposition of Ms. Perri.  The deposition was noticed for a start time of 8:00 a.m.  Counsel and the court reporter have been waiting since 8:00 a.m., and we will continue to wait until the witness and all other counsel arrives.  No other counsel is present except for Loop AI, Loop AI's counsel.

(Recess taken from 8:48 to 9:00.)

MS. HEALY:  The time is now 9:00 a.m., and counsel for Loop AI Labs, Valeria Calafiore Healy and Dianna Wong, are still here in 333 Bush Street, in the office of DTI, for the deposition of Ms. Perri.  Nobody from Almawave or the AlmavivA defendants has yet arrived, even though the deposition was noticed for 8:00 a.m.  So we will be continuing to wait for the arrival of counsel and the witness.

(Recess taken from 9:00 to 9:04.)

MS. HEALY:  Good morning.  Let's go on the record.

MS. WONG:  This is case number 15-798, the

matter of Loop AI Labs Inc. v. Anna Gatti, et al.  The date is January 20th, 2016.  The time is 9:05 a.m.  The witness is Mariantonietta Perri.

And will counsel please state their appearances for the record.

MR. WALLERSTEIN:  Who is speaking, please?

MS. WONG:  My name is Dianna Wong, counsel for Loop AI Labs.

MR. WALLERSTEIN:  This is Tom Wallerstein.  I am asking if there is an interpreter here, because my witnesses speak Italian.

MS. HEALY:  This is Valeria Calafiore Healy, and I am counsel for Loop AI Labs, and we are here to take the deposition of Ms. Perri.  And for the record, Ms. Perri and counsel for the AlmavivA defendants just arrived at 9:04 a.m.

MR. WALLERSTEIN:  So, is there an interpreter here, Ms. Healy?

MS. HEALY:  Are we ready to proceed for the deposition?

MR. WALLERSTEIN:  Obviously not, if there is not an interpreter.

MS. HEALY:  Will the court reporter please swear the witness?

MR. WALLERSTEIN:  Ms. Healy, we need an

MR. WALLERSTEIN:  Let me take a moment.  I may have a -- let me take a moment.  I may have some questions.

No, I don't.

MS. HEALY:  Okay.  So thank you, Ms. Perri.  This concludes the deposition of Ms. Perri.  And the time is 5:09 p.m., and we are ready to start whenever you are with Ms. Nicolella.

MR. WALLERSTEIN:  We will be back at 10:00, or 9:00.  I am sorry.

I'm sorry.  Are we on the record?

MS. HEALY:  Yes.

MR. WALLERSTEIN:  I am ready to conclude.  I will wait for you to...

THE REPORTER:  Okay.  Off?

MS. HEALY:  Thank you.

MR. WALLERSTEIN:  We will be here at 9:00.

MS. HEALY:  The deposition starts at 8:00.

MR. WALLERSTEIN:  I sincerely hope you go on the record at 8:00 and -- I sincerely hope you do.

MS. HEALY:  So we were not able to locate a --

THE REPORTER:  Off the record, or are you making a statement?

MS. HEALY:  I am making a statement to him, that we were not able to locate an interpreter, so we

SAN FRANCISCO, CALIFORNIA; THURSDAY, JANUARY 21, 2016    07:55:26

8:30 A.M.    07:55:26

--oOo--    07:55:26

P R O C E E D I N G S    07:55:15

MS. HEALY:  The time is now 8:30 a.m. on    08:30:34
January 21st, 2016.  Counsel for Loop AI labs, Valeria    08:30:38
Calafiore Healy and Dianna Wong, are at the deposition    08:30:48
site pursuant to the notice of deposition for Mr. Luca    08:30:51
Ferri noticed for 8:00 a.m. this morning.  There are no    08:30:54
other counsel present in the room, and the witness has    08:31:01
not arrived, so counsel will wait until they arrive.    08:31:05

Counsel also notes that during the last three    08:31:10
days of deposition AlmavivA's counsel and their    08:31:14
witnesses have arrived more than an hour late each day    08:31:19
of deposition.    08:31:24

(Recess taken from 8:31 to 9:06.)    08:31:25

(Discussion off the record.)    09:09:05

MS. HEALY:  The time is now 9:09.  Counsel for    09:09:23
the AlmavivA defendants, Mr. Wallerstein, Ms. Culp, and    09:09:28
two witnesses, Ms. Nicolella and Mr. Ferri, and a    09:09:34
witness who testified yesterday, Ms. Perri, arrived at    09:09:42
9:06 a.m. at the deposition site.  The time is now 9:09,    09:09:45
and Mr. Wallerstein has asked to meet and confer on the    09:09:48
record.    09:09:53

MR. WALLERSTEIN:  Yeah, I received a facsimile    09:09:54

SAN FRANCISCO, CALIFORNIA; FRIDAY, JANUARY 22, 2016

8:03 A.M.

--oOo--

P R O C E E D I N G S

MS. HEALY:  The time is now 8:03 on January 22nd, 2016.  Counsel for Loop AI Labs, Valeria Calafiore Healy and Dianna Wong, are here in the deposition room waiting for the noticed witness, Valeria Sandei.  The witness is not in the room and no other counsel is present in the room at this time.

(Recess taken from 8:03 to 8:53.)

MS. HEALY:  The time is now 8:53.  Counsel for Almawave and the witness have arrived about 10 minutes ago.  They refuse to come to the deposition room and get the deposition started until 9:00 o'clock.  And I have requested that they come to the room and get started immediately so we can proceed with Ms. Sandei's deposition, and they said they will not do so.

(Recess taken from 8:54 to 8:58.)

MS. HEALY:  Good morning, everyone.  Will counsel please state their appearance for the record.

MR. WALLERSTEIN:  Hi.  This is Tom Wallerstein with Venable.  I am here with the deponent Valeria Sandei, my colleague Kimberly Culp, Raniero Romagnoli, Mariantonietta Perri.

MR. WALLERSTEIN:  Do you have the time recorded?    09:11:18 / 09:11:19

THE REPORTER:  I do.    09:11:21

MR. WALLERSTEIN:  It's really not necessary, Ms. Healy.  It's ridiculous to keep saying that.    09:11:21 / 09:11:23

So pursuant to the court order, we have the right to have an interpreter.  Ms. Nicolella is going to testify in Italian, which I do not understand.    09:11:26 / 09:11:28 / 09:11:33

So no matter what you ask her, even if you ask it -- well, you must ask it in English.  But even if it's about an English document, she is going to answer in Italian.  I cannot understand it without an interpreter.  That is why the Court ordered you to have one today.    09:11:38 / 09:11:41 / 09:11:45 / 09:11:48 / 09:11:52 / 09:11:55

As soon as you are ready to proceed, we will proceed.    09:11:56 / 09:11:58

MS. HEALY:  I am ready to proceed now.  And I want to establish that Ms. Nicolella speaks or doesn't speak English.  So I am asking for the witness to sit on the witness seat, which you are currently occupying, and we can ask her some questions, and if she doesn't understand --    09:11:58 / 09:12:00 / 09:12:05 / 09:12:11 / 09:12:13 / 09:12:18

MR. WALLERSTEIN:  It's not a matter of whether she understands or not.  That has nothing to do with it.    09:12:18 / 09:12:18

MS. HEALY:  I have a right to establish    09:12:20

whether she speaks English.

MR. WALLERSTEIN:  No, you do not.  You do not.
That's not even part of the scope of this deposition, so
no, you do not.

MS. HEALY:  Yes, because the Court is
requiring us to pay for her interpreter --

MR. WALLERSTEIN:  Correct.

MS. HEALY:  -- and I have a right to establish
whether or not she speaks English --

MR. WALLERSTEIN:  Incorrect.

MS. HEALY:  -- because that's the law.  The
law does not allow you to impose this cost on an
opponent without establishing that the person does not
speak English.

MR. WALLERSTEIN:  I'm not imposing anything.
The judge has made a ruling on this precise issue.  The
judge has ruled, and we are going to obey the judge's
order.  She is not testifying unless you obey the
judge's order with an interpreter.  So we will wait
until there is an interpreter so that I can understand
her testimony.

MS. CULP:  And so that she can understand the
question and so she can be sworn in, which she can't be.

MR. WALLERSTEIN:  Of course.  For innumerable
reasons.

MS. HEALY: I also would like to note for the record that all three witnesses are here today without an interpreter, so presumably you have been speaking to them in English.

MR. WALLERSTEIN: That's an amazing presumption, Ms. Healy.

So we will adjourn, and I guess you could send me an email if you have an interpreter, and we will try to come back.

MS. HEALY: So I think probably the best way is for us to call the Court again if you --

MR. WALLERSTEIN: We already did that, and she has ruled. I don't think there is any ambiguity whatsoever in the ruling.

MS. HEALY: So if you don't want to call the Court, there is nothing I can do. I am not going to be able to force you. We will be here ready to take the deposition, and we are not moving from here, because the judge ordered us to take these depositions.

MR. WALLERSTEIN: Are you going to stay on the record again? That was...

MS. CULP: Do you have an estimate on when the interpreter will be here?

MR. WALLERSTEIN: We are on standby, I suppose.

| 09:13:08 |
| 09:13:10 |
| 09:13:12 |
| 09:13:15 |
| 09:13:16 |
| 09:13:18 |
| 09:13:20 |
| 09:13:22 |
| 09:13:27 |
| 09:13:27 |
| 09:13:30 |
| 09:13:31 |
| 09:13:33 |
| 09:13:35 |
| 09:13:37 |
| 09:13:39 |
| 09:13:41 |
| 09:13:44 |
| 09:13:46 |
| 09:13:50 |
| 09:13:51 |
| 09:13:52 |
| 09:13:52 |
| 09:13:58 |
| 09:13:59 |

# EXHIBIT F

## OTHER IMPROPER CONDUCT TO FRUSTRATE DEPOSITION

MR. WALLERSTEIN:  Do you have the time recorded?   09:11:18 / 09:11:19

THE REPORTER:  I do.   09:11:21

MR. WALLERSTEIN:  It's really not necessary, Ms. Healy.  It's ridiculous to keep saying that.

So pursuant to the court order, we have the right to have an interpreter.  Ms. Nicolella is going to testify in Italian, which I do not understand.

So no matter what you ask her, even if you ask it -- well, you must ask it in English.  But even if it's about an English document, she is going to answer in Italian.  I cannot understand it without an interpreter.  That is why the Court ordered you to have one today.

As soon as you are ready to proceed, we will proceed.

MS. HEALY:  I am ready to proceed now.  And I want to establish that Ms. Nicolella speaks or doesn't speak English.  So I am asking for the witness to sit on the witness seat, which you are currently occupying, and we can ask her some questions, and if she doesn't understand --

MR. WALLERSTEIN:  It's not a matter of whether she understands or not.  That has nothing to do with it.

MS. HEALY:  I have a right to establish

whether she speaks English.

MR. WALLERSTEIN:  No, you do not.  You do not.  That's not even part of the scope of this deposition, so no, you do not.

MS. HEALY:  Yes, because the Court is requiring us to pay for her interpreter --

MR. WALLERSTEIN:  Correct.

MS. HEALY:  -- and I have a right to establish whether or not she speaks English --

MR. WALLERSTEIN:  Incorrect.

MS. HEALY:  -- because that's the law.  The law does not allow you to impose this cost on an opponent without establishing that the person does not speak English.

MR. WALLERSTEIN:  I'm not imposing anything.  The judge has made a ruling on this precise issue.  The judge has ruled, and we are going to obey the judge's order.  She is not testifying unless you obey the judge's order with an interpreter.  So we will wait until there is an interpreter so that I can understand her testimony.

MS. CULP:  And so that she can understand the question and so she can be sworn in, which she can't be.

MR. WALLERSTEIN:  Of course.  For innumerable reasons.

MS. HEALY:  I also would like to note for the record that all three witnesses are here today without an interpreter, so presumably you have been speaking to them in English.

MR. WALLERSTEIN:  That's an amazing presumption, Ms. Healy.

So we will adjourn, and I guess you could send me an email if you have an interpreter, and we will try to come back.

MS. HEALY:  So I think probably the best way is for us to call the Court again if you --

MR. WALLERSTEIN:  We already did that, and she has ruled.  I don't think there is any ambiguity whatsoever in the ruling.

MS. HEALY:  So if you don't want to call the Court, there is nothing I can do.  I am not going to be able to force you.  We will be here ready to take the deposition, and we are not moving from here, because the judge ordered us to take these depositions.

MR. WALLERSTEIN:  Are you going to stay on the record again?  That was...

MS. CULP:  Do you have an estimate on when the interpreter will be here?

MR. WALLERSTEIN:  We are on standby, I suppose.

to make.

Q.   Were you the one asking AlmavivA do Brasil how much to transfer to Almawave USA?

A.   I sent the emails to my colleagues in Brazil, but I was not the one deciding on the amount of those transfers.

Q.   So you would just send instructions?

A.   So if I got word or was instructed, I would communicate to Almawave do Brasil to make those transfers to Almawave USA.

Q.   And who would give you those instructions?

A.   The instructions were coming to me from Valeria Sandei.

Q.   And did you also have to agree with Christian De Felice about these transfers?

MR. WALLERSTEIN:  Objection; vague.

THE WITNESS:  In which way "agree"?

(Deposition Exhibit 10 was marked for identification.)

MS. HEALY:  Q.  Well, I can read from an email you wrote.

(Reads in Italian.)

No, I am going to read from the email.  You can translate, because I am reading in Italian, if you don't mind.

16:46:04
16:46:04
16:46:08
16:46:34
16:46:38
16:46:43
16:46:43
16:47:03
16:47:10
16:47:16
16:47:22
16:47:30
16:47:34
16:47:35
16:47:41
16:47:47
16:47:54
16:47:56
16:47:56
16:47:56
16:47:58
16:48:04
16:48:07
16:48:11
16:48:14

F-415

This is an email you wrote.

MR. WALLERSTEIN:  Counsel, I object unless you are going to let me follow along with an email.  The Court has ordered you --

MS. HEALY:  I am reading to you.

MR. WALLERSTEIN:  No, Counsel, I object and --

MS. HEALY:  You can object when I am done asking my question.

MR. WALLERSTEIN:  Okay.  Please don't interrupt me.  I am going to object and I am not going to allow the witness to answer a question that is spoken in Italian, unless you are reading from a document --

MS. HEALY:  I am.

MR. WALLERSTEIN:  -- and I can follow along with a certified translation if it's in Italian.

MS. HEALY:  That's why we have a certified translator.

MR. WALLERSTEIN:  No, no.  The document must be translated.

MS. HEALY:  Okay.  You can instruct her not to answer.  I am going to ask my question.

Q.   On September 19, 2014, you wrote to Carlo Ruggeri, "Buongiorno."

I think you should translate in English as well, "Good morning."

THE INTERPRETER:  So would you like me to sight translate this in English first?

MS. HEALY:  I think you should translate when I read in Italian.

MR. WALLERSTEIN:  This is why the Court has ordered that counsel may not read from an Italian document unless an English certified translation is provided.  That is precisely why.

MS. HEALY:  And the English certified translation is being provided.

MR. WALLERSTEIN:  No, no.  That is not a translator.  That is an interpreter.

And for the record, it is the Court's order dated September 18, 2015, document number 203, at page 7, lines 23 to 28.  And it says, "Translations of Italian language exhibits are necessary because the judge and jury will need to be able to read and understand the exhibits."  The Court said specifically, "The Court orders that plaintiff shall prepare certified translations of any Italian language exhibits it will use at deposition."

MS. WONG:  I just noticed, for the record --

MR. WALLERSTEIN:  Ms. Wong, there is only one counsel at a time on the record.

MS. HEALY:  No, she can make objections.

MR. WALLERSTEIN:  No, she cannot.                    16:50:28

MS. HEALY:  She can.                                 16:50:29

MS. WONG:  As we discussed yesterday, that           16:50:29
order that you are reading from pertains to Mr. Pepe's   16:50:32
deposition only --                                   16:50:35

MR. WALLERSTEIN:  That makes no sense                16:50:36
whatsoever.                                          16:50:37

MS. WONG:  -- and so it does not apply to the        16:50:38
current deposition that's taking place right now.    16:50:42

MR. WALLERSTEIN:  Why not, Counsel?                  16:50:46

MS. WONG:  Because it addresses the joint            16:50:46
discovery letter regarding Mr. Pepe's deposition only.   16:50:48

MR. WALLERSTEIN:  But if a document is in            16:50:51
Italian, and the judge and jury doesn't speak Italian,   16:50:53
doesn't the same rationale apply?                    16:50:56

MS. HEALY:  Q.  Ms. Nicolella, I would like to       16:50:59
ask a question.  In September you wrote an email to  16:51:00
Carlo Ruggeri telling him that, as you -- as requested   16:51:05
by Anna Gatti of Almawave USA and as agreed with     16:51:10
Christian, it is necessary to effect a transfer of funds   16:51:15
of $50,000 from Almawave do Brasil, AWB, to AW USA.  16:51:20

My question to you --                                16:51:28

MR. WALLERSTEIN:  Are you reading something?         16:51:39

THE INTERPRETER:  I am reading this.  This --        16:51:41

MR. WALLERSTEIN:  What's in your hand?               16:51:44

THE INTERPRETER:  I have names here, so that I can pronounce them correctly.    16:51:47 / 16:51:49

MR. WALLERSTEIN:  Is it an Italian document?    16:51:51

MS. HEALY:  Yes, it's a document from -- you don't have a copy.  Here you go.    16:51:53 / 16:51:55

MR. WALLERSTEIN:  I want an English certified translation.    16:51:57 / 16:51:59

THE INTERPRETER:  I am doing a sight translation from what Ms. Healy has said here.    16:52:02 / 16:52:07

MR. WALLERSTEIN:  All I want is to see what you are saying.    16:52:07 / 16:52:07

MS. HEALY:  Please let her translate for the witness what I said on the record.    16:52:07 / 16:52:07

THE INTERPRETER:  I am not reading this, but I am interpreting what Ms. Healy said, and I am reading off the transcript.    16:52:11 / 16:52:13 / 16:52:18

MR. WALLERSTEIN:  That's why I asked what you had in your hand.  That's all.    16:52:26 / 16:52:26

THE INTERPRETER:  I have names here and dates.  Do you mind if we go up to what she asked?    16:52:26 / 16:52:26

MR. WALLERSTEIN:  Counsel, where is the translation?  This is in Italian.    16:52:31 / 16:52:32

MS. HEALY:  Go ahead.  Interpret, please.    16:52:36

(The interpreter re-interprets the question.)    16:52:37

MS. HEALY:  Q.  What do you mean by "as agreed    16:53:08

with Christian"?                                          16:53:10

MR. WALLERSTEIN:  Objection.                  16:53:15

MS. HEALY:  Q.  Is that Christian De Felice?  16:53:16

MR. WALLERSTEIN:  Objection; misstates --     16:53:20
objection; misstates testimony.  The witness did not say  16:53:20
that she agreed.  You said that, Counsel.    16:53:23

MS. HEALY:  Right.  I said that in this email  16:53:25
that's what she said.                        16:53:27

MR. WALLERSTEIN:  What email?                 16:53:27

MS. HEALY:  In this email that I am reading   16:53:28
from.                                        16:53:29

MR. WALLERSTEIN:  That is improper and        16:53:30
unacceptable.  I won't allow her to answer the question  16:53:31
if you are reading from an Italian document where I do  16:53:35
not have a certified translation.            16:53:38

If you want to ask a question without         16:53:45
referring to an Italian language document, that's fine.  16:53:47

MS. HEALY:  Q.  You can answer the question.  16:53:50
You can answer.                              16:53:58

A.  Can I see the document?                   16:54:03

Q.  Yes.  Sure.                              16:54:05

And this has been marked as Exhibit Number 10.  16:54:06

MR. WALLERSTEIN:  I am sorry.  I am sorry.  I  16:54:09
do not have a certified translation of this, so I am not  16:54:12
going to allow you to look at it.            16:54:15

contract signed.

Q.   Do you recall anything about this particular document with Tony Di Napoli?

A.   I don't know what you mean by anything.

(Telephonic interruption.)

MS. HEALY:  Let the record reflect that was Mr. Wallerstein's phone.

Q.   Did you ask -- Ms. Perri, do you recall asking IQSystem Inc. to sign a confidentiality agreement of -- in March of 2017 -- 2014?  "You" meaning the legal department of AlmavivA.

A.   I don't remember.  I don't remember that I had this text signed or not signed.

(Deposition Exhibit 8

was marked for identification.)

MS. HEALY:  Let's move on to Exhibit Number -- what we premarked as Exhibit Number 8.

MR. WALLERSTEIN:  Counsel, Exhibit 8 appears to be in Italian.  Do you have a certified translation?

MS. HEALY:  No, I do not.

MR. WALLERSTEIN:  Then -- so pursuant to the Court's order dated September 18, 2015, docket number 203 at page 7, lines 23 through 28, translations of Italian language exhibits are necessary because the judge and jury will need to be able to read and

understand the exhibits.

The Court orders, quote, "that plaintiff shall prepare certified translations of any Italian language exhibits it will use at deposition."

THE INTERPRETER:  Sorry.

MR. WALLERSTEIN:  "As it introduces an exhibit, it shall simultaneously introduce the English language translation of the document."

I will not allow the witness to be questioned about documents I cannot read.

MS. WONG:  I just want to note for the record the order that Mr. Wallerstein read from addresses a joint discovery letter regarding Mr. Pepe's deposition and Mr. Pepe's deposition only.  Mr. Wallerstein misstates the Court's order and its applicability.

MS. HEALY:  Can you place the exhibit in front of the witness, please?

MR. WALLERSTEIN:  No, I will not allow it.

MS. HEALY:  Q.  Ms. Perri, were you involved in the procurement of the Lloyd's policy reflected at Exhibit Number 7?

MR. WALLERSTEIN:  Objection; vague and ambiguous.  Number 7 is the NDA.

MS. HEALY:  Can you give me the actual exhibits, please?  Because I want to check the number.

MR. WALLERSTEIN:  You are trying to refer to Number 8.

MS. HEALY:  No, I need to see how the exhibit is marked.  And the exhibits that are --

Sorry.  Exhibit Number 8.

Q.   Were you involved in the procurement of the Lloyd's policy, Exhibit Number 8?

MR. WALLERSTEIN:  Pursuant to the Court order, I will not allow the witness to answer questions about exhibits in Italian that do not have certified translations.

MS. HEALY:  Q.  Ms. Perri, were you involved in the procurement of a Lloyd's insurance policy to cover the legal cost of any proceeding involving Almawave USA?

MR. WALLERSTEIN:  Objection; asked and answered.  And the last time the question was asked I objected that it was vague with regard to "involved."  This identical question is objectionable for the same reason.

MS. HEALY:  Q.  You can answer.

A.   As I said -- tried to say earlier, but apparently with little success, if the question is if I was involved in the negotiation -- in the search of a policy that would cover Anna Gatti -- Anna Gatti and

F-423

MS. HEALY:  Ms. Perri --

MR. WALLERSTEIN:  Counsel, stop interrupting me.

If you do not have an Italian interpreter, then we can do this for as long as you like, but the witness will not be responding to questions in English and I will not allow her to respond to you speaking Italian.

MS. HEALY:  Ms. Perri, do you speak English?

MR. WALLERSTEIN:  Asked and answered.

MS. HEALY:  Ms. Perri --

MR. WALLERSTEIN:  That question has been asked --

MS. HEALY:  Don't let me interrupt you. Please go ahead.

MR. WALLERSTEIN:  The question has been asked and answered.  You can respond however you responded the first several times.

MS. HEALY:  Ms. Perri, I put in front of you a declaration that was presented to the Court.  Did you sign that declaration?

THE WITNESS:  (Speaks in Italian.)

MS. HEALY:  Translation:  "I will not respond to a question posed to me in English because English is not my first language and I don't feel comfortable

responding in English."

09:25:26

MR. WALLERSTEIN:  Counsel, you are behaving inappropriately, and I -- if you continue to proceed in this fashion, I am offering to call the Court.  I am offering to discuss alternative solutions with you.  If you don't want to do that, that's your prerogative, but we are not going to continue the charade for -- I don't know how many hours you intend to do this.

09:25:28
09:25:29
09:25:32
09:25:36
09:25:40
09:25:43
09:25:46

MS. HEALY:  Ms. Perri, is this your declaration, the document in front of you?

09:25:50
09:25:52

MR. WALLERSTEIN:  Objection; asked and answered.

09:25:54
09:25:55

MS. HEALY:  Ms. Perri, will you answer the question, please?

09:25:59
09:26:00

MR. WALLERSTEIN:  Objection.

09:26:01

MS. HEALY:  The witness can answer.

09:26:01

MR. WALLERSTEIN:  Well, she cannot, because you are not speaking Italian.

09:26:03
09:26:04

MS. HEALY:  You don't want me to speak Italian.

09:26:06
09:26:07

MR. WALLERSTEIN:  Touché.

09:26:07

MS. HEALY:  It's difficult.

09:26:07

MR. WALLERSTEIN:  Touché.  She will not, because you do not have an interpreter here.

09:26:09
09:26:10

MS. HEALY:  Then if she is not going to speak,

09:26:12

Page 26

MR. WALLERSTEIN:  Pathetic.

(Addressing Ms. Wong)  You should be ashamed to be part of it.

(Addressing the Reporter)  As should you, ma'am.

MS. HEALY:  Let the record reflect that the witness is back in the room.  The time is now 9:33 a.m. Counsel for the AlmavivA defendants is back in the room, along with their consultant/interpreter and another witness, and counsel, Ms. Culp.

(Deposition Exhibit 6 was marked for identification.)

MS. HEALY:  Ms. Perri, I am going to place in front of you what we have premarked as Exhibit Number 6.

First of all, I guess we should try again to swear the witness.

MR. WALLERSTEIN:  Do you have copies for counsel?

MS. HEALY:  Here is a copy.

Because she is not under oath at the moment, so --

Ms. Perri, do you understand an oath?

THE WITNESS:  (Speaks in Italian.)

MS. HEALY:  I understand.  Ms. Perri, do you understand what the words "I declare under --"

**F-426**

learned that Ms. Sandei wanted to hire Ms. Gatti for the    18:19:27

Almawave USA venture?    18:19:34

A.    I think between May and June 2014.    18:19:49

Q.    Did Ms. Sandei or anyone announce --    18:19:53

(Tones heard.)    18:19:54

MR. WALLERSTEIN:  That's our timer, so this is    18:19:55

the final question.    18:19:56

MS. HEALY:  Q.  Did Ms. Sandei or anyone else    18:19:57

tell you why Ms. Sandei wanted to hire Ms. Gatti for the    18:19:59

Almawave USA venture?    18:20:10

(Clarification requested by reporter.)    18:20:12

THE WITNESS:  No.    18:20:29

MR. WALLERSTEIN:  We are done.    18:20:30

MS. HEALY:  Q.  Did you ask --    18:20:30

MR. WALLERSTEIN:  We are done, Counsel.  That    18:20:33

was our timer.    18:20:35

MS. HEALY:  Thank you, Mr. Romagnoli.    18:20:36

(Whereupon, the deposition was    18:20:38

adjourned at 6:20 p.m.)    18:20:38

--oOo--    18:20:38

Case 4:15-cv-00798-HSG   Document 889-9   Filed 09/08/16   Page 429 of 470

RANIERO ROMAGNOLI – 1/22/2016

Page 25

I declare under penalty of perjury the foregoing is true and correct.  Subscribed at _____, this ____ day of _____, 2016.

_____

Raniero Romagnoli

DTI Court Reporting Solutions – San Francisco
800-869-9132                          www.deposition.com

F-428

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  January 29, 2016

*Sarah Lucia Brann*
_____

SARAH LUCIA BRANN, CSR No. 3887

**F-429**

Page 107

Q.   In Palo Alto or in California?   13:12:47

A.   It wouldn't be accurate to say in Palo Alto,   13:12:49
because I think the offices of Carr & Ferrell are in   13:12:54
Menlo Park.  But yes, it was on that occasion.   13:12:57

Q.   Before meeting him in person in Silicon   13:12:59
Valley, did you -- in March of 2014, did you receive any   13:13:06
written information about who Tony Di Napoli was?   13:13:27

A.   What type of written information about who he   13:13:30
was?   13:13:30

Q.   His resume, his background, who he worked for.   13:13:44

A.   As I told you earlier, these are information   13:13:48
that I asked personally of him.   13:13:50

Q.   But -- so you were meeting with someone you   13:13:55
had never met before and you didn't know anything about   13:13:58
him, and you bring him to meetings regarding very   13:14:02
sensitive matters relating to your company?   13:14:05

MR. WALLERSTEIN:  Objection; misstates prior   13:14:07
testimony.   13:14:08

MS. HEALY:  Please translate.   13:14:27

Q.   Why wouldn't you ask for his resume or some   13:14:32
information about Mr. Di Napoli before meeting him?   13:14:35

MR. WALLERSTEIN:  Objection; misstates prior   13:14:36
testimony.  She said she did that.   13:14:46

MS. HEALY:  Q.  No, I am asking again.  Please   13:14:48
answer, and please don't follow your counsel --

**F-430**

Please let me ask the questions.    13:14:52

MR. WALLERSTEIN:  Let her answer the questions    13:14:54
and let the transcript --    13:14:56

MS. HEALY:  You are interrupting the    13:14:57
testimony, and that's really inappropriate.    13:15:00

MR. WALLERSTEIN:  What's really inappropriate    13:15:01
is not letting the witness's answers get recorded onto    13:15:05
the transcript.    13:15:06

MS. HEALY:  Q.  Ms. Sandei, before meeting    13:15:07
Mr. Di Napoli, why didn't you ask anyone to send you a    13:15:14
resume or written information about his background,    13:15:16
regarding Mr. Di Napoli?    13:15:34

A.    Why was I supposed to do that?  I don't    13:15:36
understand the question.    13:15:38

Q.    Why did you decide to bring him with you to a    13:15:40
meeting with legal counsel?    13:16:04

A.    Because he was introduced to me by certain    13:16:05
people as somebody who was very experienced in business    13:16:11
development, and I wanted to understand if he was a    13:16:13
valid person and capable of doing this kind of work.    13:16:26

That he was introduced to me by people that    13:16:29
were trusted people, and so I would trust their    13:16:32
opinions.    13:16:32

Q.    Who are these trusted people who introduced    13:16:35
you?

and therefore I decided that I was interested in    13:31:30

continuing to continue with him.    13:31:31

Q.    But you didn't ask him the question of "Are    13:31:34

you working with somebody already, a specific company?"    13:31:41

MR. WALLERSTEIN:  Objection.  As I heard    13:31:42

referred to the other day, I too will adopt to what I    13:31:48

heard referred to as the three-strike rule.  And that is    13:31:52

the third strike.  For the third and last time, you can    13:31:55

answer the question.    13:32:12

THE WITNESS:  As I said before, that he    13:32:15

presented himself to me as an entrepreneur, a person who    13:32:19

works by himself, and that's what I assumed, and I did    13:32:23

not feel necessary about going to ask him where else he    13:32:31

worked, in what company.    13:32:36

I never -- I never thought that I needed to    13:32:41

ask that question.    13:32:48

MS. HEALY:  I lost my train of thought.    13:32:52

Q.    Did you -- did you ask him where his office    13:32:57

was when you met him in March of 2014?    13:33:07

A.    No.    13:33:12

Q.    How many meetings did you have with Mr. Di    13:33:14

Napoli in March of 2014 during your trip to California?    13:33:28

A.    I think one meeting.    13:33:34

Q.    And the one meeting, was there also a meeting    13:33:38

with Ms. Gatti that we discussed earlier?

you were in San Francisco and this meeting that you -- 10:21:44

this social meeting in Rome? 10:21:49

A.    At the best of my recollection, in the Q1 2014 10:21:54

I had a phone call with Ms. Sandei while I was driving 10:22:02

in San Francisco, and I met her in Italy. 10:22:07

Q.    Did you have any email correspondence with 10:22:16

her? 10:22:19

A.    I really don't remember. 10:22:20

Q.    Did you have any correspondence with anyone 10:22:22

else during this first Q that we identified on the 10:22:24

record as ending on March 31st, 2014, regarding doing 10:22:30

business with Almawave? 10:22:36

A.    I don't remember. 10:22:48

Q.    Did you discuss with Tony Di Napoli the 10:22:48

prospect of doing business with Almawave? 10:22:53

A.    In Q1? 10:22:57

Q.    Yes. 10:22:59

A.    You know, I don't remember when this 10:23:00

conversation started. 10:23:02

Q.    Do you remember a time -- did you have a 10:23:03

discussion with Jeff Capaccio about Almawave? 10:23:05

MR. WALLERSTEIN:  I am going to object to the 10:23:09

extent that any questions relating to discussions with 10:23:11

Mr. Capaccio implicate the attorney-client privilege of 10:23:15

any of my clients.  Obviously there was a point at which 10:23:21

**F-433**

Ms. Gatti became an agent of at least one or more of my clients and had conversations with Mr. Capaccio. To the extent that she did, they may be covered by privilege, so I object to Ms. Gatti revealing any privileged communications with regard to my client.

MR. LOSAVIO: I have a slightly different objection.

MS. HEALY: Okay. Just give me a second. Go ahead.

MR. LOSAVIO: So to the extent Ms. Gatti is talking to an attorney, there is a personal attorney-client privilege that would apply.

If I can have your stipulation that an answer to the pending question does not waive the privilege, then that issue is not presented by the pending question.

MS. HEALY: Your objection is noted.

Q. So, Ms. Gatti, I want to pick up on something Mr. Wallerstein said. Do you understand he is counsel for the AlmavivA entities in this case?

A. I understand --

Q. Do you understand that Mr. Wallerstein represents three different entities under the umbrella of AlmavivA?

A. I think so.

Q.   Okay.  Do you understand he represents Almawave S.r.l.?

A.   Yes.

Q.   And AlmavivA S.p.A.?

A.   Yes.

Q.   And Almawave USA?

A.   Yes.

Q.   Okay.  So Mr. Wallerstein just said that during the first Q he objects to you answering any questions regarding Mr. Capaccio because at some point you became an agent of one or more of his clients.

Can you tell me for which -- who you were an agent for?

MR. WALLERSTEIN:  Objection.  Misstates my objection.  I never said that happened during the first Q.  I said at some point.

MS. HEALY:  Q.  Okay.  Can you tell me at what point you became an agent of AlmavivA S.p.A.?

MR. LOSAVIO:  Object to the form; calls for a legal conclusion.

MS. HEALY:  Q.  Mr. Wallerstein said you became an agent of one or more of his clients.  I am asking you to identify specifically, so that we can put some time frames, when did you become an agent of AlmavivA S.p.A.?

**F-435**

MR. LOSAVIO:  Object to the form.  It calls for a legal conclusion.

MS. HEALY:  Q.  You can answer.

A.  As far as I know, I never became an agent of AlmavivA S.p.A.

Q.  When did you become an agent of Almawave S.r.l.?

MR. LOSAVIO:  Object to the form; calls for a legal conclusion.

MS. HEALY:  I am just asking what he is saying.

THE WITNESS:  As far as I know, I never became an agent for Almawave S.r.l.

MS. HEALY:  Q.  Okay.  So during the first quarter did you contact Jeff Capaccio to discuss Almawave?

MR. WALLERSTEIN:  Same objection.

MS. HEALY:  What's the objection?

MR. WALLERSTEIN:  I object to the extent that any conversations between Mr. Capaccio and an agent of one or more of my clients is privileged.

MS. HEALY:  And who is the agent?

MR. WALLERSTEIN:  At some point Ms. Gatti became an agent.

MS. HEALY:  Can you please identify the dates?

**F-436**

MR. WALLERSTEIN:  Ms. Healy, do not interrupt me.

At some point Ms. Gatti became an agent of one or more of my clients.  To the extent that an agent of one or more of my clients had a conversation with an attorney, Mr. Capaccio, that conversation is privileged, and I object to the disclosure of it.

MR. LOSAVIO:  And I am reiterating my previous objection that there is a personal relationship between an attorney and a client for which the person is entitled to invoke the attorney-client privilege.

MS. HEALY:  I understand your objection.

MR. LOSAVIO:  And I tried to give you an out, but you didn't take it.  So I am going to instruct the witness, conversations that you have with counsel are protected by the attorney-client privilege and you are privileged not to discuss those.

MS. HEALY:  Maybe, Mr. Wallerstein, the question is better directed to you.  Can you identify some dates in the first Q of 2014 or the second Q of 2014 where Ms. Gatti became an agent of AlmavivA S.p.A. or Almawave S.r.l.?

MR. LOSAVIO:  Ms. Healy, that doesn't address my objection and my concern about the personal privilege, which applies prior to any time that she

became an agent or employee of some other entity. 10:27:45

MS. HEALY: Q. Ms. Gatti, did you have communications with Mr. Capaccio about Almawave S.r.l.? I am not asking you about the content of the communications. I am asking only whether you reached out to Mr. Capaccio in first Q, so January through March 31st, 2014, to tell him about Almawave S.r.l. or AlmavivA S.p.A. 10:27:48 10:27:49 10:27:52 10:27:56 10:27:58 10:28:03 10:28:09

MR. LOSAVIO: Objection. 10:28:12

MR. WALLERSTEIN: Objection to the extent it requires disclosure of privileged information. 10:28:13 10:28:15

MS. HEALY: Are you instructing her not to answer? 10:28:17 10:28:18

MR. LOSAVIO: May I make my objection? 10:28:20

MS. HEALY: Sure. 10:28:22

MR. LOSAVIO: So my objection is only with respect to the component of your question that contains the phrase about Almawave. That gets into the substance of what the client and the attorney talked about. 10:28:22 10:28:23 10:28:28 10:28:32

MS. HEALY: Can you explain to me what's the basis for this privilege? 10:28:35 10:28:37

MR. LOSAVIO: Let me explain the difference. Did you talk to -- 10:28:38 10:28:41

MS. HEALY: No, I don't want to understand. I am going to call the Court. 10:28:42 10:28:44

**F-438**

MR. LOSAVIO:  Please, please, let me help you.    10:28:46

MS. HEALY:  I don't want -- I don't want your help.    10:28:46 / 10:28:48

MR. LOSAVIO:  I am going to give you a form of the question --    10:28:49 / 10:28:50

MS. HEALY:  Mr. LoSavio, you were here one hour and 20 minutes late.  I need to take this deposition.  I want to understand the basis for the privilege so we can call the Court and we can ask the Court to resolve it.  So let me ask some questions to establish the privilege.  I am not asking her about the content of the communications.    10:28:50 / 10:28:53 / 10:28:55 / 10:28:57 / 10:29:01 / 10:29:04 / 10:29:06

Q.  Ms. Gatti, did you ever retain Carr & Ferrell in connection with AlmavivA -- any business relating to AlmavivA in the first quarter of 2014?    10:29:08 / 10:29:11 / 10:29:15

A.  No, not that I remember.    10:29:19

Q.  Did you ever retain Jeff Capaccio as a lawyer to help you with anything relating to Almawave S.r.l. or AlmavivA S.p.A. in 2014?    10:29:21 / 10:29:27 / 10:29:31

MR. WALLERSTEIN:  Objection; calls for a legal conclusion.    10:29:35 / 10:29:36

MS. HEALY:  Q.  You can answer.    10:29:37

A.  Not that I remember.    10:29:40

Q.  Did you ever -- so you didn't have any type of attorney-client relationship with Mr. Capaccio relating    10:29:43 / 10:29:46

**F-439**

to Almawave S.r.l. or S.p.A. during the first quarter of 2014?

MR. WALLERSTEIN:  Objection; calls for a legal conclusion.

MR. LOSAVIO:  Join.  Legal conclusion.

MS. HEALY:  Q.  You can answer.

A.  I don't remember in Q1.  It's very hard for me to remember the dates.

Q.  Did you reach out to Jeff Capaccio at any point regarding Almawave?

A.  Yes.

Q.  When?

A.  To the best of my recollection, might be around April, maybe.

Q.  2014?

A.  Yeah.  It's really -- it's really blurred in my mind, the time frame.

Q.  I understand.

And what was the purpose of your call to Capaccio regarding Almawave?

MR. LOSAVIO:  Objection to the extent it calls for attorney-client privilege.

MS. HEALY:  Well, are you instructing her not to answer?

Q.  Were you calling Mr. Capaccio on behalf of

Almawave?

A.   What do you mean, on behalf of?

Q.   He is saying that it may call for attorney-client privilege, so I am trying to establish whether you were calling Mr. Capaccio as you were doing something for Almawave.

A.   I -- I don't understand the legal -- you know.

Q.   Why were you calling Mr. Capaccio regarding Almawave?

MR. WALLERSTEIN:  Objection to the extent it calls for attorney-client privilege.

MS. HEALY:  Q.  You can answer.

MR. LOSAVIO:  I am going to object on the same grounds.  You don't have to disclose the content of communications between you and an attorney that you consult with.

MS. HEALY:  Q.  Did you consult with Mr. Capaccio on behalf of Almawave?

MR. LOSAVIO:  Same objection.

MS. HEALY:  Are you instructing?  I am not clear whether you are instructing her not to answer or not.  Because you are basically impeding her to answer any questions.  So I am asking her:

Q.   Did you reach out to -- is Mr. Capaccio a lawyer?

A.    He is.

Q.    Okay.  Did you reach out to Mr. Capaccio to retain him for Almawave?

A.    I was not in the position to do that.

Q.    So why did you reach out to Mr. Capaccio?

MR. WALLERSTEIN:  Objection to the extent it calls for privilege.

MS. HEALY:  Q.  You can answer.

A.    To facilitate a meeting between Mr. Capaccio and his firm and Valeria Sandei.

Q.    What was the reason -- who asked you to do that?

MR. LOSAVIO:  Assumes facts; no foundation.

MS. HEALY:  Q.  Who asked you to call Mr. Capaccio --

MR. LOSAVIO:  Assumes --

MS. HEALY:  Q.  -- to introduce him to Ms. Sandei?

MR. LOSAVIO:  Assumes facts.  No foundation.

MS. HEALY:  Q.  You can answer.

A.    I don't remember anyone asking me for that.

Q.    Why were you reaching out to him?

MR. LOSAVIO:  Asked and answered.

MR. WALLERSTEIN:  Objection to the extent it calls for privilege.

MS. HEALY:  Q.  You can answer.

A.  Valeria Sandei was looking for the legal services --

Q.  Mm-hmm.

A.  -- in California.

Q.  Mm-hmm.

A.  And --

Q.  For herself personally or for her company?

A.  For her company.

Q.  Okay.

A.  And I offered, I believe, to introduce her to the law firm of -- of Mr. Capaccio, because I think it's healthy to meet a different service provider when you enter a market.

Q.  Okay.  So what was there?  What was she looking for?  What kind of assistance was she looking for?

MR. WALLERSTEIN:  Objection.  That is privileged.  I heard the witness testify that Ms. Sandei was looking for legal services, and I object to the disclosure of any details on the basis of privilege.

MS. HEALY:  Q.  Were you working for Ms. Sandei at the time that she asked you for this introduction?

A.  Just for the record, Ms. Sandei never asked me

**F-443**

startup?")

THE WITNESS:  Not that I remember.

MS. HEALY:  Q.  Before you received the first draft of the agreement and the job offer made by Almawave, did you have a discussion and an understanding of what you were going to be doing for them?

A.  Yes.

Q.  Who gave you that understanding?

A.  It was -- probably it was for -- based on my conversation with Valeria.

Q.  Ms. Sandei?

A.  Ms. Sandei.  Sorry.  Yes.

Q.  Anyone else?

A.  And I had a conversation with Mario Pepe.

Q.  Okay.  Anyone else?

A.  Not that I recall.

Q.  Did you have any discussions with Orrick, Herrington & Sutcliffe about your going to work for Almawave?

MR. WALLERSTEIN:  Objection; vague as to time.

More importantly, I object to the extent it calls for privileged conversations.  To the extent that Ms. Gatti was serving as an agent for my client and having conversation with my client's attorneys, I object on grounds of privilege.

MS. HEALY:  For which client?

MR. LOSAVIO:  And --

MS. HEALY:  For which client?

MR. WALLERSTEIN:  To the extent that Ms. Gatti was serving as an agent for any of my clients, I object on the grounds of privilege to her disclosing communications, directly or indirectly, between any of my clients and Orrick.

MR. LOSAVIO:  And to the extent --

MS. HEALY:  Q.  Ms. Gatti --

MR. LOSAVIO:  Wait a second.

MS. HEALY:  Go ahead.

MR. LOSAVIO:  If she was seeking legal advice from an attorney with respect to employment or anything else, that invades the attorney-client privilege, as it asks for the content.

MS. HEALY:  I understand.

MR. LOSAVIO:  But there is a form that doesn't ask for the content that's an acceptable question.

MS. HEALY:  That's a good point, Tom.  Thank you.  You are really helpful.

Q.   So let's look into that, Ms. Gatti.  Did you ask for legal advice about your employment agreement?

MR. WALLERSTEIN:  Objection.

MR. LOSAVIO:  Objection; form.  It calls for

invasion of the attorney-client privilege.    12:28:28

MS. HEALY:  Q.  I am not asking about the    12:28:33
nature of the advice.  I am asking whether you went to    12:28:35
any lawyer seeking advice about a job offer that was    12:28:38
given to you by Almawave USA.    12:28:42

MR. WALLERSTEIN:  Objection to the extent it    12:28:45
calls for attorney-client privileged communications    12:28:47
between any of my clients, their agent, and their    12:28:48
attorney.    12:28:50

MS. HEALY:  What does that have to do with    12:28:52
whether she got -- if she is going to ask for legal    12:28:53
advice about the job offer she is getting?  How is that    12:28:55
relating to your client?    12:28:57

MR. LOSAVIO:  My objection is that, again, the    12:28:58
question as put asks for the invasion of the    12:29:01
attorney-client privilege because of the element that    12:29:05
describes the content of the consultation.    12:29:07

MS. HEALY:  Q.  Ms. Gatti --    12:29:10

MR. LOSAVIO:  You can ask in the absence of    12:29:11
describing the content.    12:29:13

MS. HEALY:  I did not ask for the content.  I    12:29:14
said, "Did you go to any lawyer seeking legal advice    12:29:17
about the job offer you were being given?"  I didn't ask    12:29:22
for what was said.    12:29:25

MR. LOSAVIO:  "About the job offer" is the    12:29:26

content of the potential conversation --    12:29:28

MS. HEALY:  Okay.  Fine.    12:29:30

MR. LOSAVIO:  -- between attorney and client.    12:29:30

MS. HEALY:  It doesn't really matter.    12:29:32

MR. WALLERSTEIN:  It's 12:30, and I would like to take our lunch break.    12:29:34 12:29:35

MS. HEALY:  I am sorry.  Since you objected I need to keep going, and I'm asking that in light of the delay --    12:29:37 12:29:39 12:29:43

Why are you shaking?  Are you okay?    12:29:44

MR. WALLERSTEIN:  I am waiting for you to finish.    12:29:49 12:29:49

MS. HEALY:  Do you need some water?    12:29:49

MR. WALLERSTEIN:  No.    12:29:49

MS. HEALY:  You look a little nervous.    12:29:49

MR. WALLERSTEIN:  I'm not nervous.    12:29:49

MS. HEALY:  If you need a break, you can, like -- I don't know if you are having an attack or something.    12:29:51 12:29:52 12:29:54

MR. LOSAVIO:  All right.  We previously agreed to break -- we previously advised you that we were breaking at 12:30.    12:29:55 12:29:56 12:29:58

MS. HEALY:  I have a question pending, and Mr. Wallerstein is about to explode, so I don't want to -- are you okay?    12:29:59 12:30:01 12:30:03

MR. WALLERSTEIN: I am waiting for you to finish.

MS. HEALY: Okay. I just want to make sure.

MR. WALLERSTEIN: Are you finished? Because I have something to say.

MS. HEALY: I am not finished. I have a question pending, so please let me finish.

MR. WALLERSTEIN: You interrupted me.

MS. HEALY: No, you interrupted me.

MR. WALLERSTEIN: No. So it's about 12:30. We agreed to have a lunch break. I want you to finish your line of questioning. We need our lunch break.

MR. LOSAVIO: Well, I am not agreeing to a line of questioning being finished. We set a time of 12:30. It's 12:30. There is no pending question, because the pending question --

MS. HEALY: So I -- okay.

MR. LOSAVIO: -- was answered.

MS. HEALY: So this is what I want to do. I would like to call the Court, because we have a limited amount of time.

MR. LOSAVIO: Call the Court during the lunch hour. We will be having lunch and then we will get back, and you can tell us what happened.

MS. HEALY: You know, we waited here. We had

the court reporter waiting for quite some time.  You
didn't show up until 9:10, I believe.  We have the
timing on the record.

MR. WALLERSTEIN:  We were here at 8:00.

MS. HEALY:  You were not here at 8:00.  Ms.
Culp was here at 8:00, and the witness was not here, and
nobody else was here except the court reporter and us.
So we have to wait and I need to proceed with this
deposition as soon as possible.

So we can't have a one-hour lunch break.  I am
asking that the break be much shorter.  And if you are
not agreeable -- we are going to get back on the record
in half an hour.

MR. WALLERSTEIN:  I am not agreeable to a
shorter than one-hour lunch break.

MR. LOSAVIO:  I am not agreeable to a shorter
than one-hour lunch break.

MS. HEALY:  Okay.  So we are done when you
want.

MR. LOSAVIO:  Okay.  See you in an hour.

MS. HEALY:  Thank you.

(Lunch recess taken from 12:31 to 1:45.)

(Ms. Sandei and Ms. Schneider-Stocking no
longer present.)

MS. HEALY:  We are back on the record.  The

Inc. or Venable, that requires you to do anything for them?

MS. TITOVA: Objection. Vague and ambiguous, and calls for a legal conclusion as to the definition of the word "agreement."

THE WITNESS: Not that I'm aware of.

BY MS. HEALY:

Q. When you were at the deposition in January 2016, were you on good terms with the -- the AlmavivA witnesses?

MS. BRAYER: Vague and ambiguous as to "good terms"; relevancy.

MS. TITOVA: Objection as to "Almaviva witnesses."

BY MS. HEALY:

Q. Do you know who Ms. Perri is?

A. So I know her name. And I have -- I never remember her face.

Q. Do you remember you saw her here in January 2016 during the round of depositions?

A. What --

MS. TITOVA: Objection. Introduces facts not in evidence.

THE WITNESS: So there were only two ladies: Valeria Sandei and another lady. Is

ANNA GATTI - 4/4/2016

Page 444

Ms. Perri the other lady?

BY MS. HEALY:

Q.   I believe so.   There were a few more -- at least another lady.   So I saw Ms. Perri patting you on the back.   Do you recall that?

A.   I don't.

MS. TITOVA:   Objection.   Calls for speculation.

BY MS. HEALY:

Q.   Do you know who Ms. Perri is?

A.   As I said, her name sounds familiar, but I wouldn't be able to recognize Ms. Perri.

Q.   Do you have -- did you have any meetings with Venable?

MS. TITOVA:   Objection.

BY MS. HEALY:

Q.   Since the litigation began?

MS. TITOVA:   Objection.   Calls for common-interest and joint-defense-privilege communications with counsel.

BY MS. HEALY:

Q.   You can answer.

MS. BRAYER:   Did you have any meetings with Venable where your attorney was not present?

THE WITNESS:   No.

ANNA GATTI - 4/4/2016

Page 445

BY MS. HEALY:

Q.   No, that's not the question I asked.

MS. BRAYER:   That's the question she's going to answer.

MS. HEALY:   No.   You have -- if she refuses to answer, that's fine, but she's not going to answer your question.   It's my deposition.

THE WITNESS:   So it's your --

BY MS. HEALY:

Q.   Did you participate in any meetings with Venable since this litigation began?

MS. BRAYER:   I will instruct her not to answer insofar as it invades the attorney-client privilege.

If you can answer the question where your attorney's not involved, go right ahead.

BY MS. HEALY:

Q.   I am not asking about the content of the meetings.   I am asking about whether you participated in any meetings with Venable since this litigation began.

MS. TITOVA:   Objection to the extent the word "meetings" is vague and ambiguous.

MS. BRAYER:   Same instruction.   You can answer it as long as you're not divulging

**F-452**

# EXHIBIT F

## CERTIFICATIONS FOR EXCERPTS OF DEPOSITION TRANSCRIPTS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

LOOP AI LABS INC.,                )
                                  )
                Plaintiff,        )
                                  )
          vs.                     ) No. 3:15-cv-00798-HAG
                                  )
ANNA GATTI, an individual,        )
ALMAVIVA S.p.A., an Italian       )
corporation, ALMAWAVE S.r.l.,     )
an Italian corporation,           )
ALMAWAVE USA, Inc., a             )
California corporation,           )
IQSYSTEM LLC, a California        )
limited liability company,        )
IQSYSTEM Inc., a Delaware         )
corporation,                      )
                                  )
                Defendants.       )
_____  )

DEPOSITION OF

ANNA GATTI

_____

JANUARY 19, 2016

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887  (JOB SF-070102)

**F-453**

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  January 26, 2016

_____

SARAH LUCIA BRANN, CSR No. 3887

244

**F-454**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

LOOP AI LABS INC.,                    )
                                      )
                Plaintiff,            )
                                      )
            vs.                       ) No. 3:15-cv-00798-HAG
                                      )
ANNA GATTI, an individual,            )
ALMAVIVA S.p.A., an Italian           )
corporation, ALMAWAVE S.r.l.,         )
an Italian corporation,               )
ALMAWAVE USA, Inc., a                 )
California corporation,               )
IQSYSTEM LLC, a California            )
limited liability company,            )
IQSYSTEM Inc., a Delaware             )
corporation,                          )
                                      )
                Defendants.           )
_____)


DEPOSITION OF

MARIANTONIETTA PERRI

_____

JANUARY 20, 2016


REPORTED BY:  SARAH LUCIA BRANN, CSR 3887  (JOB SF-070110)

**F-455**

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  January 27, 2016

_Sarah Lucia Brann_
_____

SARAH LUCIA BRANN, CSR No. 3887

165

**F-456**

ANGELA NICOLELLA – 1/21/2016

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

LOOP AI LABS INC.,                    )
                                      )
                Plaintiff,            )
                                      )
           vs.                        ) No. 3:15-cv-00798-HAG
                                      )
ANNA GATTI, an individual,            )
ALMAVIVA S.p.A., an Italian           )
corporation, ALMAWAVE S.r.l.,         )
an Italian corporation,               )
ALMAWAVE USA, Inc., a                 )
California corporation,               )
IQSYSTEM LLC, a California            )
limited liability company,            )
IQSYSTEM Inc., a Delaware             )
corporation,                          )
                                      )
                Defendants.           )
_____)

DEPOSITION OF

ANGELA NICOLELLA

_____

JANUARY 21, 2016

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887  (Job SF-070112)

**F-457**

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:   January 28, 2016

_____

SARAH LUCIA BRANN, CSR No. 3887

**F-458**

VALERIA SANDEI – 1/22/2016

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

LOOP AI LABS INC.,                )
                                  )
              Plaintiff,          )
                                  )
         vs.                      ) No. 3:15-cv-00798-HAG
                                  )
ANNA GATTI, an individual,        )
ALMAVIVA S.p.A., an Italian       )
corporation, ALMAWAVE S.r.l.,     )
an Italian corporation,           )
ALMAWAVE USA, Inc., a             )
California corporation,           )
IQSYSTEM LLC, a California        )
limited liability company,        )
IQSYSTEM Inc., a Delaware         )
corporation,                      )
                                  )
              Defendants.         )
_____ )

DEPOSITION OF

VALERIA SANDEI

_____

JANUARY 22, 2016

VOLUME I

(Pages 1 – 198)

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887  (JOB SF-070114)

**F-459**

CERTIFICATE OF REPORTER

I, SARAH LUCIA BRANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  January 29, 2016

_Sarah Lucia Brann_
_____

SARAH LUCIA BRANN, CSR No. 3887

**F-460**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOOP AI LABS, INC., a Delaware ) corporation, )
)
       Plaintiffs, )
)
       vs. ) Case No.
) 3:15-cv-00798-HSG
ANNA GATTI, an individual, ) (DMR)
ALMAVIVA S.p.A. an Italian )
corporation, ALMAWAVE S.r.l., )
an Italian corporation, )
ALMAWAVE USA, Inc., a )
California corporation, )
IQSYSTEM LLC, a California )
limited liability company, )
IQSYSTEM, Inc., a Delaware )
corporation, )
)
       Defendants. )
_____ )

ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF BART PEINTNER

San Francisco, California

Tuesday, March 29, 2016

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No.: 10023086

**F-461**

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated:  11th day of April, 2016

_____
Hanna Kim
CLR, CSR No. 13083

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOOP AI LABS, INC., a Delaware  )
corporation,                    )
                                )
          Plaintiffs,           )
                                )
          vs.                   ) Case No.
                                ) 3:15-cv-00798-HSG
ANNA GATTI, an individual,      ) (DMR)
ALMAVIVA S.p.A. an Italian      )
corporation, ALMAWAVE S.r.l.,   )
an Italian corporation,         )
ALMAWAVE USA, Inc., a           )
California corporation,         )
IQSYSTEM LLC, a California      )
limited liability company,      )
IQSYSTEM, Inc., a Delaware      )
corporation,                    )
                                )
          Defendants.           )
_____ )

ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF PATRICK EHLEN, PH.D.

San Francisco, California

Wednesday, April 6, 2016

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No.: 10023309

**Attorneys' Eyes Only**

**Patrick Ehlen, Ph.D.**                                    **Loop AI Labs, Inc. vs. Gatti, et al.**

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated:  19th day of April, 2016

_____
Hanna Kim
CLR, CSR No. 13083

**Page 388**

**F-464**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOOP AI LABS, INC., a Delaware  )
corporation,                    )
                                )
          Plaintiffs,           )
                                )
          vs.                   ) Case No.
                                ) 3:15-cv-00798-HSG
ANNA GATTI, an individual,      ) (DMR)
ALMAVIVA S.p.A. an Italian      )
corporation, ALMAWAVE S.r.l.,   )
an Italian corporation,         )
ALMAWAVE USA, Inc., a           )
California corporation,         )
IQSYSTEM LLC, a California      )
limited liability company,      )
IQSYSTEM, Inc., a Delaware      )
corporation,                    )
                                )
          Defendants.           )
_____ )

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF

GIANMAURO CALAFIORE, VOLUME II

San Francisco, California

Thursday, April 7, 2016

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No.: 10023310

**Page 429**

**F-465**

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated:  21st day of April, 2016

_____
Hanna Kim
CLR, CSR No. 13083

**Gianmauro Calafiore**                    **Loop AI Labs, Inc. vs. Gatti, et al.**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOOP AI LABS, INC., a Delaware )
corporation, )
                                )
        Plaintiffs,             )
                                )
        vs.                     ) Case No.
                                ) 3:15-cv-00798-HSG
ANNA GATTI, an individual,      ) (DMR)
ALMAVIVA S.p.A. an Italian      )
corporation, ALMAWAVE S.r.l.,   )
an Italian corporation,         )
ALMAWAVE USA, Inc., a           )
California corporation,         )
IQSYSTEM LLC, a California      )
limited liability company,      )
IQSYSTEM, Inc., a Delaware      )
corporation,                    )
                                )
        Defendants.             )
_____ )

VIDEOTAPED DEPOSITION OF

GIANMAURO CALAFIORE, 30(B)(6) OF LOOP AI LABS, INC.

San Francisco, California

Friday, April 8, 2016

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No.: 10023311

Gianmauro Calafiore                           Loop AI Labs, Inc. vs. Gatti, et al.

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated:  25th day of April, 2016

_____
Hanna Kim
CLR, CSR No. 13083

www.aptusCR.com

F-468